IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MARICEL MARCIAL, | ) |
| Plaintiff, | ) |
| v. | ) Case No: 16-cv-6109 |
| | ) Magistrate Judge Susan E. Cox |
| RUSH UNIVERSITY MEDICAL CENTER; DR. MICHAEL KREMER; in his individual capacity, RAY NARBONE; in his individual capacity; and JILL WIMBERLEY, in her individual capacity, | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

For the reasons discussed below, the Motion to Dismiss filed by Defendant Rush University Medical Center [37] is granted in part and denied in part; the Motion to Dismiss filed by Defendants Raymond Narbone, Michael Kremer, and Jill Wimberly [40] is also granted in part and denied in part. Counts I, II, III, IV, V, VII, IX, and X of Plaintiff's Amended Complaint are dismissed without prejudice.

**BACKGROUND**

Plaintiff Maricel Marcial ("Plaintiff") is a 44-year-old Asian woman of Filipina descent. (Dkt. 5 at ¶ 9.) In 2012, Plaintiff, who had previously worked for fifteen years as a registered nurse, enrolled in the Certified Registered Nurse Anesthetist ("CRNA") program at the Rush University Medical Center ("Rush") College of Nursing. (*Id*. at ¶¶ 10-11.) The CRNA program consists of a didactic program and a fifteen-month clinical course of study. (*Id*. at ¶¶ 12-13.) Plaintiff completed the didactic program with a 3.6 grade point average (on a 4.0 scale); Plaintiff did not experience any issues during her first six weeks of the clinical program. (*Id.* at ¶¶ 12,

1

15.) In June 2013, Plaintiff began being supervised by Defendant Jill Wimberly ("Wimberly"). (*Id.* at ¶ 16.) On the first day that Plaintiff began working under Wimberly, Plaintiff alleges that Wimberly began engaging in "unprofessional behavior" toward Plaintiff, including providing false statements and accusations in Wimberly's evaluations of Plaintiff, and falsely telling another CRNA that Plaintiff had "tried to overdose a patient" on Fentanyl. (*Id*. at ¶¶ 17, 20.) Plaintiff claims that the dosing error was actually Wimberly's fault, and that Wimberly was attempting to blame her own mistakes on Plaintiff. (*Id.* at ¶ 20.) Plaintiff immediately reported Wimberly's conduct to Defendant Dr. Michael Kremer ("Kremer") (the CRNA Program Director) and Defendant Ray Narbone ("Narbone") (the Director of Operating Room Services). (*Id.* at ¶¶ 18-19.) Both Narbone and Kremer failed to take corrective or investigative action regarding Wimberly's false evaluations of Plaintiff. (*Id.* at ¶¶ 18-19.) Later, Plaintiff met with Kremer and Dr. Judith Wiley (the Associate Director of Rush Anesthesia Program), and "reported that she was being bullied and harassed" by her supervising CRNAs. (*Id.* at ¶ 22.) Kremer did not investigate Plaintiff's claims, told her that it would be a "Herculean task" to succeed in the CRNA program, and expressed that he was more likely to believe the faculty of the CRNA program over Plaintiff. (*Id.* at ¶¶ 23-24.)

Plaintiff alleges that these misrepresentations continued to be spread among other supervisory CRNAs, which created increased "harassment and bias." (*Id.* at ¶ 25.) In August 2013, Plaintiff requested a two week leave of absence due to the emotional distress that the alleged harassment and discrimination were causing her. (*Id.* at ¶ 26.) Kremer informed Plaintiff that she could not return until January 2014 if she took her proposed leave of absence, but promised her a "fresh start" when she came back and that "he would do his best to make sure that [Plaintiff] would not be placed with CRNA Wimberly upon her return." (*Id.* at ¶¶ 27-29.)

In October 2013, Plaintiff contacted Narbone to discuss her return to the CRNA program at Rush; Narbone told Plaintiff that she was "emotionally unfit" to return to the program, and that CRNA would "look at [her] differently" and struggle to evaluate Plaintiff objectively. (*Id.* at ¶¶ 30-31.) Narbone further stated "I don't suppose you are the youngest in your class, so why waste your time on something that will make you miserable?" (*Id.* at ¶ 32.)

