**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MARICEL MARCIAL, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 16-cv-06109 |
| v. | ) | |
| | ) | Hon. Ronald A. Guzman |
| | ) | Judge Presiding. |
| RUSH UNIVERSITY MEDICAL CENTER, | ) | |
| DR. MICHAEL KREMER, in his individual | ) | |
| Capacity, RAY NARBONE, in his individual | ) | |
| Capacity, and JILL WIMBERLY, in her | ) | |
| Individual capacity, | ) | Magistrate Judge Susan E. Cox |
| | ) | |
| Defendants. | ) | Plaintiff Demands |
| | ) | Trial By Jury |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR
MOTION TO EXCLUDE TESTIMONY OF PLAINTIFF'S EXPERT FARMILANT**

CHI-164830-1

I. **INTRODUCTION**

Defendants Rush University Medical Center ("Rush"), Dr. Michael Kremer, Ray Narbone, and Jill Wimberly (together, the "Rush Defendants") respectfully submit this Memorandum in Support of Their Motion to Exclude Testimony of Plaintiff's Expert Farmilant. The evidence adduced during fact discovery clarifies that Plaintiff Maricel Marcial ("Marcial" or "Plaintiff") admits to significant errors involving patient safety during her clinical practice as a Student Registered Nurse Anesthetist ("SRNA") at Rush. Several Rush witnesses testified that such clinical errors, observed by at least 13 different evaluators, led to Marcial's dismissal from the SRNA Program. Plaintiff's admissions on this issue are significant because, initially, Marcial alleged that critical evaluations of her clinical work were "false." Now, Marcial seeks to change course to argue that her admittedly deficient clinical performance in 2013 and early 2014 resulted from a "stress disorder," which she apparently seeks to assert rendered her unable to perform adequately. She now tries to support this theory by relying on the testimony of a psychiatrist she first met on April 1, 2018, 4-5 years after the relevant events.

Specifically, Marcial seeks to rely on Dr. Steven R. Farmilant, who opined in an April 3, 2018 report (the "Report") that Marcial "does meet the diagnostic criteria for a stress disorder as a direct result of the workplace experiences [at Rush] she described." Report, 7, attached hereto as Exhibit A. Marcial seeks to use the Report to support her theory of liability (ie., what caused her performance problems) even though the Report does not specify the extent to which any such stress disorder existed in 2013-2014. However, it appears that Marcial, having admitted to the deficiencies for which she was dismissed from the SRNA program, now seeks to assert through Dr. Farmilant that these deficiencies did not warrant her dismissal because stress caused by Rush led Marcial to be unable to perform satisfactorily.

1

Dr. Farmilant's qualifications are not explained, and his opinions are speculative and not based on reliable scientific methods because they rely only on Marcial's descriptions of five-year old events and limited documents that have little to do with Marcial's health or any evaluations of Marcial's clinical performance. One of the documents upon which Farmilant relies is an illegally created recording of a conversation between Marcial and Rush personnel from 2013.[1] Moreover, Farmilant's vaguely couched opinions that Marcial's stress disorder may have caused her performance problems are irrelevant and do not assist the trier of fact in assessing Marcial's claims because such opinions do not specify when or how Marcial was impaired or whether the Rush Defendants subjected Marcial to discrimination.

For all of these reasons, as explained below, the Court should exclude the Report and any related testimony offered by Dr. Farmilant in this matter.

## II. FACTUAL BACKGROUND

In 2012, Marcial matriculated into the Rush University College of Nursing Nurse Anesthesia Program (the "Program"), which included didactic and clinical components. Marcial completed the didactic component and, with her SRNA cohort, moved into the clinical component. Marcial initially received generally satisfactory evaluations of her clinical performance from multiple Certified Registered Nurse Anesthetists ("CRNAs"). Between June 2013 and May 2014, however, multiple CRNA evaluations of Marcial's clinical performance concurred that Marcial regularly created patient-safety concerns related to medication dosage and administration, failing to maintain professional reasoned composure in the operating room, and inadequate documentation, among other areas.

