# EXHIBIT A



Steven R. Farmilant, Psy.D

CLINICAL AND FORENSIC PSYCHOLOGY　　　　　　　　　　　　　333 NORTH MICHIGAN AVENUE
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　SUITE 614 CHICAGO, IL 60601

April 3, 2018

Elaine K.B. Siegel
Elaine K.B. Siegel & Assoc., P.C.
53 W. Jackson Boulevard
Suite 405
Chicago, IL 60604

re: Maricel Marcial

Ms. Siegel:

At your request I evaluated Maricel Marcial, a 45-year-old Filipina woman who is a former student in the Nurse Anesthetist program at Rush Hospital in Chicago. You described a pattern of alleged unfair treatment against her and asked me to assess whether this type of perceived treatment would reasonably be expected to impair one's work performance, and to assess Ms. Marcial to determine if she meets the diagnostic criteria for any stress disorder that might have resulted from this treatment.

I met with Ms. Marcial on April 1, 2018 for a period of 4.5 hours, during which time I conducted a social history interview and administered three psychometric tests: the Personality Assessment Inventory (PAI), the Rorschach, and the Detailed Assessment of Posttraumatic Stress (DAPS). I also reviewed documents provided by your office and by Ms. Marsial, including a transcription of a meeting between Ms. Marcial, Michael Kremer and Mary Johnson and college transcripts.

Ms. Marcial was made aware of the limits of confidentiality in forensic evaluation and agreed to proceed, knowing any findings relevant to the referral question would be communicated to you and to the court.

Ms. Marcial arrived a few minutes early to the scheduled appointment. When asked, she told me she was referred to my office for psychological testing to determine how stress played a role in her life during her training in the Nurse Anesthesia program, and expressed the belief that stress contributed a great deal to a decline in her performance, "ever since I had an encounter with a couple of instructors who seemed determined to jeopardize my success". Even since, and to her belief as a direct result of those encounters, she has "felt shaky in my skills and ability to progress in the program". She made it clear that it was not the academic environment that caused her distress, as she had been successful in academic programs and had worked in high stress positions as a Registered Nurse in the past, but "the antagonism of the people around me, the instructors who were supposed to provide learning for me but became the detractors.

She reported a series of events in which, having been reassured teaching and administrative staff would support her, she was ultimately betrayed. She believes the teachers in question singled her out due to her age, race, and ethnic origin. "In the beginning I didn't recognize the racial components, but talking to other (minority) students, I learned they have felt the antagonism I have felt particularly from two instructors, Jill Wimberly and Eva Fisher."

Ms. Marcial was evaluated in a clinical setting by Eva Fisher on June 11, 2013, which she thought had gone well; Ms. Fisher had no negative comments for her after the evaluation. She did make a comment about not asking the mother of a patient a question about separating from her child in front of the child, lest she scare the child.

She recounted that she felt intimidated during a clinical encounter with Ms. Jill Wimberly, a clinical instructor on June 20, 2013. Ms. Wimberley was a CRNA who herself had only recently graduated from the Rush CRNA program. She experienced =a series of hostile interactions with her. Ms. Wimberly asked her a question about the proper dosage of a certain medication for a child. Ms. Marcial answered; Ms. Wimberly told her she had answered incorrectly, and accused her of not being prepared for her cases. (Ms. Marcial subsequently asked an anesthesiologist what the range of acceptable dosages was for that medication; her answer was within that range.) Ms. Marcial went to wait in the pre-op area for Ms. Wimberly. The case was cancelled, so Ms. Marcial went back to the OR suite, where she found Ms. Wimberly, who angrily asked Ms. Marcial where she had been, said that she had paged her multiple times, that she, Ms. Marcial, didn't know what was going on, was not prepared for her patients, and "had not prepared anything correctly" while slamming drawers and throwing syringes. "She went on with a tirade I wasn't prepared for". There had apparently been two cases added to the schedule at the last minute, when Ms. Marcial was waiting for Ms. Wimberly in the pre-op area for which Ms. Wimberly thought Ms. Marcial should have prepared. Ms. Wimberly "stormed out saying she would see me in the pre-op area". Ms. Marcial began an assessment of the patient when Ms. Wimberly forcibly pushed her away. "She actually pushed me on the chest to prevent me from seeing a patient."

Ms. Marcial began to weep at this point in her narrative in my office, and was in obvious distress. She described at that moment her throat feeling tight, her mind reliving the events of that day, her muscles feeling shaky and chest feeling heavy, and overwhelming sadness. She reported a sense of disappointment in herself, and that she had failed in some way, believed she might actually not have been prepared, and regrets that she was "not strong enough to deal with this kind of bullying". She did tell Ms. Wimberly that she had prepared for the patient, but the director's stern accusation that she had not prepared caused her to second-guess herself. "I arrived at 5:15 a.m. to prepare. She looked at my prep and had no comments on it. Everything seemed to be OK."