When Plaintiff returned to the CRNA program in January 2014, Wimberly began supervising Plaintiff within two weeks of her return, despite the promises of a "fresh start." (*Id.* at ¶ 33.) Kremer required daily evaluations of Plaintiff on her return. (*Id.* at ¶ 34.) Plaintiff's evaluations contained "false negative feedback" from Wimberly and other CRNAs that went uninvestigated when Plaintiff reported them to Kremer. (*Id.* at ¶¶ 35-37.) In February 2014, Plaintiff's requests to be transferred to a different clinical site were denied. (*Id.* at ¶ 41.)

On April 8, 2014, Plaintiff submitted a complaint to Shanon Shumpert (the Director of the Compliance Office) alleging "abuse, mistreatment, and discrimination." (*Id.* at ¶ 42.) Following a "brief break to address stress-related medical issues," Plaintiff was cleared to return to the clinical area, but Dr. Kremer refused to allow her to return because of her pending claim of discrimination. (*Id.* at ¶ 44.) Rush offered Plaintiff a five-week training period begin in early May 2014. (*Id.* at ¶ 46.) On May 29, 2014, Plaintiff was dismissed for the day after a CRNA inaccurately questioned the medication dosage Plaintiff gave to a patient, and Kremer ordered Plaintiff not to return to her clinical training. (*Id.* at ¶ 49.) The following day Plaintiff provided a detailed rebuttal of the CRNA's "false evaluation" and "false statements," but Kremer informed Plaintiff that she would receive a "No Pass" grade, which effectively meant that Plaintiff could not continue with the clinical portion of the CRNA program. (*Id.* at ¶¶ 50-51.) Plaintiff was formally dismissed from the CRNA program in February 2015. (*Id.* at ¶ 52.)

Plaintiff alleges that "other minority students in the program at Rush have been discriminated against in the same manner as Plaintiff, and that other similarly-situated employees who were not Asian, Filipina, or over 40 years old were treated more favorably and disciplined less severely than Plaintiff. (*Id.* at ¶¶ 54, 59, 67, 75, 110.) Plaintiff filed charges of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), and the EEOC issued a Notice of Right to Sue on March 16, 2016. (*Id.* at ¶ 56.)

The Plaintiff filed the instant suit on June 10, 2016; the operative complaint in the case brings the following claims: 1) race discrimination under Title VII against Rush (Count I); 2) national origin discrimination under Title VII against Rush (Count II); 3) age discrimination under the ADEA against Rush (Count III); 4) retaliation under Title VII against Rush (Count IV); 5) retaliation under the ADEA against Rush (Count V); 6) intentional race and national origin discrimination under Title VI against Rush (Count VI); 7) tortious interference with contract against Kremer, Narbone, and Wimberly (collectively, "the Individual Defendants") (Count VII); 8) tortious interference with prospective economic advantage against the Individual Defendants (Count VIII); 9) retaliatory discharge under Illinois law against Rush (Count IX); and 10) breach of contract against Rush (Count X). Both Rush and the Individual Defendants moved to dismiss Plaintiff's claims against them. Those motions are fully briefed and ripe for disposition.

## DISCUSSION

### I. LEGAL STANDARD

Defendants have moved to dismiss for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). In ruling on a motion pursuant to Rule 12(b)(6) the Court must treat the allegations in the complaint as true and give the Plaintiff

4

the benefit of any reasonable and favorable inferences from those allegations. *Anicich v. Home Depot U.S.A., Inc.*, 852 F.3d 643, 646 (7th Cir. 2017.)