---

[1] Defendant Michael Kremer has filed, concurrently with this motion, a motion for leave to file a counterclaim seeking damages and injunctive relief barring Plaintiff from using the illegal recording or transcript of the conversation upon which Farmilant relies pursuant to the Illinois Eavesdropping Act. 720 ILCS 5/14-2, *et seq.*

Specifically, Marcial received at least five clinical evaluations with unsatisfactory ratings during Summer 2013 from five different CRNAs, including problems with improper equipment and drug dosage for child patients, basic airway management analysis errors, and other patient-safety issues. Between August 2013 and January 2014, Marcial requested and was allowed a leave of absence from the Program. Upon her return, over a period from January to May 2014, Marcial received 17 more clinical evaluations with unsatisfactory ratings from 12 different CRNAs. The quantity and nature of the patient-safety concerns addressed in these evaluations demonstrated Marcial's failure to improve her clinical performance and led to her dismissal from the Program due to her unsafe and unsatisfactory clinical practice.

Marcial filed suit against the Rush Defendants on June 10, 2016, alleging principally that she was subject to discrimination on the basis of her race, national origin, and age, based primarily on her assertion that CRNA criticism of her clinical performance was "false." Marcial and the Rush Defendants have completed fact discovery, which included the exchange of a significant volume of documents as well as the depositions of Marcial and six other witnesses. In her deposition, Marcial repeatedly admitted that many of the patient-safety concerns reflected in her clinical evaluations were, in fact, true and accurate. Indeed, there were as many as 20 separate instances in which Marcial admitted that criticism of her performance was accurate.

On April 4, 2018, after these admissions, Marcial disclosed an expert witness, Dr. Steven R. Farmilant. According to his report, Dr. Farmilant assessed whether an alleged pattern of unfair treatment described to him by Marcial's counsel, Elaine Siegel, "would reasonably be expected to impair one's work performance" and whether Marcial "[met] the diagnostic criteria for any stress disorder that might have resulted from this treatment." Report, 1. The Report clarifies that Dr. Farmilant relied only on statements from Marcial during one meeting on April

3

1, 2018, statements from Marcial's attorney, review of Marcial's college transcript, and review of a transcript of a recording of a conversation between Marcial, Kremer, and another Rush employee on November 19, 2013.[2] Dr. Farmilant also administered three psychological tests.

## III. ARGUMENT

Plaintiff's efforts to repackage her own beliefs about the reasons for her clinical failures as testimony of an expert to opine that such failures were caused by discrimination must be rejected for two primary reasons. First, the Report fails to satisfy the requirements of *Daubert v. Merrell Dow Pharms.,* 509 U.S. 579 (1993) and Rule 702 of the Federal Rules of Evidence in several different ways that require barring such testimony. Second, Dr. Farmilant's Report and opinions stem from review of the transcript of an illegal recording generated by Plaintiff that violates the Illinois Eavesdropping Act ("the Act"), which renders both the creation of the recording and delivery of the transcript to Dr. Farmilant a criminal and civil violation. Plaintiff and her counsel were warned that the recording was unlawful under the Act, yet they now seek to use the illegal recording through the guise of expert testimony. To uphold the privacy protections the Act establishes, Dr. Farmilant must be barred from testifying.

### A. Dr. Farmilant's Report Does Not Adequately Demonstrate Dr. Farmilant's Qualifications to Serve as an Expert Witness.

Plaintiff cannot show that Dr. Farmilant is qualified as required under *Daubert,* Rule 702, and Rule 26(a)(2) of the Federal Rules of Civil Procedure. Under Rule 702, an expert must be qualified to testify on the subject to which his testimony relates. *See* FED R. EVID. 702. And, pursuant to Rule 26(a)(2), any witness that may be used at trial to present evidence under Federal

---

[2] Marcial testified that she typed this transcript from the illegally recorded conversation at her attorney's direction, after the date of her initial deposition in this matter, during which she admitted the conversation was private, that she secretly recorded the conversation without knowledge of or consent from the other two participants in the conversation by hiding her iPhone in her purse during the November 19, 2013 meeting, a violation of the Illinois Eavesdropping Act ("the Act"), 720 ILCS 5/14-5. *See* Section III.C, *infra*.