She believes she should have been more accountable for standing up for herself during the incident, and had been "more assertive with my own story, my own truths…I had been warned beforehand from a classmate who is Asian, my age, who experienced mistreatment from the same person. I was apprehensive that I would fall into the same trap. I regret that I cowered. I wasn't sure how to respond to that kid of aggression."

Ms. Marcial believes Ms. Wimberly and Ms. Fisher compared notes and agreed to support each other's untruthful negative evaluations of her. The evaluation with Jill Wimberly took place on June 20th. The written evaluation by Ms. Fisher was filed on June 22, although it was dated June 18th. Ms. Fisher's evaluation contained a comment that Ms. Marcial did not know how to talk to children; Ms. Wimberly also included a comment in her written evaluation of the June 20th clinical that Ms. Marcial did not know how to evaluate because she asked if a child had ever been left alone in front of the child, even though Ms. Wimberly did not allow Ms. Marcial to evaluate the child.

She believes these two false evaluations were the beginning of what appeared to be a conspiracy against her. There are many other events illustrating the hostility and negative experiences Ms. Marcial was subjected to while she was in the program.

She sought an ally in Amy Gawura, and confided in her that she felt she was being pressured to leave the program subsequent to the Wimberly and Fisher evaluations. Ms. Gawura betrayed this confidence by reporting Ms. Marcial's comments to Michael Kremer, and lying to Mr. Kremer that she had Ms. Marcial's permission to share these comments.

She was reassured that she would be supported and was not supported by staff. She took a leave of absence after her humiliating experiences with Ms. Wimberly and Ms. Fisher and was told she would not be paired with them upon her return to the program; she was in fact reassigned to Ms. Wimberly upon her return.

She recounted a meeting with Ray Narbone during which he called her "delusional" if she thought she if she thought she would complete the program. Mr. Narbone told her that a CRNA said "God, I hope not" when he told her Ms. Marcial would be returning to the program. He also told her that he was unable to control the attitudes of the CRNA preceptors toward her upon her return, and that he "neither intends or wishes to tell his own staff to support (her) or at least give (her) the benefit of the doubt upon (her) return". She saw this as confirmation that she was being set up to fail.

She had a bizarre, Kafkaesque conversation with Program Director Michael Kremer and Mary Johnson that contained the following comments:

K I don't know if you understand or if you've looked at an organizational chart…

…. Um you told Dr Halsted… that Dr Wiley had always been supportive of you and had not provided a guidance for suggestions for improvement. (sic)

M …I didn't mention anything about Dr Wiley not being supportive of me.

K That isn't what I said.

M Okay, I'm sorry.

and

K and apparently you choose not to believe me or others who have spoken to you and said we would like you to be able to be successful that you you choose not to accept the counsel from people who vehemently feel for many years that you chance of being successful are slim at best...(sic)

The results of standardized psychometric testing is as follows:

The PAI is a 344 item self-report questionnaire that produces a profile consisting of four validity scales, 11 clinical scales, five treatment consideration scales, and two interpersonal scales. She produced a valid and interpretable profile. She did not attempt to portray herself in a negative light. She does have a tendency to present herself in a positive light in a way that seems to downplay ways in which her functioning might be less than optimal. This is a common finding in PAI profiles administered in a forensic setting. This tendency does not rise to the level of invalidating the test results, but interpretation of the results were made with this in mind.

The PAI clinical profile is marked by a significant elevation on the Anxiety Related Disorders scale, indicating significant symptoms related to traumatic stress. She has likely experienced a disturbing traumatic event in the past that continues to distress her and produce recurrent episodes of anxiety.

She describes herself as being more wary and sensitive in interpersonal relationships than the average adult. Others are likely to see her as tough-minded, skeptical, and somewhat hostile.

She describes certain problems potentially associated with elevated and variable mood. Although she may view herself as active, outgoing, ambitious, and self-confident, others may perceive her as impatient and somewhat demanding.

Ms. Marcial's self-concept appears to involve a self-evaluation that has both positive and negative aspects. Her attitudes about herself may vary from states of pessimism and self-doubt to periods of relative self-confidence and self-satisfaction. Some fluctuation in self-esteem may be a function of her current circumstances. These fluctuations will not be extreme and are comparable to those experienced by most adults. During stressful times in particular, she is prone to be somewhat self-critical, uncertain, and indecisive.

She tends to be somewhat distant and withdrawn in personal relationships. Others may view her as reserved and possibly aloof, although she is more likely to perceive herself as being shy. She is likely to value her independence, although she is nonetheless concerned about how others perceive the client.

The Rorschach test is a valid and reliable psychometric test when scored with the Exner scoring system. Her responses were scored using this valid and reliable system.

Rorschach findings suggest she has had long-term difficulty dealing with demands that overwhelm her coping resources. When she is distressed, she becomes emotionally flooded with anxiety, tension, nervousness, and irritability. At these times, she may have a limited frustration tolerance and express emotions without thinking through her responses. Her distress may preoccupy her and prevent her from functioning well.

Some of the stress she is experiencing seems related to the loss of an important relationship and may also be generated by recently emerging guilt, shame, remorse, or regret.