## II. RUSH'S MOTION TO DISMISS

### A. Employment Discrimination and Federal Retaliation Claims (Counts I-V)

Plaintiff has failed to allege sufficient facts to demonstrate that she was an "employee" of Rush as defined by Title VII or the ADEA, and the Court dismisses those claims without prejudice. In order to bring a claim under the ADEA or Title VII, a plaintiff must establish the existence of an employer-employee relationship. *Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 701 (7th Cir. 2015). Both statutes use the same circular definition for employee: "[t]he term 'employee' means an individual employed by an employer . . . ." 29 U.S.C. § 630(f); 42 U.S.C. § 2000e(f).[1] Because this definition is not very helpful, courts have constructed various methods and tests to determine whether a plaintiff qualifies as an employee under the statutes. However, as far as the Court can tell, the issue of whether a graduate student is an employee is an issue of first impression in the Seventh Circuit. *See Ruiz v. Trustees of Purdue University*, 2008 WL 833125, at *7 (N.D. Ind. Feb. 20, 2008) ("[W]hether a graduate student who works for a university in exchange for a stipend and a tuition and fee remission is an employee, presents a question of first impression within the Seventh Circuit"). In determining whether an employer-employee relationship exists, the Seventh Circuit looks to the "economic realities" of the relationship and how much control the would-be employer exerted over the plaintiff. *Love*, 779 F.3d at 702. There are five factors that the Court must examine in making this decision: 1) the extent of the employer's control and supervision over the employee; 2) the kind of occupation and nature of skill required, including whether skills were acquired on the job; 3) the employer's

---

[1] Because the definition is the same under both statutes, the Court will treat claims brought pursuant to the ADEA and Title VII together for the purposes of this opinion.

responsibility for the costs of the operation; 4) the method and form of payment and benefits; and 5) the length of the job commitment. *Id.* (citing *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 378-79 (7th Cir. 1991)).

Although other courts in this district have considered – and rejected – claims brought by graduate students alleging employment discrimination, the Court believes that those opinions gave short shrift to the issue and failed to analyze the factors articulated by the Seventh Circuit. *See Olojo v. Kennedy-King College*, 2006 WL 1648441, at *2 (N.D. Ill. June 7, 2006); *Piotrowski v. Barat College*, 1994 WL 594726, at *1 (N.D. Ill. 1994); *Lewis v. Russe*, 713 F. Supp. 1227, 1230 (N.D. Ill. 1989). Other courts have considered the issue in the context of graduate education and have reached different conclusions.[2]

In this case, Plaintiff has not pled sufficient facts to establish that she is an employee of Rush. Plaintiff alleged that she enrolled in Rush's CRNA program, which had a didactic program and a fifteen-month clinical program. (Dkt. 5 at ¶¶ 11-13.) Being charitable, Plaintiff has only pled sufficient facts to show that she satisfies the first factor of the *Knight* test cited above (*i.e.*, that Rush controlled and supervised Plaintiff's work). However, there are no facts alleged regarding the remaining factors. This is enforced by Plaintiff's brief in response to Rush's motion, which contains literally no citations to any allegations in the operative complaint

---

[2] *Compare Cuddleback v. Florida Bd. of Ed.*, 381 F.3d 1230, 1235 (11th Cir. 2004) ("[T]he economic realities of this particular situation lead us to conclude that the district court correctly found that [graduate student plaintiff] was an employee for Title VII purposes"); *Consolomagno v. Hospital of St. Raphael School of Nurse Anesthesia*, 72 F. Supp.3d 367, 379 (D. Conn. 2014) ("While the Court recognizes that many students may not be able [to prove they are employees under the relevant test], those who do are entitled to Title VII protections"); *Stewart v. Morgan State University*, 2013 WL 425081, at *3 (D. Md. Feb 1, 2013) ("A graduate student completing coursework can also be an employee for purposes of Title VII"); *Ruiz*, 2008 WL 833125, at *11 ("Ultimately, the Court finds that under the circumstances presented in this case, [Ph.D. student] was a Purdue employee for Title VII purposes), *with, O'Connor v. Davis*, 126 F.3d 112, 115-116 (2d. Cir. 1997) (holding that social work student was not an employee because she did not receive "direct or indirect remuneration"); *Lagueux v. Bridgeport Hosp. School of Nursing*, 2013 WL 1310557, at *3 (D. Conn. Mar. 27, 2013) (granting motion to dismiss because "the plaintiff's complaint clearly identifies him as a nursing student and not an employee of either of the two defendant hospitals"); *Al-Maqablh v. University of Cincinnati College of Medicine*, 2013 WL 5944073, at *10 (S.D. Ohio Nov. 5, 2013); *Samour v. Medical University of South Carolina of Health Professionals*, 2010 WL 2773052, at *2 (D.S.C. June 22, 2010).

in the portion of the brief discussing the remaining factors. (*See Dkt.* 44-1 at 8-10.) Although the Court must draw all reasonable inferences in favor of the Plaintiff, those inferences must be based on well-pled allegations; they cannot be conjured from thin air or taken from Plaintiff's brief. As such, the Court grants Rush's motion on Counts I-V. However, those claims are dismissed without prejudice; the fact that Plaintiff has not yet alleged sufficient facts to establish that she is an employee does not mean that she could never do so.