Rule of Evidence 702, 703, or 705 must provide a written report that must contain: "(i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; (iii) any exhibits that will be used to summarize or support them; (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years; (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for the study and testimony in the case." FED. R. CIV. P. 26(A)(2).

The Report lacks most of the information required by Rule 26(a)(2). First, the Report does not include the facts or data considered by Dr. Farmilant in forming his opinions, as it omits the data Dr. Farmilant collected in administering the three psychometric tests to Marcial, instead relaying only the general conclusions Dr. Farmilant drew from the data. Moreover, the Report does not state in detail Marcial's descriptions of the alleged events that, according to Dr. Farmilant, caused trauma to Marcial—let alone append the documents on which Dr. Farmilant expressly relied in forming his opinions.

Second, the Report lacks information required to evaluate whether Dr. Farmilant is qualified to testify as an expert on the matters addressed and certain bases for bias on the part of Dr. Farmilant, including any description of Dr. Farmilant's background and credentials, a resume, a list of all publications he authored in the previous ten years, a list of all other cases in which Dr. Farmilant testified as an expert during the previous four years, or any statement of the compensation Dr. Farmilant was or will be paid for his interview of Marcial and his testimony in the case. *See* FED. R. CIV. P. 26(a)(2)(B). This information is required by rule and necessary to properly evaluate whether Dr. Farmilant is qualified as an appropriate expert witness and

5

whether his testimony is admissible. In the absence of such information, Dr. Farmilant should be disallowed from testifying in this matter.

  **B. Rule 702 and *Daubert* Standards Require Barring Dr. Farmilant from Serving as an Expert in this Litigation.**

Under Federal Rules of Evidence 702, an expert witness may testify if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. FED. R. EVID. 702. In addition, under Federal Rule of Evidence 403, an expert witness may not testify if such testimony would be more prejudicial than probative. *See U.S. v. Schiro*, 679 F.3d 521, 529 (7th Cir. 2012).

*Daubert* requires the district court to serve as a gatekeeper charged with screening out experts who do not meet the required standards of both Rules 702 and 403. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 138 (1999).[3] Judges must conduct preliminary fact-finding to determine expert admissibility. *See Daubert*, 509 U.S. at 592-93. For this fact-finding exercise, trial judges have considerable discretion. *See Kumho*, 526 U.S. at 152. The party offering the expert bears the burden of laying the proper foundation for the admission of expert testimony. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). That party must show the expert's admissibility by a preponderance of the evidence. *See id.*

The trial judge has a two-part duty to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 590 U.S. at 589, meaning: (1) that

---

[3] To make this determination, under *Daubert*, the judge may consider the following factors, among others: (1) whether the theory or technique used has been tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the theory or technique has been generally accepted by the scientific community. *Daubert*, 509 U.S. at 593-94.

the reasoning and method underlying the opinion is scientifically valid and (2) that the reasoning and methodology can properly be applied to the facts at issue in order to assist the jury. *See id.* at 592-93. The Report fails all of these standards, and Dr. Farmilant should be barred from serving as an expert in this case.

        **1.     Dr. Farmilant's Opinion that Plaintiff's Deficient Clinical Performance Was Caused By Her Experiences Working at Rush Is Speculative and Based on Unreliable Methods.**

To determine the reliability of a purported expert's methods, courts examine whether the method has been tested, has been subject to peer review, has a known or potential rate of error, and has gained acceptance within the relevant scientific community. *See Daubert*, 509 U.S. at 593-94. Ultimately, the purpose of the inquiry into the expert's reliability is to ensure that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *See Kumho*, 526 U.S. at 152. "Red flags that caution against certifying an expert include reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012); *see generally Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806-07 (7th Cir. 2013). The Report cannot satisfy these requirements.