Her test responses indicate she is more likely to let her actions be guided by thinking than by feeling, and seldom allows emotion to influence her decisions. When she is overwhelmed by her own emotions or the emotions of others, she may become disorganized.

She appears to be experiencing stress related to unwelcome circumstances she feels helpless to control.

She appears able to think logically and coherently, and is as capable as most people of coming to reasonable conclusions about the relationship between events. When distressed, she may display poor judgment or loss of focus.

She is inclined to examine situations thoroughly, taking in more information than necessary to solve problems or arrive at decisions. As a result, she is likely to function well in situations that call for being very careful, provided she has enough time to work at her preferred pace.

She is likely to behave in socially expected ways and to show respect for rules and regulations, but not to the extent of rigid conformity.

She is likely to form very precise impressions of situations. Although her concern with accuracy and precision may be an asset, it she may be overly concerned with being careful for the purpose of avoiding harsh criticism.

She is more likely than most people to worry about aspects of herself she views as undesirable, and is inclined to be self-critical.

She appears capable of forming close, mutually supportive relationships with others, but there are indications that her needs for affiliation are easily disappointed. She pays attention to what others say and do, but since she expects people be competitive rather than cooperative and is sensitive to negative evaluation, she can become unduly upset when she is harshly criticized.

The Rorschach test can be used to assess for trauma-related dysfunction. Posttraumatic stress disorders are conceived as consisting of (a) re-experiencing distressing events, (b) efforts to avoid emotions and situations that trigger psychological distress, and (c) a state of mental and physical hyperarousal. Several Rorschach variables help identify personality characteristics associated with these PTSD signs and symptoms.

Persons with a stress disorder manifested primarily in reexperiencing and hyperarousal typically produce a flooded Rorschach protocol that is notable for the incursions of anxiety on comfortable and effective functioning. Those with a stress disorder marked by avoidance typically produce a constricted Rorschach protocol that is notably guarded or evasive. In persons known to have experienced threatening events, each of these indices increases the likelihood of a stress disorder.

Ms. Marcial appears to be experiencing a substantial amount of intrusive ideation consisting largely of worries about being helpless to control unwelcome circumstances in her life.

She gives evidence of having the ability to tolerate participation in emotionally arousing situations, but she shows limited capacity to become aware of her own feelings and to express these feelings to other people.

She appears to have been having longstanding and substantial difficulty mustering sufficient psychological resources to cope with the demands in her life without becoming quite distressed by them. This pattern of hyperarousal increases the likelihood that she has a chronic stress disorder. This finding may support the conclusion that her distress is of long-term origin and likely to have existed prior to any recent traumatic experience.

The Detailed Assessment of Posttraumatic Stress (DAPS) is a valid and reliable psychological test designed to rate levels of symptomatology associated with a specific traumatic event. I included this instrument in the evaluation after observing her emotional reaction while discussing the events she experienced. Although current DSM-5 criteria requires "exposure to actual or threatened death, serious injury, or sexual violence" to diagnose PTSD, recent scientific research published in peer-review journals has found a correlation between workplace bullying and PTSD (Stig et al., 2004) and racism and PTSD (Helms et al., 2010).

Ms. Marcial's responses to the DAPS, using the supervisory experience with Ms. Wimberly as the index event, indicate re-experiencing, avoiding, and hypervigilance that rise to the level of a diagnosable stress disorder.

Finally, there exists research that directly addresses the issue of the effect of stress on learning in surgical skill acquisition, which conclusively states that while constructive criticism is inevitable, "an exceedingly critical and negative mentoring style by attending physicians could be detrimental to trainees' acquisition of surgical skills". (Flynn et al., 2016).

To answer the question of whether this type of perceived treatment would reasonably be expected to impair one's work performance, the evidence provided by Ms. Marcial's statements, psychometric testing using valid and reliable testing instruments, documents I reviewed, and a review of scientific literature suggests that the treatment Ms. Marcial experienced could indeed impair her work performance.

Regarding the question of whether Ms. Marcial meets the diagnostic criteria for any stress disorder that might have resulted from this treatment, in my opinion, to a reasonable degree of scientific certainty, based upon information gathered during the clinical interview, direct observation, review of records, and valid and reliable psychometric tests does meet the diagnostic criteria for a stress disorder as a direct result of the workplace experiences she described. Thank you for the opportunity to evaluate this remarkable woman. Feel free to reach out to me if I can be of additional assistance in this matter.

Respectfully,

Steve Farmilant, Psy.D.

## Bibliography

Flynn JT, Miller A, Pyatka N, Brewer J, Schneider, T & Cao, CGL. 2016. *The effect of stress on learning in surgical skill acquisition.* Medical Teacher. (38):897-903.

Helms JE, Guerda N, Green CE. 2010. *Racism and ethnoviolence as trauma: Enhancing professional training.* Traumatology. 16(4):53-62.

Stig et al. 2004. *Psychiatric distress and symptoms of PTSD among victims of bullying at work.* British Journal of Guidance & Counseling. 32(3) 335-356.