      **B.**      **Title VI Claim (Count VI)**

Plaintiff has adequately pled a claim for intentional discrimination under Title VI. Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 42 U.S.C. § 2000d. "To state a claim under Title VI, plaintiffs must allege facts satisfying two elements: (1) that they have been intentionally discriminated against on the ground of race; and (2) that defendants are recipients of federal financial assistance." *Khan v. Midwestern University*, 147 F. Supp. 3d 718, 720 (N.D. Ill. 2015) (citing *Irving v. Pui Tak Ctr.*, 2013 WL 2251757, at *2 (N.D. Ill. May 22, 2013)).

Plaintiff alleges that she "was evaluated disparately, was disciplined more severely, and was treated less favorably than other similarly-situated employees of a different race and/or national origin." (Dkt. 5 at ¶ 110.) In particular, Plaintiff alleges that this intentional discrimination included: 1) being harassed through false negative evaluations from supervising CRNAs, 2) requiring daily evaluations of her work, unlike other CRNA students; 3) having her complaints of harassment ignored, and 4) being dismissed from the CRNA program. (*Id.*) If true, these allegations would support a cause of action pursuant to Title VI.

7

Rush argues that Plaintiff's Title VI claim should be dismissed because it is conclusory, relying primarily on *Khan*. However, this case is distinguishable from *Khan*; in that case, the court held that the plaintiff had failed to plead a cause of action under Title VI because she "failed to allege that students of another race or national origin were treated differently than her, or than any individual associated with Defendant made any comments relating to her race or national origin." 147 F. Supp. 3d at 721. Here, the Plaintiff made precisely the allegations that the court in *Khan* found were lacking. Plaintiff has alleged that she was treated differently than other students because of her race or national origin, and has provided specific examples of the ways in which she was treated differently, as described above. While Rush may question whether Plaintiff is able to prove those claims, that is not the issue currently before the Court. The Court believes that Plaintiff has alleged sufficient facts to survive a motion to dismiss, and denies Rush's motion to dismiss Count VI of the Amended Complaint.

### C. State Law Retaliatory Discharge Claim (Count IX)

Plaintiff's claim for retaliatory discharge is also dismissed without prejudice. "To establish a claim for retaliatory discharge, a plaintiff must prove she was an employee at will" and that the plaintiff was: (1) discharged; (2) in retaliation for the plaintiff's activities; and (3) that the discharge violates a clear mandate of public policy. *Caufield v. Packer Engineering, Inc.*, No. 1-14-0463, 2015 WL 1455140, at 16 (Ill. App. Mar. 30, 2015); *see also, Thakkar v. Station Operators, Inc.*, 697 F. Supp. 2d 908, 928-29 (N.D. Ill. 2010) ("Under this cause of action, a plaintiff must show that (1) the employer discharged *the employee*, (2) in retaliation for *the employee's* activities, and (3) that the discharge violates a clear mandate of public policy") (emphasis added). As noted above, Plaintiff has only alleged that she was a student, not an employee. Although being a graduate student and an employee are not necessarily mutually

8

exclusive, the Plaintiff has not alleged sufficient facts for the Court to infer that she was an at will employee of Rush. As such, this claim is insufficiently pled in its current state and is dismissed without prejudice.

### D. Breach of Contract Claim (Count X)

Plaintiff's claim for breach of contract is also denied without prejudice, because Plaintiff has failed to cite any contractual obligation or provision that was breached by Rush. Under Illinois law, the elements of a breach of contract claim are: (1) the existence of a valid and enforceable contract, (2) substantial performance by the plaintiff, (3) a breach by the defendant, and (4) resultant damages. *Royal Sleep Prods., Inc. v. Restonic Corp.*, 2010 WL 1172555, at *7 (N.D. Ill. Mar. 22, 2010) (citing *Reger Development, LLC v. National City Bank*, 592 F.3d 759, 764 (7th Cir. 2010)). Courts in this district have come to differing conclusions on whether plaintiffs must identify a particular contractual provision that was breached in order to properly plead a cause of action for breach of contract. *See International Capital Group v. Starrs*, 2010 WL 3307345, at *1 (N.D. Ill. Aug. 19, 2010) (collecting cases). However, even when reference to a specific contractual provision is held unnecessary to plead a breach of contract claim, courts still require that "a plaintiff must still plead enough facts to establish a breach, for example, the existence of some unsatisfied obligation." *Id.*