Dr. Farmilant's opinions are speculative and based on unreliable methods because Dr. Farmilant does not rely on "sufficient facts or data." Rather, the Report relies merely on Plaintiff's beliefs and an incomplete factual record about the circumstances of Plaintiff's clinical performance and failures. With this limited basis of knowledge, Dr. Farmilant first purports to address whether Marcial's perceived treatment by two particular CRNAs "would reasonably be expected to impair one's work performance." He does not mention and may never have considered that 10 other CRNAs found similar problems with Marcial's clinical work. Instead,

he cites Marcial's statements to him during an interview, three types of psychometric tests, the illegally recorded conversation, and "a review of scientific literature," concluding that "the treatment Ms. Marcial experienced could indeed impair her work performance." Report, 6. Next, Dr. Farmilant cites "information gathered during the clinical interview," direct observation, review of records, and psychometric tests, concluding that Marcial "does meet the diagnostic criteria for a stress disorder as a result of the workplace experiences she described." *Id.*, 7.

But there is no scientific basis for Dr. Farmilant to rely on Marcial's statements to him during her interview or on her counsel's account of the alleged facts forming the basis of Marcial's lawsuit. Such statements, made in the course and for the purpose of advancing Marcial's position in this litigation, are self-serving. The report makes no indication that Dr. Farmilant sought to verify these statements. And Dr. Farmilant's reliance on "direct observation" of Marcial at her April 3, 2018 interview means that Dr. Farmilant drew conclusions about the nature and degree of Marcial's stress in mid-2013 from only his current observations five years later as to, e.g., Marcial's "obvious distress" and her description of certain physical symptoms as they exist today. *See* Report, 2. Dr. Farmilant acknowledges no limitations on the power of these recent observations to reveal the particulars of Marcial's condition five years ago, proceeding to opine about her ability to work effectively while enrolled at Rush. This is inherently unreliable methodology, unsupported by any scientific approach, especially considering that the Report makes no attempt to even speculate about what Marcial's condition might have been during the time she was enrolled in the clinical setting in 2013-2014. *See Rowe Ent., Inc. v. William Morris Agency, Inc.*, No. 98 Civ. 8272, 2003 WL 22272587

(S.D.N.Y. Oct. 2, 2003) (excluding testimony where expert's report was based solely on the accounts in the complaint and a limited set of depositions).

Dr. Farmilant's unscientific, unsupported reliance on Marcial's self-serving statements and affect in 2018 is particularly dubious in light of the precise nature of one of his opinions. Specifically, Dr. Farmilant opines that Marcial's experiences working with CRNAs Jill Wimberly and Eva Fisher in June 2013 are among the causes of Marcial's current alleged stress disorder. Report, 6. But Dr. Farmilant does not offer a sufficient basis for connecting Marcial's stress—either in 2018 or in 2013—to those particularly instructors. For Dr. Farmilant's conclusion to meet scientific standards, he must provide a proven basis for believing that a psychologist interviewing a litigant in 2018 can determine with precision what unverified events from several years prior contributed to her stress and that such an interview can lead to reliable assessment of specifics of a mental health condition five years earlier and the causes of such condition. *See Lewis*, 561 F.3d at 705.

Dr. Farmilant attempts to plug this flaw in his methodology with a lone citation to scientific literature, stating that "there exists research . . . which conclusively states that while constructive criticism is inevitable, 'an exceedingly critical and negative mentoring style by attending physicians could be detrimental to trainees' acquisition of surgical skills'. (Flynn et al., 2016)." Report, 6. This statement is immaterial. The Report establishes neither any basis for Dr. Farmilant to determine that Marcial was subjected to "an exceedingly critical and negative mentoring style" nor to conclude that Marcial had an issue "acqui[ring] . . . skills." Indeed, it is unclear why "mentoring" is relevant to Dr. Farmilant's analysis. Both "an exceedingly critical and negative mentoring style" and "acquisition of surgical skills" are general and vague terms. Moreover, an expert opinion is unhelpful to a trier of fact if it "attempts to apply a general

observation about a larger group to particular individuals whose conduct is in question." *Rolls-Royce*, 2010 WL 184313, at *6. Accordingly, there is no basis to believe that the research cited in the Report supports Dr. Farmilant's conclusions with respect to Marcial. This lone reference to scientific literature also highlights the conspicuous absence of other such references throughout the Report.