Plaintiff has failed to plead enough facts to establish a breach of contract. Her breach of contract claim states that Plaintiff had an enforceable contract with Rush that was set forth in a Student Handbook. (Dkt. 5 at ¶ 153.) However, her allegations regarding the breach are too conclusory and vague for this Court to hold that she has adequately pled her claim. Plaintiff claims that Rush had "a duty to provide for Plaintiff's continued coursework" and that Rush breached the contract by "foreclosing Plaintiff's ability to continue and successfully complete the

Rush CRNA program." (*Id.* at ¶¶ 156-57.)  The Court is left in the dark as to Rush's obligations under the Student Handbook.  Without more, the Plaintiff's cause of action for breach of contract cannot survive the instant motion to dismiss.  Plaintiff, perhaps realizing that her claims were pled too vaguely, sought "leave to amend to add the Student Handbook." (Dkt. 44-1 at 14.)  The Court rejects this request, but denies Plaintiff's breach of contract claim without prejudice.[3]  The Court cannot say that Plaintiff is incapable of bringing a cause of action for breach of contract, only that she has not adequately pled such a claim at the Amended Complaint is currently drafted.  As such, Rush's motion is granted as to Count X.

### III.  THE INDIVIDUAL DEFENDANTS' MOTION TO DISMISS

#### A.  Tortious Interference with Contract (Count VII)

Plaintiff's claim for tortious interference with a contract is also dismissed without prejudice because Plaintiff has failed to allege a breach of the relevant contract.  In order to state a claim for tortious interference with a contract, Plaintiff must allege: (1) the existence of a contract; (2) the Individual Defendants' awareness of the contract; (3) the intentional inducement of a contract breach; (4) an actual breach of the contract; and (5) damages.  *Cody v. Harris*, 409 F.3d 853, 859 (7th Cir. 2005) (citing *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 676 (Ill. 1989)).  Where a Plaintiff fails to plead facts fact that show a breach of contract, a claim for tortious interference with a contract must be dismissed.  *Id.*; *see also*, *Salaymeh v. Interqual, Inc.*, 508 N.E.2d 1155, 1159 (Ill. App. 1987) ("To maintain an action for interference with a contractual relationship, a plaintiff must plead a breach of the contract in question").  As discussed above, Plaintiff's amended complaint fails to adequately plead a breach of the Student Handbook.  Because Plaintiff has not pled sufficient facts to support an inference

---

[3] Although not required, the Plaintiff would be well served to attach a copy of the Student Handbook to her complaint if she seeks to amend her cause of action for breach of contract.

that the Student Handbook was breached by Rush, her claims against the Individual Defendants alleging tortious interference with that contract also fail. The Court grants the Individual Defendants' motion on this count and denies these claims without prejudice.

### B. Tortious Interference with Prospective Economic Advantage (Count VIII)

The Court believes that Plaintiff has adequately pled a cause of action for tortious interference with a prospective economic advantage. The elements for a claim for tortious interference with a prospective economic advantage in Illinois are: (1) a reasonable expectancy of entering into a valid business relationship; (2) the defendant's knowledge of the expectancy; (3) an intentional and unjustified interference by the defendant that induced or cause a breach or termination of the expectancy; and (4) damage to the plaintiff resulting from the defendant's interference. *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 508 (7th Cir. 2007). "However, the tortious behavior must be directed toward a third party with whom the expected employment or business relationship was to occur." *Ricco v. Southwest Surgery Center, LLC*, 73 F. Supp. 3d 961, 973 (N.D. Ill. 2014). As such, a corporate entity cannot be held liable for interfering with its own business relationship with its own employees; this rule includes employees acting on behalf of an employer who are alleged to have interfered with a plaintiff's employment. *See Trujillo v. American Bar Assoc.*, 2015 WL 5139419, at *7 (N.D. Ill. Aug. 28. 2015) (citing *Vickers v. Abbott Labs.*, 719 N.E.2d 1101, 1116 (Ill. App. 1999)). That rule does not apply when the agent of the principal places his or her own interests ahead of the corporate entity's interests. *Ricco*, 73 F. Supp. 3d at 973 ("A corporate officer acting on behalf of a corporation can be held liable for interference with employment expectancy only where he places his own interests ahead of the corporation's interest"). In this case, the Individual Defendants are employees of Rush, and Plaintiff has alleged that she had an "enforceable