### 2. Dr. Farmilant's Opinion Is Irrelevant to Plaintiff's Cause of Action and Would Not Assist Any Fact Finder.

Even if based on acceptable, scientifically reliable methodology, expert testimony is inadmissible unless it helps the trier of fact understand evidence about a fact in issue in the particular case. *See* FED. R. EVID. 702; *Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful"); *Kumho Tire*, 526 U.S. at 147; *Lees v. Carthage C.*, 714 F.3d 516, 521 (7th Cir. 2013). To establish relevance, the proponent of the expert must show "a valid scientific connection to the disputed facts in the case." A court may conclude, for instance, that "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997). An opinion based on mere speculation is patently inadmissible. *See Daubert*, 509 U.S. at 590. "Subjective speculation that masquerades as scientific knowledge does not provide good grounds for the admissibility of expert opinions." *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1244-45 (11th Cir. 2005) (internal quotation omitted); *see also Ammons v. Aramark Uniform Serv., Inc.*, 368 F.3d 809 (7th Cir. 2004) (affirming district court's exclusion of proposed expert where expert's opinion was "unsupported speculation" not based on any specific methodology). Dr. Farmilant's opinions do not meet this standard because they have no bearing on the underlying, material facts of the case or the cause of any anxiety experienced by Marcial.

### a. Dr. Farmilant's Opinion Has No Bearing on Findings as to Marcial's Clinical Performance or Unsafe Practices.

Dr. Farmilant's findings do not bear on the facts at issue in the case, including, e.g., the extent to which Marcial's clinical performance included patient-safety mistakes rendering her unfit to continue in the program. Dr. Farmilant's findings similarly lack any ability to help the finder of fact determine what actually happened during Marcial's interactions with CRNAs (including with Fisher on June 11, 2013 and with Wimberly on June 20, 2013); the possibility of a conspiracy among the supervising CRNAs to lie about Marcial's performance, as Marcial alleges; or the nature of the Rush Defendants' treatment of Marcial as an SRNA in the Program.

Instead, the portions of the Report that pertain to facts at issue in this case constitute mere recitations of what Dr. Farmilant was told by Plaintiff or her attorney. *See Rowe,* 2003 WL 22272587, at *10-11 (expert opinion relying solely on complaint and select depositions could not be validated or tested for rate of error). At the outset, Dr. Farmilant states that Siegel told him upfront of Marcial's alleged mistreatment: "You described a pattern of alleged unfair treatment against [Marcial] and asked me to assess whether this type of perceived treatment would reasonably be expected to impair one's work performance, and to assess Ms. Marcial to determine if she meets the diagnostic criteria for any stress disorder that might have resulted from this treatment." Report, 1. The Report lacks any details upon which Dr. Farmilant based his opinions; instead, Farmilant echoes additional statements that he asserts were made to him during his April 3 meeting with Marcial herself.[4] Allowing litigants to present their own beliefs about contested facts through "expert testimony" about those facts would unfairly prejudice a

---

[4] The statements Dr. Farmilant relied upon include the following: Marcial "had an encounter with a couple of instructors who seemed determined to jeopardize my success"; Marcial "believe[d] the teachers in question singled her out due to her age, race, and ethnic origin"; Marcial "experienced a series of hostile interactions with [Jill Wimberly]" on June 20, 2013; and Marcial believe[d] "Ms. Wimberly and Ms. Fisher compared notes and agreed to support each other's untruthful negative evaluations of [Marcial]." Report at 2-3.