11

expectation of continued coursework within and completion of the Rush CRNA program." (Dkt. 5 at ¶ 129.) Therefore, the Individual Defendants can only be held liable for interference with Plaintiff's prospective economic advantage with Rush to the extent they were putting their own interests ahead of Rush's.[4]

Individual Defendants argue that their "assessments of Plaintiff's clinical performance were core portions of their duties as employees of Rush, and there are no factual allegations creating any inference whatsoever of unjustified, improper self-interest." (Dkt. 41 at 9.) The Court disagrees and believes that the Plaintiff has sufficiently alleged that the Individual Defendants placed their own interests ahead of Rush's or were acting outside the scope of their agency. For example, Plaintiff claims that "[w]ith actual malice, [Individual Defendants], by intentionally and unjustifiably inducing Plaintiff's removal from the Rush CRNA program, acted in their own self-interests, outside the scope of their agency relationship with Rush, and contrary to the interests of Rush." (Dkt. 5 at ¶ 133.) Plaintiff has also alleged sufficient facts to support an inference that leads to this conclusion. Much of Plaintiff's troubles appear to have begun on June 20, 2013, when Wimberly allegedly blamed her own Fentanyl dosage error on the Plaintiff. (Dkt. 5 at ¶ 20.) When Plaintiff reported this issue to Narbone and Kremer, they did not investigate the problem and chose to side with Wimberly and other Rush staff. (Dkt. 5 at ¶¶ 22-24.) Upon Plaintiff's return to the CRNA program in January 2014, Narbone placed Plaintiff under Wimberly's supervision, despite having several CRNA's available to supervise Plaintiff.

---

[4] The Court also notes that Plaintiff has alleged she "could reasonably expect increased job opportunities and monetary compensation" if she had successfully completed the CRNA program. (Dkt. 5 at ¶ 129.) Contrary to Individual Defendants' assertion that these allegations "clarify the absence of any third-party interference," this allegation shows that the Individual Defendants' actions were directed toward business relationships with third parties with whom Plaintiff alleges she had a reasonable expectancy of entering into a business relationship. The cases cited by the Individual Defendants to support their contention are not on point. *See Muthuswamy v. Burke*, 646 N.E.2d 616, 621 (Ill. App. 1993) (analyzing a cause of action for tortious interference with a contract, not prospective economic advantage); *Salaymeh*, 508 N.E.2d at 1159 (same); *Vickers*, 719 N.E.2d at 1116 (plaintiff suing based on interference with continued employment with corporation, not future employment with third parties).

(Dkt. 5 at ¶ 33.) Accepting those accusations as true, as the Court must at this stage of the litigation, one could reasonably infer that the Individual Defendants were acting outside of the scope of their agency relationship with Rush and in their own self-interest when concocting a false story and failing to investigate a matter relating to the improper dosage of a patient with a drug as dangerous as Fentanyl.[5] "Perhaps discovery will belie these allegations, but at this stage of the case, the allegations control and are sufficient to state a claim." *Trujillo*, 2015 WL 5139419, at *7. As such, the Court denies Individual Defendants' motion on this cause of action.

## CONCLUSION

For the reasons discussed herein, Rush's Motion to Dismiss and the Individual Defendants' Motion to Dismiss are granted in part and denied in part. Counts I, II, III, IV, V, VII, IX, and X of Plaintiff's Amended Complaint are dismissed without prejudice. Plaintiff is given until June 9, 2017 to amend her complaint.

**ENTERED:**

Date: May 18, 2017

_____
U.S. Magistrate Judge, Susan E. Cox

---

[5] For instance, one could infer that the Individual Defendants were seeking to avoid culpability for any adverse consequences for this error in dosing by blaming Plaintiff. This would certainly not be in Rush's best interests, and would put the Individual Defendants' self-interest ahead of Rush.