11

fact finder without adding any probative value, which is not permissible under Rule 403.

In essence, Dr. Farmilant bases his opinions upon Marcial's unfounded "beliefs" about events and accepts as true Marcial's self-serving, contested account of the alleged discrimination she experienced. For example, Marcial testified that she did not have personal knowledge of any communication between CRNAs about evaluating Marcial's performance. Marcial Dep. 70:6-72:2. Evidentiary rules bar Marcial from speculating about such "facts" without basic knowledge. *See Abioye v. Sunstrand Corp.*, 164 F.3d 364, 367-68 (7th Cir. 1998). Rule 702 further prohibits a purported "expert" from relying on unreliable facts, requiring instead that expert testimony be "based on sufficient facts or data." FED. R. EVID. 702; *see Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 781 (7th Cir. 2017). An expert "must employ 'those kinds of facts or data' on which experts in the field would reasonably rely." *See id.* (quoting *Manpower, Inc.*, 732 F.3d at 809 and FED. R. EVID. 703). Because Dr. Farmilant's findings rely on the truth of Marcial's own account, his findings cannot assist the trier of fact in determining the veracity of the underlying facts at issue in this matter.

      **b.**      **Dr. Farmilant's testimony does not assist the trier of fact in determining the cause of Marcial's impaired work performance.**

Dr. Farmilant's findings would also not assist the trier of fact to determine why Marcial was unable to perform satisfactorily in the clinical setting. Dr. Farmilant generally found only that Marcial met the diagnostic criteria for a stress disorder "as a direct result of the workplace experiences she described," without explaining when she purportedly first met such criteria or whether she had any "stress disorder" when she was enrolled at Rush. Report, 7. As an initial matter, this finding is of no value to a trier of fact in determining what might have caused Marcial's deficient clinical performance in 2013-2014. And, the Report provides insufficient

information as to the precise nature of the "workplace experiences" that resulted in the purported disorder. Moreover, this finding suggests an unreliable opinion that Marcial had a stress disorder due to her treatment in the Program, but it does not assist any fact finder in determining whether or how much this purported stress disorder had an impact on her ability to succeed in the program.

Dr. Farmilant's findings likewise would not assist the trier of fact in determining whether Marcial's alleged treatment by the Rush Defendants affected her work performance while she was in the Program. Dr. Farmilant found only that "the treatment Ms. Marcial experienced could indeed impair her work performance," again without specifying any time period of such potential impairment or the degree of potential impairment. Report, 6. Indeed, the Report also noted a

> . . . likelihood that she has a chronic stress disorder. This finding may support the conclusion that her distress is of long-term origin, and likely to have existed prior to any recent traumatic experience.

Report, 6. This statement lacks any conclusion about when the purported stress disorder began, such that it could have pre-dated Marcial's matriculation to Rush or started after she failed out of the Program. Taken together, these inconclusive statements from the Report offer the trier of fact little guidance in determining the effect of Marcial's alleged treatment in the Program.

      **c.    Farmilant's Reliance on Insufficient Facts or Data Renders His Opinions Irrelevant.**

Dr. Farmilant's approach of relying on an artificially limited factual foundation renders his opinions legally irrelevant. To be relevant, an "expert's assumptions must still be 'accompanied by a sufficient factual foundation' and cannot ignore the 'real world.'" *See Edison Wetlands Ass'n, Inc. v. Akzo Nobel Chemicals, Inc.*, No. 08-419, 2009 WL 5206280 *6 (D.N.J. Dec. 22, 2009); *see also Weigel v. Target Stores*, 122 F.3d 461, 468 (7th Cir. 1997). Under

13

*Daubert*, it is improper for an expert to rule out alternative explanations before he has even evaluated them. *See* FED. R. EVID. 702 (2000) Committee Note (providing that a court should consider "[w]hether the expert has adequately accounted for obvious alternative explanations"); *Rolls-Royce Corp. v. Heros, Inc.*, No. 07-CV-0739, 2010 WL 184313 (N.D. Tex. Jan. 14, 2010) (excluding expert opinion where expert made faulty assumptions and drew conclusions from circumstantial evidence). There is no indication that Dr. Farmilant was aware of Marcial's underlying or ongoing medical conditions or any other potential sources of "trauma," such as the passing of her now-husband's grandmother. There also is no indication that Dr. Farmilant had any information—let alone any information from a source other than Marcial herself or her counsel—about the totality of Marcial's experience at Rush, including the possible psychological effects of the vast array of clinical errors to which Marcial has admitted.

      C.      **Plaintiff Impermissibly Seeks to Circumvent the Illinois Eavesdropping Act Through Dr. Farmilant's Report and Testimony.**

One of the limited sources of information about Marcial's experience in the Program upon which Dr. Farmilant relies is an illegal recording of a private conversation that Plaintiff created in 2013, and that Plaintiff and her counsel transcribed and delivered to Dr. Farmilant in 2018 with knowledge of its illegal status under the Illinois Eavesdropping Act ("the Act"). 720 ILCS 5/14-2.[5] The Act specifically states that "[a]ny evidence obtained in violation of this

---

[5] Delivery of the recording to Dr. Farmilant and his use of it clearly violates the Act. Plaintiff testified that, on November 19, 2013, she surreptitiously recorded a private conversation with Defendant Kremer and another Rush administrator without their knowledge or consent, hiding her iPhone in her purse. Exhibit B, pp. 203-205. After that testimony, defense counsel informed Plaintiff's counsel that the recording violated Illinois law. Plaintiff later testified that, at the direction of her attorney, Plaintiff created a transcript of the November 19, 2013 recording. Exhibit C, pp. 26-27. And Farmilant's report states that Plaintiff's counsel provided a copy of that transcript to him, which he then quoted and relied upon in his Report. Report, 1. Under the version of the Act in place when the recording was created, "a person commits eavesdropping when he knowingly and intentionally uses an eavesdropping device for the purpose of . . . recording all or any part of any conversation" without consent of all parties. 720 ILCS 5/14-2(a) (1). It is also a violation of the Act, both as it applied in 2013 and in its current version, when a party "transcribes" such communication or "uses or divulges . . . any information which he knows or

14

Article is not admissible in any civil" trial. 720 ILCS 5/14-5. Allowing Dr. Farmilant to present opinions based on such illegally obtained information, which is subject to both criminal and civil penalties under Illinois law, would improperly circumvent the Act's express terms and its intended deterrent effect on future parties.

Plaintiff and her counsel have violated the Act by recording the conversation illegally, transcribing it, and then using it and divulging it to Dr. Farmilant for the purpose of trying to gain advantage and use it against the Rush Defendants in this litigation. This Court must not allow such blatant disregard for clearly applicable law, and Dr. Farmilant must be barred from serving as an expert in this case. *See* 720 ILCS 5/14-5 ("any evidence obtained in violation of this Article is not admissible in any civil . . . trial").

## IV. CONCLUSION

For the reasons stated above, the Rush Defendants respectfully request: (a) that the opinions of expert Dr. Farmilant be stricken in their entirety and disregarded and prohibited for use at trial; (b) that the Court award the Rush Defendants their attorneys' fees and costs in challenging Plaintiff's inadequate expert disclosure; and (c) for such other and further relief as the Court deems just and proper under the circumstances.

Respectfully submitted,

s/ Peter G. Land
One of Defendants' Attorneys

Peter G. Land (06229659)
Karen L. Courtheoux (06303103)
Husch Blackwell LLP
120 S. Riverside Plaza, Suite 2200
Chicago, Illinois 60606
(312) 655-1500
Dated: May 4, 2018

---

reasonably should know was obtained through the use of an eavesdropping device." 720 ILCS 5/14-2(a)(3).