**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MARICEL MARCIAL | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:16-cv-06109 |
| | ) | |
| v. | ) | Honorable Susan E. Cox |
| | ) | |
| RUSH UNIVERSITY MEDICAL CENTER, | ) | |
| DR. MICHAEL KREMER, in his individual | ) | |
| capacity, RAY NARBONE, in his individual | ) | |
| capacity, and JILL WIMBERLY, in her individual | ) | |
| capacity, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S EXHIBITS A15 THROUGH A27 TO REPORT OF
EXPERT WITNESS DR. STEVEN R. FARMILANT**

Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B), and to this Honorable Court's

August 30, 2018, Memorandum Opinion, Dkt #101, and its September 10, 2018, Minute Entry

Order, Dkt #104, Plaintiff, Maricel Marcial, by her attorneys, Elaine K.B. Siegel & Assoc., P.C.,

submits the accompanying Plaintiff's Exhibits A15 Through A27 to Report of Expert Witness

Dr. Steven R. Farmilant.

DATED:        October 4, 2018

                                        Respectfully submitted,

                                        /s/ Elaine K.B. Siegel
                                        One of Plaintiffs' Attorneys

OF COUNSEL:

Elaine K.B. Siegel
ELAINE K.B. SIEGEL & ASSOC., P.C.
53 W. Jackson Boulevard, Suite 405
Chicago, Illinois 60604
Telephone: (312) 583-9970
Fax: (312) 583-9972
administrator@siegel-law.com
Attorney No. 40875

# EXHIBIT A15

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MARICEL MARCIAL,              )
                             )
          Plaintiff,          )
                             )
     vs.                      )      No. 16-cv-06109
                             )
RUSH UNIVERSITY MEDICAL CENTER; )
DR. MICHAEL KREMER, in his    )
individual capacity; RAY NARBONE,)
in his individual capacity; and )
JILL WIMBERLY, in her individual )
capacity,                     )
                             )
          Defendants.         )


          The deposition of MARICEL MARCIAL, called

by the Defendants for examination, pursuant to notice

and pursuant to the Rules of Civil Procedure for the

United States District Courts pertaining to the taking

of depositions, taken before Erin McLaughlin, CSR, at

120 S. Riverside Plaza, Suite 1100,, Chicago,

Illinois, on Wednesday, February 28, 2018, commencing

at the hour of 9:30 o'clock a.m.




Reported for
MAGNA LEGAL SERVICES, by
Erin McLaughlin, CSR



Page 2

1  APPEARANCES:
2
3    ELAINE K.B. SIEGEL & ASSOCIATES, P.C.
     53 W. Jackson Blvd, Suite 405
4    Chicago, Illinois 60604
     siegeledlaw@aol.com, 312.583.9970, by:
5    MS. ELAINE K.B. SIEGEL,
6        appeared on behalf of the Plaintiff;
7
8    HUSCH BLACKWELL
     120 S. Riverside Plaza, Suite 2200
9    Chicago, Illinois 60606
     peter.land@huschblackwell.com
10   karen.courtheoux@huschblackwell.com,
     312.526.1631, by:
11   MR. PETER G. LAND and MS. KAREN L. COURTHEOUX,
12       appeared on behalf of the Defendant;
13
14   ALSO PRESENT:
15     MR. DAVID RICE;
16     MR. JOSEPH MENDELSOHN.
17
18
19        * * * * *
20
21
22
23
24

Page 3

1          I N D E X
2
3
4   THE WITNESS: MARICEL MARCIAL
5
                PAGE
6
7
8   EXAMINATION BY:
9
10    MR. LAND              6
11
12
13
14   EXHIBITS MARKED:
15
16     No. 1          6
       No. 2          55
17     No. 3          85
       No. 4          100
18     No. 5          183
       No. 6          190
19
20
21
22
23
24

Page 4

1              (Witness sworn.)
2          MR. LAND: Good morning. Can you please state
3   your name for the record and spell your last name.
4          THE WITNESS: My name is Maricel Marcial,
5   M-a-r-c-i-a-l.
6          MR. LAND: Thank you.
7          So I'm Pete Land, and I'm an attorney.
8   I represent Rush University Medical Center and the
9   other individually named defendants who are in the
10  lawsuit that you initiated in Federal Court. We're
11  here for your deposition pursuant to notice, and it
12  will be taken pursuant the Federal Rules of Civil
13  Procedure. Do you understand that?
14         THE WITNESS: I do.
15         MR. LAND: Have you had your deposition taken
16  before?
17         THE WITNESS: No.
18         MR. LAND: Let's go over a few ground rules to
19  keep in mind today. Let me start with how would you
20  prefer me to address you? Is it okay for me to call
21  you by your first name?
22         THE WITNESS: Yes. Maricel is fine.
23         MR. LAND: So the purpose of today's discussion
24  or deposition is for me to ask questions and get

Page 5

1   answers from you. As we do that, I'd like for you to
2   if you can allow me to finish my question before you
3   answer even if you anticipate what I might be saying.
4   Okay?
5          THE WITNESS: Yes.
6          MR. LAND: That allows the court reporter to
7   get it down.
8          The other thing is to try to answer out
9   loud --
10         THE WITNESS: Okay.
11         MR. LAND: -- as you've been doing so the court
12  reporter can get it down too.
13         If you don't understand the question I
14  ask, please let me know that and I can rephrase it.
15  Okay?
16         THE WITNESS: Okay.
17         MR. LAND: Otherwise if you answer a question,
18  I'll assume you understood what I meant in asking you.
19  Okay?
20         THE WITNESS: All right.
21         MR. LAND: We can take a break any time during
22  today. It's not meant to be a marathon session. So
23  if you would like a break, you can just let me know.
24  The only thing I'd ask is that if I've asked you a



Page 6

1  question you answer it before we take a break. Okay?
2  THE WITNESS: Of course, yes.
3  MR. LAND: Let me you -- And this is related to
4  understanding your ability to remember things. It's a
5  common question asked. Are you taking any medication
6  that would impede your ability to recall?
7  THE WITNESS: No.
8  (Marcial Deposition Exhibit No. 1
9  was marked for identification.)
10
11
12  MARICEL MARCIAL,
13  Called on behalf of the Defendants, having been first
14  duly sworn, was examined and testified as follows:
15
16
17  DIRECT EXAMINATION
18  BY MR. LAND:
19
20  Q   Maricel, let's hand you what's been marked
21  as Exhibit Number 1. Do you recognize this document?
22  A   Yes.
23  Q   What is it?
24  A   It's an amended complaint by my party

Page 7

1  against Rush University Medical Center and the
2  individuals named herein.
3  Q   Okay. So this is a copy of your lawsuit
4  setting for your claims in this case; right?
5  A   Yes.
6  Q   Could you turn to what's marked Page 13.
7  I'll ask you some questions about this, but first the
8  claims you've raised in this case have to do with, in
9  part, discrimination, harassment, and retaliation;
10  right?
11  A   Yes.
12  Q   And based on national origin, race, and
13  age?
14  A   Yes.
15  Q   You have some other claims against the
16  individual defendants, and we will talk about those
17  later. But I want to focus on the discrimination
18  claims and harassment claims and those bases.
19  If you look at the top of Page 13 and
20  the paragraphs that are enumerated A through F, there
21  is a list there of categories of conduct I think you
22  are claiming was discriminatory or harassing; is that
23  right.
24  A   That's right.

Page 8

1  Q   And is this a complete list of the
2  categories of conduct you believe was discriminatory
3  or harassing that you are seeking to pursue in this
4  case?
5  A   As far as I can surmise here, yes.
6  I believe this is pretty complete.
7  Q   Are you aware as you sit here now of
8  anything else that you claim is discriminatory or
9  harassing?
10  A   Not that I can recall right now.
11  Q   Okay. So in paragraph A it indicates you
12  were harassed by and given false negative evaluations
13  from supervising CRNAs. Do you see that?
14  A   Yes.
15  Q   Is part of your claim there that you were
16  both given false negative evaluations but also
17  addressed in ways during your attempts to attend to
18  patients in clinical settings in ways that impacted
19  your ability to perform?
20  A   Yes. I believe that.
21  Q   So those are two different things?
22  A   I believe both happened to me.
23  I experienced both during my time there.
24  Q   I don't see anything listed in these

Page 9

1  categories about comments that anyone made to you
2  about your race or your national origin. I'm
3  wondering are you claiming that anyone at Rush during
4  the time that you were enrolled in the SRNA program,
5  did anyone make any derogatory comments to you based
6  on race or national origin?
7  A   Not that I recall.
8  Q   I'm sorry?
9  A   Not that I recall.
10  Q   What does that mean?
11  A   Well, I didn't hear anything outright that
12  directed their comments towards my race that directed
13  their actions, so no comments that I've heard that's
14  directed to my race or origin.
15  Q   Okay. So no comments about your race or
16  national origin?
17  A   Yes.
18  Q   Directly?
19  A   Yes.
20  Q   At any time while you were enrolled at
21  Rush?
22  A   Yes.
23  Q   I know there is an allegation -- and we
24  can go over this -- about comments about your age that



3 (Pages 6 to 9)

## Page 10

1  you address in your complaint that were raised by Ray
2  Narbone.
3      A  Yes.
4      Q  Other than Ray Narbone, do you recall
5  anyone at Rush saying anything to you in a derogatory
6  or negative way about your age?
7      A  Dr. Kremer enforced that statement by
8  Mr. Ray Narbone that your age is a hindrance to my
9  progression to the program, so he reenforced his
10  statements from what I recall.
11      Q  When you say he, that Mr. Kremer
12  reenforced Mr. Narbone's statements, what do you mean?
13      A  He said, right, Nurse Marcial, do you
14  think -- Let me just try to recollect.  When
15  Mr. Narbone said your age might affect your
16  progression, I believe Dr. Kremer said, Yes, Maricel,
17  do consider, maybe consider another program, like to
18  switch to another program.  I think that's how they
19  segued it to the Clinical Nurse Ladder Program.
20          So, from my impression, he was
21  reenforcing Mr. Narbone's statement of my age being an
22  impedance to my progression to the program.
23      Q  Okay.  Did Mr. Kremer say anything
24  directly about your age?

## Page 11

1      A  No.
2      Q  And the comment you were describing
3  occurring in the same meeting with Mr. Narbone?
4      A  Yes.
5      Q  You said something there about Mr. Narbone
6  saying that age might affect your progression?
7      A  Yes.
8      Q  Did he say those words?
9      A  No.  I can't really say the exact words
10  except for what's stated here.  I guess I'm
11  summarizing it, what he said, that don't you think
12  you're too old for this program; and we wrote it down
13  here.
14      Q  So I think you're saying as you sit here
15  you don't remember exactly what Mr. Narbone said about
16  your age during that meeting?
17      A  Just whatever we have written here.
18      Q  So as you sit here now, you don't remember
19  that yourself?
20      A  Not the exact words; but pertaining to my
21  age, I do remember him referring to my age as
22  something that would be an impedance to my
23  progression.
24      Q  That's how you interpreted what he said?

## Page 12

1      A  Yes.
2      Q  You wrote I believe -- and we can look at
3  this later.  You wrote some documents at the time that
4  explained what he said to you; right?
5      A  Yes.
6      Q  Would you rely more on those documents and
7  your recitation of what he said to you than your
8  ability to remember here today?
9      A  Yes.  I would rely more on that.
10      Q  If you could turn to -- Let me back up.
11  So I believe you're saying that no CRNA ever said
12  anything to you in a derogatory way about your race;
13  right?
14      A  Correct.
15      Q  And no CRNA at Rush ever said anything
16  negative or derogatory to you about your national
17  origin?
18      A  Yes.
19      Q  And no CRNA ever said anything derogatory
20  or negative about your age; right?
21      A  Yes.
22      Q  What about Judy Wiley, did she say
23  anything degenerative or negative about your age,
24  race, or national origin?

## Page 13

1      A  No.
2      Q  If you could turn to Page 19 of your
3  Second Amended Complaint, I want to ask you about a
4  couple of questions.  Near the bottom of the page it
5  lists Count 4, retaliation and violation of Title VII
6  and then a series of other words.  Do you see that?
7      A  Uh-huh.
8      Q  I'm sorry?
9      A  Yes.
10      Q  So in Paragraph 86 it indicates that you
11  submitted a complaint of discriminatory abuse and
12  mistreatment to the director of the Compliance Office,
13  Shannon Shumpert.  Do you see that?
14      A  Yes.
15      Q  It indicates that was submitted in April
16  of 2014?
17      A  Yes.
18      Q  Is that right?
19      A  Yes.  That's correct.
20      Q  Had you raised any complaint about
21  discrimination or harassment on the basis of your age,
22  race, or national origin before 2014?
23      A  No.
24      Q  So the first time you raised those



Page 14

1  concerns about discrimination were in April of 2014;
2  is that right?
3      A   I had in my meetings with Dr. Kremer had
4  verbally complained to him that I feel there was some
5  discriminatory or disparate treatment that I was
6  receiving, so with Dr. Kremer I have.
7      Q   When did you first do that?
8      A   To the best of my recollection, it was
9  right after I received about three false negative or
10 negative evaluations in my performance. I raised the
11 concern that I felt like I was being discriminated on.
12     Q   When was that?
13     A   On or about about my leave of absence,
14 probably a couple weeks before that.
15     Q   Are you sure?  You're talking about your
16 leave of absence in 2013?
17     A   2013.
18     Q   Are you sure that you told Mr. Kremer
19 about your leave of absence that you thought your
20 mistreatment was discriminatory on the basis of your
21 national origin, race, or age?
22     A   I believe I had mentioned to him that I
23 felt that owing to my interaction with my other
24 minority classmates, particularly Karen Kam, also a

Page 15

1  Filipino who had received some -- She went through
2  some harassment with Jill Wimberly as well. With that
3  in mind, I presented my complaint to Dr. Kremer.
4      Q   I'm trying to understand how certain you
5  are that in your communication with Dr. Kremer that
6  you mentioned age, race, or national origin
7  discrimination in 2013?  How certain are you that you
8  did that then?
9      A   I'm certain about the race, but I didn't
10 raise the issue with age and national origin just
11 because with Karen she was also paired with another
12 white student; and Jill mistreated her but not the
13 other white student who was Kim Huntzinger.
14         So Karen had disclosed to me that she
15 felt there was discriminatory treatment between the
16 two of them because Miss Wimberly left Kim Huntzinger
17 alone while grilling Karen tremendously; and I felt
18 the same way. So Karen had warned me the night before
19 of Miss Wimberly's actions.
20     Q   You are saying it was sometime after Karen
21 Cam told you that that you told Dr. Kremer you
22 believed you were subjected to discriminatory
23 treatment?
24     MS. SIEGEL:  I'm going to object. I believe

Page 16

1  you misspoke.  You might want to ask the question
2  again.
3      MR. LAND:  Q  Did you understand what I said?
4      A   No.
5      Q   You're talking about a conversation with
6  Karen Kam?
7      A   Yes.
8      Q   You believe it was after a conversation
9  with Karen Kam that you reported to Dr. Kremer that
10 you were subjected to discriminatory treatment on the
11 basis of your race; is that right?
12     A   Not immediately after. It was over a
13 couple of -- well, after I received a couple of
14 negative evaluations in the course of our -- I think
15 we had three meetings I had raised that concern.
16     Q   Three meetings with Dr. Kremer?
17     A   Dr. Kremer and with Dr. Wiley.
18     Q   During the summer of 2013?
19     A   Yes.
20     Q   Are you sure that it was one of those
21 three meetings that you raised the discrimination
22 issue with Dr. Kremer?
23     MS. SIEGEL:  It's been asked and answered.
24         You may answer.

Page 17

1      A   I believe it was in one of those meetings
2  that I raised that concern.
3      MR. LAND:  Q  The reason I ask is because you
4  say you believe and not that you know.
5      A   Yes.
6      Q   And I'm not sure if you do know.
7      A   I'm not sure which part of the or which of
8  the meetings, but I know in one of the meetings I had
9  raised that concern.
10     Q   Only one of them?
11     A   I believe so because from what I recall,
12 Dr. Kremer countered or argued with me that, Are you
13 alleging that they're colluding against you, and I
14 vehemently responded, Yes, I believe they are
15 colluding against me.
16     Q   Are you saying you had that discussion in
17 the same meeting where you reported you believed it
18 was because of race discrimination?
19     A   It might have been leading up to another
20 meeting, but I'm not sure of which part of it; but I
21 know that I had raised that concern in probably a
22 later meeting that we had prior to my leave of
23 absence.
24     Q   Who was in the meeting when you raised the



Page 18

1    issue of race discrimination with Dr. Kremer?
2        A   Just Dr. Kremer.
3        Q   Let me ask you a little bit about your
4    background.  So before you enrolled in the SRNA
5    program at Rush you were an ICU nurse?
6        A   Yes.
7        Q   How long were you in that role?
8        A   About 13 years prior to my start because I
9    started as an ICU nurse in 2000, so I think I
10   matriculated around 2012.  So when I started the core
11   program, it was 2013.  So about 13 years of ICU
12   experience.
13       Q   What does an ICU nurse do generally?
14       A   So I'm a primary bedside nurse.  I usually
15   have about two to three patients that I provide
16   critical care to them primarily for patients who have
17   medical and cardiac critical conditions.
18           I also collaborate with the doctors in
19   bringing to them like the status of the patients and
20   the treatment plans.
21           I've also participated in the
22   committees in our unit, primarily in informatics and
23   also some safety measures that we enforce in the unit.
24           I've also done some teaching of like

Page 19

1    new orientees and nursing students who visit our unit.
2        Q   Do you interact with anesthesiologists as
3    an ICU nurse?
4        A   On occasions when I have to bring my
5    patients to surgery or if they come and would like to
6    ask about the status of the patient, when the
7    anesthesiologist would come up to our unit to ask
8    about patient's condition and any special background,
9    medical conditions that would preclude them from
10   surgery.
11       Q   So before or after surgery you might
12   consult with an anesthesiologist?
13       A   Before surgery and afterwards too, where
14   they give me a report of what kind of anesthetic
15   management they did and any events during surgery and
16   also preferences and pain management postoperatively.
17       Q   So as an ICU nurse, you did not consult or
18   talk with any anesthesiologist during surgery?
19       A   On occasions I would call them and report
20   to them about possible special needs the patient may
21   have that would enable or optimize the patient for
22   surgery.  Like if they have a history of postop nausea
23   and vomiting, then I try to highlight that to make
24   sure that they premedicate the patient enough that

Page 20

1    this complication doesn't occur afterwards.
2        Q   You would have that conversation during
3    surgery?
4        A   No, no before surgery.
5        Q   My question was have you ever interacted
6    with anesthesiologists during surgery?
7        A   No.
8        Q   Do you ever interact with
9    anesthesiologists during surgery?
10       A   No.
11       Q   You talked about collaborating with
12   doctors about treatment plans?
13       A   Uh-huh.
14       Q   Would the doctors direct you to what to do
15   with the treatment plan as an ICU nurse?
16       A   On occasion I would present some
17   treatments or needs that the patient might have and
18   request for them to order certain procedures or
19   certain treatments like physical therapy or wound
20   care.
21           Also I would report, you know, current
22   status, highlight the abnormals or significant
23   symptoms that a patient might have and the progress of
24   their care, so mostly reporting status, requesting for

Page 21

1    orders for the patient's progression.  And that's
2    mostly the gist of it, the interactions with them.
3        Q   So the doctors would decide on treatment
4    plans and might take your input --
5        A   Yes.
6        Q   -- into their consideration in making
7    those decisions?
8        A   Yes.
9        Q   But you wouldn't decide on the treatment
10   plan as the ICU nurse; right?
11       A   No.
12       Q   How much independent judgment did you have
13   as an ICU nurse about treatment of patients?
14       A   I would say some amount of independent
15   judgment because on occasions we would -- Like let's
16   say a patient's blood pressure is dropping.  Then I
17   would go ahead and start fluids before I can reach the
18   doctor because I know that that's our protocol.
19           There are also some pre-made or like
20   nurse-driven orders that, like a sepsis protocol,
21   where we draw labs and follow the guidelines of what
22   to do in managing a patient who is in septic shock.
23       Q   Would you would it's fair that most of
24   your treatment of patients as an ICU nurse, most of



Page 22

1  your treatment was directed by doctors or physicians?
2      A   Yes.
3      Q   Let's talk a little bit about the SRNA
4  program.  So what would you say the objectives and
5  requirements are for the SRNA program?  What's the
6  goal of enrolling in that program?
7      A   The goal is to be able to provide
8  efficient and safe service in anesthesia, to be able
9  to act independently as a professional nurse
10 anesthesiologist, to be able to work with a team
11 effectively and I guess enforce the care or the
12 provision of care provided by the anesthesia staff.
13     Q   The degree of acting independently as a
14 CRNA, is that different than an ICU nurse?
15     A   I would say there is much more autonomy as
16 a CRNA.
17     Q   Would you agree that working as a CRNA
18 involves conduct that can relate to the life and death
19 of the patients?
20     A   Yes.
21     Q   More so than an ICU nurse?
22     A   I feel -- From my experience, I engaged in
23 more death situations like Code Blue or cardiac
24 arrests.  So I forgot to mention that earlier, that I

Page 23

1  was part of the Code Blue team, so that's about a two
2  to three times a week basis when I'm at work.  So I
3  run to emergency events where I participate in
4  reviving or resuscitating patients.
5          So I've seen that happen more in my
6  time as an ICU nurse than in my time as a Student
7  Registered Nurse Anesthetist or as an SRNA.
8      Q   So aside from a comparison to your ICU
9  experience, would you agree that CRNAs would be in
10 positions to affect life and death consequences for
11 patients in administering anesthesia?
12     A   Yes.
13     Q   And that's an important element of patient
14 safety for CRNAs?
15     A   Yes.
16     Q   Are the standards of the Rush SRNA program
17 high?  Are they difficult and tough?
18     A   From our perception -- it was students --
19 yes, we felt they have standards that we have to
20 maintain; and some are difficult but not
21 insurmountable.
22     Q   Do you think there is a correlation
23 between how difficult those standards are and how
24 important they are to how important the life and death

Page 24

1  approach to anesthesia is?
2      A   To some extent I do although in
3  researching other programs I felt that their standards
4  correlated with the quality of care that they provided
5  without compromising the safety and health and
6  well-being of their student residents.
7      Q   I'm not sure what you're referring to
8  there.  Are you saying other programs when you say
9  they?
10     A   Uh-huh, other programs.
11     Q   So the SRNA program had kind of two main
12 components, right, a didactic component and a clinical
13 component?
14     A   Yes.
15     Q   How long was didactic component?
16     A   Well, I had to same take some
17 prerequisites.  So from what I recall, I think it took
18 me two years for the prereqs, and then the core
19 competencies I would approximate around two years.
20     Q   So you started in --
21     A   2011 I was already taking courses,
22 prerequisites like anatomy and statistics.
23     Q   When did you finish with your courses, the
24 didactic part?

Page 25

1      A   I believe May of 2013.
2      Q   Did any aspect of the didactic part of the
3  program at Rush involve clinical work?
4      A   During the didactic courses, we had about
5  two days of the week that we were in clinicals.
6      Q   Who oversaw your work when you were in the
7  didactic part of the program but in the two or
8  three days a week of clinicals?
9      A   I'm sorry?
10     Q   What role of the person oversaw your work
11 or evaluated you?
12     A   So CRNAs and Dr. Kremer providing the
13 lectures and Dr. Wiley as well.
14     Q   Did Mr. Narbone ever evaluate your work in
15 the clinicals during the didactic program?
16     A   No.
17     Q   Did you believe that the evaluations of
18 you during that component of the program were fair?
19     A   Well, the didactics were graded, so I felt
20 they were fair; and in the clinicals, yes, I believe
21 most of them were.  I believe they're fair.
22     Q   Did you ever tell anyone at Rush that you
23 thought any component of the clinical evaluation of
24 you during the didactic portion of the program was



Page 26

1  unfair?
2      A  Not that I recall.
3      Q  Does that mean you didn't or you are not
4  sure?
5      A  I think with my classmates we compared,
6  I guess we compared our evaluations at times and had
7  our own like opinions of how they were graded as
8  compared to our other classmates.
9      Q  Do you believe as you sit here now that
10  any evaluation of you by a CRNA during the didactic
11  part of the program in the clinicals was unfair?
12      A  I don't think so, that there was --
13  I thought they were fair then.
14      Q  Do you think they're fair now?
15      A  Not for the later clinical evaluations
16  during my -- Oh, you mean if --
17      Q  I'm talking about the earlier ones.
18      A  Right now?
19      Q  Yeah.
20      A  Yes.  I think they are fair.
21      Q  During the didactic part of the program,
22  was part of that involving learning certain drugs?
23      A  Yes.
24      Q  How they worked?

Page 27

1      A  Yes.
2      Q  Dosages?
3      A  Yes.
4      Q  I know I'm speaking very generally here
5  about what I assume is a very significant part of the
6  program; is that right?
7      A  Yes.
8      Q  Was there a list of drugs that you needed
9  to know about by heart and dosages and their actions,
10  how they worked in the body?
11      A  Mostly the emergency drugs.  We had sort
12  of a rough guide of which ones we have to know by
13  heart.
14      Q  When you say it was a rough guide, what do
15  you mean?
16      A  Well, I guess each student -- Well, we
17  were given the basic emergency drugs and what we need
18  to be more familiar with; and each student also added
19  to their list of things to know by heart during, you
20  know, the didactics.
21      Q  As part of the Rush program, were you
22  given a list of drugs to know by heart?
23      A  Yes.
24      Q  What do you remember were the drugs that

Page 28

1  were on that list?
2      A  We have Atropine, neostigmine,
3  glycopyrrolate.  There is phenylephrine, pain
4  medications of course, morphine, fentanyl.
5      Q  How about muscle relaxants?
6      A  Yeah, muscle relaxants, reversal drugs,
7  induction medications like Versed and some anesthetics
8  like Lidocaine.
9      Q  What muscle relaxants do you remember
10  being on the list?
11      A  I believe they're rocuronium,
12  succinylcholine, cisatracurium.
13      Q  And which reversal drugs were on the list
14  that you needed to know by heart?
15      A  Gosh, there is like glyco and neostigmine
16  and -- I don't recall right now.  I haven't seen those
17  things in a while.
18      Q  That was impressive.  I know it's been a
19  while.
20          So you didn't just need to learn the
21  name of the drug.  You needed to learn what it did?
22      A  Yes.
23      Q  And what else would you need to learn
24  about those drugs?

Page 29

1      A  Any contraindications, any particular
2  patient medical history that would be considered in
3  choosing which kind of drug would be appropriate for
4  them.
5      Q  What about knowing the drug's actions?
6      A  Yes.
7      Q  What does that mean, a drug's actions?
8      A  The physiology or how it affects the
9  body's physiology and the duration or the onset of
10  start, like what effect it actually provides and
11  duration of actions, mechanism of action of the drug.
12      Q  So for each of the drugs on the list you
13  need to know what it was.  You need to know how it
14  worked in the body and how long it would affect the
15  patient?
16      A  Yes.
17      Q  What about dosages?
18      A  Yes, that too.
19      Q  Is there a range of appropriate dosage?
20      A  Yes.
21      Q  For different drugs?
22      A  Yes.  Some of the drugs were weight-based;
23  and depending on also the medical comorbidities of the
24  patient, then you taper or tailor it to that patient's



Page 30

1    unique needs.
2        Q    And that was again part didactic program;
3    right?
4        A    Yes.
5        Q    So by the time you moved into the later
6    part of the program was which was the clinical part --
7        A    Yes.
8        Q    -- say, I don't know, sometimes you refer
9    it to the residency, you were expected to know all of
10   those drugs by heart and how they worked and their
11   actions and duration; right?
12       A    Yes.  That's fair.  That's why we carry
13   our what they call cheat sheet or little cards to
14   remind us because there are quite a bit of them; and
15   the range of doses can be confusing for some students,
16   for us.
17       Q    What does it mean to know a list of drugs
18   and how they work by heart?  I think it means you
19   don't need to refer to something.  But does that mean
20   something else to you?
21       A    Yes.  Even if you know it by heart, for me
22   and most of my classmates, we still refer to a card to
23   make sure that we are appropriately dosing the patient
24   because there are some drugs that have very close dose

Page 31

1    ranges.
2            And to be sure that we're not making
3    any mistakes, we're referring to those guides off and
4    to make sure that we have the correct dosages.  Even
5    though I mean we are familiar with the drug, the
6    numbers are still what throws us off sometimes, and so
7    we have to refer to our dosage references.
8        Q    So let's talk about the clinical part of
9    the program.  Is it okay if we call that the residency
10   part?
11       A    Okay.
12       Q    For you that started in May of 2013; is
13   that right?
14       A    Yes, like a later part of May.
15       Q    And the clinical component, the residency
16   part of the program is different than the didactic
17   part; right?
18       A    Yes.
19       Q    How is it different?
20       A    Well, we were in the clinical area five
21   days a week, sometimes six to do postoperative
22   follow-up.  We would probably be in class for journal
23   club they call it where we discuss some articles, and
24   there is also some classwork where we presented our

Page 32

1    assigned I guess topics that relate to anesthesia.
2            Like I think in my case I presented
3    patient-controlled analgesia in one of the -- I forgot
4    what they called it, capstone -- it's not capstone but
5    one of those student presentations.  So there is
6    limited class work but mostly clinical work.
7        Q    When you say mostly clinical work, like
8    what percentage of your time was spent in clinicals?
9        A    I would say about 90 percent.
10       Q    Were the requirements, expectations for
11   you during residency different than they were during
12   the didactic part of the program?
13       A    I believe they were because that's more,
14   you know, hands on like clinical exposure, yeah.
15       Q    Were the expectations of your ability to
16   apply what you learned to the clinical setting higher
17   during the residency program?
18       A    Yes.
19       Q    So you were expected to be able to apply
20   knowledge you had learned in the didactic part of the
21   program; right?
22       A    Yes.
23       Q    When you were in the clinicals during
24   residency, was it common for the anesthesia plan you

Page 33

1    had set for a particular case to change?
2        A    Yes.  Well, it's not uncommon, but you
3    expect it to happen.
4        Q    Did you say it's not uncommon?
5        A    It's not very --
6        Q    Let me back up.
7        A    Yeah.
8        Q    Is it common for the anesthesia plan to
9    change during a case?  Did you experience that when
10   you were in the residency program?
11       A    Not a whole lot.  It usually was it pretty
12   consistent.
13       Q    What do you mean by that?
14       A    So if we prepared for -- because prior to
15   our cases in the morning, we look up the patients,
16   their history, and we devise an anesthesia care plan
17   that basically has the drugs that we plan to use the
18   next day.
19           But of course if there is an emergent
20   issue that arises during surgery, then that's where
21   plans may not follow the care plan that we have
22   prepared the night before.
23       Q    Are you saying that in your experience
24   most of the time the care plan you prepared the night



Page 34

1 before is just what you followed during the case?
2    A   For the most part.
3    Q   How often would you have to vary from
4 that?
5    A   That's usually just a guide; so in
6 different cases, different things arise and of in the
7 course of the surgery.  So I don't know that there is
8 much that --
9           I can't really recall like a particular
10 case; but for the most part we followed the guide, and
11 it just gives us sort of an overview of what to expect
12 during surgery.
13    Q   When you say guide, I think you're also
14 referring to the anesthesia plan that you prepared the
15 night before?
16    A   Yes.
17    Q   Did it have options to consider during the
18 case?
19    A   I think on like one of the pages we --
20 Because we have to tailor it to the patient's
21 comorbidities or other conditions, then we have --
22 Well, I prepare like in one of the pages how this
23 disease would -- We anticipate or I would anticipate
24 certain things that could happen as a result of the

Page 35

1 patient's comorbidity, so I add that towards the end
2 of my care plan as I anticipate the possibility of
3 these complications.
4    Q   Okay.  That's what I'm trying to get at.
5 Aside from specific examples like that, isn't it
6 common in the course of the case that you would need
7 to make some decisions about what to do from an
8 anesthesia care perspective?
9    A   Yes.
10    Q   So you would need to understand your guide
11 or your plan but adjust to the circumstances?
12    A   Exactly.
13    Q   And was that every time you'd have to do
14 that or was it part of the time?
15    A   Well, there are some cases that are more
16 simple, so things go along as planned.  I would say
17 most of the time it goes the way we planned it.
18    Q   By that you mean you wouldn't have to make
19 any decisions during the case about treatment or do
20 you mean something else?
21    A   No.  There are tweaks that happen
22 throughout with each surgery.  So I guess what I'm
23 saying is the guide, I mean the plan is just your
24 overview guide; but you come in expecting that things

Page 36

1 can change dramatically from one minute to the next.
2 So you would anticipate how to treat or possibly see
3 what you can do to treat those occurrences.
4    Q   Would you say it's accurate to say there
5 are dozens of decision points you have to make during
6 a particular case as an SRNA?
7    A   Yes.
8    Q   On each patient there would be dozens of
9 them?
10    A   Yes.
11    Q   As part of the residency program were you
12 required to show the ability to exercise your judgment
13 when conditions changed in the course of a case?
14    A   Yes.
15    Q   And that's pretty much every patient?
16    A   Yes.
17    Q   And that was different than the didactic
18 part of the program?
19    A   In terms of the clinical part in the
20 didactic?
21    Q   Yeah, the judgment element, the
22 requirement or you as an SRNA to demonstrate your
23 judgment in the moment of a case, was there a
24 heightened element to exercise that judgment during

Page 37

1 the residency program?
2    A   Yes.
3    Q   Was part of your role in the residency
4 program that you needed to be able to react to
5 information as it evolved during the course of a case?
6    A   Yes.
7    Q   Would that include recognizing and
8 diagnosing issues and making decisions about keeping
9 patients safe?
10    A   Yes.
11    Q   Would you say it's accurate to say that
12 CRNAs exercise judgment about what to do during the
13 course of a case about 80 to 85 percent of the time?
14    A   CRNAs in collaboration with the
15 anesthesiologist sometimes even at the start of a case
16 I've seen where a CRNA would present an anesthesia
17 plan and an anesthesiologist will also kind of modify
18 it; and so it's like an agreement between the two.
19    Q   How much of the time do you think a CRNA
20 makes a completely independent judgment during the
21 course of a case?
22    A   I would say about 80 percent.
23    Q   And that is a big change from being an ICU
24 nurse; right?



Page 38

1    A   Yes.
2    Q   During your first term of residency, you
3   were initially assigned with a CRNA to every case?
4    A   Yes.
5    Q   Sort of one-on-one monitoring of your work
6   as a SRNA?
7    A   Yes.
8    Q   Did you ever progress past that?
9    A   I had occasions prior to -- well, in the
10   summer I think around June when I was with Dr. Wiley a
11   couple of times where I was left alone in some of the
12   cases because she was also overseeing another student.
13   So for the majority of the case I was by myself.
14        And then in other cases too
15   sporadically throughout the residency I had periods
16   where I'm alone in the room because there was only one
17   lead shield they call it where there is a constant use
18   of fluoroscopy or X-ray technology that only affords
19   protection -- the lead shield only affords for one
20   staff.
21        So my CRNA and anesthesiologist would
22   sometimes be in the monitoring room adjacent to the OR
23   suite, and basically I would be running the provision
24   of anesthesia with hardly any feedback from them.

Page 39

1    Q   But they were there?
2    A   They were in the monitoring room just
3   looking, but for the most part I managed the majority
4   of the case.
5    Q   But they were watching what you were
6   doing?
7    A   Yes.
8    Q   Would you say that the vast majority of
9   time during your residency program you were supervised
10   by a CRNA?
11    A   Yes.
12    Q   And as part of the program within the SRNA
13   program and the clinical development part to start
14   weaning SRNAs from one-on-one supervision?
15    A   Yes.
16    Q   And you never entered that phase; right?
17    A   I was not allowed to enter into that
18   phase.
19    Q   Why weren't you allowed to enter into that
20   phase?
21        MS. SIEGEL: I'm going to object. That calls
22   for speculation.
23        MR. LAND: Q You can answer if you know.
24    A   That's their decision. I don't know what

Page 40

1   their decision paths were to make that, to put me into
2   one-to-one supervision the whole time.
3    Q   No one ever told you why they wouldn't put
4   you into one-to-one, take you away from the one-to-one
5   supervision component?
6    A   Dr. Wiley had mentioned that I still need
7   one-to-one supervision based on supposedly my negative
8   evals, although one of the clinical associate
9   directors, Renee Prygodska had told me or asked me,
10   Why are you still not on your own?  You are more than
11   ready. So I have had experiences with her several
12   times, and she had seen my work.
13        Two other anesthesiologists had
14   mentioned that observation.
15    Q   Two other anesthesiologists is?
16    A   Yes.  One was Dr. Lai, and I believe the
17   other one was Dr. Katsionis (phonetic).
18    Q   Can you say Renee's last name again?
19    A   It's Prygodzka, P-r-y-g-o-d-z-k-a.
20   I think that's how you spell it.
21    Q   When did she tell you she thought you
22   could be on your own?
23    A   This was when I came back from my leave of
24   absence.

Page 41

1    Q   So in 2014?
2    A   Yes.
3    Q   Do you know when in 2014 she said that to
4   you?
5    A   So we had done -- I'm trying to think.  It
6   was after one of our breaks in the endoscopy unit, and
7   so I would say probably around February.  She had
8   filled out an eval, so I would be able to know more of
9   the dates that I was with her.
10    Q   During the residency portion of the
11   program, you are aware that the program called for
12   frequent clinical evaluations from CRNAs; right?
13    A   Yes.
14    Q   And a summative evaluation every term?
15    A   Yes.
16    Q   Summing up those evaluations throughout
17   the term?
18    A   Yes.
19    Q   That was the point.
20        Was there a requirement to receive 28
21   written evaluations every term for all you students in
22   the program?
23    A   Yes.
24    Q   And you knew that when you started the



Page 42

1   residency program?
2       A   Yes.
3       Q   Were clinical courses graded as pass-fail?
4       A   Yes.
5       Q   Do you know that students were required to
6   consistently meet or exceed standards in order to
7   pass?
8       A   Yes.
9       Q   And do you know that multiple
10  unsatisfactory ratings or repeated patient safety
11  concerns could be grounds for course failure in the
12  residency program?
13      A   I was told that.
14      Q   So you knew that when you started?
15      A   Yes.
16      Q   Meaning that if you had an unsatisfactory
17  rating from a CRNA on a clinical evaluation, that was
18  significant to you; right?
19      A   Yes.
20      Q   It rendered you at risk for failing the
21  course; right?
22      A   Yes.
23      Q   And it rendered you at risk for failing
24  out of the program?

Page 43

1       A   Yes.
2       Q   So it was a big concern to you I assume --
3   but tell me if I'm wrong -- if you received multiple
4   unsatisfactory ratings and clinical evaluations;
5   right?
6       A   It was a big concern for me.
7       Q   During the clinical component, during the
8   residency program, who evaluated you?
9       A   There were multiple CRNAs.
10      Q   CRNAs evaluated you?
11      A   Anesthesiologists.  Those are the two main
12  people.  And Dr. Kremer had come in a couple of times
13  to look at my work.  So in some sense he gave me
14  feedback.  He had emailed me about, when he came to
15  visit me one time.
16      Q   One time?
17      A   Well, he visited me twice, but he emailed
18  me this one time to remind me, also to him -- I think
19  it was Jim Miller I was with at that time -- an
20  evaluation; and he also gave me feedback on how I did.
21      Q   Do you remember when Dr. Kremer reviewed
22  you that way or evaluated you if it was before your
23  leave of absence or after?
24      A   I believe it was after my leave of

Page 44

1   absence.
2       Q   Were both of his visits after the leave of
3   absence?
4       A   Yes.
5       Q   Judy Wiley evaluated you too; right?
6       A   Yes.
7       Q   Is she a CRNA?
8       A   Yes.
9       Q   Did Ray Narbone evaluate at all when you
10  were in the residency program?
11      A   No.
12      Q   Let's talk a little bit about
13  anesthesiologists and their reviews.  Were they ever
14  critical of you?
15      A   Some would be; but in terms of the written
16  one, they're mostly favorable.
17      Q   Were any of them unsatisfactory?
18      A   Not that I recall.
19      Q   The written ones?
20      A   No.
21      Q   Do you know if that's common for other
22  students, to have anesthesiologists not provide any
23  written unsatisfactory rankings?
24      A   I don't know what my other classmates have

Page 45

1   gotten.  We don't really share or show each other's
2   evaluations for the most part, so I don't know what
3   theirs looks like.
4       Q   Did you ever hear of any other student
5   getting an unsatisfactory ranking from an
6   anesthesiologist?
7       A   I've heard one or two.
8       Q   Did you ever hear that anesthesiologists
9   are pretty much easier graders than the CRNAs?
10      A   I think I heard that from my one
11  classmate.
12      Q   Okay.  Do you know if that's true?
13      A   I guess it all depends on which
14  anesthesiologist you're approaching and also how the
15  case went.  Even if it was a nicer anesthesiologist,
16  if he really felt that you were not performing well,
17  then you get what you deserve.  I felt they were fair
18  enough and not overly -- gracious with grading.
19      Q   Were the CRNAs the primary people
20  responsible for evaluating grading SRNA's program
21  performance?
22      A   At the beginning, but later on the
23  anesthesiologists also took a much more frequent role
24  in grading the SRNAs.



Page 46

1    Q    In your experience did that happen?
2    A    That's usually what we experience.
3    Q    You're talking about what you experienced
4  is my question.
5    A    What is the question?
6    Q    You were saying as you moved on in the
7  program, anesthesiologists provided more evaluation?
8    A    Yes.
9    Q    And that happened to you?
10   A    No, because I was mostly one to one with a
11  CRNA. So if either the CRNA has left and the
12  anesthesiologist is there still there, then I would
13  give the evaluation to them.
14   Q    So when you talk about anesthesiologists
15  providing more evaluative information, that's at the
16  point of the program when SRNAs moved beyond the
17  one-on-one monitoring with the CRNA?
18   A    Yes.
19   Q    You were saying Ray Narbone did not do any
20  evaluating of CRNA performance in the residency
21  program; right?
22   A    Of my performance, yeah.
23   Q    What's your understanding of what his role
24  was with respect to the SRNA program?

Page 47

1    A    I think he -- Well, the job that I know he
2  does is he coordinates the cases by assigning them to
3  particular anesthesia staff. So he I guess runs
4  interference or what do call it, scheduling cases with
5  anesthesia staff and also scheduling, you know, SRNAs,
6  their case loads for the day.
7    Q    Do you know anything else about any role
8  he played within the SRNA program?
9    A    As far as I know, he's the chief of the
10  CRNAs; so he coordinates with them or talks to them
11  about their affairs or whatever agenda they have. I'm
12  not really sure what his direct role is with them.
13   Q    What do you mean by any agenda they have?
14   A    Like meetings and student feedback, yeah.
15  That's as far as I know.
16   Q    What do you know about how CRNAs and SRNAs
17  are paired or assigned to cases? I'm not sure if you
18  know much with that.
19   A    No. They don't tell us really how we are
20  paired to certain CRNAs.
21       I guess -- Well, later on you have to
22  meet a certain case requirement for particular
23  specialties like ENT or neuro; and so I guess it has
24  to be attuned to what specialty you are in to be able

Page 48

1  to get a certain number of those cases in your
2  requirement.
3    Q    Do you have a sense there is an attempt in
4  scheduling SRNAs the cases to get them a variety of
5  exposure to different kinds of cases?
6    A    I guess so.
7    Q    And different medical situations?
8    A    Yes.
9    Q    Do you know if there is any -- You may
10  not, but is there any effort to consider how
11  complicated a situation might be based on how an SRNA
12  is performing, whether they can handle it?
13   A    I think there is some consideration to
14  that, but I really don't know what his algorithm is to
15  assign.
16   Q    Do you know if there is any effort to mix
17  up who SRNAs are paired with respect with respect to
18  CRNAs?
19   A    There is some, yes. I think there is --
20  You know, they try to attempt that.
21   Q    Is there any goal to get SRNAs used to
22  working with different people because that's part of
23  what CRNAs actually do?
24       MS. SIEGEL: Object: Calls for speculation.

Page 49

1    A    I don't know.
2    MR. LAND: Q  You don't know?
3    A    No.
4    Q    No one ever talked to you but any goal
5  like that for the SRNA program?
6    A    Not to my recollection.
7    Q    Do CRNAs work with a lot of different
8  people in the OR?
9    A    Yeah. They work with various people that
10  I know.
11   Q    Do you think it's important for CRNAs to
12  get used to working with different people, sometimes
13  people they don't know?
14   A    I think so.
15   Q    It's part of the professionalism of a
16  CRNA?
17   A    Yeah.
18   Q    How many people would be present typically
19  when you were working in the residency part of your
20  program in a particular case? How many people would
21  be there in the operating room with you generally?
22   A    Probably ten, or, no, probably less than
23  that. Depending on the case, it could be as little as
24  four people and as much as maybe ten.



Page 50

1    Q   That could include another SRNA?
2    A   That's on occasion, but we're talking
3  about OR staff as well, right, in the room.
4    Q   Uh-huh.
5    A   Yeah.
6    Q   I'm wondering about people who would be
7  present when you would have been engaged in the
8  residency program in a case in a clinical, would there
9  be another SRNA there sometimes?
10   A   On occasions, yeah.
11   Q   What about a CRNA, there would always be
12 one there pretty much; right?
13   A   Yes.
14   Q   And a nurse?
15   A   OR nurse?
16   Q   Yeah.
17   A   Yes.
18   Q   What about a scrub nurse or scrub tech?
19   A   Yes.
20   Q   Maybe a resident?
21   A   Usually residents -- well, surgical
22 residents of course.
23   Q   And maybe an anesthesiologist resident
24 too?

Page 51

1    A   Usually they don't perform in the same
2  case. They have their own assignments if they're
3  anesthesia residents.
4    Q   Okay. And there would always be an
5  anesthesiologist there when you were engaged in
6  clinicals during the residency program; right?
7    A   Yes.
8    Q   Would those people generally be able to
9  observe what you experienced when you are in a case?
10   A   I don't know if they would be paying
11 attention to me so much as the whole case itself.
12   Q   But they're present and could observe?
13   A   Yes.
14   Q   You are not sure if they would, but they
15 could; right?
16   A   Yes. They could.
17   Q   Let me ask you about some basic
18 anesthesiology setup common steps; and I'm obviously
19 not an anesthesiologist or trained, so forgive me if I
20 explain things, correct me if I explain it
21 incorrectly.
22       Is it a common step to check the
23 anesthesia machine?
24   A   Yes.

Page 52

1    Q   Is that the ventilator?
2    A   The anesthesia machine they call it, but
3  it is a ventilator.
4    Q   Is it a common setup to have airway
5  management steps ready?
6    A   Yes.
7    Q   And does that include having a breathing
8  tube, having a correct size and other instruments?
9    A   Yes.
10   Q   Is it a common step to have suction set
11 up?
12   A   Yes.
13   Q   And that involves connecting to the vacuum
14 system that exists in the building?
15   A   Yes.
16   Q   And hook it up from the wall to a canister
17 and then to the patient; is that right?
18   A   Well, from the wall to the canister; and
19 then it's just an open vacuum area that you use to
20 attach to like what they call a suction device, a
21 Yankauer. So it's not attached to the patient. It's
22 just used as needed to clean out the patient's
23 secretions or any, you know, blood that might be on
24 the patient, to help clean them up.

Page 53

1    Q   Thank you. I understand that.
2        Did you learn about suction and how
3  that worked when you were an ICU nurse?
4    A   Yes.
5    Q   So you were fairly familiar with the wall
6  to the canister and then use on the patient, that
7  process?
8    A   Yes.
9    Q   Is another common setup step to have the
10 appropriate drugs drawn up and labeled?
11   A   Yes.
12   Q   And what does it mean to have a drug drawn
13 up?
14   A   So you have it in a syringe and make sure
15 you have the right drug label on it. On occasion like
16 different people have labeled it differently where
17 like with residents, they don't even bother to write
18 the dosages there. But for us, we mostly write our
19 doses there. But if it's the right label, then you
20 know that you have the right drug that you are giving
21 to the patient.
22   Q   So when you say residents might not do
23 that, what kind of residents?
24   A   Medical residents or sometimes --



Page 54

1    Q   So CRNAs write both the name of the drug
2  and the dosage?
3    A   Yes.
4    Q   On the syringe?
5    A   Yes.
6    Q   On a label put on the syringe?
7    A   Yes.
8    Q   And that was the expectation for you too?
9    A   Yes.
10   Q   Would you say that the core of your claims
11 have of discrimination is that CRNAs fabricated and
12 falsified clinical evaluations of your performance?
13   A   I believe some of the false evaluations
14 weren't entirely, misrepresented my work.
15   Q   Did some of them accurately represent your
16 work?
17   A   No.
18   Q   None of them did?
19   A   I mean some of them did not accurately
20 represent my work.
21   Q   Did some of the critical evaluations of
22 your work accurately reflect your work?
23   A   Yes.
24   MS. SIEGEL:  Are you going into a new set of

Page 55

1  exhibits?
2    MR. LAND:  Yeah.  Do you want to take a break?
3    MS. SIEGEL:  Yeah.
4        (Whereupon a brief recess was had,
5        after which the deposition of
6        Ms. Marcial continued as
7        follows:)
8        (Marcial Deposition Exhibit No. 2
9        was marked for identification.)
10   MR. LAND:  Back on the record.
11   Q   I hand you what's marked Marcial
12 Deposition Exhibit Number 2.  It's a group exhibit.
13 I don't need you to look at every page in here.  It's
14 a compilation of various clinical evaluation forms for
15 you.
16   A   Yes.
17   Q   These are for the time period preceding
18 your move into the residency program, so really from
19 April, 2013 back through the time in 2012.
20       And you would agree with me that time
21 period is sort of going backwards?
22   A   Yes.
23   Q   So April of 2013 back into 2012, that
24 preceded your time in the residency program; right?

Page 56

1    A   Yes.
2    Q   I just want to direct your attention to a
3  few of these pages.  Like the first page, it appears
4  to be a review of you by Judy Wiley from April 11,
5  2013; is that right?
6    A   Yes.
7    Q   Is her review of you here positive?
8    A   It says here satisfactory.
9    Q   And do you think that this review was fair
10 of you?
11   A   I believe I performed well that day.
12   Q   Do you think this review is fair?
13   A   Yes.
14   Q   It indicates in the comments:  Overall a
15 good day, need to work on putting things together and
16 application what you've learned; right?
17   A   Yes.
18   Q   Is that a fair comment?
19   A   Yes.
20   Q   The next page is an evaluation from March
21 28th, 2013, the date of your case in the clinical
22 residency program, right, by Mary Rodzik; is that
23 right?
24   A   Yes.

Page 57

1    Q   Was this review positive?  It rated you as
2  satisfactory?
3    A   It looks -- Overall it says in there
4  satisfactory as well as the comments are positive.
5    Q   Did you think this review is fair?
6    A   Yeah.
7    Q   The next page, it's a review from Alida
8  Hooker from it looks like March 22nd, 2012; but the
9  date it's signed is March 21, 2013.  Is that your
10 signature at the bottom as well?
11   A   Yes.
12   Q   Dated March 21, 2013?
13   A   Yes.
14   Q   Is this review positive of your work?
15   A   It looks overall positive.
16   Q   Do you think this review is fair by CRNA
17 Hooker?
18   A   I think so.
19   Q   If you turn to the next page, it's another
20 review from Alida Hooker, this one dated April 4,
21 2013?
22   A   Yes.
23   Q   Is that positive and do you think it's
24 fair?



Page 58

1    A    Yes.
2    Q    If you could turn back a few pages, at the
3  bottom sometimes there are numbers.  This one is Rush
4  126 is the one I'm looking for.  If you go into it a
5  few pages, you'll find Rush 126.
6    A    Okay.
7    Q    They're not in numeric order they're in
8  date order.  It's the seventh page into the exhibit?
9    A    Okay.
10   Q    This appears to be a review or evaluation
11 of you by Sheila Warren?
12   A    Yes.
13   Q    Dated February 14, 2013.
14        And this rates you as satisfactory as
15 well?
16   A    Yes.
17   Q    Did you think this review was fair by CRNA
18 Warren?
19   A    Yes.
20   Q    This review also notes in the comment
21 section some things for you to work on; right?
22   A    It appears that.
23   Q    Was this review accurate?
24   A    I don't recall like the exact details of

Page 59

1  that case.  I also had gotten this later on in the
2  month.  Like this was dated the 2nd of or February 14,
3  and I think I had seen this much later; so it's hard
4  to recollect.
5    Q    Do you have any reason or any basis to say
6  that any aspect of this review by CRNA Warren was
7  inaccurate?
8    A    No.
9    Q    If you could turn to the next page, this
10 appears to be an evaluation of you by Amy Gawura?
11   A    Yes.
12   Q    Dated February 7, 2013?
13   A    Yes.
14   Q    Is this also a positive review of you?
15   A    It appears to be.
16   Q    Did you think this was fair?
17   A    Like I said, I don't recall the actual
18 dates; and I don't even know if I saw this since I
19 haven't signed it.
20   Q    Any reason to believe it wasn't fair?
21   A    Not that I recall.
22   Q    If you turn to the next page, it appears
23 to be an evaluation again by Amy Gawura dated
24 January 24, 2013?

Page 60

1    A    Uh-huh.
2    Q    This one you did sign; right?
3    A    Yes.
4    Q    Is this review also satisfactory and
5  positive of your work?
6    A    As indicated there, yes.
7    Q    It indicates at expected level; is that
8  right?
9    A    Yes.
10   Q    Did you think this was fair, this review
11 by CRNA Gawura?
12   A    To the best of my knowledge.  If I had
13 signed this, I might have seen it like, but yes.
14   Q    Do you have any hesitancy of saying this
15 was a fair evaluation?
16   A    No.  I don't think so.
17   Q    One more I want to ask you about is Rush
18 112 at the bottom, and it's maybe ten pages from the
19 back.  There it is.
20        You see this review, this evaluation is
21 by Eva Fisher dated November 26; is that right?
22   A    Yes.
23   Q    2012?
24   A    Yes.

Page 61

1    Q    Does this review rate you as satisfactory?
2    A    As it's marked there, yes.
3    Q    And you signed this review?
4    A    Yes.
5    Q    Did you think this review was fair?
6    A    Yes.
7         MS. SIEGEL:  I'm going to object.  No. Withdraw
8  the objection.
9         MR. LAND:  Q  I'm sorry.  I have one more.
10 It's Rush 121, and it's three to four pages from the
11 back.
12   A    All right.
13   Q    This appears to be a review by a faculty
14 member named Colino?
15   A    Yes.
16   Q    Dated October 8, 2012?
17   A    Yes.
18   Q    Do you know who that refers to, Colino?
19   A    One of the CRNAs.  I think it's Katie
20 Colino.
21   Q    Do you think this review is fair?
22   A    She didn't discuss this with me, so I
23 didn't get a chance to like review it with her.
24 I didn't sign it.



Page 62

1    Q   So do you have any reason as you sit
2  here -- I think what you're saying is you don't know
3  if this was fair or not?
4    MS. SIEGEL:  What page are we on?
5    A   121.
6       Yeah.
7    MR. LAND:  Q  I think you're saying you don't
8  know if this was fair or not, this evaluation?
9    A   Yes.
10   Q   Before you started in the residency
11 program, did you have any basis to believe that Katie
12 Colino had evaluated you in an unfair way?
13   A   Before I started in the residency?
14   Q   Yeah.
15   A   Not that I recall.
16   Q   You can put that exhibit aside.
17      We talked before the break about the
18 core of your claims, part of your claims is that you
19 believed that CRNAs falsified or fabricated portions
20 of critical evaluations of you during the residency
21 program period; right?
22   A   Yes.
23   Q   And we were talking about not all of them
24 were false or not all of them were fabricated in terms

Page 63

1  of their criticisms; right?
2    A   Yes.
3    Q   So you agree that in some cases the CRNAs
4  identified mistakes you had made that were problems
5  and that were accurate?
6    A   Yes, some.
7    Q   And we will look at some of the documents,
8  and I know you wrote a bunch of things about the
9  evaluations about the CRNAs.  In some of them you
10 conceded you had some bad days; right?
11   A   I believe so.
12   Q   And that in some instances you conceded
13 that there were dosage, drug dosage issues that were
14 raised that were accurate about your work; right?
15   A   Yes.
16   Q   And that in some situations there were
17 airway management issues and criticisms of your work
18 that you were raised that you agreed were correct; is
19 that right?
20   A   I don't recall.  I think I mentioned in
21 the rebuttal section I don't recall those instances.
22   Q   So you are not sure if you ever agreed
23 with the CRNA during the residency part of the program
24 that you made mistakes with respect to airway

Page 64

1  management?
2    A   I might have made like a miscalculation.
3  There were some things that I didn't agree with.
4    Q   And I'm wondering about the things that
5  you did agree with --
6    A   Yes.
7    Q   -- their criticisms of you and whether
8  that included any airway management issues?
9    A   I think so.
10   Q   What about instrument monitoring issues,
11 did you also agree with some CRNA criticism of you
12 with respect to that?
13   A   I'd have to determine exactly which ones
14 because I think I had reviewed some of them.
15   Q   Okay.  So you are not sure if you agreed
16 with others criticism of your instrument monitoring
17 performance?
18   A   Yes.
19   Q   Is that what you're saying, you are not
20 sure?
21   A   No.  I'm not sure.
22   Q   I think you're saying that some CRNA
23 evaluations of you that raised criticisms and rated
24 you as unsatisfactory during the residency program

Page 65

1  were fair and accurate?
2    MS. SIEGEL:  I'm going to object.  It
3  mischaracterizes the witness's testimony.
4    MR. LAND:  Q  Is that an accurate statement?
5    MS. SIEGEL:  Can we have that back, please?
6       (Whereupon the last question
7        was read.)
8    Q   Is that an accurate statement?
9    MS. SIEGEL:  Same objection.
10   A   No.  I don't think some of them were fair
11 and accurate.
12   MR. LAND:  Q  Does that mean you're saying that
13 every unsatisfactory rating that you got from a CRNA
14 during the residency program was unfair or not
15 accurate?
16   A   No.
17   Q   So some of them were fair?
18   A   Yes.
19   Q   Some of them were accurate?
20   A   Yes.
21   Q   Were some of the mistakes that you made
22 during the residency program aspects of you having
23 difficulty applying knowledge that you knew in the OR
24 setting?



Page 66

1    A   Can you repeat that question?
2    Q   Were some of the mistakes that you made
3  issues where you knew what to do, you just didn't do
4  the right thing in the OR setting?
5    A   I just have to recall. I guess yes.
6    MS. SIEGEL: Objection: Calls for speculation.
7  Move to strike.
8    MR. LAND: Q  You don't know?
9    A   No.
10    Q   Were some of your points of contention
11  with the CRNA evaluations of you, were they related to
12  issues that you had a different judgment than the
13  CRNA?
14    A   Yes.
15    Q   About like standard of care or what's
16  appropriate care?
17    A   No, about their biases.
18    Q   I guess what I'm wondering is were there
19  times when you just disagreed about medical judgments
20  with the CRNA's criticism of you?
21    A   Yes.
22    Q   And sometimes you felt that they were
23  making up facts that didn't happen?
24    A   No.

Page 67

1    Q   Did you vocalize your disagreement with
2  the CRNA's judgment about medical issues involving
3  your work?
4    A   On occasion.
5    Q   Is that different than other students?
6    A   No.
7    Q   How do you know?
8    A   Well, just from when we have our talks
9  with the SRNAs that I'm close with, how they would
10  argue certain aspects of the anesthesia progression or
11  how it's managed.
12    Q   Is part of the education as an SRNA to
13  accept criticism from CRNAs and learn from it?
14    A   Yes.
15    Q   Did you think that you had difficulty
16  doing that?
17    A   No.
18    Q   Did you ever tell any therapist or doctor
19  that you did?
20    A   Accepting criticisms?
21    Q   Yeah.
22    A   No.
23    Q   No? You never discussed that with a
24  therapist or a doctor, difficulty accepting criticism,

Page 68

1  defensiveness to criticism?
2    A   No.
3    Q   Are you sure?
4    A   That I was defensive --
5    Q   Yeah.
6    A   -- when I was criticized? I don't recall
7  mentioning that to the doctors, the school counselor
8  that I spoke to on a regular basis, so no.
9    Q   What do you know about your performance
10  during the clinical residency program compared to
11  other students in the program?
12    A   I don't compare my work on a daily basis
13  with them, but I have a strong feeling that I was
14  average or even above some of my classmates. That's
15  my appraisal.
16    Q   Based upon what information did you make
17  that appraisal?
18    A   The tasks that I was assigned, the kinds
19  of cases that I was assigned to, my evaluations on
20  some of those complicated cases, certain specialized
21  tasks that I was trusted to do; and I've asked them if
22  they have done the same, and some of them haven't.
23    Q   Is that all that you know about other
24  student's performance is asking them if they have done

Page 69

1  some of the same things you did and their responses to
2  you?
3    A   Just on occasions they would show me their
4  eval.
5    Q   Who showed you their eval?
6    A   Some of my classmates.
7    Q   Which ones?
8    A   I believe Miss Ebele had showed one to me.
9  I don't recall my other classmates, but on occasions
10  we have seen each others evals.
11    Q   So I'm wondering about you and seeing
12  other students' evaluations, how many do you think
13  you've seen in total?
14    A   Probably three.
15    Q   Other than what they have told you about
16  procedures they have done and the three evaluations
17  you've seen, what else do you know about other
18  students' performance in the residency program?
19    A   Just my classmates talking about how other
20  students performed.
21    Q   So students other than themselves?
22    A   Yes.
23    Q   Any other basis of information for how
24  other students performed that you know?



Page 70

1    A   Not that I know of.
2    Q   So do you feel like you can actually
3  compare in a thorough way your performance in the
4  residency program to other students?
5    A   No.
6    Q   Is it accurate to say that you believe
7  that Jill Wimberly started the unfair criticism of you
8  during the residency program?
9    A   Yes.
10   Q   You are claiming that Miss Wimberly
11 communicated to other CRNAs who followed her lead?
12   A   Yes.
13   Q   That they colluded together; right?
14   A   Yes.
15   Q   You've said that they agreed to evaluate
16 you unfairly.  Is that what you mean?
17   A   From what I've observed.
18   Q   What exactly do you believe that they
19 agreed to do, the CRNAs?
20      MS. SIEGEL:  I'm going to object.  It calls for
21 speculation.
22         You can answer.
23   A   I don't know.
24      MR. LAND:  Q  What do you base your belief

Page 71

1  about that collusion on?
2    A   A couple of instances where I saw Jill
3  talking to Eva almost in the discreet way whispering
4  into, her ear and then looking at me and then
5  whispering again, sort of implicating that they're
6  talking about me and an occurrence that happened with
7  Miss Eva Fisher showed up in Miss Wimberly's
8  evaluation of me when it didn't happen on the occasion
9  I was with her.
10   Q   You're saying Wimberly wrote about
11 something that Fisher observed in an evaluation?
12   A   Yes.
13   Q   Do you know when that was?
14   A   Around June.
15   Q   June of 2013?
16   A   Yes.
17   Q   I asked you why you believed that CRNAs
18 were colluding to provide negative and critical,
19 unfair, untrue evaluations of you; and you told me
20 about a conversation you saw between Jill Wimberly and
21 Eva Fisher?
22   A   Uh-huh.
23   Q   And one evaluation of Jill Wimberly that
24 included in your opinion information that Eva Fisher

Page 72

1  observed; right?
2    A   Yes.
3    Q   Is there anything else that you base your
4  allegation of collusion on?
5    A   I told Dr. -- Well, Dr. Kremer told me or
6  sort of accused me that I am assuming the CRNAs are
7  colluding against each other towards me; and I told
8  him, yes, I believe that, and he didn't argue back.
9  So that gave me the impression that he knew about this
10 happening.
11   Q   Okay.  Other than that conversation with
12 Dr. Kremer, is there any other based evidence or
13 basis, facts you have to support your belief that
14 CRNAs were colluding against you?
15   A   Over the course of my researching about,
16 you know, what's been happening to me, I have gotten
17 comments from former students and current students
18 about how they're being treated and similarities with
19 my experience.
20   Q   You mean after you were dismissed from the
21 program?
22   A   No, during and after.
23   Q   So other students told you things about
24 the CRNAs that led you to believe that they were

Page 73

1  colluding against you?
2    A   Not mainly me, but people in my racial or
3  like the minority group and protected class.
4    Q   So who told you that?
5    A   Miss Okonkwor, Miss Karen Kam, Mr. Hakeem
6  Ellis, Mr. Kazim Fojolli (phonetic), Mr. Ben
7  Gardner I'm trying to think of who else.  That's the
8  best of my recollection right now.
9    Q   What did Okonkwor tell you?
10   A   That on occasions she was with another
11 student who is a minority.  I'm trying to refresh my
12 memory.  Oh, actually that's a different SRNA.  Well,
13 in terms of the --
14   Q   I want to know what they told you about
15 CRNAs colluding.  Did Okonkwor say anything about it?
16   A   She had told me that she told Dr. Kremer
17 she feels there is discrimination and that the CRNAs
18 are very much a part of it and Dr. Kremer wrote or
19 told her back, like I didn't know about this, why
20 didn't you tell me.  And she said, And what, be
21 expelled from the program if I open my mouth.  I would
22 just rather keep it myself because I know you won't do
23 anything.
24   Q   Do you know anything more about what



Page 74

1  Okonkwor said to you?
2      A    Just similar impressions of how she was
3  graded versus how a white student was graded if she
4  was paired with another student from what I vaguely
5  recall.
6      Q    What about Karen Kam, what did she say
7  about collusion of CRNAs?
8      A    She was the one paired with another white
9  student; and she felt that she was grilled much more
10 harshly and was humiliated during the case whereas her
11 colleague, white classmate was left alone to perform
12 her work without being maybe questioned once and
13 basically left alone to do the case without much
14 interference.
15     Q    Did she say that happened one time?
16     A    Yes.
17     Q    Which CRNA did she say?
18     A    Jill Wimberly.
19     Q    Is that the day before your negative
20 evaluation from Jill Wimberly?
21     A    Yes.
22     Q    In June of 2013?
23     A    Yes, from what I recall.
24     Q    Did Karen Cam say anything else about

Page 75

1  collusion between CRNAs?
2      A    She would mention comments.  I don't
3  recall the exact detail of who was close to each other
4  and would likely influence their judgment of us.  But
5  I don't know the -- I can't really say the exact
6  detail of what she said.  She intimated to me?
7      Q    What about Ellis, what did Ellis say about
8  collusion among CRNAs?
9      A    Same comments of how he was being treated;
10 but also when he had participated in the internal
11 investigation, he had told me afterwards that he
12 voiced his concern of discrimination.
13     Q    What was his concern about discrimination?
14     A    That he feels he is disparately treated
15 compared to this other nonminority classmates.
16     Q    In what way?
17     A    He didn't go into it, but he said during
18 an internal investigation he voiced that concern.
19     Q    So you don't know what he thought was the
20 different treatment he received, what even the issue
21 was?
22     A    There were instances when he returned from
23 being away from Rush after being on an off-site for a
24 while coming back, and he started getting paired one

Page 76

1  on one with CRNAs again; and he said a lot of
2  experiences there were negative.
3      Q    In what way?
4      A    I guess little things get pointed at which
5  weren't really issues but would show up in his eval,
6  like wearing pair of gloves even though they were
7  newly donned; and it was interpreted in a very
8  negative way in his evaluation even though it wasn't
9  how, you know, it turned out or how the occurrence
10 happened.
11     Q    Anything else he said that was
12 discriminatory against him besides that?
13     A    There were two other CRNAs who I don't
14 recall who they were, but he mentioned them.  That was
15 a while back, so I don't recall.
16     Q    Did he tell you which CRNA gave him
17 criticism on these little things like gloves?
18     A    I don't recall.
19     Q    But it was one CRNA who did that?
20     A    I believe so.
21     Q    What about is it Fojolli?
22     A    Fojolli.
23     Q    What did Fojolli say about collusion among
24 CRNAs?

Page 77

1      A    With him it was a CRNA who had already
2  left; and he said that he had been put under scrutiny,
3  more scrutiny because of one complaint by a CRNA which
4  was later I guess unfounded or was disregarded because
5  he was assigned to Dr. Wiley then; and Dr. Wiley had
6  said you are okay.  So that previous issue really was
7  probably a one-time incident.  But he felt there were
8  some treatments that were not fair towards him.
9      Q    By one CRNA?
10     A    Several others.  He didn't really
11 elaborate.
12     Q    I'm not sure what you mean.  He said there
13 were multiple CRNAs who had mistreated him but he
14 didn't say who or how?
15     A    I don't recall the names because with the
16 other students, the CRNA names were, you know, kind of
17 mixed; so I'm not sure of specific ones but
18 Mr. Fojolli.
19     Q    Are you sure he was referencing more than
20 one CRNA as creating problems for him in a
21 discriminatory way?
22     A    That's what he intimated to me.
23     Q    That's what he what?
24     A    That's what he indicated to me.



Page 78

1      Q   What about Gardner and collusion among
2  CRNAs, what did he say to you?
3      A   That he was behind a group of CRNAs and
4  they were talking about different SRNAs and how they
5  were going to treat them and a comment made by one
6  CRNA saying, well, we are the gatekeepers and we
7  determine who gets through or not.
8      Q   Is that true?
9      MS. SIEGEL:  I'm going to object.  Calls for
10  speculation.
11      MR. LAND:  Let me ask it a different way.
12      Q   Do you believe it's true that the CRNAs
13  act as gatekeepers as to who gets through the SRNA
14  program?
15      A   I have a strong sense that that was
16  happening.
17      Q   Isn't that kind of their role in
18  evaluating SRNAs and whether their performance is
19  satisfactory or unsatisfactory?
20      A   If they were not tainted with their own
21  motives.
22      Q   But that's not what I'm asking.  I'm
23  asking isn't that their role, not what their motives
24  are.  But isn't that their role?

Page 79

1      A   Their role is to be fair with us in their
2  treatment and grading.
3      Q   But to evaluate and grade and identify
4  unsatisfactory performance if they see it; right?
5      A   In what is fair.
6      Q   Okay.  So you are agreeing with me, as
7  long as it's fair?
8      A   As long as it's fair.
9      Q   Other than the comments from those five
10  other students and other things you've told me about
11  why you believe there was collusion among the CRNAs to
12  unfairly criticize your performance, is there any
13  other reason you believe that that's what happened to
14  you?
15      A   More CRNAs or more SRNAs in the later
16  program or later batch had told me their own
17  experiences.
18      Q   You are saying other students besides the
19  ones you've identified talked about their own
20  experiences?
21      A   Uh-huh, yes.
22      Q   Involving CRNA collusion?
23      A   Yes.
24      Q   To unfairly criticize people?

Page 80

1      A   Yes.
2      Q   How many?
3      A   A later batch.  We have Mahalia and
4  Dwight.
5      Q   What did Mahalia say?
6      A   Just the harassment she felt that Wimberly
7  treated her is I believe -- That's mostly what I
8  recall.
9      Q   So she said that Jill Wimberly harassed
10  her and didn't treat her well?
11      A   Yes.
12      Q   What about Dwight, what did Dwight say
13  that you interpret as indicating collusion among CRNAs
14  to unfairly evaluate SRNAs?
15      A   Dwight had mentioned to me how he wrote an
16  eval that was disparaging, not disparaging but
17  negative towards one CRNA because of his experience
18  with her; and I don't remember the exact details.
19      Q   So Dwight told you he wrote a written
20  evaluation of a CRNA that was critical?
21      A   Uh-huh, yes.
22      Q   And that's all you remember Dwight saying
23  to you?
24      A   He made the comment of how he felt that he

Page 81

1  was treated differently.
2      Q   Is that all you remember either Dwight or
3  Mahalia saying about CRNA treatment of SRNAs?
4      A   Well, with Mahalia there is multiple
5  infractions; but the gist of it is she mostly had
6  negative instances with Jill, and she brought this to
7  Dr. Kremer's attention, but she kept getting assigned
8  to her.
9      Q   Do you know if nonminority students had
10  problems with Jill Wimberly?
11      A   I don't recall.  I don't.  Yeah.  I don't.
12      Q   Does that mean you don't know?
13      A   I don't know.
14      Q   Which CRNAs with respect to you and
15  evaluations of you do you believe Jill Wimberly
16  colluded with to give you negative evaluations?  You
17  mentioned Eva Fisher.
18      A   I can't say for sure.
19      Q   Why not?
20      A   I guess there is no written, just more of
21  an observation, but nothing outright to say that she
22  did approach them.
23      Q   When you say just an observation, you mean
24  your own observation?



Page 82

1    A   Yeah.
2    Q   Your observation of what leads you to
3  believe that others colluded with Jill Wimberly and
4  Eva Fisher?
5    A   From my recollection, just one other CRNA
6  who wrote me up after Jill had relieved her. I'm
7  trying to recall because I was relieved by Ray from
8  that case, and Jill complained to that CRNA who I was
9  with that morning that I didn't return even though Ray
10  had relieved me.
11       And so I believe I got a negative
12  evaluation from that other CRNA even though I don't
13  recall anything that she said would have been wrong
14  during that day in our case.
15    Q   Who was that other CRNA?
16    A   Lea Forester.
17    Q   Anything else that leads you to believe
18  that there was collusion amongst CRNAs?
19    A   So in addition to those students --
20    Q   Let me back up. Is there any other people
21  that you believe, other CRNAs who colluded with Jill
22  Wimberly and Eva Fisher?
23    A   Is there any other CRNAs that colluded
24  with --

Page 83

1    Q   Yeah.
2    A   I don't know.
3    Q   Wasn't Jill Wimberly new as a CRNA when
4  you were in residency in May and June of 2013?
5    A   From what I recall, yes.
6    Q   Was Eva Fisher new as a CRNA?
7    A   No.
8    Q   Why would other CRNAs follow Jill Wimberly
9  in her effort to unfairly criticize you; do you know?
10    MS. SIEGEL: Calls for speculation.
11    A   I have no idea.
12    MR. LAND: Q   Did you say you have no idea.
13    A   No.
14    MS. SIEGEL: I move to strike. That calls for
15  speculation.
16    MR. LAND: Q   How many times did you actually
17  work with Jill Wimberly during clinicals from May,
18  2013 through August of 2013?
19    A   I believe there were two full occasions
20  and two other times I was assigned to her, but I got
21  sick on the fourth time I believe.
22    Q   So two times where you actually worked
23  with her in that time?
24    A   Yes.

Page 84

1    Q   And two other times where you were
2  assigned to her but didn't end up working with her?
3    A   Yes. The one time is when Ray relieved me
4  from being assigned to her. I was sent home, and then
5  the fourth time is when I had to call in the day
6  before I was assigned the next day to her; and, yeah,
7  I didn't come in that day.
8    Q   Did you receive written evaluations from
9  Jill Wimberly for both times you worked with her
10  during that time, May, 2013 to August, 2013?
11    A   Yes.
12    Q   One of them was positive; right?
13    A   Yes.
14    Q   So it was only one time when she was
15  critical of you during that time period?
16    A   In written form, but she reported me to
17  Lea because I didn't show up even though Ray had
18  relieved me.
19    Q   Then Lea wrote you up, is that what you're
20  saying?
21    A   I believe she wrote me a negative eval
22  later on.
23    Q   About your not showing up?
24    A   No, about the case that we had, not

Page 85

1  necessarily that day, I think another day.
2    Q   So I think you're saying you didn't get a
3  negative critical evaluation of the day when Jill told
4  Lea you didn't show up when she was in incorrect but
5  that that influenced Lea's later evaluation of you on
6  a different day, is that what you're saying?
7    A   I believe so, yes.
8    MR. LAND: Mark this as Exhibit 3.
9       (Marcial Deposition Exhibit No. 3
10       was marked for identification.)
11    Q   Exhibit 3, do you recognize this document?
12    A   Yes.
13    Q   So it's entitled Plaintiff's Responses and
14  Objections to Defendants' First Set of
15  Interrogatories. Do you see that?
16    A   Yes.
17    Q   These are your responses to my client's
18  questions called interrogatories. And if you look at
19  the last page of the exhibit, that's your signature;
20  right?
21    A   Yes.
22    Q   Indicating that you are verifying that
23  these responses are accurate and true?
24    A   Yes.



Page 86

1    Q   Could you turn to Page 17. If you look,
2  there is paragraph enumerated C. Do you see that?
3    A   Uh-huh, yes.
4    Q   It says: On or about blank, 2013
5  Miss Marcial told Dr. Kremer that she believed she was
6  being subjected to harder or more frequent questioning
7  during her cases than other SRNAs resulting in unfair,
8  negative evaluations and that other SRNAs had
9  expressed surprise at the frequency and difficulty.
10  Do you see that?
11    A   Yes.
12    Q   And it says she pointed out to Dr. Kremer
13  that the suspect group of CRNAs included defendant
14  Wimberly, Eva Fisher, Angela Keehn, Amy Gawura and Lea
15  Forester. Do you see that?
16    A   Yes.
17    Q   Do you know when you told Dr. Kremer that?
18    A   I believe right around July before,
19  leading up to my leave of absence.
20    Q   Had Angela Keehn evaluated you as of July
21  of 2013?
22    A   I don't recall who I've had that time so
23  far.
24    Q   Isn't this paragraph intended to explain

Page 87

1  that you thought that these are the people who were
2  treating you harshly and subjecting you to harder and
3  more frequent questioning during the cases?
4    A   Yes.
5    Q   Is it possible that Angela Keehn hadn't
6  even evaluated you or worked with you at that time?
7    A   I don't recall. Like every day that I was
8  there I believe, I had been with her on one of those
9  days; and there is certain times when I hand them an
10  evaluation and they don't return it so.
11    Q   What do you remember about Angela Keehn
12  evaluating you in 2013 or talking to you or asking you
13  questions during a case?
14    A   I don't recall like my encounters with her
15  then because I am not sure if I'm recalling stuff that
16  happened in 2014 or 2013 just because at that time the
17  distress I was going through, I just was not sleeping
18  enough.
19    Q   So there may not have been a time in 2013
20  when Angela Keehn treated you poorly in an evaluation
21  or in a case?
22    A   Yeah. I don't recall exactly.
23    Q   What about Lea Forester, do you recall any
24  time where she treated you poorly during the case

Page 88

1  itself as opposed to giving you a critical evaluation?
2    A   There was an occasion when she was
3  questioning me quite a bit; and then I later was
4  showed the evaluation, and I had to refute them point
5  by point, that my suggestions were valid. I think
6  that was -- Yeah. That was with her.
7    Q   What do you remember about her questioning
8  you quite a bit?
9    A   There was a patient who told me about --
10  I'm not sure if this is from this instance but where a
11  patient who came in for port placement as an
12  outpatient procedure ended up being a general case;
13  and so I suggested that we use Epolamine which is more
14  for general cases.
15    Q   What was that you suggested using?
16    A   Epolamine patch.
17    Q   Okay.
18    A   And she said that that was a poor -- like
19  in the eval, that was an inappropriate plan.
20    Q   What did she saying say during the case
21  itself that you thought was overly critical or harder
22  and more frequent questioning?
23    A   I think during cases I was being
24  questioned from time to time about different like, you

Page 89

1  know -- I think it was about air embolism, and she had
2  asked me about the symptoms. But in the evaluation, I
3  think she wrote that I couldn't answer what the
4  treatment was, so she had switched it around or like
5  didn't really put down the right questioning them.
6    Q   So you are concerned with how she treated
7  you during the case and that she asked you a lot of
8  questions?
9    A   Not necessarily then. But when I saw the
10  eval of how she translated my answers and my
11  actions --
12    Q   So you're --
13  MS. SIEGEL: She is still answering.
14  MR. LAND: I'm sorry.
15      Can we have the question back and the
16  witness's answer.
17      (Whereupon the requested portion
18        of the record was read.)
19    A   -- then I felt that they weren't lining
20  up.
21  MR. LAND: Q   Did you have a concern about how
22  she addressed you during the case itself?
23    A   Not right then.
24    Q   What about Eva Fisher, did you ever have a



23  (Pages 86 to 89)

Page 90

1 concern about how she, Eva Fisher addressed you during
2 a case itself versus what she wrote in an evaluation?
3     A  Not during a case.
4     Q  With respect to Amy Gawura, would you turn
5 to Page 19. In the third full paragraph on this page,
6 three-quarters of the way down, the paragraph, the
7 sentence that starts I perceived Miss Gawura, do you
8 see that?
9     A  Yes.
10     Q  It says: I perceived Miss Gawura as tough
11 but fair, and I had decided to approach her to help
12 me. Do you see that?
13     A  Yes.
14     Q  Is that an accurate description of how Amy
15 Gawura treated you during cases?
16     A  My appraisal then was yes.
17     Q  Was there ever a time where during a case
18 she didn't treat you properly?
19     A  Yes. There was different instances, not
20 this one.
21     Q  What I'm asking you is during the case
22 itself as opposed to her evaluation after the case,
23 was there ever a time where during the case itself she
24 talked to you or asked you questions or approached you

Page 91

1 in a way that you thought wasn't appropriate?
2     A  Not during this particular case.
3     Q  Was there some other case where she talked
4 to you poorly during the case itself?
5     A  Yes.
6     Q  What do you remember about that?
7     A  It was I believe surgery for a breast
8 resection type of surgery, and it was a younger
9 patient; and I was in the process of intubating the
10 patient, so I had the blade in my one hand. And I'm
11 not sure if she held me; but clearly she told me, If
12 you as so much chip that patient's teeth, I will knock
13 yours myself.
14         And this was witnessed by the surgeon
15 and his resident who reacted saying, Did you hear that
16 CRNA threaten that student?
17     Q  When was that?
18     A  I believe that was after my return from my
19 leave.
20     Q  Other than that one comment, was there
21 anything else in that case that you thought was
22 inappropriate that she said to you?
23     A  Not to my recollection.
24     Q  Other than that case, are there any other

Page 92

1 cases where you thought that Amy Gawura said anything
2 inappropriate to you during the case itself?
3     A  No.
4     Q  During May of 2013 through the time you
5 took your leave of absence in August of 2013, there
6 were other CRNAs who treated you or worked with you
7 and evaluated you; right?
8     A  Yes.
9     Q  Did any of them treat you poorly during
10 that case itself?
11     A  Not to my recollection.
12     Q  So between May of 2013 and August of 2013,
13 I think you are saying the only times anyone talked to
14 you poorly during the case itself was Jill Wimberly on
15 June 20, 2013; is that right?
16     A  During the case? Yes.
17     Q  So you have issues --
18     A  No. I'm sorry. Also Miss Eva.
19     Q  Miss Eva Fisher?
20     A  Yes. I'm trying to recall.
21     Q  Let me make sure I understand what you're
22 saying. During a case between May, 2013 and August of
23 2013, you're saying Eva Fisher said something or
24 addressed you in an inappropriate way during the case?

Page 93

1     A  Not the operative case but preoperatively
2 while we were examining a pediatric patient.
3     Q  What happened?
4     A  I had discretely -- Because the patient
5 was here, we were on the head part of the patient; and
6 Eva -- I was talking to the parent; and I said -- It's
7 one of the things I was told by Lea Forester and also
8 in our lectures to ask to gauge the kid or the child's
9 readiness or gauge if they have any type of separation
10 anxiety, to ask. So I discretely asked the parent,
11 Has your child been by herself or himself before, and
12 even Eva loudly interjected, Whoa, Whoa, Whoa. We
13 don't ask those questions, and you're scaring the kid
14 is from what I recall.
15         And I didn't really argue back, but I
16 thought that it would have been better handled if she
17 pulled me aside and told me what I did wrong when I
18 was just following what I was told in the previous
19 encounters with Lea who was a pediatric CRNA as well.
20         Yeah. So that was a little -- It kind
21 of undermined me in front of the parent that I
22 apparently did something wrong.
23     Q  Is that the only thing Eva Fisher did
24 during that case in that preoperative examination that



Page 94

1 you thought was inappropriate?
2     A   Well, during the surgery, I didn't really
3 think it was any issue; but she made a big deal out of
4 me removing the expiratory part of the ventilation
5 circuit even though it was maybe a second that it came
6 off and I reattached it.
7         And just from my recollection, I
8 thought that the case was already done and they were
9 motioning to transfer the child to his crib; and so it
10 wasn't being used.  And I didn't think it was
11 inappropriate then, but she reacted strongly to it and
12 wrote me up later on in the evaluation negatively
13 pertaining to that fact.
14     Q   When you say she made a big deal about
15 that, you mean she told you not disconnect it and to
16 reconnect the ventilation circuit?
17     A   Yes, this one tube in the circuit.  It's
18 like Stop, put it back.
19     Q   She said those words.  Did she do anything
20 else?
21     A   No.  She was attending to the patient, but
22 it's more than the negative eval that followed which
23 Dr. Kremer kept pointing out what I did.
24     Q   Was there anything else that Eva Fisher

Page 95

1 did in that case that you thought was inappropriate
2 during the case?
3     A   Not that I recall.
4     Q   So other than the one time Jill Wimberly
5 on June 20, 2013 criticized you and the things in the
6 case that you think are inappropriate and the things
7 with Eva Fisher that you just described, is there
8 anything else that any CRNA did between August of 2013
9 and May of 2013 that you thought was inappropriate?
10     A   No, not that I recall.
11     Q   How would you remember if there were any
12 other instances?
13     A   On occasions I would write down at the end
14 of the day and other times just reviewing the
15 evaluations later on.  Like after, I guess mostly
16 after I was dismissed and trying to recollect what had
17 happened.
18     Q   Did you think that Eva Fisher talked to
19 you that way those two times in that one case because
20 of your race or your national origin?
21     A   No.
22     Q   Or your age?
23     A   No.
24     Q   What about with Jill Wimberly when she

Page 96

1 talked to you the way she did on June 20, 2013 which
2 we will look at, do you think that was because of your
3 age or your race or your national origin?
4     A   I have a sense it was my race with her.
5     Q   Why?
6     A   Because of the prior experience that my
7 other colleague had with her and -- yeah, mostly that
8 she had behaved differently towards a white classmate
9 versus her.
10         And going forward, Miss Ebele and
11 Mr. Hakeem also felt that she behaved that way towards
12 them more harshly than our other classmates.
13     Q   Did you ever talk to any nonminority
14 classmates about what they thought of Jill Wimberly's
15 treatment of them?
16     A   I didn't talk to them, but I was part of a
17 text group; and my white classmates would say that I
18 really don't have a problem with them.  But I'm not
19 sure if it was Kathy who said that, I know she hates
20 Asians, but I'm white, so I don't have a problem with
21 her.
22     Q   How many white classmates of yours were on
23 the text message stream that you're talking about?
24     A   Two.

Page 97

1     Q   Did the other one besides Kathy say
2 anything about Jill Wimberly's perception of Asians?
3     A   I don't recall her comments.
4     Q   Did the other white classmate say anything
5 about what she thought of Jill Wimberly?
6     A   Just that -- Oh, no.  I'm not sure now.
7     Q   So other than one white classmate saying
8 something on a text message about Jill Wimberly, do
9 you have any basis to know what other white classmates
10 thought about Jill Wimberly's treatment of them?
11     A   Well, Kim who was with her apologized to
12 Karen for the way she was treated; but she recognized
13 she didn't have any problems with her even in the
14 later encounters with Jill.
15     Q   Kim Huntzinger --
16     A   Yes.
17     Q   -- said that to Karen Cam?
18     A   Yes.
19     Q   But not to you; right?
20     A   Karen told me of what Kim said.
21     Q   Other than that, do you have any other
22 information about white classmates' perspective of
23 Jill Wimberly's treatment of them?
24     A   No.



Page 98

1    Q    Let's talk about Karen Cam for a minute.
2  Do you know what her national origin and race are?
3    A    She is Filipino.
4    Q    And that's your national origin; right?
5    A    Yes.
6    Q    So she is Asian like you are as well?
7    A    Yes.
8    Q    Is she also a similar age to you?
9    A    Yes.
10   Q    And she passed through the program; right?
11   A    Yes.
12   Q    And do you have any idea why she passed
13 through the program and you didn't?
14   A    No.
15   Q    Have you ever asked Karen about that?
16   A    I don't think we discussed it, no.  It was
17 sort of a sensitive topic.
18   Q    Could it be because her clinical
19 performance was better than yours?
20   MS. SIEGEL:  Calls for speculation.
21   A    I can't really gauge that because I've
22 never been with her.
23   MR. LAND:  Q  What about Anthony Nguyen?  I
24 might be mispronouncing it.

Page 99

1    A    Nguyen.
2    Q    Is that how you say it?
3    A    Yes.
4    Q    How do you spell it?
5    A    N-g-u-y-e-n.
6    Q    Do you know Anthony?
7    A    Yes.
8    Q    Do you know what his national origin or
9  race are?
10   A    I believe he's Vietnamese.
11   Q    Did he pass through the program?
12   A    Yes.
13   Q    Do you know why he was treated differently
14 than you?
15   MS. SIEGEL:  Calls for speculation.
16   A    No.
17   MR. LAND:  Q  Well, you do know he was treated
18 differently than you; right?
19   A    I never really interacted with him a lot,
20 and I don't know how his performance was.
21   Q    By that I mean you know that he passed
22 through the program and you did not?
23   A    Yes.
24   Q    And you don't know why that happened?

Page 100

1    A    Well --
2    MS. SIEGEL:  Same objection.
3    A    Yeah.  I don't know.  I don't know why.
4        (Whereupon a brief recess was had,
5         after which the deposition of
6         Ms. Marcial continued as
7         follows:)
8        (Marcial Deposition Exhibit No. 4
9         was marked for identification.)
10   MR. LAND:  Back on the record.
11   Q    I meant to ask you after you left Rush's
12 program, did you resume working as an ICU nurse?
13   A    Yes.
14   Q    When did you start doing that?
15   A    I think when I was on leave I started
16 working again for that five-month period that I was on
17 leave of absence, and then I believe I took a leave
18 from the hospital from my ICU work and focused on the
19 return to my residency.  Then I think I started again
20 when I was dismissed, like the week of my dismissal.
21   Q    And where are you employed as an ICU
22 nurse?
23   A    Lutheran General Hospital.
24   Q    That's where you had worked before you

Page 101

1  enrolled in the SRNA program?
2    A    Yes.
3    Q    And you're still working there now?
4    A    Yes.
5    Q    I hand you what's been marked Exhibit
6  Number 4.  Exhibit 4 is a compilation of evaluations
7  from the May, 2013 through August, 2013 time period?
8    A    Yes.
9    Q    So this is when you were in the residency
10 program that we were talking about earlier?
11   A    Yes.
12   Q    The residency portion of the program?
13   A    Yes.
14   Q    And the first two pages of this appear to
15 be a summative evaluation of you during that time
16 period?
17   A    Yes.
18   Q    Compiling examples of some of your
19 evaluative comments, evaluative comments about you;
20 right?
21   A    Yes.
22   Q    But not all?
23   A    Not all of them.
24   Q    Was this ever shared with you at the time



Page 102

1    when you were enrolled at Rush?
2        A    Not right there, not right then, not right
3    away after they wrote this. It was more towards the
4    part of it towards my leading up to my leave of
5    absence, so not contemporaneously I'm saying.
6        Q    But it was shared before you went on your
7    leave of absence?
8        A    Some of them.
9        Q    I'm talking about the summative
10   evaluation, this two-pager that's at the beginning of
11   Exhibit 4.
12       A    I believe so.
13       Q    When did you start your leave of absence?
14       A    I think it was the first week of August.
15       Q    If you look at the top of this first page,
16   it references an evaluation was done on July 30, 2013.
17   Do you see that?
18       A    Yes.
19       Q    So this was shared with you pretty close
20   in time then, right, to when it was prepared if it
21   included July 30 and you went on leave the first week
22   of August?
23       MS. SIEGEL:    When you say this, what are you
24   referring to?

Page 103

1        MR. LAND:    The summative evaluation. Thank
2    you.
3        A    Can you repeat the question?
4        MR. LAND:    Q  I'm wondering when this summative
5    evaluation was shared with you. The fact that it
6    includes a reference to a July 30, 2013 evaluation,
7    I'm wondering if that leads you to recognize you
8    received this very soon after it was prepared but
9    before you went on your leave of absence the first
10   week of August?
11       A    This first part I recognize before my
12   leave of absence.
13       Q    By the first part, you mean this two-page
14   document, the summative evaluation?
15       A    Well, the whole summative evaluation is
16   what you're referring to.
17       Q    Yeah. So this is a group exhibit --
18       A    Yes.
19       Q    -- that we compiled for purposes of this
20   deposition. The first two pages are one document?
21       A    Yes.
22       Q    That's what I'm asking you about. You
23   received that?
24       A    Yes.

Page 104

1        Q    I want to use that as a reference tool to
2    refer to some of the evaluations that come behind it?
3        A    Okay.
4        Q    That's the point of it being here. So if
5    you turn to the second page of the summative
6    evaluation, there is a reference, the last bullet
7    point says:
8                5/10/13. Great job today. Asked
9                appropriate questions, easier to
10               improve stills.
11               J. Wimberly. That indicate that
12               Jill Wimberly evaluated on May 10,
13               2013.
14           Right?
15       A    Yes.
16       Q    If you turn into the rest of this
17   document -- Rush 10 is the page number, and these are
18   numbered sequentially I believe -- does this appear to
19   be the evaluation that Jill Wimberly completed on
20   May 10, 2013 for you?
21       A    Yes.
22       Q    And the scores on this evaluation are all
23   either satisfactory or outstanding; right?
24       A    Yes.

Page 105

1        Q    And it includes in the comments the quoted
2    language I just read; right?
3        A    Yes.
4        Q    Would you agree this evaluation from Jill
5    Wimberly is fair and accurate?
6        A    I didn't see this at the time that she
7    filled it out. I haven't signed it. I didn't see it.
8        Q    Looking at it now, do you think it's fair,
9    a fair evaluation of what you did that day?
10       A    I felt I performed strongly that day, so I
11   think it's pretty accurate.
12       Q    That's what this evaluation indicates;
13   right?
14       A    Yes.
15       Q    So this was one of the two days that you
16   worked with and were evaluated by Jill Wimberly;
17   right?
18       A    Actually I just recalled that I had a
19   third full day with her in January, so there is
20   actually five encounters with her.
21       Q    What I meant was this is one of the two
22   times you worked with Jill Wimberly during 2013 in the
23   residency program?
24       A    Yes, in 2013.



## Page 106

1    Q   When you say five, you mean one in 2014,
2  two actual working together experiences in 2013, and
3  the other two that were scheduled but didn't happen;
4  right --
5    A   Yes.
6    Q   -- that you talked about before?
7    A   Yes.
8    Q   So this May 10th, 2013 evaluation reflects
9  one of the two times you worked with Jill Wimberly in
10 the 2013 residency period?
11   A   Yes.
12   Q   If you look back now at the summative
13 evaluation, the second page, the next bullet above
14 5/10/13 says 5/14/13?
15   A   Yes.
16   Q   And refers to an evaluation that was
17 prepared by Judy Wiley I believe; is that right?
18   A   Yes.
19   Q   If you turn to page Rush 11, those two
20 pages appear to be the evaluation prepared by Judy
21 Wiley about May 14, 2013?
22   A   Yes.
23   Q   This is a slightly different form, but all
24 of the evaluative ratings are either satisfactory,

## Page 107

1  above level expected, or outstanding; right?
2    A   Yes.
3    Q   So this was a positive evaluation of you?
4    A   Yes.
5    Q   Did you think it was fair and accurate?
6    A   To the best of my knowledge.  Yes.  I
7  reviewed this through Typhon.
8    THE REPORTER:  You reviewed this through --
9    THE WITNESS:  Typhon.  It's an online
10 evaluation.
11   MR. LAND:  Q   If you look back at the summative
12 evaluation again, the second page, the next bullet
13 going up the list is June 3rd, 2013, evaluation from
14 A. Hooker who I think is Alida Hooker?
15   A   Yes.
16   Q   And if you can, find that evaluation at
17 Rush 14.
18       Do you see this evaluation from CRNA
19 Hooker?
20   A   Yes.
21   Q   Are all of the ratings satisfactory or
22 outstanding in the numeric categories?
23   A   It appears that, yes.
24   Q   And did you view this evaluation as

## Page 108

1  positive and fair?
2    A   Well, it's positive; but I don't recall
3  discussing with her the ratings on like the lower
4  satisfactory ratings here; so I can't say that it's
5  entirely, that I entirely agree with her ratings.
6    Q   I was asking if the evaluation is fair,
7  and you are saying you are not sure what you think
8  about the ratings that are circled as 2's.  Is that
9  what you're saying?
10   A   Yes, because this was not really presented
11 to me and discussed as to how I got that 2.
12   Q   So does that mean you don't have a
13 position on whether it's fair or unfair?
14   A   I have to be able to I guess discern, get
15 her opinion on how she rated me fair.  So I can't
16 really comment on the fairness of it.
17   Q   Does that mean you don't look at it and
18 think it's unfair?
19   A   I don't think it's unfair.
20   Q   If you go back to the summative
21 evaluation, the next bullet up is a June 11, 2013
22 reference?
23   A   Yes.
24   Q   Do you see that?

## Page 109

1    A   Yes.
2    Q   And that relates to a review from
3  Elizabeth Fisher?
4    A   Eva.
5    Q   I'm sorry, Eva Fisher.
6        You can find that evaluation on Rush
7  16.  Now, this is an evaluation that includes some
8  unsatisfactory ratings; right?
9    A   Yes.
10   Q   Several of them?
11   A   Yes.
12   Q   And I believe this is one evaluation that
13 you took issue with at the time?
14   A   Correct.
15   Q   If you could keep this Exhibit 4 and this
16 page in front of you but also pull out what was marked
17 as Exhibit Number 3, your responses to interrogatories
18 and turn to Page 24.  Do you see the reference in
19 what's enumerated number 9 allegation and then
20 reference to June 11th as reported by evaluator
21 E. Fisher?
22   A   Yes.
23   Q   What follows I believe is your explanation
24 of what you disagreed with about this evaluation; is

MAGNA
LEGAL SERVICES

Page 110

1  that right?
2      A  Yes.
3      Q  I just want to have them both in front of
4  us and ask you some questions.
5      A  Okay.
6      Q  So on the evaluation itself at the top, it
7  is handwritten next to room preparation and equipment
8  check, Wrong size ETT for child.  Do you see that?
9      A  Yes.
10     Q  Was that accurate?
11     A  Not entirely from my recollection because
12  I had a guide which was a pre made, personalized guide
13  for this particular patient.  So I based my
14  preparation with that particular patient and I
15  followed that, and she struck that down for some
16  reason.
17     Q  In your response in Exhibit 3, did you
18  reference this issue about whether the ETT was the
19  wrong size for the child?
20     A  I referenced that I had carefully prepared
21  for the first and had no recall of difficulties, that
22  I was confident that my preparation was appropriate.
23     Q  Where are you referring to in your
24  response?

Page 111

1      A  I had carefully prepared for the first and
2  recalled no difficulties.
3      Q  So I don't see a reference there to what
4  size was used for the ETT?
5      A  Because it was not raised then, and so
6  this was -- I got this much later; and when I was
7  rebutting it, I know that my preparation was adequate.
8      Q  Do you know what sized ETT you used that
9  day?
10     A  I have no recollection exactly.  Like I
11  said, they prepared a document for that particular
12  patient which I followed.
13     Q  Do you have that document?
14     A  I might be able to retrieve it somewhere,
15  but I have to -- I don't know the name of this
16  patient.
17     Q  So I guess what I'm wondering is how do
18  you know that it's incorrect that you used the wrong
19  sized ETT if you don't know what size you used?
20     A  I can't recall the exact size right now,
21  but my recollection was that she had her own
22  preference for this particular patient which does not
23  necessarily follow the standard or the reference that
24  I used as a guide for my prep.

Page 112

1          So sometimes some CRNAs have their own
2  preferences of the size, and it's not necessarily
3  wrong.  It's just another option because when
4  preparing ET tube sizes, we prepare different sizes.
5  And so if she just wanted to just have that one size,
6  she could call it as a wrong ET tube size for child
7  even though the proper sizings are there, the
8  different options are there.
9      Q  Let me refer to the bottom of Page 24 in
10  the interrogatory response, Exhibit 3 to your left,
11  the paragraph that starts at the bottom --
12     A  Yes.
13     Q  -- this is you saying the second case as
14  scheduling changed involved a premature infant,
15  27 weeks old delivered two days before?
16     A  Yes.
17     Q  There was no time to prepare for this
18  emergent situation?
19     A  Yes.
20     Q  Wasn't it this child --
21     A  No.
22     Q  -- that the ETT reference is for?
23     A  No.  It's a different child.  The first
24  patient was a 6-year old.  There is two cases here.

Page 113

1  Mass excision of a 6-year old if you look at the case
2  above, and the second case is an explore lap of a
3  1-day old.  So those are two different patients.
4      Q  How do you know you didn't use the wrong
5  sized ETT for the second patient, the 27-week old?
6      A  Oh, I didn't prepare for that.  She is
7  commenting --
8      Q  How do you know which child she is
9  referring to when she says wrong sized ETT for child?
10         MS. SIEGEL:  Could we have the question back?
11             (Whereupon the requested portion
12              of the record was read.)
13         MR. LAND:  Maybe I should start over.
14     Q  How do you know which child is being
15  referred to by this comment of wrong sized ETT for
16  child?
17     A  Because I only prepared for the 6-year
18  old, and the second child was an add-on.  I didn't
19  prepare for that.
20     Q  Did you use an ETT for the second child?
21     A  She did because she prepared for that
22  child.  I didn't.  I was just an observer.
23     Q  So you didn't do any work?
24     A  No.

MAGNA
LEGAL SERVICES

Page 114

1    Q   Or make any decisions on the second child?
2    A   No.  This was a very complicated case of a
3 premature infant, so I was just an observer.
4    Q   Okay.  The next written comment here is I
5 think took circuit off after extubation?
6    A   With baby having apneic spells.
7    Q   Is that referring to what you talked about
8 earlier?
9    A   Yes.
10   Q   About Miss Fisher commenting on you
11 disconnecting the circuit?
12   A   Yes.
13   Q   So that happened; right?
14   A   It did, but not the way she portrayed it.
15   Q   What part is wrong about what she wrote
16 there in your view?
17   A   It was already a while that we recovered
18 the baby.  They were motioning to transfer the baby to
19 the crib, and so I acted to remove part of the circuit
20 because then we're turning over the room so I could
21 come with them to transfer the baby back to the
22 neonatal ICU.  So they weren't using the mask that was
23 attached to the circuit, so it was not affecting --
24 The baby was having apneic spells.

Page 115

1        The way she related here is that they
2 were actively reviving the patient who was having
3 apneic periods when I removed that circuit, that part
4 of the circuit.
5    Q   Well, you added some words there that
6 aren't here, right?  You said they were actively
7 reviving someone.  That's not written here, is it?
8    A   Well, she was saying with baby having
9 apneic spells.  That was initially as the baby was
10 being recovered; but later on when they were motioning
11 to transfer the baby, he wasn't having apneic spells
12 anymore.
13   Q   So you're saying you took the circuit off
14 when the baby was done with the apneic spells?
15   A   Well, when we assumed that the baby was
16 stable to move out of the crib or move out of the OR
17 table into his crib which means that he's recovered
18 his own breathing.
19   Q   So Miss Fisher disagreed with you about
20 that step you took then.  She told you not to do it?
21   A   Well, she told me to stop because then
22 they decided to hold back; and I'm not sure if it's
23 because they thought he was apneic and decided to
24 observe some more.  But that act took one second to

Page 116

1 remove and then put back, so it didn't affect the
2 patient's recovery at any point.
3    Q   But then the patient stayed with the
4 circuit connected for a period of time after that;
5 right?
6    A   No.  They just observed briefly, and then
7 they moved on to transferring the patient to the crib
8 from my recollection.
9    Q   Further down on this evaluation under
10 clinical judgment there are several 1 ratings?
11   A   Yes.
12   Q   Did you address those in your explanation
13 in this interrogatory response on Page 24 and 25?
14   A   Yes.  In this very short, case there was
15 no request for fluids.  There is no time for
16 preparation for this emergent situation.  Many of the
17 criticisms appear to be directed towards preparation,
18 unsatisfactory ratings, and room prep, equipment
19 check, protect patient from iatrogenic complications.
20 In this very short case, there was no request for
21 fluids.  The CRNA made decisions in this complicated
22 case.
23        So if she was referring to my
24 participating in this, I didn't because she mostly ran

Page 117

1 the case for the second part.
2        In the first part there was not a --
3 There was a neck mass excision which was a very quick
4 surgery, not requiring extensive fluid management or
5 hemotherapy.
6    Q   So you're interpreting her reference to
7 clinical judgment being unsatisfactory as referring to
8 the infant patient, not the 6-year old patient; is
9 that right?
10   A   I'm interpreting they're for both, but
11 there was nothing that she pointed out in the first
12 case that made me think she was referring to my
13 performance in the first case.
14        She didn't point out anything.  She
15 didn't tell me any negative or positive comments
16 during our time together then afterwards; and even
17 when I first saw this, she never commented on them.
18   Q   Okay.  Let's look at her handwritten
19 comments at the bottom of this evaluation.  Please
20 review everything under pediatric.  Is that indicating
21 she thought you didn't deal well with pediatric
22 patients?
23        MS. SIEGEL:  Objection: Calls for speculation.
24   A   I'm not sure what she meant by that.  As I

MAGNA
LEGAL SERVICES

Page 118

1    said, she didn't discuss this with me.
2        MR. LAND:  Q  Then it reads:  It does not
3    matter if you are planning to intubate...general is
4    always your back-up plan.  You need to know the way to
5    figure out ETT size and depth; right?
6        A   Yes.
7        Q   So she is criticizing you for not knowing
8    the ETT size and depth; is that fair?
9        A   That's what she seems to indicate there.
10       Q   And you didn't address the ETT size or
11   depth in your rebuttal, right?
12       A   No.
13       Q   Why is that?
14       A   From my first statement here, I'm
15   referring to the first case since that's the case that
16   I was involved in mostly.  I had covered that I
17   carefully prepared for it and had no difficulties.
18       Q   So you just disagreed with her?
19       A   She didn't really point out exactly --
20       Q   Well, this is pointing out there is a
21   problem with ETT size and depth, and I'm asking you
22   why you are not addressing that; and you said you
23   prepared properly.
24       A   It's because I remember my preparation as

Page 119

1    following the reference that's tailored to this
2    particular patient, so I know that I made a correct
3    preparation.  But she presented it as if none of my
4    preparation was valid.
5        Q   It says:  Work on mask ventilation and
6    inhaled induction; right?
7        A   Yes.
8        Q   Do you address that in your response?
9        A   I don't think I did.
10       Q   Why not?
11       A   Probably because I don't recall exactly
12   what she meant since she didn't really give me
13   feedback, and so I don't recall exactly what I needed
14   to correct or she was referring to.
15       Q   Is this evaluation feedback to you?
16       A   Yes.
17       Q   And you did receive this evaluation around
18   this time; right?  You received it in June of 2013?
19       A   Yes.  But trying to recollect what she
20   meant here, it's hard for me to refute something that
21   I don't recall.
22       Q   At the time though you did understand what
23   happened; right?
24       A   At the time of the procedure?

Page 120

1        Q   Yeah.  At the time of receiving the
2    evaluation.
3        A   Yes.  But if I don't recall what she meant
4    by this when we didn't discuss it --
5        MR. LAND:  The witness is pointing to a portion
6    of the document.  Can we have the record reflect what
7    she is pointing to.
8        A   Work on mask ventilation and inhaled
9    induction, I don't recall what she was referring to
10   there for me to be able to refute that.
11       MR. LAND:  Q  It indicate:  Please draw up
12   medications in the appropriate dose for the child's
13   weight.  It would be much easier for you.  Do you see
14   that?
15       A   Yes.
16       Q   Did you address that in your response, in
17   the interrogatory?
18       A   I don't think I did that either, and I'm
19   not sure if she is referring to the second case or the
20   first case; but I know that I prepared for the first
21   case as I've indicated here.
22       Q   Do you know if you drew up medications in
23   the appropriate dose for the child's weight in the
24   first case?

Page 121

1        A   I remember doing that based on my
2    knowledge of the patient's height and weight and
3    what's appropriate for this particular age group.
4        Q   Did you draw up medications for the second
5    child?
6        A   No.  I didn't.
7        Q   Did you do anything with respect to the
8    second child except watch?
9        A   I just watched.
10       Q   Are you sure?
11       A   Well, transfer the patient in terms of --
12   Yes.
13       Q   You just transferred the patient?
14       A   Yes.
15       Q   So other than that, you didn't do any work
16   at all on the second patient?
17       A   Probably running errands, like if they
18   needed to reach for something, but not directly
19   involved with providing anesthesia for that second
20   patient.
21       Q   Were you supposed to be evaluating
22   adjusted changes in the patient?
23       A   Not necessarily considering that this is a
24   complicated case like they basically -- Her and the

Page 122

1 anesthesiologist were mainly the ones managing this
2 patient.
3     Q   So why were you there then for the second
4 patient?
5     A   Because this is an experience that I'm
6 asked to observe.
7     Q   How do you know that? How did you know
8 when you had a case where you are just supposed to
9 observe versus actually engage in some anesthesia
10 care-giving role?
11     A   Well, they gesture to you to stay on the
12 side; or if they actively perform the procedures, then
13 I don't try to --
14         This is like the first few weeks since
15 my return, and this is pediatrics which we're not
16 exposed most of the time. And they are aware of that,
17 that pediatrics is rare, and this is a more
18 complicated case of a premature baby with a
19 complicated condition.
20     Q   Do you remember? Did someone wave at you
21 or tell you somehow not to the engage in any
22 care-giving role here and just observe?
23     A   Their actions were indicating that they
24 are going to be managing the patient more.

Page 123

1     Q   Whose actions?
2     A   Eva Fisher and Dr. Manahas (phonetic). He
3 actually stayed there the whole time for the
4 procedure.
5     Q   Your interrogatory response indicates that
6 you didn't see this evaluation from Miss Fisher until
7 June 22nd which was after something we will look at in
8 a minute, an evaluation you got from Jill Wimberly;
9 right? That's your interrogatory response?
10     A   Yes.
11     Q   And I believe you've alleged that you
12 believe that Miss Fisher created this evaluation after
13 June 20 but backdated it; is that right?
14     A   Yes. Well, I didn't hand her this
15 evaluation. She filled it out herself. So the event
16 happened on the 11th, and I guess they she filled it
17 out at some point later.
18     Q   Well, she writes the date when she signed
19 it; right?
20     A   Yes.
21     Q   June 18, 2013. And I believe you are
22 alleging that she falsely listed that date, and she
23 wrote that date on there after June 20th; is that
24 right?

Page 124

1     A   I didn't see when she wrote this or what
2 her motives are for writing it that date, so I can't
3 guess her motives.
4     Q   I'm not asking about you guessing her
5 motives. I'm saying are you alleging that this
6 June 18th date here is not accurate as to when she
7 filled out this form?
8     MS. SIEGEL: Could I have the question back,
9 please?
10     MR. LAND: I think she understands the
11 question.
12     MS. SIEGEL: I'm sorry. I lost it.
13     MR. LAND: I'll restate it.
14     Q   Are you alleging that the June 18th date
15 written here by Eva Fisher was not the date that she
16 filled out and signed this form?
17     A   Yes. I believe she backdated this.
18     Q   What is the basis for your belief that she
19 backdated this?
20     A   Just the encounter of her talking to Jill
21 in the lounge and then subsequently seeing this when I
22 met with Dr. Kremer, not being aware of it prior.
23 Like she had no -- We had no interaction about this
24 date; and then suddenly like closer to, you know, the

Page 125

1 time that I saw them in the lounge, then this
2 reappeared in Dr. Kremer's office.
3     Q   In your interrogatory response you
4 indicate that you received this on approximately
5 June 22nd; right?
6     A   Yes.
7     Q   Is that the only basis for your belief
8 that that's backdated, the date that you got it?
9     MS. SIEGEL: It's been asked and answered.
10     MR. LAND: Actually I haven't asked her about
11 the day she got it.
12     A   Yes.
13     MR. LAND: That's the only reason; right?
14     MS. SIEGEL: You didn't ask her about the
15 reason.
16     MR. LAND: Q   Let's go back to the summative
17 evaluation if we could. On the first page is a
18 reference at the bottom, bullet point June 20, 2013.
19     A   Yes.
20     Q   And then that goes on, and on the next
21 page it indicates it was an evaluation from Jill
22 Wimberly?
23     A   Yes.
24     Q   Let's find that evaluation which is at

Page 126

1  Rush 20.  If you look in your interrogatory responses
2  which is Exhibit 3, I believe your response to this
3  evaluation starts at Page 22; is that right?  Your
4  response starts at Page 22?
5      A   Yes.
6      Q   So my first question is:  In your response
7  you indicate, This evaluation is flagrantly false and
8  should not be considered.  And I want to know do you
9  have any basis for believing that people involved in
10  the SRNA program evaluation can just ignore an
11  evaluation from a CRNA?
12      A   If it's full of misrepresentations and
13  there is a lot of falsehoods in it, then I don't think
14  it should be considered valid.
15      Q   Do you know of any instance when a CRNA
16  evaluation has just been deleted or not considered at
17  all?
18      A   Yes.
19      Q   What do you know about that?
20      A   Mr. Hakeem Ellis pointed out to Dr. Kremer
21  at one point that there were misrepresentations of his
22  work, and Dr. Kremer -- No.  Let me go back.
23  Mr. Ellis said, I've been doing well; and if this
24  jeopardizes my graduation, I will report you to my

Page 127

1  superior for which Dr. Kremer responded, Oh you have
2  enough positive evaluations, don't worry about this.
3          So he made that disappear, but
4  Mr. Ellis kept a copy of it.  So he had his full,
5  complete records of his evaluations.
6      Q   How do you know Kremer made that
7  evaluation disappear?
8      A   Because he didn't give it to Hakeem, but
9  Hakeem had already made a copy of it.
10          At the end of the term, sometimes we
11  request our full records of the different, of our
12  complete evaluations.
13          So Mr. Hakeem didn't receive that one
14  negative evaluation; and Dr. Kremer assured him,
15  That's okay.  You have enough positives.
16      Q   So do you know one way or the other if
17  Mr. Ellis's file contains that negative evaluation?
18      A   Say that again.
19      Q   Do you know if that negative evaluation is
20  in Mr. Ellis's file?
21      A   No.
22      Q   At the top of the evaluation itself --
23  First of all, this evaluation contains many
24  unsatisfactory ratings; right?

Page 128

1      A   Yes.
2      Q   And you believe that this evaluation is
3  false and fabricated --
4      A   Yes.
5      Q   -- and unfair; right?
6          Is there anything about this evaluation
7  you think is accurate, the first page?
8      A   Well, there are certain, you know,
9  categories here which you can't really miss doing
10  that.  Like the labeling syringes, taping eyes.  So
11  even though it's just barely satisfactory, I feel at
12  least she gave me a passing grade there.
13          I've always been aware of universal
14  precautions, so the satisfactory ratings on those
15  things I believe I performed well but should be rated
16  a bit higher.  So everything that I had performed
17  according to standards was barely rated satisfactory.
18      Q   So you find every unsatisfactory
19  evaluative issue here to be -- you take issue with it
20  or you think they're all fabricated?
21      A   Pretty much all of it, and I address most
22  of it in my rebuttal.
23      Q   What about the reference to incorrect
24  ETT --

Page 129

1          What's the next word?
2      A   Drugs.
3      Q   -- drugs, do you address that in your
4  rebuttal?
5      A   So on the second paragraph of Page 23 in
6  the top I mention:  The next morning I went to the
7  hospital early to set up about two hours before the
8  scheduled procedure.  Miss Wimberly examined my
9  pediatric case setup and said it was fine.  My patient
10  care and preparation document was there as well, and I
11  also informed her I had prepared for two other cases.
12      Q   So you are reading about your preparation,
13  not whether you actually used the right ETT and drugs
14  or not; right?
15      A   That's what I prepared, basically the
16  airways, the drugs that were going to be used for the
17  case coming up.
18          So she didn't comment on anything wrong
19  or particularly what was wrong with the ETT tube size
20  or what drugs I didn't prepare properly in her comment
21  here.  She just made a blanket statement that
22  everything was incorrect.
23          But from my recollection of that day, I
24  set up appropriately based on my tailor-made prep for



Page 130

1 this particular patient. There were I think three
2 cases this day. This is the first one.
3     Q   Three cases with --
4     A   Three cases.
5     Q   -- Miss Wimberly?
6     A   For that room with Miss Wimberly, but I
7 only assisted with one of them.
8     Q   What about under clinical judgment, F,
9 develops a postoperative plan of care where she
10 wrote -- I think it says incorrect dosing for postop
11 pain management, does not know correct dosing for
12 opioids?
13     A   Yes.
14     Q   Do you address that in your response?
15     A   Yes. So on Page 23, the paragraph that
16 starts with Miss Wimberly's account of the dosing is
17 false both in terms of what was actually said and of
18 the substance of the medical information. For
19 example, Miss Wimberly did not ask about the use of
20 Tylenol. Miss Wimberly was herself incorrect about
21 the use of morphine. I meant the dosing of the
22 morphine she suggested.
23         Similarly, her statements are erroneous
24 regarding Fentanyl dosing. Specific and standard

Page 131

1 dosing quantities for Fentanyl dosing were not
2 recommended anywhere in the postop peds pain
3 management, and I was referring to my surgical book
4 for anesthesiologists. I have since specifically
5 researched this point to check for error.
6         So I addressed those things because she
7 elaborated more of it in the narrative she wrote down.
8     Q   When it references dosing for opioids, is
9 that the morphine?
10     A   Morphine and Fentanyl specifically.
11     Q   Both of them are opioids?
12     A   Yes.
13     Q   Why didn't you address the dosage of
14 morphine in your rebuttal directly?
15     A   I mentioned that her suggestion of my
16 answer was incorrect with what the dosing for morphine
17 is. I refuted here that her suggestion was not
18 entirely correct; so my rebuttal here was addressing
19 the morphine use, meaning use and dosing.
20     Q   So you had a difference of opinion about
21 that from Miss Wimberly?
22     A   It's not my opinion. It's the reference
23 that I was using based on a pediatric emergency drug
24 book.

Page 132

1     Q   If you turn to the second page of her
2 evaluation, the handwritten page, I have a few
3 questions. At the top there is a line. It starts on
4 the right upon trying to help encourage her. Do you
5 see that?
6     A   Uh-huh, yes.
7     Q   Upon trying to help encourage her in the
8 right direction for dosing and figuring out ETT sizes,
9 she continually made excuses -- I think that's says
10 and -- and said things like "on my previous cases" or
11 "I don't have a cheat sheet."
12         So my question is, did you discuss ETT
13 sizes with her?
14     A   No, because it was already prepared and
15 she examined it at the beginning of the case; and she
16 had no comment about it.
17     Q   So you are saying she was making up she
18 talked to you about ETT sizes and dosing?
19     A   She made that up.
20     Q   And did you say on my previous cases or I
21 don't have a cheat sheet, did you make any comments
22 like that to her?
23     A   I made those comments in terms of how the
24 morphine was dosed from a previous experience that I

Page 133

1 had, and so I was rationalizing with her how I was
2 taught previously to dose morphine based on a recent
3 pediatric case that I had with Miss Eva Fisher
4 actually.
5         So that's when I used that comment, not
6 because of this ETT tube sizing. She had no comment
7 about my prep for ET tube size or drugs at the start
8 of the case.
9     Q   So your reference to previous cases had to
10 do with dosing of drugs?
11     A   Dosing of the morphine.
12     Q   She says here that you said you didn't
13 have a cheat sheet. You had lost your preparation
14 document; right? Had you lost your preparation
15 document?
16     A   No. It was taken away by the OR nurse,
17 and then I was able to retrieve one of them. I don't
18 know what happened to the rest.
19     Q   Did you have that document during the
20 procedure?
21     A   Yes.
22     Q   During the case?
23     A   Yes.
24     Q   You had it there with you?

Page 134

1     A   Later on, not immediately. Like I said,
2  the OR nurse took my prep papers along with the
3  patient's medical records. And when I recognized
4  that, I was able to retrieve part of it and came back
5  to running the case again, put it in plain view to her
6  so she knows that I did have a bunch of preparation
7  papers for this particular case.
8     Q   So you left the procedure for a little bit
9  and then came back?
10     A   No. It's inside a room. It's just that
11  the paper was moved to a different work desk within
12  the OR room.
13     Q   So you never told her that you didn't have
14  a cheat sheet?
15     A   I told her I don't have my cheat sheet
16  now.
17     Q   So you did tell her that?
18     A   Yes, but probably in in the middle of the
19  case.
20     Q   Did you refer to those preparation
21  documents as a cheat sheet generally?
22     A   Well, not all of them. I meant the
23  summary of drugs and particular doses that is specific
24  to this particular patient.

Page 135

1     Q   She next writes here: I asked her if she
2  had figured out dosing for patients in the room
3  (induction dosing, emergency drugs, etc. for each
4  patient). She said she had but was unable to provide
5  any evidence that she had done so.
6     So my first question is: Did she ask
7  you if you had figured out dosing for patients in the
8  room of the types listed here?
9     A   That's what the CRNAs do with the SRNAs in
10  the morning. They quiz you with the drugs that you
11  have prepared, and I remember that day she had asked
12  me what the dosing was for particular emergency drugs
13  and I think particularly for pediatric patients. So
14  she quizzed me in the morning, and she had seen that
15  the drugs that I've drawn up.
16     In addition, I told her that I spoke to
17  Dr. Meyer because he wanted to do a caudal anesthesia
18  prep which involved a different mixture of drugs, and
19  so I informed her that I did those because she hadn't
20  talked to Dr. Meyers then. And so I just updated her
21  that Dr. Meyers wanted this particular mixture of
22  drugs for the caudal anesthesia that we were planning
23  on performing for this case.
24     Q   So you're saying you did have evidence

Page 136

1  that you had figured out the dosage when she asked
2  you?
3     A   I had the syringes laid out, so that's my
4  evidence.
5     Q   Did you show it to her?
6     A   She looked at every one of them.
7     Q   She then writes: I then asked how her
8  drugs were dosed, and she lists some references to --
9  I think was that milligrams of kilograms or something,
10  for the drugs, and she was unable to tell me. Did
11  that happen? Did she ask you?
12     A   I think she specifically asked about the
13  succinylcholine because I think that's one of the
14  emergency drugs she wanted to know, and I had just
15  answered that question from a previous case. So I
16  told her the answer, and she didn't have --
17     Oh, she also asked about Atropine, what
18  the dosing is for pediatrics, and I told her about
19  that too.
20     Q   When she writes doesn't know drug dosing
21  at all, you're saying that is not true because you
22  told her how you dosed the drugs?
23     A   I answered all of those questions
24  satisfactorily before the beginning of our case.

Page 137

1     Q   How do you know it was satisfactory to
2  her?
3     A   Because she nodded, and she didn't counter
4  or she didn't correct me; and I based it on a recent
5  reference that I had just reviewed.
6     Q   Then the next line of the text that she
7  wrote says: After some time in the OR, it was time to
8  put in postop orders for the patient. It says she
9  wanted to order for a patient that was 26 kilograms
10  post inguinal hernia repair morphine 4 milligrams.
11  I think that's a reference to what you wanted to
12  order.
13     A   She asked me. That's not correct. That's
14  not how it went. So I filled out the first portion of
15  the PACU or the postop orders which did not include
16  drugs. It was mostly like monitor vital signs q such
17  and such for how many hours, where the patient is
18  going to be transferred, so nonmedication portion of
19  the orders.
20     Then the second section is all about
21  medications. And before I was able to input that
22  because it just is by clicking, she first asked me do
23  you know what the dosing is for morphine; and I gave
24  her an answer. And that's when I also justified my

Page 138

1 answers with the suggestions that Miss Eva recommended
2 to me in my previous case with a similar weight and
3 aged patient in pediatrics.
4         And so she asked me these questions.
5 I wasn't inputting it because she decided to take over
6 at that point. When I didn't answer -- I think it's
7 about when she asked me about the Fentanyl. She asked
8 what is Fentanyl dosing for pediatrics; and when I
9 answered, I believe my answer was 1 mic. per kilo
10 based upon the reference I had, she said, That's
11 wrong. Step away. I'll take over now because you're
12 going to overdose the patient. So she didn't lay out
13 these sets of doses here from my recollection.
14     Q   Wasn't this saying what you wanted?
15     A   No. She asked me what the morphine dosing
16 is.
17     Q   You're saying she wanted to order it means
18 you; right?
19     A   No.
20     Q   That's what it means?
21     A   That's what she wrote there, but that's
22 not what I was doing. I was answering her question,
23 and I wasn't putting the orders in.
24     Q   You were or were not?

Page 139

1     A   I was not in terms of the drug section of
2 the order sheet.
3     Q   She was asking you about dosing --
4     A   Yes.
5     Q   -- and disagreeing with your answers;
6 right?
7     A   Yes.
8     Q   And you were referencing your previous
9 experience in answering those questions; right?
10     A   Plus the reference material that I had
11 there based on a pediatric activity worksheet that I
12 researched beforehand.
13     Q   Can you go down a little further in that
14 same section. It says: I then explained that this
15 child would not need much pain medicine postop. Do
16 you see that?
17     MS. SIEGEL: I'm sorry. Where are you reading?
18     MR. LAND: It's down a few lines in the same
19 paragraph. It starts on the far right.
20     Q   I then explained that this child would not
21 need much pain medicine. Did she explain that to you?
22     A   I think she mentioned that, and so we were
23 thinking about including Tylenol; but she didn't
24 really go at length. She was very curt in that

Page 140

1 portion.
2     Q   It later says, We could order --
3     MS. SIEGEL: She's not finished with her
4 answer.
5         (Whereupon the last answer
6         was read.)
7     A   Yeah. She didn't really give me a chance
8 to comment or answer her aside from her straight
9 forward questions of do you know the dose of such and
10 such drugs.
11     MR. LAND: Q   Okay.
12     A   She also did not ask me about the dosing
13 for Tylenol; and when Dr. Kremer and I were going
14 through this, I told her the things that had happened,
15 and he threw the paper and says, Your account is not
16 lining up with hers. So she is saying something
17 differently, and my recollection was different from
18 when he was writing down, you know, when they met with
19 me and he was writing down.
20     Q   Were you nervous during this exchange with
21 Jill Wimberly?
22     A   Yes.
23     Q   Was it stressful?
24     A   Because she was screaming at me before

Page 141

1 this case started, and it reminded me of the event the
2 previous night where she just harassed and verbally
3 abused Karen in front of the other surgical team and
4 in front of Kim Huntzinger. That's why Kim Huntzinger
5 apologized for how she was treated the day before.
6     Q   Do you think your stress and nervousness
7 affected your ability to take in information and to
8 remember during the case?
9     A   No, because after I was dismissed from
10 this case, I recalled the event with my classmate
11 Ebele because she knew about the event too that
12 happened with Karen; and I went through all of the,
13 you know, events that transpired that day.
14         So I had told her. Then I had told
15 Karen Cam afterwards. So several repetitions made me
16 remember the exact events of what happened.
17     Q   So you believe you were taking in and
18 observing everything that was happening just fine
19 during this case?
20     A   Well, I was remembering exactly what her
21 questions were because I also looked back on my
22 reference.
23         In addition, when Dr. Kremer and
24 Dr. Wiley were examining or discussing this with me, I

Page 142

1  told them that it's really difficult to find specific,
2  you know, particularly Fentanyl and morphine from the
3  references we have. The pediatric workbook or
4  textbook didn't have it. The surgical anesthesia
5  textbook didn't have it, and they both pulled it from
6  their shelf and they didn't find it.
7         So Dr. Wiley suggested to me, Why don't
8  you look for a pediatric anesthesiologist and ask them
9  or him if your recommended suggestion was or what you
10 suggested was appropriate.
11        And so that's when I looked up Dr. Tim
12 Shively who was still a staff there up until July. So
13 it's false that they said here he wasn't.
14      Q   I'm sorry. I don't mean to interrupt
15 except that we have some time complaints on how long
16 we can do this, and the question I asked is different
17 than what you are answering and I believe you are
18 trying to answer.
19        But what I asked was whether your
20 stress and level of nervousness impacted your ability
21 to take in information during this case?
22      A   I don't think so. I felt like I was
23 thinking clearly and remembering, you know, the
24 crucial events of that day so I could basically vouch

Page 143

1  for myself when the time comes that this has to be
2  recalled.
3      Q   So the interactions with Miss Wimberly
4  didn't affect your ability to perform during this
5  case?
6      A   I felt -- Well, it did in some sense.
7  I felt like after Miss Wimberly, like after she had
8  stepped me aside, I was shaken a little bit just
9  feeling embarrassed and humiliated in front of the
10 surgical team. Yeah. The surgical team was stopping
11 and looking at us because she was screaming at me.
12      Q   But you don't think that that distracted
13 you from being able to take in information and
14 remember it and process it, that level of
15 embarrassment?
16      A   Well, I know what was correct and what I
17 needed to know at that time; so I probably don't
18 remember the other details. But the ones that I felt
19 were important that I discussed several times with
20 Dr. Wiley and Kremer, I have it in good recall.
21      Q   Later in this handwriting it talks about:
22 I again had to reiterate the type of procedure and
23 pain management needs expected as well as appropriate
24 drug dosing for this patient. Did she have to do that

Page 144

1  for you?
2      A   No.
3      Q   Did she do that?
4      A   No.
5      Q   So she didn't repeat anything about the
6  type of procedure or pain management needs?
7      A   No. She just says, You will overdose this
8  patient, step aside. I'm taking over, and she stopped
9  talking to me for the most part.
10      Q   In the next what looks like paragraph of
11 this handwriting, it starts: After several unsafe
12 practices in the OR, incorrect repeated dosing, and
13 incorrect airway management, did you have any issues
14 with airway management? I'm not asking you if you
15 agree with the characterizations here. I'm just
16 asking you did you have any issues with airway
17 management in this case?
18      A   From what I recall, I intubated the
19 patient without any issue. I believe I got it in one
20 shot.
21      Q   Are you sure?
22      A   From what I recall, I was the one who
23 intubated the patient.
24      Q   Was that the only airway management that

Page 145

1  needed to be the done, intubating the patient?
2      A   Well, of course managing the anesthesia
3  machine which she didn't really comment on like
4  specifically. So, yes, I'm sure.
5      Q   Can you turn to the next page of this
6  evaluation. This handwriting indicates: When
7  redirected or corrected, Maricel continually makes
8  excuses about her performance. Do you see that?
9      A   Yes.
10      Q   Did you receive redirection or correction
11 from Miss Wimberly?
12      A   Not that I recall.
13      Q   So she might have tried to redirect you or
14 correct you?
15      A   No. She just said I was wrong when I gave
16 her an answer to the drugs.
17      Q   Well, you talked about a lot of other
18 things than just the drugs; right?
19      A   Yes.
20      Q   She says you continually made up excuses
21 about your performance. Did you try to explain why
22 you had done what did you?
23      A   I think the only excuse I made was when I
24 referred to Eva Fisher suggesting in terms of the

Page 146

1   morphine dosing. That's in reference to on my
2   previous case where I was referring to Eva's
3   suggestion on morphine dosing. And that's the only
4   excuse or the only explanation that I tried to tell
5   her.
6        Q   The last sentence of what she writes here
7   is: She brushes off learning experiences or
8   instruction if different from her previous thoughts of
9   how day should go. I couldn't know what that says,
10  she?
11       A   Should do LMA.
12       Q   If thinks should do LMA but do ETT
13  instead, unable to be redirected. Do you see that?
14       A   Yes.
15       Q   Did that happen in this case?
16       A   No. This was general surgery. So for
17  pediatrics we didn't have to use LMAs which is usually
18  for not as severe as this or not as involved as the
19  surgery from my recollection.
20           So I don't recall that we discussed
21  LMAs or that it was even something that was going to
22  be used in that particular surgery.
23       Q   So you don't think that was in your
24  preparation --

Page 147

1        A   No.
2        Q   -- the idea of an LMA but then ended up
3   doing an ETT instead?
4        A   I don't recall preparing an LMA, just
5   different ET tube sizes.
6        Q   Is it possible that that was the
7   preparation, the preparation was for LMA and it
8   switched for an ETT?
9        MS. SIEGEL: Calls for speculation.
10       A   I'm trying to recall. That was a major
11  surgery I think. I'm not sure. I know that we ended
12  up using an ET tube, and there were no talks about
13  using an LMA from my recollection in place of an ET
14  tube.
15           And usually with surgeries, LMA would
16  be the first consideration if they think that surgery
17  would just be an LMA and an ET tube would be the
18  backup, not the other way around. So you choose an ET
19  tube and usually stick with it and not go back and do
20  a less invasive airway which is an LMA.
21       MR. LAND: Q  We talked about the ETT question
22  before and your rebuttal, and you said that I think
23  the place you referenced anything relating to ETT was
24  in your preparation paragraph; right?

Page 148

1        A   Yes.
2        Q   So I also don't think you referenced the
3   LMA question at all in here. That's listed in the
4   evaluation here in your rebuttal; right?
5        A   No.
6        Q   Let's go back to the summative evaluation,
7   the front page of Exhibit 4. The next bullet is
8   July 1st, 2013. It's listed as an unsatisfactory
9   rating from Alida Hooker. Do you see that reference?
10       A   Yes.
11       Q   And you can find that evaluation at Rush
12  24.
13       A   Okay.
14       Q   Then if you turn to Page 21 of your
15  interrogatory responses is your explanation or
16  addressing that unsatisfactory rating from Miss
17  Hooker?
18       A   Rush 21?
19       Q   If you stay on Rush 24, and it's Page 21
20  of the interrogatory responses.
21       MS. SIEGEL: Did you say Page 21?
22       MR. LAND: Yes, 21 of the interrogatory
23  responses.
24       Q   If you look at the evaluation first, this

Page 149

1   is from Alida Hooker on I can't tell if it's July 1st
2   of 2013 or July 2nd. I think it's July 1st, and the
3   evaluation was written on the 2nd.
4            But you see this evaluation and there
5   is one unsatisfactory rating; right?
6        A   Yes.
7        Q   And that's for recognizes intraoperative
8   complications?
9        A   Yes.
10       Q   In your response, in your interrogatory
11  response you indicate in that first paragraph a
12  response to the assertion that you had compromised
13  patient safety through inadequate blood pressure
14  management. You say this is false. Do you see that?
15       A   Yes.
16       Q   Then you say the patient had a normal
17  blood pressure, and on one reading there was a
18  20 percent drop?
19       A   Yes.
20       Q   And the CRNA faulted me for not taking
21  immediate action?
22       A   Yes.
23       Q   So that happened; right? There was a
24  20 percent drop?

Page 150

1    A   Yes.
2    Q   And she thought you should have reacted
3  quicker?
4    A   Her opinion was that I should treat that
5  one data point and, yeah, just react to that one
6  particular event.
7    Q   Okay.  And you disagreed with that?
8    A   I disagreed that I needed to address that
9  versus basically trending the vital signs to see if it
10 actually improved on its own instead of us
11 overshooting one particular abnormal blood pressure
12 reading basically.
13   Q   How unusual is it for there to be a
14 20 percent drop in blood pressure?
15   A   It's common because we're providing
16 anesthesia, and the gases can cause intravascular
17 instabilities, hemodynamic instabilities.
18   Q   On the second page of the evaluation
19 itself --
20   A   Yes.
21   Q   -- in the handwriting there is a reference
22 that you had discussed I think it's GlideScope --
23   A   GlideScope.
24   Q   -- for preop for airway.  Is that reasons?

Page 151

1    A   Where are you?
2        Focus on getting the GlideScope ready
3  and in place.  I think it got cut off, and in place.
4    Q   You don't place the DL blade and handle
5  under the patient's pillow for intubation.
6        So I didn't see any reference I don't
7  think in your response to that question?
8    A   In terms of arguing against it, I mean
9  that's her suggestion; and it's something that she
10 prefers, but other anesthesiologists or practitioners
11 would not take issue with.  So I didn't think it was
12 something I needed to respond to.
13   Q   So this actually happened?
14   A   I believe so, to my recollection.
15   Q   And she had addressed that with you during
16 the procedure?
17   A   Just briefly I think.  No.  She didn't
18 tell me about not putting the DL blade under the
19 patient's pillow.  It's just something she observed
20 and then wrote later her observation.
21   Q   In the handwriting it looks like two
22 paragraphs lower it says: Be proactive with treating
23 the vitals and making vent changes.  Not only write
24 down/chart the information but know what is safe for

Page 152

1  the patient.  And then it looks like SBP.
2    A   Systolic blood pressure within 20 percent
3  of baseline lane or unrelaxed patient.
4    Q   And be proactive with treating the patient
5  and making changes?
6    A   Yes.
7    Q   That's a reference to the same 20 percent
8  drop we talked about before?
9    A   Yes.
10   Q   And you disagreed with her criticism of
11 you?
12   A   I didn't disagree with her opinion because
13 that's her preference, but I disagreed that's the only
14 way of managing that change in vital sign because as I
15 refuted here, I was trending which means I take it
16 several data points and act on the average of that
17 which actually takes -- I'm not sure.  I think this
18 patient might have had an art line.  I'm not sure.
19 But within a 10-minute period, you've had three vital
20 signs then.
21       So if the patient improved in the next
22 ones, then for me there is no need to correct it
23 because she could overshoot it and actually make the
24 patient hypertensive.

Page 153

1    Q   Did you perceive this evaluation from CRNA
2  Hooker as discriminatory in any way or biased against
3  you?
4    A   Yes.
5    Q   Why?
6    A   Because it's misrepresenting my actions or
7  my opinions of what her, in her rating here with
8  making me unsatisfactory when she didn't really ask me
9  my reasoning.  She just assumed that I wasn't going to
10 address this problem.
11   Q   You said it misrepresented your actions,
12 and I'm not sure that that's right?
13   A   My actions in terms of not reacting or
14 treating that one data point, not correcting that one
15 data point.
16   Q   I think in this evaluation -- I'm not
17 sure, but tell me -- I think you agree that she is
18 recording facts accurately, and the judgment she has
19 about whether they should have happened that way
20 differ from you; is that fair?
21   A   No.
22   Q   No?
23   A   No, because I've observed --
24   Q   Like the 20 percent blood pressure change



Page 154

1  happened; right?
2      A   It did.
3      Q   Okay.  And the GlideScope discussion here
4  addresses things that happened; right?
5      A   Yes.
6      Q   Okay.  And the reason you think that this
7  is discriminating and biased against you is because
8  you disagree with the judgments she made about whether
9  those are accurate steps to take or proper steps to
10  take?
11      A   No.  She didn't ask me my line of thinking
12  which was also valid; and so she made a judgment
13  without asking me why did you not treat it, that one
14  point.
15      Q   Why did you think that was motivated by
16  bias against you because of race or national origin?
17      A   I'm just not sure how it is that she was
18  rash in judging me here whereas the previous time she
19  wasn't, and this had occurred shortly after my
20  encounters with Jill and Eva.
21      Q   Do you have any indication or any basis to
22  believe that CRNA Hooker was communicating with Jill
23  Wimberly or Eva Fisher in any way to collude against
24  you?

Page 155

1      A   From what I'm hearing, they have weekly or
2  some CRNA meetings; and there is potentially an
3  opportunity there that Miss Hooker might have been
4  influenced by Miss Wimberly or Miss Eva.
5      Q   You are saying that would be improper if
6  weekly or monthly meetings involved some communication
7  between CRNAs and it influenced their view of how to
8  evaluate students?
9      A   If it's an improper influencing of that
10  CRNA, yes, I think it's not appropriate that they
11  should be sort of coloring their impression of a
12  student.
13      Q   So doing that at all would be a problem?
14      A   If they are being biased, the coloring is
15  in making a false impression of a student and sharing
16  that impression to the CRNA or another CRNA.
17      Q   How long had CRNA Hooker been a CRNA?
18      A   I don't know.
19      Q   What you're saying I think is that if she
20  heard some negative comment from Jill Wimberly, she
21  wouldn't evaluate you based on her own judgments?
22      MS. SIEGEL:  Mischaracterizes.
23      MR. LAND:  Q  Is that what you're saying?
24      A   What I'm saying is there is a known or

Page 156

1  there is, the students have recognized that there have
2  been talks about CRNAs talking to each other about how
3  they're going to treat certain students.
4      Q   But you don't know if Miss Hooker had any
5  such communication with anyone about you; right?
6      A   No.
7      Q   And you are saying you think this is
8  biased against you which suggests you think she is not
9  employing her own judgment about whether these were
10  problems.  Is that what you're saying?
11      A   I'm saying she made that judgment without
12  full understanding of what my reasoning is of not
13  reacting directly to that particular problem she was
14  pointing at.
15      MR. LAND:  Let's take a break.
16          (Whereupon a brief recess was had,
17          after which the deposition of
18          Ms. Marcial continued as
19          follows:)
20      Q   Maricel, could you turn in Exhibit 4, the
21  one you are looking at, Rush 26 at the bottom.  Turn
22  to that page.
23      A   Yes.
24      Q   So Rush 26 is an email from Alida Hooker

Page 157

1  to Mike Kremer dated July 2nd, 2013, and it's
2  addressing I believe the patient care situation that
3  was part of CRNA Hooker's evaluation that we were just
4  talking about?
5      A   Yes.
6      Q   That's what this looks to you to be
7  talking about?
8      A   Yes.
9      Q   It starts in the first couple of
10  sentences, it talks about how you were really
11  prepared, had event, a cart, a drug tray with
12  induction drugs all set up, that you had taken efforts
13  to get other aspects of preparation set up; and it's
14  praising you there; right?
15      A   Yes.
16      Q   Then it goes on to explain that you
17  appeared disorganized when you got to intubation?
18      A   Yes.
19      Q   Do you have any reason to think that Alida
20  Hooker didn't believe that, that you appeared
21  organized to her or disorganized to her?
22      A   From my recollection, she was commenting
23  on this because I initially had reached for direct
24  laryngoscopy as sort of a force of habit because



Page 158

1  normally what's what we use, and I stopped myself from
2  doing that and redirected myself to doing the
3  GlideScope instead.
4          That's the only aspect I think that she
5  is commenting on of me being disorganized, just
6  because I veered briefly and then went back to the
7  original plan of using GlideScope.
8      Q   You are saying you didn't actually grab
9  the DL blade and handle?
10     A   No.  I didn't because it's in a different
11 section.  The GlideScope is right next here, so I
12 might have reached this way for the DL; and for her,
13 that was an irregularity that even though I --
14         You know what, I think I might have
15 grabbed it and then -- Let me just because my
16 recollection is a little fuzzy.  I might have grabbed
17 it initially but then realized that we were doing
18 GlideScope, and that's why I had set it down and
19 instead redirected on using the GlideScope.
20     Q   She writes after reference to the DL blade
21 and handle that she asked -- It says, I asked her how
22 she wanted to intubate the patient, giving her the
23 choice and letting her think through it.  Did that
24 happen?  Did she ask you that question?  Do you know?

Page 159

1      A   I don't recall, but she might have.
2      Q   Down a couple of paragraphs there is a
3  reference to after we discussed 20 percent of baseline
4  and identifying a number, she stuck with it?
5      A   Uh-uh, yes.
6      Q   Is that a reference to the blood pressure
7  question that we talked about before?
8      A   Yes.
9      Q   And did you change what you were doing
10 after she brought that 20 percent of baseline idea up?
11 She says you stuck with it.
12     A   Yeah.  So basically what I think she meant
13 is that I made sure that the blood pressure was above
14 the baseline, 20 percent above baseline.
15     Q   So you did change what you were doing
16 after that?
17     A   There was not a change as so much a
18 reacting to drops in blood pressure, so I did -- Well,
19 I did change my perception of, you know, treating
20 blood pressures.
21     Q   The next sentence says:  With the
22 anesthesia she made poor judgment calls of lowering
23 the CVO and not having muscle relaxant on board for
24 this prone case with a delicate surgery.  Did that

Page 160

1  happen?  Did you lower the CVO?
2      A   I don't recall that part, but what I'm
3  confused about is not having muscle relaxant on board
4  for this prone case with a delicate surgery because as
5  I did a rebuttal here, you give muscle relaxant before
6  you intubate somebody, and there is a leftover.  There
7  is leftovers there.  And throughout the case we check
8  twitches to see if they're returning with their motor
9  movements and re-dose accordingly.
10         So I don't think that I would agree
11 with this portion here, not having muscle relaxant on
12 board.
13     Q   You started by saying that you don't
14 recall; right?
15     A   I don't recall the CVO part, but the
16 muscle relaxant -- Well, I'm just rationalizing
17 because I don't recall what specific muscle relaxant;
18 but it's not possible to not have a muscle relaxant on
19 board on a case like this because you can't intubate
20 the patient who would potentially move.  So that
21 doesn't make sense that I wouldn't have a muscle
22 relaxant on board.
23     Q   Isn't that kind of what she is saying is
24 that that was the problem was that you didn't have it

Page 161

1  and should have known to have it?
2      A   So then I argue that that's not correct.
3      Q   But I think you are saying you don't
4  recall if you had it or not?
5      MS. SIEGEL:  Objection:  Mischaracterizes her
6  testimony.
7      A   I don't recall the dosing or which
8  particular muscle relaxant it is, but I'm not saying
9  that I don't recall having it.  I just don't recall
10 the specific drug or muscle relaxant in the dose that
11 we gave.
12         But I recall that there is a muscle
13 relaxant involved; otherwise it would not be possible
14 to perform even the intubation part because that goes
15 hand in hand in any case.  That's a general case.
16     MR. LAND:  Q  Okay.  The next couple of
17 sentences down says:  Maricel also asks "permission"
18 from me almost every time she did something; i.e.,
19 re-dosing medication, checking twitches.  Did you do
20 that a lot?
21     A   It's possible, I guess just trying to
22 gauge her preferences since she -- When she called my
23 attention to the 20 percent baseline, I guess I was
24 trying to gauge her style or her way of managing.



41  (Pages 158 to 161)

Page 162

1    Q   Later near the end it writes:  Overall
2  Maricel has a great setup; but during the case, she
3  becomes scattered and acts in a nervous rush.  I found
4  myself double-checking everything she did and
5  redirecting her on a regular basis.
6        Do you have any reason to think that
7  Alida Hooker didn't believe that?
8    A   Believe what exactly?
9    Q   That you became scattered and acted in a
10  nervous rush and that she felt compelled to
11  double-check everything you did and redirect you on a
12  regular basis?
13    A   Yeah.  I questioned her statements on
14  redirecting me on a regular basis because I think from
15  my recollection she had to go away for a break and she
16  was relieved by the anesthesiologist.
17        So at that point most of the time
18  anesthesiologists aren't very hands on with the
19  student RNA's.  So for that period of time I was
20  really running the case and didn't require too much
21  direction from the anesthesia staff there.
22        So I'm not sure if she is gauging this
23  based on a couple of things that I didn't do which is
24  the treating of the blood pressure and also my

Page 163

1  inadvertent taking of the laryngoscope, the DL instead
2  of the GuideScope that we agreed on.  So that's why I
3  don't know exactly which one she was referring to as
4  far as constantly redirecting when she was gone for
5  part of the case.
6    Q   She wrote this the day after this
7  happened; right?
8    A   It appears like it.
9    Q   Had she talked to you about the case at
10  all at the time?
11    A   No.
12    Q   Could you turn to page Rush 29?
13    A   Okay.
14    Q   This looks like an evaluation from Jillian
15  Klunk dated July 9th, 2013 of you --
16    A   Yes.
17    Q   -- which is positive and rates you as
18  satisfactory or outstanding in every category; right?
19    A   Yes.
20    Q   It says:  Great job today, well-prepared,
21  knowledgeable about the case; right?
22    A   Yes.
23    Q   And so do you believe this is fair and
24  accurate assessment of your performance that day?

Page 164

1    A   To the best of my knowledge, I remember
2  performing well that day.
3    Q   Did you ever think that Jillian Klunk was
4  biased against you?
5    A   No.  I don't think so.
6    Q   If you turn to Rush 34, this appears to be
7  an evaluation of you by Judy Wiley --
8    A   Yes.
9    Q   -- from a clinical case from July 23rd,
10  2013; is that right?
11    A   Yes.
12    Q   If you turn to your interrogatory
13  responses at Page 20, I believe you respond there to
14  this evaluation and what's enumerated in Paragraph 2;
15  right?
16    A   Yes.
17    Q   If you look back at the evaluation itself,
18  under patient safety, paragraph C, it says below level
19  expected?
20    A   Yes.
21    Q   I needed to point out airway obstruction
22  on one occasion, but after that Maricel recognized it
23  without prompting.
24    A   Yes.

Page 165

1    Q   Did that happen?
2    A   I recall it did probably once; and I might
3  have like turned to get something.  It's possible,
4  yeah, I think it did happen.
5    Q   I ask because that's not addressed in your
6  interrogatory response.  I didn't see it.
7    A   Yeah.  I believe there was one instance
8  when the patient was I guess snoring louder, and
9  that's an indication of some form of airway
10  obstruction that she pointed out and I corrected or I
11  acted on.
12    Q   In psychomotor skills in the evaluation,
13  paragraph B rates you as below level expected.  It
14  indicates:  ETT placed in first attempt, had to remind
15  Maricel twice that we do not ventilate with RSI.
16  Maricel asked about placing OGT and esophageal
17  temperature probe on our general case.  Patient with
18  foreign body in stomach and esophagus.
19        And I think you took issue with her
20  saying that she had to remind you twice not to
21  ventilate with the RSI in your interrogatory response.
22  But I think your interrogatory indicates that she did
23  tell you not to ventilate with RSI; is that right?
24    A   Yes.  I argued that she mentioned here I

MAGNA
LEGAL SERVICES

Page 166

1 did it twice; but from what I recall, I actually just
2 did it once and did not do it again.
3     Q    If you look at additional comments on the
4 second page of the evaluation, a couple sentences in,
5 it says:  Could not discuss importance of checking for
6 return of twitches after using -- I'm not going to try
7 to pronounce that -- a drug for administering a
8 nondepolarizing muscle relaxant.
9         What happened there.  Do you remember
10 that?
11     A    So she was asking me what that syndrome
12 was that prevents or delays a patient's recovery from
13 succinylcholine which is a paralytic.  So she did not
14 ask me to discuss it.  She asked me about the syndrome
15 which I had forgotten then.
16         And I researched it later.  What she
17 was meaning was pseudocholinesterase syndrome.  So she
18 had asked me what it was, not that she wanted me to
19 discuss it.  So I think her recall of it is not the
20 same as what we really happened.
21     Q    So she asked you about it and you didn't
22 know, and you went and looked it up.  Is that what you
23 said?
24     A    Yes.

Page 167

1     Q    Did you find this evaluation, did you
2 think this evaluation was fair?
3     A    No.
4     Q    Why not?
5     A    I believe some of them were not accurate
6 in terms of the twice that she had prompted me to not
7 ventilate in RSI.  As I rebutted here, I was only
8 instructed once; and I didn't do it again.
9         And in terms of how she phrased this
10 syndrome which I didn't know then, she didn't ask me
11 to discuss it.  She just asked what it was, but she
12 presented it differently.  So that wasn't accurate.
13     Q    How is it different to say could not
14 discuss and you are saying she asked you and you
15 didn't know the answer?  How are those not consistent?
16     A    Because she was referring here, Why is it
17 important?  What's the importance of checking for
18 return of twitches which what I remember her asking is
19 what syndrome is it called when that we need to be
20 recognizing the importance of return of twitches with
21 the use of succinylcholine.
22         From what I recall, I know the
23 significance of checking for twitches with any muscle
24 relaxant; but it's misrepresented here that I did not

Page 168

1 know the importance of checking for those vital signs
2 to be returning when using a paralytic.
3         So it undermines my ability to
4 recognize -- correcting any complications or
5 anticipating any complications.  So the way this is
6 worded is making it look like I had no clue of my role
7 in using these drugs and the possible complications
8 associated with it.
9     Q    The next sentence on that narrative says:
10 This material was covered during fall semester 2012,
11 almost a year ago.  Is that accurate?
12     A    As far as I know, yes.  That's like the
13 didactic period.
14     Q    If you turn to page Rush 38, this appears
15 to it be an evaluation prepared by Amy Gawura; is that
16 right?
17     A    Yes.
18     Q    It's dated July 30, 2013?
19     A    Yes.
20     Q    It rates you as an unsatisfactory with
21 zeros in several categories; right?
22     A    Yes.
23     Q    Before this date of being evaluated by Amy
24 Gawura, did you think she was fair, thorough, and

Page 169

1 tough?
2     A    I thought she was fair.  I mean she was
3 tough, but myself and the other students had
4 reservations about how she was treating us because we
5 felt she was a little abrasive sometimes.  And so we
6 were not sure if our skills are being graded, you
7 know, accordingly.  Like we felt that she could really
8 give us a lower grade than our actual performance.
9     Q    When you say she was abrasive, then you
10 talked about how she was a tough grader or graded
11 lower than you thought she should, is there some other
12 way she was abrasive besides grading?
13     A    Just with her interaction.  Like sometimes
14 she doesn't care for like explanations, like I don't
15 care.  Just sometimes we'd get cutoff when we're
16 explaining things, just the general interaction.
17         And also her having warned another
18 student, that if he complained about not getting the
19 cases he wanted, that you might get punished or you
20 might get given a heavier load which will make you
21 like work longer hours.
22     Q    Who is that student?
23     A    I don't recall.  I just -- Yeah.  I don't
24 recall who it was.

Page 170

1    Q  Do you recall anything about the other
2  student who said that?
3    A  I think it was a guy because I think I
4  shared a case with him, but there is like -- I think
5  we only have one minority, and then the rest are white
6  guys.  So it's hard to determine if it's Horey or Nate
7  or Ed.
8    Q  So it could have been a white guy?
9    A  Yes.
10   Q  Before July 30, 2013, had you ever
11  received a negative evaluation from CRNA Gawura?
12   A  I don't think so.
13   Q  If you could turn to the next page in that
14  exhibit --
15   A  Yes.
16   Q  -- it's a two-page written summary from
17  Amy Gawura about that day.  It starts by saying it was
18  a challenging day for you.  It's saying you had
19  difficulty applying many concepts that had been
20  discussed in basics of anesthesia course last fall.
21  And it says:  During our second case, she had trouble
22  placing and managing an LMA in a healthy 18-year old
23  female.
24       Is that true?

Page 171

1    A  Also that it look longer than usual.
2    Q  And it says:  After induction, she
3  attempted had to ventilate the patient twice, first
4  with an oral airway and then with just a mask.  I had
5  to instruct her that LMAs are immediately placed after
6  loss of a lid reflex and no masking is necessary.  Did
7  that happen?
8    A  It's possible that I attempted to grab the
9  mask; but, you know, Amy is one who would like stop
10  you if you are doing something wrong.  So I might
11  have, by my usual habit with general or regular
12  intubations, habitually picked up the mask to
13  ventilate.
14   Q  So is it true that an LMA is used when a
15  patient is breathing on their own without a muscle
16  relaxant?
17   A  Yes, but there is times when if they're
18  given a little bit more of a sedative called Versed
19  that they don't breathe enough times that you would
20  have to assist them by changing the vent settings.
21   Q  So I think she is saying here that you
22  were trying to use a mask when it wasn't required; is
23  that right?
24   A  Yes, but I'm not sure that it meant I

Page 172

1  actually had the mask on the patient or I attempted to
2  get the mask to attempt to ventilate the patient.
3    Q  Later on in this paragraph there is a
4  sentence that starts:  At this point we had a
5  discussion about how ventilation.  Do you see that?
6  It's after the number 30-34.
7    A  On the second paragraph?
8    Q  At this point the sentence starts.
9    A  Okay.
10   Q  At this point we had a discussion about
11  how ventilation through LMA differs from that of the
12  ETT and how ET CO2 is variable with LMA because the
13  patient is spontaneously breathing.
14       Did you have that conversation?
15   A  I think so.
16   Q  Then it says:  Later, closer to the end of
17  the case, I asked Maricel what criteria were needed to
18  remove the LMA, specifically which command we ask the
19  patient to perform.  She told me we needed to check
20  head lift, hand strength and minute ventilation.  Did
21  that happen?
22   A  I believe that's how I answered her.
23   Q  Then she indicates there is no mention of
24  telling the patient to open her mouth, and it took

Page 173

1  many questions from me for her to realize no muscle
2  relaxant had been given; therefore, it was unnecessary
3  to check strength by head lift or hand grasp.  Is that
4  right?
5    A  From what I recall, she had asked what are
6  the signs that indicate to you the patient is ready to
7  be extubated if they had an LMA; and I gave her these
8  different signs which really is for like a regular
9  intubation because in our textbooks there is not
10  really a specific sign that indicates for an LMA
11  intubated patient, what other symptoms you look for
12  aside from the regular objective signs that the
13  patient shows that they're ready to be extubated.
14   Q  Let me ask you this:  If you were saying
15  that you needed to check head lift, hand strength, and
16  minute ventilation, are those things you check to see
17  if the muscle relaxant is finished and isn't affecting
18  the patient anymore?
19   A  Yes, and so it is with sedatives like
20  Fentanyl; or sometimes with anesthesia gases, like you
21  can depress their respiratory effort that you want to
22  see that they're performing or they're putting out
23  adequate minute ventilation.
24   Q  So if there was no muscle relaxant, then



Page 174

1  is there no reason to look for those signs?
2      A   It's mainly indicated I guess for the
3  muscle relaxant in terms of raising your head, but the
4  other ones are also noticeable with when you are
5  providing just regular sedation with opioids or with
6  anesthetic gases.
7          So the hand strength, minute
8  ventilation, that could be something you could observe
9  for patients who are not given muscle relaxant.
10     Q   Isn't she telling you here though that it
11 was unnecessary to check those things because there
12 wasn't a muscle relaxant?
13     A   I think I erroneously mentioned check head
14 lift because that's indicated when somebody had a
15 muscle relaxant. But if a patient doesn't follow
16 commands like lifting their head because they're still
17 pretty well sedated, then that could still be
18 interchangeable with regular sedatives and regular
19 anesthetics. So I don't think I was erroneous in
20 mentioning that other symptom.
21     Q   She did though; right? She thought you
22 were wrong; right?
23     A   That's her indication there, sure.
24     Q   And she goes to be say that this is kind

Page 175

1  of a basic concept of anesthesia, right, that if you
2  are using an LMA, you should know to use it correctly.
3  Do you agree that's a basic element after of a CRNA
4  role is knowing how to use an LMA correctly?
5      A   Yes. It's a basic understanding or basic
6  knowledge that the CRNA must have, but it's not -- If
7  we're saying we're including open your mouth is one of
8  the basic concepts, that's something that we didn't
9  really see in our textbook.
10     Q   So doesn't every patient either get -- You
11 know, you have to affect their ability to breathe
12 while they're under anesthesia; right?
13     A   Yes.
14     Q   And the basic approach is either an LMA or
15 an ETT?
16     A   ETT tube, yes.
17     Q   So it talks in the next paragraph: The
18 following case involved an anesthetic with an ETT, and
19 she says you again had difficulty placing the patient
20 on the correct ventilation mode; is that right?
21     A   Yes. Well, I had instinctively I think
22 picked a pressure support. I think we started out
23 with volume control; and then she was asking me
24 because, from what I recall, there was something

Page 176

1  pressing on top of the patient. So his ability to
2  expand his lungs was compromised. So we had to switch
3  to a different mode.
4          And since I was still trying to figure
5  out the functionality of pressure support versus
6  pressure control ventilation, that's when I got a
7  little confused as to the modes that I should use.
8      Q   Were you trying to use the mode for an LMA
9  setting for a person --
10     A   No.
11     Q   -- who couldn't breathe on their own?
12     A   This is an ET tube.
13     Q   I know. So they can't breathe on their
14 own; right?
15     A   No.
16     Q   Let me ask it a different way. With the
17 ET tube they need help breathing?
18     A   Yes.
19     Q   And were you choosing a mode that could
20 apply the LMA?
21     A   We have used pressure support for ET tube.
22     Q   Could it also be used for LMA?
23     A   Sure, yes.
24     Q   Did it create this apnea ventilation

Page 177

1  problem that's noted here?
2      A   This triggered?
3      Q   It says: This triggered apnea ventilation
4  and again took prompting from me as to which mode
5  might be a better choice. So do you know, did your
6  initial choice trigger apnea ventilation?
7      A   It possibly did.
8      Q   And were you then prompted by Miss Gawura
9  to make a different choice about the mode of
10 ventilation?
11     A   From what I recall, we were discussing
12 like what other modes could be used. That's when she
13 suggested maybe switching to pressure control
14 ventilation.
15     Q   Did you think about attempting to increase
16 title volumes by increasing PEEP after it had been
17 discussed?
18     A   So she was asking me how this should be,
19 how we should troubleshoot this; and I was thinking
20 out loud the things that it could possibly do. But I
21 think -- I'm not exactly sure of the details of how it
22 went after that. Like I suggested ways to correct it,
23 and things improved afterwards.
24     Q   She says here at the end of that



Page 178

1 paragraph: It was clear to me at this point she does
2 not know how to appropriately manage patients on the
3 ventilator which anesthesia is a life-saving piece of
4 equipment. Let me ask this: Is the ventilator in
5 anesthesia a life-saving piece of equipment?
6    A   Yes.
7    Q   Do you have any reason to think that she
8 didn't believe this judgment she renders here which is
9 you didn't know how to appropriately manage patients
10 on a ventilator?
11    A   I think this was one incident out of so
12 many other instances that I effectively managed cases
13 that involved anesthesia machines.
14        In this one instance I was under
15 extreme pressure from the previous negative
16 evaluations that I had been getting, and the threats
17 by Dr. Kremer that I could be expelled after two
18 negatives evals had affected my thinking or my
19 concentration in managing this particular case.
20        So I was told, You've had two
21 negatives, and it will be an Herculean task to pass
22 this program which Dr. Wiley piled on by saying, It's
23 not impossible, but it's going to be very difficult.
24        With that in mind, I was in some ways

Page 179

1 starting to be caught up with the stress and had
2 thought of going to Miss Gawura for guidance.
3    Q   By this point, July 3, '07 -- we have gone
4 over many evaluations -- you have had four or five
5 negative evaluations, right, unsatisfactory
6 evaluations?
7    A   They pointed out the three that were like
8 with Alida Hooker included; but the other two like
9 with Dr. Wiley in terms of the two, I disputed that.
10 And so, yeah, I was under extreme pressure thinking,
11 having those in mind.
12    Q   The pressure from receiving unsatisfactory
13 ratings and knowing you might fail out; right?
14    A   Yes.
15    Q   And then on this day, July 30 there
16 actually were two problems that happened, right, two
17 different patients with problems --
18    A   Yes.
19    Q   -- that we just went over; right?
20    A   Yes.
21    Q   And when you say you wanted to talk to Amy
22 Gawura, you sat down and talked to her after this?
23    A   Yes.
24    Q   After these cases that day; right?

Page 180

1    A   Yes.
2    Q   She goes on to say here in this narrative
3 that you told her, that you sat down and had a long
4 discussion about your performance; and it says,
5 Maricel indicated to me she was under tremendous
6 amount of stress while being on clinical probation.
7 Her anxiety was overwhelming to her and she frequently
8 had a mental block.
9        Did you tell her that?
10    A   From what I recall, yes, I told her the
11 stress I was going through.
12    Q   Did you tell her you had a mental block
13 when trying to perform tasks and skills required of
14 you?
15    A   I might have mentioned that term to her.
16    Q   Did that lead her to suggest that you take
17 a leave of absence?
18    A   I think she had said, yeah, take two weeks
19 off to clear your mind to help I guess get better
20 control of your anxiety.
21        But the one thing she also said was,
22 This is not the end of it but maybe try to recalibrate
23 by taking some time off.
24    Q   So on balance would you agree that Amy

Page 181

1 Gawura's assessment of your performance as
2 unsatisfactory in both of these patients on this day
3 was correct and accurate?
4    A   Well, so I'm thinking about just getting
5 zeros for, you know, things that I actually did do,
6 like having a plan of care for those patients. So I
7 didn't get any credit for some things that did go
8 right in these aspects, in these categories.
9        Like that was the whole day. So there
10 were certain things that did go well or that I was
11 able to address, so it was not like a whole -- It
12 wasn't like the whole time she was holding my hand. I
13 was still performing during these different cases.
14        But I felt that getting a zero even to
15 like preps that I already did or things that I did
16 correctly, I did not get any credit at all, it's
17 almost like I just stood there and did nothing. So I
18 don't agree with just getting a zero even though I did
19 participate in and perform some of the acts
20 effectively.
21    Q   Well, she didn't give you zeros in
22 everything; right?
23    A   No.
24    Q   She gives you twos and threes and fours in



Page 182

1 many categories, didn't she?
2     A   She did.
3     Q   Are you saying that these problems that we
4 talked through here that you agree we're accurately
5 recorded, that they weren't significant problems?
6     A   Well, they were problematic in the sense
7 of my state of mind then, you know. That's why I came
8 to her, that I needed guidance, a student who is still
9 learning and going through training.
10     So their role as educators or
11 instructors is to help us sort out our imperfections
12 and also learn from our mistakes. It is also part of
13 their job to direct us appropriately and not persecute
14 us for mistakes that the student normally could make.
15     I'm not the first one to have made
16 these mistakes, and I don't imagine students would be
17 put on probation every time they made a similar degree
18 of mistakes.
19     Q   Based on what do you make the assessment
20 that other students wouldn't be put on probation for
21 the series of mistakes that you were making? What's
22 your basis for that belief that other students
23 wouldn't be put on probation for that?
24     A   Just from my classmate, recalling another

Page 183

1 student overdosing the patient; but there was no
2 consequence to that person, and that person went on to
3 graduate and another person giving the wrong drug and
4 not being held back or not having the same degree of
5 scrutiny that I got after these mistakes that are
6 egregiously dangerous to patients.
7     Q   Do you agree that you deserved some
8 unsatisfactory ratings from Amy Gawura for both of
9 these patience this day?
10     A   Well, some of these things that did
11 happen, that was brought about by me being under
12 stress.
13     Q   But you do agree you deserved
14 unsatisfactory ratings for some of it then?
15     A   For some of it, yes.
16         (Marcial Deposition Exhibit No. 5
17         was marked for identification.)
18     Q   Do you recognize what's been marked as
19 Exhibit Number 5, Maricel?
20     A   Yes.
21     Q   It looks like an Academic Improvement Form
22 dated July 1st, 2013; is that right?
23     A   Yes.
24     Q   And did Mike Kremer give this to you?

Page 184

1     A   Is there another page?
2     Yes.
3     Q   At the bottom is that your signature but
4 then crossed out?
5     A   Yeah. I'm not sure what happened there.
6     Q   You don't remember? Did you sign it and
7 then cross it out?
8     A   I don't recall this particular one. What
9 I recall was the improvement form that I received when
10 I came back from the leave of absence.
11     Q   So the handwriting at the bottom says:
12 Reviewed evaluations and Academic Improvement Form
13 with student from 3:45 to 5:45 p.m. on 7/1/13?
14     A   Yes.
15     Q   Do you remember talking with Mike Kremer
16 on July 1st about evaluations and what they meant?
17     A   Yes. I think I recall having a meeting
18 with him.
19     Q   The form itself, underneath the course
20 number there is a paragraph that includes a sentence
21 that say: These behaviors if not addressed put the
22 student at risk for receiving a non-passing final
23 grade in this course. This is a notification that the
24 above student is not meeting the passing standards set

Page 185

1 for this course.
2     Was that communicated to you, that you
3 were at risk of not passing?
4     A   Yes.
5     Q   And then in the comment section there is a
6 reference to clinical evaluations for June 11, 2013
7 and June 20, 2013 have unsatisfactory ratings in the
8 areas of safety patient, clinical judgment, and
9 professionalism. It indicates that those evaluations
10 are attached for review; and evaluation from June 27,
11 2013 describes issues with preoperative assessment.
12     Do you remember talking through those
13 issues with Mike Kremer on July 1st?
14     A   I don't know the exact details; but I
15 imagine that I had met him that day, that we had
16 talked about these particular evaluations. I don't
17 recall the exact detail.
18     Q   Part 2 indicates a plan of action. Met
19 with student on July 1st, 2013, discussed need for
20 consistency and clinical performance and consequences
21 for unsatisfactory ratings in areas of patient safety;
22 i.e., a grade of no pass for NRS 600 PA. Continue to
23 work on consistency and clinical performance.
24 Discussed availability of counseling center's

MAGNA
LEGAL SERVICES

Page 186

1   services.
2           Did you discuss those issues?
3       A   I recall the counseling service advice and
4   of course the standards for passing, but I'm not
5   sure -- I think I had asked him like how many negative
6   evals are you, would you have to have to be failed.
7   I think that's one of the things we discussed.  But
8   from my recollection, I think I also disputed these
9   evaluations during that meeting.
10      Q   Do you remember anything else about what
11  you discussed in that meeting?
12      A   This was about a two-hour period, so there
13  is a lot to remember.  I think part of it was just
14  doing a rebuttal on these evaluations.  And the 6/27,
15  I don't recall which evaluation that is.  So I'm not
16  clear to me the details of it.  This was five years
17  ago.
18      Q   About that discussion?
19      A   Yeah.
20      Q   But do you remember being informed that in
21  the beginning of July that -- Let me back up.
22          There is as reference in the document
23  we were looking at from Amy Gawura that talked about
24  you being on probation?

Page 187

1       A   Yes.
2       Q   Did this document we're looking at now,
3   Exhibit 5, provide you with that understanding that
4   you were at risk of failing out and that your
5   performance needed to be better?
6       A   Yes, because I had that meeting with them
7   already where they said two strikes and you are out or
8   a Herculean task to pass after these two negatives.
9   So I interpreted that to mean that I was under
10  probation for those two negative evaluations.
11      Q   And after that you had -- We looked at
12  these.  You had several other unsatisfactory ratings;
13  right?
14      A   Yes.
15      Q   One from Alida Hooker, some from Judy
16  Wiley, and then the one from Amy Gawura?
17      A   Yes.
18      Q   So by the time you were evaluated by Amy
19  Gawura on July 30, there had been five unsatisfactory
20  ratings; right?
21      A   Yes.
22      Q   By five different CRNAs?
23      A   Yes.
24      Q   At that point in time did you decide to

Page 188

1   take a leave of absence?
2       A   I think I had presented to him the
3   intention to take a leave of absence because my
4   physical, my health was being affected by the stress
5   of what I was going through; and I had spoken to
6   Dr. Wiley.
7           Dr. Wiley was initially there; and then
8   I had presented, you know, for a leave between two
9   weeks to one month to them, Dr. Wiley and Dr. Kremer.
10  And Dr. Kremer said, I don't know if we have one for
11  students which Dr. Wiley interjected, Of course we do.
12  You can decide to take a two or one month, two week or
13  a one-month leave and make up for it during the
14  holidays, like Thanksgiving so you could still be on
15  time with graduating.
16          So then Dr. Kremer had to leave
17  somewhere, I think for a meeting; and Dr. Wiley and I
18  had discussed how I was going to time this leave of
19  absence.
20          So in my impression, Dr. Wiley's
21  suggestion or like recommendation of a two-week to a
22  one-month leave was what I was going to be allowed to
23  have; and that's where we left it in that meeting from
24  what I recall.

Page 189

1       Q   Was part of the reason you were seeking a
2   leave of absence to avoid being dismissed from the
3   program?
4       A   No.
5       Q   No?
6       A   No.
7       Q   Wasn't that probably what was going to
8   happen if you didn't take a leave?
9       A   Well, they didn't really indicate how many
10  negatives I had accrued for me to be failed.  Plus, I
11  had disputed the other negative evaluations.  They
12  didn't really say that they're still considering it as
13  valid despite my contention against it and my
14  rebuttals.
15          And so my main goal was to just clear
16  my mind; and I had been seeing the counselor, the
17  school counselor by that time, and she was the one who
18  suggested that I take a leave of absence for my own
19  mental and physical health.
20          And I had explained this to Dr. Kremer,
21  that I was losing weight, was very insomniac and
22  losing my hair.
23      Q   I'm sorry to hear that, that that was what
24  you were experiencing.



Page 190

1    When you say you were seeing a
2 therapist, was that --
3    What was that person's name?
4    A    That was Dr. Terrebessy who then directed
5 me to see Dr. Kramer who was a psychiatrist.
6    MR. LAND:  Do you want to take a short break?
7    THE WITNESS:  Yes, please.
8         (Whereupon a brief recess was had,
9         after which the deposition of
10        Ms. Marcial continued as
11        follows:)
12   MR. LAND:  Could you mark this 6.
13        (Marcial Deposition Exhibit No. 6
14        was marked for identification.)
15   Q    Maricel, if you look at what's been handed
16 to you and marked as Exhibit Number 6 for your
17 deposition, it's documents that we received from your
18 therapist, Terrebessy?
19   A    Terrebessy.
20   Q    These are just all of the documents that
21 we received from that therapist.
22        What's Terrebessy's first name?
23   A    Hilarie.
24   Q    So on the first page it appears to

Page 191

1 indicate that July 24, 2013 was your initial
2 appointment; is that right?
3    A    The 24 of July?
4    Q    Yeah.
5    A    It appears that, yes.
6    Q    There are notes that say:  This woman is
7 in residency portion in the program, and then it says
8 is in danger of dismissal due to several poor
9 evaluations that she has received from CRNAs Jill and
10 Eva who appear to be close friends.
11        Did you tell the therapist that you
12 were in danger of dismissal due to several poor
13 evaluations?
14   A    I believe I disclosed that to her.
15   Q    Then there is some handwritten notes that
16 start at the bottom of this page?
17   A    Yes.
18   Q    From it looks like another visit,
19 August 2nd, 2013?
20   A    Uh-huh.
21   Q    Is that right?
22   A    Yes.
23   Q    It indicates:  Met with program head
24 yesterday following another negative evaluation.  One

Page 192

1 suggested a leave of absence which I supported.  So
2 were you talking to her about the possible leave of
3 absence?
4    A    Yes, because I wasn't sure how to survive
5 basically; so she had suggested a leave of absence.
6    Q    So that was after the review, the critical
7 review from Amy Gawura?  That's another negative
8 evaluation that's referenced here.
9    A    I'm not sure.  I mean based on this date,
10 it's my recollection it seems to overlap.  I thought
11 that she had suggested for me to look for a mentor,
12 and that's why I thought of confiding initially to
13 Miss Amy Gawura.  So like the date's just --
14   Q    Forgetting the dates, did you confide in
15 Amy Gawura before the July 30 date where you had the
16 problems with the two patients or after the problems
17 with the patients and at the end of that day?
18   A    At the end of the day.
19   Q    And that was July 30, and then is this
20 looks like August 2nd you are meeting with the
21 therapist?
22   A    Okay.
23   Q    I reference that, and then the next page
24 is information she actually -- No.  Mine is slightly

Page 193

1 different, but the second page they have Bates numbers
2 at the bottom; right?
3    A    Yes.
4    Q    So Terrebessy Number 2?
5    A    Yes.
6    Q    That follows up on the notes from
7 August 2nd, the second page; right?
8    A    Yes.
9    Q    In those notes on the second page
10 three-quarters of the way down, it starts to say:  She
11 had scheduled an appointment with L. Alstead
12 (phonetic) --
13        Do you see that?
14   A    Yes.
15   Q    -- but decided to cancel it when it became
16 evident that her program is willing to work with her;
17 right?
18   A    Yes.
19   Q    So you were learning that you might be
20 able to work out a leave of absence; right?
21   A    Yes.
22   Q    Then the next set of notes looks like it's
23 from a third meeting with Terrebessy on August 8,
24 2013?



---

Page 194

1    A   Uh-huh.
2    Q   Took LOA which will last about three and a
3 half months. This is instead of failing current
4 rotation and being dismissed. Do you see this?
5    A   Yes.
6    Q   Did you tell Terrebessy that?
7    A   My perception was that it's a -- Well, I
8 didn't tell her the grade that I was given; and my
9 perception of that grade which was WM I think was that
10 it was not a final grade, that they are allowing me to
11 remediate when I come back.
12       So I think what I told her was that I
13 was being given a chance to redo my time of being away
14 on a leave of absence.
15    Q   Wasn't the arrangement that the grade you
16 just referenced that was not a failing grade was part
17 of the agreement for leave of absence, to give you a
18 chance to come back and try to adjust your
19 performance?
20    A   That was what was imposed on me because
21 Dr. Kremer said that you can't really take a leave in
22 the middle of the quarter. You have to take, you
23 know, you have to be graded according to -- because he
24 consulted with Dr. Johnson I guess, the Associate

Page 195

1 Dean, that if we were going to give you this leave,
2 then we have to assign a grade because you are midway
3 into the quarter from what I recall.
4       And so under duress I had to agree with
5 that so I could just proceed with getting my leave.
6 So I really was not given a choice of --
7    Q   If you had stayed, did you think you had a
8 chance of passing the course?
9    A   Not in my state of mind then and I felt
10 like under the stress that I was going through. If I
11 was given a shorter leave, like two weeks to one
12 month, I might be able to not fall as behind as I did
13 with like August, September, October, November,
14 December, almost five months of being away which
15 Dr. Terrebessy was not, when I had to tell her that,
16 she wasn't happy about that recommendation because she
17 said it's just going to delay me and cause my skills
18 to atrophy because I have no chance of being exposed
19 to clinicals. Whatever I'm studying, I won't be able
20 to apply in actual situation even though I made up
21 some opportunities to do clinicals with
22 anesthesiologists I know, yeah.
23    Q   I guess what I'm wondering, so was Rush's
24 approach to allowing you time away instead of staying

Page 196

1 with the course and getting a grade, was that in some
2 way like beneficial to you from a grading perspective,
3 like lenient instead of dismissing you for failing the
4 course and giving you a chance to regroup and come
5 back, aside from how long the leave was?
6    A   Can you ask that again?
7    Q   Was it lenient of Rush to try to allow you
8 time off so that you could try to regroup and come
9 back and perform better as opposed of taking the five
10 unsatisfactory ratings and applying that to a grade?
11    A   I wouldn't call that lenient in the sense
12 that if I contested the other negative evaluations, I
13 don't know why they would consider or like add that
14 into my grading.
15       And so I didn't consider myself as
16 failing them despite these negatives evals because I
17 knew that I was able to be effectively refute them,
18 and they didn't investigate or do enough to look up
19 the validity of my statements because there were
20 certain times that the documentation would reflect
21 what I was saying in my rebuttals; and I suggested to
22 Dr. Kremer, why don't you compare my documentation
23 with what such and such CRNAs are putting in my
24 evaluations so you could validate that what I'm saying

Page 197

1 is true.
2       And so I don't think it's lenient
3 inasmuch as it's fair for me to take that leave
4 without the risk of being failed.
5    Q   Okay. Later in these notes on this page
6 it talks about, Talked regarding her tendency --
7       Do you see that?
8    A   Yes.
9    Q   -- to explain too much, to defend her
10 decisions or actions when she has been corrected
11 rather than accept the correction and agree to doing
12 it in a specified manner the next time. She
13 acknowledged that she does this, sees how it can be a
14 problem.
15       Did you talk about that with
16 Terrebessy?
17    A   I took in her observation based on what I
18 presented to her. And she was recommended to me by
19 another SRNA, and I'm not sure if she is also gauging
20 it from the experience of that other SRNA as to my
21 experience as well.
22       But I was taking in her advice without
23 necessarily thinking that I don't know if I've given
24 her enough to say that I was talking a lot and



Page 198

1 refusing correction.
2     Q   But did she talk to you -- I guess I'm
3 just asking. Did she talk to you about having a
4 tendency to defend yourself rather than accept
5 correction and agree to learn from it? Did she talk
6 to you about that?
7     A   She said to just take in the instruction
8 and try not to defend yourself so you don't come off
9 as resistant from what I recall.
10         But I took it in as, okay, this is
11 advice that maybe I should be internalizing or taking
12 in and recognize that, you know, this might improve my
13 interaction later.
14     Q   I mean here it says she acknowledged that
15 she does this?
16     A   Yes.
17     Q   Sees how it could be a problem. Is that
18 accurate about what you told Terrebessy?
19     A   At that time, like I said, I expressed my
20 agreement with her advice; but I didn't really state
21 that there was a particular like cause and relation to
22 my behavior and the problem that I was experiencing.
23     Q   If you look further down the page, it
24 looks like another set of notes from another visit

Page 199

1 with Terrebessy of August 13, 2013; and it talks about
2 urged, halfway down, urged her to accept this outcome
3 and work on fixing problem that led up to it.
4         Do you see that?
5     A   Yes.
6     Q   Then after that, specifically talked with
7 her regarding tendency to challenge authority of
8 people over her but appearing to question them or
9 explaining her reasons for handling things the way she
10 did. Do you remember talking about that with
11 Terrebessy the second time in a meeting?
12     A   I think she made that recommendation, that
13 maybe I should just sit back and not speak out, just
14 to keep myself, like what my classmates would often
15 say, stay under the radar and not make too much noise
16 so you don't get picked on.
17         And that's how she referred to as, when
18 we speak out or try to rationalize our way of thinking
19 things through with how we're performing our tasks,
20 that's how she explained to me, that that may come out
21 as resistant to their, to authority's handle on us.
22         And so I think her stance is to just to
23 back off and not to try defend yourself or rationalize
24 your actions so that you don't I guess offend them or

Page 200

1 make them feel like you are being resistant.
2     Q   If you could turn to Page 17 of this --
3 I know we're getting close to 4:00 o'clock, real
4 close; but I do have a few questions to ask you.
5         This appears to be something you wrote
6 and sent to Terrebessy?
7     A   Which one, the bottom one?
8     Q   The bottom part of it, both of them, but I
9 am looking at the bottom part, other notes from
10 October 24.
11     A   Okay.
12     Q   Did you create those?
13     A   Yes. This is my email to her I believe.
14     Q   So if you go under the other notes from
15 October 24, if you go to the third paragraph, the
16 second sentence starts: He was somewhat apologetic --
17         Do you see that?
18     A   Yes.
19     Q   -- about the incidents of how to deal with
20 Jill and Eva and concedes that in the ER there are
21 plenty of personalities which could be difficult or
22 challenging but reassured me that he will inform Ray
23 to limit my interaction with them in clinicals. Do
24 you see that?

Page 201

1     A   Yes.
2     Q   So Mike told you he would inform Ray to
3 limit your interaction with Jill and Eva --
4     A   Yes.
5     Q   -- when you returned?
6     A   Yes.
7     Q   So that's different than no interaction;
8 right?
9     A   Yes.
10     Q   So that means there could be some?
11     A   Potentially is what I thought, but okay.
12     Q   Then two paragraphs down from that, the
13 one that starts we again revisited, do you see that?
14     A   Okay.
15     Q   You are describing, We again revisited the
16 terms for the LOA and said that in the first month of
17 my return, I will be assigned to a CRNA (I was a
18 little surprised as I thought that since I was still
19 on probation that I would still need a full three
20 months of CRNA supervision.)
21         So he told you that would be the case
22 when you came back, one month of CRNA supervision?
23     A   Yes.
24     Q   Then the last sentence, it starts in that



Page 202

1 page, He said, I'm sure Ray will try to ease you into
2 it by starting you with simple, not so challenging
3 cases at the beginning, and so I just need to know the
4 basics (got the impression that he was reassuring me
5 that I don't need to be at the level I was in before
6 LOA when I came back). Then in quotes: "Nonetheless,
7 cases change easily, so be prepared and flexible to
8 take whatever he assigns you to do."
9 　　　　Is that a quote of what Mike said to
10 you, what Dr. Kremer said to you?"
11 　　A　I was recalling that after our meeting, so
12 not verbatim but most of what, the substance after
13 what he said.
14 　　Q　Okay. So it seems he's telling you that
15 the cases that are assigned might be limited or
16 attempt to be adjusted so that you could start back up
17 but that you need to be ready for anything because
18 things could change; right?
19 　　A　Yes.
20 　　Q　There is some areas in what you've sent
21 along here that include quotes, sometimes long quotes.
22 Did you tape-record any conversations with anyone
23 relating to the SRNA program?
24 　　A　This particular one, this particular

Page 203

1 meeting, no.
2 　　Q　I asked a slightly different question.
3 Did you ever record any conversation you had with
4 people at Rush about the SRNA program?
5 　　A　With Dr. Johnson and Dr. Kremer, just so I
6 can remember what they were saying coming back.
7 　　Q　What do you mean?
8 　　A　I think it was November that I had a
9 meeting with them.
10 　　Q　And you tape-recorded it?
11 　　A　I believe so.
12 　　Q　What do you mean?
13 　　A　Yeah. I did.
14 　　Q　Did they know you were doing that?
15 　　A　I don't know if I had informed them.
16 　　Q　How did you record it?
17 　　A　Just on my iPhone.
18 　　Q　Was your iPhone hidden when you were doing
19 that?
20 　　A　It was on my purse.
21 　　Q　In your purse?
22 　　A　Yes.
23 　　Q　So they couldn't see it; right?
24 　　A　Yes.

Page 204

1 　　Q　Do you still have that recording?
2 　　A　Yes.
3 　　Q　Have you produced it to your lawyer?
4 　　A　I believe I gave it to her.
5 　　　　Did we submit it?
6 MS. SIEGEL: No.
7 　　A　Not yet, but we had mentioned it to her.
8 　　MR. LAND: Elaine, we're going to need that
9 recording.
10 　　MS. SIEGEL: I understand.
11 　　MR. LAND: Q Did you tell them they were being
12 recorded?
13 　　A　No. It was just more for me to remember
14 what was going on.
15 　　Q　Do you know that there are legal
16 requirements relating to recording conversations?
17 　　A　No.
18 　　MS. SIEGEL: I object. It relates to a legal
19 conclusion.
20 　　MR. LAND: I'm not asking for a legal
21 conclusion, just her knowledge.
22 　　Q　You don't know?
23 　　A　No.
24 　　Q　Why did you record it?

Page 205

1 　　A　Because I wanted to be aware of the
2 details and make sure that it could help me later to
3 recall the requirements of what was really said.
4 　　Q　Why didn't you ask them if you could
5 record it then if that was the reason?
6 　　A　I'm not sure. I didn't think it was a big
7 deal to do it since it's mostly for me remembering
8 details as a guide for when I come back.
9 　　Q　You didn't think that would matter to
10 them, that they were being recorded?
11 　　A　I guess I didn't think of that.
12 　　Q　Really?
13 　　A　No.
14 　　Q　What other conversations relating to the
15 SRNA program did you record?
16 　　A　With my classmates? We had text messages.
17 　　Q　Any conversations you had with people at
18 Rush that you recorded. That's what I'm asking about.
19 　　A　There is nothing else because this is,
20 like I said, this is primarily for me, like a
21 checklist for me. So that's the only recording I
22 made.
23 　　Q　You're sure you didn't record any other
24 conversations?



Page 206

```
 1      A   Yes.  I'm sure.
 2      Q   You hesitated a little bit there.
 3      A   No.  I'm sure I haven't recorded anything
 4  else except that.
 5      Q   Did any of the quotes that you put into
 6  documents come from recordings?
 7      A   No.
 8      Q   None?
 9          I'm just asking you:  Do you ever
10  remember using a recording to create a document with
11  quotes?
12      A   Yes.
13      Q   What did you do with that document?
14      A   Oh, you mean for -- Not for this
15  particular one.  I'm using quotes because I'm trying
16  to reproduce their verbatim statements, but it's not
17  necessarily the exact words that they said.  So this
18  is not from a recording.  This is from my memory.
19      Q   What I asked is:  Did you ever use the
20  recording to create documents that quoted people from
21  the recording, and you said yes?
22      A   No.  I didn't create documents that I
23  pulled from recording that I recall.
24      Q   So maybe you did but you are not sure?
```

Page 207

```
 1      A   I know that I didn't use it to produce a
 2  document, any of the things in the recording except
 3  for my, the things I need to remember, not necessarily
 4  the statements they made.
 5      Q   The last thing I want to ask you about
 6  before we break is the next paragraph on Page 18 of
 7  the Terrebessy documents.  So it's the paragraph that
 8  starts as far as evaluations.
 9          Do you see that?  I just want to know
10  if you see that paragraph.  It's the one at the top,
11  this one there.
12      A   Okay.
13      Q   So it says:  As far as evaluations, he,
14  that's Mike Kremer; right?
15      A   Uh-huh.
16      Q   He repeated that if unsatisfactory evals
17  start coming again, that I will get a verbal warning
18  at first, then second time around a written warning,
19  and if things don't go well, then we can talk about
20  transitioning me to CNL (Clinical Nurse Leader)
21  program so I can get full credits for all of the
22  courses I've taken before.  I agreed to all of the
23  aforementioned conditions.
24          Did that happen?
```

Page 208

```
 1      A   Yeah.  I had a verbal, you know --
 2  I agreed to him then in October when we had this
 3  discussion.
 4      Q   So you agreed that if you got
 5  unsatisfactory evaluations you'd get a verbal warning
 6  first and then the second time you got one you'd get a
 7  written warning and if things didn't go well after
 8  that you would talk about transitioning?
 9      A   Yes.  That is back in October.
10      Q   I understand.  But this is setting up how
11  things would work when you came from your leave of
12  absence; right?
13      A   Yes.
14      Q   You clearly understood that when you got
15  back, if you got unsatisfactory evaluations there
16  would be consequences, and by the third one you might
17  have to talk about transitioning; right?
18      A   Yes.
19      Q   And you agreed to that; right?
20      A   I agreed to it then.
21      Q   You said that like three times now.  I'm
22  not sure what you mean.
23      A   Because when we had another meeting with
24  Dr. Johnson and Dr. Kremer, I had stipulated that I
```

Page 209

```
 1  will sign a contract only if you can assure me that
 2  there would be no -- because this was before my talk
 3  with Narbone, and I had requested that with this
 4  contract they add that somebody should oversee the way
 5  I'm being treated, if there is any forms of bias or
 6  discrimination, that somebody should intervene and not
 7  consider the merits of their evaluations.
 8          And so I was presenting that based on
 9  how I was treated by Ray and the things that he had
10  said that would almost guarantee my failure even
11  before I came back.
12      Q   Okay.  And I think you're saying that you
13  had this subsequent discussion and it was in the
14  meeting that you recorded?
15      A   Yes.
16  MR. LAND:  I think we should break for now.
17  MS. SIEGEL:  Sure.
18  MR. LAND:  Off the record.
19          (Whereupon the deposition of
20           Ms. Marcial was adjourned.)
21
22
23
24
```



Page 210

1  UNITED STATES DISTRICT COURT
2  NORTHERN DISTRICT OF ILLINOIS    SS.
3  EASTERN DIVISION
4
5
6       I have read the foregoing transcript of my
7  deposition, taken on February 28, 2018, consisting of
8  pages 1 through 209, inclusive, and I find it is a
9  true and correct transcript of my deposition so given
10 as aforesaid.
11
12
13
14
15
              MARICEL MARCIAL
16
17
18 SUBSCRIBED AND SWORN TO
   before me this_____day
19 of_____, 2018.
20
21    Notary Public
22
23
24

Page 211

1  STATE OF ILLINOIS      )
                          )  SS.
2  COUNTY OF COOK         )
3
4
5       I, Erin McLaughlin, CSR, do hereby certify
6  that I am a court reporter doing business in the City
7  of Chicago, that I reported in shorthand the testimony
8  given at the deposition of MARICEL MARCIAL, on
9  February 28, 2018, and that the foregoing is a true
10 and correct transcript of my shorthand notes so taken
11 as aforesaid.
12
13
14
15
16
17         Certified Shorthand Reporter
18
19
20
21
22
23
24



54 (Pages 210 to 211)

**A**

**ability** 6:4,6 8:19
12:8 32:15 36:12
141:7 142:20
143:4 168:3
175:11 176:1
**able** 22:7,8,10
32:19 37:4 41:8
47:24 51:8 108:14
111:14 120:10
133:17 134:4
137:21 143:13
181:11 193:20
195:12,19 196:17
**abnormal** 150:11
**abnormals** 20:22
**abrasive** 169:5,9,12
**absence** 14:13,16
14:19 17:23 40:24
43:23 44:1,3
86:19 92:5 100:17
102:5,7,13 103:9
103:12 180:17
184:10 188:1,3,19
189:2,18 192:1,3
192:5 193:20
194:14,17 208:12
**abuse** 13:11
**abused** 141:3
**Academic** 183:21
184:12
**accept** 67:13
197:11 198:4
199:2
**accepting** 67:20,24
**account** 130:16
140:15
**accrued** 189:10
**accurate** 36:4
37:11 58:23 63:5
63:14 65:1,4,8,11
65:15,19 70:6
85:23 90:14 105:5
105:11 107:5
110:10 124:6

128:7 154:9
163:24 167:5,12
168:11 181:3
198:18
**accurately** 54:15
54:19,22 153:18
182:4
**accused** 72:6
**acknowledged**
197:13 198:14
**act** 22:9 78:13
115:24 152:16
**acted** 114:19 162:9
165:11
**acting** 22:13
**action** 29:11 149:21
185:18
**actions** 9:13 15:19
27:9 29:5,7,11
30:11 89:11
122:23 123:1
153:6,11,13
197:10 199:24
**actively** 115:2,6
122:12
**activity** 139:11
**acts** 162:3 181:19
**actual** 59:17 106:2
169:8 195:20
**add** 35:1 196:13
209:4
**added** 27:18 115:5
**addition** 82:19
135:16 141:23
**additional** 166:3
**address** 4:20 10:1
116:12 118:10
119:8 120:16
128:21 129:3
130:14 131:13
150:8 153:10
181:11
**addressed** 8:17
89:22 90:1 92:24
131:6 151:15
165:5 184:21

**addresses** 154:4
**addressing** 118:22
131:18 148:16
157:2
**add-on** 113:18
**adequate** 111:7
173:23
**adjacent** 38:22
**adjourned** 209:20
**adjust** 35:11
194:18
**adjusted** 121:22
202:16
**administering**
23:11 166:7
**advice** 186:3
197:22 198:11,20
**affairs** 47:11
**affect** 10:15 11:6
23:10 29:14 116:1
143:4 175:11
**affords** 38:18,19
**aforementioned**
207:23
**aforesaid** 210:10
211:11
**age** 7:13 9:24 10:6
10:8,15,21,24
11:6,16,21,21
12:20,23 13:21
14:21 15:6,10
95:22 96:3 98:8
121:3
**aged** 138:3
**agenda** 47:11,13
**ago** 168:11 186:17
**agree** 22:17 23:9
55:20 63:3 64:3,5
64:11 105:4 108:5
144:15 153:17
160:10 175:3
180:24 181:18
182:4 183:7,13
195:4 197:11
198:5
**agreed** 63:18,22

64:15 70:15,19
163:2 207:22
208:2,4,19,20
**agreeing** 79:6
**agreement** 37:18
194:17 198:20
**ahead** 21:17
**air** 89:1
**airway** 52:4 63:17
63:24 64:8 144:13
144:14,16,24
147:20 150:24
164:21 165:9
171:4
**airways** 129:16
**algorithm** 48:14
**Alida** 57:7,20
107:14 148:9
149:1 156:24
157:19 162:7
179:8 187:15
**allegation** 9:23
72:4 109:19
**alleged** 123:11
**alleging** 17:13
123:22 124:5,14
**allow** 5:2 196:7
**allowed** 39:17,19
188:22
**allowing** 194:10
195:24
**allows** 5:6
**Alstead** 193:11
**amended** 6:24 13:3
**amount** 21:14
180:6
**Amy** 59:10,23
86:14 90:4,14
92:1 168:15,23
170:17 171:9
179:21 180:24
183:8 186:23
187:16,18 192:7
192:13,15
**analgesia** 32:3
**anatomy** 24:22

**anesthesia** 22:8,12
23:11 24:1 32:1
32:24 33:8,16
34:14 35:8 37:16
38:24 47:3,5 51:3
51:23 52:2 67:10
121:19 122:9
135:17,22 142:4
145:2 150:16
159:22 162:21
170:20 173:20
175:1,12 178:3,5
178:13
**anesthesiologist**
19:7,12,18 22:10
37:15,17 38:21
45:6,14,15 46:12
50:23 51:5,19
122:1 142:8
162:16
**anesthesiologists**
19:2 20:6,9 40:13
40:15 43:11 44:13
44:22 45:8,23
46:7,14 131:4
151:10 162:18
195:22
**anesthesiology**
51:18
**anesthetic** 19:14
174:6 175:18
**anesthetics** 28:7
174:19
**Anesthetist** 23:7
**Angela** 86:14,20
87:5,11,20
**answer** 5:3,8,17 6:1
16:24 39:23 70:22
89:3,16 131:16
136:16 137:24
138:6,9 140:4,5,8
142:18 145:16
167:15
**answered** 16:23
125:9 136:15,23
138:9 172:22



**answering** 89:13
138:22 139:9
142:17
**answers** 5:1 89:10
138:1 139:5
**Anthony** 98:23
99:6
**anticipate** 5:3
34:23,23 35:2
36:2
**anticipating** 168:5
**anxiety** 93:10 180:7
180:20
**anymore** 115:12
173:18
**apnea** 176:24 177:3
177:6
**apneic** 114:6,24
115:3,9,11,14,23
**apologetic** 200:16
**apologized** 97:11
141:5
**apparently** 93:22
**appear** 101:14
104:18 106:20
116:17 191:10
**APPEARANCES**
2:1
**appeared** 2:6,12
157:17,20
**appearing** 199:8
**appears** 56:3 58:10
58:22 59:10,15,22
61:13 107:23
163:8 164:6
168:14 190:24
191:5 200:5
**application** 56:16
**apply** 32:16,19
176:20 195:20
**applying** 65:23
170:19 196:10
**appointment** 191:2
193:11
**appraisal** 68:15,17
90:16

**approach** 24:1
81:22 90:11
175:14 195:24
**approached** 90:24
**approaching** 45:14
**appropriate** 29:3
29:19 53:10 66:16
91:1 104:9 110:22
120:12,23 121:3
142:10 143:23
155:10
**appropriately**
30:23 129:24
178:2,9 182:13
**approximate** 24:19
**approximately**
125:4
**April** 13:15 14:1
55:19,23 56:4
57:20
**area** 31:20 52:19
**areas** 185:8,21
202:20
**argue** 67:10 72:8
93:15 161:2
**argued** 17:12
165:24
**arguing** 151:8
**arises** 33:20
**arrangement**
194:15
**arrests** 22:24
**art** 152:18
**articles** 31:23
**Asian** 98:6
**Asians** 96:20 97:2
**aside** 23:8 35:5
62:16 93:17 140:8
143:8 144:8
173:12 196:5
**asked** 5:24 6:5
16:23 40:9 68:21
71:17 89:2,7
90:24 93:10 98:15
104:8 122:6 125:9
125:10 135:1,11

136:1,7,12,17
137:13,22 138:4,7
138:7,15 142:16
142:19 158:21,21
165:16 166:14,18
166:21 167:11,14
172:17 173:5
186:5 203:2
206:19
**asking** 5:18 68:24
78:22,23 87:12
90:21 103:22
108:6 118:21
124:4 139:3
144:14,16 154:13
166:11 167:18
175:23 177:18
198:3 204:20
205:18 206:9
**asks** 161:17
**aspect** 25:2 59:6
158:4
**aspects** 65:22 67:10
157:13 181:8
**assertion** 149:12
**assessment** 163:24
181:1 182:19
185:11
**assign** 48:15 195:2
**assigned** 32:1 38:3
47:17 68:18,19
77:5 81:7 83:20
84:2,4,6 201:17
202:15
**assigning** 47:2
**assignments** 51:2
**assigns** 202:8
**assist** 171:20
**assisted** 130:7
**associate** 40:8
194:24
**associated** 168:8
**ASSOCIATES** 2:3
**assume** 5:18 27:5
43:2
**assumed** 115:15

153:9
**assuming** 72:6
**assure** 209:1
**assured** 127:14
**atrophy** 195:18
**Atropine** 28:2
136:17
**attach** 52:20
**attached** 52:21
114:23 185:10
**attempt** 48:3,20
165:14 172:2
202:16
**attempted** 171:3,8
172:1
**attempting** 177:15
**attempts** 8:17
**attend** 8:17
**attending** 94:21
**attention** 51:11
56:2 81:7 161:23
**attorney** 4:7
**attuned** 47:24
**August** 83:18 84:10
92:5,12,22 95:8
101:7 102:14,22
103:10 191:19
192:20 193:7,23
195:13 199:1
**authority** 199:7
**authority's** 199:21
**autonomy** 22:15
**availability** 185:24
**average** 68:14
152:16
**avoid** 189:2
**aware** 8:7 41:11
122:16 124:22
128:13 205:1
**a.m** 1:19

———— **B** ————
**B** 165:13
**baby** 114:6,18,18
114:21,24 115:8,9
115:11,14,15

122:18
**back** 12:10 33:6
40:23 55:10,19,23
58:2 60:19 61:11
65:5 72:8 73:19
75:24 76:15 82:20
89:15 93:15 94:18
100:10 106:12
107:11 108:20
113:10 114:21
115:22 116:1
124:8 125:16
126:22 134:4,9
141:21 147:19
148:6 158:6
164:17 183:4
184:10 186:21
194:11,18 196:5,9
199:13,23 201:22
202:6,16 203:6
205:8 208:9,15
209:11
**backdated** 123:13
124:17,19 125:8
**background** 18:4
19:8
**backup** 147:18
**backwards** 55:21
**back-up** 118:4
**bad** 63:10
**balance** 180:24
**barely** 118:11,17
**base** 70:24 72:3
**based** 7:12 9:5 40:7
48:11 68:16 72:12
110:13 121:1
129:24 131:23
133:2 137:4
138:10 139:11
155:21 162:23
182:19 192:9
197:17 209:8
**baseline** 152:3
159:3,10,14,14
161:23
**bases** 7:18



basic 27:17 51:17
  175:1,3,5,5,8,14
basically 33:17
  38:23 74:13
  121:24 129:15
  142:24 150:9,12
  159:12 192:5
basics 170:20 202:4
basis 13:21 14:20
  16:11 23:2 59:5
  62:11 68:8,12
  69:23 72:13 97:9
  124:18 125:7
  126:9 154:21
  162:5,12,14
  182:22
batch 79:16 80:3
Bates 193:1
bedside 18:14
beginning 45:22
  102:10 132:15
  136:24 186:21
  202:3
behalf 2:6,12 6:13
behaved 96:8,11
behavior 198:22
behaviors 184:21
belief 70:24 72:13
  124:18 125:7
  182:22
believe 8:2,6,20,22
  10:16 12:2,11
  14:22 15:24 16:8
  17:1,4,11,14 25:1
  25:17,20,21 26:9
  28:11 32:13 40:16
  43:24 54:13 56:11
  59:20 62:11 63:11
  69:8 70:6,18 72:8
  72:24 76:20 78:12
  79:11,13 80:7
  81:15 82:3,11,17
  82:21 83:19,21
  84:21 85:7 86:18
  87:8 91:7,18
  99:10 100:17

102:12 104:18
  106:17 109:12,23
  123:11,12,21
  124:17 126:2
  128:2,15 138:9
  141:17 142:17
  144:19 151:14
  154:22 157:2,20
  162:7,8 163:23
  164:13 165:7
  167:5 172:22
  178:8 191:14
  200:13 203:11
  204:4
believed 15:22
  17:17 62:19 71:17
  86:5
believing 126:9
Ben 73:6
beneficial 196:2
best 14:8 60:12
  73:8 107:6 164:1
better 93:16 98:19
  177:5 180:19
  187:5 196:9
beyond 46:16
bias 154:16 209:5
biased 153:2 154:7
  155:14 156:8
  164:4
biases 66:17
big 37:23 43:2,6
  94:3,14 205:6
bit 18:3 22:3 30:14
  44:12 88:3,8
  128:16 134:8
  143:8 171:18
  206:2
BLACKWELL 2:8
blade 91:10 151:4
  151:18 158:9,20
blank 86:4
blanket 129:21
block 180:8,12
blood 21:16 52:23
  149:13,17 150:11

150:14 152:2
  153:24 159:6,13
  159:18,20 162:24
Blue 22:23 23:1
Blvd 2:3
board 159:23 160:3
  160:12,19,22
body 27:10 29:14
  165:18
body's 29:9
book 131:3,24
bother 53:17
bottom 13:4 57:10
  58:3 60:18 112:9
  112:11 117:19
  125:18 156:21
  184:3,11 191:16
  193:2 200:7,8,9
break 5:21,23 6:1
  55:2 62:17 156:15
  162:15 190:6
  207:6 209:16
breaks 41:6
breast 91:7
breathe 171:19
  175:11 176:11,13
breathing 52:7
  115:18 171:15
  172:13 176:17
brief 55:4 100:4
  156:16 190:8
briefly 116:6
  151:17 158:6
bring 19:4
bringing 18:19
brought 81:6
  159:10 183:11
brushes 146:7
building 52:14
bullet 104:6 106:13
  107:12 108:21
  125:18 148:7
bunch 63:8 134:6
business 211:6

─────────
C
─────────

C 86:2 164:18
call 4:20 19:19
  30:13 31:9,23
  38:17 47:4 52:2
  52:20 84:5 112:6
  196:11
called 1:12 6:13
  32:4 41:11 85:18
  161:22 167:19
  171:18
calls 39:21 48:24
  66:6 70:20 78:9
  83:10,14 98:20
  99:15 117:23
  147:9 159:22
Cam 15:21 74:24
  97:17 98:1 141:15
cancel 193:15
canister 52:16,18
  53:6
capacity 1:7,8,9
capstone 32:4,4
card 30:22
cardiac 18:17
  22:23
cards 30:13
care 18:16 20:20,24
  22:11,12 24:4
  33:16,21,24 35:2
  35:8 66:15,16
  129:10 130:9
  157:2 169:14,15
  181:6
carefully 110:20
  111:1 118:17
care-giving 122:10
  122:22
carry 30:12
cart 157:11
case 7:4,8 8:4 32:2
  33:1,9 34:1,10,18
  35:6,19 36:6,13
  36:23 37:5,13,15
  37:21 38:3,13
  39:4 45:15 47:6
  47:22 49:20,23

50:8 51:2,9,11
  56:21 59:1 74:10
  74:13 82:8,14
  84:24 87:13,21,24
  88:12,20 89:7,22
  90:2,3,17,21,22
  90:23 91:2,3,4,21
  91:24 92:2,10,14
  92:16,22,24 93:1
  93:24 94:8 95:1,2
  95:6,19 112:13
  113:1,2 114:2
  116:14,20,22
  117:1,12,13
  118:15,15 120:19
  120:20,21,24
  121:24 122:8,18
  129:9,17 132:15
  133:3,8,22 134:5
  134:7,19 135:23
  136:15,24 138:2
  141:1,8,10,19
  142:21 143:5
  144:17 146:2,15
  159:24 160:4,7,19
  161:15,15 162:2
  162:20 163:5,9,21
  164:9 165:17
  170:4,21 172:17
  175:18 178:19
  201:21
cases 33:15 34:6
  35:15 38:12,14
  47:2,4,17 48:1,4,5
  63:3 68:19,20
  86:7 87:3 88:14
  88:23 90:15 92:1
  112:24 129:11
  130:2,3,4 132:10
  132:20 133:9
  169:19 178:12
  179:24 181:13
  202:3,7,15
categories 7:21 8:2
  9:1 107:22 128:9
  168:21 181:8



182:1
category 163:18
caudal 135:17,22
caught 179:1
cause 150:16
  195:17 198:21
Center 1:6 4:8 7:1
center's 185:24
certain 15:4,7,9
  20:18,19 26:22
  34:24 47:20,22
  48:1 67:10 68:20
  87:9 128:8 156:3
  181:10 196:20
Certified 211:17
certify 211:5
challenge 199:7
challenging 170:18
  200:22 202:2
chance 61:23 140:7
  194:13,18 195:8
  195:18 196:4
change 33:1,9 36:1
  37:23 152:14
  153:24 159:9,15
  159:17,19 202:7
  202:18
changed 36:13
  112:14
changes 121:22
  151:23 152:5
changing 171:20
characterizations
  144:15
cheat 30:13 132:11
  132:21 133:13
  134:14,15,21
check 51:22 110:8
  116:19 131:5
  160:7 172:19
  173:3,15,16
  174:11,13
checking 161:19
  166:5 167:17,23
  168:1
checklist 205:21

Chicago 1:17 2:4,9
  211:7
chief 47:9
child 93:11 94:9
  110:8,19 112:6,20
  112:23 113:8,9,14
  113:16,18,20,22
  114:1 121:5,8
  139:15,20
child's 93:8 120:12
  120:23
chip 91:12
choice 158:23
  177:5,6,9 195:6
choose 147:18
choosing 29:3
  176:19
circled 108:8
circuit 94:5,16,17
  114:5,11,19,23
  115:3,4,13 116:4
circumstances
  35:11
cisatracurium
  28:12
City 211:6
Civil 1:14 4:12
claim 8:8,15
claiming 7:22 9:3
  70:10
claims 7:4,8,15,18
  7:18 54:10 62:18
  62:18
class 31:22 32:6
  73:3
classmate 45:11
  74:11 96:8 97:4,7
  141:10 182:24
classmates 14:24
  26:5,8 30:22
  44:24 68:14 69:6
  69:9,19 75:15
  96:12,14,17,22
  97:9,22 199:14
  205:16
classwork 31:24

clean 52:22,24
clear 178:1 180:19
  186:16 189:15
clearly 91:11
  142:23 208:14
clicking 137:22
client's 85:17
clinical 8:18 10:19
  24:12 25:3,23
  26:15 30:6 31:8
  31:15,20 32:6,7
  32:14,16 36:19
  39:13 40:8 41:12
  42:3,17 43:4,7
  50:8 54:12 55:14
  56:21 68:10 98:18
  116:10 117:7
  130:8 164:9 180:6
  185:6,8,20,23
  207:20
clinicals 25:5,8,15
  25:20 26:11 32:8
  32:23 51:6 83:17
  195:19,21 200:23
close 30:24 67:9
  75:3 102:19
  191:10 200:3,4
closer 124:24
  172:16
club 31:23
clue 168:6
CNL 207:20
Code 22:23 23:1
Colino 61:14,18,20
  62:12
collaborate 18:18
collaborating 20:11
collaboration 37:14
colleague 74:11
  96:7
collude 154:23
colluded 70:13
  81:16 82:3,21,23
colluding 17:13,15
  71:18 72:7,14
  73:1,15

collusion 71:1 72:4
  74:7 75:1,8 76:23
  78:1 79:11,22
  80:13 82:18
coloring 155:11,14
come 19:5,7 35:24
  43:12 84:7 104:2
  114:21 194:11,18
  196:4,8 198:8
  199:20 205:8
  206:6
comes 143:1
coming 75:24
  129:17 203:6
  207:17
command 172:18
commands 174:16
commencing 1:18
comment 11:2
  56:18 58:20 78:5
  80:24 91:20
  108:16 113:15
  114:4 129:18,20
  132:16 133:5,6
  140:8 145:3
  155:20 185:5
commented 117:17
commenting 113:7
  114:10 157:22
  158:5
comments 9:1,5,12
  9:13,15,24 56:14
  57:4 72:17 75:2,9
  79:9 97:3 101:19
  101:19 105:1
  117:15,19 132:21
  132:23 166:3
committees 18:22
common 6:5 32:24
  33:8 35:6 44:21
  51:18,22 52:4,10
  53:9 150:15
communicated
  70:11 185:2
communicating
  154:22

communication
  15:5 155:6 156:5
comorbidities
  29:23 34:21
comorbidity 35:1
compare 68:12
  70:3 196:22
compared 26:5,6,8
  68:10 75:15
comparison 23:8
compelled 162:10
competencies 24:19
compilation 55:14
  101:6
compiled 103:19
Compiling 101:18
complained 14:4
  82:8 169:18
complaint 6:24
  10:1 13:3,11,20
  15:3 77:3
complaints 142:15
complete 8:1,6
  127:5,12
completed 104:19
completely 37:20
Compliance 13:12
complicated 48:11
  68:20 114:2
  116:21 121:24
  122:18,19
complication 20:1
complications 35:3
  116:19 149:8
  168:4,5,7
component 24:12
  24:13,15 25:18,23
  31:15 40:5 43:7
components 24:12
compromised
  149:12 176:2
compromising 24:5
conceded 63:10,12
concedes 200:20
concentration
  178:19



concept 175:1
concepts 170:19
175:8
concern 14:11
16:15 17:2,9,21
43:2,6 75:12,13
75:18 89:21 90:1
concerned 89:6
concerns 14:1
42:11
conclusion 204:19
204:21
condition 19:8
122:19
conditions 18:17
19:9 34:21 36:13
207:23
conduct 7:21 8:2
22:18
confide 192:14
confident 110:22
confiding 192:12
confused 160:3
176:7
confusing 30:15
connected 116:4
connecting 52:13
consequence 183:2
consequences
23:10 185:20
208:16
consider 10:17,17
34:17 48:10
196:13,15 209:7
consideration 21:6
48:13 147:16
considered 29:2
126:8,14,16
considering 121:23
189:12
consistency 185:20
185:23
consistent 33:12
167:15
consistently 42:6
consisting 210:7

constant 38:17
constantly 163:4
consult 19:12,17
consulted 194:24
contains 127:17,23
contemporaneou...
102:5
contention 66:10
189:13
contested 196:12
continually 132:9
145:7,20
Continue 185:22
continued 55:6
100:6 156:18
190:10
contract 209:1,4
contraindications
29:1
control 175:23
176:6 177:13
180:20
conversation 16:5
16:8 20:2 71:20
72:11 172:14
203:3
conversations
202:22 204:16
205:14,17,24
COOK 211:2
coordinates 47:2
47:10
copy 7:3 127:4,9
core 18:10 24:18
54:10 62:18
correct 12:14 13:19
31:4 51:20 52:8
63:18 109:14
119:2,14 130:11
131:18 137:4,13
143:16 145:14
152:22 161:2
175:20 177:22
181:3 210:9
211:10
corrected 145:7

165:10 197:10
correcting 153:14
168:4
correction 145:10
197:11 198:1,5
correctly 175:2,4
181:16
correlated 24:4
correlation 23:22
counseling 185:24
186:3
counselor 68:7
189:16,17
Count 13:5
counter 137:3
countered 17:12
COUNTY 211:2
couple 13:4 14:14
16:13,13 38:11
43:12 71:2 157:9
159:2 161:16
162:23 166:4
course 6:2 16:14
28:4 33:19 34:7
35:6 36:13 37:5
37:13,21 42:11,21
50:22 72:15 145:2
170:20 184:19,23
185:1 186:4
188:11 195:8
196:1,4
courses 24:21,23
25:4 42:3 207:22
court 1:1 4:10 5:6
5:11 210:1 211:6
COURTHEOUX
2:11
Courts 1:15
covered 118:16
168:10
CO2 172:12
create 176:24
200:12 206:10,20
206:22
created 123:12
creating 77:20

credit 181:7,16
credits 207:21
crib 94:9 114:19
115:16,17 116:7
criteria 172:17
critical 18:16,17
44:14 54:21 62:20
71:18 80:20 84:15
85:3 88:1,21
192:6
criticism 64:11,16
66:20 67:13,24
68:1 70:7 76:17
152:10
criticisms 63:1,17
64:7,23 67:20
116:17
criticize 79:12,24
83:9
criticized 68:6 95:5
criticizing 118:7
CRNA 12:11,15,19
22:14,16,17 26:10
37:16,19 38:3,21
39:10 42:17 44:7
46:11,11,17,20
49:16 50:11 57:16
58:17 59:6 60:11
63:23 64:11,22
65:13 66:11,13
74:17 76:16,19
77:1,3,9,16,20
78:6 79:22 80:17
80:20 81:3 82:5,8
82:12,15 83:3,6
91:16 93:19 95:8
107:18 116:21
126:11,15 149:20
153:1 154:22
155:2,10,16,16,17
155:17 157:3
170:11 175:3,6
201:17,20,22
CRNAs 8:13 23:9
23:14 25:12 37:12
37:14 41:12 43:9

43:10 45:9,19
47:10,16,20 48:18
48:23 49:7,11
54:1,11 61:19
62:19 63:3,9
67:13 70:11,19
71:17 72:6,14,24
73:15,17 74:7
75:1,8 76:1,13,24
77:13 78:2,3,12
79:11,15 80:13
81:14 82:18,21,23
83:8 86:13 92:6
112:1 135:9 155:7
156:2 187:22
191:9 196:23
CRNA's 66:20 67:2
cross 184:7
crossed 184:4
crucial 142:24
CSR 1:16,23 211:5
current 20:21
72:17 194:3
curt 139:24
cut 151:3
cutoff 169:15
CVO 159:23 160:1
160:15

### D

D 3:1
daily 68:12
danger 191:8,12
dangerous 183:6
data 150:5 152:16
153:14,15
date 56:21 57:9
58:8 123:18,22,23
124:2,6,14,15,24
125:8 168:23
192:9,15
dated 57:12,20
58:13 59:2,12,23
60:21 61:16 157:1
163:15 168:18
183:22



dates 41:9 59:18
192:14
date's 192:13
DAVID 2:15
day 33:18 47:6
56:11,15 74:19
82:14 84:5,6,7
85:1,1,3,6 87:7
95:14 105:9,10,19
111:9 125:11
129:23 130:2
135:11 141:5,13
142:24 146:9
163:6,24 164:2
170:17,18 179:15
179:24 181:2,9
183:9 185:15
192:17,18 210:18
days 25:5,8 31:21
63:10 87:9 105:15
112:15
deal 94:3,14 117:21
200:19 205:7
Dean 195:1
death 22:18,23
23:10,24
December 195:14
decide 21:3,9
187:24 188:12
decided 90:11
115:22,23 138:5
193:15
decision 36:5 39:24
40:1
decisions 21:7 35:7
35:19 37:8 114:1
116:21 197:10
defend 197:9 198:4
198:8 199:23
defendant 2:12
86:13
defendants 1:10,13
4:9 6:13 7:16
85:14
defensive 68:4
defensiveness 68:1

degenerative 12:23
degree 22:13
182:17 183:4
delay 195:17
delays 166:12
deleted 126:16
delicate 159:24
160:4
delivered 112:15
demonstrate 36:22
depending 29:23
49:23
depends 45:13
deposition 1:12
4:11,15,24 6:8
55:5,8,12 85:9
100:5,8 103:20
156:17 183:16
190:9,13,17
209:19 210:7,9
211:8
depositions 1:16
depress 173:21
depth 118:5,8,11
118:21
derogatory 9:5
10:5 12:12,16,19
described 95:7
describes 185:11
describing 11:2
201:15
description 90:14
deserve 45:17
deserved 183:7,13
desk 134:11
despite 189:13
196:16
detail 75:3,6 185:17
details 58:24 80:18
143:18 177:21
185:14 186:16
205:2,8
determine 64:13
78:7 170:6
development 39:13
develops 130:9

device 52:20
devise 33:16
diagnosing 37:8
didactic 24:12,15
24:24 25:2,4,7,15
25:24 26:10,21
30:2 31:16 32:12
32:20 36:17,20
168:13
didactics 25:19
27:20
differ 153:20
difference 131:20
different 8:21
22:14 29:21 31:16
31:19 32:11 34:6
34:6 36:17 48:5,7
48:22 49:7,12
53:16 66:12 67:5
73:12 75:20 78:4
78:11 85:6 88:24
90:19 106:23
112:4,8,23 113:3
127:11 134:11
135:18 140:17
142:16 146:8
147:5 158:10
167:13 173:8
176:3,16 177:9
179:17 181:13
187:22 193:1
201:7 203:2
differently 53:16
81:1 96:8 99:13
99:18 140:17
167:12
differs 172:11
difficult 23:17,20
23:23 142:1
178:23 200:21
difficulties 110:21
111:2 118:17
difficulty 65:23
67:15,24 86:9
170:19 175:19
direct 6:17 20:14

47:12 56:2 157:23
182:13
directed 9:12,12,14
22:1 116:17 190:4
direction 132:8
162:21
directly 9:18 10:24
121:18 131:14
156:13
director 13:12
directors 40:9
disagree 152:12
154:8
disagreed 66:19
109:24 115:19
118:18 150:7,8
152:10,13
disagreeing 139:5
disagreement 67:1
disappear 127:3,7
discern 108:14
disclosed 15:14
191:14
disconnect 94:15
disconnecting
114:11
discreet 71:3
discretely 93:4,10
discriminated
14:11
discriminating
154:7
discrimination 7:9
7:17 13:21 14:1
15:7 16:21 17:18
18:1 54:11 73:17
75:12,13 209:6
discriminatory
7:22 8:2,8 13:11
14:5,20 15:15,22
16:10 76:12 77:21
153:2
discuss 31:23 61:22
118:1 120:4
132:12 166:5,14
166:19 167:11,14

186:2
discussed 67:23
98:16 108:11
143:19 146:20
150:22 159:3
170:20 177:17
185:19,24 186:7
186:11 188:18
discussing 108:3
141:24 177:11
discussion 4:23
17:16 154:3 172:5
172:10 180:4
186:18 208:3
209:13
disease 34:23
dismissal 100:20
191:8,12
dismissed 72:20
95:16 100:20
141:9 189:2 194:4
dismissing 196:3
disorganized
157:17,21 158:5
disparaging 80:16
80:16
disparate 14:5
disparately 75:14
disputed 179:9
186:8 189:11
disregarded 77:4
distracted 143:12
distress 87:17
District 1:1,1,15
210:1,2
DIVISION 1:2
210:3
DL 151:4,18 158:9
158:12,20 163:1
doctor 21:18 67:18
67:24
doctors 18:18
20:12,14 21:3
22:1 68:7
document 6:21
85:11 103:14,20



104:17 111:11,13
120:6 129:10
133:14,15,19
186:22 187:2
206:10,13 207:2
**documentation**
196:20,22
**documents** 12:3,6
63:7 134:21
190:17,20 206:6
206:20,22 207:7
**doing** 5:11 39:6
67:16 100:14
121:1 126:23
128:9 138:22
147:3 155:13
158:2,2,17 159:9
159:15 171:10
186:14 197:11
203:14,18 211:6
**donned** 76:7
**dosage** 29:19 31:7
54:2 63:13,13
131:13 136:1
**dosages** 27:2,9
29:17 31:4 53:18
**dose** 30:24 120:12
120:23 133:2
140:9 161:10
**dosed** 132:24 136:8
136:22
**doses** 30:15 53:19
134:23 138:13
**dosing** 30:23
130:10,11,16,21
130:24 131:1,1,8
131:16,19 132:8
132:18 133:10,11
135:2,3,7,12
136:18,20 137:23
138:8,15 139:3
140:12 143:24
144:12 146:1,3
161:7
**double-check**
162:11

**double-checking**
162:4
**down/chart** 151:24
**dozens** 36:5,8
**Dr** 1:7 10:7,16 14:3
14:6 15:3,5,21
16:9,16,17,17,22
17:12 18:1,2
25:12,13 38:10
40:6,16,17 43:12
43:21 72:5,5,12
73:16,18 77:5,5
81:7 86:5,12,17
94:23 123:2
124:22 125:2
126:20,22 127:1
127:14 135:17,20
135:21 140:13
141:23,24 142:7
142:11 143:20
178:17,22 179:9
188:6,7,9,9,10,11
188:16,17,20
189:20 190:4,5
194:21,24 195:15
196:22 202:10
203:5,5 208:24,24
**dramatically** 36:1
**draw** 21:21 120:11
121:4
**drawn** 53:10,12
135:15
**drew** 120:22
**drop** 149:18,24
150:14 152:8
**dropping** 21:16
**drops** 159:18
**drug** 28:21 29:3,11
31:5 53:12,15,20
54:1 63:13 131:23
136:20 139:1
143:24 157:11
161:10 166:7
183:3
**drugs** 26:22 27:8
27:11,17,22,24

28:6,13,24 29:12
29:21,22 30:10,17
30:24 33:17 53:10
129:2,3,13,16,20
133:7,10 134:23
135:3,10,12,15,18
135:22 136:8,10
136:14,22 137:16
140:10 145:16,18
157:12 168:7
**drug's** 29:5,7
**due** 191:8,12
**duly** 6:14
**duration** 29:9,11
30:11
**duress** 195:4
**Dwight** 80:4,12,12
80:15,19,22 81:2

**E**

**E** 3:1 109:21
**ear** 71:4
**earlier** 22:24 26:17
101:10 114:8
**early** 129:7
**ease** 202:1
**easier** 45:9 104:9
120:13
**easily** 202:7
**EASTERN** 1:2
210:3
**Ebele** 69:8 96:10
141:11
**Ed** 170:7
**education** 67:12
**educators** 182:10
**effect** 29:10
**effectively** 22:11
178:12 181:20
196:17
**efficient** 22:8
**effort** 48:10,16 83:9
173:21
**efforts** 157:12
**egregiously** 183:6
**either** 46:11 81:2

104:23 106:24
120:18 175:10,14
**elaborate** 77:11
**elaborated** 131:7
**Elaine** 2:3,5 204:8
**element** 23:13
36:21,24 175:3
**Elizabeth** 109:3
**Ellis** 73:6 75:7,7
126:20,23 127:4
**Ellis's** 127:17,20
**email** 156:24
200:13
**emailed** 43:14,17
**embarrassed** 143:9
**embarrassment**
143:15
**embolism** 89:1
**emergency** 23:3
27:11,17 131:23
135:3,12 136:14
**emergent** 33:19
112:18 116:16
**employed** 100:21
**employing** 156:9
**enable** 19:21
**encounter** 124:20
**encounters** 87:14
93:19 97:14
105:20 154:20
**encourage** 132:4,7
**ended** 88:12 147:2
147:11
**endoscopy** 41:6
**enforce** 18:23
22:11
**enforced** 10:7
**engage** 122:9,21
**engaged** 22:22 50:7
51:5
**enrolled** 9:4,20
18:4 101:1 102:1
**enrolling** 22:6
**ENT** 47:23
**enter** 39:17,19
**entered** 39:16

**entirely** 54:14
108:5,5 110:11
131:18
**entitled** 85:13
**enumerated** 7:20
86:2 109:19
164:14
**Epolamine** 88:13
88:16
**equipment** 110:7
116:18 178:4,5
**ER** 200:20
**Erin** 1:16,23 211:5
**errands** 121:17
**erroneous** 130:23
174:19
**erroneously** 174:13
**error** 131:5
**esophageal** 165:16
**esophagus** 165:18
**ET** 112:4,6 133:7
147:5,12,13,17,18
172:12 176:12,17
176:21
**ETT** 110:8,18
111:4,8,19 112:22
113:5,9,15,20
118:5,8,10,21
128:24 129:13,19
132:8,12,18 133:6
146:12 147:3,8,21
147:23 165:14
172:12 175:15,16
175:18
**Eva** 60:21 71:3,7
71:21,24 81:17
82:4,22 83:6
86:14 89:24 90:1
92:18,19,23 93:6
93:12,23 94:24
95:7,18 109:4,5
123:2 124:15
133:3 138:1
145:24 154:20,23
155:4 191:10
200:20 201:3



eval 41:8 69:4,5
76:5 80:16 84:21
88:19 89:10 94:22
evals 40:8 69:10
178:18 186:6
196:16 207:16
evaluate 25:14 44:9
70:15 79:3 80:14
155:8,21
evaluated 25:11
43:8,10,22 44:5
62:12 86:20 87:6
92:7 104:12
105:16 168:23
187:18
evaluating 45:20
46:20 78:18 87:12
121:21
evaluation 25:23
26:10 41:14 42:17
43:20 46:7,13
55:14 56:20 58:10
59:10,23 60:15,20
62:8 71:8,11,23
74:20 76:8 80:20
82:12 85:3,5
87:10,20 88:1,4
89:2 90:2,22
94:12 101:15
102:10,16 103:1,5
103:6,14,15 104:6
104:19,22 105:4,9
105:12 106:8,13
106:16,20 107:3
107:10,12,13,16
107:18,24 108:6
108:21 109:6,7,12
109:24 110:6
116:9 117:19
119:15,17 120:2
123:6,8,12,15
125:17,21,24
126:3,7,10,11,16
127:7,14,17,19,22
127:23 128:2,6
132:2 145:6 148:4

148:6,11,24 149:3
149:4 150:18
153:1,16 157:3
163:14 164:7,14
164:17 165:12
166:4 167:1,2
168:15 170:11
185:10 186:15
191:24 192:8
evaluations 8:12,16
14:10 16:14 25:17
26:6,15 41:12,16
41:21 43:4 45:2
54:12,13,21 62:20
63:9 64:23 66:11
68:19 69:12,16
71:19 81:15,16
84:8 86:8 95:15
101:6 104:2 127:2
127:5,12 178:16
179:4,5,6 184:12
184:16 185:6,9,16
186:9,14 187:10
189:11 191:9,13
196:12,24 207:8
207:13 208:5,15
209:7
evaluative 46:15
101:19,19 106:24
128:19
evaluator 109:20
Eva's 146:2
event 123:15 141:1
141:10,11 150:6
157:11
events 19:15 23:3
141:13,16 142:24
evidence 72:12
135:5,24 136:4
evident 193:16
evolved 37:5
exact 11:9,20 58:24
75:3,5 80:18
111:20 141:16
185:14,17 206:17
exactly 11:15 35:12

64:13 70:18 87:22
111:10 118:19
119:11,13 141:20
162:8 163:3
177:21
examination 1:13
3:8 6:17 93:24
examined 6:14
129:8 132:15
examining 93:2
141:24
example 130:19
examples 35:5
101:18
exceed 42:6
exchange 140:20
excision 113:1
117:3
excuse 145:23
146:4
excuses 132:9
145:8,20
exercise 36:12,24
37:12
exhibit 6:8,21 55:8
55:12,12 58:8
62:16 85:8,9,11
85:19 100:8 101:5
101:6 102:11
103:17 109:15,17
110:17 112:10
126:2 148:7
156:20 170:14
183:16,19 187:3
190:13,16
exhibits 3:14 55:1
exists 52:14
expand 176:2
expect 33:3 34:11
expectation 54:8
expectations 32:10
32:15
expected 30:9
32:19 60:7 107:1
143:23 164:19
165:13

expecting 35:24
expelled 73:21
178:17
experience 18:12
22:22 23:9 33:9
33:23 46:1,2
72:19 80:17 96:6
122:5 132:24
139:9 197:20,21
experienced 8:23
46:3 51:9
experiences 40:11
76:2 79:17,20
106:2 146:7
experiencing
189:24 198:22
expiratory 94:4
explain 51:20,20
86:24 139:21
145:21 157:16
197:9
explained 12:4
139:14,20 189:20
199:20
explaining 169:16
199:9
explanation 109:23
116:12 146:4
148:15
explanations
169:14
explore 113:2
exposed 122:16
195:18
exposure 32:14
48:5
expressed 86:9
198:19
extensive 117:4
extent 24:2
extreme 178:15
179:10
extubated 173:7,13
extubation 114:5
eyes 128:10

| F |
|---|
F 7:20 130:8
fabricated 54:11
62:19,24 128:3,20
fact 94:13 103:5
facts 66:23 72:13
153:18
faculty 61:13
fail 179:13
failed 186:6 189:10
197:4
failing 42:20,23
187:4 194:3,16
196:3,16
failure 42:11
209:10
fair 21:23 25:18,20
25:21 26:13,14,20
30:12 45:17 56:9
56:12,18 57:5,16
57:24 58:17 59:16
59:20 60:10,15
61:5,21 62:3,8
65:1,10,17 77:8
79:1,5,7,8 90:11
105:5,8,9 107:5
108:1,6,13,15
118:8 153:20
163:23 167:2
168:24 169:2
197:3
fairly 53:5
fairness 108:16
fall 168:10 170:20
195:12
false 8:12,16 14:9
54:13 62:24 126:7
128:3 130:17
142:13 149:14
155:15
falsehoods 126:13
falsely 123:22
falsified 54:12
62:19
familiar 27:18 31:5



53:5
**far** 8:5 47:9,15
86:23 139:19
163:4 168:12
207:8,13
**faulted** 149:20
**favorable** 44:16
**February** 1:18 41:7
58:13 59:2,12
210:7 211:9
**Federal** 4:10,12
**feedback** 38:24
43:14,20 47:14
119:13,15
**feel** 14:4 22:22 70:2
128:11 200:1
**feeling** 68:13 143:9
**feels** 73:17 75:14
**felt** 14:11,23 15:15
15:17 23:19 24:3
25:19 45:16,17
66:22 74:9 77:7
80:6,24 89:19
96:11 105:10
142:22 143:6,7,18
162:10 169:5,7
181:14 195:9
**female** 170:23
**fentanyl** 28:4
130:24 131:1,10
138:7,8 142:2
173:20
**figure** 118:5 176:4
**figured** 135:2,7
136:1
**figuring** 132:8
**file** 127:17,20
**Filipino** 15:1 98:3
**filled** 41:8 105:7
123:15,16 124:7
124:16 137:14
**final** 184:22 194:10
**find** 58:5 107:16
109:6 125:24
128:18 142:1,6
148:11 167:1

210:8
**fine** 4:22 129:9
141:18
**finish** 5:2 24:23
**finished** 140:3
173:17
**first** 4:21 6:13 7:7
13:24 14:7 38:2
56:3 85:14 101:14
102:14,15,21
103:9,11,13,20
110:21 111:1
112:23 117:2,11
117:13,17 118:14
118:15 120:20,20
120:24 122:14
125:17 126:6
127:23 128:7
130:2 135:6
137:14,22 147:16
148:24 149:11
157:9 165:14
171:3 182:15
190:22,24 201:16
207:18 208:6
**Fisher** 60:21 71:7
71:11,21,24 81:17
82:4,22 83:6
86:14 89:24 90:1
92:19,23 93:23
94:24 95:7,18
109:3,5,21 114:10
115:19 123:2,6,12
124:15 133:3
145:24 154:23
**five** 31:20 79:9
105:20 106:1
179:4 186:16
187:19,22 195:14
196:9
**five-month** 100:16
**fixing** 199:3
**flagrantly** 126:7
**flexible** 202:7
**fluid** 117:4
**fluids** 21:17 116:15

116:21
**fluoroscopy** 38:18
**focus** 7:17 151:2
**focused** 100:18
**Fojolli** 73:6 76:21
76:22,23 77:18
**follow** 21:21 33:21
83:8 111:23
174:15
**followed** 34:1,10
70:11 94:22
110:15 111:12
**following** 93:18
119:1 175:18
191:24
**follows** 6:14 55:7
100:7 109:23
156:19 190:11
193:6
**follow-up** 31:22
**force** 157:24
**foregoing** 210:6
211:9
**foreign** 165:18
**Forester** 82:16
86:15 87:23 93:7
**Forgetting** 192:14
**forgive** 51:19
**forgot** 22:24 32:3
**forgotten** 166:15
**form** 84:16 106:23
124:7,16 165:9
183:21 184:9,12
184:19
**former** 72:17
**forms** 55:14 209:5
**forward** 96:10
140:9
**found** 162:3
**four** 49:24 61:10
179:4
**fours** 181:24
**fourth** 83:21 84:5
**frequency** 86:9
**frequent** 41:12
45:23 86:6 87:3

88:22
**frequently** 180:7
**friends** 191:10
**front** 93:21 109:16
110:3 141:3,4
143:9 148:7
**full** 83:19 90:5
105:19 126:12
127:4,11 156:12
201:19 207:21
**functionality** 176:5
**further** 116:9
139:13 198:23
**fuzzy** 158:16

**G**

**G** 2:11
**Gardner** 73:7 78:1
**gases** 150:16
173:20 174:6
**gatekeepers** 78:6
78:13
**gauge** 93:8,9 98:21
161:22,24
**gauging** 162:22
197:19
**Gawura** 59:10,23
60:11 86:14 90:4
90:7,10,15 92:1
168:15,24 170:11
170:17 177:8
179:2,22 183:8
186:23 187:16,19
192:7,13,15
**Gawura's** 181:1
**general** 88:12,14
100:23 118:3
146:16 161:15
165:17 169:16
171:11
**generally** 18:13
27:4 49:21 51:8
134:21
**gesture** 122:11
**getting** 45:5 75:24
81:7 151:2 169:18

178:16 181:4,14
181:18 195:5
196:1 200:3
**gist** 21:2 81:5
**give** 19:14 46:13
81:16 119:12
127:8 140:7 160:5
169:8 181:21
183:24 194:17
195:1
**given** 8:12,16 27:17
27:22 169:20
171:18 173:2
174:9 194:8,13
195:6,11 197:23
210:9 211:8
**gives** 34:11 181:24
**giving** 53:20 88:1
158:22 183:3
196:4
**GlideScope** 150:22
150:23 151:2
154:3 158:3,7,11
158:18,19
**gloves** 76:6,17
**glyco** 28:15
**glycopyrrolate**
28:3
**go** 4:18 9:24 21:17
35:16 58:4 75:17
108:20 125:16
126:22 139:13,24
146:9 147:19
148:6 162:15
181:7,10 200:14
200:15 207:19
208:7
**goal** 22:6,7 48:21
49:4 189:15
**goes** 35:17 125:20
157:16 161:14
174:24 180:2
**going** 15:24 39:21
54:24 55:21 61:7
65:2 70:20 78:5,9
87:17 96:10



107:13 122:24
129:16 137:18
138:12 140:13
146:21 153:9
156:3 166:6
178:23 179:2
180:11 182:9
188:5,18,22 189:7
195:1,10,17 204:8
204:14
good 4:2 56:15
143:20
Gosh 28:15
gotten 45:1 59:1
72:16
grab 158:8 171:8
grabbed 158:15,16
gracious 45:18
grade 79:3 128:12
169:8 184:23
185:22 194:8,9,10
194:15,16 195:2
196:1,10
graded 25:19 26:7
42:3 74:3,3 169:6
169:10 194:23
grader 169:10
graders 45:9
grading 45:18,20
45:24 79:2 169:12
196:2,14
graduate 183:3
graduating 188:15
graduation 126:24
grasp 173:3
great 104:8 162:2
163:20
grilled 74:9
grilling 15:17
ground 4:18
grounds 42:11
group 55:12 73:3
78:3 86:13 96:17
103:17 121:3
guarantee 209:10
guess 11:10 22:11

26:6 27:16 32:1
35:22 45:13 47:3
47:21,23 48:6
66:5,18 76:4 77:4
81:20 95:15
108:14 111:17
123:16 124:3
161:21,23 165:8
174:2 180:19
194:24 195:23
198:2 199:24
205:11
guessing 124:4
guidance 179:2
182:8
guide 27:12,14 34:5
34:10,13 35:10,23
35:24 110:12,12
111:24 205:8
guidelines 21:21
guides 31:3
GuideScope 163:2
guy 170:3,8
guys 170:6

H
habit 157:24
171:11
habitually 171:12
hair 189:22
Hakeem 73:5 96:11
126:20 127:8,9,13
half 194:3
halfway 199:2
hand 6:20 55:11
87:9 91:10 101:5
123:14 161:15,15
172:20 173:3,15
174:7 181:12
handed 190:15
handle 48:12 151:4
158:9,21 199:21
handled 93:16
handling 199:9
hands 32:14 162:18
handwriting

143:21 144:11
145:6 150:21
151:21 184:11
handwritten 110:7
117:18 132:2
191:15
happen 23:5 33:3
34:24 35:21 46:1
66:23 71:8 106:3
136:11 146:15
158:24 160:1
165:1,4 171:7
172:21 183:11
189:8 207:24
happened 8:22
46:9 71:6 74:15
76:10 79:13 87:16
93:3 95:17 99:24
114:13 119:23
123:16 133:18
140:14 141:12,16
149:23 151:13
153:19 154:1,4
163:7 166:9,20
179:16 184:5
happening 72:10
72:16 78:16
141:18
happy 195:16
harassed 8:12 80:9
141:2
harassing 7:22 8:3
8:9
harassment 7:9,18
13:21 15:2 80:6
hard 59:3 119:20
170:6
harder 86:6 87:2
88:21
harshly 74:10 87:2
96:12
hates 96:19
head 93:5 172:20
173:3,15 174:3,13
174:16 191:23
health 24:5 188:4

189:19
healthy 170:22
hear 9:11 45:4,8
91:15 189:23
heard 9:13 45:7,10
155:20
hearing 155:1
heart 27:9,13,19,22
28:14 30:10,18,21
heavier 169:20
height 121:2
heightened 36:24
held 91:11 183:4
help 52:24 90:11
132:4,7 176:17
180:19 182:11
205:2
hemodynamic
150:17
hemotherapy 117:5
Herculean 178:21
187:8
hernia 137:10
hesitancy 60:14
hesitated 206:2
hidden 203:18
high 23:17
higher 32:16
128:16
highlight 19:23
20:22
Hilarie 190:23
hindrance 10:8
history 19:22 29:2
33:16
hold 115:22
holding 181:12
holidays 188:14
home 84:4
hook 52:16
Hooker 57:8,17,20
107:14,14,15
148:9,17 149:1
153:2 154:22
155:3,17 156:4,24
157:20 162:7

179:8 187:15
Hooker's 157:3
Horey 170:6
hospital 100:18,23
129:7
hour 1:19
hours 129:7 137:17
169:21
humiliated 74:10
143:9
Huntzinger 15:13
15:16 97:15 141:4
141:4
HUSCH 2:8
hypertensive
152:24

I
iatrogenic 116:19
ICU 18:5,9,11,13
19:3,17 20:15
21:10,13,24 22:14
22:21 23:6,8
37:23 53:3 100:12
100:18,21 114:22
idea 83:11,12 98:12
147:2 159:10
identification 6:9
55:9 85:10 100:9
183:17 190:14
identified 63:4
79:19
identify 79:3
identifying 159:4
ignore 126:10
Illinois 1:1,18 2:4,9
210:2 211:1
imagine 182:16
185:15
immediate 149:21
immediately 16:12
134:1 171:5
impacted 8:18
142:20
impedance 10:22
11:22



impede 6:6
imperfections 182:11
implicating 71:5
importance 166:5 167:17,20 168:1
important 23:13,24 23:24 49:11 143:19 167:17
imposed 194:20
impossible 178:23
impression 10:20 72:9 155:11,15,16 188:20 202:4
impressions 74:2
impressive 28:18
improper 155:5,9
improve 104:10 198:12
improved 150:10 152:21 177:23
improvement 183:21 184:9,12
inaccurate 59:7
inadequate 149:13
inadvertent 163:1
inappropriate 88:19 91:22 92:2 92:24 94:1,11 95:1,6,9
inasmuch 197:3
incident 77:7 178:11
incidents 200:19
include 37:7 50:1 52:7 137:15 202:21
included 64:8 71:24 86:13 102:21 179:8
includes 103:6 105:1 109:7 184:20
including 139:23 175:7
inclusive 210:8

incorrect 85:4 111:18 128:23 129:22 130:10,20 131:16 144:12,13
incorrectly 51:21
increase 177:15
increasing 177:16
independent 21:12 21:14 37:20
independently 22:9 22:13
indicate 104:11 118:9 120:11 125:4 126:7 149:11 173:6 189:9 191:1
indicated 60:6 77:24 120:21 174:2,14 180:5
indicates 8:11 13:10,15 56:14 60:7 105:12 123:5 125:21 145:6 165:14,22 172:23 173:10 185:9,18 191:23
indicating 80:13 85:22 117:20 122:23
indication 154:21 165:9 174:23
individual 1:7,8,8 7:16
individually 4:9
individuals 7:2
induction 28:7 119:6 120:9 135:3 157:12 171:2
infant 112:14 114:3 117:8
influence 75:4
influenced 85:5 155:4,7
influencing 155:9
inform 200:22 201:2

informatics 18:22
information 37:5 46:15 68:16 69:23 71:24 97:22 130:18 141:7 142:21 143:13 151:24 192:24
informed 129:11 135:19 186:20 203:15
infractions 81:5
inguinal 137:10
inhaled 119:6 120:8
initial 177:6 191:1
initially 38:3 115:9 157:23 158:17 188:7 192:12
initiated 4:10
input 21:4 137:21
inputting 138:5
inside 134:10
insomniac 189:21
instabilities 150:17 150:17
instance 88:10 126:15 165:7 178:14
instances 63:12,21 71:2 75:22 81:6 90:19 95:12 178:12
instinctively 175:21
instruct 171:5
instructed 167:8
instruction 146:8 198:7
instructors 182:11
instrument 64:10 64:16
instruments 52:8
insurmountable 23:21
intended 86:24
intention 188:3
interact 19:2 20:8

interacted 20:5 99:19
interaction 14:23 124:23 169:13,16 198:13 200:23 201:3,7
interactions 21:2 143:3
interchangeable 174:18
interference 47:4 74:14
interjected 93:12 188:11
internal 75:10,18
internalizing 198:11
interpret 80:13
interpreted 11:24 76:7 187:9
interpreting 117:6 117:10
interrogatories 85:15,18 109:17
interrogatory 112:10 116:13 120:17 123:5,9 125:3 126:1 148:15,20,22 149:10 164:12 165:6,21,22
interrupt 142:14
intervene 209:6
intimated 75:6 77:22
intraoperative 149:7
intravascular 150:16
intubate 118:3 158:22 160:6,19
intubated 144:18 144:23 173:11
intubating 91:9 145:1
intubation 151:5

157:17 161:14 173:9
intubations 171:12
invasive 147:20
investigate 196:18
investigation 75:11 75:18
involve 25:3
involved 112:14 118:16 121:19 126:9 135:18 146:18 155:6 161:13 175:18 178:13
involves 22:18 52:13
involving 26:22 67:2 79:22
iPhone 203:17,18
irregularity 158:13
issue 15:10 16:22 18:1 33:20 75:20 77:6 94:3 109:13 110:18 128:19,19 144:19 151:11 165:19
issues 37:8 63:13 63:17 64:8,10 66:3,12 67:2 76:5 92:17 144:13,16 185:11,13 186:2
i.e 161:18 185:22

---

**J**

J 104:11
Jackson 2:3
January 59:24 105:19
jeopardizes 126:24
Jill 1:8 15:2,12 70:7 71:2,20,23 74:18 74:20 80:9 81:6 81:10,15 82:3,6,8 82:21 83:3,8,17 84:9 85:3 92:14 95:4,24 96:14



97:2,5,8,10,14,23
104:12,19 105:4
105:16,22 106:9
123:8 124:20
125:21 140:21
154:20,22 155:20
191:9 200:20
201:3
**Jillian** 163:14
164:3
**Jim** 43:19
**job** 47:1 104:8
163:20 182:13
**Johnson** 194:24
203:5 208:24
**JOSEPH** 2:16
**journal** 31:22
**judging** 154:18
**judgment** 21:12,15
36:12,21,23,24
37:12,20 66:12
67:2 75:4 116:10
117:7 130:8
153:18 154:12
156:9,11 159:22
178:8 185:8
**judgments** 66:19
154:8 155:21
**Judy** 12:22 44:5
56:4 106:17,20
164:7 187:15
**July** 86:18,20
102:16,21 103:6
142:12 148:8
149:1,2,2 157:1
163:15 164:9
168:18 170:10
179:3,15 183:22
184:16 185:13,19
186:21 187:19
191:1,3 192:15,19
**June** 38:10 71:14
71:15 74:22 83:4
92:15 95:5 96:1
107:13 108:21
109:20 119:18

123:7,13,21,23
124:6,14 125:5,18
185:6,7,10
**justified** 137:24

---
**K**
---

**Kam** 14:24 16:6,9
73:5 74:6
**Karen** 2:11 14:24
15:11,14,17,18,20
16:6,9 73:5 74:6
74:24 97:12,17,20
98:1,15 141:3,12
141:15
**karen.courtheou...**
2:10
**Kathy** 96:19 97:1
**Katie** 61:19 62:11
**Katsionis** 40:17
**Kazim** 73:6
**Keehn** 86:14,20
87:5,11,20
**keep** 4:19 73:22
109:15 199:14
**keeping** 37:8
**kept** 81:7 94:23
127:4
**kid** 93:8,13
**kilo** 138:9
**kilograms** 136:9
137:9
**Kim** 15:13,16 97:11
97:15,20 141:4,4
**kind** 19:14 24:11
29:3 37:17 53:23
77:16 78:17 93:20
160:23 174:24
**kinds** 48:5 68:18
**Klunk** 163:15
164:3
**knew** 41:24 42:14
65:23 66:3 72:9
141:11 196:17
**knock** 91:12
**know** 5:14,23 9:23
17:4,6,8,21 20:21

21:18 27:4,9,12
27:19,20,22 28:14
28:18 29:13,13
30:8,9,17,21
32:14 34:7 39:23
39:24 41:3,8 42:5
42:9 44:21,24
45:2,12 47:1,5,7,9
47:15,16,18 48:9
48:14,16,20 49:1
49:2,10,13 51:10
52:23 53:20 59:18
61:18 62:2,8 63:8
66:8 67:7 68:9,23
69:17,24 70:1,23
71:13 72:16 73:14
73:19,22,24 75:5
75:19 76:9 77:16
81:9,12,13 83:2,9
86:17 89:1 96:19
97:9 98:2 99:6,8
99:13,17,20,21,24
100:3,3 111:7,8
111:15,18,19
113:4,8,14 118:4
119:2 120:20,22
122:7,7 124:24
126:8,15,19 127:6
127:16,19 128:8
130:11 133:18
136:14,20 137:1
137:23 140:9,18
141:13 142:2,23
143:16,17 146:9
147:11 151:24
155:18 156:4
158:14,24 159:19
163:3 166:22
167:10,15,22
168:1,12 169:7
171:9 175:2,11
176:13 177:5
178:2,9 181:5
182:7 185:14
188:8,10 194:23
195:22 196:13

197:23 198:12
200:3 202:3
203:14,15 204:15
204:22 207:1,9
208:1
**knowing** 29:5
118:7 175:4
179:13
**knowledge** 32:20
60:12 65:23 107:6
121:2 164:1 175:6
204:21
**knowledgeable**
163:21
**known** 155:24
161:1
**knows** 134:6
**Kramer** 190:5
**Kremer** 1:7 10:7,11
10:16,23 14:3,6
14:18 15:3,5,21
16:9,16,17,22
17:12 18:1,2
25:12 43:12,21
72:5,12 73:16,18
86:5,12,17 94:23
124:22 126:20,22
127:1,6,14 140:13
141:23 143:20
157:1 178:17
183:24 184:15
185:13 188:9,10
188:16 189:20
194:21 196:22
202:10 203:5
207:14 208:24
**Kremer's** 81:7
125:2
**K.B** 2:3,5

---
**L**
---

**L** 2:11 193:11
**label** 53:15,19 54:6
**labeled** 53:10,16
**labeling** 128:10
**labs** 21:21

**Ladder** 10:19
**Lai** 40:16
**laid** 136:3
**Land** 2:11 3:10 4:2
4:6,7,15,18,23 5:6
5:11,17,21 6:3,18
16:3 17:3 39:23
49:2 55:2,10 61:9
62:7 65:4,12 66:8
70:24 78:11 83:12
83:16 85:8 89:14
89:21 98:23 99:17
100:10 103:1,4
107:11 113:13
118:2 120:5,11
124:10,13 125:10
125:13,16 139:18
140:11 147:21
148:22 155:23
156:15 161:16
190:6,12 204:8,11
204:20 209:16,18
**lane** 152:3
**language** 105:2
**lap** 113:2
**laryngoscope** 163:1
**laryngoscopy**
157:24
**lawsuit** 4:10 7:3
**lawyer** 204:3
**lay** 138:12
**Lea** 82:16 84:17,19
85:4 86:14 87:23
93:7,19
**lead** 38:17,19 70:11
180:16
**Leader** 207:20
**leading** 17:19 86:19
102:4
**leads** 82:2,17 103:7
**learn** 28:20,21,23
53:2 67:13 182:12
198:5
**learned** 32:16,20
56:16
**learning** 26:22



146:7 182:9
193:19
leave 14:13,16,19
17:22 40:23 43:23
43:24 44:2 86:19
91:19 92:5 100:15
100:17,17 102:4,7
102:13,21 103:9
103:12 180:17
184:10 188:1,3,8
188:13,16,18,22
189:2,8,18 192:1
192:2,5 193:20
194:14,17,21
195:1,5,11 196:5
197:3 208:11
Lea's 85:5
lectures 25:13 93:8
led 72:24 199:3
left 15:16 38:11
46:11 74:11,13
77:2 100:11
112:10 134:8
188:23
leftover 160:6
leftovers 160:7
legal 1:22 204:15
204:18,20
length 139:24
lenient 196:3,7,11
197:2
letting 158:23
let's 4:18 6:20
21:15 22:3 31:8
44:12 98:1 117:18
125:16,24 148:6
156:15
level 60:7 107:1
142:20 143:14
164:18 165:13
202:5
lid 171:6
Lidocaine 28:8
life 22:18 23:10,24
life-saving 178:3,5
lift 172:20 173:3,15

174:14
lifting 174:16
limit 200:23 201:3
limited 32:6 202:15
line 132:3 137:6
152:18 154:11
lines 139:18
lining 89:19 140:16
list 7:21 8:1 27:8,19
27:22 28:1,10,13
29:12 30:17
107:13
listed 8:24 123:22
135:8 148:3,8
lists 13:5 136:8
little 18:3 22:3
30:13 44:12 49:23
76:4,17 93:20
134:8 139:13
143:8 158:16
169:5 171:18
176:7 201:18
206:2
LMA 146:11,12
147:2,4,7,13,15
147:17,20 148:3
170:22 171:14
172:11,12,18
173:7,10 175:2,4
175:14 176:8,20
176:22
LMAs 146:17,21
171:5
LOA 194:2 201:16
202:6
load 169:20
loads 47:6
long 18:7 24:15
29:14 79:7,8
142:15 155:17
180:3 196:5
202:21
longer 169:21
171:1
look 7:19 12:2
33:15 43:13 55:13

63:7 85:18 86:1
96:2 102:15
106:12 107:11
108:17 113:1
117:18 123:7
126:1 142:8
148:24 164:17
166:3 168:6 171:1
173:11 174:1
190:15 192:11
196:18 198:23
looked 136:6
141:21 142:11
166:22 187:11
looking 39:3 58:4
71:4 105:8 143:11
156:21 186:23
187:2 200:9
looks 45:3 57:3,8
57:15 144:10
151:21 152:1
157:6 163:14
183:21 191:18
192:20 193:22
198:24
losing 189:21,22
loss 171:6
lost 124:12 133:13
133:14
lot 33:11 49:7 76:1
89:7 99:19 126:13
145:17 161:20
186:13 197:24
loud 5:9 177:20
louder 165:8
loudly 93:12
lounge 124:21
125:1
lower 108:3 151:22
160:1 169:8,11
lowering 159:22
lungs 176:2
Lutheran 100:23

_____
M
_____
machine 51:23 52:2

145:3
machines 178:13
MAGNA 1:22
Mahalia 80:3,5
81:3,4
main 24:11 43:11
189:15
maintain 23:20
major 147:10
majority 38:13
39:3,8
making 21:6 31:2
37:8 66:23 132:17
151:23 152:5
153:8 155:15
168:6 182:21
manage 178:2,9
managed 39:3
67:11 178:12
management 19:15
19:16 52:5 63:17
64:1,8 117:4
130:11 131:3
143:23 144:6,13
144:14,17,24
149:14
managing 21:22
122:1,24 145:2
152:14 161:24
170:22 178:19
Manahas 123:2
manner 197:12
marathon 5:22
March 56:20 57:8,9
57:12
Marcial 1:3,12 3:4
4:4 6:8,12 10:13
55:6,8,11 85:9
86:5 100:6,8
156:18 183:16
190:10,13 209:20
210:15 211:8
Maricel 1:3,12 3:4
4:4,22 6:12,20
10:16 145:7
156:20 161:17

162:2 164:22
165:15,16 172:17
180:5 183:19
190:15 210:15
211:8
mark 85:8 190:12
marked 3:14 6:9,20
7:6 55:9,11 61:2
85:10 100:9 101:5
109:16 183:17,18
190:14,16
Mary 56:22
mask 114:22 119:5
120:8 171:4,9,12
171:22 172:1,2
masking 171:6
mass 113:1 117:3
material 139:10
168:10
matriculated 18:10
matter 118:3 205:9
McLaughlin 1:16
1:23 211:5
mean 9:10 10:12
26:3,16 27:15
29:7 30:17,19
31:5 33:13 35:18
35:20,23 47:13
53:12 54:19 65:12
70:16 72:20 77:12
81:12,23 94:15
99:21 103:13
106:1 108:12,17
142:14 151:8
169:2 187:9 192:9
198:14 203:7,12
206:14 208:22
meaning 42:16
131:19 166:17
means 30:18
115:17 138:17,20
152:15 201:10
meant 5:18,22
100:11 105:21
117:24 119:12,20
120:3 130:21



134:22 159:12
171:24 184:16
measures 18:23
mechanism 29:11
medical 1:6 4:8 7:1
18:17 19:9 29:2
29:23 48:7 53:24
66:19 67:2 130:18
134:3
medication 6:5
161:19
medications 28:4,7
120:12,22 121:4
137:21
medicine 139:15,21
meet 42:6 47:22
meeting 11:3,16
17:17,20,22,24
184:17,24 186:9
186:11 187:6
188:17,23 192:20
193:23 199:11
202:11 203:1,9
208:23 209:14
meetings 14:3
16:15,16,21 17:1
17:8,8 47:14
155:2,6
member 61:14
memory 73:12
206:18
MENDELSOHN
2:16
mental 180:8,12
189:19
mention 22:24 75:2
129:6 172:23
mentioned 14:22
15:6 40:6,14
63:20 76:14 80:15
81:17 131:15
139:22 165:24
174:13 180:15
204:7
mentioning 68:7
174:20

mentor 192:11
merits 209:7
message 96:23 97:8
messages 205:16
met 124:22 140:18
185:15,18 191:23
Meyer 135:17
Meyers 135:20,21
mic 138:9
MICHAEL 1:7
middle 134:18
194:22
midway 195:2
Mike 157:1 183:24
184:15 185:13
201:2 202:9
207:14
Miller 43:19
milligrams 136:9
137:10
mind 4:19 15:3
178:24 179:11
180:19 182:7
189:16 195:9
Mine 192:24
minority 14:24
73:3,11 170:5
minute 36:1 98:1
123:8 172:20
173:16,23 174:7
miscalculation 64:2
mischaracterizes
65:3 155:22 161:5
mispronouncing
98:24
misrepresentations
126:12,21
misrepresented
54:14 153:11
167:24
misrepresenting
153:6
misspoke 16:1
mistakes 31:3 63:4
63:24 65:21 66:2
182:12,14,16,18

182:21 183:5
mistreated 15:12
77:13
mistreatment
13:12 14:20
mix 48:16
mixed 77:17
mixture 135:18,21
mode 175:20 176:3
176:8,19 177:4,9
modes 176:7
177:12
modify 37:17
moment 36:23
monitor 137:16
monitoring 38:5,22
39:2 46:17 64:10
64:16
month 59:2 188:9
188:12 195:12
201:16,22
monthly 155:6
months 194:3
195:14 201:20
morning 4:2 33:15
82:9 129:6 135:10
135:14
morphine 28:4
130:21,22 131:9
131:10,14,16,19
132:24 133:2,11
137:10,23 138:15
142:2 146:1,3
motioning 94:9
114:18 115:10
motivated 154:15
motives 78:21,23
124:2,3,5
motor 160:8
mouth 73:21
172:24 175:7
move 55:18 66:7
83:14 115:16,16
160:20
moved 30:5 46:6,16
116:7 134:11

movements 160:9
multiple 42:9 43:3
43:9 77:13 81:4
muscle 28:5,6,9
159:23 160:3,5,11
160:16,17,18,21
161:8,10,12 166:8
167:23 171:15
173:1,17,24 174:3
174:9,12,15
M-a-r-c-i-a-l 4:5

## N

N 3:1
name 4:3,3,4,21
28:21 40:18 54:1
111:15 190:3,22
named 4:9 7:2
61:14
names 77:15,16
Narbone 1:7 10:2,4
10:8,15 11:3,5,15
25:14 44:9 46:19
209:3
Narbone's 10:12,21
narrative 131:7
168:9 180:2
Nate 170:6
national 7:12 9:2,6
9:16 12:16,24
13:22 14:21 15:6
15:10 95:20 96:3
98:2,4 99:8
154:16
nausea 19:22
near 13:4 162:1
necessarily 85:1
89:9 111:23 112:2
121:23 197:23
206:17 207:3
necessary 171:6
neck 117:3
need 27:17 28:20
28:23 29:13,13
30:19 35:6,10
40:6 55:13 56:15

118:4 139:15,21
152:22 167:19
176:17 185:19
201:19 202:3,5,17
204:8 207:3
needed 27:8 28:14
28:21 37:4 52:22
119:13 121:18
143:17 145:1
150:8 151:12
164:21 172:17,19
173:15 182:8
187:5
needs 19:20 20:17
30:1 143:23 144:6
negative 8:12,16
10:6 12:16,20,23
14:9,10 16:14
40:7 71:18 74:19
76:2,8 80:17 81:6
85:3 86:8 94:22
117:15 127:14,17
127:19 155:20
170:11 178:15
179:5 186:5
187:10 189:11
191:24 192:7
196:12
negatively 94:12
negatives 178:18
178:21 187:8
189:10 196:16
neonatal 114:22
neostigmine 28:2
28:15
nervous 140:20
162:3,10
nervousness 141:6
142:20
neuro 47:23
never 39:16 67:23
98:22 99:19
117:17 134:13
new 19:1 54:24
83:3,6



newly 76:7
Nguyen 98:23 99:1
nicer 45:15
night 15:18 33:22
33:24 34:15 141:2
nodded 137:3
noise 199:15
nondepolarizing
166:8
nonmedication
137:18
nonminority 75:15
81:9 96:13
non-passing 184:22
normal 149:16
normally 158:1
182:14
NORTHERN 1:1
210:2
Notary 210:21
noted 177:1
notes 58:20 191:6
191:15 193:6,9,22
197:5 198:24
200:9,14 211:10
notice 1:13 4:11
noticeable 174:4
notification 184:23
November 60:21
195:13 203:8
NRS 185:22
number 6:21 48:1
55:12 101:6
104:17 109:17,19
159:4 172:6
183:19 184:20
190:16 193:4
numbered 104:18
numbers 31:6 58:3
193:1
numeric 58:7
107:22
nurse 10:13,19 18:5
18:9,13,14 19:3
19:17 20:15 21:10
21:13,24 22:9,14

22:21 23:6,7
37:24 50:14,15,18
53:3 100:12,22
133:16 134:2
207:20
nurse-driven 21:20
nursing 19:1
N-g-u-y-e-n 99:5

— O —
object 15:24 39:21
48:24 61:7 65:2
70:20 78:9 204:18
objection 61:8 65:9
66:6 100:2 117:23
161:5
Objections 85:14
objective 173:12
objectives 22:4
observation 40:14
81:21,23,24 82:2
151:20 197:17
observe 51:9,12
115:24 122:6,9,22
174:8
observed 70:17
71:11 72:1 116:6
151:19 153:23
observer 113:22
114:3
observing 141:18
obstruction 164:21
165:10
obviously 51:18
occasion 20:16 50:2
53:15 67:4 71:8
88:2 164:22
occasions 19:4,19
21:15 38:9 50:10
69:3,9 73:10
83:19 95:13
occur 20:1
occurred 154:19
occurrence 71:6
76:9
occurrences 36:3

occurring 11:3
October 61:16
195:13 200:10,15
208:2,9
offend 199:24
office 13:12 125:2
off-site 75:23
OGT 165:16
Oh 26:16 73:12
97:6 113:6 127:1
136:17 206:14
okay 4:20 5:4,10,15
5:16,19 6:1 7:3
8:11 9:15 10:23
31:9,11 35:4
45:12 51:4 58:6,9
64:15 72:11 77:6
79:6 88:17 104:3
110:5 114:4
117:18 127:15
140:11 148:13
150:7 154:3,6
161:16 163:13
172:9 192:22
197:5 198:10
200:11 201:11,14
202:14 207:12
209:12
Okonkwor 73:5,9
73:15 74:1
old 11:12 112:15,24
113:1,3,5,18
117:8 170:22
once 74:12 165:2
166:2 167:8
ones 26:17 27:12
44:19 64:13 69:7
77:17 79:19 122:1
143:18 152:22
174:4
one-month 188:13
188:22
one-on-one 38:5
39:14 46:17
one-time 77:7
one-to-one 40:2,4,4

40:7
online 107:9
onset 29:9
open 52:19 73:21
172:24 175:7
operating 49:21
operative 93:1
opinion 71:24
108:15 131:20,22
150:4 152:12
opinions 26:7 153:7
opioids 130:12
131:8,11 174:5
opportunities
195:21
opportunity 155:3
opposed 88:1 90:22
196:9
optimize 19:21
option 112:3
options 34:17 112:8
oral 171:4
order 20:18 42:6
58:7,8 137:9,12
138:17 139:2
140:2
orders 21:1,20
137:8,15,19
138:23
organized 157:21
orientees 19:1
origin 7:12 9:2,6,14
9:16 12:17,24
13:22 14:21 15:6
15:10 95:20 96:3
98:2,4 99:8
154:16
original 158:7
other's 45:1
outcome 199:2
outpatient 88:12
outright 9:11 81:21
outstanding 104:23
107:1,22 163:18
overall 56:14 57:3
57:15 162:1

overdose 138:12
144:7
overdosing 183:1
overlap 192:10
overly 45:18 88:21
oversaw 25:6,10
oversee 209:4
overseeing 38:12
overshoot 152:23
overshooting
150:11
overview 34:11
35:24
overwhelming
180:7
owing 14:23
o'clock 1:19 200:3

— P —
PA 185:22
PACU 137:15
page 3:5 7:6,19
13:2,4 55:13 56:3
56:20 57:7,19
58:8 59:9,22 62:4
85:19 86:1 90:5,5
102:15 104:5,17
106:13,19 107:12
109:16,18 112:9
116:13 125:17,21
126:3,4 128:7
129:5 130:15
132:1,2 145:5
148:7,14,19,21
150:18 156:22
163:12 164:13
166:4 168:14
170:13 184:1
190:24 191:16
192:23 193:1,7,9
197:5 198:23
200:2 202:1 207:6
pages 34:19,22 56:3
58:2,5 60:18
61:10 101:14
103:20 106:20



210:8
**pain** 19:16 28:3
130:11 131:2
139:15,21 143:23
144:6
**pair** 76:6
**paired** 15:11 47:17
47:20 48:17 74:4
74:8 75:24
**paper** 134:11
140:15
**papers** 134:2,7
**paragraph** 8:11
13:10 86:2,24
90:5,6 112:11
129:5 130:15
139:19 144:10
147:24 149:11
164:14,18 165:13
172:3,7 175:17
178:1 184:20
200:15 207:6,7,10
**paragraphs** 7:20
151:22 159:2
201:12
**paralytic** 166:13
168:2
**parent** 93:6,10,21
**part** 7:9 8:15 17:7
17:20 23:1 24:24
25:2,7 26:11,21
26:22 27:5,21
30:2,6,6 31:8,10
31:14,16,17 32:12
32:20 34:2,10
35:14 36:11,18,19
37:3 39:3,12,13
45:2 48:22 49:15
49:19 62:18 63:23
67:12 73:18 93:5
94:4 96:16 102:4
103:11,13 114:19
114:19 115:3
117:1,2 134:4
144:9 157:3 160:2
160:15 161:14

163:5 182:12
185:18 186:13
189:1 194:16
200:8,9
**participate** 23:3
181:19
**participated** 18:21
75:10
**participating**
116:24
**particular** 29:1
33:1 34:9 36:6
47:3,22 49:20
91:2 110:13,14
111:11,22 119:2
121:3 130:1 134:7
134:23,24 135:12
135:21 146:22
150:6,11 156:13
161:8 178:19
184:8 185:16
198:21 202:24,24
206:15
**particularly** 14:24
129:19 135:13
142:2
**party** 6:24
**pass** 42:7 99:11
178:21 185:22
187:8
**passed** 98:10,12
99:21
**passing** 128:12
184:24 185:3
186:4 195:8
**pass-fail** 42:3
**patch** 88:16
**paths** 40:1
**patience** 183:9
**patient** 19:6,20,21
19:24 20:17,23
21:22 23:13 29:2
29:15,24 30:23
36:8,15 42:10
52:17,21,24 53:6
53:21 88:9,11

91:9,10 93:2,4,5
94:21 110:13,14
111:12,16,22
112:24 113:5
115:2 116:3,7,19
117:8,8 119:2
121:11,13,16,20
121:22 122:2,4,24
129:9 130:1
134:24 135:4
137:8,9,17 138:3
138:12 143:24
144:8,19,23 145:1
149:13,16 152:1,3
152:4,18,21,24
157:2 158:22
160:20 164:18
165:8,17 171:3,15
172:1,2,13,19,24
173:6,11,13,18
174:15 175:10,19
176:1 183:1 185:8
185:21
**patients** 8:18 18:15
18:16,19 19:5
21:13,24 22:19
23:4,11 33:15
37:9 113:3 117:22
135:2,7,13 174:9
178:2,9 179:17
181:2,6 183:6
192:16,17
**patient's** 19:8 21:1
21:16 29:24 34:20
35:1 52:22 91:12
116:2 121:2 134:3
151:5,19 166:12
**patient-controlled**
32:3
**paying** 51:10
**pediatric** 93:2,19
117:20,21 129:9
131:23 133:3
135:13 139:11
142:3,8
**pediatrics** 122:15

122:17 136:18
138:3,8 146:17
**peds** 131:2
**PEEP** 177:16
**people** 43:12 45:19
48:22 49:8,9,12
49:13,18,20,24
50:6 51:8 53:16
73:2 79:24 82:20
87:1 126:9 199:8
203:4 205:17
206:20
**perceive** 153:1
**perceived** 90:7,10
**percent** 32:9 37:13
37:22 149:18,24
150:14 152:2,7
153:24 159:3,10
159:14 161:23
**percentage** 32:8
**perception** 23:18
97:2 159:19 194:7
194:9
**perform** 8:19 51:1
74:11 122:12
143:4 161:14
172:19 180:13
181:19 196:9
**performance** 14:10
45:21 46:20,22
54:12 64:17 68:9
68:24 69:18 70:3
78:18 79:4,12
98:19 99:20
117:13 145:8,21
163:24 169:8
180:4 181:1
185:20,23 187:5
194:19
**performed** 56:11
69:20,24 105:10
128:15,16
**performing** 45:16
48:12 135:23
164:2 173:22
181:13 199:19

**period** 55:17,21
62:21 84:15
100:16 101:7,16
106:10 116:4
152:19 162:19
168:13 186:12
**periods** 38:15
115:3
**permission** 161:17
**persecute** 182:13
**person** 25:10 176:9
183:2,2,3
**personalities**
200:21
**personalized**
110:12
**person's** 190:3
**perspective** 35:8
97:22 196:2
**pertaining** 1:15
11:20 94:13
**Pete** 4:7
**PETER** 2:11
**peter.land@husc...**
2:9
**phase** 39:16,18,20
**phenylephrine** 28:3
**phonetic** 40:17
73:6 123:2 193:12
**phrased** 167:9
**physical** 20:19
188:4 189:19
**physicians** 22:1
**physiology** 29:8,9
**picked** 171:12
175:22 199:16
**piece** 178:3,5
**piled** 178:22
**pillow** 151:5,19
**place** 147:13,23
151:3,3,4
**placed** 165:14
171:5
**placement** 88:11
**placing** 165:16
170:22 175:19



plain 134:5
Plaintiff 1:4 2:6
Plaintiff's 85:13
plan 20:15 21:10
 32:24 33:8,16,17
 33:21,24 34:14
 35:2,11,23 37:17
 88:19 118:4 130:9
 158:7 181:6
 185:18
planned 35:16,17
planning 118:3
 135:22
plans 18:20 20:12
 21:4 33:21
played 47:8
Plaza 1:17 2:8
please 4:2 5:14 65:5
 117:19 120:11
 124:9 190:7
plenty 200:21
Plus 139:10 189:10
point 41:19 46:16
 88:4,5 104:4,7
 116:2 117:14
 118:19 123:17
 125:18 126:21
 131:5 138:6 150:5
 153:14,15 154:14
 162:17 164:21
 172:4,8,10 178:1
 179:3 187:24
pointed 76:4 86:12
 117:11 126:20
 165:10 179:7
pointing 94:23
 118:20 120:5,7
 156:14
points 36:5 66:10
 152:16
poor 88:18 159:22
 191:8,12
poorly 87:20,24
 91:4 92:9,14
port 88:11
portion 25:24

41:10 89:17
 101:12 113:11
 120:5 137:14,18
 140:1 160:11
 191:7
portions 62:19
portrayed 114:14
position 108:13
positions 23:10
positive 56:7 57:1,4
 57:14,15,23 59:14
 60:5 84:12 107:3
 108:1,2 117:15
 127:2 163:17
positives 127:15
possibility 35:2
possible 19:20 87:5
 147:6 160:18
 161:13,21 165:3
 168:7 171:8 192:2
possibly 36:2 177:7
 177:20
post 137:10
postop 19:22
 130:10 131:2
 137:8,15 139:15
postoperative
 31:21 130:9
postoperatively
 19:16
potentially 155:2
 160:20 201:11
practices 144:12
practitioners
 151:10
praising 157:14
pre 110:12
precautions 128:14
preceded 55:24
preceding 55:17
preclude 19:9
prefer 4:20
preference 111:22
 152:13
preferences 19:16
 112:2 161:22

prefers 151:10
premature 112:14
 114:3 122:18
premedicate 19:24
preop 150:24
preoperative 93:24
 185:11
preoperatively
 93:1
prep 111:24 116:18
 129:24 133:7
 134:2 135:18
preparation 110:7
 110:14,22 111:7
 116:16,17 118:24
 119:3,4 129:10,12
 133:13,14 134:6
 134:20 146:24
 147:7,7,24 157:13
prepare 34:22
 112:4,17 113:6,19
 129:20
prepared 33:14,22
 33:24 34:14
 102:20 103:8
 106:17,20 110:20
 111:1,11 113:17
 113:21 118:17,23
 120:20 129:11,15
 132:14 135:11
 157:11 168:15
 202:7
preparing 112:4
 147:4
preps 181:15
prereqs 24:18
prerequisites 24:17
 24:22
present 2:14 20:16
 37:16 49:18 50:7
 51:12
presentations 32:5
presented 15:3
 31:24 32:2 108:10
 119:3 167:12
 188:2,8 197:18

presenting 209:8
pressing 176:1
pressure 21:16
 149:13,17 150:11
 150:14 152:2
 153:24 159:6,13
 159:18 162:24
 175:22 176:5,6,21
 177:13 178:15
 179:10,12
pressures 159:20
pretty 8:6 33:11
 36:15 45:9 50:12
 102:19 105:11
 128:21 174:17
prevents 166:12
previous 77:6
 93:18 132:10,20
 132:24 133:9
 136:15 138:2
 139:8 141:2 146:2
 146:8 154:18
 178:15
previously 133:2
pre-made 21:19
primarily 18:16,22
 205:20
primary 18:14
 45:19
prior 17:22 18:8
 33:14 38:9 96:6
 124:22
proactive 151:22
 152:4
probably 14:14
 17:21 31:22 41:7
 49:22,22 69:14
 77:7 119:11
 121:17 134:18
 143:17 165:2
 189:7
probation 180:6
 182:17,20,23
 186:24 187:10
 201:19
probe 165:17

problem 96:18,20
 118:21 153:10
 155:13 156:13
 160:24 177:1
 197:14 198:17,22
 199:3
problematic 182:6
problems 63:4
 77:20 81:10 97:13
 156:10 179:16,17
 182:3,5 192:16,16
procedure 1:14
 4:13 88:12 119:24
 123:4 129:8
 133:20 134:8
 143:22 144:6
 151:16
procedures 20:18
 69:16 122:12
proceed 195:5
process 53:7 91:9
 143:14
produce 207:1
produced 204:3
professional 22:9
professionalism
 49:15 185:9
program 9:4 10:9
 10:17,18,19,22
 11:12 18:5,11
 22:4,5,6 23:16
 24:11 25:3,7,15
 25:18,24 26:11,21
 27:6,21 30:2,6
 31:9,16 32:12,17
 32:21 33:10 36:11
 36:18 37:1,4 39:9
 39:12,13 41:11,11
 41:22 42:1,12,24
 43:8 44:10 45:20
 46:7,16,21,24
 47:8 49:5,20 50:8
 51:6 55:18,24
 56:22 62:11,21
 63:23 64:24 65:14
 65:22 68:10,11



69:18 70:4,8
72:21 73:21 78:14
79:16 98:10,13
99:11,22 100:12
101:1,10,12
105:23 126:10
178:22 189:3
191:7,23 193:16
202:23 203:4
205:15 207:21
**programs** 24:3,8,10
**progress** 20:23
38:8
**progression** 10:9
10:16,22 11:6,23
21:1 67:10
**prompted** 167:6
177:8
**prompting** 164:23
177:4
**prone** 159:24 160:4
**pronounce** 166:7
**proper** 112:7 154:9
**properly** 90:18
118:23 129:20
**protect** 116:19
**protected** 73:3
**protection** 38:19
**protocol** 21:18,20
**provide** 18:15 22:7
44:22 71:18 135:4
187:3
**provided** 22:12
24:4 46:7
**provides** 29:10
**providing** 25:12
46:15 121:19
150:15 174:5
**provision** 22:12
38:23
**Prygodska** 40:9
**Prygodzka** 40:19
**pseudocholineste...**
166:17
**psychiatrist** 190:5
**psychomotor**

165:12
**Public** 210:21
**pull** 109:16
**pulled** 93:17 142:5
206:23
**punished** 169:19
**purpose** 4:23
**purposes** 103:19
**purse** 203:20,21
**pursuant** 1:13,14
4:11,12
**pursue** 8:3
**put** 40:1,3 54:6
62:16 77:2 89:5
94:18 116:1 134:5
137:8 182:17,20
182:23 184:21
206:5
**putting** 56:15
138:23 151:18
173:22 196:23
**P-r-y-g-o-d-z-k-a**
40:19
**P.C** 2:3
**p.m** 184:13

## Q

**quality** 24:4
**quantities** 131:1
**quarter** 194:22
195:3
**question** 5:2,13,17
6:1,5 16:1 20:5
46:4,5 65:6 66:1
89:15 103:3
113:10 124:8,11
126:6 132:12
135:6 136:15
138:22 142:16
147:21 148:3
151:7 158:24
159:7 199:8 203:2
**questioned** 74:12
88:24 162:13
**questioning** 86:6
87:3 88:3,7,22

89:5
**questions** 4:24 7:7
13:4 85:18 87:13
89:8 90:24 93:13
104:9 110:4 132:3
136:23 138:4
139:9 140:9
141:21 173:1
200:4
**quick** 117:3
**quicker** 150:3
**quite** 30:14 88:3,8
**quiz** 135:10
**quizzed** 135:14
**quote** 202:9
**quoted** 105:1
206:20
**quotes** 202:6,21,21
206:5,11,15

## R

**race** 7:12 9:2,6,12
9:14,15 12:12,24
13:22 14:21 15:6
15:9 16:11 17:18
18:1 95:20 96:3,4
98:2 99:9 154:16
**racial** 73:2
**radar** 199:15
**raise** 15:10
**raised** 7:8 10:1
13:20,24 14:10
16:15,21 17:2,9
17:21,24 63:14,18
64:23 111:5
**raising** 174:3
**ran** 116:24
**range** 29:19 30:15
**ranges** 31:1
**ranking** 45:5
**rankings** 44:23
**rare** 122:17
**rash** 154:18
**rate** 61:1
**rated** 57:1 64:23
108:15 128:15,17

**rates** 58:14 163:17
165:13 168:20
**rating** 42:17 65:13
148:9,16 149:5
153:7
**ratings** 42:10 43:4
106:24 107:21
108:3,4,5,8 109:8
116:10,18 127:24
128:14 179:13
183:8,14 185:7,21
187:12,20 196:10
**rationalize** 199:18
199:23
**rationalizing** 133:1
160:16
**Ray** 1:7 10:1,4,8
44:9 46:19 82:7,9
84:3,17 200:22
201:2 202:1 209:9
**reach** 21:17 121:18
**reached** 157:23
158:12
**react** 37:4 150:5
**reacted** 91:15
94:11 150:2
**reacting** 153:13
156:13 159:18
**read** 65:7 89:18
105:2 113:12
140:6 210:6
**readiness** 93:9
**reading** 129:12
139:17 149:17
150:12
**reads** 118:2
**ready** 40:11 52:5
151:2 173:6,13
202:17
**real** 200:3
**realize** 173:1
**realized** 158:17
**really** 11:9 34:9
45:1,16 47:12,19
48:14 55:18 75:5
76:5 77:6,10 89:5

93:15 94:2 96:18
98:21 99:19
108:10,16 118:19
119:12 128:9
139:24 140:7
142:1 145:3 153:8
157:10 162:20
166:20 169:7
173:8,10 175:9
189:9,12 194:21
195:6 198:20
205:3,12
**reappeared** 125:2
**reason** 17:3 59:5,20
62:1 79:13 110:16
125:13,15 154:6
157:19 162:6
174:1 178:7 189:1
205:5
**reasoning** 153:9
156:12
**reasons** 150:24
199:9
**reassured** 200:22
**reassuring** 202:4
**reattached** 94:6
**rebuttal** 63:21
118:11 128:22
129:4 131:14,18
147:22 148:4
160:5 186:14
**rebuttals** 189:14
196:21
**rebutted** 167:7
**rebutting** 111:7
**recalibrate** 180:22
**recall** 6:6 8:10 9:7
9:9 10:4,10 17:11
24:17 26:2 28:16
34:9 44:18 58:24
59:17,21 62:15
63:20,21 66:5
68:6 69:9 74:5,23
75:3 76:14,15,18
77:15 80:8 81:11
82:7,13 83:5



86:22 87:7,14,22
87:23 92:20 93:14
95:3,10 97:3
108:2 110:21
111:20 119:11,13
119:21 120:3,9
143:20 144:18,22
145:12 146:20
147:4,10 159:1
160:2,14,15,17
161:4,7,9,9,12
165:2 166:1,19
167:22 169:23,24
170:1 173:5
175:24 177:11
180:10 184:8,9,17
185:17 186:3,15
188:24 195:3
198:9 205:3
206:23
**recalled** 105:18
111:2 141:10
143:2
**recalling** 87:15
182:24 202:11
**receive** 41:20 84:8
119:17 127:13
145:10
**received** 14:9 15:1
16:13 43:3 75:20
103:8,23 119:18
125:4 170:11
184:9 190:17,21
191:9
**receiving** 14:6
120:1 179:12
184:22
**recess** 55:4 100:4
156:16 190:8
**recitation** 12:7
**recognize** 6:21
85:11 103:7,11
168:4 183:18
198:12
**recognized** 97:12
134:3 156:1

164:22
**recognizes** 149:7
**recognizing** 37:7
167:20
**recollect** 10:14 59:4
95:16 119:19
**recollection** 14:8
49:6 73:8 82:5
91:23 92:11 94:7
110:11 111:10,21
116:8 129:23
138:13 140:17
146:19 147:13
151:14 157:22
158:16 162:15
186:8 192:10
**recommendation**
188:21 195:16
199:12
**recommended**
131:2 138:1 142:9
197:18
**reconnect** 94:16
**record** 4:3 55:10
89:18 100:10
113:12 120:6
203:3,16 204:24
205:5,15,23
209:18
**recorded** 182:5
204:12 205:10,18
206:3 209:14
**recording** 153:18
204:1,9,16 205:21
206:10,18,20,21
206:23 207:2
**recordings** 206:6
**records** 127:5,11
134:3
**recovered** 114:17
115:10,17
**recovery** 116:2
166:12
**redirect** 145:13
162:11
**redirected** 145:7

146:13 158:2,19
**redirecting** 162:5
162:14 163:4
**redirection** 145:10
**redo** 194:13
**reenforced** 10:9,12
**reenforcing** 10:21
**refer** 30:8,19,22
31:7 104:2 112:9
134:20
**reference** 103:6
104:1,6 108:22
109:18,20 110:18
111:3,23 112:22
117:6 119:1
125:18 128:23
131:22 133:9
137:5,11 138:10
139:10 141:22
146:1 148:9
150:21 151:6
152:7 158:20
159:3,6 185:6
186:22 192:23
**referenced** 110:20
147:23 148:2
192:8 194:16
**references** 31:7
102:16 131:8
136:8 142:3
**referencing** 77:19
139:8
**referred** 113:15
145:24 199:17
**referring** 11:21
24:7 31:3 34:14
102:24 103:16
110:23 113:9
114:7 116:23
117:7,12 118:15
119:14 120:9,19
131:3 146:2 163:3
167:16
**refers** 61:18 106:16
**reflect** 54:22 120:6
196:20

**reflects** 106:8
**reflex** 171:6
**refresh** 73:11
**refusing** 198:1
**refute** 88:4 119:20
120:10 196:17
**refuted** 131:17
152:15
**regarding** 130:24
197:6 199:7
**Registered** 23:7
**regroup** 196:4,8
**regular** 68:8 162:5
162:12,14 171:11
173:8,12 174:5,18
174:18
**reiterate** 143:22
**relate** 22:18 32:1
**related** 6:3 66:11
115:1
**relates** 109:2
204:18
**relating** 147:23
202:23 204:16
205:14
**relation** 198:21
**relaxant** 159:23
160:3,5,11,16,17
160:18,22 161:8
161:10,13 166:8
167:24 171:16
173:2,17,24 174:3
174:9,12,15
**relaxants** 28:5,6,9
**relieved** 82:6,7,10
84:3,18 162:16
**rely** 12:6,9
**remediate** 194:11
**remember** 6:4
11:15,18,21 12:8
27:24 28:9 43:21
80:18,22 81:2
87:11 88:7 91:6
95:11 118:24
121:1 122:20
135:11 141:8,16

143:14,18 164:1
166:9 167:18
184:6,15 185:12
186:10,13,20
199:10 203:6
204:13 206:10
207:3
**remembering**
141:20 142:23
205:7
**remind** 30:14 43:18
165:14,20
**reminded** 141:1
**remove** 114:19
116:1 172:18
**removed** 115:3
**removing** 94:4
**rendered** 42:20,23
**renders** 178:8
**Renee** 40:9
**Renee's** 40:18
**repair** 137:10
**repeat** 66:1 103:3
144:5
**repeated** 42:10
144:12 207:16
**repetitions** 141:15
**rephrase** 5:14
**report** 19:14,19
20:21 126:24
**reported** 1:22 16:9
17:17 84:16
109:20 211:7
**reporter** 5:6,12
107:8 211:6,17
**reporting** 20:24
**represent** 4:8 54:15
54:20
**reproduce** 206:16
**request** 20:18
116:15,20 127:11
**requested** 89:17
113:11 209:3
**requesting** 20:24
**require** 162:20
**required** 36:12



42:5 171:22
180:13
**requirement** 36:22
41:20 47:22 48:2
**requirements** 22:5
32:10 204:16
205:3
**requiring** 117:4
**researched** 131:5
139:12 166:16
**researching** 24:3
72:15
**resection** 91:8
**reservations** 169:4
**residency** 30:9 31:9
31:15 32:11,17,24
33:10 36:11 37:1
37:3 38:2,15 39:9
41:10 42:1,12
43:8 44:10 46:20
49:19 50:8 51:6
55:18,24 56:22
62:10,13,20 63:23
64:24 65:14,22
68:10 69:18 70:4
70:8 83:4 100:19
101:9,12 105:23
106:10 191:7
**resident** 50:20,23
91:15
**residents** 24:6
50:21,22 51:3
53:17,22,23,24
**resistant** 198:9
199:21 200:1
**respect** 46:24 48:17
48:17 63:24 64:12
81:14 90:4 121:7
**respiratory** 173:21
**respond** 151:12
164:13
**responded** 17:14
127:1
**response** 110:17,24
112:10 116:13
119:8 120:16

123:5,9 125:3
126:2,4,6 130:14
149:10,11,12
151:7 165:6,21
**responses** 69:1
85:13,17,23
109:17 126:1
148:15,20,23
164:13
**responsible** 45:20
**rest** 104:16 133:18
170:5
**restate** 124:13
**result** 34:24
**resulting** 86:7
**resume** 100:12
**resuscitating** 23:4
**retaliation** 7:9 13:5
**retrieve** 111:14
133:17 134:4
**return** 82:9 87:10
91:18 100:19
122:15 166:6
167:18,20 201:17
**returned** 75:22
201:5
**returning** 160:8
168:2
**reversal** 28:6,13
**review** 56:4,7,9,12
57:1,5,7,14,16,20
58:10,17,20,23
59:6,14 60:4,10
60:20 61:1,3,5,13
61:21,23 109:2
117:20 185:10
192:6,7
**reviewed** 43:21
64:14 107:7,8
137:5 184:12
**reviewing** 95:14
**reviews** 44:13
**revisited** 201:13,15
**reviving** 23:4 115:2
115:7
**re-dose** 160:9

**re-dosing** 161:19
**RICE** 2:15
**right** 5:20 7:4,10,23
7:24 8:10 10:13
12:4,13,20 13:18
14:2,9 16:11
21:10 24:12 26:18
27:6 28:16 30:3
30:11 31:13,17
32:21 37:24 39:16
41:12 42:18,21
43:5 44:5 46:21
50:3,12 51:6,15
52:17 53:15,19,20
55:24 56:5,16,22
56:23 58:21 60:2
60:8,21 61:12
62:21 63:1,10,14
63:19 66:4 70:13
72:1 73:8 79:4
84:12 85:20 86:18
89:5,23 92:7,15
97:19 98:4,10
99:18 101:20
102:2,2,2,20
104:14,23 105:2
105:13,17 106:4
106:17 107:1
109:8 110:1
111:20 114:13
115:6 116:5 117:9
118:5,11 119:6,18
119:23 123:9,13
123:19,24 125:5
125:13 126:3
127:24 128:5
129:13,14 132:4,8
133:14 138:18
139:6,9,19 145:18
147:24 148:4
149:5,23 153:12
154:1,4 156:5
157:14 158:11
160:14 163:7,18
163:21 164:10,15
165:23 168:16,21

171:23 173:4
174:21,22 175:1
175:12,20 176:14
179:5,13,16,19,24
181:8,22 183:22
187:13,20 191:2
191:21 193:2,7,17
193:20 201:8
202:18 203:23
207:14 208:12,17
208:19
**risk** 42:20,23
184:22 185:3
187:4 197:4
**Riverside** 1:17 2:8
**RNA's** 162:19
**rocuronium** 28:11
**Rodzik** 56:22
**role** 18:7 25:10
37:3 45:23 46:23
47:7,12 78:17,23
78:24 79:1 122:10
122:22 168:6
175:4 182:10
**room** 38:16,22 39:2
49:21 50:3 110:7
114:20 116:18
130:6 134:10,12
135:2,8
**rotation** 194:4
**rough** 27:12,14
**RSI** 165:15,21,23
167:7
**rules** 1:14 4:12,18
**run** 23:3
**running** 38:23
121:17 134:5
162:20
**runs** 47:3
**rush** 1:6 4:8 7:1 9:3
9:21 10:5 12:15
18:5 23:16 25:3
25:22 27:21 58:3
58:5 60:17 61:10
75:23 102:1
104:17 106:19

107:17 109:6
126:1 148:11,18
148:19 156:21,24
162:3,10 163:12
164:6 168:14
196:7 203:4
205:18
**Rush's** 100:11
195:23

---

**S**

**S** 1:17 2:8
**safe** 22:8 37:9
151:24
**safety** 18:23 23:14
24:5 42:10 149:13
164:18 185:8,21
**sat** 179:22 180:3
**satisfactorily**
136:24
**satisfactory** 56:8
57:2,4 58:14 60:4
61:1 78:19 104:23
106:24 107:21
108:4 128:11,14
128:17 137:1
163:18
**saw** 59:18 71:2,20
89:9 117:17 125:1
**saying** 5:3 10:5
11:6,14 12:11
15:20 17:16 24:8
33:23 35:23 46:6
46:19 60:14 62:2
62:7 64:19,22
65:12 71:10 78:6
79:18 80:22 81:3
84:20 85:2,6
88:20 91:15 92:13
92:22,23 97:7
102:5 108:7,9
112:13 115:8,13
124:5 132:17
135:24 136:21
138:14,17 140:16
155:5,19,23,24



156:7,10,11 158:8
160:13,23 161:3,8
165:20 167:14
170:17,18 171:21
173:14 175:7
178:22 182:3
196:21,24 203:6
209:12
**says** 56:8 57:3 86:4
86:12 90:10 104:7
106:14 113:9
119:5 130:10
132:9 133:12
137:7,8 139:14
140:2,15 144:7
145:20 146:9
151:22 158:21
159:11,21 161:17
163:20 164:18
166:5 168:9
170:21 171:2
172:16 175:19
177:3,24 180:4
184:11 191:7
198:14 207:13
**SBP** 152:1
**scaring** 93:13
**scattered** 162:3,9
**scheduled** 106:3
129:8 193:11
**scheduling** 47:4,5
48:4 112:14
**school** 68:7 189:17
**scores** 104:22
**screaming** 140:24
143:11
**scrub** 50:18,18
**scrutiny** 77:2,3
183:5
**second** 13:3 94:5
104:5 106:13
107:12 112:13
113:2,5,18,20
114:1 115:24
117:1 120:19
121:4,8,16,19

122:3 129:5 132:1
137:20 150:18
166:4 170:21
172:7 193:1,7,9
199:11 200:16
207:18 208:6
**secretions** 52:23
**section** 58:21 63:21
137:20 139:1,14
158:11 185:5
**sedated** 174:17
**sedation** 174:5
**sedative** 171:18
**sedatives** 173:19
174:18
**see** 8:13,24 13:6,13
36:2 60:20 79:4
85:15 86:2,10,15
90:8,12 102:17
105:6,7 107:18
108:24 109:18
110:8 111:3
120:13 123:6
124:1 132:5
139:16 145:8
146:13 148:9
149:4,14 150:9
151:6 160:8 165:6
172:5 173:16,22
175:9 190:5
193:13 194:4
197:7 199:4
200:17,24 201:13
203:23 207:9,10
**seeing** 69:11 124:21
189:16 190:1
**seeking** 8:3 189:1
**seen** 23:5 28:16
37:16 40:12 59:3
60:13 69:10,13,17
135:14
**sees** 197:13 198:17
**segued** 10:19
**semester** 168:10
**sense** 43:13 48:3
78:15 96:4 143:6

160:21 182:6
196:11
**sensitive** 98:17
**sent** 84:4 200:6
202:20
**sentence** 90:7 146:6
159:21 168:9
172:4,8 184:20
200:16 201:24
**sentences** 157:10
161:17 166:4
**separation** 93:9
**sepsis** 21:20
**September** 195:13
**septic** 21:22
**sequentially** 104:18
**series** 13:3 167:3
**service** 22:8 186:3
**services** 1:22 186:1
**session** 5:22
**set** 33:1 52:10
54:24 85:14 129:7
129:24 157:12,13
158:18 184:24
193:22 198:24
**sets** 138:13
**setting** 7:4 32:16
65:24 66:4 176:9
208:10
**settings** 8:18
171:20
**setup** 51:18 52:4
53:9 129:9 162:2
**seventh** 58:8
**severe** 146:18
**shaken** 143:8
**Shannon** 13:13
**share** 45:1
**shared** 101:24
102:6,19 103:5
170:4
**sharing** 155:15
**sheet** 30:13 132:11
132:21 133:13
134:14,15,21
139:2

**Sheila** 58:11
**shelf** 142:6
**shield** 38:17,19
**Shively** 142:12
**shock** 21:22
**short** 116:14,20
190:6
**shorter** 195:11
**shorthand** 211:7,10
211:17
**shortly** 154:19
**shot** 144:20
**show** 36:12 45:1
69:3 76:5 84:17
85:4 136:5
**showed** 69:5,8 71:7
88:4
**showing** 84:23
**shows** 173:13
**Shumpert** 13:13
**sick** 83:21
**side** 122:12
**SIEGEL** 2:3,5
15:24 16:23 39:21
48:24 54:24 55:3
61:7 62:4 65:2,5,9
66:6 70:20 78:9
83:10,14 89:13
98:20 99:15 100:2
102:23 113:10
117:23 124:8,12
125:9,14 139:17
140:3 147:9
148:21 155:22
161:5 204:6,10,18
209:17
**siegeledlaw@aol....**
2:4
**sign** 60:2 61:24
152:14 173:10
184:6 209:1
**signature** 57:10
85:19 184:3
**signed** 57:9 59:19
60:13 61:3 105:7
123:18 124:16

**significance** 167:23
**significant** 20:22
27:5 42:18 182:5
**signs** 137:16 150:9
152:20 168:1
173:6,8,12 174:1
**similar** 74:2 98:8
138:2 182:17
**similarities** 72:18
**Similarly** 130:23
**simple** 35:16 202:2
**sit** 8:7 11:14,18
26:9 62:1 199:13
**situation** 48:11
112:18 116:16
157:2 195:20
**situations** 22:23
48:7 63:16
**six** 31:21
**size** 52:8 110:8,19
111:4,19,20 112:2
112:5,6 118:5,8
118:10,21 129:19
133:7
**sized** 111:8,19
113:5,9,15
**sizes** 112:4,4 132:8
132:13,18 147:5
**sizing** 133:6
**sizings** 112:7
**skills** 165:12 169:6
180:13 195:17
**sleeping** 87:17
**slightly** 106:23
192:24 203:2
**snoring** 165:8
**somebody** 160:6
174:14 209:4,6
**somewhat** 200:16
**soon** 103:8
**sorry** 9:8 13:8 25:9
61:9 89:14 92:18
109:5 124:12
139:17 142:14
189:23
**sort** 27:11 34:11



38:5 55:21 71:5
72:6 98:17 155:11
157:24 182:11
**speak** 199:13,18
**speaking** 27:4
**special** 19:8,20
**specialized** 68:20
**specialties** 47:23
**specialty** 47:24
**specific** 35:5 77:17
130:24 134:23
142:1 160:17
161:10 173:10
**specifically** 131:4
131:10 136:12
145:4 172:18
199:6
**specified** 197:12
**speculation** 39:22
48:24 66:6 70:21
78:10 83:10,15
98:20 99:15
117:23 147:9
**spell** 4:3 40:20 99:4
**spells** 114:6,24
115:9,11,14
**spent** 32:8
**spoke** 68:8 135:16
**spoken** 188:5
**spontaneously**
172:13
**sporadically** 38:15
**SRNA** 9:4 18:4
22:3,5 23:7,16
24:11 36:6,22
38:6 39:12 46:24
47:8 48:11 49:5
50:1,9 67:12
73:12 78:13 101:1
126:10 197:19,20
202:23 203:4
205:15
**SRNAs** 39:14 45:24
46:16 47:5,16
48:4,17,21 67:9
78:4,18 79:15

80:14 81:3 86:7,8
135:9
**SRNA's** 45:20
**SS** 210:2 211:1
**stable** 115:16
**staff** 22:12 38:20
47:3,5 50:3
142:12 162:21
**stance** 199:22
**standard** 66:15
111:23 130:24
**standards** 23:16,19
23:23 24:3 42:6
128:17 184:24
186:4
**start** 4:19 18:8
21:17 29:10 37:15
39:13 100:14
102:13 113:13
133:7 191:16
202:16 207:17
**started** 18:9,10
24:20 31:12 41:24
42:14 62:10,13
70:7 75:24 100:15
100:19 141:1
160:13 175:22
**starting** 179:1
202:2
**starts** 90:7 112:11
126:3,4 130:16
132:3 139:19
144:11 157:9
170:17 172:4,8
193:10 200:16
201:13,24 207:8
**state** 4:2 182:7
195:9 198:20
211:1
**stated** 11:10
**statement** 10:7,21
65:4,8 118:14
129:21
**statements** 10:10
10:12 130:23
162:13 196:19

206:16 207:4
**States** 1:1,15 210:1
**statistics** 24:22
**status** 18:19 19:6
20:22,24
**stay** 122:11 148:19
199:15
**stayed** 116:3 123:3
195:7
**staying** 195:24
**step** 51:22 52:10
53:9 115:20
138:11 144:8
**stepped** 143:8
**steps** 51:18 52:5
154:9,9
**stick** 147:19
**stills** 104:10
**stipulated** 208:24
**stomach** 165:18
**stood** 181:17
**stop** 94:18 115:21
171:9
**stopped** 144:8
158:1
**stopping** 143:10
**straight** 140:8
**stream** 96:23
**strength** 172:20
173:3,15 174:7
**stress** 141:6 142:20
179:1 180:6,11
183:12 188:4
195:10
**stressful** 140:23
**strike** 66:7 83:14
**strikes** 187:7
**strong** 68:13 78:15
**strongly** 94:11
105:10
**struck** 110:15
**stuck** 159:4,11
**student** 15:12,13
23:6 24:6 27:16
27:18 32:5 38:12
45:4 47:14 73:11

74:3,4,9 91:16
155:12,15 162:19
169:18,22 170:2
182:8,14 183:1
184:13,22,24
185:19
**students** 19:1 23:18
30:15 41:21 42:5
44:22 67:5 68:11
69:12,18,20,21,24
70:4 72:17,17,23
77:16 79:10,18
81:9 82:19 155:8
156:1,3 169:3
182:16,20,22
188:11
**student's** 68:24
**studying** 195:19
**stuff** 87:15
**style** 161:24
**subjected** 15:22
16:10 86:6
**subjecting** 87:2
**submit** 204:5
**submitted** 13:11,15
**SUBSCRIBED**
210:18
**subsequent** 209:13
**subsequently**
124:21
**substance** 130:18
202:12
**succinylcholine**
28:12 136:13
166:13 167:21
**suction** 52:10,20
53:2
**suddenly** 124:24
**suggest** 180:16
**suggested** 88:13,15
130:22 142:7,10
177:13,22 189:18
192:1,5,11 196:21
**suggesting** 145:24
**suggestion** 131:15
131:17 142:9

146:3 151:9
188:21
**suggestions** 88:5
138:1
**suggests** 156:8
**suite** 1:17 2:3,8
38:23
**summarizing** 11:11
**summary** 134:23
170:16
**summative** 41:14
101:15 102:9
103:1,4,14,15
104:5 106:12
107:11 108:20
125:16 148:6
**summer** 16:18
38:10
**Summing** 41:16
**superior** 127:1
**supervised** 39:9
**supervising** 8:13
**supervision** 39:14
40:2,5,7 201:20
201:22
**support** 72:13
175:22 176:5,21
**supported** 192:1
**supposed** 121:21
122:8
**supposedly** 40:7
**sure** 14:15,18 16:20
17:6,7,20 19:24
24:7 26:4 30:23
31:2,4 47:12,17
51:14 53:14 63:22
64:15,20,21 68:3
77:12,17,19 81:18
87:15 88:10 91:11
92:21 96:19 97:6
108:7 115:22
117:24 120:19
121:10 144:21
145:4 147:11
152:17,18 153:12
153:17 154:17



159:13 162:22
169:6 171:24
174:23 176:23
177:21 184:5
186:5 192:4,9
197:19 202:1
205:2,6,23 206:1
206:3,24 208:22
209:17
**surgeon** 91:14
**surgeries** 147:15
**surgery** 19:5,10,11
19:13,15,18,22
20:3,4,6,9 33:20
34:7,12 35:22
91:7,8 94:2 117:4
146:16,19,22
147:11,16 159:24
160:4
**surgical** 50:21
131:3 141:3 142:4
143:10,10
**surmise** 8:5
**surprise** 86:9
**surprised** 201:18
**survive** 192:4
**suspect** 86:13
**switch** 10:18 176:2
**switched** 89:4
147:8
**switching** 177:13
**sworn** 4:1 6:14
210:18
**symptom** 174:20
**symptoms** 20:23
89:2 173:11
**syndrome** 166:11
166:14,17 167:10
167:19
**syringe** 53:14 54:4
54:6
**syringes** 128:10
136:3
**system** 52:14
**Systolic** 152:2

## T

**table** 115:17
**tailor** 29:24 34:20
**tailored** 119:1
**tailor-made** 129:24
**tainted** 78:20
**take** 5:21 6:1 21:4
24:16 40:4 55:2
128:19 138:5,11
141:7 142:21
143:13 151:11
152:15 154:9,10
156:15 180:16,18
188:1,3,12 189:8
189:18 190:6
194:21,22 197:3
198:7 202:8
**taken** 1:16 4:12,15
133:16 157:12
207:22 210:7
211:10
**takes** 152:17
**talk** 7:16 19:18
22:3 31:8 44:12
46:14 96:13,16
98:1 179:21
197:15 198:2,3,5
207:19 208:8,17
209:2
**talked** 20:11 49:4
62:17 79:19 90:24
91:3 92:13 95:18
96:1 106:6 114:7
132:18 135:20
145:17 147:21
152:8 159:7 163:9
169:10 179:22
182:4 185:16
186:23 197:6
199:6
**talking** 14:15 16:5
26:17 46:3 50:2
62:23 69:19 71:3
71:6 78:4 87:12
93:6 96:23 101:10

102:9 124:20
144:9 156:2 157:4
157:7 184:15
185:12 192:2
197:24 199:10
**talks** 47:10 67:8
143:21 147:12
156:2 157:10
175:17 197:6
199:1
**taper** 29:24
**tape-record** 202:22
**tape-recorded**
203:10
**taping** 128:10
**task** 178:21 187:8
**tasks** 68:18,21
180:13 199:19
**taught** 133:2
**teaching** 18:24
**team** 22:10 23:1
141:3 143:10,10
**tech** 50:18
**technology** 38:18
**teeth** 91:12
**tell** 25:22 40:21
43:3 47:19 67:18
73:9,20 76:16
117:15 122:21
134:17 136:10
146:4 149:1
151:18 153:17
165:23 180:9,12
191:11 194:6,8
195:15 204:11
**telling** 172:24
174:10 202:14
**temperature**
165:17
**ten** 49:22,24 60:18
**tendency** 197:6
198:4 199:7
**term** 38:2 41:14,17
41:21 127:10
180:15
**terms** 36:19 44:15

62:24 73:13
121:11 130:17
132:23 139:1
145:24 151:8
153:13 167:6,9
174:3 179:9
201:16
**Terrebessy** 190:4
190:18,19 193:4
193:23 194:6
195:15 197:16
198:18 199:1,11
200:6 207:7
**Terrebessy's**
190:22
**testified** 6:14
**testimony** 65:3
161:6 211:7
**text** 96:17,23 97:8
137:6 205:16
**textbook** 142:4,5
175:9
**textbooks** 173:9
**Thank** 4:6 53:1
103:1
**Thanksgiving**
188:14
**theirs** 45:3
**therapist** 67:18,24
190:2,18,21
191:11 192:21
**therapy** 20:19
**thing** 5:8,24 66:4
93:23 180:21
207:5
**things** 6:4 8:21
27:19 28:17 34:6
34:24 35:16,24
51:20 56:15 58:21
63:8 64:3,4 69:1
72:23 76:4,17
79:10 93:7 95:5,6
128:15 131:6
132:10 140:14
145:18 154:4
162:23 169:16

173:16 174:11
177:20,23 181:5,7
181:10,15 183:10
186:7 199:9,19
202:18 207:2,3,19
208:7,11 209:9
**think** 7:21 10:14,18
11:11,14 16:14
18:9 23:22 24:17
26:5,12,14,20
30:18 32:2 34:13
34:19 37:19 38:10
40:20 41:5 43:18
45:10 47:1 48:13
48:19 49:11,14
56:9,12 57:5,16
57:18,23 58:17
59:3,16 60:10,16
61:5,19,21 62:2,7
63:20 64:9,14,22
65:10 67:15 69:12
73:7 85:1,2 88:5
88:23 89:1,3
92:13 94:3,10
95:6,18 96:2
98:16 100:15,19
102:14 105:8,11
107:5,14 108:7,18
108:19 114:5
117:12 119:9
120:18 124:10
126:13 128:7,20
130:1,10 132:9
135:13 136:9,12
136:13 137:11
138:6 139:22
141:6 142:22
143:12 145:23
146:23 147:11,16
147:22 148:2
149:2 150:22
151:3,7,11,17
152:17 153:16,17
154:6,15 155:10
155:19 156:7,8
157:19 158:4,14



158:23 159:12
160:10 161:3
162:6,14 164:3,5
165:4,19,22
166:19 167:2
168:24 170:3,3,4
170:12 171:21
172:15 174:13,19
175:21,22 177:15
177:21 178:7,11
180:18 184:17
186:5,7,8,13
188:2,17 194:9,12
195:7 197:2
199:12,22 203:8
205:6,9,11 209:12
209:16
thinking 139:23
142:23 154:11
177:19 178:18
179:10 181:4
197:23 199:18
thinks 146:12
third 90:5 105:19
193:23 200:15
208:16
thorough 70:3
168:24
thought 14:19
25:23 26:13 40:21
75:19 87:1 88:21
91:1,21 92:1
93:16 94:1,8 95:1
95:9 96:14 97:5
97:10 115:23
117:21 150:2
169:2,11 174:21
179:2 192:10,12
201:11,18
thoughts 146:8
threaten 91:16
threats 178:16
three 14:9 16:15,16
16:21 18:15 23:2
25:8 61:10 69:14
69:16 130:1,3,4

152:19 179:7
194:2 201:19
208:21
threes 181:24
three-quarters
90:6 193:10
threw 140:15
throws 31:6
Tim 142:11
time 5:21 8:23 9:4
9:20 12:3 13:24
23:6,6 30:5 32:8
33:24 35:13,14,17
37:13,19 39:9
40:2 43:15,16,18
43:19 55:17,19,20
55:24 74:15 83:21
83:23 84:3,5,10
84:14,15 86:22
87:6,16,19,24
88:24,24 90:17,23
92:4 95:4 101:7
101:15,24 102:20
105:6 109:13
112:17 116:4,15
117:16 119:18,22
119:24 120:1
122:16 123:3
125:1 137:7,7
142:15 143:1,17
154:18 161:18
162:17,19 163:10
180:23 181:12
182:17 187:18,24
188:15,18 189:17
194:13 195:24
196:8 197:12
198:19 199:11
207:18 208:6
times 23:2 26:6
38:11 40:12 43:12
66:19 83:16,20,22
84:1,9 87:9 92:13
95:14,19 105:22
106:9 143:19
171:17,19 196:20

208:21
title 13:5 177:16
today 4:19 5:22
12:8 104:8 163:20
today's 4:23
told 14:18 15:21,21
40:3,9 42:13
69:15 71:19 72:5
72:5,7,23 73:4,14
73:16,16,19 75:11
79:10,16 80:19
85:3 86:5,17 88:9
91:11 93:7,17,18
94:15 97:20
115:20,21 134:13
134:15 135:16
136:16,18,22
140:14 141:14,14
142:1 172:19
178:20 180:3,10
194:12 198:18
201:2,21
tool 104:1
top 7:19 102:15
110:6 127:22
129:6 132:3 176:1
207:10
topic 98:17
topics 32:1
total 69:13
tough 23:17 90:10
169:1,3,10
trained 51:19
training 182:9
transcript 210:6,9
211:10
transfer 94:9
114:18,21 115:11
121:11
transferred 121:13
137:18
transferring 116:7
transitioning
207:20 208:8,17
translated 89:10
transpired 141:13

tray 157:11
treat 36:2,3 78:5
80:10 90:18 92:9
150:4 154:13
156:3
treated 72:18 75:9
75:14 80:7 81:1
87:20,24 89:6
90:15 92:6 97:12
99:13,17 141:5
209:5,9
treating 87:2
151:22 152:4
153:14 159:19
162:24 169:4
treatment 14:5
15:15,23 16:10
18:20 20:12,15
21:3,9,13,24 22:1
35:19 75:20 79:2
81:3 89:4 96:15
97:10,23
treatments 20:17
20:19 77:8
tremendous 180:5
tremendously
15:17
trending 150:9
152:15
tried 145:13 146:4
trigger 177:6
triggered 177:2,3
trouble 170:21
troubleshoot
177:19
true 45:12 78:8,12
85:23 136:21
170:24 171:14
197:1 210:9 211:9
trusted 68:21
try 5:8 10:14 19:23
48:20 122:13
145:21 166:6
180:22 194:18
196:7,8 198:8
199:18,23 202:1

trying 15:4 35:4
41:5 73:7,11 82:7
92:20 95:16
119:19 132:4,7
142:18 147:10
161:21,24 171:22
176:4,8 180:13
206:15
tube 52:8 94:17
112:4,6 129:19
133:6,7 147:5,12
147:14,17,19
175:16 176:12,17
176:21
turn 7:6 12:10 13:2
57:19 58:2 59:9
59:22 86:1 90:4
104:5,16 106:19
109:18 132:1
145:5 148:14
156:20,21 163:12
164:6,12 168:14
170:13 200:2
turned 76:9 165:3
turning 114:20
tweaks 35:21
twice 43:17 165:15
165:20 166:1
167:6 171:3
twitches 160:8
161:19 166:6
167:18,20,23
two 8:21 15:16
18:15 23:1 24:11
24:18,19 25:5,7
37:18 40:13,15
43:11 45:7 76:13
83:19,20,22 84:1
95:19 96:24
101:14 103:20
105:15,21 106:2,3
106:9,19 112:15
112:24 113:3
129:7,11 151:21
178:17,20 179:8,9
179:16,16 180:18



187:7,8,10 188:8
188:12,12 192:16
195:11 201:12
twos 181:24
two-hour 186:12
two-page 103:13
170:16
two-pager 102:10
two-week 188:21
Tylenol 130:20
139:23 140:13
type 91:8 93:9
143:22 144:6
types 135:8
Typhon 107:7,9
typically 49:18

**U**

Uh-huh 13:7 20:13
24:10 50:4 60:1
71:22 79:21 80:21
86:3 132:6 191:20
194:1 207:15
Uh-uh 159:5
unable 135:4
136:10 146:13
uncommon 33:2,4
undermined 93:21
undermines 168:3
underneath 184:19
understand 4:13
5:13 15:4 16:3
35:10 53:1 92:21
119:22 204:10
208:10
understanding 6:4
46:23 156:12
175:5 187:3
understands
124:10
understood 5:18
208:14
unfair 26:1,11
62:12 65:14 70:7
71:19 86:7 108:13
108:18,19 128:5

unfairly 70:16
79:12,24 80:14
83:9
unfounded 77:4
unique 30:1
unit 18:22,23 19:1
19:7 41:6
United 1:1,15 210:1
universal 128:13
University 1:6 4:8
7:1
unnecessary 173:2
174:11
unrelaxed 152:3
unsafe 144:11
unsatisfactory
42:10,16 43:4
44:17,23 45:5
64:24 65:13 78:19
79:4 109:8 116:18
117:7 127:24
128:18 148:8,16
149:5 153:8
168:20 179:5,12
181:2 183:8,14
185:7,21 187:12
187:19 196:10
207:16 208:5,15
untrue 71:19
unusual 150:13
updated 135:20
urged 199:2,2
use 33:17 38:17
52:19 53:6 88:13
104:1 113:4,20
130:19,21 131:19
131:19 146:17
158:1 167:21
171:22 175:2,4
176:7,8 206:19
207:1
usual 171:1,11
usually 18:14 33:11
34:5 46:2 50:21
51:1 146:17
147:15,19

**V**

vacuum 52:13,19
vaguely 74:4
valid 88:5 119:4
126:14 154:12
189:13
validate 196:24
validity 196:19
variable 172:12
variety 48:4
various 49:9 55:14
vary 34:3
vast 39:8
veered 158:6
vehemently 17:14
vent 151:23 171:20
ventilate 165:15,21
165:23 167:7
171:3,13 172:2
ventilation 94:4,16
119:5 120:8 172:5
172:11,20 173:16
173:23 174:8
175:20 176:6,24
177:3,6,10,14
ventilator 52:1,3
178:3,4,10
verbal 207:17
208:1,5
verbally 14:4 141:2
verbatim 202:12
206:16
verifying 85:22
Versed 28:7 171:18
versus 74:3 90:2
96:9 122:9 150:9
176:5
Vietnamese 99:10
view 107:24 114:16
134:5 155:7
VII 13:5
violation 13:5
visit 19:1 43:15
191:18 198:24
visited 43:17

visits 44:2
vital 137:16 150:9
152:14,19 168:1
vitals 151:23
vocalize 67:1
voiced 75:12,18
volume 175:23
volumes 177:16
vomiting 19:23
vouch 142:24
vs 1:5

**W**

W 2:3
wall 52:16,18 53:5
want 7:17 13:3 16:1
55:2 56:2 60:17
73:14 104:1 110:3
126:8 173:21
190:6 207:5,9
wanted 112:5
135:17,21 136:14
137:9,11 138:14
138:17 158:22
166:18 169:19
179:21 205:1
warned 15:18
169:17
warning 207:17,18
208:5,7
Warren 58:11,18
59:6
wasn't 59:20 76:8
83:3 91:1 94:10
112:20 115:11
138:5,14,23
142:13 153:9
154:19 167:12
171:22 174:12
181:12 189:7
192:4 194:15
195:16
watch 121:8
watched 121:9
watching 39:5
wave 122:20

way 10:6 12:12
15:18 35:17 43:22
62:12 70:3 71:3
75:16 76:3,8
77:21 78:11 90:6
91:1 92:24 95:19
96:1,11 97:12
114:14 115:1
118:4 127:16
147:18 152:14
153:2,19 154:23
158:12 161:24
168:5 169:12
176:16 193:10
196:2 199:9,18
209:4
ways 8:17,18
177:22 178:24
weaning 39:14
wearing 76:6
Wednesday 1:18
week 23:2 25:5,8
31:21 100:20
102:14,21 103:10
188:12
weekly 155:1,6
weeks 14:14 112:15
122:14 180:18
188:9 195:11
weight 120:13,23
121:2 138:2
189:21
weight-based 29:22
well-being 24:6
well-prepared
163:20
went 15:1 45:15
102:6,21 103:9
129:6 137:14
141:12 158:6
166:22 177:22
179:19 183:2
weren't 39:19
54:14 76:5 89:19
114:22 182:5
we're 4:10 31:2,3



50:2 114:20
122:15 150:15
169:15 175:7,7
182:4 187:2
199:19 200:3
204:8
whispering 71:3,5
white 15:12,13 74:3
74:8,11 96:8,17
96:20,22 97:4,7,9
97:22 170:5,8
Whoa 93:12,12,12
Wiley 12:22 16:17
25:13 38:10 40:6
44:5 56:4 77:5,5
106:17,21 141:24
142:7 143:20
164:7 178:22
179:9 187:16
188:6,7,9,11,17
Wiley's 188:20
willing 193:16
Wimberly 1:8 15:2
15:16 70:7,10
71:10,20,23 74:18
74:20 80:6,9
81:10,15 82:3,22
83:3,8,17 84:9
86:14 92:14 95:4
95:24 97:5,8
104:11,12,19
105:5,16,22 106:9
123:8 125:22
129:8 130:5,6,19
130:20 131:21
140:21 143:3,7
145:11 154:23
155:4,20
Wimberly's 15:19
71:7 96:14 97:2
97:10,23 130:16
Withdraw 61:7
witness 3:4 4:1,4,14
4:17,22 5:5,10,16
5:20 6:2,7 107:9
120:5 190:7

witnessed 91:14
witness's 65:3
89:16
WM 194:9
woman 191:6
wondering 9:3 50:6
64:4 66:18 69:11
103:4,7 111:17
195:23
word 129:1
worded 168:6
words 11:8,9,20
13:6 94:19 115:5
206:17
work 22:10 23:2
25:3,6,10,14
30:18 32:6,6,7
38:5 40:12 43:13
49:7,9 54:14,16
54:20,22,22 56:15
57:14 58:21 60:5
63:14,17 67:3
68:12 74:12 83:17
100:18 113:23
119:5 120:8
121:15 126:22
134:11 169:21
185:23 193:16,20
199:3 208:11
workbook 142:3
worked 26:24
27:10 29:14 30:10
53:3 83:22 84:9
87:6 92:6 100:24
105:16,22 106:9
working 22:17
48:22 49:12,19
84:2 100:12,16
101:3 106:2
worksheet 139:11
worry 127:2
wouldn't 21:9
35:18 40:3 155:21
160:21 182:20,23
196:11
wound 20:19

write 53:17,18 54:1
95:13 151:23
writes 123:18 135:1
136:7,20 146:6
158:20 162:1
writing 124:2
140:18,19
written 11:17 41:21
44:15,19,23 80:19
81:20 84:8,16
114:4 115:7
124:15 149:3
170:16 207:18
208:7
wrong 43:3 82:13
93:17,22 110:8,19
111:18 112:3,6
113:4,9,15 114:15
129:18,19 138:11
145:15 171:10
174:22 183:3
wrote 11:12 12:2,3
63:8 71:10 73:18
80:15,19 82:6
84:19,21 89:3
90:2 94:12 102:3
114:15 123:23
124:1 130:10
131:7 137:7
138:21 151:20
163:6 200:5

### X

X 3:1
X-ray 38:18

### Y

Yankauer 52:21
yeah 26:19 28:6
32:14 33:7 36:21
46:22 47:14 49:9
49:17 50:5,10,16
55:2,3 57:6 62:6
62:14 67:21 68:5
81:11 82:1 83:1
84:6 87:22 88:6

93:20 96:7 100:3
103:17 120:1
140:7 143:10
150:5 159:12
162:13 165:4,7
169:23 179:10
180:18 184:5
186:19 191:4
195:22 203:13
208:1
year 168:11
years 18:8,11 24:18
24:19 186:16
yesterday 191:24
younger 91:8

### Z

zero 181:14,18
zeros 168:21 181:5
181:21

### 0

07 179:3

### 1

1 3:16 6:8,21
116:10 138:9
210:8
1st 148:8 149:1,2
183:22 184:16
185:13,19
1-day 113:3
10 104:12,17,20
10th 106:8
10-minute 152:19
100 3:17
11 56:4 106:19
108:21 185:6
11th 109:20 123:16
1100 1:17
112 60:18
120 1:17 2:8
121 61:10 62:5
126 58:4,5
13 7:6,19 18:8,11
199:1

14 58:13 59:2
106:21 107:17
16 109:7
16-cv-06109 1:5
17 86:1 200:2
18 123:21 207:6
18th 124:6,14
18-year 170:22
183 3:18
19 13:2 90:5
190 3:18

### 2

2 3:16 55:8,12
108:11 164:14
185:18 193:4
2nd 59:2 149:2,3
157:1 191:19
192:20 193:7
2's 108:8
20 92:15 95:5 96:1
123:13 125:18
126:1 149:18,24
150:14 152:2,7
153:24 159:3,10
159:14 161:23
164:13 185:7
20th 123:23
2000 18:9
2011 24:21
2012 18:10 55:19
55:23 57:8 60:23
61:16 168:10
2013 14:16,17 15:7
16:18 18:11 25:1
31:12 55:19,23
56:5,21 57:9,12
57:21 58:13 59:12
59:24 71:15 74:22
83:4,18,18 84:10
84:10 86:4,21
87:12,16,19 92:4
92:5,12,12,15,22
92:23 95:5,8,9
96:1 101:7,7
102:16 103:6



104:13,20 105:22
105:24 106:2,8,10
106:21 107:13
108:21 119:18
123:21 125:18
148:8 149:2 157:1
163:15 164:10
168:18 170:10
183:22 185:6,7,11
185:19 191:1,19
193:24 199:1
**2014** 13:16,22 14:1
41:1,3 87:16
106:1
**2018** 1:18 210:7,19
211:9
**209** 210:8
**21** 57:9,12 148:14
148:18,19,21,22
**22** 126:3,4
**22nd** 57:8 123:7
125:5
**2200** 2:8
**23** 129:5 130:15
**23rd** 164:9
**24** 59:24 109:18
112:9 116:13
148:12,19 191:1,3
200:10,15
**25** 116:13
**26** 60:21 137:9
156:21,24
**27** 112:15 185:10
**27-week** 113:5
**28** 1:18 41:20 210:7
211:9
**28th** 56:21
**29** 163:12

———————————
**3**
———————————
**3** 3:17 85:8,9,11
109:17 110:17
112:10 126:2
179:3
**3rd** 107:13
**3:45** 184:13

**30** 102:16,21 103:6
168:18 170:10
179:15 187:19
192:15,19
**30-34** 172:6
**312.526.1631** 2:10
**312.583.9970** 2:4
**34** 164:6
**38** 168:14

———————————
**4**
———————————
**4** 3:17 13:5 57:20
100:8 101:6,6
102:11 109:15
137:10 148:7
156:20
**4:00** 200:3
**405** 2:3

———————————
**5**
———————————
**5** 3:18 183:16,19
187:3
**5/10/13** 104:8
106:14
**5/14/13** 106:14
**5:45** 184:13
**53** 2:3
**55** 3:16

———————————
**6**
———————————
**6** 3:10,16,18 190:12
190:13,16
**6-year** 112:24
113:1,17 117:8
**6/27** 186:14
**600** 185:22
**60604** 2:4
**60606** 2:9

———————————
**7**
———————————
**7** 59:12
**7/1/13** 184:13

———————————
**8**
———————————
**8** 61:16 193:23
**80** 37:13,22

**85** 3:17 37:13
**86** 13:10

———————————
**9**
———————————
**9** 109:19
**9th** 163:15
**9:30** 1:19
**90** 32:9



# EXHIBIT A16

Transcription of meeting with Maricel Marcial (M), Michael Kremer (K), Mary Johnson (MJ)

K How are you?

M I'm you know doing the best I can to keep up. Studying and shadowed a few times. So I'm still scheduled to shadow at Lutheran and Racine actually where I've been meeting Jeremy and I'm gonna be taking the C exam on Monday and also the in-training exam – that's December 14-16 right? Okay. Yeah but I'm continuing c work on it, work on studying it, keeping myself you know up to date and you know, resting getting some exercise,

K In August um there were some discussions we had where

M Yes

K Did you think about – the stress – that you were experiencing in the OR um so I'm what specifically are you doing to help you cope more c with stress coming back?

M I feel that keeping myself um just exercising, doing yoga, meditating, also reviewing the things I need to learn and to improve upon. I set up like I was following the guideline that you gave me and I've also kind of when I was shadowing people I would ask them things I wasn't sure about, writing them down, actually doing voice memos after my experience with them so I know that, okay I remember encountering this in clinicals. And um I know now how to approach it, and if I had questions again, I now have more opportunities to shadow, I'd bring that up. When I actually went to Racine, they are about to um actually they're using it now – there was a rep from um I forgot – Apollo machine? Cause they're using a different machine. So I got to sit in on that in-service when they're gonna use the same machine as we're using. So I took the rep's number so I could kind of have a one-to-one you know meeting with them or discussion of my questions about the machine. I mean they're certain things of course about the ventilator that it wasn't sure. So I want to discuss that with him, so when I come back to shadow, Jeremy was gonna spend some time with me to work on that to be more familiarized with the settings and their uses.

K For the Apollo?

M The Apollo is what we have here, right?

K We train on the Apollo

M Right

K And you've had difficulty programming the ventilator when you worked with Amy

M With Amy. I think it's more when I realized what I did, I knew that okay, I understood why and I think, like I said, I was just, I felt my level of functioning was affected by the stress that I was going through. But I understood what I did, and how I should correct it. And uh, aside from that, I've talked to um the educational center at Lutheran and they're gonna have me use the intubating mannequin for infants and adults in their facility. I can even take it hope to practice on just so I can get my skills up to speed.

K So I was summoned to a meeting with Dr Halsted

M Yes

K On November 8

M um hum

K um any special reason you thought it necessary to go to Dr Halsted

M I just felt like I needed an ally and I've talked to you know some of my classmates and they said that she has this open-door policy with students, and I felt that I need to you know tell her about my situation cause I just honestly, I know that you said you gave me your word that you will support me, but when we had that meeting with Ray, it just kinda opened my eyes that you know, I don't know w if I will be supported. Especially that he just, basically predicted that I'm just gonna fail when I come back. So I was gonna be set up to fail and I felt like I don't know if I'll have the support to really succeed in this try this second try that I'm coming back. And so I really just wanted to have a consistent advocate for myself knowing that I am giving this you know the best effort that I could. But I wanna know that somebody will be there for me to oversee you know whatever challenges or like you said, there was a unanimous skepticism about my return and I don't' know how you have, how else I could be equipped to face that aside from making my own preparations. I want to know that somebody will be supportive of me, that I'm making the best effort that I can and unfortunately if there is bias or prejudgment before I come back, then it just is more insurmountable than I've imagined. And so

K I don't know if you understand or if you've looked at an organizational chart, the doctor Halsted is not administratively over the college of nursing. She's over academic services at the university. She's a faculty in the nursing college. Um you told Dr Halsted that there were 4 or 5 people who provided unsatisfactory feedback for your clinical performance. And that Dr Wiley had always been supportive of you and had not provided a guidance for suggestions for improvement.

M I didn't tell her that Dr Wiley had not provided any guidance. The way I told her or how I presented it to her is that I do have 5 negative evals, but out of the 20 21 evals I have, the rest are positive. So 5 out of the 20 are negative, but the rest are positive. I didn't mention anything about Dr Wiley not being supportive of me.

K That isn't what I said.

M Okay, I'm sorry.

K You worked with Judy on 2 different occasions

M Yes

K Both times in endo, both times she expressed concerns about your clinical performance. There were 6 people who expressed concerns about your clinical performance, in addition to the evaluations there um is an email communication from Alida Hooker that expressed concern that you need constant supervision and direction when you worked with her. There was communication from Dr Pryzgodzka indicating concern that you went into a room that you got involved in a case that you subsequently told me that you had no choice but to follow the orders of the attending anesthesiologist. So I wish there

was a way you know, if you send me an email of Oct 25th saying 'thank you for your concern' and then shortly after that, you go to see Dr Halstead and you told her that you're not being treated fairly. And with all the time that we have spent addressing your formative evaluations and concerns that have been raised about your performance, counseling you about alternatives that are available to you, you really believe as you sit here that the reason that you uh took the step of withdrawing non-passing. Why would have even agreed to take this step of withdrawing non-passing if you believe that was the result of um differential treatment on the part of multiple different faculty members?

M Why did I agree to take the withdraw non-passing? Well, I didn't know that was an option then, when Dr Johnson brought it up, that was the grade that I needed dot get and because I had asked for a leave of absence, I didn't realize that was part of it. And you had, you and Dr Johnson did say that it would reverse later on when I come back. And so I accepted it with the thought that when I come back and successfully complete, you know, the trimester, that it would be reversed to, that she said that it would not affect my GPA.

K It would not affect your GPA, but you received a letter from the progressions committee, which Dr Wiley chaired on August 29th which said um, you'd be coming back on probation and referred to in the student handbook that if you had taken the time to handbook of policy it indicates that if you get a second failing grade you'll be dismissed from the university.

M um humm

K and apparently you choose not to believe me or others who have spoken to you and said we would like you to be able to be successful that you you choose not to accept the counsel from people who vehemently feel for many years that you chance of being successful are slim at best and apparently and help me understand this – you would rather risk another failing grade in clinical and be dismissed from the university, rather than transfer to another program.

M When we met in the beginning before we saw Ray, you had mentioned the steeps that if I could come back, you know, the first negative eval would be a verbal warning, the second would be a written warning, the third would be a determination to to um progress me to or sort of bridge me to a different program which is the clinical nurse leadership. SO that's what I understood that I still would have a chance to come back, perform, and that if it didn't work out that you would help me segued into a different program. That's how I remembered it. And so when we met with Ray, it kind of became a little bit confusing to me that the opportunity is right now or never. So it kind of changed that if I didn't shift now, then my chances of shifting later on would not be looked at favorably. Because I have s second failing grade. So my thoughts were why don't I give it a chance. At least I know that I told myself that I gave it a go and not just gave up right there an then. And then I have that option anyway later on to be able to shift to a different program from what you had explained to me.

K That's something less than clear, and I apologize for any lack of clarity on my part, but its, if you well Mary's gonna join us when she gets up from a meeting. Um, I guess at some point during the spring term it might be feasible for you to. Okay, there's Mary.
[undecipherable]
We're talking about Maricel's conversation with Dr Halstead.

MJ Mmm (emphatically)

K about um the consequences of um continuing to pursue anesthesia with you know the knowledge that another failing grade would result in dismissal from the university since she'd be coming back on probation. She seemed to have a different understanding from our last conversation about what her options were. Um when she was here last, and conversations prior to that we talked about other options that we and um, then on October 24th last time you were here I talked to you. Ray and I talked with you and then I talked with you again afterward or subsequent to that that you went to see Dr Halstead with your concern that you weren't being treated fairly in the program. Umm, so what we were talking about right as you were coming in Mary was other options as far as where we sit today, Uh it seems clear to me that Maricel's options would be to either seek transfer to another program, or take the chance of returning and um to clinical residency in spring and risk uh failing. Uh Maricel seemed to think and correct me if I'm wrong that she could resume clinical residency and if that wasn't going well that you could then perhaps withdraw and transfer to a different program.

M That was my understanding. That you said that if I continue to have negative evals then we can talk about switching to a different program. From conversations that we had before we met with Ray. So that's why in my head switching right there and then didn't seem to make sense if I hadn't given it a try yet to see if I'm gonna succeed first. And when we met before, you said that pulling out early to I guess reset myself would probably be you know a positive thing to help me be centered when I get back so I could reverse the withdraw non pass the grade that I was given then. And you said that some nursing students had been successful in pulling back for a little bit and then coming back a little more refreshed, a different perspective and you've seen more of them succeed by doing that. So that was my hope that to taking the leave of absence, reviewing studying and putting myself fin order so when I come back I do have that capacity to overcome clinicals so that was the promise that you know I took with me for the full leave of absence even though I only wanted a couple of weeks or one month to reset myself. You said that because um I don't' know if it's the timing

MJ right

M that I have to take the whole trimester off

MJ right, right right. Um, you know that sometimes you know it depends. Sometimes students are successful, sometimes they are not depending on kind of the origins of the issue. So there's no guarantee

M of course

MJ so there's you know, the options um some ways trying to guess I mean on the one hand, um you're confident that you can be successful, and I know situation where students are very confident that they're not, um, Dr Kremer's right in that if there's another um probationary event which would be WF or failure, then you do run the risk of dismissal. Um you know, so that's that is the possibility but you know, there's no guarantee

M sure, of course of course

MJ I mean if you, there is a cutoff if you find you're not doing well and you withdraw before the midterm whenever that is,

K cause I'm still thinking – I'm not even sure where that is

MJ Yeah, I'm not either. I'm not even sure what week that is that a withdraw is W not a WF. Even if you're failing so let's say so if it's before the midterm

M um hmm

MJ There's no obligation on our part to say WF or WP. It just goes down as a W on your transcript. Um so maybe that gives you you know your 15 week term, 15 weeks so. It's in the registrar's office. At what point, I should know, I just don't.

M Yeah

MJ But it's about midterm, midway um and um. And then you know that would surely be more desirable than waiting longer and getting a WF. But hopefully you'd get feedback along the way. You know how it felt to you. You know, it's easy to sit here today and say "I'm fine, I'll be able to think and do whatever I was able to do". And you may get into it and say 'gee I wasn't able to come back' or wasn't you know it's not looking, I think. I think you would know that fairly soon to residency. So you're kind of, so you're not you know one to one any more, you're sort of thrown in so to speak.

M Sure

K Maricel seems pretty adamant that she will not be treated fairly and that is part of her concern going forward and why she feels Dr Halstead would be her ally in ensuring that she is treated fairly. Do I have that correct?

M I think that from a recent meeting that we had with Ray where right off the bat he said I was delusional

K Um excuse me, um, that was not the way that meeting unfolded. That statement was made, it wasn't right off the bat. He subsequently apologized for making that statement.

M Well, he apologized for making me cry but I don't –

K He apologized for making that statement. He had a daughter who failed out of a physical therapy program the week before she was due to graduate. He really feels strongly about all our students and especially somebody who's in jeopardy as the rest of us, we really want to do the right thing for our students and give them the best possible advice based on available um data that we have. Um if you continue to believe that that you will not be treated uh fairly and um even going back to August when you had the day with Amy where you had difficulty programming he ventilator, and you made this statement "Amy, please don't tell Mike about this"

M I told her not about situation but just coming to her with you know the stress that I was going through – not exactly with what happened. I admit that that happened and I didn't tell her "don't tell him about my screw-ups" I told her "Please don't tell him that you know the stress that I'm experiencing" So

M How is that--

MJ Can I interject a second because I think I can appreciate your concern that you would be treated unfairly, but I want to point out that the other is also true, that you're not going to be given special treatment and that--

M of course, I understand that

MJ and so the the I expect as well as Dr Kremer as you know everybody expects that you will be the expectations are you will be the same as any other student

M Of course

MJ and it could feel unfair at the time, but we are committed to making every effort

M um hmm

MJ to giving you a fair  shot. In residency though, there is an expectation of you performing at a certain level, so we will expect that

M of course

MJ at that level

M but the other thing to that Ray had brought up and you had brought up is that supposedly when Ray mentioned that he was meeting with Dr Kremer and me, a CRNA mentioned well "She's not coming back is she?" . And then they expressed their skepticism of me coming back, I just felt like that was one of the things that adds to the unfairness where there's already bias to me coming back whereas.

MJ What would you like us to do or what would you like Dr Kremer to do?

M I was just hoping there would be oversight so that if there is bias with how I am being evaluated that I could rely on

MJ well how do you know there is going to be bias? So if you're not performing up to par, how do you know that that's not because you're not performing up to par?

M well I don't understand that

MJ well how will you be able to tell if there's bias? What will be an indicator?

M I think that's something we can discuss and I can't really say until I'm in that situation whether I feel bias that

MJ Well my experience is that students who are not successful often feel they're being treated unfairly, and um what happens is that students who are weaker students who have had difficulty will be watched more closely because we want you to be safe. I mean this is pretty dangerous business.

M Of course

MJ and so um and student perceive that as being treated unfairly and yet on our part we're trying to make sure things are safe, so it goes both ways. So if you go into it with an expectation that you'll be treated unfairly, I think you'll be looking for evidence of that.

M Well, I guess from the experience that I had where Jill and Eva they would say that "okay I didn't tell them the right dosage for something" but she didn't really ask me that particular medication and then certain things that I did, which I don't remember doing like giving fentanyl when she was the one who gave it to the patient, and had me write it. So there are just those certain things where somethings were fabricated that I didn't feel was existent then.

K What would be their motivation for fabricating evaluations?

M I don't know, but I know that it happened to another one of my classmates too

K that

M she showed me

K Its

M It didn't happen to me, but somehow it was put into my evaluation

K Okay, that's hearsay. As we were saying before Dr Johnson arrived 6 different people during the summer term expressed serious concern about your performance. Jill Wimberly, Eva Fisher, Alida Hooker, Judy Wiley, Renee Prydgodzka. So these are a cross section of faculty members in the anesthesia program. You seem to be fixated on the idea that you have these whatever it was 5 or 6 unsatisfactory evaluations and others that were satisfactory. And you mentioned to Dr Halstead that you had satisfactory evaluations from the anesthesiologists. You were assigned one to one with CRNAs. They were spending the bulk of the time with you. Um the grade calculation that Judy and I discussed with you for residency which was pass fail is one that very heavily weights any unsatisfactory in areas like patient safety as well as the other categories on the evaluation tool. And so to go back to what Mary was saying a minute ago, you would be coming back into the clinical area having been away for um several months and you would be assigned and evaluated like any beginning student beginning residency and so you'd be working with all the different CRNA faculty and when it comes to the issue of uh perceptions of bias, or somehow selectively um looking at evaluation feedback and saying, well, this isn't accurate because they're biased or because they're fabricating. Uh, I think it would be challenging at best to try to um develop any kind of improvement plan going forward, if you're not willing to accept feedback from credentialed faculty.

M I am willing to accept if they were accurate. It's just those two--

K Excuse me—

M Evaluations is--

MJ Well who is to decide?

M Okay, I guess if there is no witness to decide had happened .

K You had multiple unsatisfactory evaluations, not just form Eva and um Jill. Judy expressed concerns on two different evaluations when she worked with you on rapid sequence induction where she had to repeatedly tell you not to ventilate the patient. Patient could aspirate

MJ Mmm [emphatically]

K We reviewed that in class, we reviewed that in simulation lab. Were you ever go into the operating room so, this is serious stuff we're talking about. And, I think Mary and I have discussed this, but um since I was asked to meet with Dr Halstead about concerns that you raised her suggestions to uh address those. We have to get this on the document. The concerns for you returning are to generate a learning contract which I've done. And um, that we would need to meet weekly

M Um humm

K To review your clinical progress. There's the learning contract.

[1-2 minutes pause, presumably to review the contract]

M Basically it's the same expectations as for you know, asked to adhere to the evaluations that we are given. SO of course I agree with this. I've also been thinking about it, of course, and I'm not sure what's gonna be in the contract but I figured this is pretty much what was on the eval, so I was hoping in some ways to that I could add something where we have this expectation of me, so I was hoping as my advisor and somebody would support me have the expectation that I need to succeed through the program, and so um just basically knowing and trusting that there is oversight with making sure the evaluations are fair and non-biased and um that if there were deficiencies that I would be directed to the way I could improve upon them and be able to progress accordingly in my training. So that's I think there's a couple of things I might want to add to the contract that you have these expectations of me and I in good faith would trust that you would support me to and be on my side reasonably um would you know planning my return so that I could you know successfully complete the training. So that's all I ask too.

MJ Um humm.

K How would one guarantee--

MJ Yeah, that's hard to guarantee. I think that I was gonna say I think that the um meeting weekly is a good idea for both cases. I think that um the again you know, bias is in the eyes of the

M Sure

MJ There's always perception and perception is very hard to figure out to verify. In fact, this person is biased or not. But I think meeting weekly and discussing your progress of how you're doing and if there are issues bringing in the clinical faculty member and sort of nipping some of it in the bud. Um, you know I think that the I think the only real way to ensure you know, not being biased and given a fair shake is to right of the bat showing that you are clinically competent.

M of course

MJ and I think that the, I think people will give you that fair shake, I mean I don't think anybody is out to flunk you out or anything like that. So I really think the onus is on you in terms of your performance and I think if people see that you're taking this seriously, you've used the time, you're able to perform competent competently, then you know, people will be treating you with you know, as they would any other student. And so, um, I would say that um that there uh you know faculty don't have a desire to sort of flunk you o'ıt or anything like that. They have concerns, and I think that's rightly so, they are concerned about safety. But only you can show that those concerns are unwarranted.

M That's my goal is just to be able to competently perform and basically meet the expectations they have of me and hopefully ][???] if I could. And like I said my main thing is that uh that I do feel that sense that I am supported that if I need that guidance or direction that if deficiency is noted that I will be put on notice and given the right um advice as to how I can approach it and make it right. And like you said, a fair shake.

MJ Yeah, I think meeting weekly is a very supportive offer. But I think if people wanted you to sink or swim, they would have, Dr Kremer would just say "okay you're on your own there". But the offer to meet weekly, um is you know, aside from keeping on top of potential issues, but I think it's also --

M I do appreciate that

MJ It's a support for you. Um, you know I also think um to not the OR you know my background is not OR and it's not anesthesia, but having spent a little time just wandering around and hearing about it form students, it's it's you know, it's a tough environment to work in. It's not for the tender at heart, and so um I think that's not gonna change. And I think it's rough on anybody. Frankly I'm not sure I would have the you know, the ability to you know, weather this. And this is here as well as on the outside world and wherever you go. So it's a tough world where there are high expectations and it's life and death

M Sure

MJ So I think your skin has to be a little bit thick too

M Yeah

K knowing this is a tough environment. You can, you know, it's commendable that you sought out ways to deal with stress, but it doesn't go away when you're in the OR for days of indeterminate length, cases that change and high acuity patients, and uh, you have to be able to respond to questions and justify your actions. Um so you've had discussions about that before, freezing up and not answering isn't an option – well it's an option but it'll just result in more low evaluations forwards because if you can't demonstrate to people that you are cogently processing information around you and that you know your drugs and fluid calculations, and airway equipment. Um they'll rapidly lose confidence.

M Um humm

K So that's going back to a conversation last month and beginning the conversation today, uh, what Dr Johnson was just saying , it's really hard and it only gets harder as one goes along, and you just have to

be prepared for that. And so um some of stress-reduction kinds of things we've talked about, I'm not sure how it would carry out. Stress is in the OR and uh it's something to think about.

MJ I think you'll know - it's a big unknown – I think you'll know that pretty quickly. Um, but yeah, I think that as Dr Kremer said, we expect that students who graduate will be able to walk into this really highly stressed. It's not for everybody. SO you know, I think, you know it sounds like the learning contract that's good, I think that the opportunity to meet weekly is something that you can take advantage of in terms of you know, if there are things that you are unclear about. That's quite a bit, that's an offer of time and support. You know, it's an opportunity if something is going on to remediate it at the moment it's happening. Or not quite the moment, but shortly afterwards. Um, I guess I feel pretty confident that that is probably the best you know, the best we can offer in terms of assuring that you'll be treated fairly. Um, anything else, I think would be, that you would be treated differently and that you wouldn't be given the same, um there wouldn't' be the same expectations as there would be for everybody else. So we have to maintain the same expectations.

M I know there's standards to be met

MJ Right

M and I'm not trying to you know, go below that, or find a way to ease out of it. It's I know that it stands the same and I've actually been given a rare favor of being able to move back and recalibrate myself and using that time wisely by studying and seeking experience that would help me be at least up to date and be in the environment for the period of time that I've been away, so that when I've come back it won't be like a whole culture shock. So, yeah, I've I definitely believe that standards should be upheld and that's what I'm working on doing, to just continue to make my efforts of quality level and be able to meet the expectations that are given to me.

MJ So really that's the policy. SO how does that sound?

M You know, you mentioned before, let's say, like you said if things – I just wanted to clarify that if things were not as expected and there is that, there is a period of time where I can make the decision to switch to a different program, or is that not a different option any more when I decide to come back.

MJ You know I think that, I don't want to speak for uh Dr Hixx who is running the program. But um I mean so there's an opportunity to um, there's a period of time in the beginning where if you decide to, "gee I really miscalculated" cause you never know. Just as faculty don't know and you don't know until you get into it how things are going to pan out. There's a period of time where you can withdraw from clinical without a penalty in the sense that there's just a W and it doesn't go on another ?. And then it would be a matter of talking to Dr Hixx about what it would take to transfer. I think that you could, if you really wanted to know what the options were, you could set up an appointment with him and talk about, would he accept you into the program. That's for clinical nurse leader right?

K The one masters option that we have besides the graduate entry masters, the other advanced practice tracks have all transitioned to DNP, so that would be involve fresh application.

MJ But the clinical nurse leader, I mean certainly the bulk of your courses, although there's some, there's some of their courses that they have. But you certainly could find out more about that that

might be useful to um, call him and make an appointment with him and talk to him just so you know what that entails and what the options would be.

M Um, so at this point

MJ Where do you work – do you work now?

M Lutheran General Hospital

MJ In the ICU?

M Yes

MJ And that's gone well?

M Yes. I've put hours there, and at the same time I go to Racine for shadowing CRNA but I've also shadowed anesthesiologists at Lutheran. So I've been invited to, if ever I need to continue shadowing, that I continue with Dr Odemo {??] And he allows me to do everything. Run the case, and he's – he does the documentation, though which. So with him, and the CRNA at Racine I am also open to shadowing like whenever my uh CRNA was there that I know.

K How many times did you shadow since August.

M So 3 at Lutheran and then with Jeremy about 5. And then we have till the end of the year, I am still good, but actually until June next year because they were just basing it on the papers that I sent them. One of them will expire in June which is the ?? for TB testing, so as long as that's all up to date, then I can continue to go there to shadow.

MJ That was good that you were able to do that.

M Yeah they,

MJ Did you find that that was useful in terms of your learning, that

M Yes, cause the cases have been interesting. There's even one OB case which – I haven't been to OB here, so there was a lot of things that I learned through that. And my friend, who is the CRNA there also spends time to go over theories like on our downtime we'd go over equipment and he would ask me questions and you know, just kind of direct me to subjects that I can focus on that would be very practical to a case by case basis. That's like sort of the bread and butter with anesthesia cases.

K How have you approached the outline that I gave you

M SO I've been sort of pairing it with Valerie (?) and Prodigy. With Prodigy there's a weekly recommendation of what subjects I should be doing for board review. SO I would take the quiz, and I've also taken the simulation exams. And also a little bit of the board exam simulation. So I would check off what system was in that Prodigy that I covered, and then the outline that you gave me to make sure that I cover the things that I need to cover. Plus with Valerie too, I carried it around with me on a thumb drive so that when I have down time at work, I can just plug it in the computer and pull out some review

questions there and the materials, and then off and on refer to the textbook of things were unclear, I need more information about.

MJ Um humm

K Please help me understand here as far as I've never had to do a learning contract. My impression was that was something that was generated by um faculty so when Maricel was talking about adding language to the contract um is that something that can include hers?

MJ You know I think that there um you know, any contract is a mutual agreement. I mean I think that um you could add this in writing that's an expectation um. Knowing that its um you know it's a very hard to you know measure thing

M Sure

MJ and I think part of um part of the discussion is you know, realizing that the support that you're being given is, weekly meetings with Dr Kremer and you know, to talk about how things are going. So that's a two way in terms of how are things going from your perspective, how are things going from the faculty perspective. So I mean I think certainly you could write that in as you sign.

K I would have to review any language before I'd be willing to sign.

MJ Oh, absolutely.

M I've thought about it, and I've written something out, and if that's agreeable with you, we could just tag it to that contract. I have a copy here, and I'm not expecting a whole lot. But I wrote this promise that I would be treated fairly ??? ?? with my experience.

[pause]

MJ Um, The one thing I would maybe add is, um you know, yes, 'this is a learning environment and we want you to learn. It's also a residency where we expect that there's a certain degree of independence then when people are in clinical. So there is, when you say that they'll be, you'll be given guidance in ways that I might rectify and improve on those areas, that is true, but there could potentially be a point at which there are so many.. let's say you are not successful, let's say the difficulties you had in the past are repeated, that the guidance won't go on forever and ever.

M I understand

MJ So that would be my kind of my issue with the middle part would be that. It sort of gives an open ended, that you'll be given unlimited opportunities to rectify and improve upon those areas which are not accurate.

M Sure, okay.

MJ I'm not sure how you would word that.

K And as far as that final sentence goes: "I expect that those assigned to evaluate me will do so without bias and that there will be oversight to ensure that this is the case" How would you suggest that this is operationalized.

M I think that when we meet just having you know, um that conversation of, I don't know how that they would go by, but if I felt that before things that I've not said were evaluated meant that, that I felt were added to that then, it's just something that needs to be looked into I think.

MJ You know one of my big concerns is that how will you know that there is bias? And so on the one hand, and so I guess it is it really comes down to a legal [thing?] really because you know, we know, we tried the best we can in all our agreements to treat every student fairly. I know there are students who think they are being treated unfairly, um, but but often - sometimes their behavior means being treated differently because they need more oversight. Or they don't want to be quizzed like every other student. And so, the concern my concern about putting something like this in writing is that it it's really hard you know not sure how you know that there's bias. You know if you're not successful, does that automatically mean that there was bias.

M That's why I think that like you said, the weekly meetings will be –

MJ I think the weekly meetings will be important. I think it just comes down to a leap of faith. If you really don't think you're going to be given a fair shake, then you should <u>probably think about an alternative</u>. Otherwise, there's just – it's just too difficult to figure out if you're being treated in biased – if you're obviously if somebody's out and out rude to you, that would be against all of our codes of conduct regardless of who the student is and who the faculty members are. People need to treat you with respect, they need to treat you – obviously not being rude and inconsiderate of you and all the things that would go against our values here at Rush.

M I think that is

MJ Yeah, that doesn't need to be in writing.

M OK

MJ That's part of our medical center values. Part of who we are, it's the college of nursing. So I don't see that as having as needing to be written. So if you were treated rudely, if you disrespectfully in some you know way, um, then that certainly would be something I would expect you to bring to Dr Kremer. My experience is that students feel their biased as they're being quizzed or watched over carefully. You know that's gonna happen. You know because we don't want you harming somebody.

M Of course

MJ And so and that's gonna happen in the beginning until you prove yourself.

M Um humm

MJ That you are in fact doing well. And it sounds like you've taken a lot of steps, and but there's no guarantee either. You know because of you know, you're not in that high stakes situation. You may be

fine and then people can be "oh, okay" and they can back up. But I think my guess is that people will be watching you pretty closely which may make you feel like you're being treated unfairly.

M I understand that< I expect that there would be close watching me, like you said. Just the behavior of professional behavior, being able to... if we have a rationale for certain things and not being treated rudely, especially in front of other teams, is one of the expectations I have--

MJ And we would expect that of any faculty member with any student. So in that sense, to not expect either positive or negative that you would be treated any differently, I think is um, a realistic expectation on your part and um you know part of Dr Kremer's job is to ensure that the students be treated fairly in general. And so um if there are any situations that seem really egregious, that would go. The weekly meetings would be the opportunity to talk about that. But I think there's a, Dr Kremer has given you the assurance that you'll be treated fairly. It becomes.. there's a leap of faith. There's no written anything that

K I think there's kind of the gulf between how fairness is being perceived.

MJ Yeah, and that you know, I think that that often is the case. And so... So it's really in your, the ball's' in your court, I think. Um

M So, like you said, there's whatever I wanted to add as far as my expectations, that's something like. Is there anything of that the things I mentioned I thought of that we can add to the contract so we have an—

MJ You know, I think if there's something concrete and measurable that we would like ,we can consider that. This is very vague.

M Um hmm

MJ And so I think it would not be to anybody's best interests to write. What we have here is much more behavioral kinds of things

M Um humm

K Just from talking to others, it's not my impression that learning contracts are typically negotiable. Learning contracts are developed when performance deficiencies have been identified and conditions for um remedy remedying those deficiencies are imposed. Or maybe I'm saying something...

M I'm definitely agreeing with everything here. These are things that have been expected of us from the start of clinical I imagine. Even before residency.

MJ You know, I think that part of the contract is a two way thing where the agreement is that if you – if you're doing this, you're not going to be treated unfairly. That goes without saying. It's implicit in this. That if you do these things you won't be treated unfairly. There's nobody that has any axe to grind. There are concerns about your behavior and concerns about your ability, but if you do these things, you will be treated fairly. Does that make sense?

M Yeah it does

MJ It really is in your, it falls back in your court to be able to you know show that you have what it takes to be successful in this.

M Um humm. Coming back, I will be expected to perform at the level of my training before I left? Pretty much in

MJ  Beginning residency

M Okay. Yeah, I just wanted to clear that. I'm not trying to sort of downgrade my abilities or the things that I've put out, but I am still a student, and I as best as I can to not have any errors or perform or have deficiencies, some things will arise where I need guidance with learning things. And so I just wanted to clear that, to make sure that when I come back I would be expected to know you know, at the level that my classmates are in, um.

K Your classmates, the people you started with are already at a different point. And they're training, they're doing specialty rotations. They have been in clinical since May. You have not.

M Yes, I understand that, that's why I wanted to.

MJ So it's really back in, you know as if May is starting all over again. Which gives you, I mean an opportunity to you know, make up that time so to speak. On the other hand, residency is different than your clinical rotation where you're given a lot more one on one guidance.

K And actually that's normally how it works. The first few months they're one on one with the CRNA.

MJ Their residency?

K And they have to demonstrate their ability to work with, without continuous supervision before they're put into specialty residencies, specialty locations.

MJ So you're a student, but you're not a beginning student.

M Umm, so I'll sign this and, so this term would be then another 15 months when I start in January, I would be another 15 months of that training which is from January to March.

K What we talked about is that your graduation would be December of 14 to ??

M Um humm. Okay because I was thinking of until March of 2015 if I were to make up 15 months starting in January.

MJ Is a residency 15 months or 12 months?

K In the master's curriculum 15 months and so, she completed 3.

M So then it still stands, hopefully that 2014 would be where I complete.

K Plus you get 20 vacation days. But her work for cause I know I found it in notes from previous meetings, I think I need a clarification about back in August, was the progressions decision, it doesn't negate her work from summer does it?

MJ Well yeah, because it was a WI.

K So There's the thing--

MJ So it's basically starting over.

K So then that would push, um graduation back to the end of spring of 15.

MJ I mean I think that's to your best interest in the sense of starting off from the beginning. If you had been successful in the summer, we wouldn't be sitting here. So...

M So it would be

[inaudible exchange]

MJ Okay

M Is this my copy?

MJ You should probably make a copy. Once you sign, I'll make a copy.

M Okay.

[ pause about 1 minute]

M So like you said, the fairness its inherent in that contract. Basically you know my expectations here would be met by—

MJ I think so. I mean I truly I really um no one has an axe to grind, but there is an expectation that you'll be successful.

M And that's understandable. It's just the impression that I got at the last meeting when Ray said that you'll just come back and fail and I told you so" didn't seem very supportive of all the efforts that I've been you know, working on this time. With the hopes of what ?? had mentioned before I took the leave of absence would hopefully rejuvenate me and—

MJ Well I do think there are um different ways of approaching it and one way of approaching could be "okay I'll show you I can do it".

M Of course.

MJ [to someone else] How long are you around? {reply}...

MJ So I would take that stance of you know,

M That's what I've been fighting all this time for this and just really , you know, making the most of the time that's given to me, and I'm hoping that when I come back I'm able to put out those efforts for the preparations that I've made these past few months. It is challenging to, even with shadowing, being able to transmit that when I'm actually in the situation.

MJ Yea, yeah

M So I can only hope for the best.

MJ Um humm. Yeah, that's all anybody can do.

M And the main thing is that I do get that consistent support.

MJ I would not focus as much on  that

M Sure

MJ The main thing is that you perform.

M Perform

MJ And then you are getting that support in meeting with Dr Kremer and you'll find that the doubters will be fine.

M Um humm

MJ If there are doubters

M I find there is a lot of really supportive staff. The CRNAs I've been assigned to have been mostly supportive. I'm not saying it is going to change. I have faith with the decency and the professionalism that the staff has. Yeah, I'm pretty optimistic of the return...

MJ Alright...  alright. Sounds good...

M Thank you for coming to

MJ Sure, sure. See you later.

[pause]

M [some talk, but very quiet/distant]  .. coming in for simlab I signed up for two other Mondays to meet with you – is that okay? Or do you want me to just...

K Inaudible

M Can we meet prior to my start in January. And you said 2 days in the Sim Lab, 2 Mondays in the Sim Lab would be enough. And uh, I think I gave the 2nd and the 30th and also the um 24th maybe? [inaudible].

K Let's just concentrate on days [inaudible]

M So Monday, uh you said Mondays would be ideal, right?

K Any day can work but tell me when you're available.

M I'm available after the 18th onwards.

K Of December?

M Um humm, does that work for you?

K Sure

M So it's you and Keith who can go through the Sim Lab with me?

[END]

# EXHIBIT A17

Page 212

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MARICEL MARCIAL,                    )
                                    )
          Plaintiff,                )
                                    )
     vs.                            )     No. 16-cv-06109
                                    )
RUSH UNIVERSITY MEDICAL CENTER;     )
DR. MICHAEL KREMER, in his          )
individual capacity; RAY NARBONE,   )
in his individual capacity; and     )
JILL WIMBERLY, in her individual    )
capacity,                           )
                                    )
          Defendants.               )

          The continued deposition of

MARICEL MARCIAL, called by the Defendants for

examination, pursuant to notice and pursuant to the

Rules of Civil Procedure for the United States

District Courts pertaining to the taking of

depositions, taken before Erin McLaughlin, CSR, at

120 S. Riverside Plaza, Suite 1100,, Chicago,

Illinois, on Tuesday, March 6, 2018, commencing

at the hour of 9:30 o'clock a.m.

Reported for
MAGNA LEGAL SERVICES, by
Erin McLaughlin, CSR

Page 213

```
1   APPEARANCES:
2
3       ELAINE K.B. SIEGEL & ASSOCIATES, P.C.
        53 W. Jackson Blvd, Suite 405
4       Chicago, Illinois 60604
        siegeledlaw@aol.com, 312.583.9970, by:
5       MS. ELAINE K.B. SIEGEL,
6           appeared on behalf of the Plaintiff;
7
8       HUSCH BLACKWELL
        120 S. Riverside Plaza, Suite 2200
9       Chicago, Illinois 60606
        peter.land@huschblackwell.com
10      karen.courtheoux@huschblackwell.com,
        312.526.1631, by:
11      MR. PETER G. LAND and MS. KAREN L. COURTHEOUX,
12          appeared on behalf of the Defendant;
13
14  ALSO PRESENT:
15      MR. JOSEPH MENDELSOHN.
16
17
18
19          * * * * *
20
21
22
23
24
```

Page 214

```
1           I N D E X
2
3
4   THE WITNESS: MARICEL MARCIAL
5                   PAGE
6
7
8   EXAMINATION BY:
9
10      MR. LAND              215
11
12
13
14
15
16  EXHIBITS MARKED:
17
18      No. 7          215
        No. 8          248
19      No. 9          272
        No. 10         275
20      No. 11         277
        No. 12         279
21
22
23
24
```

Page 215

```
1               (Witness sworn.)
2           MR. LAND:  Good afternoon, Maricel.  Back for
3   the second session of your deposition.  You are still
4   under oath.  The same basic ideas of how to conduct
5   the deposition will apply as before.
6           I just have to ask you one question.
7   Are you on any medication today that would impair your
8   ability to remember or to testify?
9           THE WITNESS:  I am not.
10          MR. LAND:  Good.
11
12
13              MARICEL MARCIAL,
14  Called on behalf of the Defendants, having been first
15  duly sworn, was examined and testified further as
16  follows:
17
18              DIRECT EXAMINATION
19              BY MR. LAND:
20
21      Q   First I want to marked an exhibit, number
22  seven?
23              (Marcial Deposition Exhibit No. 7
24               was marked for identification.)
```

Page 216

```
1           I don't want to spend a lot of time on
2   this Exhibit 7.  Exhibit 7 is a copy of the documents,
3   and it's about 175 pages that we received last night.
4   I just have a few questions to you to help orient me
5   or to orient us as to what these are.
6           So the first page it looks like is a
7   document that runs for three or four pages.  What is
8   this?
9       A   So this is our care plan for anesthesia,
10  for the anesthesia that we're going to provide that
11  SRNAs are advised to prepare for their cases, their
12  individual cases, particularly those that are more
13  complicated.
14      Q   So this is something you prepared in
15  advance of a case you were going to be working on?
16      A   Yes, the night before.
17      Q   And you called it your care plan?
18      A   Yes.
19      Q   How do you know which case this care plan
20  related to?
21      A   How do you know what case I'm going to
22  have and which one to prepare for?
23      Q   Yeah.
24      A   So we look up our cases the night before
```

2  (Pages 213 to 216)

Page 217

1  and our case assignments and then basically find out
2  the history on the patient, what type of procedure
3  they're getting or they're having done; and then we
4  have several book references that we type up, some
5  information that will guide us the next day when we
6  provide for anesthesia.
7       Q    I meant something else.  I meant if you
8  look at this particular care plan that starts here, do
9  you have a way of matching up a care plan with an
10  evaluation or a CRNA who provided that
11  evaluation?
12       A    Usually with the data that we have here
13  and also sometimes we include the date.
14       Q    That's what I was wondering.  I didn't see
15  a date anywhere on here.
16       A    I think more on my laptop there would be a
17  time log as to when I made this particular care plan.
18  That's how I know which date I did it and when I
19  performed the procedure.
20       Q    I noticed a couple of times in here there
21  are some care plans where it looked like there was a
22  CRNA listed at the top and often there is not.
23       A    Yes.
24       Q    Is there any reason for why there is

Page 218

1  sometimes and there isn't other times?
2       A    Not really.  It's just really a rough
3  guide for us.  Occasionally they would ask to see it,
4  but it's not necessarily required to write their names
5  there or even to write our names sometimes.  It's just
6  to have handy for our own reference.
7       Q    Did you look through these before they
8  were produced by your lawyer to us?
9       A    Yeah.  I actually looked them up.
10       Q    Do you know if in this group there is a
11  care plan from the day you worked with Jill Wimberly
12  on June 20, 2013?
13       A    I could not find that particular one.
14  I have switched to two other laptops before this.  So
15  it might have been in one of those which I'm not sure
16  where that laptop is anymore.
17       Q    Okay.  So do you know what dates any of
18  these care plans are for or what years?
19       A    I think this one -- I'd have to correlate
20  them with another laptop of mine to see if that's
21  where I got it because when I submitted this to
22  Elaine, this was already in hard copy.  I didn't
23  retrieve this from the laptop is what I'm saying.
24       Q    But you're sure that the laptop does not

Page 219

1  contain the care plan from June 20, 2013 when you
2  worked with Jill Wimberly?
3       A    Can you ask that again?
4       Q    I thought you said you looked and you
5  don't have the care plan from June 20, 2013.
6       A    Yes.  The current laptop I have right now
7  I couldn't find the care plan that I did from
8  June 20th, so I'd have to figure out which laptop I
9  had then that might still have it.
10       Q    So you might still have it.  You are not
11  sure?
12       A    I'm not sure, yeah.  First of all I'd have
13  to look if we still have that laptop or if that's one
14  of the ones that we gave away.
15       Q    Okay.  So you had these in hard copy
16  somewhere?
17       A    Yes.
18       Q    How did you end up with them in hard copy?
19       A    Well, I produced a copy to bring with me
20  to the case; so some of them I was able to keep.  Some
21  of them I guess I stored somewhere or had scattered
22  because I didn't really think of like keeping all of
23  my care plans through the years.  I had almost two
24  years of clinicals; and almost every case -- not every

Page 220

1  case, but towards the later time, I would do a care
2  plan every day that I am in clinicals.
3       Q    So you had a dispute I thought when you
4  communicated with Jill Wimberly about whether you had
5  a care plan for that day on June 20, 2013; right?
6       A    Yes.
7       Q    Did you make an effort to keep that care
8  plan?
9       A    I did; and for some reason, I was only
10  able to retrieve like part of it.  I'm not sure if
11  some of the papers got taken away with the patient
12  records.  So the only thing that I remember that I was
13  able to retain and had laid on the top of our work
14  desk during our case is the pediatric anesthesia
15  worksheet which is similar to that; but, like I said,
16  on that particular day.  I don't know where that
17  record is.
18       Q    I guess what I'm getting is I believe you
19  said that you had a ten- or eleven-page care plan for
20  June 20, 2013; right?
21       A    Yes.
22       Q    And that you tried to show it to Jill
23  Wimberly but she wouldn't look at it?
24       A    Yes.

3  (Pages 217 to 220)

Page 221

```
 1      Q   And you later offered to show it to Mike
 2  Kremer; right?
 3      A   Correct.
 4      Q   But you don't have that anymore?
 5      A   Not that I recall.
 6      Q   And you didn't make an effort to keep
 7  that?  That's what I'm wondering, what I'm trying to
 8  understand.
 9      A   Like I said, when I left the case, I think
10  I only had maybe two pages, three pages because
11  originally, like I mentioned before, at the start of
12  the case it got mixed in with the patient records
13  which the OR nurse brought to their work bench.
14          So when I went to look for it, I think
15  the only thing I was able to retrieve was the
16  pediatric anesthesia worksheet; and actually part of
17  that ten-page prep is the procedures for caudal
18  anesthesia which I actually have in my iPhone.  But it
19  doesn't -- It's just basically a screen capture of
20  that caudal anesthesia from a book which I then
21  emailed to myself and then printed.
22      Q   Here is what I'm trying understand.
23      A   Sure.
24      Q   Didn't you offer to Mike Kremer after
```

Page 222

```
 1  June 20, 2013, didn't you offer to him that you could
 2  show him your care plan from that day?
 3      A   Then, right then.
 4      Q   Yeah.
 5          And you didn't do that.  Did you ever
 6  share that with him?
 7      A   I shared with him the pediatric anesthesia
 8  worksheet and then a couple of pages for which he
 9  commented, It seems like you highlighted some of the
10  drugs here but you didn't highlight this one.  So we
11  were going through a couple of those pages with him.
12  But the rest of it, like I said, it wasn't the
13  complete ten page that I was able to show to him.
14      Q   So you lost a portion of the paper copy in
15  the OR or in the case that day?
16      A   Yes.
17      Q   But you had the electronic version
18  somewhere; right?
19      A   I believe so.  That's what we have been
20  trying to locate.
21      Q   At the time in 2013 did you have the
22  electronic copy of it?
23      A   Yes.
24      Q   So what happened to it?
```

Page 223

```
 1      A   It's in that laptop like I said; and,
 2  like, we have changed two laptops later on, and I
 3  can't find that exact care plan now.  It don't know if
 4  we failed to transfer it to my newer laptop, so I just
 5  can't find it anymore.
 6      Q   Did you ever submit that care plan in any
 7  of your appeals that you filed with Rush?
 8      A   No.
 9      Q   Why not?
10      A   I can't find it.
11      Q   So you couldn't find it back then either?
12      A   No.  I couldn't find it.  It wasn't
13  something that I was asked to produce.
14      Q   But did you look for it back then?
15      A   I think I tried look for it, and I'm not
16  sure at what point now that I've changed or where to
17  look for it; but I just couldn't find it.
18      Q   I just want you to turn -- Some of them
19  don't have numbers; or if they do, I can't read them.
20  Can you turn in your exhibit to -- I don't care which
21  page -- the notes that look like this?
22      A   Yeah.
23      Q   There, any one of those.  I just want to
24  know what are those notes?
```

Page 224

```
 1      A   So when we do in-hospital assessments of
 2  patients, if a patient is inpatient, then we put like
 3  the basic information on them.
 4          I also write like little notes after a
 5  particular case, like this is what I did, this is what
 6  I learned from that case, you know, particulars about
 7  the patient's planned surgery, if there was anything
 8  significant that happened during the case that I
 9  could, you know, study later, yeah, just tips for me
10  to review later of things that I've learned from the
11  cases.
12      Q   So there are notes that you made after a
13  case about the case?
14      A   Yes.
15      Q   That was your practice to do?
16      A   Usually.
17      Q   In the notes that you have in here, do you
18  have notes from June 20, 2013?  Do you know?
19      A   No.  I don't think I had notes from that
20  day because it's not dated; and that was a very short
21  run.  Like I was only, you know, kind of actively
22  involved maybe for half an hour, and then she
23  dismissed me.
24          Yeah.  It's not dated, like some of
```

4 (Pages 221 to 224)

Page 225

1  this.
2      MR. LAND: Elaine, the only other thing I would
3  note, if you look at these, many of these pages are
4  very hard to read from the copying. I don't know if
5  you have original copies of these that you can make
6  copies of.
7      MS. SIEGEL: I can try to get copies.
8      MR. LAND: Some of these are completely
9  illegible, like this page.
10     MS. SIEGEL: I don't have the -- If what you're
11 asking me is do I have the originals, the answer is
12 no. Can I make get better copies, I believe I can.
13     MR. LAND: Okay.
14     MS. SIEGEL: Or I can certainly try.
15     MR. LAND: Q Maricel, do you know if you
16 have --
17     A  I think are those are the Post It notes
18 that I have the original for.
19     Q  You do have the original?
20     A  Yeah.
21     Q  What about the notes?
22     A  I do.
23     Q  You have those too?
24     A  Yes. I have the notes.

Page 226

1      MR. LAND: So I'd just like to get copies of
2  these that we can read.
3      MS. SIEGEL: Okay, sure.
4      MR. LAND: Q Then later on there is some forms
5  that look like they're not filled out.
6      A  So sometimes --
7      Q  Do you see what I'm looking at?
8      A  Yes.
9      Q  Marcial 1243, is this like a draft or
10 something?
11     A  Yeah. It's just a template because
12 sometimes a patient gets added on; and basically if a
13 patient doesn't have a prior history and all I can
14 gather is the type of surgery this person's having,
15 then I fill up the rest on the day of or before in the
16 preoperative area.
17     Q  One last question I have of you just about
18 this stack of documents, any of the care plans that
19 are in there, are they for days where you got
20 unsatisfactory ratings?
21     A  I don't know how many are here.
22     Q  I don't need you to look through them all,
23 but do you know? Like did you try to get copies of
24 your care plans for days where you had unsatisfactory

Page 227

1  ratings?
2      A  It's possible it's here, like the ones
3  that I got unsatisfactories.
4      Q  But you don't know?
5      A  No. I'm not for sure.
6          (Whereupon a brief recess was had,
7          after which the deposition of
8          Ms. Marcial continued as
9          follows:)
10     MR. LAND: Back on the record.
11     Q  Maricel, if you could look at what's
12 marked as Exhibit Number 6 to your deposition,
13 Page 18, you may recall we had looked at this. There
14 is series of pages here of your typed notes; right?
15     A  Yes.
16     Q  In the third paragraph on this page, near
17 the end of it there is a reference to Mike Kremer
18 saying that Ray wanted to meet you and Mike in his
19 office?
20     A  In Narbone's office. This is after my
21 meeting with Mike. You are looking at this?
22     Q  That's where I'm looking, yeah.
23         So there is a sentence that says:
24 Afterwards he said it would be better if we met with

Page 228

1  Ray today to discuss the plans for my return; right?
2      A  Yes.
3      Q  And you got off the phone; and per their
4  conversation, Ray wanted to meet us at his office?
5      A  Ray's office, yes.
6      Q  So you went to Ray's office with Mike?
7      MS. SIEGEL: Where are we?
8      THE WITNESS: 18.
9      MR. LAND: Q So there is some bolded language
10 there and below that it returns to describing what
11 happened; right?
12     A  Yes.
13     Q  And I believe the paragraph that starts we
14 arrived at Ray's office and then the paragraph after
15 that and the one after that, they all describe your
16 conversation with Ray and Mike in Ray's office; right?
17     A  Yes.
18     Q  And on the next page, all of that page,
19 the non-bolded words describe your notes about what
20 was said during that meeting with Ray and Mike as
21 well; right?
22     A  Yes.
23     Q  And the bolded notes are your commentary
24 maybe about what happened in that meeting?

5 (Pages 225 to 228)

Page 229

1      A   Yes.
2      Q   And the following page -- so we're now at
3  Page 20 -- it also continues.  This whole page I think
4  is more of your notes in the same format about the
5  conversation with Mike and Ray; right?
6      A   Yes.
7      Q   And the last page, Page 21 is also a
8  continuation of notes from that meeting; right?
9      A   Yes.  Well, this part we had left the
10 office already; and I think I mentioned here MK
11 reassures me that in fact he too really is on my side.
12 It's my commentary.  This was in the hallway.  He
13 pulled me aside.
14     Q   So in the middle of Page 18 through the
15 bottom of Page 20, all of that are notes about your
16 conversations with Ray and Mike in Ray's office;
17 right?
18     A   Yes, up to the paragraph before this last
19 one. At this part we had already left the office, the
20 last paragraph.
21     Q   The last paragraph on page --
22     A   Page 20.
23     Q   And this all took place on October 24,
24 2013; is that right?

Page 230

1      A   I guess that's what I wrote there.
2      Q   That's what it says there on Page 17?
3      A   Yes.
4      Q   Okay.  Would you agree with me that in
5  your notes about what Ray said to you that there are
6  many references to clinical issues in your clinical
7  performance?
8      A   Some references.  Others are his opinion.
9      Q   And he was telling you, paraphrasing he
10 was telling you that he didn't think that you were a
11 good fit for the program and that coming back would be
12 something you'd be unsuccessful at; right?
13     A   Yes.
14     Q   That was his opinion?
15     A   Yes.
16     Q   And you had him saying things like, I
17 don't think you are a fit at all for the program?
18     A   Yes.
19     Q   He said those words to you?
20     A   Yes.
21     Q   He said, You are really pushing the
22 envelope?
23     A   Yes.
24     Q   He said that?

Page 231

1      A   Yes.
2      Q   He said, It's like you're a square peg in
3  a round hole?  Did he say that?
4      A   Yes.
5      Q   It just does not work.  You can't force
6  it?
7      A   Yes.
8      Q   Okay.  And you have those words in quotes
9  here on Page 18.  Are those like verbatim quotes?
10     A   From what I remember him saying right
11 afterwards.  I tried to recall as much as I can that
12 came from him.
13     Q   When did you write these notes?
14     A   Like that same day.  I'm not sure if I
15 started calling my husband on the phone about that
16 meeting; and then when I got home, we started
17 rehashing like the conversations that went on at that
18 meeting.
19     Q   The order of how you indicate what was
20 said in that meeting in your notes, is that the order
21 in which these comments were made during the meeting?
22     A   Pretty much like just recalling because it
23 was one thing after the other, so I just tried to
24 recall as many as I can from that conversation; but I

Page 232

1  can't really say that that's the exact order.  It
2  might have the overlapped.
3      Q   Is this your sense of how his comments fit
4  together, your sense of how that fit together?
5      A   Well, that's what I heard and what
6  Dr. Kremer had also witnessed.  He was there this
7  whole time.
8      Q   Yeah.  I say this because these are your
9  notes.  This is your written record of your memory of
10 what was said at that meeting; right?
11     A   Yes.
12     Q   I'm wondering if you organized it in ways
13 that related to how you heard what he said?
14     A   Yes.
15     Q   So after he said those things I was
16 talking to you about, pushing the envelope, square peg
17 in a round hole, doesn't work, you can't force it, I
18 think you indicate that he said, I thought that when
19 you left you would be coming back in a few weeks
20 telling us that you were going to drop out of the
21 program, so I'm surprised to hear that you're still
22 around; right?
23     A   Yes.
24     Q   After that he told you, I don't think this

6  (Pages 229 to 232)

Page 233

1   plan of yours to be shadowing an anesthesiologists and
2   CRNAs outside of Rush is going to work because the
3   critical decision is theirs, not yours, so it won't
4   help you, and I don't know whose idea this was because
5   it isn't going to help you. Plus, the acuity of cases
6   and standards in those hospitals is not the same as
7   the standards here at Rush.
8           Is that what he told you?
9       A   Yes.
10      Q   And he said that after he was explaining
11  the square peg in the round hole and you can't force
12  it comments; is that right?
13      A   From what I recall.
14      Q   Okay. Now, on the next page, the next
15  thing you write that he said is you need to open your
16  eyes and realize this is not a fit for you. Even if
17  you try to apply in other places for nurse anesthesia,
18  it would be difficult or even impossible because they
19  would have to talk to us, and we would have to tell
20  them about your poor performance.
21          So he talked about that?
22      A   Yes.
23      Q   Referring to your prior poor performance;
24  right?

Page 234

1       A   Yes.
2       Q   And it's not enough that you wish this,
3   think. Don't let your mind, your heart, or your
4   emotions make this decision because you are just not a
5   fit for this program. There are people who are not
6   meant to do this, so don't force the issue. As an
7   example, there was a child in the OR who was scheduled
8   for an --
9           I don't know what that word is.
10      A   Myringotomy.
11      Q   -- myringotomy?
12      A   Which is an ear -- tympanic membrane hole
13  for pressure relief.
14      Q   And ended up having an arrest. Can you
15  imagine taking care of that or being in that
16  situation? And you write, I replied, It certainly
17  sounds overwhelming. Then you say he cuts me off and
18  says, You can't be overwhelmed. You need to be able
19  to act promptly during these stressful situations.
20  Now can you imagine being in charge of this child's
21  life?
22          Right?
23      A   Yes.
24      Q   So he was explaining those circumstances

Page 235

1   and those ideas to you in that order?
2           MS. SIEGEL: I'm going to object. It calls for
3   speculation.
4           MR. LAND: What's the speculation? These are
5   her notes.
6           MS. SIEGEL: You're asking her what his motive
7   was.
8           MR. LAND: I asked if he explained these ideas
9   to you.
10      A   He related --
11          MS. SIEGEL: I'm sorry. Let's get the
12  question.
13      A   He made the statements. Like he cited an
14  event.
15          MR. LAND: Q And other things in that
16  paragraph; right?
17      A   Yes.
18      Q   Like your prior performance and
19  performance issues you had exhibited before; right?
20      A   Yes.
21      Q   And part of this was him explaining his
22  comments about a square peg in a round hole and it
23  doesn't work and you can't force it?
24      A   I don't know if he's seen my evaluations

Page 236

1   to make those descriptions. I think a lot of his
2   statements are from opinions by his CRNAs. He's never
3   told me that he's looked at my evaluations to make
4   that determination that I wasn't fit because before I
5   left I had far more positive evaluations than
6   negatives, and the negatives I've disputed with
7   Dr. Kremer.
8       Q   I'm talking about what he said to you and
9   what he was referencing, and he was referencing your
10  evaluations; right?
11      A   He didn't say that he referenced it. He's
12  just making an opinion of me.
13      Q   He was making reference to your
14  evaluations, wasn't he?
15      A   Possibly.
16      Q   The next paragraph says: You just don't
17  have the emotional readiness to deal with this kind of
18  thing. You have the smarts, but you don't have the
19  emotional capability for this kind of profession.
20  Your evaluations have been reflective of this.
21          These are your notes talking about what
22  he said. He said those things to you; right?
23      A   Yes.
24      Q   And you note here that you argued you had

7  (Pages 233 to 236)

Page 237

1    other evaluations from CRNAs and attendings that gave
2    you positive evaluations more than the negative ones
3    even; right?
4        A.   Yes.  At that time he was just barraging
5    me with all of these insults.  I could only say like
6    one sentence before he cut me off again.
7        Q.   I guess my question is those two
8    paragraphs we just read are referring to clinical
9    assessment meant issues, right, and evaluations and
10   explaining why he thought you were a square peg in a
11   round hole; is that right?
12       A.   Yes.
13       Q.   Then the next two paragraphs you reference
14   I think Mike and Ray talking about the idea of you
15   moving on to a different program?
16       A.   Yes.
17       Q.   The bottom paragraph on this page says:
18   When you come back, the CRNAs -- You say that Ray said
19   this to you.  When you come back, the CRNAs are going
20   to look at you differently; and it's human nature, so
21   I don't have control of how they're going to behave
22   towards you.  As a matter of fact, before this
23   meeting, I told one CRNA that I was about to meet with
24   MK and you, and she said, She is not coming back, is

Page 238

1    she?
2             And this comment about how CRNAs are
3    going to look at you differently followed the prior
4    discussion about your clinical performance, right?
5        A.   That and also being on leave of absence.
6        Q.   Where does it talk about you being on a
7    the leave of absence in these notes?
8        A.   Well, this is a check-in during my leave.
9        Q.   But I'm talking about what he said to you,
10   and I don't think in any of your notes about what he
11   said to you does he reference a leave of absence
12   right?  He says when you come back.
13       A.   Yes, from my leave.
14       Q.   It doesn't say from your leave; right?
15       A.   No, but that's the implication.  I was on
16   leave during this time, and this is one of the
17   check-ins I had.
18       Q.   On the next page -- We're at Page 20 now.
19   Are you on the same one with me?
20       A.   Yes.
21       Q.   You indicate that Mike -- These are your
22   comments sort of editorializing.  Mike stepped in
23   again to elaborate on this theme.  Do you see that?
24       A.   Yes.

Page 239

1        Q.   Then you indicate that Mike said, I
2    actually had a meeting with them this week and they
3    showed their scepticism regarding Maricel's return;
4    right?
5        A.   Yes.
6        Q.   And Ray said, See, realize what you're up
7    against.  It will be more than an uphill battle for
8    you; and if you made a mistake, it would be looked
9    into with more disdain than when you first committed
10   them.  Right?
11       A.   Yes.
12       Q.   So is that another example of Ray
13   referring to your prior performance?
14       A.   Yes.
15       Q.   And explaining why the CRNAs would look at
16   your current performance differently?
17       A.   I think it's that plus this cause of my
18   leave altogether, not just my performance.
19       Q.   Those comments talk about there will be
20   uphill battle if you made a mistake, comparing them to
21   when you first committed them; right?
22       A.   I guess that's his opinion.
23       Q.   And he was expressing his opinion to you;
24   right?

Page 240

1        A.   Yes.
2        Q.   His opinion about why the CRNAs would, why
3    it would be difficult for you to succeed in the
4    program; right?
5        A.   It appears that.
6        Q.   I'm sorry?
7        A.   It appears that that's what he's
8    indicating, that they would be more judgmental when I
9    come back.
10       Q.   And he's saying that they'll be more
11   judgmental because of your prior performance problems;
12   right?
13       A.   Not only because of that.  I think it's
14   also just this forced leave of absence I was put into.
15       Q.   Where does he say that in your notes about
16   what he said.
17       A.   Well, when he had run into one of the
18   CRNAs who said, Is she coming back, I hope not, so
19   like factoring in that I was put on leave, plus, you
20   know, referencing some negatives I had.
21       Q.   He talked a lot about your prior
22   performance, didn't he, and how it would create issues
23   for you?
24       A.   He mentions the negatives which like I

8  (Pages 237 to 240)

Page 241

1    said I disputed.
2        Q   And then in the next paragraph he's
3    talking about if you make mistakes it will be harder
4    for you to transition to other programs or if you fail
5    out, it will be harder for you.
6        A   Yes.
7        Q   Right?
8        A   Yes.
9        Q   So at this point he was trying to talk to
10   you about the decision about when to transfer or when
11   to make that decision?
12       A   Yes.
13       Q   And then Mike in the next paragraph I
14   think your reference is, that he then asked Mike how
15   many people transfer from their initial program to
16   another program, and Mike indicated that that happens
17   a lot.
18           So again they're talking about
19   transferring; right?
20       A   Yes.
21       Q   And then you say Ray then refers to my
22   age; and you write here that he said, See, find out
23   where you can be truly successful and be happy there.
24   I don't suppose you are the youngest in the class, so

Page 242

1    why waste your time on something that will make you
2    miserable. Just try to be happy and find that place
3    where you can be a good fit. I'm sorry I've upset
4    you, but you need to hear the truth. The people that
5    are telling you this don't care about you because
6    they're not letting you see your shortcomings, but
7    they're not being honest to you.
8            So the first sentence there, the first
9    two sentences, he's talking about find a place where
10   you can be successful and referencing your age in
11   reference to when to decide to move?
12       A   Just saying that I'm -- The way, my
13   impression is he's indicating that I'm the oldest or
14   one of the oldest in my class, not when it's -- So
15   when it's a good time to move, that's not how I
16   interpreted that.
17       Q   Is it possible that's what he meant?
18       A   No.
19   MS. SIEGEL: Calls for speculation.
20   MR. LAND: Q  Why is that not possible?
21   MS. SIEGEL: Calls for speculation.
22       A   I don't know. The way he said it at that
23   time, he seemed very pointed at, you know, you are not
24   the youngest in your class; and it struck a nerve on

Page 243

1    me that you are basically, highlighting my age as a
2    disability for me to succeed in this program.
3        MR. LAND: Q  So you don't think it's possible
4    he was talking about when you should decide to
5    transfer?
6        A   No.
7        Q   Isn't that what he was talking about
8    leading up to making that comment?
9        A   No. That's not how I received it.
10       Q   That's not what I asked really. I asked
11   what he was talking about before he made that comment,
12   and the paragraphs just prior have him talking about
13   transitioning and when to do that; right?
14       A   No, because if you transition to a
15   different program like he mentions further down here,
16   you'd have to get their permission or the reference to
17   go to that program. So even if I've finish my
18   didactics, it's still up to them to make that
19   discretion of giving me a good reference to transition
20   to a different program.
21           So I recognize that what he's saying
22   here is really not the optimal timing of me to
23   transition to a different program but that, you know,
24   he just was indicating I'm not the youngest in my

Page 244

1    class. Age was a factor.
2        Q   I asked you about what he said. You
3    talked about didactics and other things which he
4    didn't talk about with you at all.
5            What I'm asking is hadn't he just
6    talked to you about transitioned timing and doing it
7    before you fail out? Isn't that what the notes show,
8    how it would be easier to do that instead of waiting
9    until you fail out later? Isn't what he's saying?
10       A   Yes.
11   MS. SIEGEL: I'm going to object. The witness
12   has indicated and you asked and the testimony has
13   established that these comments are not necessarily in
14   the order in which they are were delivered.
15   MR. LAND: What kind of objection are you
16   making now outside from coaching her about what to
17   say?
18   MS. SIEGEL: I'm not coaching her about
19   anything.
20   MR. LAND: I didn't hear any form of objection.
21   I heard you saying many words telling her what to say.
22   I would prefer that you not do that.
23   MS. SIEGEL: I did not do that, and she
24   answered the question while I was pointing out that

9  (Pages 241 to 244)

Page 245

1 one of the first questions that you asked -- and she
2 can step out of the room if you want me to make the
3 objection so she doesn't hear it. I'm not coaching
4 her. But what I'm saying -- Do you want me to do
5 that?
6 MR. LAND: No. I don't want you to do that.
7 I would like you to let me ask her questions.
8 MS. SIEGEL: I want my objection on the record.
9 First of all, you established that the comments --
10 MR. LAND: This is not an objection. This is
11 you testifying.
12 MS. SIEGEL: I'm not testifying, and like I'd
13 to make this objection.
14 And I would like you to go out of the
15 room so that I am not accused of coaching you because
16 I don't do that.
17 (Whereupon the witness exited the
18 room.)
19 One of the first things that you did
20 was that you established that this wasn't necessarily
21 in the order, this -- I'm point to the document --
22 that the comments were not necessarily in the order
23 that they were stated at the meeting but that she had
24 grouped them according to her understanding of the

Page 246

1 topics
2 MR. LAND: And how did that fit together which
3 is what she said in her mind.
4 MS. SIEGEL: Right. And now you're saying,
5 well, didn't he talk about this age discrimination
6 right after talking -- I'm sorry, the reference to the
7 age right after talking about the transfer into other
8 programs.
9 MR. LAND: Those are not mutually exclusive
10 things.
11 MS. SIEGEL: Sure they are.
12 MR. LAND: No. They're not. If two comments
13 happen to be next to each other, they might be
14 sequential.
15 MS. SIEGEL: Your question assumed that. You
16 didn't establish that. If you want to ask it
17 correctly, I don't have any objection to it.
18 MR. LAND: The objection you're raising is
19 what? Is it the form of the question that's wrong?
20 MS. SIEGEL: It assumes a fact not in evidence.
21 MR. LAND: Okay. Thank you.
22 MS. SIEGEL: You are welcome.
23 (Whereupon the witness entered the
24 room.)

Page 247

1 MR. LAND: Q Did Ray Narbone comment about you
2 not being the youngest person in your class follow
3 what he asked you about or talk to you about your
4 transition timing?
5 A To the best of my recollection, yes.
6 Q But you don't think that that was related
7 to the transition timing?
8 A No.
9 Q And you think that it's not possible that
10 that's what he meant?
11 A No.
12 Q Why not if they were next to each other in
13 the way that he communicated to you?
14 A I just feel that he wanted to point at
15 that age factor a lot and my success in the program
16 and that to soften the blow, transition to or offer
17 this consolation that I could be transitioned. That's
18 how I received it then.
19 Q Did Ray Narbone evaluate your performance
20 in the program?
21 A No.
22 Q This comment he made about I don't suppose
23 you're the youngest in your class, is that the only
24 comment he made about your age?

Page 248

1 A From the best of my recollection, yes.
2 Q What does that mean?
3 A Yes. That's all I can recall him
4 referring to my age.
5 Q Did Ray Narbone say anything about your
6 national origin or race during this meeting?
7 A No.
8 (Marcial Deposition Exhibit No. 8
9 was marked for identification.)
10 Q Do you recognize what's been marked as
11 Deposition exhibit Number 8, Maricel?
12 A Yes.
13 Q What is it?
14 A It's my student learning contract in
15 preparation for my return in the spring or in January.
16 Q Did you sign this document?
17 A Yes.
18 Q Does this document create an outline of
19 your expectations, your work, your learning objectives
20 when you return?
21 A Yes.
22 Q And was this a follow-up to the fact that
23 you had left the program when you were on probation?
24 A Yes.

10 (Pages 245 to 248)

Page 249

1  Q  So part of the reason to have this
2  learning contract with its expectations and objectives
3  for you was to make sure that Rush was following up on
4  those prior problems; is that right?
5  A  I think this is just a general expectation
6  of any SRNA because most of this was lifted from the
7  student, the SRNA handbook.
8  Q  You are saying that these don't contain
9  any different obligations for you than other SRNAs?
10  A  Except for the one-to-one CRNA, this is
11  pretty much the expectation for us in the residency.
12  It's the same as what would be expected of my
13  classmates except the one-to-one CRNA and this
14  clinical skills simulation.  So the action plan is
15  different, but the rest is pretty much the same
16  expectations as my classmates.
17  Q  So it starts by saying the identified
18  problem.  Do you see that at the top?
19  A  Yes.
20  Q  And it references faculty members'
21  expressions of concerns about your ability to provide
22  anesthesia care without constant CRNA supervision;
23  right?
24  A  Yes.

Page 250

1  Q  So that's different than most SRNAs;
2  right?
3  A  Yes.
4  Q  And then under the action plan it requires
5  you to execute this learning contract; right?
6  A  Yes.
7  Q  And that's different than most SRNAs;
8  right?
9  A  Well, there is a difference in this
10  portion.
11  Q  It also says you agree to weekly meetings
12  with a program director to review clinical progress.
13  Is that different?
14  A  Yes.  It's different.
15  Q  You said that the one-on-one CRNA
16  supervision in the OR on a general rotation until
17  further notice, you said that that was different?
18  A  Yes, because at that point I've already
19  had like three months I think of residency.  So coming
20  back on one to one again, it different from my
21  classmates at that point in training.  Like they're
22  not one to one anymore is what I meant.
23  Q  If you move on to criteria for
24  achievement, it lists:  Be prepared for assigned cases

Page 251

1  each day.  Do you see that?
2  A  Yes.
3  Q  And then after that it says failure to be
4  adequately prepared for each day will result in
5  dismissal from the clinical area for the day.  Do you
6  see that?
7  A  Yes.
8  Q  Is that different than other SRNAs?
9  A  No.
10  Q  That's the same?
11  A  Yes.  They're all expected to come in
12  prepared and ready to provide anesthesia.
13  Q  Under patient safety, it says:  The
14  student will consistently attain satisfactory scores
15  in this category of the formative evaluation.  Failure
16  to consistently obtain satisfactory scores and
17  criteria related to patient safety will result in a
18  grade of no pass for NRS 600 PA.  Was that the same as
19  other SRNAs?
20  A  This looks familiar in the sense of what
21  the student handbook tells us to read as part of our
22  residency or as part of our being in clinicals.  So
23  this was lifted from the student handbook.  So it's
24  expected from each SRNA.

Page 252

1  Q  So this sounds a little different than --
2  I don't see anywhere in this learning contract to any
3  reference to a verbal warning for one unsatisfactory
4  rating, a written warning for another, right, that you
5  had discussed previously with Mike Kremer?
6  A  Yes.  It doesn't seem to stipulate that.
7  Q  In the evaluation section at the end, it
8  indicates that you would need a minimum of 28
9  formative evaluations to be submitted for the academic
10  term; right?
11  A  Yes.
12  Q  And that you'd meet with a program
13  director weekly to review formative evaluations?
14  A  Yes.
15  Q  Then it goes on to indicate that you'd
16  need to have ratings in the areas of patient safety,
17  psychomotor skills, clinical judgment and
18  professionalism, most consistently be satisfactory for
19  the student to attain a passing grade in NRS 600 PA;
20  right?
21  A  Yes.
22  Q  So this was designed to set up the terms
23  for your return?
24  A  Yes.

11  (Pages 249 to 252)

Page 253

1    Q   Were you coming back at the beginning of
2  the residency?
3    A   I was told during our meeting -- When I
4  signed this contract, I was meeting with Dr. Johnson
5  and Dr. Kremer; and I had asked, Am I being given a
6  fresh start which is basically a do over from my
7  residency that started in like late May or June.  So
8  my understanding was it's a fresh start for my
9  residency.
10   Q   Meaning what?
11   A   That I'm not going to be treated as
12 expertly or the way -- I'm not going to be graded the
13 way my classmates who have not had any interruption in
14 their training, the same way.
15   Q   They said that to you?
16   A   I asked, Are you guaranteeing that I will
17 get a fresh start because, as you know, I have not
18 been exposed to any clinicals for about five months.
19 So if my grading system is gauged against us, another
20 student, one of my classmates who's never had any
21 interruption, then I don't think it would be fair to
22 expect of me their level of skill as opposed to mine
23 when I come back when I haven't been exposed for five
24 months.

Page 254

1    Q   When you say your classmates, do you mean
2  the members of your cohort who had started with you?
3    A   Yes.
4    Q   Who had started residency with you in the
5  spring of 2013?
6    A   Yes, because we had like -- Back then it
7  wasn't residency yet.  Residency started late May or
8  June.
9    Q   I don't think you are saying that they
10 said they would ignore that you had unsatisfactory
11 ratings before?
12   A   No.
13   Q   Is that right?
14   A   Yes.
15   Q   So the prior unsatisfactory ratings were
16 still relevant to evaluation of your work?
17   A   Yes.
18   Q   Did you complain about discrimination at
19 this meeting with, is it, Mary Johnson and Mike
20 Kremer?
21   A   Yes.
22   Q   You did?
23   A   Yes.
24   Q   Is that the meeting you recorded?

Page 255

1    A   Yes.
2    Q   Without telling them that you were doing
3  that?
4    A   Yes.
5    Q   What did you say about discrimination in
6  that meeting?
7    A   I mentioned that I'd like to revise this
8  contract to add that if there are any discriminatory
9  treatments towards me that there should be oversight
10 to recognize that or to correct that.
11   Q   They didn't agree to that?
12   A   Dr. Kremer said no; and then Dr. Johnson
13 said, How do you gauge that, that they are
14 discriminating?  And I said, Aren't you supposed to
15 set the standard also to be advocates of the students?
16 So I turned it to them to give me sort of like or to
17 have a sense of accountability for the faculty to be
18 fair to students in general.
19   Q   Did they agree that the faculty should be
20 fair?
21   A   Yes.
22   Q   Did you say bias to them or
23 discrimination?
24   A   I think I mentioned bias, the term bias;

Page 256

1  and I might have mentioned -- I might have said
2  discrimination, but that was my thought process then.
3    Q   Discrimination on the basis of what did
4  you say to them?
5    A   I didn't elaborate on it, but I just said
6  like I'd like to make sure that there is oversight if
7  I felt like I'm being discriminated or biased upon by
8  the faculty.
9    Q   So did you tell them that you thought you
10 had been discriminated against in the past at that
11 meeting?
12   A   No.  From my understanding Dr. Kremer was
13 aware, and he had been meeting with Dr. Johnson
14 routinely; so I had an understanding that she knew
15 what was going on.
16   Q   With respect to things you had said about
17 feeling that you had been discriminated against?
18   A   To Dr. Kremer, yes.
19   Q   When did you tell Dr. Kremer what you
20 thought you were discriminated against?
21   A   I think in some of our meetings leading up
22 to my leave of absence.  I'm not sure which -- I met
23 with him maybe four, five times then; so I mentioned
24 that to them, to him.

12  (Pages 253 to 256)

Page 257

1    Q   Discrimination on the basis of what did
2  you tell him you thought you were suffering?
3    A   I just said that I feel like I'm getting
4  discriminated upon, and I might have mentioned racial
5  to him.
6        But also I mentioned that the pattern
7  of treatment that I'm receiving is indicating that
8  compared to my white cohorts there is definitely a
9  disparity in our treatment. That's what I remember
10 mentioning to Dr. Kremer.
11   Q   In what way did you say there was
12 disparity in your treatment compared to white cohorts?
13   A   So I mentioned that certain times -- For
14 example, I had missed maybe a history or an item in
15 the preoperative sheet of a patient, and I would be
16 ranked non-satisfactory for that minor detail whereas
17 another white cohort of mine had missed two crucial
18 cardiovascular histories.
19       And I reported it to our CRNA then.
20 I believe it was Kathleen Uremovic, and she didn't
21 blink an eyelash. She didn't make anything out of it
22 as far as I know. She wasn't reprimanded for that
23 misstep.
24       And also, you know, missing an IV, I

Page 258

1  would get dinged for it whereas another student,
2  somebody else I would be paired with sometimes would
3  miss IVs and be witness but not be dinged for it or
4  they don't get unsatisfactory for that.
5        So some things are glossed over when
6  some of my classmates are getting evaluated as
7  compared to my shortcomings. It never escapes their
8  scrutiny.
9    Q   That's what you said to Mike in one of
10 those meetings leading up to your leave of absence,
11 that you thought you were discriminated against
12 because you got unsatisfactory ratings for things that
13 your white cohorts did but they didn't get the same
14 ratings?
15   A   Yes.
16   Q   Is there anything else you told them you
17 thought was discriminatory besides evaluations?
18   A   I told him that it seems like their
19 pattern of criticizing me or scrutinizing me is much
20 more harsh compared to my cohorts sometimes. I'm just
21 trying to recall.
22   Q   When you say you told them that their
23 pattern of criticism and scrutiny was harsh, more
24 harsh, you mean in the evaluations themselves?

Page 259

1    A   In the evaluations; and sometimes we don't
2  necessarily have to hand an evaluation to, you know to
3  every CRNA, but some of them actively get it and write
4  me up for some things which I've noticed that my other
5  classmates don't really sometimes experience that. So
6  I'm just trying to recall like the --
7    Q   I'm hearing you talk about evaluations.
8    A   Yes, evaluations.
9    Q   Written evaluations that you thought were
10 different for you than others?
11   A   Yes.
12   Q   Based on race?
13   A   Yes.
14   Q   Is there anything else you thought that
15 you told Mike that you thought was discriminatory in
16 the way you were treated besides written evaluations?
17   A   I don't recall like everything offhand,
18 but that's mostly what I told him.
19   Q   And you told us last time -- but I don't
20 remember -- you haven't seen very many other students'
21 written evaluations; right?
22   A   Some of them we have compared, yeah, but
23 not a whole lot.
24   Q   At the time you hadn't seen --

Page 260

1    A   Yes. At the time, yes.
2    Q   And you said that you might have mentioned
3  race as the basis for discrimination to Mike. Does
4  that mean you might have not?
5    A   I might have alluded to it. So I had like
6  several meetings with him and sometimes not in person
7  or in his office meetings. Sometimes like after a
8  class in the hallway, in between class breaks I've
9  talked to him. So in one of those conversations I
10 might have referred to it.
11   Q   And you might not have referred to race?
12   A   No. I'm sure I referred race to him.
13   Q   You but don't know what meeting it was?
14   A   No. I don't.
15   Q   Was it one meeting where you referred to
16 race you think?
17   A   It could have been, yeah, one meeting.
18   Q   You don't know?
19   A   No. I don't.
20   Q   So you don't know when it was and you
21 don't know if you said it more than once before your
22 leave of absence?
23   A   Yes, because of a lot of things -- We
24 talked about a lot of things, and so it's from what I

13  (Pages 257 to 260)

Page 261

1  remember.
2      Q   And before your leave of absence, did you
3  talk to anyone else at Rush and tell them you thought
4  you were being treated differently on the basis of
5  your race?
6      A   My classmates.
7      Q   Anyone who worked at Rush?
8      A   I think I might have mentioned -- I'm not
9  sure if I happened to mention it to Dr. Terrebessy.
10     Q   Your therapist?
11     A   Yes, the counselor, the school counselor.
12     Q   Anyone else at Rush who you think you
13 might have mentioned it to, race before your leave of
14 absence?
15     A   I'm not sure if we -- Well, I saw
16 Dr. Halsted after my leave.  So I think that's pretty
17 much from what I can remember.  That's it that I can
18 remember.
19     Q   Okay.  And after you went on leave, did
20 you tell anyone else at Rush that you thought that you
21 were subjected to race discrimination?
22     A   I think it was mostly Dr. Kremer and
23 Shannon Shumpert at HR when I returned from my leave.
24     Q   That was in the spring of 2014 that you

Page 262

1  complained to Shannon Shumpert?
2      A   Yes.
3      Q   Did you do that in writing?
4      A   In person, and I think we followed up by
5  email.
6      Q   Before you went on your leave of absence,
7  did you ask to be allowed to work at a different
8  neutral location instead of at Rush?
9      A   Yes.
10     Q   Do you know if students were allowed to do
11 that if they were not past the stage of one-on-one
12 CRNA supervision?
13     A   Yes.
14     Q   How do you know that?
15     A   Because I went to one of the Oak Park
16 orientations around June, and we were still one-on-one
17 then.  I had seen three of my classmates work there,
18 Michelle Becka, Ashley Essig, and Kelly Palmer.
19     Q   You said July 1st?
20     A   No, around June.
21     Q   June 1st.
22     A   I think it was a couple, the first couple
23 weeks of June.  It probably is in one of the emails
24 when I was sent there to have orientation.

Page 263

1      Q   Do you know if they had progressed further
2  in their residency in terms of independence than you
3  had?
4      A   No.
5      Q   So they might have?
6      A   Well, we have an Excel spread sheet of
7  where our rotation is supposed to be; and we all start
8  in general rotation in June.  That's the first
9  month --
10     Q   In May; right?
11     A   -- of our residency.  In June I think?
12     Q   Didn't Jill Wimberly evaluate you May 10
13 of 2013?
14     A   That was before residency.
15     Q   It was?
16     A   That was still part of our didactics.
17     Q   When did your residency start?
18     A   As far as I know, the last week of May or
19 the first week of June because we had a break from,
20 you know, finishing didactics.  Then we had a
21 three-week break, and then we start on to residency.
22     Q   You're saying that you believe that three
23 of your classmates were allowed to work without
24 one-on-one supervision in early June?

Page 264

1      A   Well, it was a neutral site.  I'm not sure
2  if they were still one-on-one supervision there.  It
3  was an off site.
4      Q   Do you know if there have been students
5  with multiple unsatisfactory ratings that are allowed
6  to work at a different location than Rush?
7      A   Well, there is a couple of places, MacNeal
8  and Cook County where I'm the only one who didn't go
9  there; but the rest of my classmates who in talking to
10 them later have also had unsatisfactories were sent to
11 MacNeal and Cook County, and those two hospitals are
12 required one-to-one supervision.
13     Q   How do you know that those two hospitals
14 required one-to-one supervision?
15     A   There was an email by Dr. Kremer to the
16 class saying -- Well, first it started off that it has
17 come to his attention that students are complaining
18 about the CRNAs they are being paired with; and then
19 he mentions later on that don't feel that this is a
20 regression of your skills, something to that effect or
21 that kind of theme.  Don't think this is a regression
22 to your skills, but when you go to MacNeal and Cook
23 County, you are going to be required to be overseen
24 one to one by the CRNAs there.

14  (Pages 261 to 264)

Page 265

1  Q   You said that there were people that you
2  knew who were assigned to MacNeal and Cook County who
3  had unsatisfactory ratings?
4  A   Uh-huh, yes.
5  Q   Who were those people?
6  A   I believe Ebele and Karen.  They had
7  mentioned they have had their own shares of
8  unsatisfactories, but we all at some point were
9  scheduled to rotate in those facilities.
10  Q   I understand.  I just want to understand
11  who you are saying you knew had unsatisfactory ratings
12  but were allowed to be assigned to MacNeal and Cook
13  County.  You said Ebele and Karen?
14  A   Ed Gradman (phonetic) had
15  unsatisfactories, but he had chosen to go to Cook
16  County.  So not all of us actually would choose to go
17  to Cook County.
18      So I'm talking in terms of MacNeal.
19  I think Karen and Ebele went there.  Ed, he chose to
20  go to Cook County; but he's had previous
21  unsatisfactories which what we have heard, yeah.
22  Q   How many unsatisfactory ratings did Ebele
23  have?
24  A   I don't know.

Page 266

1  Q   How many did Karen have?
2  A   She mentioned three, but she didn't say
3  all of it.
4  Q   How many did Ed have?
5  A   I think I know of two just overhearing one
6  of the CRNAs I think who graded him.  Yeah.  That's
7  all.  I'm not sure.
8  Q   Do you know if their unsatisfactory
9  ratings were for reasons that were as severe as what
10  people wrote down about what your unsatisfactory
11  ratings were for?
12  A   We didn't discuss in detail what they
13  were.
14  Q   So you don't know; right?
15  A   No.
16  Q   Was it explained to you why you wouldn't
17  be assigned to work at another location?
18  A   The only answer I was given was problem
19  students need to return to the main hospital.
20  Q   Do you know anyone who was put on an
21  academic improvement plan who was assigned to work at
22  another location?
23  A   Yes, from another cohort, Faith Bloomer
24  who was on probation twice, but she was allowed to

Page 267

1  have some of her clinicals off site.
2  Q   While she was on probation?
3  A   Yes.
4  Q   Did anyone tell you the reason you
5  wouldn't be assigned to another location was because
6  you needed to have one-on-one supervision in light of
7  your unsatisfactory ratings or performance?
8  A   No.  They just said in general that
9  problem students -- because I asked Dr. Wiley why
10  can't I be sent off-site, and her only response was
11  problem students have to come back to the university.
12  Q   Do you know if that's true?
13  A   No, because, like I said, I've seen three
14  of my classmates go there as beginners in an off-site
15  facility.
16  Q   Were they problems?
17  A   I have never talked to them about their
18  evals.
19  Q   Yeah.  That's what I'm asking you is.  Do
20  you know if it's true that students who are considered
21  problems, students who are considered to have
22  problematic clinical experiences are not allowed to be
23  sent away from Rush?
24  A   Like I had mentioned, Faith, she has had

Page 268

1  problematic histories, but she was allowed to go off
2  -site.
3  Q   Is there anyone else you know of who was
4  allowed to do that?
5  A   No, no. I'm not sure.
6  Q   Isn't there a sense of for patient safety
7  purposes it could make sense for an SRNA program to
8  want students who have had problems in clinicals to be
9  kept somewhere where people can evaluate them
10  carefully?
11  MS. SIEGEL:  Calls for speculation.
12  A   No.
13  MR. LAND: Q  No?
14  A   I don't think that that's the main thing
15  because -- Well, I guess from my observation when I'm
16  being paired with my other cohorts that I am surprised
17  that they are allowed to go off even though their
18  skills are not up to par from, you know, my
19  observations.  So I don't know.  I don't know what
20  their standards are or by what measure they gauge it.
21  Q   You thought there were other students that
22  you didn't think were very good who were allowed to go
23  somewhere else; is that what you just said?
24  A   Yes.

Lake Shore Reporting Service
A Magna Legal Services Company

Page 269

1  Q  From your own observation of evaluating
2  their work?
3  A  And like comments that CRNAs, we overhear.
4  Q  Did you think you were qualified to
5  evaluate how far along other SRNAs were in their
6  abilities?
7  A  No.
8  Q  When you were go going to return in 2014,
9  was it your understanding that you would need to get
10  evaluations from CRNAs for everything that you did?
11  A  It was suggested that I give daily
12  evaluations.
13  Q  Who suggested that?
14  A  Dr. Kremer.
15  Q  Was that requirement for you?
16  A  No.
17  Q  Explain to me how if the director of the
18  program makes a suggestion to you don't take that as a
19  requirement?
20  A  Because it's not in my learning contract
21  and it's not in the student policy. It says there
22  what's required of second-year residency students in
23  the student policy, that we just need to have 28
24  evaluations at the end of the quarter.

Page 270

1  Q  Did Mike Kremer follow up with you after
2  you started asking you to make sure that you turn in
3  evaluations?
4  A  On occasions.
5  Q  Did you avoid getting evaluations from
6  CRNAs in some cases when you first started?
7  A  Not initially.
8  Q  I don't understand. Does that mean that
9  you got evaluations from every CRNA when you started?
10  A  Yes. Some of them didn't return it; and
11  Dr. Kremer told me, Make sure you follow up with that
12  CRNA, and I did; and they still didn't return it. So
13  that's all we could do it is give it out.
14  Q  When you met with Dr. Kremer and Mary
15  Johnson, did you talk at all about who you would be
16  assigned to work with, CRNAs?
17  A  I think I had mentioned -- I'm trying to
18  recall if it's at that meeting. I think, you know, we
19  just mostly talked about the learning contract. I
20  don't recall that we talked about which CRNAs I'd like
21  to be assigned to.
22  Q  In your notes with your Counselor
23  Terrebessy that we went over in your first deposition,
24  there was reference to you telling her that the plan

Page 271

1  was that Mike told you he would seek to limit your
2  exposure to Jill Wimberly and Eva Fisher?
3  A  Yes.
4  Q  But not eliminate exposure to them; right?
5  A  Yes.
6  Q  So was it your understanding that it would
7  be fair for you to be assigned to Jill Wimberly or Eva
8  Fisher as a CRNA?
9  A  Was it my understanding that it would be
10  fair?
11  Q  Yeah.
12  A  No. I expected that I wouldn't be
13  assigned with them again because I had expressed my
14  concern of their biased evaluations of my work.
15  Q  But no one had promised that to you;
16  right?
17  A  No.
18  Q  Mike had said he would try to limit it as
19  much as he could; right?
20  A  He said, I will try not to pair you with
21  her. He didn't say limit. He just said, I will try
22  not to look at you.
23  Q  Should we look at the notes of what you
24  told your counselor, Terrebessy?

Page 272

1  A  Sure.
2  Q  Are you sure he didn't say he would limit
3  it?
4  A  He might have.
5  Q  Because that's what you testified to
6  before. That's why I'm asking you.
7  A  Sure. I guess, sure.
8  MS. SIEGEL: Why don't you pull it out so she
9  can see it.
10  MR. LAND: Q I'm just not sure that you know.
11  Do you know what he said to you about what was
12  expected when you came back on that issue?
13  A  From what I recall, he said, We will try
14  not to pair you with her.
15  Q  Which meant you could be paired with her?
16  A  I could be, but I know that other students
17  who have requested that of him were never paired again
18  to the CRNAs they complained about. So my expectation
19  was he was going to follow through with that same
20  promise to me.
21  (Marcial Deposition Exhibit No. 9
22  was marked for identification.)
23  Q  Exhibit 9, Maricel, is a series of emails
24  between you and Mike Kremer dated January 17 and 19;

16  (Pages 269 to 272)

Page 273

1  is that right?
2     A   Yes.
3     Q   2014?
4     A   Yes.
5     Q   And it's related to clinical evaluations:
6  Right? That's the subject line?
7     A   Yes.
8     Q   In the first email which is at the bottom
9  of the page, isn't he indicating he has not received
10  evaluations from you and some, in fact, they reported
11  that you have not given them evaluations to complete?
12     A   Yes.
13     Q   Was that true, that you hadn't given
14  evaluations to some faculty to complete?
15     A   I think there were a couple of faculty
16  that I didn't give it to.
17     Q   Why didn't you?
18     A   The first evaluation, what I recall was I
19  was assigned to Angela twice; and the first one was
20  just full of misrepresentations. So my sense was she
21  wasn't going to evaluate me fairly, and so I tried --
22  I decided for my own benefit and also to try to save
23  my skin basically is to get somebody who is more fair
24  and honest with their appraisal of me.

Page 274

1     Q   The next paragraph starts: Per my text
2  messages to you this week, you must distribute
3  evaluations to CRNAs you work with each day.
4        Had he sent you text messages saying
5  that?
6     A   I don't recall. I think the text messages
7  I have gotten from him were either like when we're
8  going to schedule a meeting at the end of the week.
9  I don't recall like the texts that he sent me.
10     Q   Then two sentences later it says: If you
11  do not submit formative evaluations, you will not be
12  assigned to cases in the OR since we need this
13  feedback to evaluate performance.
14        Is that a requirement?
15     A   I guess he's indicating that, but I still
16  got sent -- I still got assigned to the OR, so I don't
17  know if after that he started getting the evaluations
18  that I've handed to some of the CRNAs.
19     Q   So I asked if that's a requirement and,
20  I'm not sure you explained whether it is or it isn't.
21     A   I don't think so.
22     Q   The email he writes to you at the top of
23  this page --
24     A   Yes.

Page 275

1     Q   -- has a sentence that says, You must
2  distribute evaluations each day. I cannot keep you in
3  the clinical area without formative evaluation
4  feedback. Is that a requirement?
5     A   That's what he suggests to me, but I don't
6  find that as a requirement since it's not in my
7  learning contract and it's not in the student
8  handbook. So why am I going to have to a different
9  requirement compared to my cohorts.
10     Q   Maybe because you had a series of
11  unsatisfactory ratings and they were worried about
12  patient safety?
13     A   Just like my other classmates who have had
14  also negatives that held back.
15        MR. LAND: Let's mark another exhibit.
16        (Marcial Deposition Exhibit No. 10
17           was marked for identification.)
18     Q   Did you receive this email from
19  Mike Kremer dated January 20, 2014 about clinical
20  assignments?
21     A   Yes.
22     Q   In it he's indicating that he had never
23  told you that your clinical assignments would exclude
24  any members of the anesthesia department; right?

Page 276

1     A   Yes.
2     Q   Is that true?
3     A   When I met with him, I disputed that.
4  I told him, You said you weren't going to pair me with
5  her again; and he answered back, That was then. This
6  is now. You can't possibly avoid every single CRNA.
7  I said, I'm not trying to avoid every single one of
8  them. I'm asking one person, to one person not to be
9  assigned. So I disputed this in person with him in
10  one of our meetings.
11     Q   So I have to say I'm confused. You've
12  testified several times in different ways about what
13  Mike Kremer told you about whether you would assigned
14  to CRNAs including Jill Wimberly and Eva Fisher. What
15  did he actually tell you when you were talking about
16  coming back; do you know?
17     A   Well, like I said, when I had this meeting
18  with him and Dr. Johnson, we didn't discuss a specific
19  CRNA that I wasn't going to assigned to. I still had
20  the understanding that before my leave when he said we
21  will limit or try to avoid pairing you with Jill that
22  that promise was still effective when I came back from
23  my leave.
24     Q   The promise to try to avoid pairing you

Lake Shore Reporting Service
A Magna Legal Services Company

Page 277

1  with Jill?
2      A   Yes.
3          MS. SIEGEL:  It's a little after 3:00.  Why
4  don't we take a little time here.
5          MR. LAND:  Okay.
6              (Whereupon a brief recess was had,
7              after which the deposition of
8              Ms. Marcial continued as
9              follows:)
10             (Marcial Deposition Exhibit No. 11
11             was marked for identification.)
12         MR. LAND: Q  Do you recognize Exhibit
13  Number 11, Maricel?
14     A   Yes.
15     Q   Did you write this document?
16     A   I put it together.
17     Q   It's entitled Response of Maricel Marcial
18  to Evaluations between January and March, 2014; right?
19     A   Yes.
20     Q   You said you helped put it together?
21     A   Well, I didn't write it.  I just added.
22     Q   Who helped you?
23     A   My husband.
24     Q   If you could turn to Page 5 of this

Page 278

1  document, near the bottom there is a reference to Jill
2  Wimberly on January 20, 2014.  Do you see that?
3      A   Yes.
4      Q   And the third bullet under that evaluation
5  day, this document explains your response to various
6  evaluations of you during this time period, right,
7  January to March, 2014?
8      A   Yes.
9      Q   And it references this evaluation day with
10  Jill Wimberly of January 20, 2014; right?
11     A   Yes.
12     Q   The third bullet there says:  Evaluations
13  from that day were nearly exclusively ones with a
14  small number of twos.  Per Dr. Kremer, a score of
15  "one" renders an entire evaluation as unsatisfactory.
16  It is worth comparing here the evaluations before and
17  after this day from different CRNAs; right?
18     A   Yes.
19     Q   So are you suggesting here that Jill
20  Wimberly had an impact on CRNA evaluations of you in
21  2014?
22     A   No.  I'm suggesting that this is such a
23  stark difference in how I was evaluated compared to
24  two different CRNAs who evaluated me positively, one

Page 279

1  by Jim Miller on the 17th and the other by Renee
2  Przygodzlek on the 24th.
3      Q   So it seems to be saying that the January
4  20th was the turning point?
5      A   It's saying that it's a stark difference
6  from my other evaluations, like right in the middle.
7  This is the 20th?  Yeah.
8      Q   So was it your idea that it would be a
9  good idea to compare evaluations before January 20 and
10  those after?  It says:  It is worth comparing here the
11  evaluations before and after this day; right?
12     A   Yes.
13         MR. LAND:  Let's mark this.
14             (Marcial Deposition Exhibit No. 12
15             was marked for identification.)
16     Q   So if you could keep Exhibit 11 available
17  to you --
18     A   Yes.
19     Q   -- but let's look at Exhibit Number 12
20  right now.  Exhibit 12 I'll represent to you is a
21  compilation of --
22         MS. SIEGEL:  I'm sorry.  Am I missing -- Oh, I
23  got them mismarked.  So the response is DX 11?
24         MR. LAND:  Yes.

Page 280

1      Q   Exhibit 12 is a compilation of evaluations
2  of you from January of 2014 through May of 2014.
3  Okay?
4      A   Yes.
5      Q   So the first one is dated January 9th,
6  2014; right?
7      A   Yes.
8      Q   Who is that from?
9      A   Kathleen Oskvarek.
10     Q   Does that contain an unsatisfactory rating
11  for you?
12     A   Yes.
13     Q   A one for performs complete preoperative
14  assessment?
15     A   Yes.
16     Q   And then in her notes she writes some good
17  comments about good job with intubations and IVs?
18     A   Yes.
19     Q   Then I think it says:  Be cautious with --
20  What does that say?
21     A   Preops, preoperative.  Missed abnormal
22  EKG.
23     Q   Did you miss an abnormal EKG that day?
24     A   There was a comment on the bottom that I

18  (Pages 277 to 280)

Page 281

1    had missed, yes.
2        Q   Did you miss an abnormal EKG that day?
3        A   Not during the case, just on that one
4    document that we were reviewing all of this files of
5    patients' histories.  That's the one she was referring
6    to.
7            So there was an EKG.  The diagnosis was
8    on top; and on the bottom there was a comment, I think
9    second-degree AV block, and the patient wasn't in that
10   rhythm.  So that's what she was referring to, that one
11   item of the multiple documents that we had to review
12   on this patient.
13           But in terms of the actual performance
14   in the surgery, there were no instances that I missed
15   an EKG.
16       Q   Isn't this rating you unsatisfactory for
17   your clinical judgment in performing a complete
18   preoperative assessment?
19       A   Yes.
20       Q   And that happened; right?
21       A   Yes.
22       Q   Because you missed an abnormal EKG in the
23   preoperative assessment; right?
24       A   Yes.

Page 282

1        Q   So is this unsatisfactory rating fair and
2    accurate?
3        A   No, because I had reviewed other things
4    that were accurate; and CRNAs, anesthesiologists, and
5    my cohorts alike miss multiple information, and it
6    doesn't get ranked as harshly.
7            From what I recall, like I said, I was
8    with Kathleen and my cohort Kelly Gallagher had missed
9    two crucial CV, cardiovascular histories; and she
10   wasn't put on notice for that.
11       Q   Did you write a rebuttal to this
12   evaluation?
13       A   I thought I did.  I don't remember.
14       Q   Do you see it in Exhibit 11?
15       A   No.  I don't think I did.
16       Q   Can you find Exhibit 3?  It's the
17   interrogatory responses?
18       A   Yes.
19       Q   If you turn to Page 27 --
20       A   Yes.
21       Q   -- on that page near the bottom there is a
22   reference to a day on January 15 with Angela Keehn?
23       A   Yes.
24       Q   And I don't want to the talk about that

Page 283

1    right now, but if you follow the next several pages,
2    it goes through a series of other evaluations you had?
3        A   Yes.
4        Q   And I don't see a reference to the
5    evaluation by Kathleen Oskvarek in this either.
6        A   Yeah.  I don't think I made one.  I didn't
7    do a rebuttal on this.
8        Q   Why didn't you rebut this unsatisfactory
9    rating?
10       A   I'm not sure.  I think I spoke to
11   Dr. Kremer about it in person, and I guess -- Yeah.
12   I'm not sure why I didn't do one on this.  I just
13   recall the circumstances around it.
14       Q   So you agree that you missed something.
15   You thought it was rated too harshly, this one?
16       A   Yes.
17       Q   If you turn to the next page in
18   Exhibit 12 --
19       A   Yes.
20       Q   -- this appears to be an email from Renee
21   Przygodzlek --
22       A   Yes.
23       Q   -- to Mike Kremer dated January 13, 2014
24   reporting about her day with you; right?

Page 284

1        A   Yes.
2        Q   In it she says that she worked, I worked
3    with Maricel today.  We had an okay day.  Two spines,
4    nothing unusual.  Right?
5        A   Yes.
6        Q   So she is saying you did a good job?
7        A   Yes.
8        Q   She is saying that she did not leave me an
9    evaluation, so I just wanted to follow-up with you;
10   right?
11       A   Yes.
12       Q   Is that accurate, that you did not leave
13   her an evaluation?
14       A   Yeah.  I don't recall that I left with her
15   one.
16       Q   Did you think that Kathleen Oskvarek, was
17   her evaluation of you biased?
18       A   I think so.
19       Q   Why?
20       A   Because I thought this was just a little
21   bit too harsh to have missed one item which was not
22   actively relevant during the case, so I could have
23   gotten a better rating if I had gotten most of it
24   correct anyway and there is just this one item.

19  (Pages 281 to 284)

Lake Shore Reporting Service
A Magna Legal Services Company

Page 285

1    Q   Why do you think that was biased against
2  you based on -- Do you think it's biased against you
3  based on your race or national origin or age?
4    A   I have a sense that she's had, she's heard
5  of being on leave and just my whole event from before
6  my leave.
7          On a personal note, this is Vic
8  Oskvarek's wife. Dr. Kremer had approached him
9  before, and I had walked into their conversation of
10 how I think that everybody is after me. And that
11 evaluation that proceeded from Vic was mostly negative
12 even though nothing really untoward happened in that
13 case.
14   Q   Vic evaluated you before January 9th,
15 2014?
16   A   I think I was with him at some point. I'm
17 not sure if it was before this or afterwards.
18   Q   So you don't know?
19   A   No. I don't.
20   Q   So are you saying this evaluation on
21 January 9th, 2014 was discriminating against you on
22 the basis of race, national origin or age or not? I
23 can't tell.
24   A   Well, there is some form of

Page 286

1  discrimination, but it's not distinct as to whether it
2  pertains to my race or age.
3    Q   And that's because you think it was a
4  minor error and it was evaluated too harshly?
5    A   Yes.
6    Q   The next evaluation is dated January 15
7  from Lea Forester?
8    A   Yes.
9    Q   So this is an evaluation from Lea
10 Forester; right?
11   A   Yes.
12   Q   From on the event on January 15, 2014?
13   A   Yes.
14   Q   And it rates you as unsatisfactory in
15 several categories; right?
16   A   Yes.
17   Q   Can you read the comments out loud,
18 please?
19   A   Very weak student. Unable to formulate an
20 appropriate anesthetic plan of care. Example, wanted
21 to put on a Scopolamine patch for an outpatient port
22 placement with history of postop nausea and vomiting.
23 Unable to describe treatment for venous air embolism
24 and laryngospasm which are basic principles,

Page 287

1  treatments which should be known. She said she would
2  "freak out" if a laryngospasm occurred. Needs a lot
3  of direction and prompting.
4    Q   Did you agree with that evaluation?
5    A   No.
6    Q   Can you turn to Page 4 of Exhibit 11.
7  That's this one.
8    A   Okay.
9    Q   On Page 4, does that have your explanation
10 of what you dispute about Lea Forester's January 15,
11 2014 evaluation?
12   A   Yes.
13   Q   So I think your reference there is to the
14 Scopolamine patch?
15   A   Yes.
16   Q   That you suggested it, that they ended up
17 doing something else but that it wasn't inappropriate
18 for you to suggest it; is that right?
19   A   Yes.
20   Q   So did Lea have a different judgment about
21 that than you?
22   A   Yes, because she still points out here
23 that this is an outpatient procedure, and a
24 Scopolamine patch wouldn't be appropriate for this

Page 288

1  minor surgery. But this procedure was converted to
2  general, so it was appropriate to have that as one of
3  your regimen to avoid postop nausea and vomiting.
4          So she didn't correct this part here
5  that it was an outpatient. It was converted to
6  general surgery because originally I think this is
7  going be a MAC which is a monitored anesthesia or
8  twilight where the patient is not going to be
9  intubated, and the patient ended up being intubated;
10 or we had planned to intubate the patient because
11 prior to that there was a pediatric case of the same
12 procedure, Portacath placement that went --
13         It was a little bit complicated,
14 converted from MAC to general because it took longer
15 for the surgeon to place the port, and it was the same
16 surgeon who was going to be doing this. That's why I
17 figured, you know, it's a general. And this patient
18 told me, I have severe postop nausea vomiting, and so
19 my suggestion was within the standard of care.
20   Q   But others disagreed with you?
21   A   Others?
22   Q   Did Lea disagree with you about that?
23   A   She didn't show this to me. Yeah. She
24 disagreed that Scopolamine is not appropriate.

20  (Pages 285 to 288)

Page 289

1    Q   The comment here about that you said you
2  would freak out if that happened, your rebuttal
3  indicates that you meant that as a joke?
4    A   Yes.  I was just making light of it.
5  I wasn't serious about what I said there.
6    Q   Is it possible that Lea Forester didn't
7  recognize that as a joke and thought you meant it?
8    A   I was snickering.  Oh, I'd freak out.
9  Like I meant it in a joking way.
10   Q   Okay.  So you think she should have known
11 but you don't know if she knew you meant it as a joke;
12 right?
13   A   Yeah.  I presented it sort of making light
14 of it.  Plus, I've had this experience before a couple
15 of times with one with a peds patient and another time
16 with an adult patient, and both times I acted
17 accordingly.  I had no issues addressing with those
18 problems.
19   Q   Did Lea know that?
20   A   No.  I told Dr. Kremer because we went
21 through this evaluation.
22   Q   So when she heard you say you would freak
23 out, she didn't know about your prior experience with
24 that; right?

Page 290

1    A   No.
2    Q   You're agreeing with me, she didn't know?
3    A   She didn't know.
4    Q   On Page 4 of your rebuttal, next to her
5  name and date you write, Written on the same day, same
6  care day as Angela.  And this evaluation appears to
7  have been written on January 21, 2014, right, from Lea
8  Forester?
9    A   Yes.  But I think what I meant there was I
10 was assigned with Angela another time, but I don't
11 recall that I gave her another eval that day.  So I
12 don't know if that was what I meant with that.
13   Q   Were you suggesting that Angela who is
14 Angela Keehn I believe and Lea were talking to each
15 other about how to evaluate you, or what do you mean
16 by saying it was written on the same day of care?
17   A   I don't recall.  I'm not sure it's
18 January 15.  Oh, I wonder if because Angela Keehn's is
19 January 15th and Lea Forester is January 15th, I think
20 it might have been a reminder for us to revise this or
21 correct this because those are the same days but they
22 didn't really happen on the same days.  So it might
23 just be a reminder for us.
24   Q   So the next evaluation in Exhibit 12 is

Page 291

1  one from Angela Keehn dated January 15, 2014.  Is that
2  the evaluation you're talking about?
3    A   Yes, but I think I miswrote the date
4  because I think it was really the 17th that I was with
5  her.
6    Q   Well, why do you say that?
7    A   Because I can't be assigned to one CRNA or
8  two CRNAs in one day, so I'm thinking that I might
9  have dated this incorrectly because normally if you
10 are assigned to one CRNA in a day, you stay with that
11 CRNA.
12   Q   Is that your handwriting at the top?
13   A   Yes.  At the bottom is Angela's.
14   Q   I understand.  Okay.
15        So this evaluation from Angela
16 contained several unsatisfactory ratings; right?
17   A   Yes.
18   Q   Can you read her comments at the bottom?
19   A   Multiple problems with setup and prep.
20 Nitrous tank not open.  And when asked if it was
21 checked, Maricel claimed she checked it.  No page or
22 notification that she was seeing a teenage patient to
23 myself or Dr. Chagin (phonetic).  Inaccurate area
24 assessment.  Student did not see IV site or was too

Page 292

1  nervous to attempt which is okay because it was a
2  child.  Adequate mask ventilation with assistance.
3  Successful intubation with assistance but was using
4  teeth as leverage.  Needed constant prompting during
5  all aspects of the case, and there is more.
6        Lack of basic nursing skills, that is
7  ability to recognize EKG and heart rate on pulse ox.
8  Not correlating even when prompted to this issue.
9  Student had no idea that the pulse was 120.  There was
10 a very clear tracing on the pulse ox and lots of
11 interference with the EKG.
12        Not able to count as a reliable
13 anesthesia team member when not able to recognize
14 simple monitoring readings.  Not able to pick up on
15 changes in patient status.
16        Lack of knowledge of drug pharmacology.
17 No idea of duration of action for Rocuronium.  Student
18 was checking twitches almost every three minutes.
19   Q   If you stay on that second page there, did
20 you make a mistake relating to evaluating and
21 recognizing the pulse ox and the pulse rate?
22   A   I didn't recognize that.  I could also
23 check on the pulse ox as my secondary EKG or heart
24 rate source.

21  (Pages 289 to 292)

Page 293

1    Q    So that was a mistake --
2    A    Yes.
3    Q    -- by you; right?
4    A    Yes.
5    Q    And is it true that you need to evaluate
6 and watch both the EKG and the pulse ox for heart
7 rate?
8    A    That wasn't what I was used to, and I
9 realized later that that is the secondary monitor; but
10 sometimes when there is interference like lighting, it
11 could interfere with the readings of the pulse
12 oximeter.  Sometimes movements can also interfere with
13 pulse ox accuracy.
14    Q    The next sentence says:  Student had no
15 idea that the pulse was 120.  Is that true?
16    A    I think for that three-minute period from
17 what I recall in the charting, I didn't catch that.
18    Q    So that's true and you didn't catch it;
19 right?
20    A    Yes.
21    Q    In rebuttal in Exhibit 12 on Page 3, at
22 the top it says:  I concede I should have looked at
23 the pulse ox in this case; right?
24    A    Yes.

Page 294

1    Q    So that was a legitimate criticism of you?
2    A    Yes.
3    Q    And a significant criticism of you?  Is
4 this a significant issue, monitoring the pulse rate of
5 the patient while under anesthesia?
6    A    Well, there is other parameters that we
7 look at, not just one thing that will lead us to
8 adjust our interventions or our actions.  So we also
9 had the blood pressure, the saturation.  The EKG,
10 although unreliable, we weren't going to be
11 intervening with that heart rate because this
12 particular procedure was an ablation.  They're trying
13 to trigger a fast heart rate to locate the abnormal
14 sites of arrhythmias.
15        So as much as one got missed, the other
16 parameters I was monitoring closely to see if the
17 patient's deteriorating or having problems.
18    Q    So what I asked was whether monitoring the
19 heart rate was a significant component of providing
20 safe anesthesia care?
21    A    Yes.
22    Q    And you didn't do that properly here;
23 right?
24    A    Yes.

Page 295

1    Q    And Angela Keehn believed that that was a
2 lack of basic nursing skills; right?
3    A    That's her opinion.
4    Q    And as a result, she wrote here, Not able
5 to count on you as a reliable anesthesia team member
6 when not able to recognize simple monitor readings;
7 right?  That was her opinion?
8    A    Yes.
9    Q    Did Angela say or do anything in the
10 course of this case during the case while it was going
11 on that you thought was unprofessional or
12 inappropriate?
13    A    Yes.  When we were seeing the patient, she
14 cut me off.  During the preop, we had asked the
15 patient, Where do you prefer your IV to be, and she
16 said left.  And when I looked at the left, I didn't
17 see anything that stood out.  And since I didn't want
18 to subject the patient to additional IV insertions or
19 pokes, I said, Is it okay if we looked at the right
20 side?  And she cut me off and said, No.  If she wants
21 the left, she gets the left.  Let me look at it.
22        So she just puts me aside or has me
23 step aside.  So she basically undermined me in front
24 of the patient and the patient's parent who was there.

Page 296

1    Q    Did Angela then insert the IV on the left?
2    A    She did.
3    Q    So she found a good place?
4    A    She did.
5    Q    Was there anything else she did in the
6 course of this case that you thought was inappropriate
7 or unprofessional?
8    A    I don't recall if there was anything else.
9    Q    She talks in her write-up in the first
10 page about checking the N-2 tank.  What is that?
11    A    Nitrous tank, yes.
12    Q    And that it wasn't open and that she had
13 asked if it was checked and you said that you had
14 checked it?
15    A    Yes.
16    Q    Was it Angela's view that by checking it
17 you should have opened it?
18    MS. SIEGEL:  I'm going to object.  It calls for
19 speculation.
20    A    Well, this is the IR suite.  This is not
21 like the OR suite where the Nitrous source is -- You
22 can't control not opening it.  It's just available
23 right away fed into the anesthesia machine.  So in the
24 IR it's a separate tank.

22  (Pages 293 to 296)

Lake Shore Reporting Service

Page 297

1    Like I've worked in the IR before with
2  another CRNA; and they said, If you check it, you
3  don't necessarily have to keep it open.  So once you
4  open it, it's ready for use.
5    But in an average four-hour case, we
6  don't use Nitrous on somebody who is high risk for
7  postop nausea vomiting because this is what we call a
8  pro-emetic agent.  It induces vomiting.  So I told her
9  I did check it, but I didn't think it was going to be
10 used for the case.
11    Plus, a CRNA I've worked with before in
12 the IR suite said, You could just turn the dial and
13 it's on.  So it's not going to take like two seconds
14 to do that.
15    Q    Did you do that?
16    A    Do what?
17    Q    Turn the dial and have it be on?
18    A    We don't need to turn it on in that case.
19    Q    You just said someone said you could just
20 check it, turn the dial and turn kit on?
21    A    If we needed it.
22    Q    What was the point of checking it if you
23 weren't going to open it or turn it on?
24    A    Just to make sure there that there is no

Page 298

1  leak on the tank.
2    Q    How would you check if there was a leak on
3  the tank?
4    A    You open it; and if there is a hissing
5  noise coming from the valve or if you look at the
6  anesthesia machine and the Nitrous level is not, is
7  not at full, then you know that it's empty or it needs
8  to be replaced, that it's not ready to be used during
9  the procedure.
10    Q    So did you turn it open and check it for a
11 leak?
12    A    Yes.
13    Q    Then you closed it?
14    A    Yes.
15    Q    And Angela thought you should have left it
16 open; right?
17    A    Yes.
18    Q    What did you base your understanding that
19 it didn't need to be open on?
20    A    The patient has risks of -- I mean from
21 our studies, she has the hallmarks of risks for postop
22 nausea and vomiting.  So she is young, female,
23 nonsmoker, this is her first surgery.  So we reviewed
24 from lecture that we have to watch out for that to

Page 299

1  limit the instances of postop nausea and vomiting.
2    Q    So it was your judgment that you didn't
3  need to have it open because you didn't think you'd
4  use it?
5    A    Yes, and from my previous experience like
6  I said where another CRNA said you don't necessarily
7  have to have it open.
8    Q    There is a reference here that you used
9  teeth as leverage when you were I think intubating the
10 patient?
11    A    That's her perception.
12    Q    So your hand touched or your wrist touched
13 this patient's teeth?
14    A    I must have touched it with the side of my
15 palm, but not the blade.  I think she is pointing, she
16 is alleging that I used the blade, I used the teeth as
17 a fulcrum for the blade to lift the jaw up and
18 visualize the airway; and I didn't do that.  I must
19 have touched it with this (indicating) but not with
20 the blade.
21    Q    So you did touch it with your wrist?
22    A    I could have.
23    Q    And is it possible to interpret that as
24 applying leverage to the teeth?

Page 300

1    A    No, because the way she describes it,
2  leverage is basically using the teeth to help you lift
3  the jaw.  So metal on teeth is a huge no-no for us
4  when intubating.
5    Q    Are you allowed to use your wrist as
6  leverage on the teeth?
7    A    No.  I wasn't using it as leverage.
8    Q    I just asked if you are allowed to.
9    A    No.  You are not.
10    Q    There is a reference at the end to lack of
11 knowledge of drug pharmacology, no idea of the
12 duration of action for Rocuronium?
13    A    Yes.
14    Q    Student was checking for twitches almost
15 every 3 minutes.  Was Rocuronium a drug that was on
16 that list that you needed to know by heart that we
17 talked about last time?
18    A    Yes.
19    Q    Did she ask you about the duration of
20 Rocuronium?
21    A    Yes, So I said 40 minutes; and she said
22 that was wrong.  It's 45 minutes.  It's a range.  It's
23 between 35 to 45 minutes.  And every book has
24 different -- I mean every reference changes.  It's not

Lake Shore Reporting Service
A Magna Legal Services Company

Page 301

1  a fixed like just 40 minutes.
2      Q   Couldn't it be that her point was that you
3  didn't need to be checking for twitches if Rocuronium
4  would last for longer?
5      MS. SIEGEL: Calls for speculation.
6      A   No.
7      MR. LAND: Q   That's impossible?
8      A   It's not impossible.  She asked me in
9  particular during the progression of the case what the
10 duration of action is of Rocuronium.  And this
11 checking twitches every three minutes didn't happen.
12 I disputed that.
13     Q   How often did you check twitches?
14     A   I think at the beginning for the first
15 20 minutes I think I would maybe every 5 or 10.
16 I don't recall, but it's not every three minutes
17 because we're also adjusting gases, doing charting,
18 checking on the patient.
19         So it's really not possible to just be
20 doing this because this is a whole setup here to make
21 sure that your monitor is properly in contact with
22 your patient's pulses or the nerve sites, and you are
23 applying this nerve stimulation.  So that takes some
24 time.

Page 302

1          And if I am doing documentation,
2  adjusting gases, giving medication, I can't be
3  checking twitches every three minutes.  I think that's
4  an exaggeration.
5      Q   So you were doing it every five minutes
6  you said?
7      A   I don't recall.  It might have been that,
8  or what's appropriate for --
9      Q   So Rocuronium is a muscle relaxant; right?
10     A   Yes.
11     Q   So the idea of how long it lasts means
12 that you don't need to check the twitches while it's
13 in effect; right?
14     A   That is the expected duration of action;
15 but depending on, you know, a patient's metabolism, it
16 could be burnt out sooner.  Some people, you know,
17 metabolize it faster.  Some metabolize it less.
18         But I don't know exactly at what point
19 she is saying I was checking these twitches every
20 three minutes because at the beginning everybody is
21 busy situating the patient.  So by the time you get
22 back to the patient to check your twitches, there
23 might have been like ten or twenty minutes that had
24 passed.

Page 303

1      Q   Isn't kind of her point here possibly that
2  you were checking for twitches when you didn't need to
3  because the Rocuronium would still be lasting and it's
4  not necessary and it was distracting you from looking
5  at other things like the pulse ox monitor?
6      MS. SIEGEL: Calls for speculation.
7      A   No.
8      MR. LAND: Q   That's not possible?
9      A   That's not at the time that she asked me
10 the question.  It was later on.  From what I recall,
11 it was later on in the case when she asked for the
12 duration of action of Rocuronium.
13     Q   Why was she asking you that?
14     A   They ask us different questions about
15 drugs that we're giving and, you know, specifics about
16 the case just to quiz us.
17     Q   What point of the case was it?  You said
18 it was later.  Later than what?
19     A   Like I think it was a three-hour case; so
20 it was later from when we first like intubate where,
21 you know, the paralytic would have been freshly given
22 them.  So I'm not sure that this is correlated.  My
23 recollection is she just asked me, quizzed me in
24 particular on the duration of Rocuronium.

Page 304

1      Q   For no reason she just quizzed you?  Is
2  that what you're saying?
3      MS. SIEGEL: Objection.  You're asking for
4  speculation.
5      A   Well, they ask me questions frequently.
6      MR. LAND: Q   Was there anything about the
7  timing of when she asked about the Rocuronium,
8  duration of action that led you to understand why she
9  was asking you?
10     A   No.  She didn't indicate, Do you know the
11 duration of action.  She didn't correlate those two
12 different situations.
13     Q   But the note she writes here does, right,
14 doesn't know the duration and was checking for
15 twitches every three minutes?
16     A   Yes; but she also says, No idea of
17 duration of action when, in fact, I told her.  I gave
18 her an answer.  I said 40 minutes; and she countered
19 no, it's 45 minutes.
20     Q   Let's turn to the next evaluation in
21 Exhibit 12.  I think this is the January 20, 2014
22 evaluation from Jill Wimberly.
23     A   January.
24     Q   I'm sorry.  This is a January 17, 2014

24  (Pages 301 to 304)

Page 305

1  evaluation from Jim Miller?
2      A   Yes.
3      Q   This one is positive; right?
4      A   Yes.
5      Q   Is this fair and accurate?
6      A   Yeah.
7      Q   So, Maricel, do you find the evaluations
8  that were positive of you always fair and accurate?
9      A   For the most part.
10     Q   Could you turn to the next one from Jill
11 Wimberly, January 20, 2014.  So do you remember this
12 day?
13     A   Some parts, yes.
14     Q   This is the third evaluation seen of you
15 from Jill Wimberly?
16     A   Yes.
17     Q   Do you remember there was May 10, 2013 and
18 then June 20, 2013 and this one.
19         I have a general question for you.
20 Other than those three times where you worked with
21 Jill Wimberly, did you ever interact with her at all?
22     A   There was that time where she took over
23 for Lea's case; but then I hadn't had lunch, so I was
24 sent to for lunch by Lea.  And then Ray said you could

Page 306

1  just go home after that.  So I had that brief
2  interaction with her, so I ended up not being under
3  her.
4          And then, yeah, of course like off and
5  on in the hallway, you know, I would see her or like
6  in the monitor room like the seven tower where she was
7  talking to Eva.
8      Q   So how often would you see her when it
9  wasn't for a case?
10     A   Well, there is also grand rounds when we
11 attend that, probably maybe three times a month.
12 I mean in the hallway if we're on the same floor, then
13 I'd see her in passing.
14     Q   Did you ever have any kind of meaningful
15 conversation with her, meaningful meaning longer than
16 just hello or anything like that outside of the cases
17 that you were involved with her?
18     A   Not that I recall.
19     Q   So the only times you ever interacted with
20 her in a way that involved communication between the
21 two of you were the three times you were evaluated?
22     A   I think so, yes.  That's right.
23     Q   During the January 20, 2014 evaluation or
24 during that case --

Page 307

1      A   Yes.
2      Q   -- you've indicated that in some of your
3  writings that she said to you something like, Go, go,
4  go, go before you performed a procedure; right?  Other
5  than that -- and I'll talk more about that -- are you
6  alleging that Jill said or did anything unprofessional
7  in this case on January 20?
8      A   Yes.  Like she was constantly badgering me
9  with questions; and at the start of the case, it's
10 like, What next, what are you going to do next.
11 Before I can even move in one direction, she would be
12 on my face.
13         And then when I tried to -- She was
14 trying to set up the patient, and I had the IV bag.
15 So for me to be able to start with getting my
16 introduction drugs ready, I had crossed or I had put
17 the IV bag on one side which was crossing the patient,
18 and she immediately snapped at me for that and started
19 writing disorganized because of that without asking me
20 the reason why I did that.
21         And then just the constant questioning
22 and misrepresenting my answers.  Like at one point she
23 asked me how many twitches at this point should you
24 have back.  It was I think ten minutes by then since

Page 308

1  we gave the paralytic, and I said zero.  And she said,
2  What did you say, four?  I heard you say four.  So she
3  kept insisting that I was lying.
4          And then she also suggested that I
5  should have ordered blood which she should have
6  specified that the night before when I presented the
7  case to her.  And I had checked with the other
8  surgeons, the surgeons and the residents if that would
9  be necessary, and they said no.  And the patients been
10 typed and screened.  We could definitely do a flash
11 type and cross if need be.
12         But she was irate about that, that I
13 didn't hold blood even though surgery says there is no
14 need and she didn't specify it.  Plus, with the
15 shortage of blood, we don't just randomly order it if
16 we don't see that it's a necessity.
17         Then she was teaching me things which
18 didn't make sense in terms of the ventilator, and I
19 couldn't really argue with her against that.  I just
20 like let her, you know, talk to me because the more I
21 argued -- And this is what Karen advised me too -- the
22 more I argued, the more she will get irritated and
23 just be verbally hostile to me.
24     Q   Did she raise her voice to you?

25  (Pages 305 to 308)

Page 309

1    A    Yes.
2    Q    How often?
3    A    Multiple times.  When I'm trying to get to
4  my setup, it was, What are you going to do next, what
5  are you going to do next.  So she was constantly
6  barking at me.
7    Q    You are saying she raised her voice
8  whenever she would say what are you going to do next?
9  That's what I was asking.  When did she raise her
10 voice?
11   A    Yes, when she would ask me questions.
12   Q    What do you mean by she would raise her
13 voice.  How loud was it?
14   A    Well, it was right on my face, and of
15 course it was loud enough that I was -- I think the
16 point is to startle me and to get me I guess
17 discombobulated.
18   Q    Do you think that's what she was trying
19 to?
20   A    That's her gesture that I perceived.  She
21 was just here (indicating).
22   Q    What do you mean by right on your face?
23   A    Her face is right on me.
24   Q    You are putting your hand like 3 inches

Page 310

1  from your face?
2    A    Yes.  That's how close she was.  What are
3  you going to do next, what are you going to do next?
4  It was very daunting.
5    Q    She got within 2 or 3 inches of your face?
6    A    Yes.
7    Q    All of the time?
8    A    During the beginning of the case as we
9  were trying to get organized.
10   Q    Did other people in the room notice this?
11   A    They were busy getting set up on that
12 side.
13   Q    So they didn't notice it?
14   A    I don't know.  I was looking at her.  I
15 was trying to answer her in the best way I can.
16   Q    Talk about having blood on hold, was it
17 the nature of this surgery that would be require blood
18 being on hold?
19   A    It's a potential if they transgress a
20 blood vessel along the way.
21   Q    Wasn't this surgery the type of surgery
22 that often requires blood?
23   A    No.
24   Q    No?

Page 311

1    A    No.  I've had other anterior approaches
2  for spinal fusion, and we're not required to order
3  blood prior.
4    Q    That's not really what I asked.
5    A    No.
6    Q    I didn't ask if it was required.  I asked
7  was it common to have blood on hand for this type of
8  surgery?
9    A    Not to my experience.
10   Q    Did you look up in books --
11   A    Yes.
12   Q    -- in preparing for this whether that was
13 required or not or whether this was suggested?
14   A    I reviewed that in Anesthesia For Surgical
15 Procedures.
16   Q    Who writes that book; do you remember?
17 Was it Jaffe?
18   A    No.
19   Q    Miller and McCann?
20   A    I think it was Miller and McCann.
21   Q    So you are saying in the Miller and McCann
22 textbook for this type of surgery it doesn't indicate
23 you need blood on hold?
24   A    It's a possibility or something that's

Page 312

1  suggested; but it's not, you know, in the like list of
2  priorities I guess.
3    Q    But Jill told you she thought it was
4  during the case?
5    A    She did.
6    Q    And you are saying she should have told
7  you the night before?
8    A    Yes.  We discussed these plans for the
9  next day when I presented her with the cases, the
10 patient's history or medical history.  That's one of
11 the things that's crucial to be told to us, an SRNA to
12 order the next day if they thought it was important.
13   Q    Their evaluation writes that you didn't
14 know the anatomy of the spinal cord or spinal cord
15 vessels that could be injured and abdominal vessels
16 that could be injured?
17   A    She asked me what are the blood vessels
18 that could be affected in that approach of spinal
19 fusion surgery, and I gave her I think three or four
20 blood vessels.  And then she asked what else, what
21 else?
22        I just named a few from, you know, my
23 reference; and she wanted to know more in detail of

Page 313

1 the whole, you know, whatever, blood circulatory
2 network is in that area. So I gave her at least four
3 blood vessels that I could recall, and she wasn't
4 satisfied with that.
5     Q   Do you know what she means by saying you
6 didn't know appropriate action for change in patient's
7 status with reduced heart rate, reduced blood
8 pressure, and doesn't know what to do, says I'm not
9 sure?
10     A   Where is that at? No. I don't know what
11 she referred to then. I know that we had a discussion
12 about calcium channel blocker which is below the heart
13 rate and a blood pressure medication, but she wanted
14 me to explain the whole mechanism of action which her
15 explanation didn't really make sense; and I had asked
16 Hakeem, have you had that encounter with her where she
17 just fires off some random information. And Hakeem
18 testified or mentioned to me that sometimes I don't
19 understand what she is saying.
20     Q   Did you have communication with her about
21 the dosage of glycol?
22     A   Glycopyrrolate?
23     Q   Yeah.
24     A   Yes. She had asked what dose of

Page 314

1 glycopyrrolate do we use; and my answer is, This is
2 the ratio of what we use in terms of when we mix it
3 with neostigmine because those are your reversal
4 agents.
5     Q   And she wanted to know what the dosage
6 would be if used it by itself?
7     A   Yes.
8     Q   But you didn't know; is that right?
9     A   I just know of its use in that particular
10 situation when it's mixed with neostigmine because I
11 told her the dose.
12     Q   For that mix?
13     A   For that mix.
14     Q   That's not what I'm asking you about. I'm
15 asking if you knew the dose for --
16     A   Just by itself.
17     Q   The reference is glycol. I can't remember
18 the --
19     A   Glycopyrrolate.
20     Q   She asked you that, and you didn't know;
21 right?
22     A   No.
23     Q   You didn't?
24     A   I didn't know what she was really getting

Page 315

1 to because we don't use glycol by itself in the
2 surgery.
3     Q   You don't?
4     A   No. Glycopyrrolate, it's to control
5 saliva. It's a drying agent for adults. For
6 pediatrics, you use it as a heart rate control
7 medication. I mean we have used glycopyrrolate for
8 our palliative and hospice patients to control their
9 secretions. But if you're using it in a surgery like
10 this, you use it with neostigmine.
11     Q   You're saying you would never use it on
12 its own in this surgery?
13     A   No, no, because why are we going to dry a
14 patient's secretions. The patient's sedated. They're
15 on their back, and we suction the mouth. But if you
16 use glycopyrrolate, it's to dry their secretions.
17         But we use that with neostigmine
18 because neostigmine can cause you to have a lot of
19 secretions. That's the neutralizing agent for
20 neostigmine. That's why I answered her that way which
21 is appropriate for this particular case.
22         So if she is veering off towards
23 glycopyrrolate's other uses which is for pediatrics to
24 raise their heart rate and for palliative patients to

Page 316

1 dry their secretions, that's not appropriate in this
2 setting.
3     Q   What you wrote in your rebuttal was that
4 most CRNAs do not know this form of dosage without
5 referring to a handbook. You wrote that on Page 6.
6     A   Yes, because I've asked, and it usually
7 goes hand in hand.
8     Q   Did you not know at that time what its
9 dosage would be to use it alone?
10     A   No.
11     Q   You didn't know it; right?
12     A   No.
13     Q   You are agreeing with me?
14     A   I didn't know that.
15     Q   That's just the way I was asking the
16 question. Sorry.
17     A   Okay.
18     Q   You indicate in your rebuttal on Page 7
19 that I pulled out a paper showing that in addition to
20 knowing the numbers from memory, they were reported on
21 a guideline commonly used by anesthesiology residents
22 at Rush. Did you pull that out in the OR?
23     A   No, not at that time; but I looked it up
24 later.

27  (Pages 313 to 316)

Lake Shore Reporting Service

A Magna Legal Services Company

Page 317

1    Q    Does that mean when you say I pulled out,
2  for yourself?
3    A    Yes, just to verify her --
4    Q    Afterwards you pulled it out?
5    A    I believe it was afterwards.
6    Q    Like did you show it to her?
7    A    No.
8    Q    Did you make a mistake during this
9  proceeding, this case?
10    A    Like when I was extubating because she
11  startled me by saying. Go, go, go; and I had
12  extubated without deflating the balloon which I had
13  never done before.
14    Q    That was a mistake; right?
15    A    Yes.
16    Q    Was that a significant mistake?
17    A    It could be.
18    Q    So the ET tube involves the balloon that's
19  in the throat?
20    A    Yes.
21    Q    And it needs to be deflated before it's
22  pulled out?
23    A    Yes.
24    Q    And you pulled it out without deflating

Page 318

1  it; right?
2    A    When she startled me, yes.
3    Q    I'm just asking you if you did that.
4    A    Yes.
5    Q    And you're saying she came up behind you
6  and yelled go, go, go, go?
7    A    She was near enough in my ear to say like,
8  to startle me to say go, go, go.
9    Q    I don't understand the context. Explain
10  the context.
11    A    I think she was right here, and I was
12  about to deflate, but she says go, go, go, go on my
13  ear; and so inadvertently I extubated the patient.
14    Q    Was she trying to hand you a syringe?
15    A    No. The syringe is right here next to me.
16    Q    You use a syringe to deflate it; right?
17    A    Yes.
18    Q    The balloon?
19    A    Yes.
20    Q    Did you have it in your hand, the syringe?
21    A    I think it might have been attached to it.
22  I might have it had it in my hand, or it might have
23  been attached to the pilot which is like the little
24  pigtail that's attached to the balloon. I don't

Page 319

1  recall exactly.
2    Q    If you had it right there, why didn't you
3  use the syringe?
4    A    Being startled after, you know, with the
5  way she screamed at me, I guess I acted, you know,
6  hastily from being startled by her.
7    Q    In her evaluation she says, Removed ET
8  without attempting to deflate cuff, checking tape even
9  after being told two times to do so.
10    A    No, no. There was not enough time for her
11  to instruct me to do this. From my recollection, I
12  was in the process of extubating when she screamed at
13  me go, go, go.
14    Q    Was there any hurry at that time?
15    A    No. I don't know why she had to do that.
16    Q    But why did you pull it out so quickly?
17    MS. SIEGEL: It's been asked and answered
18  multiple times.
19    A    Because she startled me.
20    MR. LAND: Q    Was there a technical reason that
21  you needed to proceed more quickly in your action?
22  That's what I'm wondering.
23    A    No. Being startled I think caused me to
24  act that quickly.

Page 320

1    Q    We talked before in 2013 about you thought
2  Jill Wimberly was trying to convince other CRNAs to
3  rate you poorly; right?
4    A    Yes.
5    Q    Do you think she did that in 2014?
6    A    It's possible. She was still hanging out
7  with Eva then.
8    Q    But do you think that that's what
9  happened?
10    A    I don't have any -- No. I don't have any
11  idea.
12    Q    Let's turn to the next page of this
13  exhibit. This is an email from Eva Fisher to Mike
14  Kremer --
15    A    Yes.
16    Q    -- dated January 22nd.
17    MS. SIEGEL: What are you looking at?
18    A    Rush 98.
19    MR. LAND: In Exhibit 12.
20    Q    This is an email from Eva Fisher to Mike
21  Kremer dated January 22nd, 2014 about you?
22    A    Yes.
23    Q    And this is an email saying she did not
24  witness but it was reported to her by a student who

28  (Pages 317 to 320)

Page 321

1  stepped in and intervened that Maricel was attempting
2  to place an IV and ETT today, and her first attempt
3  was unsuccessful. She left the Angiocath sheath in
4  the skin. She removed the needle part of the
5  Angiocath and was preparing to re-insert the same
6  Angiocath without a sheath. The senior stepped in and
7  told her she did not have a sheath and brought her a
8  new Angiocath. Did that happen?
9      A   Not the way she reported it here.
10     Q   Did you try to insert the needle part of
11 the Angiocath without a sheath?
12     A   Not knowingly.
13     Q   Okay. Did you try to do that? Did that
14 actually happen?
15     A   Can I explain to you what happened
16 exactly?
17     Q   I just want to know if you did that, and
18 you said not knowingly. I want to know if it
19 happened.
20     A   It happened.
21     Q   Was there a senior student there who
22 stopped you?
23     A   No. She didn't stop me. She pointed out
24 that, you know, sheath fell off; and I didn't realize

Page 322

1  it. So I just had the needle part of it, not knowing
2  that the sheath had slipped out, and this happened to
3  my other classmate too, Shanti (phonetic). This is a
4  defective product.
5      Q   That is what happened here.
6      A   Yes.
7      Q   So you had the needle without the sheath.
8  You were trying to insert it, and the student said
9  something to you and then you stopped?
10     A   No.
11     Q   Did you actually insert it?
12     A   I inserted the needle thinking that the
13 catheter was still in there because I didn't see that
14 the sheath fell out; and then that senior, actually
15 she was my classmate saw it, and she pointed out,
16 well, your sheath fell off.
17         And I asked her, Do you want to try
18 because normally if we missed one, you don't want to
19 keep trying; or sometimes some students do a second
20 attempt. But, you know, we are told just one attempt
21 and then have somebody try again.
22     Q   So is it true that you made one attempt,
23 it didn't work, and you tried it again?
24     A   No. I just made one attempt.

Page 323

1      Q   Do you know who that student was?
2      A   Kelly Gallagher.
3      Q   The next evaluation in Exhibit 12 looks
4  like it's dated January 24, 2014 from Renee
5  Przygodzlek?
6      A   Yes.
7      Q   And it appears to be a favorable or
8  satisfactory evaluation; is that right?
9      A   Yes.
10     Q   Was this fair and accurate?
11     A   I can't recall the details of it, but I
12 didn't really sign it. She didn't discuss it with me,
13 how she arrived at her ratings for me.
14     Q   I'm sorry. What?
15     A   I don't know that it's entirely fair that
16 I just had the lower satisfactory rating on a majority
17 of them. I just don't really remember the details
18 that well.
19     Q   Okay. So she wrote: Still needs
20 continuous support; right?
21     A   Yes.
22     Q   Did you agree with that?
23     A   At that time I think I did.
24     Q   In your rebuttal on Page 9, don't you

Page 324

1  write, I have no rebuttal here. I did a bad job that
2  day. I suspect that Renee is someone who tries to be
3  fair. Is that accurate that you wrote that?
4      A   Yeah. I wrote that.
5      Q   Is that still accurate?
6      A   Yeah.
7      Q   So this is an example of an evaluation
8  that's fair and accurate and critical; right?
9      A   Yes.
10     Q   And that you did a bad job that day?
11     A   Not my best I guess.
12     Q   I'm reading your words. I did a bad job
13 that day. Is that accurate?
14     A   Yes.
15     Q   The next thing in your rebuttal is: This
16 evaluation occurred the day following the episode with
17 Jill Wimberly. Is that accurate?
18     A   The next thing in your rebuttal is this
19 evaluation. It's shortly after. This is the 20th.
20 So, no, that's not accurate.
21     Q   Right. It's four days later; right?
22     A   Yes.
23     Q   And in your rebuttal you are explaining
24 that, I don't know, you were feeling the after effects

29 (Pages 321 to 324)

Page 325

1    emotionally of dealing with Jill Wimberly and that's
2    why you performed poorly on January 24th; is that
3    right?
4        A   Yes.
5        Q   Do you think that people could view that
6    as excuse, that four days later you are saying you
7    couldn't emotionally handle being in the case?
8        A   Well, having gone through like a difficult
9    period with her, I definitely can be reminded in
10   intense situations.  But I didn't know how to gauge
11   her evaluation of me, so I had this apprehension that
12   maybe I'll get another unsatisfactory which made me
13   really stressed out.
14       Q   Was Rush allowed to evaluate you based on
15   what you actually did on the 24th of January?
16       A   Yes.
17       Q   And it's not right what you wrote here
18   that it was the day following the episode with Jill;
19   right?
20       A   Yes.  I made a mistake there.
21       Q   Was that a mistake that was attempting to
22   support your argument, that the reason you had
23   problems was because of your emotional state?
24       A   I'm sorry.  What is the question?

Page 326

1        Q   Were you trying to be more persuasive
2    about why your emotional state was bad that day by
3    misrepresenting the sequence of days?
4        A   No.  I still felt that I was stressed out,
5    like just feeling that I'm getting scrutinized
6    constantly.  So there is always that sense of like
7    doom and gloom because Dr. Kremer reminds me that just
8    one unsatisfactory and you might be out.
9        Q   Is that what happened to you, one
10   unsatisfactory and you were out?
11       A   No, no.
12       Q   There were lots of unsatisfactory ratings
13   before you were dismissed; right?
14       A   Yes.
15       Q   The next evaluation --
16       MS. SIEGEL:  Before you go on, we're just about
17   at 4:30 here.  Why don't we stop for the day.
18       MR. LAND:  Why don't we do the next one before
19   we stop.
20       MS. SIEGEL:  Okay.
21       MR. LAND:  Q  The next evaluation in Exhibit 12
22   is February 3rd, 2014?
23       A   Yes.
24       Q   From Jillian Klunk?

Page 327

1        A   Yes.
2        Q   And she rated you with unsatisfactory
3    ratings in a couple different categories; right?
4        A   Yes.
5        Q   Can you read what she wrote there?
6        A   Make sure you stop.  Take time to think
7    about what you are doing and why.  Pay attention to
8    what others are doing around you.  Reversal should
9    always be given when DMR is dosed during the case.
10   Make sure the information you are giving to M.D. is
11   correct.  Your effort can be commended, but my trust
12   in you is not progressing.  I feel as though I need to
13   still watch you do everything.  Slow down and take the
14   time to complete tasks correctly, appropriately.  Will
15   have, CRNAs MDs will have more trust in you.
16       Q   Was this a fair and accurate evaluation of
17   you on that day?
18       A   I don't think so.
19       Q   Can you look at Page 9 of your rebuttal?
20       A   Yes.
21       Q   The reference to Jillian Klunk on
22   February 3, 2014?
23       A   Yes.
24       Q   The first sentence says: This evaluation

Page 328

1    is included here for completeness.  In fact, I believe
2    that Miss Klunk's criticism was legitimate.  Is that
3    what you wrote?
4        A   Yes.
5        Q   Is that true?
6        A   Well, in terms of that one mistake.
7        Q   Is what you wrote true is what I'm asking
8    you?
9        A   Yes.
10       Q   You believe her criticism of you was
11   legitimate?
12       A   Yes.
13       Q   The next paragraph down says:  Still this
14   was not a good day for me.  Is that true?
15       A   I guess, but I don't recall now.  I guess
16   it is.
17       Q   Well, you wrote that; right?
18       A   Yes.
19       Q   Are you backing away from what you wrote?
20       A   No.
21       Q   Okay.  You indicate there that you've been
22   gone for one week for your husband's grandmother's
23   death and funeral and that it was your first day back
24   from that?

30  (Pages 325 to 328)

Page 329

1    A   Yes.
2    Q   I'm sorry that you had that experience.
3        My question is:  Is Rush allowed to
4    evaluate your performance in clinicals irregardless of
5    whether you had some outside issue addressing your
6    emotional state?
7    A   Yes.
8    Q   You see the last entry there under your
9    rebuttal says Miss Klunk comments, and I do not
10   dispute that I need a prompting and seemed unsure?
11   A   Yes.
12   Q   Is that accurate?
13   A   I guess to some extent.
14   Q   I'm asking if your writing is accurate,
15   what you said?
16   A   Yes.
17   Q   The paragraph above that has to do with
18   interaction between you and the attending about drug
19   dosing during the case?
20   A   Yes.
21   Q   It ends with:  I admit that this was a
22   misunderstanding on my part; is that right?
23   A   Yes.
24   Q   Is there anything about this evaluation

Page 330

1    you thought was discriminatory against you in any way?
2    A   I thought this was harshly graded in terms
3    of if I missed one IV and I just get a failing mark
4    and also this misunderstanding which it didn't
5    affect -- I was able to be correct that or to address
6    the mistake, but I still was rated failing on it.
7    Q   So you are saying -- I just want to make
8    sure I understand.  I asked you if this evaluation
9    which you say you don't dispute is discriminatory, and
10   I think you said yes.
11   A   I pointed out my reasoning that this
12   grading seems very harsh, and so I don't agree that
13   it's that fair.
14   Q   Maricel, how can you say you think your
15   criticism is legitimate and then say that it's
16   discriminatory and unfair?
17   A   I guess at this point, yes.  I have to
18   have admit that I made a mistake; and her pointing
19   that out not necessarily means it's discriminatory,
20   but it's just the severity to which I was rated feels
21   discriminatory.
22   Q   Why?
23   A   Because I corrected the mistake, and she
24   didn't think that that was enough.

Page 331

1                MR. LAND:  I think we can stop there.
2
3
4
5
6
7
8
9
10
11            (Whereupon the deposition of
12             Ms. Marcial was adjourned and
13             scheduled to reconvene sine die.)
14
15
16
17
18
19
20
21
22
23
24

Page 332

1    UNITED STATES DISTRICT COURT      )
     NORTHERN DISTRICT OF ILLINOIS  )   SS.
2    EASTERN DIVISION               )
3
4
5        I have read the foregoing transcript of my
6    deposition, taken on March 6, 2018, consisting of
7    Pages 214 through 329, inclusive, and I find it is a
8    true and correct transcript of my deposition so given
9    as aforesaid.
10
11
12
13
14
              MARICEL MARCIAL
15
16
17   SUBSCRIBED AND SWORN TO
     before me this_____day
18   of_____, 2018.
19
20        Notary Public
21
22
23
24

**Lake Shore Reporting Service**
A Magna Legal Services Company

Page 333

1    STATE OF ILLINOIS      )
                            )  SS.
2    COUNTY OF COOK         )
3
4
5         I, Erin McLaughlin, CSR, do hereby certify
6    that I am a court reporter doing business in the City
7    of Chicago, that I reported in shorthand the testimony
8    given at the deposition of MARICEL MARCIAL, on
9    March 6, 2018, and that the foregoing is a true and
10   correct transcript of my shorthand notes so taken as
11   aforesaid.
12
13
14
15
16
17        Certified Shorthand Reporter
18
19
20
21
22
23
24

32  (Page 333)

**A**

abdominal 312:16
abilities 269:6
ability 215:8
  249:21 292:7
ablation 294:12
able 219:20 220:10
  220:13 221:15
  222:13 234:18
  292:12,13,14
  295:4,6 307:15
  330:5
abnormal 280:21
  280:23 281:2,22
  294:13
absence 238:5,7,11
  240:14 256:22
  258:10 260:22
  261:2,14 262:6
academic 252:9
  266:21
accountability
  255:17
accuracy 293:13
accurate 282:2,4
  284:12 305:5,8
  323:10 324:3,5,8
  324:13,17,20
  327:16 329:12,14
accused 245:15
achievement
  250:24
act 234:19 319:24
acted 289:16 319:5
action 249:14 250:4
  292:17 300:12
  301:10 302:14
  303:12 304:8,11
  304:17 313:6,14
  319:21
actions 294:8
actively 224:21
  259:3 284:22
actual 281:13
acuity 233:5
add 255:8
added 226:12

277:21
addition 316:19
additional 295:18
address 330:5
addressing 289:17
  329:5
Adequate 292:2
adequately 251:4
adjourned 331:12
adjust 294:8
adjusting 301:17
  302:2
admit 329:21
  330:18
adult 289:16
adults 315:5
advance 216:15
advised 216:11
  308:21
advocates 255:15
affect 330:5
aforesaid 332:9
  333:11
afternoon 215:2
age 241:22 242:10
  243:1 244:1 246:5
  246:7 247:15,24
  248:4 285:3,22
  286:2
agent 297:8 315:5
  315:19
agents 314:4
agree 230:4 250:11
  255:11,19 283:14
  287:4 323:22
  330:12
agreeing 290:2
  316:13
air 286:23
airway 299:18
alike 282:5
alleging 299:16
  307:6
allowed 262:7,10
  263:23 264:5
  265:12 266:24
  267:22 268:1,4,17
  268:22 300:5,8

325:14 329:3
alluded 260:5
altogether 239:18
anatomy 312:15
anesthesia 216:9,10
  217:6 220:14
  221:16,18,20
  222:7 233:17
  249:22 251:12
  275:24 288:7
  292:13 294:5,20
  295:5 296:23
  298:6 311:14
anesthesiologists
  233:1 282:4
anesthesiology
  316:21
anesthetic 286:20
Angela 273:19
  282:22 290:6,10
  290:13,14,18
  291:1,15 295:1,9
  296:1 298:15
Angela's 291:13
  296:16
Angiocath 321:3,5
  321:6,8,11
answer 225:11
  266:18 304:18
  310:15 314:1
answered 244:24
  276:5 315:20
  319:17
answers 307:22
anterior 311:1
anymore 218:16
  221:4 223:5
  250:22
anyway 284:24
appeals 223:7
APPEARANCES
  213:1
appeared 213:6,12
appears 240:5,7
  283:20 290:6
  323:7
apply 215:5 233:17
applying 299:24

301:23
appraisal 273:24
apprehension
  325:11
approach 312:19
approached 285:8
approaches 311:1
appropriate 286:20
  287:24 288:2,24
  302:8 313:6
  315:21 316:1
appropriately
  327:14
area 226:16 251:5
  275:3 291:23
  313:2
areas 252:16
argue 308:19
argued 236:24
  308:21,22
argument 325:22
arrest 234:14
arrhythmias
  294:14
arrived 228:14
  323:13
Ashley 262:18
aside 229:13
  295:22,23
asked 223:13 235:8
  241:14 243:10,10
  244:2,12 245:1
  247:3 253:5,16
  267:9 274:19
  291:20 294:18
  295:14 296:13
  300:8 301:8 303:9
  303:11,23 304:7
  307:23 311:4,6
  312:18,21 313:15
  313:24 314:20
  316:6 319:17
  322:17 330:8
asking 225:11
  235:6 244:5
  267:19 270:2
  272:6 276:8
  303:13 304:3,9

307:19 309:9
314:14,15 316:15
  318:3 328:7
  329:14
aspects 292:5
assessment 237:9
  280:14 281:18,23
  291:24
assessments 224:1
assigned 250:24
  265:2,12 266:17
  266:21 267:5
  270:16,21 271:7
  271:13 273:19
  274:12,16 276:9
  276:13,19 290:10
  291:7,10
assignments 217:1
  275:20,23
assistance 292:2,3
ASSOCIATES
  213:3
assumed 246:15
assumes 246:20
attached 318:21,23
  318:24
attain 251:14
  252:19
attempt 292:1
  321:2 322:20,20
  322:22,24
attempting 319:8
  321:1 325:21
attend 306:11
attending 329:18
attendings 237:1
attention 264:17
  327:7
AV 281:9
available 279:16
  296:22
average 297:5
avoid 270:5 276:6,7
  276:21,24 288:3
aware 256:13
a.m 212:20

**B**

**back** 215:2 223:11
223:14 227:10
230:11 232:19
237:18,19,24
238:12 240:9,18
250:20 253:1,23
254:6 267:11
272:12 275:14
276:5,16,22
302:22 307:24
315:15 328:23
**backing** 328:19
**bad** 324:1,10,12
326:2
**badgering** 307:8
**bag** 307:14,17
**balloon** 317:12,18
318:18,24
**barking** 309:6
**barraging** 237:4
**base** 298:18
**based** 259:12 285:2
285:3 325:14
**basic** 215:4 224:3
286:24 292:6
295:2
**basically** 217:1
221:19 226:12
243:1 253:6
273:23 295:23
300:2
**basis** 256:3 257:1
260:3 261:4
285:22
**battle** 239:7,20
**Becka** 262:18
**beginners** 267:14
**beginning** 253:1
301:14 302:20
310:8
**behalf** 213:6,12
215:14
**behave** 237:21
**believe** 220:18
222:19 225:12
228:13 257:20
263:22 265:6
290:14 317:5

328:1,10
**believed** 295:1
**bench** 221:13
**benefit** 273:22
**best** 247:5 248:1
310:15 324:11
**better** 225:12
227:24 284:23
**bias** 255:22,24,24
**biased** 256:7
271:14 284:17
285:1,2
**bit** 284:21 288:13
**BLACKWELL**
213:8
**blade** 299:15,16,17
299:20
**blink** 257:21
**block** 281:9
**blocker** 313:12
**blood** 294:9 308:5
308:13,15 310:16
310:17,20,22
311:3,7,23 312:18
312:21 313:1,3,7
313:13
**Bloomer** 266:23
**blow** 247:16
**Blvd** 213:3
**bolded** 228:9,23
**book** 217:4 221:20
300:23 311:16
**books** 311:10
**bottom** 229:15
237:17 273:8
278:1 280:24
281:8 282:21
291:13,18
**break** 263:19,21
**breaks** 260:8
**brief** 227:6 277:6
306:1
**bring** 219:19
**brought** 221:13
321:7
**bullet** 278:4,12
**burnt** 302:16
**business** 333:6

**busy** 302:21 310:11
___

### C

**calcium** 313:12
**call** 297:7
**called** 212:13
215:14 216:17
**calling** 231:15
**calls** 235:2 242:19
242:21 268:11
296:18 301:5
303:6
**capability** 236:19
**capacity** 212:7,8,9
**capture** 221:19
**cardiovascular**
257:18 282:9
**care** 216:9,17,19
217:8,9,17,21
218:11,18 219:1,5
219:7,23 220:1,5
220:7,19 222:2
223:3,6,20 226:18
226:24 234:15
242:5 249:22
286:20 288:19
290:6,16 294:20
**carefully** 268:10
**case** 216:15,19,21
217:1 219:20,24
220:1,14 221:9,12
222:15 224:5,6,8
224:13,13 281:3
284:22 285:13
288:11 292:5
293:23 295:10,10
296:6 297:5,10,18
301:9 303:11,16
303:17,19 305:23
306:9,24 307:7,9
308:7 310:8 312:4
315:21 317:9
325:7 327:9
329:19
**cases** 216:11,12,24
224:11 233:5
250:24 270:6
274:12 306:16

312:9
**catch** 293:17,18
**categories** 286:15
327:3
**category** 251:15
**catheter** 322:13
**caudal** 221:17,20
**cause** 239:17
315:18
**caused** 319:23
**cautious** 280:19
**CENTER** 212:6
**certain** 257:13
**certainly** 225:14
234:16
**Certified** 333:17
**certify** 333:5
**Chagin** 291:23
**change** 313:6
**changed** 223:2,16
**changes** 292:15
300:24
**channel** 313:12
**charge** 234:20
**charting** 293:17
301:17
**check** 292:23 297:2
297:9,20 298:2,10
301:13 302:12,22
**checked** 291:21,21
296:13,14 308:7
**checking** 292:18
296:10,16 297:22
300:14 301:3,11
301:18 302:3,19
303:2 304:14
319:8
**check-in** 238:8
**check-ins** 238:17
**Chicago** 212:18
213:4,9 333:7
**child** 234:7 292:2
**child's** 234:20
**choose** 265:16
**chose** 265:19
**chosen** 265:15
**circulatory** 313:1
**circumstances**

234:24 283:13
**cited** 235:13
**City** 333:6
**Civil** 212:15
**claimed** 291:21
**class** 241:24 242:14
242:24 244:1
247:2,23 260:8,8
264:16
**classmate** 322:3,15
**classmates** 249:13
249:16 250:21
253:13,20 254:1
258:6 259:5 261:6
262:17 263:23
264:9 267:14
275:13
**clear** 292:10
**clinical** 230:6,6
237:8 238:4
249:14 250:12
251:5 252:17
267:22 273:5
275:3,19,23
281:17
**clinicals** 219:24
220:2 251:22
253:18 267:1
268:8 329:4
**close** 310:2
**closed** 298:13
**closely** 294:16
**coaching** 244:16,18
245:3,15
**cohort** 254:2
257:17 266:23
282:8
**cohorts** 257:8,12
258:13,20 268:16
275:9 282:5
**come** 237:18,19
238:12 240:9
251:11 253:23
264:17 267:11
**coming** 230:11
232:19 237:24
240:18 250:19
253:1 276:16

298:5
**commencing**
212:19
**commended** 327:11
**comment** 238:2
243:8,11 247:1,22
247:24 280:24
281:8 289:1
**commentary**
228:23 229:12
**commented** 222:9
**comments** 231:21
232:3 233:12
235:22 238:22
239:19 244:13
245:9,22 246:12
269:3 280:17
286:17 291:18
329:9
**committed** 239:9
239:21
**common** 311:7
**commonly** 316:21
**communicated**
220:4 247:13
**communication**
306:20 313:20
**compare** 279:9
**compared** 257:8,12
258:7,20 259:22
275:9 278:23
**comparing** 239:20
278:16 279:10
**compilation** 279:21
280:1
**complain** 254:18
**complained** 262:1
272:18
**complaining**
264:17
**complete** 222:13
273:11,14 280:13
281:17 327:14
**completely** 225:8
**completeness** 328:1
**complicated** 216:13
288:13
**component** 294:19

**concede** 293:22
**concern** 271:14
**concerns** 249:21
**conduct** 215:4
**confused** 276:11
**considered** 267:20
267:21
**consistently** 251:14
251:16 252:18
**consisting** 332:6
**consolation** 247:17
**constant** 249:22
292:4 307:21
**constantly** 307:8
309:5 326:6
**contact** 301:21
**contain** 219:1
249:8 280:10
**contained** 291:16
**context** 318:9,10
**continuation** 229:8
**continued** 212:12
227:8 277:8
**continues** 229:3
**continuous** 323:20
**contract** 248:14
249:2 250:5 252:2
253:4 255:8
269:20 270:19
275:7
**control** 237:21
296:22 315:4,6,8
**conversation** 228:4
228:16 229:5
231:24 285:9
306:15
**conversations**
229:16 231:17
260:9
**converted** 288:1,5
288:14
**convince** 320:2
**Cook** 264:8,11,22
265:2,12,15,17,20
333:2
**copies** 225:5,6,7,12
226:1,23
**copy** 216:2 218:22

219:15,18,19
222:14,22
**copying** 225:4
**cord** 312:15,15
**correct** 221:3
255:10 284:24
288:4 290:21
327:11 330:5
332:8 333:10
**corrected** 330:23
**correctly** 246:17
327:14
**correlate** 218:19
304:11
**correlated** 303:22
**correlating** 292:8
**counselor** 261:11
261:11 270:22
271:24
**count** 292:12 295:5
**countered** 304:18
**County** 264:8,11,23
265:2,13,16,17,20
333:2
**couple** 217:20
222:8,11 262:22
262:22 264:7
273:15 289:14
327:3
**course** 295:10
296:6 306:4
309:15
**court** 212:1 332:1
333:6
**COURTHEOUX**
213:11
**Courts** 212:16
**create** 240:22
248:18
**criteria** 250:23
251:17
**critical** 233:3 324:8
**criticism** 258:23
294:1,3 328:2,10
330:15
**criticizing** 258:19
**CRNA** 217:10,22
237:23 249:10,13

249:22 250:15
257:19 259:3
262:12 270:9,12
271:8 276:6,19
278:20 291:7,10
291:11 297:2,11
299:6
**CRNAs** 233:2
236:2 237:1,18,19
238:2 239:15
240:2,18 264:18
264:24 266:6
269:3,10 270:6,16
270:20 272:18
274:3,18 276:14
278:17,24 282:4
291:8 316:4 320:2
327:15
**cross** 308:11
**crossed** 307:16
**crossing** 307:17
**crucial** 257:17
282:9 312:11
**CSR** 212:17,24
333:5
**cuff** 319:8
**current** 219:6
239:16
**cut** 237:6 295:14,20
**cuts** 234:17
**CV** 282:9

_____

### D

**D** 214:1
**daily** 269:11
**data** 217:12
**date** 217:10,13,15
217:18 290:5
291:3
**dated** 224:20,24
272:24 275:19
280:5 283:23
286:6 291:1,9
320:16,21 323:4
**dates** 218:17
**daunting** 310:4
**day** 217:5 218:11
220:2,5,16 222:2

222:15 224:20
226:15 231:14
251:1,4,5 274:3
275:2 278:5,9,13
278:17 279:11
280:23 281:2
282:22 283:24
284:3 290:5,6,11
290:16 291:8,10
305:12 312:9,12
324:2,10,13,16
325:18 326:2,17
327:17 328:14,23
332:17
**days** 226:19,24
290:21,22 324:21
325:6 326:3
**deal** 236:17
**dealing** 325:1
**death** 328:23
**decide** 242:11
243:4
**decided** 273:22
**decision** 233:3
234:4 241:10,11
**defective** 322:4
**Defendant** 213:12
**Defendants** 212:10
212:13 215:14
**definitely** 257:8
308:10 325:9
**deflate** 318:12,16
319:8
**deflated** 317:21
**deflating** 317:12,24
**delivered** 244:14
**department** 275:24
**depending** 302:15
**deposition** 212:12
215:3,5,23 227:7
227:12 248:8,11
270:23 272:21
275:16 277:7,10
279:14 331:11
332:6,8 333:8
**depositions** 212:17
**describe** 228:15,19
286:23

describes 300:1
describing 228:10
descriptions 236:1
designed 252:22
desk 220:14
detail 257:16
  266:12 312:24
details 323:11,17
deteriorating
  294:17
determination
  236:4
diagnosis 281:7
dial 297:12,17,20
didactics 243:18
  244:3 263:16,20
die 331:13
difference 250:9
  278:23 279:5
different 237:15
  243:15,20,23
  249:9,15 250:1,7
  250:13,14,17,20
  251:8 252:1
  259:10 262:7
  264:6 275:8
  276:12 278:17,24
  287:20 300:24
  303:14 304:12
  327:3
differently 237:20
  238:3 239:16
  261:4
difficult 233:18
  240:3 325:8
dinged 258:1,3
DIRECT 215:18
direction 287:3
  307:11
director 250:12
  252:13 269:17
disability 243:2
disagree 288:22
disagreed 288:20
  288:24
discombobulated
  309:17
discretion 243:19

discriminated
  256:7,10,17,20
  257:4 258:11
discriminating
  255:14 285:21
discrimination
  246:5 254:18
  255:5,23 256:2,3
  257:1 260:3
  261:21 286:1
discriminatory
  255:8 258:17
  259:15 330:1,9,16
  330:19,21
discuss 228:1
  266:12 276:18
  323:12
discussed 252:5
  312:8
discussion 238:4
  313:11
disdain 239:9
dismissal 251:5
dismissed 224:23
  326:13
disorganized
  307:19
disparity 257:9,12
dispute 220:3
  287:10 329:10
  330:9
disputed 236:6
  241:1 276:3,9
  301:12
distinct 286:1
distracting 303:4
distribute 274:2
  275:2
District 212:1,1,16
  332:1,1
DIVISION 212:2
  332:2
DMR 327:9
document 216:7
  245:21 248:16,18
  277:15 278:1,5
  281:4
documentation

302:1
documents 216:2
  226:18 281:11
doing 244:6 255:2
  287:17 288:16
  301:17,20 302:1,5
  327:7,8 333:6
doom 326:7
dosage 313:21
  314:5 316:4,9
dose 313:24 314:11
  314:15
dosed 327:9
dosing 329:19
Dr 212:7 232:6
  236:7 253:4,5
  255:12,12 256:12
  256:13,18,19
  261:22 264:15
  267:9 269:14
  270:11,14 276:18
  278:14 283:11
  285:8 289:20
  291:23 326:7
draft 226:9
drop 232:20
drug 292:16 300:11
  300:15 329:18
drugs 222:10
  303:15 307:16
dry 315:13,16
  316:1
drying 315:5
duly 215:15
duration 292:17
  300:12,19 301:10
  302:14 303:12,24
  304:8,11,14,17
DX 279:23

E

E 214:1
ear 234:12 318:7,13
early 263:24
easier 244:8
EASTERN 212:2
  332:2

Ebele 265:6,13,19
  265:22
Ed 265:14,19 266:4
editorializing
  238:22
effect 264:20
  302:13
effective 276:22
effects 324:24
effort 220:7 221:6
  327:11
either 223:11 274:7
  283:5
EKG 280:22,23
  281:2,7,15,22
  292:7,11,23 293:6
  294:9
elaborate 238:23
  256:5
Elaine 213:3,5
  218:22 225:2
electronic 222:17
  222:22
eleven-page 220:19
eliminate 271:4
email 262:5 264:15
  273:8 274:22
  275:18 283:20
  320:13,20,23
emailed 221:21
emails 262:23
  272:23
embolism 286:23
emotional 236:17
  236:19 325:23
  326:2 329:6
emotionally 325:1
  325:7
emotions 234:4
empty 298:7
encounter 313:16
ended 234:14
  287:16 288:9
  306:2
ends 329:21
entered 246:23
entire 278:15
entirely 323:15

entitled 277:17
entry 329:8
envelope 230:22
  232:16
episode 324:16
  325:18
Erin 212:17,24
  333:5
error 286:4
escapes 258:7
Essig 262:18
establish 246:16
established 244:13
  245:9,20
ET 317:18 319:7
ETT 321:2
Eva 271:2,7 276:14
  306:7 320:7,13,20
eval 290:11
evals 267:18
evaluate 247:19
  263:12 268:9
  269:5 273:21
  274:13 290:15
  293:5 325:14
  329:4
evaluated 258:6
  278:23,24 285:14
  286:4 306:21
evaluating 269:1
  292:20
evaluation 217:10
  217:11 251:15
  252:7 254:16
  259:2 273:18
  275:3 278:4,9,15
  282:12 283:5
  284:9,13,17
  285:11,20 286:6,9
  287:4,11 289:21
  290:6,24 291:2,15
  304:20,22 305:1
  305:14 306:23
  312:14 319:7
  323:3,8 324:7,16
  324:19 325:11
  326:15,21 327:16
  327:24 329:24

330:8
evaluations 235:24
  236:3,5,10,14,20
  237:1,2,9 252:9
  252:13 258:17,24
  259:1,7,8,9,16,21
  269:10,12,24
  270:3,5,9 271:14
  273:5,10,11,14
  274:3,11,17 275:2
  277:18 278:6,12
  278:16,20 279:6,9
  279:11 280:1
  283:2 305:7
event 235:14 285:5
  286:12
everybody 285:10
  302:20
evidence 246:20
exact 223:3 232:1
exactly 302:18
  319:1 321:16
exaggeration 302:4
examination
  212:14 214:8
  215:18
examined 215:15
example 234:7
  239:12 257:14
  286:20 324:7
Excel 263:6
exclude 275:23
exclusive 246:9
exclusively 278:13
excuse 325:6
execute 250:5
exhibit 215:21,23
  216:2,2 223:20
  227:12 248:8,11
  272:21,23 275:15
  275:16 277:10,12
  279:14,16,19,20
  280:1 282:14,16
  283:18 287:6
  290:24 293:21
  304:21 320:13,19
  323:3 326:21
exhibited 235:19

EXHIBITS 214:16
exited 245:17
expect 253:22
expectation 249:5
  249:11 272:18
expectations
  248:19 249:2,16
expected 249:12
  251:11,24 271:12
  272:12 302:14
experience 259:5
  289:14,23 299:5
  311:9 329:2
experiences 267:22
expertly 253:12
explain 269:17
  313:14 318:9
  321:15
explained 235:8
  266:16 274:20
explaining 233:10
  234:24 235:21
  237:10 239:15
  324:23
explains 278:5
explanation 287:9
  313:15
exposed 253:18,23
exposure 271:2,4
expressed 271:13
expressing 239:23
expressions 249:21
extent 329:13
extubated 317:12
  318:13
extubating 317:10
  319:12
eyelash 257:21
eyes 233:16

——————— F ———————
face 307:12 309:14
  309:22,23 310:1,5
facilities 265:9
facility 267:15
fact 229:11 237:22
  246:20 248:22
  273:10 304:17

328:1
factor 244:1 247:15
factoring 240:19
faculty 249:20
  255:17,19 256:8
  273:14,15
fail 241:4 244:7,9
failed 223:4
failing 330:3,6
failure 251:3,15
fair 253:21 255:18
  255:20 271:7,10
  273:23 282:1
  305:5,8 323:10,15
  324:3,8 327:16
  330:13
fairly 273:21
Faith 266:23
  267:24
familiar 251:20
far 236:5 257:22
  263:18 269:5
fast 294:13
faster 302:17
favorable 323:7
February 326:22
  327:22
fed 296:23
feedback 274:13
  275:4
feel 247:14 257:3
  264:19 327:12
feeling 256:17
  324:24 326:5
feels 330:20
fell 321:24 322:14
  322:16
felt 256:7 326:4
female 298:22
figure 219:8
figured 288:17
filed 223:7
files 281:4
fill 226:15
filled 226:5
find 217:1 218:13
  219:7 223:3,5,10
  223:11,12,17

241:22 242:2,9
  275:6 282:16
  305:7 332:7
finish 243:17
finishing 263:20
fires 313:17
first 215:14,21
  216:6 219:12
  239:9,21 242:8,8
  245:1,9,19 262:22
  263:8,19 264:16
  270:6,23 273:8,18
  273:19 280:5
  296:9 298:23
  301:14 303:20
  321:2 327:24
  328:23
Fisher 271:2,8
  276:14 320:13,20
fit 230:11,17 232:3
  232:4 233:16
  234:5 236:4 242:3
  246:2
five 253:18,23
  256:23 302:5
fixed 301:1
flash 308:10
floor 306:12
follow 247:2 270:1
  270:11 272:19
  283:1
followed 238:3
  262:4
following 229:2
  249:3 324:16
  325:18
follows 215:16
  227:9 277:9
follow-up 248:22
  284:9
force 231:5 232:17
  233:11 234:6
  235:23
forced 240:14
foregoing 332:5
  333:9
Forester 286:7,10
  289:6 290:8,19

Forester's 287:10
form 244:20 246:19
  285:24 316:4
format 229:4
formative 251:15
  252:9,13 274:11
  275:3
forms 226:4
formulate 286:19
found 296:3
four 216:7 256:23
  308:2,3 312:20
  313:2 324:21
  325:6
four-hour 297:5
freak 287:2 289:2,8
  289:22
frequently 304:5
fresh 253:6,8,17
freshly 303:21
front 295:23
fulcrum 299:17
full 273:20 298:7
funeral 328:23
further 215:15
  243:15 250:17
  263:1
fusion 311:2 312:20

——————— G ———————
G 213:11
Gallagher 282:8
  323:2
gases 301:17 302:2
gather 226:14
gauge 255:13
  268:20 325:10
gauged 253:19
general 249:5
  250:16 255:18
  263:8 267:8 288:2
  288:6,14,17
  305:19
gesture 309:20
getting 217:3
  220:18 257:3
  258:6 270:5
  274:17 307:15

310:11 314:24
326:5
give 255:16 269:11
270:13 273:16
given 253:5 266:18
273:11,13 303:21
327:9 332:8 333:8
giving 243:19 302:2
303:15 327:10
gloom 326:7
glossed 258:5
glycol 313:21
314:17 315:1
glycopyrrolate
313:22 314:1,19
315:4,7,16
glycopyrrolate's
315:23
go 243:17 245:14
264:8,22 265:15
265:16,20 267:14
268:1,17,22 269:8
306:1 307:3,3,4,4
317:11,11,11
318:6,6,6,6,8,8,8
318:12,12,12,12
319:13,13,13
326:16
goes 252:15 283:2
316:7
going 216:10,15,21
222:11 232:20
233:2,5 235:2
237:19,21 238:3
244:11 253:11,12
256:15 264:23
269:8 272:19
273:21 274:8
275:8 276:4,19
288:7,8,16 294:10
295:10 296:18
297:9,13,23
307:10 309:4,5,8
310:3,3 315:13
good 215:2,10
230:11 242:3,15
243:19 268:22
279:9 280:16,17

284:6 296:3
328:14
gotten 274:7
284:23,23
grade 251:18
252:19
graded 253:12
266:6 330:2
grading 253:19
330:12
Gradman 265:14
grand 306:10
grandmother's
328:22
group 218:10
grouped 245:24
guaranteeing
253:16
guess 219:21
220:18 230:1
237:7 239:22
268:15 272:7
274:15 283:11
309:16 312:2
319:5 324:11
328:15,15 329:13
330:17
guide 217:5 218:3
guideline 316:21

**H**
Hakeem 313:16,17
half 224:22
hallmarks 298:21
hallway 229:12
260:8 306:5,12
Halsted 261:16
hand 259:2 299:12
309:24 311:7
316:7,7 318:14,20
318:22
handbook 249:7
251:21,23 275:8
316:5
handed 274:18
handle 325:7
handwriting
291:12

handy 218:6
hanging 320:6
happen 246:13
290:22 301:11
321:8,14
happened 222:24
224:8 228:11,24
261:9 281:20
285:12 289:2
320:9 321:15,19
321:20 322:2,5
326:9
happens 241:16
happy 241:23
242:2
hard 218:22 219:15
219:18 225:4
harder 241:3,5
harsh 258:20,23,24
284:21 330:12
harshly 282:6
283:15 286:4
330:2
hastily 319:6
hear 232:21 242:4
244:20 245:3
heard 232:5,13
244:21 265:21
285:4 289:22
308:2
hearing 259:7
heart 234:3 292:7
292:23 293:6
294:11,13,19
300:16 313:7,12
315:6,24
held 275:14
hello 306:16
help 216:4 233:4,5
300:2
helped 277:20,22
high 297:6
highlight 222:10
highlighted 222:9
highlighting 243:1
hissing 298:4
histories 257:18
268:1 281:5 282:9

history 217:2
226:13 257:14
286:22 312:10,10
hold 308:13 310:16
310:18 311:23
hole 231:3 232:17
233:11 234:12
235:22 237:11
home 231:16 306:1
honest 242:7
273:24
hope 240:18
hospice 315:8
hospital 266:19
hospitals 233:6
264:11,13
hostile 308:23
hour 212:20 224:22
HR 261:23
huge 300:3
human 237:20
hurry 319:14
husband 231:15
277:23
husband's 328:22
HUSCH 213:8

**I**
idea 233:4 237:14
279:8,9 292:9,17
293:15 300:11
302:11 304:16
320:11
ideas 215:4 235:1,8
identification
215:24 248:9
272:22 275:17
277:11 279:15
identified 249:17
ignore 254:10
illegible 225:9
Illinois 212:1,19
213:4,9 332:1
333:1
imagine 234:15,20
immediately
307:18
impact 278:20

impair 215:7
implication 238:15
important 312:13
impossible 233:18
301:7,8
impression 242:13
improvement
266:21
Inaccurate 291:23
inadvertently
318:13
inappropriate
287:17 295:12
296:6
inches 309:24
310:5
include 217:13
included 328:1
including 276:14
inclusive 332:7
incorrectly 291:9
independence
263:2
indicate 231:19
232:18 238:21
239:1 252:15
304:10 311:22
316:18 328:21
indicated 241:16
244:12 307:2
indicates 252:8
289:3
indicating 240:8
242:13 243:24
257:7 273:9
274:15 275:22
299:19 309:21
individual 212:7,8
212:8 216:12
induces 297:8
information 217:5
224:3 282:5
313:17 327:10
initial 241:15
initially 270:7
injured 312:16,17
inpatient 224:2
insert 296:1 321:10

322:8,11
**inserted** 322:12
**insertions** 295:18
**insisting** 308:3
**instances** 281:14
299:1
**instruct** 319:11
**insults** 237:5
**intense** 325:10
**interact** 305:21
**interacted** 306:19
**interaction** 306:2
329:18
**interfere** 293:11,12
**interference** 292:11
293:10
**interpret** 299:23
**interpreted** 242:16
**interrogatory**
282:17
**interruption**
253:13,21
**intervened** 321:1
**intervening** 294:11
**interventions** 294:8
**introduction**
307:16
**intubate** 288:10
303:20
**intubated** 288:9,9
**intubating** 299:9
300:4
**intubation** 292:3
**intubations** 280:17
**involved** 224:22
306:17,20
**involves** 317:18
**in-hospital** 224:1
**iPhone** 221:18
**IR** 296:20,24 297:1
297:12
**irate** 308:12
**irregardless** 329:4
**irritated** 308:22
**issue** 234:6 272:12
292:8 294:4 329:5
**issues** 230:6 235:19
237:9 240:22

289:17
**item** 257:14 281:11
284:21,24
**IV** 257:24 291:24
295:15,18 296:1
307:14,17 321:2
330:3
**IVs** 258:3 280:17

___ **J** ___

**Jackson** 213:3
**Jaffe** 311:17
**January** 248:15
272:24 275:19
277:18 278:2,7,10
279:3,9 280:2,5
282:22 283:23
285:14,21 286:6
286:12 287:10
290:7,18,19,19
291:1 304:21,23
304:24 305:11
306:23 307:7
320:16,21 323:4
325:2,15
**jaw** 299:17 300:3
**Jill** 212:8 218:11
219:2 220:4,22
263:12 271:2,7
276:14,21 277:1
278:1,10,19
304:22 305:10,15
305:21 307:6
312:3 320:2
324:17 325:1,18
**Jillian** 326:24
327:21
**Jim** 279:1 305:1
**job** 280:17 284:6
324:1,10,12
**Johnson** 253:4
254:19 255:12
256:13 270:15
276:18
**joke** 289:3,7,11
**joking** 289:9
**JOSEPH** 213:15
**judgment** 252:17

281:17 287:20
299:2
**judgmental** 240:8
240:11
**July** 262:19
**June** 218:12 219:1
219:5,8 220:5,20
222:1 224:18
253:7 254:8
262:16,20,21,23
263:8,11,19,24
305:18

___ **K** ___

**Karen** 213:11
265:6,13,19 266:1
308:21
**karen.courtheou...**
213:10
**Kathleen** 257:20
280:9 282:8 283:5
284:16
**Keehn** 282:22
290:14 291:1
295:1
**Keehn's** 290:18
**keep** 219:20 220:7
221:6 275:2
279:16 297:3
322:19
**keeping** 219:22
**Kelly** 262:18 282:8
323:2
**kept** 268:9 308:3
**kind** 224:21 236:17
236:19 244:15
264:21 303:1
306:14
**kit** 297:20
**Klunk** 326:24
327:21 329:9
**Klunk's** 328:2
**knew** 256:14 265:2
265:11 289:11
314:15
**know** 216:19,21
217:18 218:10,17
220:16 223:3,24

224:6,9,18,21
225:4,15 226:21
226:23 227:4
233:4 234:9
235:24 240:20
242:22,23 243:23
253:17 257:22,24
259:2 260:13,18
260:20,21 262:10
262:14 263:1,18
263:20 264:4,13
265:24 266:5,8,14
266:20 267:12,20
268:3,18,19,19
270:18 272:10,11
272:16 274:17
276:16 285:18
288:17 289:11,19
289:23 290:2,3,12
298:7 300:16
302:15,16,18
303:15,21 304:10
304:14 306:5
308:20 310:14
312:1,15,23,24
313:1,5,6,8,10,11
314:5,8,9,20,24
316:4,8,11,14
319:4,5,15 321:17
321:18,24 322:20
323:1,15 324:24
325:10
**knowing** 316:20
322:1
**knowingly** 321:12
321:18
**knowledge** 292:16
300:11
**known** 287:1
289:10
**Kremer** 212:7
221:2,24 227:17
232:6 236:7 252:5
253:5 254:20
255:12 256:12,18
256:19 257:10
261:22 264:15
269:14 270:1,11

270:14 272:24
275:19 276:13
278:14 283:11,23
285:8 289:20
320:14,21 326:7
**K.B** 213:3,5

___ **L** ___

**L** 213:11
**lack** 292:6,16 295:2
300:10
**laid** 220:13
**LAND** 213:11
214:10 215:2,10
215:19 225:2,8,13
225:15 226:1,4
227:10 228:9
235:4,8,15 242:20
243:3 244:15,20
245:6,10 246:2,9
246:12,18,21
247:1 268:13
272:10 275:15
277:5,12 279:13
279:24 301:7
303:8 304:6
319:20 320:19
326:18,21 331:1
**language** 228:9
**laptop** 217:16
218:16,20,23,24
219:6,8,13 223:1
223:4
**laptops** 218:14
223:2
**laryngospasm**
286:24 287:2
**lasting** 303:3
**lasts** 302:11
**late** 253:7 254:7
**lawyer** 218:8
**Lea** 286:7,9 287:10
287:20 288:22
289:6,19 290:7,14
290:19 305:24
**lead** 294:7
**leading** 243:8
256:21 258:10

leak 298:1,2,11
learned 224:6,10
learning 248:14,19
  249:2 250:5 252:2
  269:20 270:19
  275:7
leave 238:5,7,8,11
  238:13,14,16
  239:18 240:14,19
  256:22 258:10
  260:22 261:2,13
  261:16,19,23
  262:6 276:20,23
  284:8,12 285:5,6
Lea's 305:23
lecture 298:24
led 304:8
left 221:9 229:9,19
  232:19 236:5
  248:23 284:14
  295:16,16,21,21
  296:1 298:15
  321:3
LEGAL 212:23
legitimate 294:1
  328:2,11 330:15
letting 242:6
let's 235:11 275:15
  279:13,19 304:20
  320:12
level 253:22 298:6
leverage 292:4
  299:9,24 300:2,6
  300:7
life 234:21
lift 299:17 300:2
lifted 249:6 251:23
light 267:6 289:4
  289:13
lighting 293:10
limit 271:1,18,21
  272:2 276:21
  299:1
line 273:6
list 300:16 312:1
listed 217:22
lists 250:24
little 224:4 252:1

277:3,4 284:20
  288:13 318:23
locate 222:20
  294:13
location 262:8
  264:6 266:17,22
  267:5
log 217:17
long 302:11
longer 288:14
  301:4 306:15
look 216:24 217:8
  218:7 219:13
  220:23 221:14
  223:14,15,17,21
  225:3 226:5,22
  227:11 237:20
  238:3 239:15
  271:22,23 279:19
  294:7 295:21
  298:5 311:10
  327:19
looked 217:21
  218:9 219:4
  227:13 236:3
  239:8 293:22
  295:16,19 316:23
looking 226:7
  227:21,22 303:4
  310:14 320:17
looks 216:6 251:20
  323:3
lost 222:14
lot 216:1 236:1
  240:21 241:17
  247:15 259:23
  260:23,24 287:2
  315:18
lots 292:10 326:12
loud 286:17 309:13
  309:15
lower 323:16
lunch 305:23,24
lying 308:3

**M**

MAC 288:7,14
machine 296:23

298:6
MacNeal 264:7,11
  264:22 265:2,12
  265:18
MAGNA 212:23
main 266:19
  268:14
majority 323:16
making 236:12,13
  243:8 244:16
  289:4,13
March 212:19
  277:18 278:7
  332:6 333:9
Marcial 212:3,13
  214:4 215:13,23
  226:9 227:8 248:8
  272:21 275:16
  277:8,10,17
  279:14 331:12
  332:14 333:8
Maricel 212:3,13
  214:4 215:2,13
  225:15 227:11
  248:11 272:23
  277:13,17 284:3
  291:21 305:7
  321:1 330:14
  332:14 333:8
Maricel's 239:3
mark 275:15
  279:13 330:3
marked 214:16
  215:21,24 227:12
  248:9,10 272:22
  275:17 277:11
  279:15
Mary 254:19
  270:14
mask 292:2
matching 217:9
matter 237:22
McCann 311:19,20
  311:21
McLaughlin
  212:17,24 333:5
MDs 327:15
mean 248:2 254:1

258:24 260:4
  270:8 290:15
  298:20 300:24
  306:12 309:12,22
  315:7 317:1
meaning 253:10
  306:15
meaningful 306:14
  306:15
means 302:11
  313:5 330:19
meant 217:7,7
  234:6 237:9
  242:17 247:10
  250:22 272:15
  289:3,7,9,11
  290:9,12
measure 268:20
mechanism 313:14
medical 212:6
  312:10
medication 215:7
  302:2 313:13
  315:7
meet 227:18 228:4
  237:23 252:12
meeting 227:21
  228:20,24 229:8
  231:16,18,20,21
  232:10 237:23
  239:2 245:23
  248:6 253:3,4
  254:19,24 255:6
  256:11,13 260:13
  260:15,17 270:18
  274:8 276:17
meetings 250:11
  256:21 258:10
  260:6,7 276:10
member 292:13
  295:5
members 249:20
  254:2 275:24
membrane 234:12
memory 232:9
  316:20
MENDELSOHN
  213:15

mention 261:9
mentioned 221:11
  229:10 255:7,24
  256:1,23 257:4,6
  257:13 260:2
  261:8,13 265:7
  266:2 267:24
  270:17 313:18
mentioning 257:10
mentions 240:24
  243:15 264:19
messages 274:2,4,6
met 227:24 256:22
  270:14 276:3
metabolism 302:15
metabolize 302:17
  302:17
metal 300:3
MICHAEL 212:7
Michelle 262:18
middle 229:14
  279:6
Mike 221:1,24
  227:17,18,21
  228:6,16,20 229:5
  229:16 237:14
  238:21,22 239:1
  241:13,14,16
  252:5 254:19
  258:9 259:15
  260:3 270:1 271:1
  271:18 272:24
  275:19 276:13
  283:23 320:13,20
Miller 279:1 305:1
  311:19,20,21
mind 234:3 246:3
mine 218:20 253:22
  257:17
minimum 252:8
minor 257:16 286:4
  288:1
minutes 292:18
  300:15,21,22,23
  301:1,11,15,16
  302:3,5,20,23
  304:15,18,19
  307:24

miserable 242:2
mismarked 279:23
misrepresentations 273:20
misrepresenting 307:22 326:3
missed 257:14,17 280:21 281:1,14 281:22 282:8 283:14 284:21 294:15 322:18 330:3
missing 257:24 279:22
misstep 257:23
mistake 239:8,20 292:20 293:1 317:8,14,16 325:20,21 328:6 330:6,18,23
mistakes 241:3
misunderstanding 329:22 330:4
miswrote 291:3
mix 314:2,12,13
mixed 221:12 314:10
MK 229:10 237:24
monitor 293:9 295:6 301:21 303:5 306:6
monitored 288:7
monitoring 292:14 294:4,16,18
month 263:9 306:11
months 250:19 253:18,24
motive 235:6
mouth 315:15
move 242:11,15 250:23 307:11
movements 293:12
moving 237:15
multiple 264:5 281:11 282:5 291:19 309:3 319:18

muscle 302:9
mutually 246:9
myringotomy 234:10,11
M.D 327:10

**N**

N 214:1
name 290:5
named 312:23
names 218:4,5
Narbone 212:7 247:1,19 248:5
Narbone's 227:20
national 248:6 285:3,22
nature 237:20 310:17
nausea 286:22 288:3,18 297:7 298:22 299:1
near 227:16 278:1 282:21 318:7
nearly 278:13
necessarily 218:4 244:13 245:20,22 259:2 297:3 299:6 330:19
necessary 303:4 308:9
necessity 308:16
need 226:22 233:15 234:18 242:4 252:8,16 266:19 269:9,23 274:12 293:5 297:18 298:19 299:3 301:3 302:12 303:2 308:11,14 311:23 327:12 329:10
needed 267:6 292:4 297:21 300:16 319:21
needle 321:4,10 322:1,7,12
needs 287:2 298:7 317:21 323:19

negative 237:2 285:11
negatives 236:6,6 240:20,24 275:14
neostigmine 314:3 314:10 315:10,17 315:18,20
nerve 242:24 301:22,23
nervous 292:1
network 313:2
neutral 262:8 264:1
neutralizing 315:19
never 236:2 253:20 258:7 267:17 272:17 275:22 315:11 317:13
new 321:8
newer 223:4
night 216:3,16,24 308:6 312:7
Nitrous 291:20 296:11,21 297:6 298:6
noise 298:5
nonsmoker 298:23
non-bolded 228:19
non-satisfactory 257:16
normally 291:9 322:18
NORTHERN 212:1 332:1
Notary 332:20
note 225:3 236:24 285:7 304:13
notes 223:21,24 224:4,12,17,18,19 225:17,21,24 227:14 228:19,23 229:4,8,15 230:5 231:13,20 232:9 235:5 236:21 238:7,10 240:15 244:7 270:22 271:23 280:16 333:10
notice 212:14

250:17 282:10 310:10,13
noticed 217:20 259:4
notification 291:22
no-no 300:3
NRS 251:18 252:19
number 215:21 227:12 248:11 277:13 278:14 279:19
numbers 223:19 316:20
nurse 221:13 233:17
nursing 292:6 295:2
N-2 296:10

**O**

Oak 262:15
oath 215:4
object 235:2 244:11 296:18
objection 244:15 244:20 245:3,8,10 245:13 246:17,18 304:3
objectives 248:19 249:2
obligations 249:9
observation 268:15 269:1
observations 268:19
obtain 251:16
Occasionally 218:3
occasions 270:4
occurred 287:2 324:16
October 229:23
offer 221:24 222:1 247:16
offered 221:1
offhand 259:17
office 227:19,20 228:4,5,6,14,16 229:10,16,19

260:7
off-site 267:10,14
Oh 279:22 289:8 290:18
okay 218:17 219:15 225:13 226:3 230:4 231:8 233:14 246:21 261:19 277:5 280:3 284:3 287:8 289:10 291:14 292:1 295:19 316:17 321:13 323:19 326:20 328:21
oldest 242:13,14
once 260:21 297:3
ones 219:14 227:2 237:2 278:13
one-on-one 250:15 262:11,16 263:24 264:2 267:6
one-to-one 249:10 249:13 264:12,14
open 233:15 291:20 296:12 297:3,4,23 298:4,10,16,19 299:3,7
opened 296:17
opening 296:22
opinion 230:8,14 236:12 239:22,23 240:2 295:3,7
opinions 236:2
opposed 253:22
optimal 243:22
order 231:19,20 232:1 235:1 244:14 245:21,22 308:15 311:2 312:12
ordered 308:5
organized 232:12 310:9
orient 216:4,5
orientation 262:24
orientations 262:16
origin 248:6 285:3

285:22
original 225:5,18
225:19
originally 221:11
288:6
originals 225:11
Oskvarek 280:9
283:5 284:16
Oskvarek's 285:8
outline 248:18
outpatient 286:21
287:23 288:5
outside 233:2
244:16 306:16
329:5
overhear 269:3
overhearing 266:5
overlapped 232:2
overseen 264:23
oversight 255:9
256:6
overwhelmed
234:18
overwhelming
234:17
ox 292:7,10,21,23
293:6,13,23 303:5
oximeter 293:12
o'clock 212:20

**P**
PA 251:18 252:19
page 214:5 216:6
222:13 223:21
225:9 227:13,16
228:18,18 229:2,3
229:3,7,7,14,15
229:21,22 230:2
231:9 233:14
237:17 238:18,18
273:9 274:23
277:24 282:19,21
283:17 287:6,9
290:4 291:21
292:19 293:21
296:10 316:5,18
320:12 323:24
327:19

pages 216:3,7
221:10,10 222:8
222:11 225:3
227:14 283:1
332:7
pair 271:20 272:14
276:4
paired 258:2
264:18 268:16
272:15,17
pairing 276:21,24
palliative 315:8,24
palm 299:15
Palmer 262:18
paper 222:14
316:19
papers 220:11
par 268:18
paragraph 227:16
228:13,14 229:18
229:20,21 235:16
236:16 237:17
241:2,13 274:1
328:13 329:17
paragraphs 237:8
237:13 243:12
paralytic 303:21
308:1
parameters 294:6
294:16
paraphrasing
230:9
parent 295:24
Park 262:15
part 220:10 221:16
229:9,19 235:21
249:1 251:21,22
263:16 288:4
305:9 321:4,10
322:1 329:22
particular 217:8,17
218:13 220:16
224:5 294:12
301:9 303:24
314:9 315:21
particularly 216:12
particulars 224:6
parts 305:13

pass 251:18
passed 302:24
passing 252:19
306:13
patch 286:21
287:14,24
patient 217:2
220:11 221:12
224:2 226:12,13
251:13,17 252:16
257:15 268:6
275:12 281:9,12
288:8,9,10,17
289:15,16 291:22
292:15 294:5
295:13,15,18,24
298:20 299:10
301:18 302:21,22
307:14,17 318:13
patients 224:2
281:5 308:9 315:8
315:24
patient's 224:7
294:17 295:24
299:13 301:22
302:15 312:10
313:6 315:14,14
pattern 257:6
258:19,23
Pay 327:7
pediatric 220:14
221:16 222:7
288:11
pediatrics 315:6,23
peds 289:15
peg 231:2 232:16
233:11 235:22
237:10
people 234:5
241:15 242:4
265:1,5 266:10
268:9 302:16
310:10 325:5
perceived 309:20
perception 299:11
performance 230:7
233:20,23 235:18
235:19 238:4

239:13,16,18
240:11,22 247:19
267:7 274:13
281:13 329:4
performed 217:19
307:4 325:2
performing 281:17
performs 280:13
period 278:6
293:16 325:9
permission 243:16
person 247:2 260:6
262:4 276:8,8,9
283:11
personal 285:7
person's 226:14
persuasive 326:1
pertaining 212:16
pertains 286:2
PETER 213:11
peter.land@husc...
213:9
pharmacology
292:16 300:11
phone 228:3 231:15
phonetic 265:14
291:23 322:3
pick 292:14
pigtail 318:24
pilot 318:23
place 229:23 242:2
242:9 288:15
296:3 321:2
placement 286:22
288:12
places 233:17 264:7
plan 216:9,17,19
217:8,9,17 218:11
219:1,5,7 220:2,5
220:8,19 222:2
223:3,6 233:1
249:14 250:4
266:21 270:24
286:20
planned 224:7
288:10

plans 217:21
218:18 219:23
226:18,24 228:1
312:8
Plaza 212:18 213:8
please 286:18
plus 233:5 239:17
240:19 289:14
297:11 308:14
point 223:16 241:9
245:21 247:14
250:18,21 265:8
279:4 285:16
297:22 301:2
302:18 303:1,17
307:22,23 309:16
330:17
pointed 242:23
321:23 322:15
330:11
pointing 244:24
299:15 330:18
points 287:22
pokes 295:19
policy 269:21,23
poor 233:20,23
poorly 320:3 325:2
port 286:21 288:15
Portacath 288:12
portion 222:14
250:10
positive 236:5
237:2 305:3,8
positively 278:24
possibility 311:24
possible 227:2
242:17,20 243:3
247:9 289:6
299:23 301:19
303:8 320:6
possibly 236:15
276:6 303:1
Post 225:17
postop 286:22
288:3,18 297:7
298:21 299:1
potential 310:19
practice 224:15

prefer 244:22
295:15
preop 295:14
preoperative
226:16 257:15
280:13,21 281:18
281:23
Preops 280:21
prep 221:17 291:19
preparation 248:15
prepare 216:11,22
prepared 216:14
250:24 251:4,12
preparing 311:12
321:5
PRESENT 213:14
presented 289:13
308:6 312:9
pressure 234:13
294:9 313:8,13
pretty 231:22
249:11,15 261:16
previous 265:20
299:5
previously 252:5
principles 286:24
printed 221:21
prior 226:13
233:23 235:18
238:3 239:13
240:11,21 243:12
249:4 254:15
288:11 289:23
311:3
priorities 312:2
probably 262:23
306:11
probation 248:23
266:24 267:2
problem 249:18
266:18 267:9,11
problematic 267:22
268:1
problems 240:11
249:4 267:16,21
268:8 289:18
291:19 294:17
325:23

procedure 212:15
217:2,19 287:23
288:1,12 294:12
298:9 307:4
procedures 221:17
311:15
proceed 319:21
proceeded 285:11
proceeding 317:9
process 256:2
319:12
produce 223:13
produced 218:8
219:19
product 322:4
profession 236:19
professionalism
252:18
program 230:11,17
232:21 234:5
237:15 240:4
241:15,16 243:2
243:15,17,20,23
247:15,20 248:23
250:12 252:12
268:7 269:18
programs 241:4
246:8
progress 250:12
progressed 263:1
progressing 327:12
progression 301:9
promise 272:20
276:22,24
promised 271:15
prompted 292:8
prompting 287:3
292:4 329:10
promptly 234:19
properly 294:22
301:21
provide 216:10
217:6 249:21
251:12
provided 217:10
providing 294:19
pro-emetic 297:8
Przygodzlek 279:2

283:21 323:5
psychomotor
252:17
Public 332:20
pull 272:8 316:22
319:16
pulled 229:13
316:19 317:1,4,22
317:24
pulse 292:7,9,10,21
292:21,23 293:6
293:11,13,15,23
294:4 303:5
pulses 301:22
purposes 268:7
pursuant 212:14,14
pushing 230:21
232:16
put 224:2 240:14
240:19 266:20
277:16,20 282:10
286:21 307:16
puts 295:22
putting 309:24
P.C 213:3

**Q**

qualified 269:4
quarter 269:24
question 215:6
226:17 235:12
237:7 244:24
246:15,19 303:10
305:19 316:16
325:24 329:3
questioning 307:21
questions 216:4
245:1,7 303:14
304:5 307:9
309:11
quickly 319:16,21
319:24
quiz 303:16
quizzed 303:23
304:1
quotes 231:8,9

**R**

race 248:6 259:12
260:3,11,12,16
261:5,13,21 285:3
285:22 286:2
racial 257:4
raise 308:24 309:9
309:12 315:24
raised 309:7
raising 246:18
random 313:17
randomly 308:15
range 300:22
ranked 257:16
282:6
rate 292:7,21,24
293:7 294:4,11,13
294:19 313:7,13
315:6,24 320:3
rated 283:15 327:2
330:6,20
rates 286:14
rating 252:4 280:10
281:16 282:1
283:9 284:23
323:16
ratings 226:20
227:1 252:16
254:11,15 258:12
258:14 264:5
265:3,11,22 266:9
266:11 267:7
275:11 291:16
323:13 326:12
327:3
ratio 314:2
Ray 212:7 227:18
228:1,4,16,20
229:5,16 230:5
237:14,18 239:6
239:12 241:21
247:1,19 248:5
305:24
Ray's 228:5,6,14,16
229:16
read 223:19 225:4
226:2 237:8
251:21 286:17
291:18 327:5

332:5
readiness 236:17
reading 324:12
readings 292:14
293:11 295:6
ready 251:12 297:4
298:8 307:16
realize 233:16
239:6 321:24
realized 293:9
really 218:2,2
219:22 229:11
230:21 232:1
243:10,22 259:5
285:12 290:22
291:4 301:19
308:19 311:4
313:15 314:24
323:12,17 325:13
reason 217:24
220:9 249:1 267:4
304:1 307:20
319:20 325:22
reasoning 330:11
reasons 266:9
reassures 229:11
rebut 283:8
rebuttal 282:11
283:7 289:2 290:4
293:21 316:3,18
323:24 324:1,15
324:18,23 327:19
329:9
recall 221:5 227:13
231:11,24 233:13
248:3 258:21
259:6,17 270:18
270:20 272:13
273:18 274:6,9
282:7 283:13
284:14 290:11,17
293:17 296:8
301:16 302:7
303:10 306:18
313:3 319:1
323:11 328:15
recalling 231:22
receive 275:18

received 216:3
243:9 247:18
273:9
receiving 257:7
recess 227:6 277:6
recognize 243:21
248:10 255:10
277:12 289:7
292:7,13,22 295:6
recognizing 292:21
recollection 247:5
248:1 303:23
319:11
reconvene 331:13
record 220:17
227:10 232:9
245:8
recorded 254:24
records 220:12
221:12
reduced 313:7,7
reference 218:6
227:17 236:13
237:13 238:11
241:14 242:11
243:16,19 246:6
252:3 270:24
278:1 282:22
283:4 287:13
299:8 300:10,24
312:24 314:17
327:21
referenced 236:11
references 217:4
230:6,8 249:20
278:9
referencing 236:9,9
240:20 242:10
referred 260:10,11
260:12,15 313:11
referring 233:23
237:8 239:13
248:4 281:5,10
316:5
refers 241:21
reflective 236:20
regarding 239:3
regimen 288:3

regression 264:20
264:21
rehashing 231:17
related 216:20
232:13 235:10
247:6 251:17
273:5
relating 292:20
relaxant 302:9
relevant 254:16
284:22
reliable 292:12
295:5
relief 234:13
remember 215:8
220:12 231:10
257:9 259:20
261:1,17,18
282:13 305:11,17
311:16 314:17
323:17
reminded 325:9
reminder 290:20
290:23
reminds 326:7
removed 319:7
321:4
renders 278:15
Renee 279:1 283:20
323:4 324:2
replaced 298:8
replied 234:16
reported 212:23
257:19 273:10
316:20 320:24
321:9 333:7
reporter 333:6,17
reporting 283:24
represent 279:20
reprimanded
257:22
requested 272:17
require 310:17
required 218:4
264:12,14,23
269:22 311:2,6,13
requirement
269:15,19 274:14

274:19 275:4,6,9
requires 250:4
310:22
residency 249:11
250:19 251:22
253:2,7,9 254:4,7
254:7 263:2,11,14
263:17,21 269:22
residents 308:8
316:21
respect 256:16
response 267:10
277:17 278:5
279:23
responses 282:17
rest 222:12 226:15
249:15 264:9
result 251:4,17
295:4
retain 220:13
retrieve 218:23
220:10 221:15
return 228:1 239:3
248:15,20 252:23
266:19 269:8
270:10,12
returned 261:23
returns 228:10
reversal 314:3
327:8
review 224:10
250:12 252:13
281:11
reviewed 282:3
298:23 311:14
reviewing 281:4
revise 255:7 290:20
re-insert 321:5
rhythm 281:10
right 219:6 220:5
220:20 221:2
222:3,18 227:14
228:1,11,16,21
229:5,8,17,24
230:12 231:10
232:10,22 233:12
233:24 234:22
235:16,19 236:10

236:22 237:3,9,11
238:4,12,14 239:4
239:10,21,24
240:4,12 241:7,19
243:13 246:4,6,7
249:4,23 250:2,5
250:8 252:4,10,20
254:13 259:21
263:10 266:14
271:4,16,19 273:1
273:6 275:24
277:18 278:6,10
278:17 279:6,11
279:20 280:6
281:20,23 283:1
283:24 284:4,10
286:10,15 287:18
289:12,24 290:7
291:16 293:3,19
293:23 294:23
295:2,7,19 296:23
298:16 302:9,13
304:13 305:3
306:22 307:4
309:14,22,23
314:8,21 316:11
317:14 318:1,11
318:15,16 319:2
320:3 323:8,20
324:8,21,21 325:3
325:17,19 326:13
327:3 328:17
329:22
risk 297:6
risks 298:20,21
Riverside 212:18
213:8
Rocuronium
292:17 300:12,15
300:20 301:3,10
302:9 303:3,12,24
304:7
room 245:2,15,18
246:24 306:6
310:10
rotate 265:9
rotation 250:16
263:7,8

rough 218:2
round 231:3 232:17
233:11 235:22
237:11
rounds 306:10
routinely 256:14
Rules 212:15
run 224:21 240:17
runs 216:7
Rush 212:6 223:7
233:2,7 249:3
261:3,7,12,20
262:8 264:6
267:23 316:22
320:18 325:14
329:3

S

S 212:18 213:8
safe 294:20
safety 251:13,17
252:16 268:6
275:12
saliva 315:5
satisfactory 251:14
251:16 252:18
323:8,16
satisfied 313:4
saturation 294:9
save 273:22
saw 261:15 322:15
saying 218:23
227:18 230:16
231:10 240:10
242:12 243:21
244:9,21 245:4
246:4 249:8,17
254:9 263:22
264:16 265:11
274:4 279:3,5
284:6,8 285:20
290:16 302:19
304:2 309:7
311:21 312:6
313:5,19 315:11
317:11 318:5
320:23 325:6
330:7

says 227:23 230:2
234:18 236:16
237:17 238:12
250:11 251:3,13
269:21 274:10
275:1 278:12
279:10 280:19
284:2 293:14,22
304:16 308:13
313:8 318:12
319:7 327:24
328:13 329:9
scattered 219:21
scepticism 239:3
schedule 274:8
scheduled 234:7
265:9 331:13
school 261:11
Scopolamine
286:21 287:14,24
288:24
score 278:14
scores 251:14,16
screamed 319:5,12
screen 221:19
screened 308:10
scrutinized 326:5
scrutinizing 258:19
scrutiny 258:8,23
second 215:3
292:19 322:19
secondary 292:23
293:9
seconds 297:13
second-degree
281:9
second-year 269:22
secretions 315:9,14
315:16,19 316:1
section 252:7
sedated 315:14
see 217:14 218:3,20
226:7 238:23
239:6 241:22
242:6 249:18
251:1,6 252:2
272:9 278:2
282:14 283:4

291:24 294:16
295:17 306:5,8,13
308:16 322:13
329:8
seeing 291:22
295:13
seek 271:1
seen 235:24 259:20
259:24 262:17
267:13 305:14
senior 321:6,21
322:14
sense 232:3,4
251:20 255:17
268:6,7 273:20
285:4 308:18
313:15 326:6
sent 262:24 264:10
267:10,23 274:4,9
274:16 305:24
sentence 227:23
237:6 242:8 275:1
293:14 327:24
sentences 242:9
274:10
separate 296:24
sequence 326:3
sequential 246:14
series 227:14
272:23 275:10
283:2
serious 289:5
SERVICES 212:23
session 215:3
set 252:22 255:15
307:14 310:11
setting 316:2
setup 291:19
301:20 309:4
seven 215:22 306:6
severe 266:9
288:18
severity 330:20
shadowing 233:1
Shannon 261:23
262:1
Shanti 322:3
share 222:6

shared 222:7
shares 265:7
sheath 321:3,6,7,11
321:24 322:2,7,14
322:16
sheet 257:15 263:6
short 224:20
shortage 308:15
shortcomings
242:6 258:7
shorthand 333:7,10
333:17
shortly 324:19
show 220:22 221:1
222:2,13 244:7
288:23 317:6
showed 239:3
showing 316:19
Shumpert 261:23
262:1
side 229:11 295:20
299:14 307:17
310:12
SIEGEL 213:3,5
225:7,10,14 226:3
228:7 235:2,6,11
242:19,21 244:11
244:18,23 245:8
245:12 246:4,11
246:15,20,22
268:11 272:8
277:3 279:22
296:18 301:5
303:6 304:3
319:17 320:17
326:16,20
siegeledlaw@aol....
213:4
sign 248:16 323:12
signed 253:4
significant 224:8
294:3,4,19 317:16
similar 220:15
simple 292:14
295:6
simulation 249:14
sine 331:13
single 276:6,7

site 264:1,3 267:1
268:2 291:24
sites 294:14 301:22
situating 302:21
situation 234:16
314:10
situations 234:19
304:12 325:10
skill 253:22
skills 249:14
252:17 264:20,22
268:18 292:6
295:2
skin 273:23 321:4
slipped 322:2
Slow 327:13
small 278:14
smarts 236:18
snapped 307:18
snickering 289:8
soften 247:16
somebody 258:2
273:23 297:6
322:21
sooner 302:16
sorry 235:11 240:6
242:3 246:6
279:22 304:24
316:16 323:14
325:24 329:2
sort 238:22 255:16
289:13
sounds 234:17
252:1
source 292:24
296:21
specific 276:18
specifics 303:15
specified 308:6
specify 308:14
speculation 235:3,4
242:19,21 268:11
296:19 301:5
303:6 304:4
spend 216:1
spinal 311:2 312:15
312:15,19
spines 284:3

spoke 283:10
spread 263:6
spring 248:15
254:5 261:24
square 231:2
232:16 233:11
235:22 237:10
SRNA 249:6,7
251:24 268:7
312:11
SRNAs 216:11
249:9 250:1,7
251:8,19 269:5
SS 332:1 333:1
stack 226:18
stage 262:11
standard 255:15
288:19
standards 233:6,7
268:20
stark 278:23 279:5
start 221:11 253:6
253:8,17 263:7,17
263:21 307:9,15
started 231:15,16
253:7 254:2,4,7
264:16 270:2,6,9
274:17 307:18
startle 309:16
318:8
startled 317:11
318:2 319:4,6,19
319:23
starts 217:8 228:13
249:17 274:1
state 325:23 326:2
329:6 333:1
stated 245:23
statements 235:13
236:2
States 212:1,15
332:1
status 292:15 313:7
stay 291:10 292:19
step 245:2 295:23
stepped 238:22
321:1,6
stimulation 301:23

stipulate 252:6
stood 295:17
stop 321:23 326:17
  326:19 327:6
  331:1
stopped 321:22
  322:9
stored 219:21
stressed 325:13
  326:4
stressful 234:19
struck 242:24
student 248:14
  249:7 251:14,21
  251:23 252:19
  253:20 258:1
  269:21,23 275:7
  286:19 291:24
  292:9,17 293:14
  300:14 320:24
  321:21 322:8
  323:1
students 255:15,18
  259:20 262:10
  264:4,17 266:19
  267:9,11,20,21
  268:8,21 269:22
  272:16 322:19
studies 298:21
study 224:9
subject 273:6
  295:18
subjected 261:21
submit 223:6
  274:11
submitted 218:21
  252:9
SUBSCRIBED
  332:17
succeed 240:3
  243:2
success 247:15
successful 241:23
  242:10 292:3
suction 315:15
suffering 257:2
suggest 287:18
suggested 269:11

269:13 287:16
  308:4 311:13
  312:1
suggesting 278:19
  278:22 290:13
suggestion 269:18
  288:19
suggests 275:5
suite 212:18 213:3
  213:8 296:20,21
  297:12
supervision 249:22
  250:16 262:12
  263:24 264:2,12
  264:14 267:6
support 323:20
  325:22
suppose 241:24
  247:22
supposed 255:14
  263:7
sure 218:15,24
  219:11,12 220:10
  221:23 223:16
  226:3 227:5
  231:14 246:11
  249:3 256:6,22
  260:12 261:9,15
  264:1 266:7 268:5
  270:2,11 272:1,2
  272:7,7,10 274:20
  283:10,12 285:17
  290:17 297:24
  301:21 303:22
  313:9 327:6,10
  330:8
surgeon 288:15,16
surgeons 308:8,8
surgery 224:7
  226:14 281:14
  288:1,6 298:23
  308:13 310:17,21
  310:21 311:8,22
  312:20 315:2,9,12
Surgical 311:14
surprised 232:21
  268:16
suspect 324:2

switched 218:14
sworn 215:1,15
  332:17
syringe 318:14,15
  318:16,20 319:3
system 253:19

**T**
take 269:18 277:4
  297:13 327:6,13
taken 212:17
  220:11 332:6
  333:10
takes 301:23
talk 233:19 238:6
  239:19 241:9
  244:4 246:5 247:3
  259:7 261:3
  270:15 282:24
  307:5 308:20
  310:16
talked 233:21
  240:21 244:3,6
  260:9,24 267:17
  270:19,20 300:17
  320:1
talking 232:16
  236:8,21 237:14
  238:9 241:3,18
  242:9 243:4,7,11
  243:12 246:6,7
  264:9 265:18
  276:15 290:14
  291:2 306:7
talks 296:9
tank 291:20 296:10
  296:11,24 298:1,3
tape 319:8
tasks 327:14
teaching 308:17
team 292:13 295:5
technical 319:20
teenage 291:22
teeth 292:4 299:9
  299:13,16,24
  300:2,3,6
tell 233:19 256:9,19
  257:2 261:3,20

267:4 276:15
  285:23
telling 230:9,10
  232:20 242:5
  244:21 255:2
  270:24
tells 251:21
template 226:11
ten 220:19 222:13
  302:23 307:24
ten-page 221:17
term 252:10 255:24
terms 252:22 263:2
  265:18 281:13
  308:18 314:2
  328:6 330:2
Terrebessy 261:9
  270:23 271:24
testified 215:15
  272:5 276:12
  313:18
testify 215:8
testifying 245:11
  245:12
testimony 244:12
  333:7
text 274:1,4,6
textbook 311:22
texts 274:9
Thank 246:21
theirs 233:3
theme 238:23
  264:21
therapist 261:10
thing 220:12
  221:15 225:2
  231:23 233:15
  236:18 268:14
  294:7 324:15,18
things 224:10
  230:16 232:15
  235:15 236:22
  244:3 245:19
  246:10 256:16
  258:5,12 259:4
  260:23,24 282:3
  303:5 308:17
  312:11

think 217:16
  218:19 219:22
  221:9,14 223:15
  224:19 225:17
  229:3,10 230:10
  230:17 232:18,24
  234:3 236:1
  237:14 238:10
  239:17 240:13
  241:14 243:3
  247:6,9 249:5
  250:19 253:21
  254:9 255:24
  256:21 260:16
  261:8,12,16,22
  262:4,22 263:11
  264:21 265:19
  266:5,6 268:14,22
  269:4 270:17,18
  273:15 274:6,21
  280:19 281:8
  282:15 283:6,10
  284:16,18 285:1,2
  285:10,16 286:3
  287:13 288:6
  289:10 290:9,19
  291:3,4 293:16
  297:9 299:3,9,15
  301:14,15 302:3
  303:19 304:21
  306:22 307:24
  309:15,18 311:20
  312:20 318:11,21
  319:23 320:5,8
  323:23 325:5
  327:6,18 330:10
  330:14,24 331:1
thinking 291:8
  322:12
third 227:16 278:4
  278:12 305:14
thought 219:4
  220:3 232:18
  237:10 256:2,9,20
  257:2 258:11,17
  259:9,14,15 261:3
  261:20 268:21
  282:13 283:15

284:20 289:7
295:11 296:6
298:15 312:3,12
320:1 330:1,2
**three** 216:7 221:10
250:19 262:17
263:22 266:2
267:13 292:18
301:11,16 302:3
302:20 304:15
305:20 306:11,21
312:20
**three-hour** 303:19
**three-minute**
293:16
**three-week** 263:21
**throat** 317:19
**time** 216:1 217:19
220:1 222:21
232:7 237:4
238:16 242:1,15
242:23 259:19,24
260:1 277:4 278:6
289:15 290:10
300:17 301:24
302:21 303:9
305:22 310:7
316:8,23 319:10
319:14 323:23
327:6,14
**times** 217:20 218:1
256:23 257:13
276:12 289:15,16
305:20 306:11,19
306:21 309:3
319:9,18
**timing** 243:22
244:6 247:4,7
304:7
**tips** 224:9
**today** 215:7 228:1
284:3 321:2
**told** 232:24 233:8
236:3 237:23
253:3 258:16,18
258:22 259:15,18
259:19 270:11
271:1,24 275:23

276:4,13 288:18
289:20 297:8
304:17 312:3,6,11
314:11 319:9
321:7 322:20
**top** 217:22 220:13
249:18 274:22
281:8 291:12
293:22
**topics** 246:1
**touch** 299:21
**touched** 299:12,16
299:14,19
**tower** 306:6
**tracing** 292:10
**training** 250:21
253:14
**transcript** 332:5,8
333:10
**transfer** 223:4
241:10,15 243:5
246:7
**transferring**
241:19
**transgress** 310:19
**transition** 241:4
243:14,19,23
247:4,7,16
**transitioned** 244:6
247:17
**transitioning**
243:13
**treated** 253:11
259:16 261:4
**treatment** 257:7,9
257:12 286:23
**treatments** 255:9
287:1
**tried** 220:22 223:15
231:11,23 273:21
307:13 322:23
**tries** 324:2
**trigger** 294:13
**true** 267:12,20
273:13 276:2
293:5,15,18
322:22 328:5,7,14
332:8 333:9

**truly** 241:23
**trust** 327:11,15
**truth** 242:4
**try** 225:7,14 226:23
233:17 242:2
271:18,20,21
272:13 273:22
276:21,24 321:10
321:13 322:17,21
**trying** 221:7,22
222:20 241:9
258:21 259:6
270:17 276:7
294:12 307:14
309:3,18 310:9,15
318:14 320:2
322:8,19 326:1
**tube** 317:18
**Tuesday** 212:19
**turn** 223:18,20
270:2 277:24
282:19 283:17
287:6 297:12,17
297:18,20,20,23
298:10 304:20
305:10 320:12
**turned** 255:16
**turning** 279:4
**twenty** 302:23
**twice** 266:24
273:19
**twilight** 288:8
**twitches** 292:18
300:14 301:3,11
301:13 302:3,12
302:19,22 303:2
304:15 307:23
**two** 218:14 219:23
221:10 223:2
237:7,13 242:9
246:12 257:17
264:11,13 266:5
274:10 278:24
282:9 284:3 291:8
297:13 304:11
306:21 319:9
**twos** 278:14
**tympanic** 234:12

**type** 217:2,4 226:14
308:11 310:21
311:7,22
**typed** 227:14
308:10

---
**U**

**Uh-huh** 265:4
**Unable** 286:19,23
**undermined**
295:23
**understand** 221:8
221:22 265:10,10
270:8 291:14
304:8 313:19
318:9 330:8
**understanding**
245:24 253:8
256:12,14 269:9
271:6,9 276:20
298:18
**unfair** 330:16
**United** 212:1,15
332:1
**university** 212:6
267:11
**unprofessional**
295:11 296:7
307:6
**unreliable** 294:10
**unsatisfactories**
227:3 264:10
265:8,15,21
**unsatisfactory**
226:20,24 252:3
254:10,15 258:4
258:12 264:5
265:3,11,22 266:8
266:10 267:7
275:11 278:15
280:10 281:16
282:1 283:8
286:14 291:16
325:12 326:8,10
326:12 327:2
**unsuccessful**
230:12 321:3
**unsure** 329:10

**untoward** 285:12
**unusual** 284:4
**uphill** 239:7,20
**upset** 242:3
**Uremovic** 257:20
**use** 297:4,6 299:4
300:5 314:1,2,9
315:1,6,10,11,16
315:17 316:9
318:16 319:3
**uses** 315:23
**usually** 217:12
224:16 316:6

---
**V**

**valve** 298:5
**various** 278:5
**veering** 315:22
**venous** 286:23
**ventilation** 292:2
**ventilator** 308:18
**verbal** 252:3
**verbally** 308:23
**verbatim** 231:9
**verify** 317:3
**version** 222:17
**vessel** 310:20
**vessels** 312:16,16
312:18,21 313:3
**Vic** 285:7,11,14
**view** 296:16 325:5
**visualize** 299:18
**voice** 308:24 309:7
309:10,13
**vomiting** 286:22
288:3,18 297:7,8
298:22 299:1
**vs** 212:5

---
**W**

**W** 213:3
**waiting** 244:8
**walked** 285:9
**want** 215:21 216:1
223:18,23 245:2,4
245:6,8 246:16
265:10 268:8
282:24 295:17

321:17,18 322:17
322:18 330:7
**wanted** 227:18
228:4 247:14
284:9 286:20
312:24 313:13
314:5
**wants** 295:20
**warning** 252:3,4
**wasn't** 222:12
223:12 236:4,14
245:20 254:7
257:22 273:21
276:19 281:9
282:10 287:17
289:5 293:8
296:12 300:7
306:9 310:21
313:3
**waste** 242:1
**watch** 293:6 298:24
327:13
**way** 217:9 242:12
242:22 247:13
253:12,13,14
257:11 259:16
289:9 300:1
306:20 310:15,20
315:20 316:15
319:5 321:9 330:1
**ways** 232:12 276:12
**weak** 286:19
**week** 239:2 263:18
263:19 274:2,8
328:22
**weekly** 250:11
252:13
**weeks** 232:19
262:23
**welcome** 246:22
**went** 221:14 228:6
231:17 261:19
262:6,15 265:19
270:23 288:12
289:20
**weren't** 276:4
294:10 297:23
**we're** 216:10 229:2

238:18 274:7
301:17 303:15
306:12 311:2
326:16
**white** 257:8,12,17
258:13
**wife** 285:8
**Wiley** 267:9
**Wimberly** 212:8
218:11 219:2
220:4,23 263:12
271:2,7 276:14
278:2,10,20
304:22 305:11,15
305:21 320:2
324:17 325:1
**wish** 234:2
**witness** 214:4 215:1
215:9 228:8
244:11 245:17
246:23 258:3
320:24
**witnessed** 232:6
**wonder** 290:18
**wondering** 217:14
221:7 232:12
319:22
**word** 234:9
**words** 228:19
230:19 231:8
244:21 324:12
**work** 220:13
221:13 231:5
232:17 233:2
235:23 248:19
254:16 262:7,17
263:23 264:6
266:17,21 269:2
270:16 271:14
274:3 322:23
**worked** 218:11
219:2 261:7 284:2
284:2 297:1,11
305:20
**working** 216:15
**worksheet** 220:15
221:16 222:8
**worried** 275:11

**worth** 278:16
279:10
**wouldn't** 220:23
266:16 267:5
271:12 287:24
**wrist** 299:12,21
300:5
**write** 218:4,5 224:4
231:13 233:15
234:16 241:22
259:3 277:15,21
282:11 290:5
324:1
**writes** 274:22
280:16 304:13
311:16 312:14
**write-up** 296:9
**writing** 262:3
307:19 329:14
**writings** 307:3
**written** 232:9 252:4
259:9,16,21 290:5
290:7,16
**wrong** 246:19
300:22
**wrote** 230:1 266:10
295:4 316:3,5
323:19 324:3,4
325:17 327:5
328:3,7,17,19

**X**

**X** 214:1

**Y**

**yeah** 216:23 218:9
219:12 222:4
223:22 224:9,24
225:20 226:11
227:22 232:8
259:22 260:17
265:21 266:6
267:19 271:11
279:7 283:6,11
284:14 288:23
289:13 305:6
306:4 313:23
324:4,6

**years** 218:18
219:23,24
**yelled** 318:6
**young** 298:22
**youngest** 241:24
242:24 243:24
247:2,23

**Z**

**zero** 308:1

**1**

**1st** 262:19,21
**10** 214:19 263:12
275:16 301:15
305:17
**11** 214:20 277:10
277:13 279:16,23
282:14 287:6
**1100** 212:18
**12** 214:20 279:14
279:19,20 280:1
283:18 290:24
293:21 304:21
320:19 323:3
326:21
**120** 212:18 213:8
292:9 293:15
**1243** 226:9
**13** 283:23
**15** 282:22 286:6,12
287:10 290:18
291:1
**15th** 290:19,19
**16-cv-06109** 212:5
**17** 230:2 272:24
304:24
**17th** 279:1 291:4
**175** 216:3
**18** 227:13 228:8
229:14 231:9
**19** 272:24

**2**

**2** 310:5
**20** 218:12 219:1,5
220:5,20 222:1
224:18 229:3,15

229:22 238:18
275:19 278:2,10
279:9 301:15
304:21 305:11,18
306:23 307:7
**20th** 219:8 279:4,7
324:19
**2013** 218:12 219:1
219:5 220:5,20
222:1,21 224:18
229:24 254:5
263:13 305:17,18
320:1
**2014** 261:24 269:8
273:3 275:19
277:18 278:2,7,10
278:21 280:2,2,6
283:23 285:15,21
286:12 287:11
290:7 291:1
304:21,24 305:11
306:23 320:5,21
323:4 326:22
327:22
**2018** 212:19 332:6
332:18 333:9
**21** 229:7 290:7
**214** 332:7
**215** 214:10,18
**22nd** 320:16,21
**2200** 213:8
**24** 229:23 323:4
**24th** 279:2 325:2,15
**248** 214:18
**27** 282:19
**272** 214:19
**275** 214:19
**277** 214:20
**279** 214:20
**28** 252:8 269:23

**3**

**3** 282:16 293:21
300:15 309:24
310:5 327:22
**3rd** 326:22
**3:00** 277:3
**312.526.1631**

213:10
**312.583.9970** 213:4
**329** 332:7
**35** 300:23

---
**4**
---
**4** 287:6,9 290:4
**4:30** 326:17
**40** 300:21 301:1
  304:18
**405** 213:3
**45** 300:22,23
  304:19

---
**5**
---
**5** 277:24 301:15
**53** 213:3

---
**6**
---
**6** 212:19 227:12
  316:5 332:6 333:9
**600** 251:18 252:19
**60604** 213:4
**60606** 213:9

---
**7**
---
**7** 214:18 215:23
  216:2,2 316:18

---
**8**
---
**8** 214:18 248:8,11

---
**9**
---
**9** 214:19 272:21,23
  323:24 327:19
**9th** 280:5 285:14,21
**9:30** 212:20
**98** 320:18

# EXHIBIT

# A18

Page 334

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MARICEL MARCIAL,                    )
                                    )
            Plaintiff,              )
                                    )
    vs.                             )      No. 16-cv-06109
                                    )
RUSH UNIVERSITY MEDICAL CENTER;     )
DR. MICHAEL KREMER, in his          )
individual capacity; RAY NARBONE,)
in his individual capacity; and  )
JILL WIMBERLY, in her individual )
capacity,                           )
                                    )
            Defendants.             )


        The continued deposition of

MARICEL MARCIAL, called by the Defendants for

examination, pursuant to notice and pursuant to the

Rules of Civil Procedure for the United States

District Courts pertaining to the taking of

depositions, taken before Erin McLaughlin, CSR, at

120 S. Riverside Plaza, Suite 1100, Chicago, Illinois,

on Monday, March 19, 2018, commencing at the hour of

1:45 o'clock p.m.




Reported for
MAGNA LEGAL SERVICES, by
Erin McLaughlin, CSR



Page 335

1  APPEARANCES:
2
3    ELAINE K.B. SIEGEL & ASSOCIATES, P.C.
     53 W. Jackson Blvd, Suite 405
4    Chicago, Illinois 60604
     siegeledlaw.com, 312.583.9970, by:
5    MS. ELAINE K.B. SIEGEL,
6      appeared on behalf of the Plaintiff;
7
8    HUSCH BLACKWELL
     120 S. Riverside Plaza, Suite 2200
9    Chicago, Illinois 60606
     peter.land@huschblackwell.com
10   karen.courtheoux@huschblackwell.com,
     312.526.1631, by:
11   MR. PETER G. LAND and MS. KAREN L. COURTHEOUX,
12     appeared on behalf of the Defendant;
13
14   ALSO PRESENT:
15     MR. JOSEPH MENDELSOHN.
16
17
18          * * * * *
19
20
21
22
23
24

Page 336

1        I N D E X
2
3
4  THE WITNESS: MARICEL MARCIAL
5
                PAGE
6
7
8  EXAMINATION BY:
9
10    MR. LAND          337
11
12
13
14
15
16
17  EXHIBITS MARKED:
18    No. 20            369
      No. 21            393
19
20
21
22
23
24

Page 337

1          MARICEL MARCIAL,
2  Called on behalf of the Defendants, having been
3  previously duly sworn under oath, was examined and
4  testified further as follows:
5
6
7        DIRECT EXAMINATION (Cont'd)
8          BY MR. LAND:
9
10    Q   Maricel, I've handed you what was
11  previously marked as Deposition Exhibit 12 to your
12  deposition.  We were going through that last time.
13  I hand you what's marked as Exhibit Number 3 which
14  were your interrogatory responses which we were also
15  using before, and Exhibit 11 which were your 2014
16  rebuttals.  Do you remember those documents?
17    A   Yes.
18    Q   Would you turn in Exhibit 12 to what's
19  marked Rush 91 at the bottom.  Does this appear to be
20  an evaluation dated February 14?
21    A   Yes.
22    Q   From Renee Prygodska?
23    A   Yes.
24    Q   Does this re-evaluation rate you in all

Page 338

1  categories as satisfactory or outstanding?
2    A   Yes.
3    Q   Is this evaluation fair?
4    A   I recall my performance that day.  I felt
5  she rated me fairly, and even I recall her comment
6  that despite the complicated setup I was able to keep
7  up on my own.
8    Q   So is it a fair evaluation of your work?
9    A   Yes.
10    Q   If you could turn to the next page which
11  the next three pages are an evaluation prepared I
12  believe of you by Judy Wiley --
13    A   Yes.
14    Q   -- from a case you worked on on
15  February 13; 2014; is that right?
16    A   Yes.
17    Q   And under Psychomotor Skills, II,
18  paragraph D, it appears Dr. Wiley rated you below
19  level expected; is that right?
20    A   Yes.
21    Q   And there is a reference there to dosing
22  an epidural?
23    A   Yes.
24    Q   Using "5 of Lidocaine"; right?



Page 339

1    A   Yes.
2    Q   Then it states:  When Maricel went to
3 re-dose, she gave .5 milliliters; and in this case 5
4 milligrams.  To me this indicates she does not know
5 the usual doses of local anesthetics.  And if she did
6 not understand, she did not ask for clarification.
7 Both are problematic behaviors?  Do you see that?
8    A   Yes.
9    Q   Was that accurate?
10   MS. SIEGEL:  Where are we?
11   THE WITNESS:  Right up here.
12   MS. SIEGEL:  What page?
13   THE WITNESS:  89.
14   MR. LAND:  Q  So my question is:  Is that
15 statement by Dr. Wiley accurate?
16   A   No.
17   Q   Did you give .5 milliliters?
18   A   I did.  But I explained to her what my
19 thinking was; and I think from my recollection I told
20 her that from my previous case, I had that mind set.
21 And so I had a little confusion which I intended to
22 correct or clarify with the resident, but that
23 conversation didn't make it to this evaluation.
24   Q   So it is accurate you gave .5 milliliters

Page 340

1 in that case?
2    A   Yes.
3    Q   And that the black resident had suggested
4 a re-dosing of 5 of Lidocaine; is that right?
5    A   Yes.
6    Q   Could you look at what's been marked
7 Exhibit 11?
8    A   Okay.
9    Q   And turn to Page 10.
10   A   Yes.
11   Q   There is a reference here to Judy Wiley,
12 February 13, 2014.  Do you see that?
13   A   Yes.
14   Q   So it's referring to the same evaluation
15 date that we're just looking at; right?
16   A   Yes.
17   Q   And it indicates Section 2, Part D.  Do
18 you see that?
19   A   Yes.
20   Q   And it says:  Dr. Wiley's narrative in
21 this section is true, but I dispute her conclusions
22 that I did not know the proper dosages.  Did you write
23 that?
24   A   I did.

Page 341

1    Q   So you're saying that her narrative that I
2 just read is true, right, from Exhibit 12 from her
3 evaluation of you February 13, 2014?
4    A   Yes.
5    Q   Did you say that's true?
6    A   It's true that I did give that amount, but
7 her translation of my understanding of the dosing that
8 I was supposed to give was not entirely accurate.  So
9 I agreed with the amount that I did give.  She was
10 correct with that.  But I dispute her conclusion that
11 I didn't know the proper dosages.
12   Q   Okay.  So your rebuttal says that this
13 narrative is true; right?
14   A   That I did give that amount is true.
15   Q   That's not what I'm asking.  I'm saying it
16 says that the narrative in this section is true; and
17 the section we're looking at that I read, that's what
18 you were referring to; right?
19   A   Yes.
20   Q   And then later in your rebuttal in that
21 same paragraph you indicate:  Still I concede this was
22 in error?
23   A   Yes.
24   Q   Right?

Page 342

1    A   Yes.
2    Q   So you made a dosing error?
3    A   I did.
4    Q   And then you wrote:  This was my first day
5 with Dr. Wiley being one of the all important
6 evaluations, and I was very nervous in that stressful
7 environment; right?  You wrote that?
8    A   Yes.  I wrote that.
9    Q   Was there anything Dr. Wiley did during
10 that session that made you nervous other than being
11 there and evaluating you?
12   A   I was nervous of her, how she would
13 perceive me because when I am with her, she usually
14 has an iPad with her; and I know that she is
15 contemporaneously writing down the evaluation.
16       And so for me I was nervous with that
17 prospect of being a constant observation, not
18 necessarily that situation that I was in, I mean not
19 necessarily that the case made me nervous.  I knew
20 that I was under scrutiny; and it made me nervous, her
21 I guess interaction.  That's what I recall.
22   Q   So it was the fact that she was evaluating
23 you that made you nervous?
24   A   Part of it, yes.



3 (Pages 339 to 342)

Page 343

1    Q   Was there anything else she did that made
2  you nervous that day?
3    A   No.  I don't remember.  I don't recall if
4  there is anything else.
5    Q   If you look in the evaluation of Dr. Wiley
6  from that day in Exhibit 12, Rush 89 --
7    A   Yes.
8    Q   -- under Clinical Judgment, III, under B
9  and D, she rated you as below level expected; right?
10   A   Yes.
11   Q   And did your rebuttal address that at all?
12 I'm asking about your rebuttal.
13   A   Okay.  I'm just trying to see.  I don't
14 see whether I addressed that.
15   Q   It's not listed anywhere, is it, on
16 Page 10?
17   A   Not that I see.
18   Q   Do you know why you didn't address those
19 ratings in your rebuttal?
20   A   I am not sure that I saw this
21 contemporaneously and recall how to address these two
22 items.  It's either I missed it and could not recall
23 what I was thinking in relation to these two items, so
24 I think we tried to do a rebuttal based on what I

Page 344

1  recall from this encounter.
2    Q   So you don't recall anything about those
3  two items that we're looking at in Paragraph 3 B and
4  D?
5    A   I don't recall it, and most of the time
6  Dr. Wiley would call me and we'd go over her reasoning
7  for grading me in those items.  And I mean these are
8  three pages, and sometimes our phone conversations are
9  just like some certain parts of it.  So I don't think
10 we went through this from my recollection.
11   Q   When did you write Exhibit 11, your
12 response to evaluations between January and March of
13 2014?
14   A   I don't recall the exact dates, but I
15 imagine before my appearance with the appeals
16 committee I think at the university from the best that
17 I can recall.
18   Q   So after you had received your failing
19 grade?
20   A   Yes.
21   Q   And is that the first time you submitted
22 this rebuttal, what's marked as Exhibit Number 11 as
23 well to anyone at Rush?
24   A   As far as I can remember.  I think we have

Page 345

1  done multiple modifications that I'm not sure which
2  ones when we submitted like this one especially.
3    Q   If you turn within Exhibit Number 12, if
4  you turn to what's marked as Rush 84, is this an
5  evaluation of you by Dr. Wiley from a case you worked
6  on on February 18, 2014?
7    A   I think this is -- I'm thrown off by these
8  dates here.  It appears that, yes, this is her
9  evaluation of me.
10   Q   On the case of February 18, 2014?
11   A   Yes.
12   Q   If you could turn to the second page under
13 III, Clinical Judgment?
14   A   Yes.
15   Q   Under paragraph E there it rated you as
16 unsatisfactory; isn't that right?
17   A   Yes.
18   Q   And there is reference there to you
19 labeling a syringe in a certain way?
20   A   Yes.
21   Q   And then reference to the amount that you
22 actually gave to the patient?
23   A   Yes.
24   Q   Do you see that?

Page 346

1    A   Yes.
2    Q   Are those statements correct in that
3  paragraph of this evaluation?
4    A   Partially.  So it is correct that I did
5  write .2 milligrams.  I don't know why.  But I did
6  give the accurate amount that I was told to give
7  despite the mislabel.  The only issue there is that I
8  mislabeled it, but the dose and the type of drug was
9  correct.
10   Q   So you mislabeled the syringe?
11   A   The drug name is right.  The writing on
12 the concentration of the drug is the only thing that's
13 incorrect.
14   Q   And that incorrect information was on the
15 syringe label; right?
16   A   Yes.
17   Q   Did you also chart it incorrectly?
18   A   No.  I charted that I gave 10 milligrams
19 as instructed.  So this is just the sticker which
20 sometimes it's optional that we write the
21 concentration of the drug there because it's mainly a
22 guide; but I gave the correct amount, the correct
23 drug, for the correct intention.
24   Q   Did you think that it was unfair to rate



Page 347

1 you as unsatisfactory because the syringe was labeled
2 incorrectly?
3    A   I think, yeah, it was unfair that it was
4 just that one portion. But the medication was
5 identified correctly, the dose, the amount; and the
6 intention for it were done correctly. But I was
7 dinged for that one slight which did not affect the
8 patient's condition except improve the condition that
9 the patient was in. He was hypertensive, and I was
10 able to relieve that.
11    Q   How do you know when you were
12 administering that drug and that syringe what the
13 concentration was in the syringe?
14    A   Because the vial tells me; and I guess
15 when I flipped it, instead of 20 because it's 20
16 milligrams per ml for the Hydralazine, so I must have
17 got dyslexic and thought it's .2 instead of 20
18 milligrams per ml that I should have written. But I
19 work with that drug in the ICU constantly, so I'm
20 familiar with that kind of drug.
21    Q   When did you prepare the syringe for this
22 case? Was it before the case had started?
23    A   No, right there because this is one of
24 those as-needed drugs. So when that situation arose

Page 348

1 where the patient was hypertensive, she told me --
2 First of all, actually I called Dr. Lai and informed
3 him that the patient was hypertensive, can I give
4 Hydralazine, and he agreed. So that's when I pulled
5 out the vial and drew up the drug, labeled it right
6 there as I'm about to like give it because the blood
7 pressure was rising steadily.
8        So I guess in the haste I didn't label
9 it accurately; but it was the right sticker for the
10 right drug, and I gave the right amount. So I
11 prepared it right then.
12    Q   Could you turn to what's marked in
13 Exhibit 12 Rush 82. Is this an evaluation of you by
14 Heather Keldahl --
15    A   Yes.
16    Q   -- from a procedure on February 20, 2014?
17 Is it?
18    A   Yes.
19    Q   And this evaluation rated you
20 unsatisfactory in several categories, right, two
21 categories?
22    A   Yes.
23    Q   Do you remember this day?
24    A   Just parts of it. I guess I remember the

Page 349

1 machine.
2    Q   Which machine?
3    A   The Neptune and irrigation that she puts
4 down here.
5    Q   Do you see in the handwriting at the
6 bottom, a couple of sentences into it, it says: Needs
7 to speak up when sterile field is contaminated?
8    A   Yes.
9    Q   During da Vinci she accidentally -- I
10 don't know what it says after that?
11    A   She accidentally hit sterile robot arm
12 after dumping urine from Foley. She did not tell
13 anyone. I observed it and informed the nurse so it
14 could be properly covered. I think maybe with the
15 printing it got, something got erased. This is a
16 patient safety issue. Mistakes happen, but you
17 something -- This is half.
18    Q   So did you bump into the da Vinci arm that
19 day?
20    A   Yes.
21    Q   Is it accurate that that created an issue
22 for a sterile environment situation?
23    A   Yes.
24    Q   And did you tell anybody?

Page 350

1    A   What happened was when I was emptying the
2 Foley, as I was getting up, she called me; and when I
3 turned around, that's when I bumped the da Vinci arm.
4 So she saw me hit it.
5        I looked around. The surgeon was busy
6 manipulating the robot arm. I looked around for the
7 circulating nurse to alert them; and I think she had
8 stepped out on the side, so I couldn't find anybody
9 except tell Heather, What do we do now? And so she
10 witnessed me bumping it; and I looked at her, looked
11 around for somebody to remedy it; and I approached her
12 like, What do we do now?
13        So it's not true that I tried to hide
14 this. She witnessed me bumping it. I saw her saw me
15 pumping it; and because she distracted me is how I
16 bumped it.
17        And shortly after the circulating nurse
18 came back, and she was the one who informed the
19 circulating nurse; but I never intended or I was never
20 hiding it. It was in her plain view.
21    Q   Did you tell the circulating nurse?
22    A   She approached the circulating nurse
23 because she saw first coming back into the OR suite.
24    Q   So you're saying there was no one you



Page 351

1  could tell at the time?
2      A   Except Heather because she was watching.
3  She saw this.  So I asked her, What do we do now?
4          Actually I think I went over this with
5  Dr. Kremer; and he said, Why didn't you tell the
6  surgeon?  I said, He was busy operating the robotic
7  arm, and I didn't want to distract him.  I didn't know
8  at what point he was snipping anything.  The robotic
9  arms are inside the patient; so if I even tapped him
10  or distracted him, I worried that I would startle him
11  or cause an error while he's operating it.
12      Q   Can you turn to Rush 80 in Exhibit 12.  Is
13  this an evaluation of you by Eva Fisher from a case on
14  February 25, 2014?
15      A   Yes.
16      Q   Did this give you unsatisfactory ratings?
17      A   Yes.
18      Q   Several of them; right?
19      A   Yes.
20      Q   If you could, look at Exhibit Number 11,
21  your rebuttal document.
22      A   Okay.
23      Q   On Page 13 of that, it ends; and I don't
24  see any reference to this evaluation from Eva Fisher;

Page 352

1  is that right?
2      A   Yes.
3      Q   And do you know why you didn't include a
4  rebuttal of this evaluation of Eva Fisher?
5      A   I don't recall.  I'm not sure if I had
6  received this entirely.  Yeah.  I don't remember why
7  we didn't do a rebuttal on this one.
8      Q   Okay.  So in the handwritten comments,
9  there was language that states:  Maricel is still
10  having problems prioritizing.  Do you see that?
11      A   Yes.
12      Q   She was trying to chart while the block
13  was being placed instead of watching the block and
14  caring for the patient.  Do you see that?
15      A   Yes.
16      Q   Did that happen?
17      A   Yes.
18      Q   She was able to recognize changes in
19  patient's --
20          What is that?
21      A   Hemodynamics I think.
22      Q   But was constantly and unnecessarily
23  fidgeting with the VA.  Do you see that?
24      A   Yes.

Page 353

1      Q   Was that accurate?
2      A   I don't recall that happening.
3      Q   What does that mean, you don't know if it
4  happened?
5      A   I don't remember that it happened that
6  way, the way she described it.  What I recall was the
7  case was uneventful and she didn't really talk to me
8  about this evaluation for me to remember exactly which
9  particular issue she was pointing at here.
10      Q   Well, she identifies it here, right, this
11  particular issue, recognizing changes; and you were
12  instead constantly and unnecessarily fidgeting with
13  the VA.  Do you remember how much you were adjusting
14  the VA?
15      A   Ventilator.  I'm not sure.
16      Q   You don't know what the VA is?
17      A   I'm not sure if that she means the VA as
18  the ventilator.  Yeah.  I don't remember doing that.
19      Q   Are you saying that she is false in saying
20  that you did or you don't remember?
21      A   I just don't remember.  Like I said, she
22  didn't discuss this with me to point out exactly what
23  she was trying to criticize me about.
24      Q   I'm just asking what you remember about

Page 354

1  that, not what she said to you?
2      A   I don't remember fidgeting with the vent a
3  lot and fighting.  I think if I saw like the
4  anesthesia record, then I would probably be able to
5  recognize or determine what she was talking about.
6      Q   Reviewing the anesthesia record would help
7  you remember what you did with respect to fidgeting
8  unnecessarily with the VA?
9      A   I don't know what she meant by unnecessary
10  because we're always going back and forth adjusting
11  gases, looking at the patient, maybe giving
12  medications.
13      Q   What would the anesthesia records show you
14  about that?
15      A   There is a section that shows what modes
16  of ventilation setting, if I was changing it; but if
17  it's consistently the same parameters, then that
18  disproves her claim that I was fidgeting with it a lot
19  because you could switch from volume control to
20  pressure control ventilation to pressure support if I
21  wanted to modify something as she was claiming here.
22          But I just don't recall that I was
23  making changes a whole lot, or I could also write the
24  concentration of gases that I was changing it to in



6  (Pages 351 to 354)

Page 355

1  the anesthesia record if that's what she was trying to
2  say here.
3      Q   That isn't what it says, is it?
4      A   Well, it's the ventilation and machine; so
5  if I'm adjusting gases, then I would also be recording
6  that on the anesthesia record.
7      Q   Okay.  On the second page of this
8  evaluation from Eva Fisher, it says, Maricel does not
9  know how many hours --
10         What is that?
11     A   Propofol.
12     Q   -- Propofol follow can be in a syringe
13  before it expires?
14     A   Yes.
15     Q   Did she ask you about that?
16     A   Yes.  She did.
17     Q   And did you know?
18     A   I did.
19     Q   Did he tell her?
20     A   I gave her an answer.  I said that I'm not
21  entirely sure with Propofol in a syringe, but I could
22  tell you that in a drip tubing it lasts for 12 hours.
23  But being that there is a quick turnover and Propofol
24  is not used on a lengthy case, I'm going to be

Page 356

1  conservative in saying it's only six hours before we
2  decide to draw a whole new vial because this might not
3  be good anymore.  So I gave her an answer, and so this
4  is inaccurate that she said I did not know.
5      Q   Your answer was?
6      A   Six hours.
7      Q   You knew how long in a tube but not in a
8  syringe?
9      A   Yes.
10     Q   Did you say you weren't sure in the
11  syringe?
12     A   I wasn't sure in the syringe, but I told
13  her my reasoning or my thought process as to why I
14  think it should be half of that or a more conservative
15  estimate because, you know, it's usually a quick
16  turnover of cases, and Propofol should not be staying
17  out that long.
18     Q   The next handwritten note is she failed to
19  recognize the Propofol was not infusing but kept
20  assessing the patient to see how sleepy they were.  Do
21  you see that?
22     A   Yes.
23     Q   Did that happen?
24     A   I think from my recollection this is -- So

Page 357

1  the Propofol syringe is primed into an IV tubing that
2  then gets connected to the patient; but there is a
3  portion where you clamp it, and I think for a brief
4  second I had it clamped still and realized that later.
5         But the way she explained it, it seems
6  like it went on for some time.  But from what I
7  recall, it was a brief period.
8      Q   Does this comment say anything about how
9  long the Propofol was not infusing?
10     A   No.  I don't think so.
11     Q   Did Eva Fisher point it out to you, that
12  the Propofol was not running?
13     A   I don't recall like whether I realized it
14  myself or if she prompted me.  I don't recall.
15     Q   So it might be true that she had to point
16  it out to you?
17     A   It's possible.
18     Q   Okay.  The next sentence is:  She also had
19  trouble working the stop cocks on the IV.  It says:
20  She repetitively turned them the wrong way.  Did you
21  do that?
22     A   The ending of the tubing sometimes --
23  Actually the tubing sometimes gets covered up, and at
24  one point maybe I got disoriented that I was turning

Page 358

1  it a certain way; and I could I have done it.  But
2  it's usually a quick just flipping of a switch.
3         And, repetitively, I don't know if I
4  would agree with her on that because once you know
5  that it's not infusing on the one direction, then
6  obviously you would turn it another direction to help
7  it infuse.
8         So I have worked with stop cocks
9  multiple times.  This is in every equipment that we
10  operate in the ICU or even like in the OR.  So I'm not
11  unfamiliar with stop cocks.  It's just that one
12  direction that I turned it to.  She took issue on
13  that.
14     Q   Well, you are not sure, are you, whether
15  you did it more than once?  Do you actually remember
16  it?
17     A   No.  I don't recall.
18     Q   And it says here that the attending
19  anesthesiologist had to show her how to use the stop
20  cocks.  Did that happen?
21     A   No.
22     Q   How do you know?
23     A   I just can't imagine that I wouldn't know
24  how to use stop cocks.  Maybe he pointed out that it's



Page 359

1  going the wrong way, it's the other way, but not
2  necessarily that he had to teach me how to work it.
3  I've worked with stop cocks constantly.
4      Q    So the anesthesiologist may have had to
5  tell you you were turning it the wrong way?
6      A    Possibly.
7      Q    If you could turn to page Rush 78 in
8  Exhibit 12, this is an evaluation from Sheila Warren
9  of your work on March 10th, 2014; is that right?
10     A    Yes.
11     Q    And there is several unsatisfactory
12  ratings in this evaluation; is that right?
13     A    Yes.
14     Q    And if you look at Exhibit 11 on Page 13,
15  you don't see any reference -- I don't see any
16  reference to this evaluation from Sheila Warren; is
17  that right?
18     A    Yes.
19     Q    So did you write a rebuttal about Sheila
20  Warren's evaluation have you?
21     A    I don't think I did.
22     Q    Why not?
23     A    I think because I don't really recall what
24  happened; and I had gotten all of these, my whole set

Page 360

1  of evaluations when I was dismissed.  So trying to go
2  back and recall some things that actually sometimes
3  some of the evaluations Dr. Kremer brings up to my
4  attention, that's how I can remember some of it and
5  make a rebuttal of it.  But this one, I don't remember
6  him bringing this to me; and so I don't recall the
7  details of what happened that day.
8          And so I think because I have no or a
9  very vague memory, perhaps we decided not to address
10  it because I don't know how to address it.  I don't
11  know remember anything from the case.
12     Q    If you turn to page Rush 76 which is the
13  next evaluation in Exhibit 12 --
14     A    Yes.
15     Q    -- is this an evaluation of your work on
16  March 14, 2014 by Katie Colino?
17     A    Yes.
18     Q    This evaluation, does it rate you as
19  unsatisfactory in two different categories?
20     A    Yes.
21     Q    And then the handwriting, there is
22  comments that say:  However, suction hooked directly
23  up to wall?
24     A    Yes.

Page 361

1      Q    Not to suction canister?
2      A    Yes.
3      Q    Did not recognize until student left for
4  something?
5      A    For the day.
6      A    For the day.
7          And then there is a picture?
8      A    Yes.
9      Q    Did that happen?
10     A    No, because if you probably looked up the
11  time stamp on this picture, the cases have ended which
12  means we used this setup.  If it was connected
13  improperly, I would have ruined the vacuum on this.
14  It doesn't show the rest of the --
15          I brought this up to Dr. Kremer, that
16  it doesn't show the remainder of this setup.  It
17  doesn't show where the canister is; and, like I said,
18  it's at the end of the day.  Housekeeping might have
19  stripped off some of the equipment.  So it's not
20  showing the full picture.
21          And, like I said, if we had used this
22  equipment in suctioning secretions, I would have
23  ruined the vacuum system if this was directly
24  connected to the patient.

Page 362

1      Q    Do you know if you used the vacuum system
2  that day?
3      A    I did because when we intubate patients
4  and we extubate, we have to clean up the secretions;
5  and sometimes if there is blood in here or even
6  irrigation, we have to clean this up with liquid which
7  will definitely reach the vacuum system and ruin it if
8  I connected it directly.
9          So I know that there has to be a
10  canister here to contain the secretions or irrigation
11  or blood, and that connects to the vacuum system.  So
12  it shouldn't be a direct connection.
13          And, like I said, if you look at the
14  time stamp on this picture which they never really
15  showed me and, as she mentioned in her evaluation,
16  it's at the end of the day.
17     Q    What are you talking about with the time
18  stamp on the picture?  Do you see a time stamp?
19     A    There isn't.  That's what I'm saying.
20     Q    So how do you know when it was taken
21  because you're saying it was taken later.  How do you
22  know that?
23     A    She says in here that suction canister,
24  did not recognize until after student left for the



Page 363

1  day.
2      Q   How can you tell that says for the day?
3  It says for --
4      A   Well, I think --
5      Q   Well, let me ask you.  You don't actually
6  know when this picture was taken; right?
7      A   No.
8      Q   So are you saying that Katie Colino made
9  that up, that the suction was hooked up to the wall?
10     A   Well, it certainly doesn't show the whole
11  picture.
12     Q   That's not really what I'm asking you.
13  You're looking at the picture.
14     MS. SIEGEL:  Can you repeat the question,
15  please?
16     MR. LAND:  I can ask it again.
17     Q   Are you saying that Katie Colino was
18  making it up in her evaluation that she wrote down,
19  that the suction was hooked up directly to the wall,
20  not to the suction canister?
21     A   I didn't know what her intentions were,
22  but it certainly wasn't clear what she is trying to
23  point out here.
24     Q   Let's turn to Rush -- Well, let me ask you

Page 364

1  one other question.  This evaluation from Katie Colino
2  is also not included in your rebuttal document which
3  is Exhibit 11, is it?
4      A   Yes.
5      Q   It's not in there; right?
6      A   No.  It's not.
7      Q   Do you know why?
8      A   I think I discussed this with Dr. Kremer,
9  and they didn't give me an answer as to why this is a
10  partial picture which doesn't really show that this is
11  hooked up to the suction directly for patient use.
12         So I had asked Dr. Kremer if there was
13  another set of pictures that could be connected to
14  this that maybe we're missing so we could establish
15  that I did incorrectly set up this suction.
16     Q   So because you had a conversation with
17  Dr. Kremer you didn't include any rebuttal in your
18  rebuttal document about this case?
19     A   Yeah.  I think we were waiting for his
20  response on maybe there is more pictures that weren't
21  included; and I guess we had missed it at some point,
22  like go back and do a rebuttal on this.
23     Q   Okay.  Could you turn to Rush 74 in
24  Exhibit 12.  This is an evaluation of you by Mary

Page 365

1  Rodzik, a case on March 20, 2014; is that right?
2      A   Yes.
3      Q   Does this contain several unsatisfactory
4  ratings of your work?
5      A   Yes.
6      Q   In the handwritten comments there is a
7  section that talks about preoperative assessments are
8  okay; but she is still not asking all important
9  questions, for example, when --
10         Do you see what I'm talking about?
11     A   Yes.
12     Q   When was --
13         What is the next word?
14     A   Coumadin stopped.
15     Q   What's the next?
16     A   When aspirin stopped, ASA stopped.
17     Q   What's the next one?
18     A   Activity to -- I can't read it, to enter,
19  et cetera.
20     Q   Was this an accurate assessment of your
21  work that day, that you didn't ask those questions?
22     A   From my recollection, I think I was going
23  through like several questions; and I wasn't sure if
24  she was in a hurry or if I was taking too long for her

Page 366

1  that she had cut me off and she then started asking
2  these questions.  So I didn't ask them because she had
3  jumped in from what I recall.
4      Q   Later in her description by the word date
5  that's on the form it says, I asked a lot of questions
6  about --
7         What comes after that?
8      A   Laryngospasm maybe or laryngoscope that is
9  VAE which is -- I think that's embolism.  Cardiac
10  reflex, et cetera.  She was able to answer them
11  partially but not completely.  This should all come
12  second nature to her by now.  You learn about this at
13  the beginning of the program.
14     Q   So did she ask you about those questions
15  on that day.  Do you remember that?
16     A   I don't remember how extensive my answer
17  was, but I imagine that I answered her questions; but
18  I'm not exactly sure what more she was looking for.
19     Q   Do you know if those are issues or
20  subjects that you would have learned about at the
21  beginning of the program?
22     A   Yes.
23     Q   They were?
24     A   Yes.



Page 367

1    Q    Would you turn to the next evaluation.
2  It's Rush 73.
3    A    Yes.
4    Q    Is this an evaluation of your work on
5  March 24, 2014?
6    A    Uh-huh, yes.
7    Q    By who, Kathleen Oskvarek?
8    A    Oskvarek.
9    Q    Did she rate your performance as
10 unsatisfactory in three different categories?
11   A    Yes.
12   Q    Can you read the handwritten comments
13 there at the bottom?
14   A    Student has a difficult time performing
15 basic functions under stress. She does not ask for
16 clarification when she does not understand something I
17 say. Maricel preop'd a second patient while I brought
18 first patient to the unit. She waited until we
19 brought the second patient in the room to tell me that
20 she needs had a GlideScope but didn't call for one.
21       Student has not given me an evaluation
22 form the last three times we have worked together.
23   Q    Was that accurate?
24   A    I don't know if it's entirely accurate.

Page 368

1    Q    Some of it is accurate?
2    A    Some of it.
3    Q    Is it accurate that you needed a
4  GlideScope but didn't call for one?
5    A    We talked about it; and I think I had
6  called for it when we got to the room, and it arrived
7  there even before the case started. So it was really
8  a non-event.
9    Q    Is there some idea that it's better to
10 call for one before you get to the room?
11   A    Yes.
12   Q    Is it true that you had not given Miss
13 Oskvarek an evaluation form the last three times she
14 had worked with you?
15   A    I don't recall like the times that I was
16 with her, so it's possible; but they can also get that
17 themselves as I have seen other CRNAs fill them out.
18 They don't have to rely on me to give it to them.
19   Q    Mike Kremer, hadn't he directed you to get
20 evaluations from CRNAs for every case you had at this
21 point?
22   A    Yes.
23   Q    Were you avoiding doing that?
24   A    At times I didn't have the eval on me; and

Page 369

1  my understanding was if they really wanted to fill out
2  one, it is there for them to get. Like some of the
3  CRNAs filled it out without me giving it to them.
4  Some of the CRNAs I have given evals they didn't
5  return it.
6        So I have given like three evals to Amy
7  one time, but not one of them came back. This is when
8  I came back from my leave of absence.
9    Q    What I asked though was: Were you
10 avoiding giving evaluations to CRNAs so they would not
11 evaluate your work after you came back in 2014?
12   A    Well, there are certain CRNAs I was not
13 comfortable giving an evaluation to; but I understand
14 it does not prevent them from evaluating me. So it's
15 not entirely up to me to give it to them. Like in her
16 case she sought it out; and she wanted to evaluate me,
17 so she'll write it.
18   Q    Did you want to avoid giving one to
19 Jillian Klunk?
20   A    No.
21       (Marcial Deposition Exhibit No. 20
22       was marked for identification.)
23   Q    You've been handed what's been marked
24 Marcial Deposition Exhibit Number 20. Do you

Page 370

1  recognize this series of emails?
2    A    Yes.
3    Q    Is this an email that you sent to Marquis
4  Foreman on February 9, 2014?
5    A    Yes.
6    Q    I'm sorry?
7    A    Yes.
8    Q    In the fifth paragraph of this email, do
9  you write: Still because it wasn't a stellar day, I
10 did not wish to give Jillian an evaluation form?
11   A    Yes.
12   Q    And that refers to Jillian Klunk?
13   A    Yes.
14   Q    After that you wrote: However, I knew
15 that if I did not, that Dr. Kremer would contact
16 Jillian directly to request one and that would make it
17 look even worse for me; is that right?
18   A    Yes.
19   Q    So is that an example that you had
20 previously avoided getting evaluations and wanted to
21 that day?
22   A    I'm sorry. What was your question again?
23   Q    Is this an example of a day where you
24 wanted to avoid having the CRNA evaluate you?



Page 371

1    A   It's possible.
2    Q   Isn't that what that's saying?
3    A   Yes.
4    Q   Isn't it referencing that Dr. Kremer had
5  previously reprimanded you for not getting an
6  evaluation form?
7    A   He had reminded me, yes.
8    Q   Didn't you use the word reprimanded me?
9    A   Yes.
10   Q   Can you turn back to be Exhibit 12 and
11 turn to page Rush 70?
12   A   Okay.
13   Q   Is this an evaluation form for you
14 completed by Dr. Judy Wiley for a case you worked on
15 on March 25, 2014?
16   A   March 25, yes.
17   Q   And is there a reference under patient
18 safety under I B and C to below level expected and
19 unsatisfactory ratings?
20   A   Yes.
21   Q   Is this statement in paragraph B correct,
22 that the label had fallen off and you injected with an
23 unlabeled syringe?
24   A   Yes.  I didn't recognize that it had

Page 372

1  fallen off, but everything else was labeled in that
2  bundle of syringes that I had.  Usually like we have
3  maybe four or five syringes, and I think that was the
4  only one that the label had fallen off.
5    Q   So the label had fallen off and the
6  syringe and you still used it to inject the patient;
7  right?
8    A   Yes.
9    Q   And Dr. Wiley was saying that you
10 shouldn't do that; right?
11   A   After the fact she noticed that it wasn't
12 labeled, and I explained to her it must have fallen
13 off.  But I am sure that it was Lidocaine because the
14 other set that I usually draw like I said were all
15 labeled, and I couldn't have given anything else
16 except the Lidocaine.
17   Q   Can you turn to page Rush 68.  Is Rush 68
18 and 69 an evaluation of your work by Mary Rodzik on a
19 case you worked on on April 1st, 2014?
20   A   Yes.
21   Q   This evaluation contained quite a number
22 of unsatisfactory ratings; right?
23   A   Yes.
24   Q   Can you turn to the second page?

Page 373

1    A   Okay.
2    Q   What looks like sort of the second
3  paragraph, it starts with I asked what?
4    A   I asked what the dose and route of
5  Methergine was, and she didn't know the dose but then
6  told me you would give it IV.  Wrong, unacceptable.
7    Q   Is that accurate?  Did that happen?
8    A   I did give her a wrong answer, but it
9  wasn't a drug that we were -- She was quizzing me.
10 Basically it wasn't a drug we were going to use.
11   Q   Can you read the next sentence?
12   A   Then asked the dose and route of other
13 meds that you might use instead of Methergine.  She
14 told me Pitocin correct but could not something a dose
15 or route, and she could not think of any more.
16   Q   Was that accurate?
17   A   I don't recall.  It possibly could be.
18   Q   Okay.  What does it say next?
19   A   I asked her about Hemabate, and she said
20 she never learned about it.  Huge lie, unacceptable.
21   Q   Let me ask you.  Did she ask you about
22 Hemabate?
23   A   She asked me about a drug that I think to
24 the best of my recollection -- What is the drug that

Page 374

1  you use in OB to help decrease bleeding I think in
2  terms of if we were doing D&C or addressing uterine
3  fibroids?  She didn't ask me -- She didn't say
4  Hemabate.  She asked me, What is the drug that you use
5  for that purpose?  And she said, You should remember
6  this.  You guys just went through this week.
7        So at this point I was overlapping with
8  the junior class, and so she thought that I had just
9  gone to the OB class that week.  And so she said, It
10 starts with the letter H; and I asked her from what I
11 recall, Do you know the category of drug that it is
12 because in my head I was thinking of prostaglandin
13 inhibitor which is what Hemabate is.  But our lecture
14 doesn't say Hemabate.  It says prostaglandin
15 inhibitor.
16       So this was not in our lecture.  And
17 that's why she said it's a huge lie that I did not
18 know about Hemabate; but she didn't ask me whether,
19 you know, we had it in lecture recently because we did
20 not have it in our lecture.  It wasn't in our Power
21 Point.
22       I went back and looked for Hemabate in
23 our Power Point in like the OB text; and what we have
24 is prostaglandin inhibitor, not Hemabate.  And then



11  (Pages 371 to 374)

Page 375

1  when I asked the juniors, they said, Yeah, we just
2  talked about this week, and they had it in their Power
3  Point, and they also have like a cheat sheet which is
4  a grid of different drugs, and Hemabate was there.
5      Q   Are you saying you had never learned about
6  Hemabate at all?
7      A   Not the drug name, but the category that
8  it belonged to.
9      Q   So you are saying that you never learned
10 about Hemabate?
11     A   I learned about it later but not at that
12 time.
13     Q   You're saying that when you were a junior
14 in the same course you didn't have that?
15     A   No.  It wasn't in our lecture.
16     Q   Can you read the next paragraph of notes
17 there?
18     A   Sure.  During one of our cases, our
19 patient's heart rate increased and the tidal volume
20 decreased.  So I deepened anesthetic and hand
21 ventilated the patient for a while deepened.
22         The something had LMA.  I asked if she
23 knew why; and she said because the LMA was dislodged,
24 not true.  So asked what else could be concerned

Page 376

1  about.  She could not answer.
2          I asked if she ever considered a
3  laryngospasm.  Maybe patient was light, increased
4  heart rate and was on the brink of spasm, decreased
5  tidal volume, and she looked at me with a blank face.
6      Q   Did you tell her that you thought that the
7  LMA might be dislodged?
8      A   I think I recall having that answer.
9      Q   And did she ask you what else it could be
10 and what else could be concerned about?
11     A   She might have.  I mean I was asked
12 several things in that case.
13     Q   Do you remember?
14     A   I don't remember.
15     Q   It says that I asked her if she ever
16 considered --
17         What's that next word?
18     A   Laryngospasm, but I think that it got cut
19 off.
20     Q   Did she ask you that?
21     A   She might have.  I just don't recall the
22 details.
23     Q   Do you know if you looked at her with a
24 blank face after she asked you that?

Page 377

1      A   I'm not sure.  I don't remember.  I know
2  that I was getting asked a lot of questions; but I
3  don't recall that, you know, part.
4      Q   The next line says:  LMA laryngospasm are
5  basic concept of anesthesia and she still not grasping
6  them.  Is it true that LMA and laryngospasm are basic
7  concepts of anesthesia?
8      A   Yes.
9      Q   She then says:  The meds I asked about
10 were in more advanced anesthesia classes; but since
11 she is finished with didactic, all questions are fair,
12 so she should be able to answer all questions.  Do you
13 think that was accurate?
14     A   That I should be able to answer all
15 questions without fail?
16     Q   About the meds she asked you about from an
17 advanced anesthesia classes.
18     A   I'm still a student.  There is
19 opportunities or situations that I don't remember
20 things.  And every year they update the lectures, so
21 there is certainly some things that I don't recall.
22 And I took didactics a year before.
23         With the leave of absence and not being
24 exposed to cases, there certainly are things that I

Page 378

1  had forgotten from when I last took courses back in I
2  think it was May of 2013.  Yes.  May of 2013 was
3  probably the last time we took courses.
4      Q   So this was in April of 2014; right?
5      A   Yes.
6      Q   So it was several months after you've been
7  back in the OR; is that right?
8      A   Yes.
9      Q   And are you saying that they couldn't hold
10 you accountable for knowing about drugs that you
11 learned about during the didactic program?
12     A   No.  I'm just saying that there are times
13 that I would forget certain drugs, especially those
14 that I'm not familiar or not exposed to a lot.
15     Q   Were those drugs that were going to
16 pertain to this case or these cases that you were
17 administering this day?
18     A   No.  She was just quizzing me on those
19 drugs.  We weren't actually using them for the actual
20 case.  She was just bringing up questions, and none of
21 these drugs were used for the case from my
22 recollection.
23     Q   Could that recollection be wrong?
24     A   I don't remember drawing anything else



Page 379

1    aside from the basic anesthesia induction drugs, so
2    these are just -- She was just quizzing me.
3        Q    She wrote at the bottom here:  More
4    importantly, she could have caused serious damage by
5    giving what is that, Mether --
6        A    Methergine IV.
7        Q    Weren't you giving Methergine that day?
8        A    No.
9        Q    No?
10       A    No.  We didn't give Methergine that day?
11       Q    Was it drawn up?
12       A    No, because it's given when the patient is
13   bleeding to stop their bleeding or if their uterus is
14   spasming, you give that.  It was a quick D&C, so there
15   was no risk of bleeding happening at that time.  It
16   was like maybe a half hour procedure, from what I
17   recall.
18       Q    Is it possible your recollection is not
19   right about that issue?
20       A    I just remember never drawing it up.  I am
21   very sure that we didn't use this drug during that
22   case, and I've never used Methergine in any of the
23   cases that I've been in.
24       Q    You've never drawn up Methergine?

Page 380

1        A    No.
2        Q    If you turn to Rush 136, it's an
3    evaluation from Jim Miller dated May 21, 2014 of you;
4    is that right?
5        A    Yes.
6        MS. SIEGEL:  136?
7        THE WITNESS:  136.
8        MR. LAND:  Q  That's an evaluation of your work
9    on May 21, 2014 by Jim Miller?
10       A    Yes.
11       Q    Jim Miller rated you as unsatisfactory in
12   one category?
13       A    Yes.
14       Q    Is Jim Miller a fair evaluator of you
15   generally speaking?
16       A    At the beginning, yes, but later on, no;
17   and I remember when he started turning --
18       Q    You do?
19       A    -- unfair.
20       Q    What do you remember?
21       A    Dr. Kremer approached him at the beginning
22   of my case which he is apt to do with some of the
23   CRNAs that have worked with me.  And after that, Jim,
24   I usually give him evaluations; but this time I'm not

Page 381

1    sure if I didn't have one or if I forgot to give him
2    one, but the next day he asked me for one which struck
3    me as a little odd which normally he doesn't ask for
4    one.
5            And this morning I remember, I recall
6    that Dr. Kremer did approach him; and I feel that that
7    had to influence him on what how he ranked me.
8        Q    Based on what, just the fact that you saw
9    him talk to him?
10       A    That and the way he interpreted this
11   negative evaluation and what happened actually
12   happened.
13       Q    The way who interpreted this negative
14   evaluation?
15       A    So he writes that --
16       Q    Who interpreted it?
17       A    Jim.
18       Q    He wrote this; right?
19       A    Yes.
20       Q    So didn't he write:  Clinically good day,
21   two intubations, intra op management done well,
22   independently with little help; right?
23       A    Yes.
24       Q    Do you agree with that?

Page 382

1        A    I do.
2        Q    Okay.  Then it says:  Wasn't able to
3    identify importance of blood pressure.  What's that --
4        A    Control with induction on something
5    cerebral aneurysm, maybe control with intervention.  I
6    think this is like ruptured cerebral aneurysm, so that
7    part I dispute.
8        Q    Are you saying it's not true?
9        A    I'm saying that I was prepared to address
10   or I was prepared to participate in like this
11   particular procedure; and I know the question that he
12   asked me that he came to this conclusion because I
13   just remember a lot from that.
14           This was an add-on case, and we were
15   told about the procedure or the case right in the OR,
16   not the OR but the interventional suite.  So the OR
17   nurse told us, there is a ruptured cerebral aneurysm
18   case that's coming up.  It's an add-on.  That's all I
19   know about the patient.
20           So then he and I went to the prep room
21   or the local to start preparing for this case; and
22   that's when he started asking me, What are the
23   anesthetic consideration for patients who have a
24   ruptured cerebral aneurysm.  And of course in my ICU

MAGNA
LEGAL SERVICES

Page 383

1  experience we go through an algorithm of A, B, C which
2  is airway, breathing, circulation.
3        So my only information on this patient
4  is that it's a ruptured aneurysm which means your
5  priority is securing their airway.  So that's my first
6  answer to him.
7        And he said what else?  Well, you have
8  to establish a stable -- you have to make sure that
9  they're ventilating fine because if the aneurysm is
10  ruptured, you could potentially suppress the
11  respiratory functions where it could potentially
12  affect the brain's respiratory center.  And he said,
13  What else?  Well, circulation which means you have to
14  control the blood pressure to control the bleeding.
15  Okay.  So that was my third answer, and I think that's
16  what he wanted to hear first of all, not the other two
17  that I answered.
18        And so that's the only thing I recall
19  that made me think that he thinks I didn't know the
20  implications of anesthesia to a ruptured cerebral
21  aneurysm when, in fact, I did have a whole Neuropack
22  is what they call it which contains two
23  antihypertensive drips, three emergency
24  anti-hypertensive medications; and he saw me have all

Page 384

1  of those, that setup and the setup for the airway
2  ready before this case was started.
3        And so I just don't understand why he
4  thought I didn't know the implications of anesthesia
5  for cerebral aneurysm.
6     Q   Did he talk to you about their evaluation
7  at all?
8     A   No.
9     Q   Did you ever talk to him about it?
10     A   No.  I didn't see it until I was
11  dismissed.
12     Q   What about the next evaluation in Exhibit
13  12, Rush 135 --
14     A   Yes.
15     Q   -- evaluation by Jim Miller from -- It's
16  dated May 27, 2014 at the bottom.
17     A   Yes.
18     Q   Do you remember this evaluation?
19     A   I saw it like I said when I collected all
20  of my evaluations when I was dismissed but not at the
21  time that he filled it out.
22     Q   Is this an accurate description of your
23  work that day?
24     A   Let me just read the bottom.  Pediatric

Page 385

1  add-on case, struggled to know drug dosage.  Difficult
2  time setting up for case in short period of time.  Was
3  told to give 5-milligrams Hydralazine, gave 10.  Don't
4  she think she knew the dose and concentration or she
5  just didn't listen to me.
6        I think there was a lot of I guess
7  misunderstanding that day.  I have not had a pediatric
8  case since I think 2013, and so certainly it's a
9  little -- I'm a little slow with setting up for peds
10  cases.  So a short period of time, I would believe
11  him, that I couldn't like set up what I needed for a
12  pediatric cases as quickly as he wanted me to.
13        And in terms of the Hydralazine, he's a
14  little soft spoken; and with a mask, I had my back
15  turned against him as I'm attending to the patient.
16  So I think I just heard him say give Hydralazine but
17  not the dose that he wanted me to give.  And since
18  this is what I'm accustomed to giving to start out at
19  10 milligrams, that's what I gave.
20        And then I told him, I think you said
21  10 milligrams or I think you said Hydralazine and I
22  assumed you wanted 10-milligrams.  So that's what I
23  recall from that day.
24     Q   So you gave a higher dose to this

Page 386

1  pediatric patient?
2     A   No.  This is actually another case.  It's
3  I think for the single spine procedure.
4     Q   I thought you were just explaining you
5  were unfamiliar with pediatric cases?
6     A   That's this one section here, pediatric
7  add-on case; but these are two cases, and I think he's
8  referring to Hydralazine for the second case which is
9  the single spine adult case.
10     Q   So is he right that he told you to give 5
11  milligrams but you may not have heard him?
12     A   I may not have heard him, and that's
13  usually the amount that we start at with Hydralazine.
14  It's a 20-milligram half vial.  We give half usually
15  and see what their response is.
16     Q   He also writes here next to reliable
17  anesthesia team member, still needs to be prompted,
18  instructed throughout.  Did that happen that day?
19     A   It could have, but I don't recall since I
20  think I was paired with him after I was in ECT which
21  is a whole different procedure.  So I don't recall
22  like if it was a last minute pairing like the case was
23  also added last minute, so I don't recall a whole lot
24  about that day.



14  (Pages 383 to 386)

Page 387

1    Q   Could you turn to page Rush 55. It's an
2  evaluation by Katie Colino?
3    A   Okay.
4    Q   Is this an evaluation of you?
5  MS. SIEGEL: Is this 55?
6  THE WITNESS: 55.
7  MR. LAND: Q Is this an evaluation from Katie
8  Colino of your case on May 29, 2014?
9    A   Yes.
10   Q   She rated you unsatisfactory in many
11 categories; is that right?
12   A   Yes.
13   Q   Was this the last case you worked on in a
14 clinical setting at Rush?
15   A   Yes.
16   Q   There is a reference in the additional
17 comments to a CO2 monitor, and it says it was not
18 turned on?
19   A   At the start of the case before the --
20 Actually it's not at the start.  I mean we were I
21 think prepping for our cases.
22   Q   Was it true that it wasn't turned on?
23   A   Yes.
24   Q   What does it say after that in the

Page 388

1  handwritten next?
2    A   I was instructed to draw up Fentanyl.
3  Student drew up, something drew up Versed and
4  Fentanyl, not detrimental but demonstrates difficulty
5  following instructions.  Instructions to some, some
6  kilogram patient with an esophageal cancer.  I don't
7  know what this is saying.  24 percent EF.  Very
8  explicitly told what meds to give.  Light sedation was
9  requested.
10   Q   Doesn't it say required?
11   A   Was required.  Patient proceeded to --
12 Wait, something proceeded to attempt to go up on
13 Propofol drip.  Maricel states was rushed and didn't
14 have time.
15   Q   Hold on.  Before you turn, does this say
16 that you were instructed to draw up Fentanyl but you
17 drew up Fentanyl and another drug?
18   A   Yes.
19   Q   And did that happen?
20   A   Yes.  She didn't tell me that there were
21 actually other drugs drawn; and so our practice with
22 this particular case is that we draw up Fentanyl,
23 Versed and Propofol and I think Lidocaine as well.  So
24 I was prepping for a typical case.

Page 389

1    But she did not tell me that another
2  student had already prepared for this patient.  And
3  basically she took me from one case that I wasn't
4  finished yet and added me to this case.  But other
5  student already saw and prepared for this patient.
6    Q   Can you turn to the second page, the
7  handwritten notes.  Start with what's after the
8  parentheses after the second page.
9    A   Done by other anesthesia provider.
10   Q   So after that it says:  Patient pale,
11 patchy hair.
12   A   Patient pale, patchy hair.  On nasal
13 canula with oxygen sats in the low nineties.
14   Q   Does that indicate anything to you about
15 the patient's condition?
16   A   Yes.
17   Q   What does that indicate to you?
18   A   That he's a frail, sick patient.
19   Q   Can you reads what follows there?
20   A   On nasal canula with O2 sats in low
21 nineties.  Doses given by CRNA very low and verbalized
22 to Maricel.  She should be able to pick up on clinical
23 situation even if didn't quickly scan anesthetic
24 record or looked at patient and realized important to

Page 390

1  look at record.
2    Q   Do you remember if this patient appeared
3  to be particularly sick?
4    A   Yes, at the actual procedure.  That's the
5  first time I saw him.
6    Q   When you were there, you noticed that?
7    A   Yes.
8    Q   In a way is it accurate as she has
9  described here, that would affect your view of how to
10 treat the patient?
11   A   Yes.
12   Q   Go on with what she wrote here.
13   A   To look at record.  Was told to give 25
14 mics Fentanyl.  Maricel put syringe to patient.  Was
15 noted by CRNA that 50 mics was missing.  Realized
16 that she grabbed Fentanyl syringe that she used from
17 prior patient.
18   Q   So that happened; right?
19   A   Yes.  We both caught it before it was
20 given to the patient.  So nothing was given to the
21 patient yet.
22   Q   And that's what it says after that; right?
23   A   No Fentanyl from that syringe was
24 administered because CRNA witnessed event.



15  (Pages 387 to 390)

Page 391

1    Q   Is that true?
2    A   Well, we both caught it. I said, This
3  looks not full, and so I didn't give it because then
4  we both realized I still had my Fentanyl from the case
5  that I had just finished that I'm supposed to -- I'm
6  supposed to waste that with another practitioner or
7  another student to make sure that we account for the
8  remainder of any narcotic.
9        That's how we usually end our cases.
10  We dump our old unused medications, especially
11  narcotics and witness that with another person.
12       So because I was hurried, I didn't get
13  a chance to do that, and that's why there were two
14  Fentanyl syringes in my pocket which we both caught.
15   Q   Eventually with this patient did you try
16  to administer more of a drug than Katie Colino thought
17  you should have?
18   A   No. From what I recall, I recall -- So
19  she told me that this patient had a cardiac condition,
20  that EF was low; so we should be very careful about
21  sedating him too much.
22       And unfortunately I think from what I
23  remember, the patient was squirming around with an
24  endoscope in his mouth; and I overheard the comments

Page 392

1  of the gastroenterologist that he has a lot of
2  esophageal erosions. And so my concern was that we
3  could potentially, he could potentially lacerate the
4  esophagus with the patient moving around.
5        And so I checked to see, I checked to
6  make sure that we were giving the right amount of
7  Propofol; or I wanted to check what was running, and
8  she stopped me and said, Don't touch it. He's fine
9  where he's at.
10       So I didn't increase the Propofol.
11  I just tried to turn the infusion pump to check how
12  much I was giving the patient. But I didn't even
13  touch the button to raise the dose of Propofol that we
14  were giving, and that wasn't my intention. I just
15  wanted to make sure that I was checking the amount I
16  was giving him.
17   Q   Were you thinking that the Propofol dose
18  was inadequate and that it should be increased?
19   A   I was trying to check how much I was
20  giving, and I was also thinking of other adjunct or
21  other medications that we could give that would not
22  affect the patient's ejection fraction or would not
23  depress the patient's cardiac function.
24   Q   I asked a really straight forward

Page 393

1  question, and you're talking about these other things.
2  I asked if you thought that the Propofol dose was
3  inadequate for this patient and were you considering
4  increasing it?
5        MS. SIEGEL: I'm going to object. The witness
6  testified to what her thought process was in response
7  to your question.
8        MR. LAND: She talked about a lot of things
9  other than what to do with Propofol.
10   Q   What I want to know is if you thought the
11  Propofol dose was inadequate and if you were
12  considering increasing it?
13   A   I didn't think it then. I wanted to check
14  to make sure I put in the correct amount that she told
15  me, and I didn't think then that's what I was going to
16  use.
17   Q   So you were checking to see if you put in
18  what she told you to?
19   A   Yes.
20        MR. LAND: Would you mark this as Exhibit 21.
21        (Marcial Deposition Exhibit No. 21
22         was marked for identification.)
23   Q   Do you recognize Exhibit Number 21?
24   A   Yes.

Page 394

1    Q   Did you write this document?
2    A   Yes.
3    Q   Did you write it on May 29, 2014?
4    A   That's what it says here.
5    Q   Wasn't this the same day as the evaluation
6  with Katie Colino?
7    A   Yes.
8    Q   This is the day you were sent out of the
9  OR?
10   A   Yes.
11   Q   This is referring to the evaluation we
12  were just discussing?
13   A   Yes.
14   Q   If you look in the fourth paragraph, do
15  you see that?
16   A   Yes.
17   Q   Despite the Fentanyl re-dose, the patient
18  continued to move. I looked at the Propofol drip and
19  confirmed that the rate was still 30 mics?
20   A   Yes.
21   Q   So you knew what it was; right?
22   A   Yes.
23   Q   At this time vital signs were stable in
24  the 130s over 80s and saturation was normal. Because



Page 395

1   the patient was moving, I felt that this Propofol dose
2   was inadequate and reached over to the pump to confirm
3   that it was indeed at 30 and also because I was
4   considering increasing the dosage to 40 mics; right?
5       A   Yes.
6       Q   Was that accurate?
7       A   I guess that's what my thought process was
8   then.
9       Q   It's different than what you were just
10  saying, isn't it?
11      A   Yes.  From my recollection if I had this,
12  then that's what I was thinking then.
13      Q   So you were thinking about increasing the
14  dosage, not just checking to see if you had done it
15  correctly as Colino had told you; right?
16      A   Yes.
17      Q   That's when she told you not to increase
18  it?
19      A   Yes.
20      Q   Had she already told you it was a cardiac
21  patient?
22      A   Yes.
23          40 mics is still a low dose for an
24  adult his size.

Page 396

1       Q   Wasn't that the whole point of her concern
2   with you was that you were seeking to increase the
3   Propofol dosage on a cardiac patient which would cause
4   potential problems from her perspective?
5       A   Yes, but I mean every practitioner has a
6   range that they feel is safe for somebody, especially
7   considering the ejection fraction here.  So 40 is
8   still within range for somebody with that condition.
9       Q   That's your opinion; right?
10      A   Well, that's founded in textbooks, and
11  I've worked with ICU intensivists and some
12  anesthesiologists who would consider that this is
13  still acceptable; and especially it's short-term.
14  It's not like it's infusing for several hours.  This
15  is just -- This is a 30-minute procedure.
16      Q   So you still think now it would have been
17  okay to increase that dosage to 40 mics?
18      A   Possibly.
19      Q   So later in this document here, the last
20  paragraph on this page, it says:  I relied that I
21  understand that, but I did not know anything about
22  this patient.  So I'm confused?
23      A   That's what she told me.
24          I did tell her that I didn't read this

Page 397

1   patient's history and am just going by, you know, the
2   patient's appearance and what she said.
3           You can't give a high dose to a cardiac
4   patient.  I guess in my head I dispute that that
5   really was a high dose.
6       Q   You wrote this rebuttal at the time of
7   this evaluation that Katie Colino gave you?
8       A   Yes.
9       Q   Isn't this the first one you wrote?
10      A   I had written some before which I offered
11  to Dr. Kremer if he wanted to read it; but he said, I
12  am not interested.
13      Q   When did you do that?
14      A   In one of our meetings I told him that I
15  have rebuttals that are written.  If you want them, I
16  can email them to you.  So in one of our Friday
17  meetings, I had a prepared rebuttal; but he wasn't
18  interested in having them.
19      Q   You said it was in one of your Friday
20  meetings that you said that to him?
21      A   Yes.
22      Q   Do you have any time period you can put
23  that in?
24      A   Probably either May or like late March.

Page 398

1   I don't recall.
2       Q   Late March you think?
3       A   In one of our Friday -- because when I
4   came back from my LOA, we're supposed to meet every
5   Friday as soon as I returned from my LOA.  It was one
6   of the learning plans that we had talked about, to
7   meet every Friday.
8       Q   Was it only one time that you offered him
9   to share written rebuttals?
10      A   I don't recall.  I mentioned it.  He
11  said -- He had asked me like, Do you have -- well, do
12  you have rebuttals for this evaluation?  Like he would
13  present an evaluation to me; and I said, I do have
14  some prepared.  Would you like to have them, and he
15  said no, like he wasn't interested.
16      Q   Did you have weekly meetings with
17  Dr. Kremer after you returned in January of 2014?
18      A   For the most part.  There is times that I
19  would be dismissed like sometimes 7:00 o'clock or
20  8:00 o'clock from my cases, so then he would be gone
21  for the day; and certain times I would leave him a
22  note in his door that I stopped by, but he was already
23  gone for the day.
24          And then I think at one point either I

**MAGNA**
**LEGAL SERVICES**

| Page 399 |
|---|

1  text'd him or I emailed him saying, did you still want
2  to meet or can you meet today, and he told me, If I'm
3  not there, then just ask Evelyn for your records to
4  review.
5          So we agreed to meet every Friday at
6  the end of the week, but it wasn't always feasible
7  based on my schedule or his schedule.
8      Q   Did you have some meetings with him on
9  Fridays?
10     A   Yes.
11     Q   Did you review evaluations that he had
12 received during those meetings?
13     A   Some of them.
14     Q   Were some of them the ones we have been
15 looking at today?
16     A   Yes.
17     Q   So you saw on unsatisfactory ratings from
18 that time period --
19     A   Yes.
20     Q   -- some of them?
21         But you didn't give, Dr. Kremer any
22 written rebuttals until this Exhibit 21?
23     A   Yeah.  I was verbally explaining to him.
24 My rebuttal is basically verbal when I meet him for my

| Page 400 |
|---|

1  weekly meetings.
2      Q   In this Exhibit 21 on the second page, on
3  the second to the last paragraph, there is a sentence
4  that begins on the right-hand side at the top line,
5  I have done well in every sphere, and that does not
6  involve a particular group of Rush CRNAs?
7      A   Yes.
8      Q   What did you mean by that?  What group of
9  Rush CRNAs are you talking about there?
10     A   Well, like around this time I had already
11 talked to several people who have the same, had the
12 same experience as mine; and we had identified a core
13 group of CRNAs who we felt were not very fair with
14 their evaluations.
15         And I had mentioned it to Dr. Kreiner,
16 the psychiatrist, as well as Dr. Terrebessy; and they
17 both had confirmed that those names were familiar,
18 that the other students have also experienced
19 difficulties with them.  So that's what I was
20 referring to here.
21     Q   Which other CRNAs, group of CRNAs are you
22 talking about?
23     A   So in comparison with the other students,
24 that we have all had the same experience, Angela

| Page 401 |
|---|

1  Keehn, Leah Forester, Eva Fisher, Jill Wimberly, Mary
2  Rodzik.  I think that's what I recall.
3      Q   So you received unsatisfactory ratings
4  from many more CRNAs than those; right?
5      A   Yes.
6      Q   Do you think it's accurate that as many as
7  16 different CRNAs gave you unsatisfactory ratings?
8      A   I guess I don't have the record for me to
9  agree with that or confirm that.
10     Q   It was a large cross section of them
11 though; right?
12     A   Yes.
13     MR. LAND:  Do you want to take a quick break?
14         (Whereupon a brief recess was had,
15          after which the deposition of
16          Ms. Marcial continued as
17          follows:)
18     Q   I'm going to hand you what's been marked
19 as Maricel Deposition Exhibit Number 1 which is a copy
20 of the Second Amended Complaint.  We looked at this
21 during your first session.  If you can turn to
22 Page 33, it has a count Tortious Interference With
23 Contract Against Defendants Kremer, Narbone, and
24 Wimberly.  Do you see that?

| Page 402 |
|---|

1      A   Yes.
2      Q   Do you understand that as being a cause of
3  action -- I won't ask you much about legal issues
4  here -- against the individual defendants in their
5  individually capacities as opposed to against Rush
6  itself?
7      MS. SIEGEL:  Objection.  It calls for a legal
8  conclusion.
9      A   I imagine if they're representing Rush
10 that that's what I'm alleging here, that they are part
11 of the institution, and so they are representing --
12     MS. SIEGEL:  Don't speculate.
13     MR. LAND:  You just interrupted her in mid
14 answer which you really shouldn't do.
15     MS. SIEGEL:  You shouldn't be calling for
16 speculation.
17     MR. LAND:  Asking her if she is suing people in
18 their individual capacity?  Seriously, Elaine, that's
19 an unprofessional interruption.  It's beneath you.
20     Q   Paragraph 149 indicates defendants Kremer,
21 Narbone, Wimberly willingly, intentionally, and
22 unjustifiably impeded plaintiff's progress within Rush
23 CRNA's program by continually issuing false and
24 misrepresentative evaluations with respect to

MAGNA
LEGAL SERVICES

Page 403

1  plaintiff and by subjecting plaintiff to undo
2  harassment and discrimination.
3      Do you see that?
4      A  Yes.
5      Q  How many evaluations did Jill Wimberly
6  write of you that were false or misrepresented
7  anything?
8      A  I know of two that was misrepresented.
9      Q  One in June of 2013 and the other in
10  January of 2014?
11      A  Yes.
12      Q  Is that what you mean by continually
13  issuing false misrepresentative evaluations with
14  respect to Jill Wimberly?
15      A  With respect to her, she had also
16  influenced Eva who had then influenced -- I don't know
17  who, but I know one person that, another student
18  witnessed Eva talking to about me in a disparaging
19  way.  So she had influenced that person, and I don't
20  know from there where the message had been spread out
21  to.
22      Q  So if Eva Fisher writes an evaluation, you
23  claim that that's Jill Wimberly issuing an evaluation?
24      A  She was definitely influenced to issue me

Page 404

1  a false evaluation.
2      Q  Based on what you testified to in your
3  first session; right?  We talked a lot about the basis
4  for your belief that Jill Wimberly influenced Eva
5  Fisher.  Do you remember that?
6      A  I think I remember that part.  I don't
7  recall the exact details.
8      Q  Okay.  Did Mike Kremer ever issue,
9  Dr. Kremer ever issue a false or misrepresentative
10  evaluation of you?
11      A  He upheld the false evaluation even though
12  I implored him to check or investigate the validity of
13  these evaluation; and despite that, he maintained
14  giving credit to those false evaluations.
15      Q  So he didn't actually issue one though;
16  right?
17      A  No.  He just supported it.
18      Q  By not deleting it?
19      A  By including it in my file of evaluations.
20      Q  Is that part of his job to include CRNA
21  evaluations of SRNAs in their files?
22      A  Yes, but he also needs to determine the
23  validity of them, if they're really worth, if they're
24  really credible and if it's really reflective of my

Page 405

1  performance.
2      Q  What did Ray Narbone do to issue a false
3  or misrepresentative evaluation, if anything?
4      A  Well, he had allowed me to be paired with
5  what I presented before as a problematic match with
6  Jill.  I had brought that problem to him before, and
7  he had ignored that and intentionally texted me and
8  Jill that we're being paired.  And then again sometime
9  in April I think he tried to pair me with her even
10  though he knows of the incompatible pair-ups that we
11  have.
12      Q  So it wasn't until after the June 20
13  evaluation you received from Jill Wimberly that you
14  asked to not be paired with her; right?
15      A  Yes.
16      Q  And you worked with Jill once after that;
17  right?
18      A  June, then January; and I was assigned to
19  her but didn't work with her, yes.
20      Q  So you were assigned and worked with her
21  once?
22      A  Yes.
23      Q  After you asked to not be assigned to her;
24  right?

Page 406

1      A  I was assigned three times, but I worked
2  with her just once out of those three.
3      Q  So my question was:  Did Ray Narbone ever
4  issue any evaluation of you?
5      A  No.
6      Q  So all he did was assign you to Jill
7  Wimberly after you asked not to be assigned.  That's
8  all he did that you think that he did that's
9  problematic?
10      A  Well, aside from that, he had made sure
11  that, you know, like I don't have, that I can't refuse
12  being sent to her.  And then he came up one time and
13  talked to her that day of January 20 which is unusual
14  because we were in 7 Tower; and normally around that
15  time, he's busy coordinating cases in 5 Tower.  So I
16  felt that there was that added, you know, pressure or
17  interaction that they had that made me feel like this
18  was very -- this is going to be a negative encounter.
19      Q  So he assigned you to Jill once, and then
20  he talked to Jill that day in front of you.  Do you
21  know what he said to her that day?
22      A  Well, Friday I argued with him.
23      Q  That's really not what I'm asking.  Do you
24  know what he said to Jill that day that she evaluated



Page 407

1  that day on January 20, 2014?
2      A   I don't. I don't know what he said.
3      Q   So other than having a conversation with
4  her, you don't know what he said. In assigning you to
5  work with her that day, did he do anything that you
6  believed is issuing a misrepresentative evaluation or
7  subjecting you to harassment and discrimination?
8      A   Well, the meeting we had in October was
9  definitely very harassing when he started calling me
10 names and just all of the disparaging remarks he right
11 off the bat told me even though Dr. Kremer had told me
12 that that meeting is supposed to be set for me to be set
13 up for my return in January, not as a counseling at
14 all.
15          So in that meeting, he was definitely
16 more than harsh with me and reassured me that I will
17 be failed, and he assured me of different hurdles and
18 different difficulties that he guarantees will happen
19 when I return.
20     Q   So his comments to you in one meeting, his
21 assignment to Jill Wimberly for one day and his
22 conversation with Jill Wimberly on that day that you
23 don't know what he said, is that the full extent of
24 anything he did that you think was harassing or

Page 408

1  discriminatory?
2      A   We have had other encounters which I can't
3  recall right now; but I felt for sure that he had a
4  hand in how I was being treated, how the CRNAs'
5  behaviors have followed this pattern. Ever since my
6  event with Jill in June, things have just spiraled
7  down from one person who wasn't writing me up, and I
8  was doing so well before the June event for a whole
9  year and a half I think.
10          And then suddenly from that event
11 moving forward, I had the multiple negatives which as
12 hard as I tried to reason them with Dr. Kremer, he
13 didn't hear or investigate or help me in trying to
14 sort this out but instead just criticized me,
15 scrutinized me for anything that I had to say about
16 these evaluations without him investigating the
17 validity of them.
18     Q   So I was asking about what Mr. Narbone
19 did, and I think all I heard you say in there was you
20 believed that he influenced other CRNAs in how they
21 treated you?
22     A   I have a sense that he did because during
23 our meeting in October, he said that if I took a poll
24 among the CRNAs whether you should return, I guarantee

Page 409

1  you that they will all unanimously vote you out.
2  So --
3      Q   Do you know if he actually took a poll?
4      MS. SIEGEL:  She's still talking.
5      MR. LAND:  I'm sorry.
6      A   I don't know.
7          But all of the implications were that I
8  cannot control their behavior and I will not stop them
9  from how they're going to treat you, and I know that
10 they're not going to look at you the same way as when
11 you were a brand new person. So every mistake you
12 make will be looked at in the most harsh or
13 unfavorable way towards you.
14     MR. LAND:  Q  Well, he didn't actually say
15 that; right?
16     A   He did say that in that meeting.
17     MS. SIEGEL:  Argumentative.
18         Can we have the last question and
19 answer, please.
20             (Whereupon the requested portion
21              of the record was read.)
22     A   He did say that.
23     MR. LAND:  Q  Are you saying that he told you
24 that every mistake you made would be viewed in the

Page 410

1  most harsh and unfavorable way towards you, those
2  words?
3      A   I'm paraphrasing from what I recall from
4  that meeting, but he did indicate that if you made a
5  mistake it's not going to be looked at the same way.
6      Q   Didn't you submit a written document --
7      A   I did.
8      Q   -- to Terrebessy that tried to explain as
9  best as you could recall what Ray Narbone said to you
10 in that October 24, 2013 meeting?
11     A   Yes.
12     Q   So I don't think that anything that you
13 just said about what he said to you you would say he
14 said those words to you unless they're in that
15 document that you wrote for Terrebessy; is that right?
16     A   Not the exact words, but I'm paraphrasing
17 from that meeting what he said.
18     Q   In Paragraph 151 on Page 34 of your
19 complaint --
20     A   Yes.
21     Q   -- it alleges with actual malice
22 defendants Kremer, Narbone and Wimberly by
23 intentionally and unjustifiably inducing plaintiff's
24 removal from the Rush CRNA program acted in their own



Page 411

1  self-interests outside the scope of their agency
2  relationship with Rush and contrary to the interests
3  of Rush. Do you see that?
4      A  Yes.
5      Q  Was it Jill Wimberly's job to evaluate you
6  as a CRNA --
7      A  Yes.
8      Q  -- when you worked with her?
9      A  Yes.
10     Q  Was it Dr. Kremer's job to evaluate your
11 progress in the SRNA program?
12     A  Yes.
13     Q  Was it his job to review the CRNA
14 evaluations of you?
15     A  Yes.
16     Q  Was it his job to work with Ray Narbone
17 about scheduling SRNAs and CRNAs?
18     A  Yes.
19     Q  Can you find Exhibit 3 which is the
20 interrogatory responses. I think it's over there.
21 Could you turn to Page 42.
22     A  Okay.
23     Q  Interrogatory Number 13 is near the
24 bottom, and it asks to state every fact supporting

Page 412

1  your contention that each of the following defendants
2  acted in their own "self interest" in relation to
3  plaintiff's removal from at the program as alleged in
4  Paragraphs 151 and 161 of the complaint. Do you see
5  that?
6      A  Yes.
7      Q  Can you tell us how Dr. Kremer acted in
8  his own self-interest? What was his self-interest in
9  the way he acted towards you?
10     MS. SIEGEL: Calls for a legal conclusion.
11     MR. LAND: Really?
12     MS. SIEGEL: Really.
13     MR. LAND: Q You don't know?
14     A  Well, there are many things that he had
15 neglected to support me and did not like I said
16 validate or investigate the validity of some of the
17 evaluations but considered them as infallible. So I
18 think his self-interest there is he didn't want to the
19 go against the CRNA group and decided to just
20 basically discredit me.
21     So despite my explanations of why
22 certain evaluations are false and I told him, check it
23 with the anesthesia record to validate the accuracy of
24 these evaluations, he did not do that.

Page 413

1      Q  And so because he believed the CRNAs and
2  didn't believe you, you think he acted in his
3  self-interest?
4      A  He certainly put more value in their
5  evaluations as opposed to what I'm pointing to him,
6  for him to do in order to validate the accuracy of
7  those evaluations. He didn't do his due diligence to
8  verify whether those, you know, evaluations --
9  Considering other students have also filed similar
10 complaints, he did not do his due diligence to
11 investigate the validity of those evaluations and to
12 support me.
13     Q  Is there anything besides that that he did
14 that you think shows that he acted in his own interest
15 and not in the interest of Rush?
16     MS. SIEGEL: Continues to ask for legal
17 conclusions.
18     A  Every time we had met for like the end of
19 the week, he was always like demeaning and disparaging
20 me despite my best efforts, and I was pointing out to
21 him that I do have positive evaluations, have
22 performed well in several instances; and he still goes
23 back to, you know, my negative evals no matter how
24 well I've proved them.

Page 414

1      So he does not listen to my
2  explanations but persists in, just persists in his own
3  beliefs. And so he did not perform his duty as the
4  advocate for the student but acted as an opponent
5  basically in opposition to me.
6      So that's how I saw him every single
7  time. It wasn't a supportive interaction. It was
8  always criticisms, scrutiny, and nothing to, you know,
9  support my point of view.
10     Q  Did he offer you multiple opportunities to
11 try to improve?
12     A  Because that's my right as a student
13 there. I'm entitled to support remediation in what he
14 thinks I think I need to work on.
15     But I can tell you that was given to me
16 begrudgingly because even when I said if you're going
17 to put me away for five months on leave of absence,
18 then you would have to consider that I should come
19 back with a fresh start. And he said, no, I don't
20 agree with that; and I had to fight for that.
21     I didn't ask for the five-month leave
22 of absence. I had no choice but to comply with him.
23     Q  Other than how he handled your leave of
24 absence or believing the CRNAs' evaluations of you,



Page 415

1 was there anything he did that you think he was acting
2 in his self-interest?
3     A  Yes.
4     MS. SIEGEL:  Calling for a legal conclusion.
5     A  Yes.  So when I came back from sim lab or
6 for sim lab, he was standing in a very close distance
7 from me and was basically telling Sherwin Sampson, one
8 of the instructors that, you know, she thinks that
9 everybody is ganging up on her.  So he's basically
10 disparaging me in front of another instructor as I'm
11 doing a simulation procedure.
12     Q  Why do you think that's in his
13 self-interest?
14     A  Because he was irritated that I was still
15 trying to come back when he and Narbone had told me,
16 you know, we don't want you to come back anymore
17 basically, like it's not advisable for you to come
18 back.  He didn't want to give me that chance.  So it
19 was too difficult for him I guess to support me in
20 going through with my program.
21     Q  Is there anything else that he did that
22 acted in his self-interest?
23     A  I think there were multiple things that I
24 can't remember off the top of my head right now.

Page 416

1     Q  What about Ray Narbone?  In Exhibit 3
2 under Interrogatory Number 13 under Ray Narbone you
3 say that he called you delusional to think that you
4 would complete the program stating that he did not
5 envision how you could be treated objectively upon
6 your return from the leave of absence.  And while
7 ignoring your complaints about Jill Wimberly, Narbone
8 consistently paired you with Jill Wimberly.
9         Is there anything other than that that
10 you think that Ray Narbone did that acted in his own
11 interest?
12     A  Well, that whole course -- I don't know if
13 you mentioned that whole discussion that we had in
14 October where he basically told me what he thought
15 about me.
16     Q  Tell me how is that, what interest of his
17 would that be advancing?
18     A  That he doesn't have to deal with a
19 student who is posing or questioning, you know, I
20 guess the evaluations of his CRNAs, that he has to
21 work harder to support me and basically go against his
22 CRNA staff, that he's somehow giving me some credence
23 over his CRNA staff is how I perceived it.
24     Q  What was his personal interest in

Page 417

1 assigning Jill Wimberly to you in the OR?
2     A  I can't say for sure what his intentions
3 were, but I've definitely heard of how he could be
4 vindictive coming from the mouth of his own CRNA, that
5 if a student questions him, then, you know, you are
6 asking for trouble.
7         That's when Amy Gawura warned one of
8 the questions like, I wouldn't question him while
9 you're getting assigned cases because you're just
10 asking for trouble.
11     Q  What about Jill Wimberly, what
12 self-interest of hers do you claim she was pursuing in
13 evaluating you negatively?
14     A  I'm not sure why she had to fabricate all
15 of those things.  But just based on her other, her
16 previous interaction with Karen and how she also
17 treated the white student who was with Karen, she
18 showed her bias, her prejudice towards a certain group
19 of students and not so much, you know, certain types
20 of students.
21         So she was acting on her own, you know,
22 prejudices and I think her self-interest to be proven
23 that she is always right even though she is really
24 putting out false information or misrepresentations of

Page 418

1 my work.
2     Q  So I believe you are limiting your
3 assertions against her to her evaluations of you and
4 comments she made to other CRNAs about your work; is
5 that right?
6     MS. SIEGEL:  Mischaracterizes the witness's s
7 testimony.
8     A  Well, I'm not sure what else, like what
9 her other intentions are; but definitely each
10 encounter has been -- Like the times that I was
11 assigned to her, there's always negative feedback.
12         When Ray dismissed me, when she had
13 taken over Leah's case, that led to feedback that was
14 negative by Leah, influenced by her.  And, yeah, just
15 the interactions have not been supportive or positive
16 with her.
17     Q  That's what I'm asking about.  Other than
18 the times she evaluated you and other than your
19 allegations about what she said to other CRNAs about
20 your work, what else are you saying she did that you
21 think was wrong or a problem for you?
22     MS. SIEGEL:  Calls for a legal conclusion.
23     MR. LAND:  What's the legal conclusion?  I
24 mean, Elaine, come on.



Page 419

1  MS. SIEGEL: You're asking this witness what
2  violated the law.
3  MR. LAND: No. I'm not. I didn't ask that.
4  MS. SIEGEL: It's a legal conclusion.
5  MR. LAND: Q I'm asking other than Jill
6  Wimberly evaluating your work in written evaluations
7  and interacting with you in the OR, in talking with
8  other CRNAs about your work as a CRNA, what else are
9  you saying that she did wrong or created a problem for
10  you?
11  A  Even though she did the evaluations, they
12  were flagrantly false. A lot of them had --
13  Q  What besides that, Maricel? That's what
14  I'm asking.
15  A  That had led to Dr. Kremer basically
16  considering that as like grounds for failure. He said
17  two strikes and you are out. And considering that
18  evaluation that she basically provided all false
19  testimony or false information, so her action she knew
20  would lead to me being confronted or held back by, you
21  know, through Dr. Kremer's judgment.
22  And she knew that, you know, whatever
23  negative evaluations she put will catch his attention,
24  and she probably was hoping that I would get in

Page 420

1  trouble once Dr. Kremer sees what she's written there,
2  even though it's full of falsehoods.
3  Q  So I have to ask again: Other than
4  writing the evaluations of you that you just talked
5  about and talking to other CRNAs about your work, do
6  you allege that Jill Wimberly did anything wrong or
7  anything else to create problems for you?
8  A  Well, her behavior with me during our
9  interactions in our cases, like pushing me in the
10  chest, screaming in my ear as I'm performing a
11  delicate procedure, just her aggressive and just
12  demeaning behavior that had led me to commit certain
13  mistakes or even just be represented in a very
14  inaccurate way, just interactions we have in front of
15  students and in front of other staff, how I was, you
16  know, disparaged in front of the surgical team.
17  It's not just evaluations. It's her
18  behavior towards me as I'm in the middle of a
19  procedure where I'm looking to her for guidance and
20  instruction and she becomes my main detractor.
21  Q  So other than how she interacted with you
22  in the OR, what she wrote about that in her
23  evaluations, and her conversations with other CRNAs
24  about your work, do you allege that Jill Wimberly did

Page 421

1  anything that created problems for you or that was
2  wrong?
3  A  Those basically lead to multiple sets of
4  problems. She started, you know --
5  Q  I just want to know if there is anything
6  else?
7  MS. SIEGEL: She is answering.
8  MR. LAND: No. She's not. It's nonresponsive.
9  She is talking about the same things. I'm asking her
10  if there is anything else.
11  MS. SIEGEL: Let her finish her answer. You
12  won't let her finish her answer.
13  MR. LAND: Q is there anything else?
14  A  So all of my physical symptoms and
15  stresses that I had to endure because I had to deal
16  with the types of treatments that I had gotten started
17  by her, and then she had influenced other CRNAs to
18  treat me disparagingly. It's like I feel those things
19  are stemming from her actions.
20  Q  Is there anything else she did that you
21  claim was wrong or created problems for you?
22  A  I can't say for certain. That's all that
23  I can think of right now; but I know that, you know,
24  she had actively put me in jeopardy that eventually

Page 422

1  led to my failure.
2  Q  So you were dismissed from the SRNA
3  program because of your grades; right?
4  A  Yes.
5  Q  And that was based on an evaluation of
6  your work in the clinical course; is that right?
7  A  Yes.
8  Q  Is the clinical course part of the
9  curriculum for the SRNA program?
10  A  Yes.
11  Q  I think you testified in the first session
12  that during your clinical time, you stayed in the
13  one-on-one supervision component of the clinical
14  program; right?
15  A  Yes.
16  Q  Did you get paid any money by Rush when
17  you were in the didactic component of the program?
18  A  No.
19  Q  Did you ever start receiving a stipend
20  from Rush?
21  A  Yes.
22  Q  When did you start receiving that?
23  A  I'm not sure if we started getting it at
24  the start of residency or even before that.



Page 423

1    Q    Are you sure you received the stipend?
2    A    Well, that's what they said.  It was a
3  stipend.
4    Q    You received a payment of money from Rush?
5    A    Yes.
6    Q    But you don't know when you started to
7  receive it?
8    A    I don't recall exactly, but I think it
9  might have been the start of residency.
10    Q    When was that then?
11    A    Probably late May or early June.
12    Q    Of 2013?
13    A    Yes.
14    Q    Was that amount a specific amount per
15  month?
16    A    I think it was roughly around $800.
17    Q    Did it relate to how much work you did,
18  how much time you spent?
19    A    No.
20    Q    Did it relate to how many hours you spent
21  in the OR?
22    A    No.
23    Q    So you could spend 40 hours or 2 hours in
24  the OR and you would still receive the same amount of

Page 424

1  money; right?
2    A    Yes.
3    Q    How did the clinical residency fit into
4  your overall education in the program?
5    A    It's partly training and partly that at
6  the point when we were independently practicing, then
7  we're doing the actual anesthesia provision as part of
8  the residency.
9    Q    And you never got to the part where you
10  did the independent anesthesia part; right?
11    A    No.
12    Q    Because you were always in the one-on-one
13  supervision?
14    A    Yes.
15    Q    So was it always educational?
16    MS. SIEGEL:  Calls for a legal conclusion.
17    A    I don't know.
18    MR. LAND:  Q  You don't know?
19    A    That's what they would call it because we
20  were considered employees, and we signed a contract
21  that basically we were being offered a position of
22  SRNA based on that contract.  We went through
23  employment orientation and got retirement benefits
24  that called 403b.

Page 425

1    Q    Did you think that the CRNAs should
2  evaluate you as if you were no longer a student, no
3  longer learning?
4    A    I don't really understand that question.
5    Q    Really?  I thought you were saying that
6  you thought that they were evaluating you too harshly
7  because they were treating you as you were further
8  along in the program.  Wasn't that part of your
9  concern?
10    A    That, but it's the inaccuracy of their
11  evaluation where I had a minor miscommunication, and
12  that was graded like very harshly.  So it's not
13  commensurate to really what happened for me to be
14  given a 0 even though I had done, you know, more
15  other, several things went accordingly.
16    Q    You didn't think that they should hold you
17  to the same standard of performance as someone in the
18  rotational stage of clinical residency, did you?
19    A    Well, I hoped that they would give me a
20  little consideration from when I had to restart in my
21  LOA and not compare me with my classmates who never
22  had an interruption with their training, had five
23  months of training ahead of me.  So I was hoping that
24  they would look at that as a consideration in grading

Page 426

1  me.
2    Q    Did you still have classes during your
3  clinical residency?
4    A    We had case presentations and journal
5  clubs, journal article presentations.
6    Q    When you were in the one-on-one
7  supervision component of your clinical residency, what
8  would you say was the dominant purpose of your role
9  there?  What was the primary goal for you?
10    A    Well, training to learn different cases
11  and learn how to provide anesthesia for different
12  cases.
13    Q    In every case you worked on, a CRNA was
14  there with you; right?
15    A    For the most part.
16    Q    And they could have done what you did
17  without you there; right?
18    A    Yes.
19    Q    How much was your stipend?
20    A    I think it was $800 a month.
21    Q    How many hours do you think you worked in
22  the OR in July of 2013?
23    A    Probably around 60 hours a week.
24    Q    60 hours a week?



Page 427

1   A   Yes.
2   Q   For $800 a month; right?
3   A   Yeah, yes.
4   Q   And that didn't vary based upon how much
5   you worked; right?
6   A   Yes.
7   Q   Do you allege that you have vacation days
8   allotted to you that were paid?
9   A   Well, it's part of the residency that we
10  are given that; but it does not decrease the amount of
11  stipend that we got for that month.  If we took that
12  vacation -- I think it's 20 days -- we still got that
13  $800 regardless.
14  Q   So vacation days were days you could -- it
15  was like an amount of time that you could take off?
16  A   Yes.
17  Q   When you got dismissed from the program,
18  did you get paid for any remaining vacation days?
19  A   No.
20  Q   Did you expect to be?
21  A   I just recall that I think I got a check
22  after I was dismissed for that because it's like by
23  every two weeks that we get paid.  I think that last
24  week I still got a check.

Page 428

1   Q   Did you receive academic credit for the
2   time that you spent in clinical residency?
3   A   I believe so.  I don't know how many
4   credits it amounted to, but I think so.
5   Q   You received a no pass for the clinical
6   residency in 2013; right?
7   A   I think it's NP/ something.  I forgot.
8   Q   Then a no pass for the residency in the
9   spring of 2014?
10  A   Yes.
11  Q   And you paid tuition to Rush at the same
12  time?
13  A   Yes.
14  Q   How much was your tuition for 2014; do you
15  remember?
16  A   Well, the clinical residency part, I think
17  it was something like 3,000; but there was also a
18  capstone part which I paid.  But I was already
19  dismissed, and he said not to come back.
20      But, nonetheless, I was failed for that
21  course which it's already been paid.  He didn't let me
22  come back, and then he gave me a no pass for a class I
23  never attended.
24  Q   When you said that you worked 60 hours a

Page 429

1   week in the OR in July of 2013, do you also study
2   outside of that time?
3   A   I mean it's part of the -- You're doing
4   the case.  You study on your patient and the
5   particular case the night before.  So in between you
6   would study, of course.  And in the weekends we'd
7   study boards I guess.
8   Q   How much time would you spend a week on
9   that kind of studying and preparation?
10  A   So depending on my case loads, I have to
11  look up the patients, look up their cases, call them,
12  talk to the attendings, prepare a care plan, study
13  their drugs and then on the weekends study some boards
14  or things that I feel I need to familiarize myself
15  with the cases that I've had for the week.
16      So if it's a typical weekday, then I
17  would probably spend an average of four hours studying
18  and putting together patient information for my cases
19  the next day.  So that's four hours a day.  Then on
20  the weekend I probably studied about eight hours per
21  day.
22  Q   So it was a lot?
23  A   Yes.
24  Q   Did anyone ever tell you how much of that

Page 430

1   you needed to do?
2   A   No.
3   Q   It was up to you; right?
4   A   Yes.
5   Q   Did you get any other benefits besides
6   vacation and stipend when you were in the SRNA program
7   in the clinical residency component?
8   A   The 403b.  That's the retirement benefits.
9   Insurance was through the student, I think part of the
10  student benefits.
11  Q   What insurance?
12  A   Health insurance.
13  Q   Did you have a health insurance during
14  didactic portion of the program too?
15  A   Yes.
16  Q   So is it just the stipend and the 403b
17  that changed during the residency program?
18  A   Well, we also got yearly bonuses that the
19  anesthesia had, so it would give us -- So it's like
20  gift cards, yep.  That's from what I remember.
21  Q   When did you get a gift card?
22  A   When?  Around Christmas time.
23  Q   Of what year.
24  A   Of 2013, 2014.



Page 431

1    Q    From whom?
2    A    Dr. Tumen and the anesthesia department I
3  assume, but Dr. Tumen signs the card.
4    Q    So is it from him personally or from Rush?
5    A    I think it's from anesthesia, the
6  anesthesia department because I don't think other
7  colleges got that.
8    Q    When you say the anesthesiology
9  department, do you mean not from the College of
10 Nursing?
11   A    Yeah. I think that's from just the
12 Department of Anesthesia.
13   Q    And was your clinical residency organized
14 by academic term?
15   A    I believe so.
16   Q    That was while you were told your leave of
17 absence had to extend longer than you wanted; right?
18   A    That's what they told me; and Dr. Wiley
19 said I could take two weeks or one month, and then
20 they changed that. Dr. Kremer decided it's not
21 feasible to do a two-week, one-month leave.
22   Q    Were you ever promised paid employment at
23 Rush upon graduation from the program?
24   A    No.

Page 432

1    Q    You would have had to apply for it and be
2  selected by Rush when you graduated; right?
3    A    Yes.
4    Q    Do you know how many of your classmates
5  from your original cohort were employed at Rush as
6  CRNAs after they graduated?
7    A    Well, Rush has other satellites. Great
8  Lakes, I think Skokie might be one of them, and Oak
9  Park is one of them. Like the off sites that we
10 rotated are Rush affiliated, so I'm approximating
11 roughly 80 percent got employed by the Rush system and
12 networks.
13   Q    But not at the Rush University Medical
14 Center in the city?
15   A    I think there were four of them that got
16 employed by Rush from my cohort.
17   Q    Four out of how many?
18   A    28.
19   Q    When you learned of your no pass grade in
20 residency in 2014, you filed a grade appeal; right?
21   A    Yes.
22   Q    And after that you also appealed your
23 dismissal from the program; is that right?
24   A    Yes.

Page 433

1    Q    Did you do anything else to challenge
2  those internally within Rush?
3    A    Internally?
4    Q    Yeah.
5    A    Well, I had frequent interactions with the
6  dean. Basically I wasn't sure, you know, how this
7  process went.
8         So I was supposed to be meeting with
9  Dr. Kremer, and he had canceled on me twice. And then
10 I had to just confer with Dr. Foreman as to how I
11 needed to progress with this appeal or what I needed
12 to do to appeal my grade or appeal my dismissal.
13   Q    So you were contesting your treatment as a
14 student with respect to your grades and your dismissal
15 from the program; right?
16   A    Yes.
17   MR. LAND: Could you give me a minute to take a
18 break and see if I have any other questions?
19   MS. SIEGEL: Yeah. If we can wind up about
20 now, that would be good.
21        (Whereupon a brief recess was had,
22        after which the deposition of
23        Ms. Marcial continued as
24        follows:)

Page 434

1    MR. LAND: Back on the record.
2         So I have no further questions for
3  today, and the only reason I say today is the
4  tape-recording issue that we need to resolve. So for
5  that purpose I leave the deposition open meaning we
6  have sought forensic evaluation of plaintiff's
7  cellphone, have an indication of I think it's 13
8  recordings; but we have not had a chance to review
9  those. We're going to work out how we do that. And
10 depending upon what we learn about those recordings,
11 we reserve the right to depose the plaintiff further
12 about those recordings.
13   MS. SIEGEL: Okay.
14
15
16
17
18
19        --ooOoo--
20
21
22
23
24



Page 435

```
 1    UNITED STATES DISTRICT COURT    )
      NORTHERN DISTRICT OF ILLINOIS   )  SS.
 2    EASTERN DIVISION                )
 3
 4
 5       I have read the foregoing transcript of my
 6    deposition, taken on March 19, 2018, consisting of
 7    Pages 337 through 434, inclusive, and I find it is a
 8    true and correct transcript of my deposition so given
 9    as aforesaid.
10
11
12
13
14
                 MARICEL MARCIAL
15
16
17    SUBSCRIBED AND SWORN TO
      before me this_____day
18    of_____, 2018.
19
20       Notary Public
21
22
23
24
```

Page 436

```
 1    STATE OF ILLINOIS    )
                           )  SS.
 2    COUNTY OF COOK       )
 3
 4
 5       I, Erin McLaughlin, CSR, do hereby certify
 6    that I am a court reporter doing business in the City
 7    of Chicago, that I reported in shorthand the testimony
 8    given at the deposition of MARICEL MARCIAL, on
 9    March 19, 2018, and that the foregoing is a true and
10    correct transcript of my shorthand notes so taken as
11    aforesaid.
12
13
14
15
16
17          Certified Shorthand Reporter
18
19
20
21
22
23
24
```



27 (Pages 435 to 436)

## A

able 338:6 347:10
352:18 354:4
366:10 377:12,14
382:2 389:22
absence 369:8
377:23 414:17,22
414:24 416:6
431:17
academic 428:1
431:14
acceptable 396:13
accidentally 349:9
349:11
account 391:7
accountable 378:10
accuracy 412:23
413:6
accurate 339:9,15
339:24 341:8
346:6 349:21
353:1 365:20
367:23,24 368:1,3
373:7,16 377:13
384:22 390:8
395:6 401:6
accurately 348:9
accustomed 385:18
acted 410:24 412:2
412:7,9 413:2,14
414:4 415:22
416:10
acting 415:1 417:21
action 402:3 419:19
actions 421:19
actively 421:24
Activity 365:18
actual 378:19 390:4
410:21 424:7
added 386:23 389:4
406:16
additional 387:16
address 343:11,18
343:21 360:9,10
382:9

addressed 343:14
addressing 374:2
add-on 382:14,18
385:1 386:7
adjunct 392:20
adjusting 353:13
354:10 355:5
administer 391:16
administered
390:24
administering
347:12 378:17
adult 386:9 395:24
advanced 377:10
377:17
advancing 416:17
advisable 415:17
advocate 414:4
affect 347:7 383:12
390:9 392:22
affiliated 432:10
aforesaid 435:9
436:11
agency 411:1
aggressive 420:11
agree 358:4 381:24
401:9 414:20
agreed 341:9 348:4
399:5
ahead 425:23
airway 383:2,5
384:1
alert 350:7
algorithm 383:1
allegations 418:19
allege 420:6,24
427:7
alleged 412:3
alleges 410:21
alleging 402:10
allotted 427:8
allowed 405:4
Amended 401:20
amount 341:6,9,14
345:21 346:6,22
347:5 348:10

386:13 392:6,15
393:14 423:14,14
423:24 427:10,15
amounted 428:4
Amy 369:6 417:7
anesthesia 354:4,6
354:13 355:1,6
377:5,7,10,17
379:1 383:20
384:4 386:17
389:9 412:23
424:7,10 426:11
430:19 431:2,5,6
431:12
anesthesiologist
358:19 359:4
anesthesiologists
396:12
anesthesiology
431:8
anesthetic 375:20
382:23 389:23
anesthetics 339:5
aneurysm 382:5,6
382:17,24 383:4,9
383:21 384:5
Angela 400:24
answer 355:20
356:3,5 364:9
366:10,16 373:8
376:1,8 377:12,14
383:6,15 402:14
409:19 421:11,12
answered 366:17
383:17
answering 421:7
antihypertensive
383:23
anti-hypertensive
383:24
anybody 349:24
350:8
anymore 356:3
415:16
appeal 432:20
433:11,12,12

appealed 432:22
appeals 344:15
appear 337:19
appearance 344:15
397:2
**APPEARANCES**
335:1
appeared 335:6,12
390:2
appears 338:18
345:8
apply 432:1
approach 381:6
approached 350:11
350:22 380:21
approximating
432:10
April 372:19 378:4
405:9
apt 380:22
argued 406:22
Argumentative
409:17
arm 349:11,18
350:3,6 351:7
arms 351:9
arose 347:24
arrived 368:6
article 426:5
ASA 365:16
aside 379:1 406:10
asked 351:3 364:12
366:5 369:9 373:3
373:4,12,19,23
374:4,10 375:1,22
375:24 376:2,11
376:15,24 377:2,9
377:16 381:2
382:12 392:24
393:2 398:11
405:14,23 406:7
asking 341:15
343:12 353:24
363:12 365:8
366:1 382:22
402:17 406:23

408:18 417:6,10
418:17 419:1,5,14
421:9
asks 411:24
aspirin 365:16
assertions 418:3
assessing 356:20
assessment 365:20
assessments 365:7
assign 406:6
assigned 405:18,20
405:23 406:1,7,19
417:9 418:11
assigning 407:4
417:1
assignment 407:21
**ASSOCIATES**
335:3
assume 431:3
assumed 385:22
assured 407:17
as-needed 347:24
attempt 388:12
attended 428:23
attending 358:18
385:15
attendings 429:12
attention 360:4
419:23
average 429:17
avoid 369:18
370:24
avoided 370:20
avoiding 368:23
369:10

## B

B 343:8 344:3
371:18,21 383:1
back 350:18,23
354:10 360:2
364:22 369:7,8,11
371:10 374:22
378:1,7 385:14
398:4 413:23
414:19 415:5,15



415:16,18 419:20
428:19,22 434:1
**based** 343:24 381:8
399:7 404:2
417:15 422:5
424:22 427:4
**basic** 367:15 377:5
377:6 379:1
**basically** 373:10
389:3 399:24
412:20 414:5
415:7,9,17 416:14
416:21 419:15,18
421:3 424:21
433:6
**basis** 404:3
**bat** 407:11
**beginning** 366:13
366:21 380:16,21
**begins** 400:4
**begrudgingly**
414:16
**behalf** 335:6,12
337:2
**behavior** 409:8
420:8,12,18
**behaviors** 339:7
408:5
**belief** 404:4
**beliefs** 414:3
**believe** 338:12
385:10 413:2
418:2 428:3
431:15
**believed** 407:6
408:20 413:1
**believing** 414:24
**belonged** 375:8
**beneath** 402:19
**benefits** 424:23
430:5,8,10
**best** 344:16 373:24
410:9 413:20
**better** 368:9
**bias** 417:18
**black** 340:3

**BLACKWELL**
335:8
**blank** 376:5,24
**bleeding** 374:1
379:13,13,15
383:14
**block** 352:12,13
**blood** 348:6 362:5
362:11 382:3
383:14
**Blvd** 335:3
**boards** 429:7,13
**bonuses** 430:18
**bottom** 337:19
349:6 367:13
379:3 384:16,24
411:24
**brain's** 383:12
**brand** 409:11
**break** 401:13
433:18
**breathing** 383:2
**brief** 357:3,7
401:14 433:21
**bringing** 360:6
378:20
**brings** 360:3
**brink** 376:4
**brought** 361:15
367:17,19 405:6
**bump** 349:18
**bumped** 350:3,16
**bumping** 350:10,14
**bundle** 372:2
**business** 436:6
**busy** 350:5 351:6
406:15
**button** 392:13

—————————
**C**
—————————
**C** 371:18 383:1
**call** 346:6 367:20
368:4,10 383:22
424:19 429:11
**called** 334:13 337:2
348:2 350:2 368:6

416:3 424:24
**calling** 402:15
407:9 415:4
**calls** 402:7 412:10
418:22 424:16
**canceled** 433:9
**cancer** 388:6
**canister** 361:1,17
362:10,23 363:20
**canula** 389:13,20
**capacities** 402:5
**capacity** 334:7,8,9
402:18
**capstone** 428:18
**card** 430:21 431:3
**cardiac** 366:9
391:19 392:23
395:20 396:3
397:3
**cards** 430:20
**care** 429:12
**careful** 391:20
**caring** 352:14
**case** 338:14 339:3
339:20 340:1
342:19 345:5,10
347:22,22 351:13
353:7 355:24
360:11 364:18
365:1 368:7,20
369:16 371:14
372:19 376:12
378:16,20,21
379:22 380:22
382:14,15,18,21
384:2 385:1,2,8
386:2,7,8,9,22
387:8,13,19
388:22,24 389:3,4
391:4 418:13
426:4,13 429:4,5
429:10
**cases** 356:16
361:11 375:18
377:24 378:16
379:23 385:10,12

386:5,7 387:21
391:9 398:20
406:15 417:9
420:9 426:10,12
429:11,15,18
**catch** 419:23
**categories** 338:1
348:20,21 360:19
367:10 387:11
**category** 374:11
375:7 380:12
**caught** 390:19
391:2,14
**cause** 351:11 396:3
402:2
**caused** 379:4
**cellphone** 434:7
**center** 334:6
383:12 432:14
**cerebral** 382:5,6,17
382:24 383:20
384:5
**certain** 344:9
345:19 358:1
369:12 378:13
398:21 412:22
417:18,19 420:12
421:22
**certainly** 363:10,22
377:21,24 385:8
413:4
**Certified** 436:17
**certify** 436:5
**cetera** 365:19
366:10
**challenge** 433:1
**chance** 391:13
415:18 434:8
**changed** 430:17
431:20
**changes** 352:18
353:11 354:23
**changing** 354:16,24
**chart** 346:17
352:12
**charted** 346:18

**cheat** 375:3
**check** 392:7,11,19
393:13 404:12
412:22 417:21,24
**checked** 392:5,5
**checking** 392:15
393:17 395:14
**chest** 420:10
**Chicago** 334:4
335:4,9 436:7
**choice** 414:22
**Christmas** 430:22
**circulating** 350:7
350:17,19,21,22
**circulation** 383:2
383:13
**city** 432:14 436:6
**Civil** 334:15
**claim** 354:18
403:23 417:12
421:21
**claiming** 354:21
**clamp** 357:3
**clamped** 357:4
**clarification** 339:6
367:16
**clarify** 339:22
**class** 374:8,9
428:22
**classes** 377:10,17
426:2
**classmates** 425:21
432:4
**clean** 362:4,6
**clear** 363:22
**clinical** 343:8
345:13 387:14
389:22 422:6,8,12
422:13 424:3
425:18 426:3,7
428:2,5,16 430:7
431:13
**Clinically** 381:20
**close** 415:6
**clubs** 426:5
**cocks** 357:19 358:8



358:11,20,24
359:3
cohort 432:5,16
Colino 360:16
363:8,17 364:1
387:2,8 391:16
394:6 395:15
397:7
collected 384:19
College 431:9
colleges 431:7
come 366:11
414:18 415:15,16
415:17 418:24
428:19,22
comes 366:7
comfortable 369:13
coming 350:23
382:18 417:4
commencing
334:19
commensurate
425:13
comment 338:5
357:8
comments 352:8
360:22 365:6
367:12 387:17
391:24 407:20
418:4
commit 420:12
committee 344:16
compare 425:21
comparison 400:23
complaint 401:20
410:19 412:4
complaints 413:10
416:7
complete 416:4
completed 371:14
completely 366:11
complicated 338:6
comply 414:22
component 422:13
422:17 426:7
430:7

concede 341:21
concentration
346:12,21 347:13
354:24 385:4
concept 377:5
concepts 377:7
concern 392:2
396:1 425:9
concerned 375:24
376:10
conclusion 341:10
382:12 402:8
412:10 415:4
418:22,23 419:4
424:16
conclusions 340:21
413:17
condition 347:8,8
389:15 391:19
396:8
confer 433:10
confirm 395:2
401:9
confirmed 394:19
400:17
confronted 419:20
confused 396:22
confusion 339:21
connected 357:2
361:12,24 362:8
364:13
connection 362:12
connects 362:11
conservative 356:1
356:14
consider 396:12
414:18
consideration
382:23 425:20,24
considered 376:2
376:16 412:17
424:20
considering 393:3
393:12 395:4
396:7 413:9
419:16,17

consistently 354:17
416:8
consisting 435:6
constant 342:17
constantly 347:19
352:22 353:12
359:3
contact 370:15
contain 362:10
365:3
contained 372:21
contains 383:22
contaminated
349:7
contemporaneou...
342:15 343:21
contention 412:1
contesting 433:13
continually 402:23
403:12
continued 334:12
394:18 401:16
433:23
Continues 413:16
contract 401:23
424:20,22
contrary 411:2
control 354:19,20
382:4,5 383:14,14
409:8
Cont'd 337:7
conversation
339:23 364:16
407:3,22
conversations
344:8 420:23
COOK 436:2
coordinating
406:15
copy 401:19
core 400:12
correct 339:22
341:10 346:2,4,9
346:22,22,23
371:21 373:14
393:14 435:8

436:10
correctly 347:5,6
395:15
Coumadin 365:14
counseling 407:13
count 401:22
COUNTY 436:2
couple 349:6
course 375:14
382:24 416:12
422:6,8 428:21
429:6
courses 378:1,3
court 334:1 435:1
436:6
COURTHEOUX
335:11
Courts 334:16
covered 349:14
357:23
CO2 387:17
create 420:7
created 349:21
419:9 421:1,21
credence 416:22
credible 404:24
credit 404:14 428:1
credits 428:4
criticisms 414:8
criticize 353:23
criticized 408:14
CRNA 370:24
389:21 390:15,24
404:20 410:24
411:6,13 412:19
416:22,23 417:4
419:8 426:13
CRNAs 368:17,20
369:3,4,10,12
380:23 400:6,9,13
400:21,21 401:4,7
408:4,20,24
411:17 413:1
414:24 416:20
418:4,19 419:8
420:5,23 421:17

425:1 432:6
CRNA's 402:23
cross 401:10
CSR 334:17,24
436:5
curriculum 422:9
cut 366:1 376:18

_____ D _____
D 336:1 338:18
340:17 343:9
344:4
da 349:9,18 350:3
damage 379:4
date 340:15 366:4
dated 337:20 380:3
384:16
dates 344:14 345:8
day 338:4 342:4
343:2,6 348:23
349:19 360:7
361:5,6,18 362:2
362:16 363:1,2
365:21 366:15
370:9,21,23
378:17 379:7,10
381:2,20 384:23
385:7,23 386:18
386:24 394:5,8
398:21,23 406:13
406:20,21,24
407:1,5,21,22
429:19,19,21
435:17
days 427:7,12,14
427:14,18
deal 416:18 421:15
dean 433:6
decide 356:2
decided 360:9
412:19 431:20
decrease 374:1
427:10
decreased 375:20
376:4
deepened 375:20



Page 4

375:21
Defendant 335:12
defendants 334:10
  334:13 337:2
  401:23 402:4,20
  410:22 412:1
definitely 362:7
  403:24 407:9,15
  417:3 418:9
deleting 404:18
delicate 420:11
delusional 416:3
demeaning 413:19
  420:12
demonstrates
  388:4
department 431:2
  431:6,9,12
depending 429:10
  434:10
depose 434:11
deposition 334:12
  337:11,12 369:21
  369:24 393:21
  401:15,19 433:22
  434:5 435:6,8
  436:8
depositions 334:17
depress 392:23
described 353:6
  390:9
description 366:4
  384:22
despite 338:6 346:7
  394:17 404:13
  412:21 413:20
details 360:7
  376:22 404:7
determine 354:5
  404:22
detractor 420:20
detrimental 388:4
didactic 377:11
  378:11 422:17
  430:14
didactics 377:22

different 360:19
  367:10 375:4
  386:21 395:9
  401:7 407:17,18
  426:10,11
difficult 367:14
  385:1 415:19
difficulties 400:19
  407:18
difficulty 388:4
diligence 413:7,10
dinged 347:7
direct 337:7 362:12
directed 368:19
direction 358:5,6
  358:12
directly 360:22
  361:23 362:8
  363:19 364:11
  370:16
discredit 412:20
discrimination
  403:2 407:7
discriminatory
  408:1
discuss 353:22
discussed 364:8
discussing 394:12
discussion 416:13
dislodged 375:23
  376:7
dismissal 432:23
  433:12,14
dismissed 360:1
  384:11,20 398:19
  418:12 422:2
  427:17,22 428:19
disoriented 357:24
disparaged 420:16
disparaging 403:18
  407:10 413:19
  415:10
disparagingly
  421:18
disproves 354:18
dispute 340:21

341:10 382:7
  397:4
distance 415:6
distract 351:7
distracted 350:15
  351:10
District 334:1,1,16
  435:1,1
DIVISION 334:2
  435:2
document 351:21
  364:2,18 394:1
  396:19 410:6,15
documents 337:16
doing 353:18
  368:23 374:2
  408:8 415:11
  424:7 429:3 436:6
dominant 426:8
door 398:22
dosage 385:1 395:4
  395:14 396:3,17
dosages 340:22
  341:11
dose 346:8 347:5
  373:4,5,12,14
  385:4,17,24
  392:13,17 393:2
  393:11 395:1,23
  397:3,5
doses 339:5 389:21
dosing 338:21
  341:7 342:2
Dr 334:7 338:18
  339:15 340:20
  342:5,9 343:5
  344:6 345:5 348:2
  351:5 360:3
  361:15 364:8,12
  364:17 370:15
  371:4,14 372:9
  380:21 381:6
  397:11 398:17
  399:21 400:15,16
  404:9 407:11
  408:12 411:10

412:7 419:15,21
  420:1 431:2,3,18
  431:20 433:9,10
draw 356:2 372:14
  388:2,16,22
drawing 378:24
  379:20
drawn 379:11,24
  388:21
drew 348:5 388:3,3
  388:17
drip 355:22 388:13
  394:18
drips 383:23
drug 346:8,11,12
  346:21,23 347:12
  347:19,20 348:5
  348:10 373:9,10
  373:23,24 374:4
  374:11 375:7
  379:21 385:1
  388:17 391:16
drugs 347:24 375:4
  378:10,13,15,19
  378:21 379:1
  388:21 429:13
due 413:7,10
duly 337:3
dump 391:10
dumping 349:12
duty 414:3
dyslexic 347:17
D&C 374:2 379:14

**E**

E 336:1 345:15
ear 420:10
early 423:11
EASTERN 334:2
  435:2
ECT 386:20
education 424:4
educational 424:15
EF 388:7 391:20
efforts 413:20
eight 429:20

either 343:22
  397:24 398:24
ejection 392:22
  396:7
Elaine 335:3,5
  402:18 418:24
email 370:3,8
  397:16
emailed 399:1
emails 370:1
embolism 366:9
emergency 383:23
employed 432:5,11
  432:16
employees 424:20
employment
  424:23 431:22
emptying 350:1
encounter 344:1
  406:18 418:10
encounters 408:2
ended 361:11
endoscope 391:24
ends 351:23
endure 421:15
enter 365:18
entirely 341:8
  352:6 355:21
  367:24 369:15
entitled 414:13
environment 342:7
  349:22
envision 416:5
epidural 338:22
equipment 358:9
  361:19,22
erased 349:15
Erin 334:17,24
  436:5
erosions 392:2
error 341:22 342:2
  351:11
esophageal 388:6
  392:2
esophagus 392:4
especially 345:2



378:13 391:10
396:6,13
**establish** 364:14
383:8
**estimate** 356:15
**et** 365:19 366:10
**Eva** 351:13,24
352:4 355:8
357:11 401:1
403:16,18,22
404:4
**eval** 368:24
**evals** 369:4,6
413:23
**evaluate** 369:11,16
370:24 411:5,10
425:2
**evaluated** 406:24
418:18
**evaluating** 342:11
342:22 369:14
417:13 419:6
425:6
**evaluation** 337:20
338:3,8,11 339:23
340:14 341:3
342:15 343:5
345:5,9 346:3
348:13,19 351:13
351:24 352:4
353:8 355:8 359:8
359:12,16,20
360:13,15,18
362:15 363:18
364:1,24 367:1,4
367:21 368:13
369:13 370:10
371:6,13 372:18
372:21 380:3,8
381:11,14 384:6
384:12,15,18
387:2,4,7 394:5
394:11 397:7
398:12,13 403:22
403:23 404:1,10
404:11,13 405:3

405:13 406:4
407:6 419:18
422:5 425:11
434:6
**evaluations** 342:6
344:12 360:1,3
368:20 369:10
370:20 380:24
384:20 399:11
400:14 402:24
403:5,13 404:14
404:19,21 408:16
411:14 412:17,22
412:24 413:5,7,8
413:11,21 414:24
416:20 418:3
419:6,11,23 420:4
420:17,23
**evaluator** 380:14
**Evelyn** 399:3
**event** 390:24 408:6
408:8,10
**eventually** 391:15
421:24
**everybody** 415:9
**exact** 344:14 404:7
410:16
**exactly** 353:8,22
366:18 423:8
**examination**
334:14 336:8
337:7
**examined** 337:3
**example** 365:9
370:19,23
**Exhibit** 337:11,13
337:15,18 340:7
341:2 343:6
344:11,22 345:3
348:13 351:12,20
359:8,14 360:13
364:3,24 369:21
369:24 371:10
384:12 393:20,21
393:23 399:22
400:2 401:19

411:19 416:1
**EXHIBITS** 336:16
**expect** 427:20
**expected** 338:19
343:9 371:18
**experience** 383:1
400:12,24
**experienced** 400:18
**expires** 355:13
**explain** 410:8
**explained** 339:18
357:5 372:12
**explaining** 386:4
399:23
**explanations**
412:21 414:2
**explicitly** 388:8
**exposed** 377:24
378:14
**extend** 431:17
**extensive** 366:16
**extent** 407:23
**extubate** 362:4

─────────────
**F**
─────────────
**fabricate** 417:14
**face** 376:5,24
**fact** 342:22 372:11
381:8 383:21
411:24
**fail** 377:15
**failed** 356:18
407:17 428:20
**failing** 344:18
**failure** 419:16
422:1
**fair** 338:3,8 377:11
380:14 400:13
**fairly** 338:5
**fallen** 371:22 372:1
372:4,5,12
**false** 353:19 402:23
403:6,13 404:1,9
404:11,14 405:2
412:22 417:24
419:12,18,19

**falsehoods** 420:2
**familiar** 347:20
378:14 400:17
**familiarize** 429:14
**far** 344:24
**feasible** 399:6
431:21
**February** 337:20
338:15 340:12
341:3 345:6,10
348:16 351:14
370:4
**feedback** 418:11,13
**feel** 381:6 396:6
406:17 421:18
429:14
**felt** 338:4 395:1
400:13 406:16
408:3
**Fentanyl** 388:2,4
388:16,17,22
390:14,16,23
391:4,14 394:17
**fibroids** 374:3
**fidgeting** 352:23
353:12 354:2,7,18
**field** 349:7
**fifth** 370:8
**fight** 414:20
**fighting** 354:3
**file** 404:19
**filed** 413:9 432:20
**files** 404:21
**fill** 368:17 369:1
**filled** 369:3 384:21
**find** 350:8 411:19
435:7
**fine** 383:9 392:8
**finish** 421:11,12
**finished** 377:11
389:4 391:5
**first** 342:4 344:21
348:2 350:23
367:18 383:5,16
390:5 397:9
401:21 404:3

422:11
**Fisher** 351:13,24
352:4 355:8
357:11 401:1
403:22 404:5
**fit** 424:3
**five** 372:3 414:17
425:22
**five-month** 414:21
**flagrantly** 419:12
**flipped** 347:15
**flipping** 358:2
**Foley** 349:12 350:2
**follow** 355:12
**followed** 408:5
**following** 388:5
412:1
**follows** 337:4
389:19 401:17
433:24
**foregoing** 435:5
436:9
**Foreman** 370:4
433:10
**forensic** 434:6
**Forester** 401:1
**forget** 378:13
**forgot** 381:1 428:7
**forgotten** 378:1
**form** 366:5 367:22
368:13 370:10
371:6,13
**forth** 354:10
**forward** 392:24
408:11
**founded** 396:10
**four** 372:3 429:17
429:19 432:15,17
**fourth** 394:14
**fraction** 392:22
396:7
**frail** 389:18
**frequent** 433:5
**fresh** 414:19
**Friday** 397:16,19
398:3,5,7 399:5



406:22
**Fridays** 399:9
**front** 406:20
415:10 420:14,15
420:16
**full** 361:20 391:3
407:23 420:2
**function** 392:23
**functions** 367:15
383:11
**further** 337:4 425:7
434:2,11

**G**

G 335:11
**ganging** 415:9
**gases** 354:11,24
355:5
**gastroenterologist**
392:1
**Gawura** 417:7
**generally** 380:15
**getting** 350:2
370:20 371:5
377:2 417:9
422:23
**gift** 430:20,21
**give** 339:17 341:6,8
341:9,14 346:6,6
348:3,6 351:16
364:9 368:18
369:15 370:10
373:6,8 379:10,14
380:24 381:1
385:3,16,17
386:10,14 388:8
390:13 391:3
392:21 397:3
399:21 415:18
425:19 430:19
433:17
**given** 367:21
368:12 369:4,6
372:15 379:12
389:21 390:20,20
414:15 425:14

427:10 435:8
436:8
**giving** 354:11 369:3
369:10,13,18
379:5,7 385:18
392:6,12,14,16,20
404:14 416:22
**GlideScope** 367:20
368:4
**go** 344:6 360:1
364:22 383:1
388:12 390:12
412:19 416:21
**goal** 426:9
**goes** 413:22
**going** 337:12
354:10 355:24
359:1 365:22
373:10 378:15
393:5,15 397:1
401:18 406:18
409:9,10 410:5
414:16 415:20
434:9
**good** 356:3 381:20
433:20
**gotten** 359:24
421:16
**grabbed** 390:16
**grade** 344:19
432:19,20 433:12
**graded** 425:12
**grades** 422:3
433:14
**grading** 344:7
425:24
**graduated** 432:2,6
**graduation** 431:23
**grasping** 377:5
**Great** 432:7
**grid** 375:4
**grounds** 419:16
**group** 400:6,8,13
400:21 412:19
417:18
**guarantee** 408:24

**guarantees** 407:18
**guess** 342:21
347:14 348:8,24
364:21 385:6
395:7 397:4 401:8
415:19 416:20
429:7
**guidance** 420:19
**guide** 346:22
**guys** 374:6

**H**

H 374:10
**hair** 389:11,12
**half** 349:17 356:14
379:16 386:14,14
408:9
**hand** 337:13
375:20 401:18
408:4
**handed** 337:10
369:23
**handled** 414:23
**handwriting** 349:5
360:21
**handwritten** 352:8
356:18 365:6
367:12 388:1
389:7
**happen** 349:16
352:16 356:23
358:20 361:9
373:7 386:18
388:19 407:18
**happened** 350:1
353:4,5 359:24
360:7 381:11,12
390:18 425:13
**happening** 353:2
379:15
**harassing** 407:9,24
**harassment** 403:2
407:7
**hard** 408:12
**harder** 416:21
**harsh** 407:16

409:12 410:1
**harshly** 425:6,12
**haste** 348:8
**head** 374:12 397:4
415:24
**health** 430:12,13
**hear** 383:16 408:13
**heard** 385:16
386:11,12 408:19
417:3
**heart** 375:19 376:4
**Heather** 348:14
350:9 351:2
**held** 419:20
**help** 354:6 358:6
374:1 381:22
408:13
**Hemabate** 373:19
373:22 374:4,13
374:14,18,22,24
375:4,6,10
**Hemodynamics**
352:21
**hide** 350:13
**hiding** 350:20
**high** 397:3,5
**higher** 385:24
**history** 397:1
**hit** 349:11 350:4
**hold** 378:9 388:15
425:16
**hooked** 360:22
363:9,19 364:11
**hoped** 425:19
**hoping** 419:24
425:23
**hour** 334:19 379:16
**hours** 355:9,22
356:1,6 396:14
423:20,23,23
426:21,23,24
428:24 429:17,19
429:20
**Housekeeping**
361:18
**huge** 373:20 374:17

**hurdles** 407:17
**hurried** 391:12
**hurry** 365:24
**HUSCH** 335:8
**Hydralazine**
347:16 348:4
385:3,13,16,21
386:8,13
**hypertensive** 347:9
348:1,3

**I**

**ICU** 347:19 358:10
382:24 396:11
**idea** 368:9
**identification**
369:22 393:22
**identified** 347:5
400:12
**identifies** 353:10
**identify** 382:3
**ignored** 405:7
**ignoring** 416:7
**II** 338:17
**III** 343:8 345:13
**Illinois** 334:1,18
335:4,9 435:1
436:1
**imagine** 344:15
358:23 366:17
402:9
**impeded** 402:22
**implications**
383:20 384:4
409:7
**implored** 404:12
**importance** 382:3
**important** 342:5
365:8 389:24
**importantly** 379:4
**improperly** 361:13
**improve** 347:8
414:11
**inaccuracy** 425:10
**inaccurate** 356:4
420:14



inadequate 392:18
393:3,11 395:2
include 352:3
364:17 404:20
included 364:2,21
including 404:19
inclusive 435:7
incompatible
405:10
incorrect 346:13,14
incorrectly 346:17
347:2 364:15
increase 392:10
395:17 396:2,17
increased 375:19
376:3 392:18
increasing 393:4,12
395:4,13
independent
424:10
independently
381:22 424:6
indicate 341:21
389:14,17 410:4
indicates 339:4
340:17 402:20
indication 434:7
individual 334:7,8
334:8 402:4,18
individually 402:5
inducing 410:23
induction 379:1
382:4
infallible 412:17
influence 381:7
influenced 403:16
403:16,19,24
404:4 408:20
418:14 421:17
information 346:14
383:3 417:24
419:19 429:18
informed 348:2
349:13 350:18
infuse 358:7
infusing 356:19

357:9 358:5
396:14
infusion 392:11
inhibitor 374:13,15
374:24
inject 372:6
injected 371:22
inside 351:9
instances 413:22
institution 402:11
instructed 346:19
386:18 388:2,16
instruction 420:20
instructions 388:5
388:5
instructor 415:10
instructors 415:8
insurance 430:9,11
430:12,13
intended 339:21
350:19
intensivists 396:11
intention 346:23
347:6 392:14
intentionally
402:21 405:7
410:23
intentions 363:21
417:2 418:9
interacted 420:21
interacting 419:7
interaction 342:21
406:17 414:7
417:16
interactions 418:15
420:9,14 433:5
interest 412:2
413:14,15 416:11
416:16,24
interested 397:12
397:18 398:15
interests 411:2
Interference
401:22
internally 433:2,3
interpreted 381:10

381:13,16
interrogatory
337:14 411:20,23
416:2
interrupted 402:13
interruption
402:19 425:22
intervention 382:5
interventional
382:16
intra 381:21
intubate 362:3
intubations 381:21
investigate 404:12
408:13 412:16
413:11
investigating
408:16
involve 400:6
iPad 342:14
irrigation 349:3
362:6,10
irritated 415:14
issue 346:7 349:16
349:21 353:9,11
358:12 379:19
403:24 404:8,9,15
405:2 406:4 434:4
issues 366:19 402:3
issuing 402:23
403:13,23 407:6
items 343:22,23
344:3,7
IV 357:1,19 373:6
379:6

**J**

Jackson 335:3
January 344:12
398:17 403:10
405:18 406:13
407:1,13
jeopardy 421:24
Jill 334:8 401:1
403:5,14,23 404:4
405:6,8,13,16

406:6,19,20,24
407:21,22 408:6
411:5 416:7,8
417:1,11 419:5
420:6,24
Jillian 369:19
370:10,12,16
Jim 380:3,9,11,14
380:23 381:17
384:15
job 404:20 411:5,10
411:13,16
JOSEPH 335:15
journal 426:4,5
judgment 343:8
345:13 419:21
Judy 338:12 340:11
371:14
July 426:22 429:1
jumped 366:3
June 403:9 405:12
405:18 408:6,8
423:11
junior 374:8
375:13
juniors 375:1

**K**

Karen 335:11
417:16,17
karen.courtheou...
335:10
Kathleen 367:7
Katie 360:16 363:8
363:17 364:1
387:2,7 391:16
394:6 397:7
Keehn 401:1
keep 338:6
Keldahl 348:14
kept 356:19
kilogram 388:6
kind 347:20 429:9
Klunk 369:19
370:12
knew 342:19 356:7

370:14 375:23
385:4 394:21
419:19,22
know 339:4 340:22
341:11 342:14
343:18 346:5
347:11 349:10
351:7 352:3 353:3
353:16 354:9
355:9,17 356:4,15
358:3,4,22,23
360:10,11 362:1,9
362:20,22 363:6
363:21 364:7
366:19 367:24
373:5 374:11,18
374:19 376:23
377:1,3 382:11,19
383:19 384:4
385:1 388:7
393:10 396:21
397:1 403:8,16,17
403:20 406:11,16
406:21,24 407:2,4
407:23 409:3,6,9
412:13 413:8,23
414:8 415:8,16
416:12,19 417:5
417:19,21 419:21
419:22 420:16
421:4,5,23,23
423:6 424:17,18
425:14 428:3
432:4 433:6
knowing 378:10
knows 405:10
Kreiner 400:15
Kremer 334:7
351:5 360:3
361:15 364:8,12
364:17 368:19
370:15 371:4
380:21 381:6
397:11 398:17
399:21 401:23
402:20 404:8,9



407:11 408:12
410:22 412:7
419:15 420:1
431:20 433:9
**Kremer's** 411:10
419:21
**K.B** 335:3,5

---
**L**
---

**L** 335:11
**lab** 415:5,6
**label** 346:15 348:8
371:22 372:4,5
**labeled** 347:1 348:5
372:1,12,15
**labeling** 345:19
**lacerate** 392:3
**Lai** 348:2
**Lakes** 432:8
**LAND** 335:11
336:10 337:8
339:14 363:16
380:8 387:7 393:8
393:20 401:13
402:13,17 409:5
409:14,23 412:11
412:13 418:23
419:3,5 421:8,13
424:18 433:17
434:1
**language** 352:9
**large** 401:10
**laryngoscope** 366:8
**laryngospasm**
366:8 376:3,18
377:4,6
**lasts** 355:22
**late** 397:24 398:2
423:11
**law** 419:2
**lead** 419:20 421:3
**Leah** 401:1 418:14
**Leah's** 418:13
**learn** 366:12
426:10,11 434:10
**learned** 366:20

373:20 375:5,9,11
378:11 432:19
**learning** 398:6
425:3
**leave** 369:8 377:23
398:21 414:17,21
414:23 416:6
431:16,21 434:5
**lecture** 374:13,16
374:19,20 375:15
**lectures** 377:20
**led** 418:13 419:15
420:12 422:1
**left** 361:3 362:24
**legal** 334:23 402:3
402:7 412:10
413:16 415:4
418:22,23 419:4
424:16
**lengthy** 355:24
**letter** 374:10
**Let's** 363:24
**level** 338:19 343:9
371:18
**Lidocaine** 338:24
340:4 372:13,16
388:23
**lie** 373:20 374:17
**light** 376:3 388:8
**limiting** 418:2
**line** 377:4 400:4
**liquid** 362:6
**listed** 343:15
**listen** 385:5 414:1
**little** 339:21 381:3
381:22 385:9,9,14
425:20
**LMA** 375:22,23
376:7 377:4,6
**LOA** 398:4,5
425:21
**loads** 429:10
**local** 339:5 382:21
**long** 356:7,17 357:9
365:24
**longer** 425:2,3

431:17
**look** 340:6 343:5
351:20 359:14
362:13 370:17
390:1,13 394:14
409:10 425:24
429:11,11
**looked** 350:5,6,10
350:10 361:10
374:22 376:5,23
389:24 394:18
401:20 409:12
410:5
**looking** 340:15
341:17 344:3
354:11 363:13
366:18 399:15
420:19
**looks** 373:2 391:3
**lot** 354:3,18,23
366:5 377:2
378:14 382:13
385:6 386:23
392:1 393:8 404:3
419:12 429:22
**low** 389:13,20,21
391:20 395:23

---
**M**
---

**machine** 349:1,2
355:4
**MAGNA** 334:23
**main** 420:20
**maintained** 404:13
**making** 354:23
363:18
**malice** 410:21
**management**
381:21
**manipulating**
350:6
**March** 334:19
344:12 359:9
360:16 365:1
367:5 371:15,16
397:24 398:2

435:6 436:9
**Marcial** 334:3,13
336:4 337:1
369:21,24 393:21
401:16 433:23
435:14 436:8
**Maricel** 334:3,13
336:4 337:1,10
339:2 352:9 355:8
367:17 388:13
389:22 390:14
401:19 419:13
435:14 436:8
**mark** 393:20
**marked** 336:16
337:11,13,19
340:6 344:22
345:4 348:12
369:22,23 393:22
401:18
**Marquis** 370:3
**Mary** 364:24
372:18 401:1
**mask** 385:14
**match** 405:5
**matter** 413:23
**McLaughlin**
334:17,24 436:5
**mean** 342:18 344:7
353:3 376:11
387:20 396:5
400:8 403:12
418:24 429:3
431:9
**meaning** 434:5
**means** 353:17
361:12 383:4,13
**meant** 354:9
**Medical** 334:6
432:13
**medication** 347:4
**medications** 354:12
383:24 391:10
392:21
**meds** 373:13 377:9
377:16 388:8

**meet** 398:4,7 399:2
399:2,5,24
**meeting** 407:8,12
407:15,20 408:12
409:16 410:4,10
410:17 433:8
**meetings** 397:14,17
397:20 398:16
399:8,12 400:1
**member** 386:17
**memory** 360:9
**MENDELSOHN**
335:15
**mentioned** 362:15
398:10 400:15
416:13
**message** 403:20
**met** 413:18
**Mether** 379:5
**Methergine** 373:5
373:13 379:6,7,10
379:22,24
**MICHAEL** 334:7
**mics** 390:14,15
394:19 395:4,23
396:17
**mid** 402:13
**middle** 420:18
**Mike** 368:19 404:8
**Miller** 380:3,9,11
380:14 384:15
**milligrams** 339:4
346:5,18 347:16
347:18 385:19,21
386:11
**milliliters** 339:3,17
339:24
**mind** 339:20
**mine** 400:12
**minor** 425:11
**minute** 386:22,23
433:17
**Mischaracterizes**
418:6
**miscommunication**
425:11



mislabel 346:7
mislabeled 346:8
 346:10
misrepresentations
 417:24
misrepresentative
 402:24 403:13
 404:9 405:3 407:6
misrepresented
 403:6,8
missed 343:22
 364:21
missing 364:14
 390:15
mistake 409:11,24
 410:5
mistakes 349:16
 420:13
misunderstanding
 385:7
ml 347:16,18
modes 354:15
modifications
 345:1
modify 354:21
Monday 334:19
money 422:16
 423:4 424:1
monitor 387:17
month 423:15
 426:20 427:2,11
 431:19
months 378:6
 414:17 425:23
morning 381:5
mouth 391:24
 417:4
move 394:18
moving 392:4
 395:1 408:11
multiple 345:1
 358:9 408:11
 414:10 415:23
 421:3

N

N 336:1
name 346:11 375:7
names 400:17
 407:10
Narbone 334:7
 401:23 402:21
 405:2 406:3
 408:18 410:9,22
 411:16 415:15
 416:1,2,7,10
narcotic 391:8
narcotics 391:11
narrative 340:20
 341:1,13,16
nasal 389:12,20
nature 366:12
near 411:23
necessarily 342:18
 342:19 359:2
need 414:14 429:14
 434:4
needed 368:3
 385:11 430:1
 433:11,11
needs 349:6 367:20
 386:17 404:22
negative 381:11,13
 406:18 413:23
 418:11,14 419:23
negatively 417:13
negatives 408:11
neglected 412:15
Neptune 349:3
nervous 342:6,10
 342:12,16,19,20
 342:23 343:2
networks 432:12
Neuropack 383:21
never 350:19,19
 362:14 373:20
 375:5,9 379:20,22
 379:24 424:9
 425:21 428:23
new 356:2 409:11
night 429:5
nineties 389:13,21

nonresponsive
 421:8
non-event 368:8
normal 394:24
normally 381:3
 406:14
NORTHERN
 334:1 435:1
Notary 435:20
note 356:18 398:22
noted 390:15
notes 375:16 389:7
 436:10
notice 334:14
noticed 372:11
 390:6
NP 428:7
number 337:13
 344:22 345:3
 351:20 369:24
 372:21 393:23
 401:19 411:23
 416:2
nurse 349:13 350:7
 350:17,19,21,22
 382:17
Nursing 431:10

O

Oak 432:8
oath 337:3
OB 374:1,9,23
object 393:5
Objection 402:7
objectively 416:5
observation 342:17
observed 349:13
obviously 358:6
October 407:8
 408:23 410:10
 416:14
odd 381:3
offer 414:10
offered 397:10
 398:8 424:21
okay 340:8 341:12

343:13 351:22
 352:8 355:7
 357:18 364:23
 365:8 371:12
 373:1,18 382:2
 383:15 387:3
 396:17 404:8
 411:22 434:13
old 391:10
once 358:4,15
 405:16,21 406:2
 406:19 420:1
ones 345:2 399:14
one-month 431:21
one-on-one 422:13
 424:12 426:6
ooOoo 434:19
op 381:21
open 434:5
operate 358:10
operating 351:6,11
opinion 396:9
opponent 414:4
opportunities
 377:19 414:10
opposed 402:5
 413:5
opposition 414:5
optional 346:20
order 413:6
organized 431:13
orientation 424:23
original 432:5
Oskvarek 367:7,8
 368:13
outside 411:1 429:2
outstanding 338:1
overall 424:4
overheard 391:24
overlapping 374:7
oxygen 389:13
o'clock 334:20
 398:19,20
O2 389:20

P

page 336:5 338:10
 339:12 340:9
 343:16 345:12
 351:23 355:7
 359:7,14 360:12
 371:11 372:17,24
 387:1 389:6,8
 396:20 400:2
 401:22 410:18
 411:21
pages 338:11 344:8
 435:7
paid 422:16 427:8
 427:18,23 428:11
 428:18,21 431:22
pair 405:9
paired 386:20
 405:4,8,14 416:8
pairing 386:22
pair-ups 405:10
pale 389:10,12
paragraph 338:18
 341:21 344:3
 345:15 346:3
 370:8 371:21
 373:3 375:16
 394:14 396:20
 400:3 402:20
 410:18
Paragraphs 412:4
parameters 354:17
paraphrasing
 410:3,16
parentheses 389:8
Park 432:9
part 340:17 342:24
 377:3 382:7
 398:18 402:10
 404:6,20 422:8
 424:7,9,10 425:8
 426:15 427:9
 428:16,18 429:3
 430:9
partial 364:10
partially 346:4
 366:11



participate 382:10
particular 353:9,11
  382:11 388:22
  400:6 429:5
particularly 390:3
partly 424:5,5
parts 344:9 348:24
pass 428:5,8,22
  432:19
patchy 389:11,12
patient 345:22
  347:9 348:1,3
  349:16 351:9
  352:14 354:11
  356:20 357:2
  361:24 364:11
  367:17,18,19
  371:17 372:6
  375:21 376:3
  379:12 382:19
  383:3 385:15
  386:1 388:6,11
  389:2,5,10,12,18
  389:24 390:2,10
  390:14,17,20,21
  391:15,19,23
  392:4,12 393:3
  394:17 395:1,21
  396:3,22 397:4
  429:4,18
patients 362:3
  382:23 429:11
patient's 347:8
  352:19 375:19
  389:15 392:22,23
  397:1,2
pattern 408:5
payment 423:4
pediatric 384:24
  385:7,12 386:1,5
  386:6
peds 385:9
people 400:11
  402:17
perceive 342:13
perceived 416:23

percent 388:7
  432:11
perform 414:3
performance 338:4
  367:9 405:1
  425:17
performed 413:22
performing 367:14
  420:10
period 357:7 385:2
  385:10 397:22
  399:18
persists 414:2,2
person 391:11
  403:17,19 408:7
  409:11
personal 416:24
personally 431:4
perspective 396:4
pertain 378:16
pertaining 334:16
PETER 335:11
peter.land@husc...
  335:9
phone 344:8
physical 421:14
pick 389:22
picture 361:7,11,20
  362:14,18 363:6
  363:11,13 364:10
pictures 364:13,20
Pitocin 373:14
placed 352:13
plain 350:20
plaintiff 334:4
  335:6 403:1,1
  434:11
plaintiff's 402:22
  410:23 412:3
  434:6
plan 429:12
plans 398:6
Plaza 334:18 335:8
please 363:15
  409:19
pocket 391:14

point 351:8 353:22
  357:11,15,24
  363:23 364:21
  368:21 374:7,21
  374:23 375:3
  396:1 398:24
  414:9 424:6
pointed 358:24
pointing 353:9
  413:5,20
poll 408:23 409:3
portion 347:4
  357:3 409:20
  430:14
posing 416:19
position 424:21
positive 413:21
  418:15
possible 357:17
  368:16 371:1
  379:18
possibly 359:6
  373:17 396:18
potential 396:4
potentially 383:10
  383:11 392:3,3
Power 374:20,23
  375:2
practice 388:21
practicing 424:6
practitioner 391:6
  396:5
prejudice 417:18
prejudices 417:22
preoperative 365:7
preop'd 367:17
prep 382:20
preparation 429:9
prepare 347:21
  429:12
prepared 338:11
  348:11 382:9,10
  389:2,5 397:17
  398:14
preparing 382:21
prepping 387:21

388:24
present 335:14
  398:13
presentations
  426:4,5
presented 405:5
pressure 348:7
  354:20,20 382:3
  383:14 406:16
prevent 369:14
previous 339:20
  417:16
previously 337:3
  337:11 370:20
  371:5
primary 426:9
primed 357:1
printing 349:15
prior 390:17
prioritizing 352:10
priority 383:5
probably 354:4
  361:10 378:3
  397:24 419:24
  423:11 426:23
  429:17,20
problem 405:6
  418:21 419:9
problematic 339:7
  405:5 406:9
problems 352:10
  396:4 420:7 421:1
  421:4,21
procedure 334:15
  348:16 379:16
  382:11,15 386:3
  386:21 390:4
  396:15 415:11
  420:11,19
proceeded 388:11
  388:12
process 356:13
  393:6 395:7 433:7
program 366:13,21
  378:11 402:23
  410:24 411:11

412:3 415:20
416:4 422:3,9,14
  422:17 424:4
  425:8 427:17
  430:6,14,17
  431:23 432:23
  433:15
progress 402:22
  411:11 433:11
promised 431:22
prompted 357:14
  386:17
proper 340:22
  341:11
properly 349:14
Propofol 355:11,12
  355:21,23 356:16
  356:19 357:1,9,12
  388:13,23 392:7
  392:10,13,17
  393:2,9,11 394:18
  395:1 396:3
prospect 342:17
prostaglandin
  374:12,14,24
proved 413:24
proven 417:22
provide 426:11
provided 419:18
provider 389:9
provision 424:7
Prygodska 337:22
psychiatrist 400:16
Psychomotor
  338:17
Public 435:20
pulled 348:4
pump 392:11 395:2
pumping 350:15
purpose 374:5
  426:8 434:5
pursuant 334:14,14
pursuing 417:12
pushing 420:9
put 390:14 393:14
  393:17 397:22



413:4 414:17
419:23 421:24
**puts** 349:3
**putting** 417:24
429:18
**P.C** 335:3
**p.m** 334:20

## Q

**question** 339:14
363:14 364:1
370:22 382:11
393:1,7 406:3
409:18 417:8
425:4
**questioning** 416:19
**questions** 365:9,21
365:23 366:2,5,14
366:17 377:2,11
377:12,15 378:20
417:5,8 433:18
434:2
**quick** 355:23
356:15 358:2
379:14 401:13
**quickly** 385:12
389:23
**quite** 372:21
**quizzing** 373:9
378:18 379:2

## R

**raise** 392:13
**range** 396:6,8
**ranked** 381:7
**rate** 337:24 346:24
360:18 367:9
375:19 376:4
394:19
**rated** 338:5,18
343:9 345:15
348:19 380:11
387:10
**ratings** 343:19
351:16 359:12
365:4 371:19

372:22 399:17
401:3,7
**Ray** 334:7 405:2
406:3 410:9
411:16 416:1,2,10
418:12
**reach** 362:7
**reached** 395:2
**read** 341:2,17
365:18 367:12
373:11 375:16
384:24 396:24
397:11 409:21
435:5
**reads** 389:19
**ready** 384:2
**realized** 357:4,13
389:24 390:15
391:4
**really** 353:7 359:23
362:14 363:12
364:10 368:7
369:1 392:24
397:5 402:14
404:23,24,24
406:23 412:11,12
417:23 425:4,5,13
**reason** 408:12
434:3
**reasoning** 344:6
356:13
**reassured** 407:16
**rebuttal** 341:12,20
343:11,12,19,24
344:22 351:21
352:4,7 359:19
360:5 364:2,17,18
364:22 397:6,17
399:24
**rebuttals** 337:16
397:15 398:9,12
399:22
**recall** 338:4,5
342:21 343:3,21
343:22 344:1,2,5
344:14,17 352:5

353:2,6 354:22
357:7,13,14
358:17 359:23
360:2,6 366:3
368:15 373:17
374:11 376:8,21
377:3,21 379:17
381:5 383:18
385:23 386:19,21
386:23 391:18,18
398:1,10 401:2
404:7 408:3 410:3
410:9 423:8
427:21
**receive** 423:7,24
428:1
**received** 344:18
352:6 399:12
401:3 405:13
423:1,4 428:5
**receiving** 422:19,22
**recess** 401:14
433:21
**recognize** 352:18
354:5 356:19
361:3 362:24
370:1 371:24
393:23
**recognizing** 353:11
**recollection** 339:19
344:10 356:24
365:22 373:24
378:22,23 379:18
395:11
**record** 354:4,6
355:1,6 389:24
390:1,13 401:8
409:21 412:23
434:1
**recording** 355:5
**recordings** 434:8
434:10,12
**records** 354:13
399:3
**reference** 338:21
340:11 345:18,21

351:24 359:15,16
371:17 387:16
**referencing** 371:4
**referring** 340:14
341:18 386:8
394:11 400:20
**refers** 370:12
**reflective** 404:24
**reflex** 366:10
**refuse** 406:11
**regardless** 427:13
**relate** 423:17,20
**relation** 343:23
412:2
**relationship** 411:2
**reliable** 386:16
**relied** 396:20
**relieve** 347:10
**rely** 368:18
**remainder** 361:16
391:8
**remaining** 427:18
**remarks** 407:10
**remediation** 414:13
**remedy** 350:11
**remember** 337:16
343:3 344:24
348:23,24 352:6
353:5,8,13,18,20
353:21,24 354:2,7
358:15 360:4,5,11
366:15,16 374:5
376:13,14 377:1
377:19 378:24
379:20 380:17,20
381:5 382:13
384:18 390:2
391:23 404:5,6
415:24 428:15
430:20
**reminded** 371:7
**removal** 410:24
412:3
**Renee** 337:22
**repeat** 363:14
**repetitively** 357:20

358:3
**reported** 334:23
436:7
**reporter** 436:6,17
**represented** 420:13
**representing** 402:9
402:11
**reprimanded** 371:5
371:8
**request** 370:16
**requested** 388:9
409:20
**required** 388:10,11
**reserve** 434:11
**residency** 422:24
423:9 424:3,8
425:18 426:3,7
427:9 428:2,6,8
428:16 430:7,17
431:13 432:20
**resident** 339:22
340:3
**resolve** 434:4
**respect** 354:7
402:24 403:14,15
433:14
**respiratory** 383:11
383:12
**response** 344:12
364:20 386:15
393:6
**responses** 337:14
411:20
**rest** 361:14
**restart** 425:20
**retirement** 424:23
430:8
**return** 369:5
407:13,19 408:24
416:6
**returned** 398:5,17
**review** 399:4,11
411:13 434:8
**Reviewing** 354:6
**re-dose** 339:3
394:17



re-dosing 340:4
re-evaluation
337:24
right 338:15,19,24
339:11 340:4,15
341:2,13,18,24
342:7 343:9
345:16 346:11,15
347:23 348:5,9,10
348:10,11,20
351:18 352:1
353:10 359:9,12
359:17 363:6
364:5 365:1
370:17 372:7,10
372:22 378:4,7
379:19 380:4
381:18,22 382:15
386:10 387:11
390:18,22 392:6
394:21 395:4,15
396:9 401:4,11
404:3,16 405:14
405:17,24 407:10
408:3 409:15
410:15 414:12
415:24 417:23
418:5 421:23
422:3,6,14 424:1
424:10 426:14,17
427:2,5 428:6
430:3 431:17
432:2,20,23
433:15 434:11
right-hand 400:4
rising 348:7
risk 379:15
Riverside 334:18
335:8
robot 349:11 350:6
robotic 351:6,8
Rodzik 365:1
372:18 401:2
role 426:8
room 367:19 368:6
368:10 382:20

rotated 432:10
rotational 425:18
roughly 423:16
432:11
route 373:4,12,15
ruin 362:7
ruined 361:13,23
Rules 334:15
running 357:12
392:7
ruptured 382:6,17
382:24 383:4,10
383:20
Rush 334:6 337:19
343:6 344:23
345:4 348:13
351:12 359:7
360:12 363:24
364:23 367:2
371:11 372:17,17
380:2 384:13
387:1,14 400:6,9
402:5,9,22 410:24
411:2,3 413:15
422:16,20 423:4
428:11 431:4,23
432:2,5,7,10,11
432:13,16 433:2
rushed 388:13

——————————
S
——————————
s 334:18 335:8
418:6
safe 396:6
safety 349:16
371:18
Sampson 415:7
satellites 432:7
satisfactory 338:1
sats 389:13,20
saturation 394:24
saw 343:20 350:4
350:14,14,23
351:3 354:3 381:8
383:24 384:19
389:5 390:5

399:17 414:6
saying 341:1,15
350:24 353:19,19
356:1 362:19,21
363:8,17 371:2
372:9 375:5,9,13
378:9,12 382:8,9
388:7 395:10
399:1 409:23
418:20 419:9
425:5
says 340:20 341:12
341:16 349:6,10
355:3,8 357:19
358:18 362:23
363:2,3 366:5
374:14 376:15
377:4,9 382:2
387:17 389:10
390:22 394:4
396:20
scan 389:23
schedule 399:7,7
scheduling 411:17
scope 411:1
screaming 420:10
scrutinized 408:15
scrutiny 342:20
414:8
second 345:12
355:7 357:4
366:12 367:17,19
372:24 373:2
386:8 389:6,8
400:2,3 401:20
secretions 361:22
362:4,10
section 340:17,21
341:16,17 354:15
365:7 386:6
401:10
securing 383:5
sedating 391:21
sedation 388:8
see 339:7 340:12,18
343:13,14,17

345:24 349:5
351:24 352:10,14
352:23 356:20,21
359:15,15 362:18
365:10 384:10
386:15 392:5
393:17 394:15
395:14 401:24
403:3 411:3 412:4
433:18
seeking 396:2
seen 368:17
sees 420:1
selected 432:2
self 412:2
self-interest 412:8
412:8,18 413:3
415:2,13,22
417:12,22
self-interests 411:1
sense 408:22
sent 370:3 394:8
406:12
sentence 357:18
373:11 400:3
sentences 349:6
series 370:1
serious 379:4
Seriously 402:18
SERVICES 334:23
session 342:10
401:21 404:3
422:11
set 339:20 359:24
364:13,15 372:14
385:11 407:12
sets 421:3
setting 354:16
385:2,9 387:14
setup 338:6 361:12
361:16 384:1,1
share 398:9
sheet 375:3
Sheila 359:8,16,19
Sherwin 415:7
she'll 369:17

short 385:2,10
shorthand 436:7,10
436:17
shortly 350:17
short-term 396:13
show 354:13
358:19 361:14,16
361:17 363:10
364:10
showed 362:15
417:18
showing 361:20
shows 354:15
413:14
sick 389:18 390:3
side 350:8 400:4
SIEGEL 335:3,5
339:10,12 363:14
380:6 387:5 393:5
402:7,12,15 409:4
409:17 412:10,12
413:16 415:4
418:6,22 419:1,4
421:7,11 424:16
433:19 434:13
siegeledlaw@aol....
335:4
signed 424:20
signs 394:23 431:3
sim 415:5,6
similar 413:9
simulation 415:11
single 386:3,9
414:6
sites 432:9
situation 342:18
347:24 349:22
389:23
situations 377:19
six 356:1,6
size 395:24
Skills 338:17
Skokie 432:8
sleepy 356:20
slight 347:7
slow 385:9



snipping 351:8
soft 385:14
somebody 350:11
   396:6,8
soon 398:5
sorry 370:6,22
   409:5
sort 373:2 408:14
sought 369:16
   434:6
spasm 376:4
spasming 379:14
speak 349:7
speaking 380:15
specific 423:14
speculate 402:12
speculation 402:16
spend 423:23 429:8
   429:17
spent 423:18,20
   428:2
sphere 400:5
spine 386:3,9
spiraled 408:6
spoken 385:14
spread 403:20
spring 428:9
squirming 391:23
SRNA 411:11
   422:2,9 424:22
   430:6
SRNAs 404:21
   411:17
SS 435:1 436:1
stable 383:8 394:23
staff 416:22,23
   420:15
stage 425:18
stamp 361:11
   362:14,18,18
standard 425:17
standing 415:6
start 382:21 385:18
   386:13 387:19,20
   389:7 414:19
   422:19,22,24

423:9
started 347:22
   366:1 368:7
   380:17 382:22
   384:2 407:9 421:4
   421:16 422:23
   423:6
startle 351:10
starts 373:3 374:10
state 411:24 436:1
statement 339:15
   371:21
statements 346:2
states 334:1,15
   339:2 352:9
   388:13 435:1
stating 416:4
stayed 422:12
staying 356:16
steadily 348:7
stellar 370:9
stemming 421:19
stepped 350:8
sterile 349:7,11,22
sticker 346:19
   348:9
stipend 422:19
   423:1,3 426:19
   427:11 430:6,16
stop 357:19 358:8
   358:11,19,24
   359:3 379:13
   409:8
stopped 365:14,16
   365:16 392:8
   398:22
straight 392:24
stress 367:15
stresses 421:15
stressful 342:6
strikes 419:17
stripped 361:19
struck 381:2
struggled 385:1
student 361:3
   362:24 367:14,21

377:18 388:3
389:2,5 391:7
403:17 414:4,12
416:19 417:5,17
425:2 430:9,10
433:14
students 400:18,23
   413:9 417:19,20
   420:15
studied 429:20
study 429:1,4,6,7
   429:12,13
studying 429:9,17
subjecting 403:1
   407:7
subjects 366:20
submit 410:6
submitted 344:21
   345:2
SUBSCRIBED
   435:17
suction 360:22
   361:1 362:23
   363:9,19,20
   364:11,15
suctioning 361:22
suddenly 408:10
suggested 340:3
suing 402:17
suite 334:18 335:3
   335:8 350:23
   382:16
supervision 422:13
   424:13 426:7
support 354:20
   412:15 413:12
   414:9,13 415:19
   416:21
supported 404:17
supporting 411:24
supportive 414:7
   418:15
supposed 341:8
   391:5,6 398:4
   407:12 433:8
suppress 383:10

sure 343:20 345:1
   352:5 353:15,17
   355:21 356:10,12
   358:14 365:23
   366:18 372:13
   375:18 377:1
   379:21 381:1
   383:8 391:7 392:6
   392:15 393:14
   406:10 408:3
   417:2,14 418:8
   422:23 423:1
   433:6
surgeon 350:5
   351:6
surgical 420:16
switch 354:19
   358:2
sworn 337:3 435:17
symptoms 421:14
syringe 345:19
   346:10,15 347:1
   347:12,13,21
   355:12,21 356:8
   356:11,12 357:1
   371:23 372:6
   390:14,16,23
syringes 372:2,3
   391:14
system 361:23
   362:1,7,11 432:11

   T
take 401:13 427:15
   431:19 433:17
taken 334:17
   362:20,21 363:6
   418:13 435:6
   436:10
talk 353:7 381:9
   384:6,9 429:12
talked 368:5 375:2
   393:8 398:6
   400:11 404:3
   406:13,20 420:4
talking 354:5

362:17 365:10
393:1 400:9,22
403:18 409:4
419:7 420:5 421:9
talks 365:7
tape-recording
   434:4
tapped 351:9
teach 359:2
team 386:17 420:16
tell 349:12,24 350:9
   350:21 351:1,5
   355:19,22 359:5
   363:2 367:19
   376:6 388:20
   389:1 396:24
   412:7 414:15
   416:16 429:24
telling 415:7
tells 347:14
term 431:14
terms 374:2 385:13
Terrebessy 400:16
   410:8,15
testified 337:4
   393:6 404:2
   422:11
testimony 418:7
   419:19 436:7
text 374:23
textbooks 396:10
texted 405:7
text'd 399:1
thing 346:12
   383:18
things 360:2 376:12
   377:20,21,24
   393:1,8 408:6
   412:14 415:23
   417:15 421:9,18
   425:15 429:14
think 339:19
   343:24 344:9,16
   344:24 345:7
   346:24 347:3
   349:14 350:7



351:4 352:21
354:3 356:14,24
357:3,10 359:21
359:23 360:8
363:4 364:8,19
365:22 366:9
368:5 372:3
373:15,23 374:1
376:8,18 377:13
378:2 382:6
383:15,19 385:4,6
385:8,16,20,21
386:3,7,20 387:21
388:23 391:22
393:13,15 396:16
398:2,24 401:2,6
404:6 405:9 406:8
407:24 408:9,19
410:12 411:20
412:18 413:2,14
414:14 415:1,12
415:23 416:3,10
417:22 418:21
421:23 422:11
423:8,16 425:1,16
426:20,21 427:12
427:21,23 428:4,7
428:16 430:9
431:5,6,11 432:8
432:15 434:7
**thinking** 339:19
343:23 374:12
392:17,20 395:12
395:13
**thinks** 383:19
414:14 415:8
**third** 383:15
**thought** 347:17
356:13 374:8
376:6 384:4 386:4
391:16 393:2,6,10
395:7 416:14
425:5,6
**three** 338:11 344:8
367:10,22 368:13
369:6 383:23

406:1,2
**thrown** 345:7
**tidal** 375:19 376:5
**time** 337:12 344:5
344:21 351:1
357:6 361:11
362:14,17,18
367:14 369:7
375:12 378:3
379:15 380:24
384:21 385:2,2,10
388:14 390:5
394:23 397:6,22
398:8 399:18
400:10 406:12,15
413:18 414:7
422:12 423:18
427:15 428:2,12
429:2,8 430:22
**times** 358:9 367:22
368:13,15,24
378:12 398:18,21
406:1 418:10,18
**today** 399:2,15
434:3,3
**told** 339:19 346:6
348:1 356:12
373:6,14 382:15
382:17 385:3,20
386:10 388:8
390:13 391:19
393:14,18 395:15
395:17,20 396:23
397:14 399:2
407:11,11 409:23
412:22 415:15
416:14 431:16,18
**top** 400:4 415:24
**Tortious** 401:22
**touch** 392:8,13
**Tower** 406:14,15
**training** 424:5
425:22,23 426:10
**transcript** 435:5,8
436:10
**translation** 341:7

**treat** 390:10 409:9
421:18
**treated** 408:4,21
416:5 417:17
**treating** 425:7
**treatment** 433:13
**treatments** 421:16
**tried** 343:24 350:13
392:11 405:9
408:12 410:8
**trouble** 357:19
417:6,10 420:1
**true** 340:21 341:2,5
341:6,13,14,16
350:13 357:15
368:12 375:24
377:6 382:8
387:22 391:1
435:8 436:9
**try** 391:15 414:11
**trying** 343:13
352:12 353:23
355:1 360:1
363:22 392:19
408:13 415:15
**tube** 356:7
**tubing** 355:22
357:1,22,23
**tuition** 428:11,14
**Tumen** 431:2,3
**turn** 337:18 338:10
340:9 345:3,4,12
348:12 351:12
358:6 359:7
360:12 363:24
364:23 367:1
371:10,11 372:17
372:24 380:2
387:1 388:15
389:6 392:11
401:21 411:21
**turned** 350:3
357:20 358:12
385:15 387:18,22
**turning** 357:24
359:5 380:17

**turnover** 355:23
356:16
**twice** 433:9
**two** 343:21,23
344:3 348:20
360:19 381:21
383:16,22 386:7
391:13 403:8
419:17 427:23
431:19
**two-week** 431:21
**type** 346:8
**types** 417:19
421:16
**typical** 388:24
429:16

_____ **U** _____

**Uh-huh** 367:6
**unacceptable** 373:6
373:20
**unanimously** 409:1
**understand** 339:6
367:16 369:13
384:3 396:21
402:2 425:4
**understanding**
341:7 369:1
**undo** 403:1
**uneventful** 353:7
**unfair** 346:24
347:3 380:19
**unfamiliar** 358:11
386:5
**unfavorable** 409:13
410:1
**unfortunately**
391:22
**unit** 367:18
**United** 334:1,15
435:1
**university** 334:6
344:16 432:13
**unjustifiably**
402:22 410:23
**unlabeled** 371:23

**unnecessarily**
352:22 353:12
354:8
**unnecessary** 354:9
**unprofessional**
402:19
**unsatisfactory**
345:16 347:1
348:20 351:16
359:11 360:19
365:3 367:10
371:19 372:22
380:11 387:10
399:17 401:3,7
**unused** 391:10
**unusual** 406:13
**update** 377:20
**upheld** 404:11
**urine** 349:12
**use** 358:19,24
364:11 371:8
373:10,13 374:1,4
379:21 393:16
**usual** 339:5
**usually** 342:13
356:15 358:2
372:2,14 380:24
386:13,14 391:9
**uterine** 374:2
**uterus** 379:13

_____ **V** _____

**VA** 352:23 353:13
353:14,16,17
354:8
**vacation** 427:7,12
427:14,18 430:6
**vacuum** 361:13,23
362:1,7,11
**VAE** 366:9
**vague** 360:9
**validate** 412:16,23
413:6
**validity** 404:12,23
408:17 412:16
413:11



value 413:4
vary 427:4
vent 354:2
ventilated 375:21
ventilating 383:9
ventilation 354:16
  354:20 355:4
ventilator 353:15
  353:18
verbal 399:24
verbalized 389:21
verbally 399:23
verify 413:8
Versed 388:3,23
vial 347:14 348:5
  356:2 386:14
view 350:20 390:9
  414:9
viewed 409:24
Vinci 349:9,18
  350:3
vindictive 417:4
violated 419:2
vital 394:23
volume 354:19
  375:19 376:5
vote 409:1
vs 334:5

___ W ___
W 335:3
Wait 388:12
waited 367:18
waiting 364:19
wall 360:23 363:9
  363:19
want 351:7 369:18
  393:10 397:15
  399:1 401:13
  412:18 415:16,18
  421:5
wanted 354:21
  369:1,16 370:20
  370:24 383:16
  385:12,17,22
  392:7,15 393:13

397:11 431:17
warned 417:7
Warren 359:8,16
Warren's 359:20
wasn't 356:12
  363:22 365:23
  370:9 372:11
  373:9,10 374:20
  375:15 382:2
  387:22 389:3
  392:14 394:5
  396:1 397:17
  398:15 399:6
  405:12 408:7
  414:7 425:8 433:6
waste 391:6
watching 351:2
  352:13
way 345:19 353:6,6
  357:5,20 358:1
  359:1,1,5 381:10
  381:13 390:8
  403:19 409:10,13
  410:1,5 412:9
  420:14
week 374:6,9 375:2
  399:6 413:19
  426:23,24 427:24
  429:1,8,15
weekday 429:16
weekend 429:20
weekends 429:6,13
weekly 398:16
  400:1
weeks 427:23
  431:19
went 339:2 344:10
  351:4 357:6 374:6
  374:22 382:20
  424:22 425:15
  433:7
weren't 356:10
  364:20 378:19
  379:7
we're 340:15
  341:17 344:3

354:10 364:14
398:4 405:8 424:7
434:9
white 417:17
Wiley 338:12,18
  339:15 340:11
  342:5,9 343:5
  344:6 345:5
  371:14 372:9
  431:18
Wiley's 340:20
willingly 402:21
Wimberly 334:8
  401:1,24 402:21
  403:5,14,23 404:4
  405:13 406:7
  407:21,22 410:22
  416:7,8 417:1,11
  419:6 420:6,24
Wimberly's 411:5
wind 433:19
wish 370:10
witness 336:4
  339:11,13 380:7
  387:6 391:11
  393:5 419:1
witnessed 350:10
  350:14 390:24
  403:18
witness's 418:6
word 365:13 366:4
  371:8 376:17
words 410:2,14,16
work 338:8 347:19
  359:2,9 360:15
  365:4,21 367:4
  369:11 372:18
  380:8 384:23
  405:19 407:5
  411:16 414:14
  416:21 418:1,4,20
  419:6,8 420:5,24
  422:6 423:17
  434:9
worked 338:14
  345:5 358:8 359:3

367:22 368:14
371:14 372:19
380:23 387:13
396:11 405:16,20
406:1 411:8
426:13,21 427:5
428:24
working 357:19
worried 351:10
worse 370:17
worth 404:23
wouldn't 358:23
  417:8
write 340:22
  344:11 346:5,20
  354:23 359:19
  369:17 370:9
  381:20 394:1,3
  403:6
writes 381:15
  386:16 403:22
writing 342:15
  346:11 408:7
  420:4
written 347:18
  397:10,15 398:9
  399:22 410:6
  419:6 420:1
wrong 357:20
  359:1,5 373:6,8
  378:23 418:21
  419:9 420:6 421:2
  421:21
wrote 342:4,7,8
  363:18 370:14
  379:3 381:18
  390:12 397:6,9
  410:15 420:22

___ X ___
X 336:1

___ Y ___
yeah 347:3 352:6
  353:18 364:19
  375:1 399:23



418:14 427:3
431:11 433:4,19
year 377:20,22
  408:9 430:23
yearly 430:18
yep 430:20

___ $ ___
$800 423:16 426:20
  427:2,13

___ 0 ___
0 425:14

___ 1 ___
1 401:19
1st 372:19
1:45 334:20
10 340:9 343:16
  346:18 385:3,19
  385:21
10th 359:9
10-milligrams
  385:22
11 337:15 340:7
  344:11,22 351:20
  359:14 364:3
1100 334:18
12 337:11,18 341:2
  343:6 345:3
  348:13 351:12
  355:22 359:8
  360:13 364:24
  371:10 384:13
120 334:18 335:8
13 338:15 340:12
  341:3 351:23
  359:14 411:23
  416:2 434:7
130s 394:24
135 384:13
136 380:2,6,7
14 337:20 360:16
149 402:20
151 410:18 412:4
16 401:7



**16-cv-06109** 334:5
**161** 412:4
**18** 345:6,10
**19** 334:19 435:6
  436:9

**2**

**2** 340:17 346:5
  347:17 423:23
**20** 336:18 347:15
  347:15,17 348:16
  365:1 369:21,24
  405:12 406:13
  407:1 427:12
**20-milligram**
  386:14
**2013** 378:2,2 385:8
  403:9 410:10
  423:12 426:22
  428:6 429:1
  430:24
**2014** 337:15 338:15
  340:12 341:3
  344:13 345:6,10
  348:16 351:14
  359:9 360:16
  365:1 367:5
  369:11 370:4
  371:15 372:19
  378:4 380:3,9
  384:16 387:8
  394:3 398:17
  403:10 407:1
  428:9,14 430:24
  432:20
**2018** 334:19 435:6
  435:18 436:9
**21** 336:18 380:3,9
  393:20,21,23
  399:22 400:2
**2200** 335:8
**24** 367:5 388:7
  410:10
**25** 351:14 371:15
  371:16 390:13
**27** 384:16

**28** 432:18
**29** 387:8 394:3

**3**

**3** 337:13 344:3
  411:19 416:1
**3,000** 428:17
**30** 394:19 395:3
**30-minute** 396:15
**312.526.1631**
  335:10
**312.583.9970** 335:4
**33** 401:22
**337** 336:10 435:7
**34** 410:18
**369** 336:18
**393** 336:18

**4**

**40** 395:4,23 396:7
  396:17 423:23
**403b** 424:24 430:8
  430:16
**405** 335:3
**42** 411:21
**434** 435:7

**5**

**5** 338:24 339:3,3,17
  339:24 340:4
  386:10 406:15
**5-milligrams** 385:3
**50** 390:15
**53** 335:3
**55** 387:1,5,6

**6**

**60** 426:23,24
  428:24
**60604** 335:4
**60606** 335:9
**68** 372:17,17
**69** 372:18

**7**

**7** 406:14

**7:00** 398:19
**70** 371:11
**73** 367:2
**74** 364:23
**76** 360:12
**78** 359:7

**8**

**8:00** 398:20
**80** 351:12 432:11
**80s** 394:24
**82** 348:13
**84** 345:4
**89** 339:13 343:6

**9**

**9** 370:4
**91** 337:19



# EXHIBIT
# A19

Deposition of Michael Kremer - March 14, 2018          1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF ILLINOIS
 3                    EASTERN DIVISION
 4   MARICEL MARCIAL,                    )
 5                   Plaintiff,          )
 6        vs.                            )  No. 16 CV 06109
 7   RUSH UNIVERSITY MEDICAL CENTER;     )   CERTIFIED
 8   DR. MICHAEL KREMER, in his          )   TRANSCRIPT
 9   individual capacity; RAY            )
10   NARBONE, in his individual          )
11   capacity; and JILL WIMBERLY, in     )
12   her individual capacity;            )
13                   Defendants.         )
14
15            The deposition of MICHAEL J.
16   KREMER, Ph.D., CRNA, CHSE, FNAP, FAAN, called by
17   the Plaintiff for examination, taken pursuant to
18   the provisions of the Code of Civil Procedure and
19   the Rules of the Supreme Court of the State of
20   Illinois pertaining to the taking of depositions
21   for the purpose of discovery, taken before JULIE
22   WALSH, CSR No. 084-004032, a Notary Public within
23   and for the County of Lake and State of Illinois,
24   and a Certified Shorthand Reporter of said State,
```

Maricel Marcial v.

Deposition of Michael Kremer
March 14, 2018

Page 2

1    at 120 South Riverside Plaza, Suite 1100, Chicago,
2    Illinois, on March 16, 2018, at 9:00 o'clock A.M.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22    Reporter: Julie Walsh
23    CSR No. 084-004032
24    APPEARANCES:

Page 3

1 ELAINE K. B. SIEGEL & ASSOCIATES, P.C.
2    BY: MS. ELAINE K. B. SIEGEL
3    53 West Jackson Boulevard, Suite 405
4    Chicago, Illinois, 60604
5    312-583-9970 | 312-583-9972 (fax)
6    Siegel-law.com
7
8    on behalf of the Plaintiff;
9
10 HUSCH BLACKWELL
11    BY: MR. PETER G. LAND
12    MS. KAREN L. COURTHEOUX
13    120 South Riverside Plaza, Suite 2200
14    Chicago, Illinois, 60606
15    312-655-1500 | 312-655-1501 (fax)
16    Peter.land@huschblackwell.com
17    Karen.courtheoux@huschblackwell.com
18
19    on behalf of the Defendants.
20
21    ALSO PRESENT: Ms. Maricel Marcial
22    Mr. Joseph Mendelsohn
23
24

Page 4

1    INDEX
2
3 WITNESS      EXAMINATION BY      PAGE
4
5 Dr. Kremer      Ms. Siegel      05
6
7
8
9
10
11
12
13
14 E X H I B I T S      PAGE
15
16 Plaintiff's Exhibit No. 11, id      48
17 Plaintiff's Exhibit No. 12, id      59
18 Plaintiff's Exhibit No. 13, id      80
19 Plaintiff's Exhibit No. 14, id      167
20
21
22
23
24

Page 5

1    (Whereupon the deposition
2    commenced at 9:11 a.m.)
3 MICHAEL J. KREMER, Ph.D., CRNA, CHSE, FNAP, FAAN,
4 witness herein, called by the Plaintiff, having
5 been first duly sworn, was examined and testified
6 as follows:
7    EXAMINATION
8    BY MS. SIEGEL:
9 Q   Will you state and spell your full
10 name for the record, please.
11 A   Michael John Kremer, K-r-e-m-e-r.
12 Q   And, Dr. Kremer, what is your current
13 position?
14 A   I'm a professor in the Rush College of
15 Nursing and Co-Director of the Rush Center for
16 Clinical Skills and Simulation.
17 Q   Who is your co-director?
18 A   Michelle Sergel, M.D.
19 Q   All right. Before we go further into
20 your background, you've had your deposition taken
21 before?
22 A   I have.
23 Q   Under what circumstances?
24 A   As a retained expert witness.

Maricel Marcial v.

Deposition of Michael Kremer
March 14, 2018

Page 6

1 Q  And when was that?
2 A  Over ten years ago.
3 Q  What kind of matter?
4 A  It was more than one case.  I would
5 say there were about two dozen mix of plaintiff
6 and defense cases, primarily defense.
7 Q  Okay.  And what was the -- just
8 generally speaking what was the nature of your
9 testimony?
10 A  Nature of the testimony pertained to
11 standards of care for nurse anesthesia practice.
12 Q  Are those the only depositions that
13 you've given?
14 A  Yes, as well as testimony in court.
15 Q  And where have you testified?
16 A  Decatur, Illinois.  Here in the city.
17 Louisville, Kentucky.  And in Miami, Florida.
18 Q  And were those state or federal
19 proceedings?
20 A  I don't know to be certain.  How could
21 I help you with that?
22 Q  All right.
23 A  I'm thinking they were probably state,
24 but I'm not positive.

Page 7

1 Q  Okay.  Well, as far as this case is
2 concerned, we'll let the record reflect that this
3 is your deposition pursuant to notice.  You
4 received a notice of your deposition?
5 A  Yes, ma'am.
6 Q  All right.  In the captioned matter
7 for all purposes under the Federal Rules of Civil
8 Procedure.
9     And now have you had your deposition
10 taken as a party or a witness as opposed to an
11 expert?
12 A  I have not.
13 Q  And expert depositions are a little
14 bit different from what we are going to be doing
15 today.  And so what I am going to be doing is
16 asking you a series of questions.  You'll be
17 answering.  We have the court reporter here who
18 will take things down verbatim.
19     And so because we need to have a clear
20 transcript, it's important that we not talk over
21 each other.  It's important that we have verbal
22 responses, not simply gestures or nods of the
23 head or things like that.  And it's important
24 that they be distinguishable.  Uh-huh and uh-uh

Page 8

1 don't come across clearly in the record as
2 affirmative or negative responses.  Do you
3 understand that?
4 A  Yes, ma'am.  Can I clarify something?
5 Q  Surely.
6 A  On a previous question?
7 Q  Surely.
8 A  When you asked if I had been deposed
9 as a party, I remembered after responding that in
10 I would say it was around 1996 there was a
11 clinical case at Rush in which I was not a named
12 defendant, but my deposition was taken.
13 Q  Okay.  And, again, you don't know
14 whether that was state or federal court?
15 A  No, I don't.
16 Q  Okay.  Did you ever have a case go to
17 trial that you were in?
18 A  As a retained expert?
19 Q  Yes.
20 A  Four that I can remember.
21 Q  All right.  Now, from time to time,
22 little differently from being in court, your
23 counsel may make objections.  That gives me the
24 opportunity to cure the form of the question that

Page 9

1 I give you, but you are expected to answer.
2     Should you be directed not to answer
3 by your counsel, that's another story.  But
4 obviously we don't have a judge sitting here.  So
5 there is nobody to rule on the -- rule on the
6 objections.  So they go on the record to be
7 resolved at a later date if that may be done.
8     Okay.  If you would like to take a
9 break at any time, just let us know.  We are glad
10 to accommodate you.  But if there is a pending
11 question, please respond to the question before
12 seeking to take a break.
13 A  Yes, ma'am.
14 Q  Is that fair?  All right.  Now, and we
15 ask this of everybody; is there any kind of
16 medication that you are taking or do you have any
17 medical condition that would prevent you from
18 responding accurately to the questions?
19 A  Do I have to answer that, what
20 medications I'm taking?
21 Q  I'm not asking you what medications
22 you're taking.  I am asking you if you are taking
23 any medications or have a medical condition that
24 would prevent you from answering accurately to

Maricel Marcial v.

Deposition of Michael Kremer
March 14, 2018

Page 10

1 the questions that I'll be posing?
2 A  No.
3 Q  What did you do to prepare for your
4 deposition?
5 A  Reviewed the student's file and any
6 other documents, internal documents, that were
7 prepared related to her academic appeal and
8 accreditation complaint.
9 Q  Did you look at anything else?
10 A  No.
11 Q  Apart from your counsel did you confer
12 with anybody regarding your deposition testimony?
13 A  I did not.
14 Q  Did you talk to anybody about any
15 testimony that they've given in this matter?
16 A  I did not.
17 Q  Did you look at any other kinds of
18 documents?
19 A  I did not.
20 Q  No litigation documents?
21 A  Well, the complaint and the responses.
22 I can't remember the name of that document.
23 Q  The answer to the complaint?
24 A  Yes.

Page 11

1 Q  Affirmative defenses?
2 A  I'm not sure if that is the name of
3 the document.
4 Q  Did you look at interrogatory
5 responses?
6 A  Yes.
7 Q  Anything else?
8 A  No.
9 Q  Did you review any deposition
10 transcripts?
11 A  No.
12    MS. SIEGEL: Can we go off the record for a
13 moment?
14    (Discussion outside the
15    record.)
16    BY MS. SIEGEL:
17 Q  Would you summarize for us,
18 Dr. Kremer, your educational background?
19 A  I have a Bachelor's Degree in
20 Psychology from Northern Illinois University that
21 I obtained in 1975. Bachelor's Degree in Nursing
22 from Northern Illinois University that I obtained
23 in 1978.
24    I earned a certificate in nurse

Page 12

1 anesthesia from St. John's Hospital in
2 Springfield, Illinois, in 1981 along with a
3 Bachelor of Science in Nurse Anesthesia from the
4 University of Illinois in 1981.
5    I earned a Master's of Science in
6 Nursing from Seattle Pacific University in 1991
7 and I completed my Ph.D. in Nursing Science at
8 Rush University in 1997. And in 1998 and 1999 I
9 completed a post-doctoral research fellowship.
10 Q  And where did you do your post doc?
11 A  At Rush.
12 Q  Would you summarize for us, please,
13 your nursing career?
14 A  Following graduation from nursing
15 school in 1978 I worked on the medical intensive
16 care unit at the time it was Presbyterian St.
17 Luke's Hospital. And following that experience I
18 moved to Springfield and started the anesthesia
19 program at St. John's, and I worked part-time in
20 the emergency department at St. John's throughout
21 my education which is a level-one trauma center.
22    Following completion of anesthesia
23 school in 1981, I moved to Seattle. I worked for
24 2 years at Swedish Hospital Medical Center. It's

Page 13

1 a large private medical center as a staff nurse
2 anesthetist.
3    From 1983 until 1992 I worked at the
4 University of Washington Medical Center as a
5 teaching associate and staff nurse anesthetist
6 and later chief nurse anesthetist.
7    Moved back to the Chicago area at the
8 end of 1993 and worked for the Rush Department of
9 Anesthesia as a staff CRNA and as a teaching
10 assistant in the College of Nursing from 1993
11 until 1997 when I finished my doctorate and then
12 was an assistant professor, continued working at
13 Rush as a staff CRNA, Co-Director of the
14 Simulation Center and instructor and later
15 Assistant Director of the Nurse Anesthesia
16 program through 2005.
17    From 2006 through 2009 I was Chair of
18 the Nurse Anesthesia Department in the College of
19 Health Professions at Rosalind Franklin
20 University in North Chicago, Illinois.
21    And since 2009 I've been at Rush as --
22 I was Program Director from 2009 until the end of
23 2017 and Co-Director of the Sim Center and a
24 part-time CRNA.

Maricel Marcial v.

Page 14

1 Q  And as Co-Director of the Sim Center,
2 what do you do?
3 A  Oversee budget and HR matters.  The
4 Sim Center is rapidly expanding from the much
5 smaller space we had when Maricel was in school.
6 Now we're -- by July we'll be in a
7 20,000-square-foot space with a lot of different
8 programming going on over 10 staff.
9    So I'm involved in the site's budget
10 and HR and overseeing getting the lab accredited.
11 There are 2 different bodies that we're working
12 toward accreditation with and involved in some
13 research projects in the Sim Center too.
14 Q  What kind of research projects?
15 A  The most recent one that I think is
16 really interesting that has to do with safety and
17 quality in the operating room has to do with a
18 scenario that surgery residents, OR nurses and
19 anesthesia providers, participate in where there
20 is a crisis in the middle of laparoscopic
21 gallbladder surgery.
22    And the object of -- what we are
23 measuring in the scenario is reaction time and
24 time to communicate and ask for help.  And we

Page 15

1 have pilot data and we have some significant
2 findings with that.
3 Q  So do I understand that you're
4 identifying factors that relate to reaction time?
5 A  Yes, ma'am.
6 Q  And communications among the personnel
7 that would be attending the procedure that's
8 being simulated in the lab?
9 A  Correct.
10 Q  Is that document in publication?
11 A  There is a manuscript draft in
12 progress and it's being submitted to the Journal
13 of Surgery.
14 Q  Is that refereed?
15 A  Yes, it's peer reviewed.
16 Q  Okay.  And do you have other
17 publications?
18 A  I do.
19 Q  Can you tell us a little about them,
20 please?
21 A  So I authored or coauthored a number
22 of journal articles and peer-reviewed
23 publications on a variety of topics both
24 educational and clinically related, and authored

Page 16

1 or coauthored book chapters and abstracts as
2 well.
3 Q  In the -- you talked about some cases
4 in which you appeared as an expert witness, were
5 you qualified as an expert by the court in any of
6 those cases?
7 A  I'm not sure what that process
8 entails.  I was allowed to testify as an expert.
9 Q  In the four cases that went to trial?
10 A  What about the four cases that went to
11 trial?
12 Q  You testified as an expert in those
13 four cases?
14 A  I did.
15 Q  And with respect to your current
16 research, what did -- what are you finding are
17 factors that contribute to communication around
18 the crisis procedure that you're discussing?
19 A  What we're finding is that the
20 participants can formulate differential
21 diagnosis, arrive at the correct diagnosis which
22 is tension pneumothorax and develop a treatment
23 plan which is the decompression of the tension
24 pneumothorax all very quickly.

Page 17

1    What we're not seeing that we're
2 trying to educate people on when they debrief
3 after the scenario is that they are not calling
4 for help.  They're not -- since it's trainees
5 participating in the project, we want them to
6 know that, you know, they should be calling their
7 attending surgeon, attending anesthesiologist and
8 for everybody in the room conveying that
9 everybody should be able to speak up if they have
10 a safety concern.
11 Q  And has your research on this crisis
12 procedure, has your research attempted to
13 identify factors that are inhibiting that type of
14 communication?
15 A  The data are being analyzed as we
16 speak, so I couldn't say for sure.
17 Q  Do you have a hypothesis?
18 A  I think hierarchical relationships
19 could contribute.
20 Q  What is a hierarchical relationship?
21 A  Well, the trainees -- actually, I was
22 thinking trainees might be inhibited about
23 letting their attendings know that there is an
24 issue, but the more I think about it is more of a

Maricel Marcial v.

Page 18

1 case of that they are rapidly acting to diagnose
2 and treat the problem that they've identified.
3 And I think because they're caught up in getting
4 the patient stabilized, they don't think to let
5 others know what is happening.
6 Q And are you doing something in this
7 capacity in order to test that hypothesis? It
8 sounds like you have two alternative explanations
9 in play; is that right?
10 A Yeah, I'm not the principal
11 investigator; but, you know, I think the data
12 will confirm or refute the hypotheses that she's
13 formulated.
14 Q Okay. And you said that you're
15 working as a part-time CRNA at the same time?
16 A Until a year-and-a-half ago. And then
17 I haven't practiced for a year-and-a-half.
18 Q And why did you change positions from
19 -- just to --
20 A I'm sorry.
21 Q Just to clarify what we're talking
22 about here, why did you change positions from
23 your prior program director position in the nurse
24 anesthesia program?

Page 19

1 A I had been requesting that change for
2 several years partly for health reasons and
3 partly advancing age. I'll be 65 this year. I
4 would like to be working less than 70 hours a
5 week and 7 days a week.
6 Q And just for the record, what is your
7 birth date?
8 A August 17, 1953.
9 Q And you are Caucasian; is that
10 correct?
11 A Yes, ma'am.
12 Q What is your national origin?
13 A My mother was -- my mother's family
14 came from Italy. My father's family came from
15 Germany.
16 Q They were both first generation?
17 A Mother was first generation. Father
18 was second generation.
19 Q Now, during the time that you were
20 director of the nurse anesthesia program at Rush
21 -- for simplicity can we refer to that as a CRNA
22 program; is that the correct title?
23 A Yes, ma'am.
24 Q Not the SRNA program?

Page 20

1 A Some people will use that terminology.
2 They're equally applicable or nursing anesthesia
3 program.
4 Q Okay. What were your duties?
5 A To keep the program in compliance with
6 accreditation standards, to assign faculty
7 workload, to insure that we had adequate clinical
8 placements for our students and to engage in
9 continuous quality improvement processes for the
10 program.
11 Q And what did the quality improvement
12 processes consist of; what were the primary ones?
13 And let's specify time period here. Let's say
14 2012 through the balance of the time that you
15 were program director?
16 A So, yeah, the quality improvement
17 activities really stemmed from the college.
18 Nursing has an evaluation plan that is pretty
19 extensive at the program level.
20   We monitor on the student side
21 formative clinical evaluations, student progress.
22 But then on the other side of things students
23 complete a number of evaluations during the
24 program and following completion of the program.

Page 21

1 So midpoint program surveys, end of program
2 surveys, graduate surveys, employer surveys and
3 use those data to identify any gaps that we can
4 address, you know, in terms of improving quality
5 of the program.
6 Q Who maintains those surveys?
7 A We have a -- well, now it is overseen
8 by somebody at the university level, Dr. Rose
9 Suhaypa who is also a faculty member.
10 Q Could you spell that for the court
11 reporter, please?
12 A Yes, ma'am. It's Rose Marie Suhaypa,
13 S-u-h-a-y-p-a, Ph.D., RN. And she's the
14 Associate Provost for Institutional Research and
15 Accreditation. So she and her staff oversee
16 evaluative processes for all the colleges. And
17 they're the ones who deploy most of the surveys
18 that are utilized that students respond to.
19 Q And I understand there are a group of
20 surveys that are on the way over today?
21 A I'm sure trying.
22 Q All right. I appreciate that. But
23 what is it that we're anticipating?
24 A They're the clinical instructor

Maricel Marcial v.

Page 22

1 evaluations. And those were deployed by our
2 previous program assistant through Survey Monkey.
3 And it's an account I don't have access to. I
4 was able to locate some hard copies yesterday
5 that I brought in this morning, but I have
6 contacted several people in the college and asked
7 for them to urgently download those surveys and
8 forward them to me and I'll get those to counsel.
9 Q Okay. And, again, for the time period
10 of 2012 -- was it -- it was through 2017 that you
11 were director?
12 A 2009 through 2017.
13 Q Okay. Now, for that time period, 2012
14 through 2017, once those surveys were -- Strike
15 that.
16     I know that we have some documents --
17 excuse me. I understand that we have copies of
18 some of these materials coming, but can you tell
19 me what generally you're attempting to measure
20 through the faculty surveys, faculty surveys by
21 the SRNAs?
22 A Yes, so the goal of deploying those
23 surveys and evaluating the results is to identify
24 people who may be performing at a very high level

Page 23

1 as a clinical instructor both nurse anesthetists
2 and anesthesiologists and to identify where there
3 may be room for improvement. And I share those
4 surveys with the clinical leadership. So the
5 attending surveys go to Dr. Tuman, Chair of the
6 Anesthesia Department and the clinical instructor
7 surveys --
8 Q Could you spell Dr. Tuman's name for
9 the court reporter?
10 A Sure. It's Kenneth J. Tuman,
11 T-u-m-a-n, M.D. And then the clinical instructor
12 evaluations for the nurse anesthetists I would
13 share with Ray Narbone.
14 Q And then once Dr. Tuman gets the
15 surveys, do you know what he does with them?
16 A Well, what he told me is that he
17 makes --
18 Q Before you tell me what he's told
19 you --
20 A Yes, ma'am.
21 Q -- can you give me a timeframe that
22 you're referring to?
23 A The timeframe would be after the
24 program assistant would send me the results and I

Page 24

1 review them, print them out and then just
2 schedule time because I had regular meetings with
3 Dr. Tuman. So in our next regular meeting we
4 would review those surveys. And he told me that
5 he made the findings part of the attendings'
6 annual review.
7 Q And, again, when did he tell you this?
8 A At regular meetings we had over the
9 nine years I was program director or eight years.
10 Q Is there a specific time of year that
11 you would typically have those meetings?
12 A Well, we met about every month.
13 Q And did you get those surveys on a
14 rolling basis?
15 A The clinical instructor evaluations?
16 Q Correct.
17 A Once a year.
18 Q All right. And then how about Ray
19 Narbone?
20 A And then I interacted with Mr. Narbone
21 more frequently than I did with Dr. Tuman. So I
22 would probably have a conversation with him on
23 average about once a week. And so it would be in
24 the course in one of those conversations in a

Page 25

1 private location that I would share the clinical
2 instructor evaluations.
3 Q Did you discuss those evaluations with
4 the instructors?
5 A Yes.
6 Q And tell me about how that transpired?
7 A It tended to be -- those discussions
8 with instructors, many of them had to do with
9 people who were getting very high rankings just
10 to let them know that their work was being
11 recognized.
12     If there were instances where a rating
13 or verbatim comment was concerning, then I would
14 talk to that instructor privately and tell them
15 that I had concerns about how they were
16 interacting with students.
17 Q And if you identified concerns with a
18 specific instructor, are we speaking of CRNAs?
19 A Yes, with CRNAs.
20 Q Where concerns were identified, what
21 would be done about that? You talked about how
22 you would share the rating with them, was there
23 any follow-up action?
24 A There were times when I asked Mr.

Maricel Marcial v.

**Deposition of Michael Kremer**
**March 14, 2018**

Page 26

1 Narbone to minimize the interactions of certain
2 instructors with students, but that was not
3 something I had control over. He usually -- he
4 usually did that, but it was hard to insure that
5 it would happen consistently.
6 Q In the -- and we can perhaps depending
7 on when we get the evaluations how many of them
8 there are, whether we have an opportunity to
9 review them in order to talk with you today about
10 them, can you tell me if there were evaluations
11 raising issues about the instructional work of
12 Jill Wimberly? And she's a CRNA in the Rush
13 program; isn't that right?
14 A That's right.
15 Q Okay.
16 A What I remember in her clinical
17 instructor evaluations were statements that she
18 was very bright. That her communication style
19 could be abrupt, but her overall numerical
20 rankings -- it's only a few items, a few
21 descriptors; but her numerical rankings outranked
22 from those of her peers.
23 Q And at any time did you discuss the
24 communication style with Miss Wimberly?

Page 27

1 A I did.
2 Q When did that occur?
3 A I remember at least one occasion
4 either before or after a CRNA staff meeting when
5 we talked privately. Actually, and then there
6 was another occasion as well when --
7 Q Let's take them one at a time.
8 A Yes, ma'am.
9 Q So after the CRNA staff meeting -- let
10 me back up a minute.
11   Can you tell us what usually goes on
12 at a CRNA staff meeting?
13 A Well, there are staff meetings and
14 there are faculty meetings. Staff meetings
15 pertain mostly to clinical operations issues.
16 Q Not personnel?
17 A More tangentially people -- when
18 personnel are mentioned, those discussions are
19 more about people who are coming or going in
20 terms of staff. You know, new staff starting or
21 staff who are leaving. But the staff meetings
22 are almost entirely about clinical operations
23 kinds of business.
24 Q Who attends them?

Page 28

1 A The nurse anesthetists, the chief
2 nurse anesthetist and now there's another
3 position, anesthesia operations director.
4 Q Who is that?
5 A Her name is Melissa Carey, C-a-r-e-y.
6 Q Okay. And how often did the staff
7 meetings occur?
8 A Roughly monthly, but sometimes there
9 would be longer intervals between those meetings.
10 Q And you mentioned faculty meetings?
11 A Yes, ma'am.
12 Q Tell me about those?
13 A There are at least in my time there
14 were two different kinds of faculty meetings.
15 One was with core academic faculty that focussed
16 primarily on academic issues like assignment of
17 course director responsibilities, lecture
18 responsibilities and now our students have to do
19 a major scholarly project and that involves a lot
20 of work and planning. So those are the kinds of
21 things we talk about at the core faculty meeting.
22   It's harder to get together with the
23 clinical instructors because there are now about
24 30 nurse anesthetists at Rush. So approximately

Page 29

1 every other month Dr. Wiley and I would meet with
2 the clinical instructors to review -- it's a
3 meeting we've had as long as I've been involved
4 with the program. It's called clinical
5 competence review. Just basically a chance to
6 kind of verify and clarify what is coming back in
7 written evaluations or also determining when
8 supervision can be thinned from one-to-one CRNA
9 supervision to the students working directly with
10 anesthesiologists.
11 Q And is Miss Wimberly a member of the
12 faculty?
13 A Miss Wimberly is a staff nurse
14 anesthetist who is employed by the Department of
15 Anesthesiology. She does not have a faculty
16 appointment in the college of nursing.
17 Q All right. And so after one of these
18 meetings, to the best of your recollection would
19 it have been one of the clinical faculty
20 meetings?
21 A I think it was actually a staff
22 meeting.
23 Q Okay. A staff meeting. All right.
24 And do you recall approximately when that

Maricel Marcial v.

**Deposition of Michael Kremer**
**March 14, 2018**

Page 30

1 occurred?
2 A Probably three years ago.
3 Q So the spring of 2014?
4 A Roughly that time, yes.
5    MR. LAND: Isn't that 4 years ago? It's
6 2018.
7    MS. SIEGEL: That's right. I missed a year.
8    BY MS. SIEGEL:
9 Q So is it your recollection that that
10 occurred in 2015 or 2014?
11 A I can't say for sure.
12 Q Okay. That's fine. And so where did
13 this discussion with Miss Wimberly occur?
14 A In the anesthesia department in an
15 alcove that's adjacent to a small classroom where
16 those staff meetings are held.
17 Q And who was involved in the
18 discussion?
19 A Just Miss Wimberly and me.
20 Q What did you say to her and what did
21 she say to you?
22 A To the best of my recollection I was
23 encouraging her to be cautious in how she spoke
24 to students. And she indicated, you know, that

Page 31

1 she understood what I was saying. That was about
2 as far as it went.
3 Q And as well as you can recall, what
4 was the -- what was the nature of the evaluation
5 that prompted that discussion with Miss Wimberly?
6 A I think a student had been upset about
7 an encounter that she had had with Jill.
8 Q Do you remember -- Strike that.
9    Did you know who the student was who
10 had the encounter she was upset with?
11 A I'm -- I think it was a student named
12 Sarah Curry.
13 Q Do you recall what cohort she was in?
14 A She was in our first DNP cohort. So
15 she completed the program in December of 2015.
16 Q And what was the nature of Miss
17 Curry's complaint? Dr. Curry I should say.
18 A You're right. I think it had to do
19 with comments that were made about Sarah being
20 dyslexic.
21 Q Did Dr. Curry tell you what that
22 incident consisted of, what happened?
23 A I believe she did at the time, yes.
24 Q And when did she tell you about that?

Page 32

1 A Probably the same day.
2 Q What did she tell you?
3 A Oh, what did she tell me?
4 Q Right, just a conversation with the
5 two of you or was Miss Wimberly involved or
6 anyone else?
7 A No, it was the two of us and it had to
8 do with something that was misspelled on a chart,
9 and Miss Wimberly being critical about that and
10 Miss Curry responding that she was dyslexic.
11 Q Do you know anything more about that
12 encounter?
13 A No.
14 Q And how did you learn about the
15 encounter?
16 A From the student.
17 Q Okay. Did you learn anything from an
18 evaluation that you received, a student
19 evaluation about Miss Wimberly?
20 A Oh, a student evaluation? Like a
21 clinical instructor evaluation?
22 Q Right. Right.
23 A No, I just remember her communication
24 style being characterized as abrupt, but there

Page 33

1 weren't a lot of verbatim comments on those
2 clinical instructor evaluations for most of the
3 instructors.
4 Q When did that first come to your
5 attention that she -- that there were student
6 concerns about her abrupt communication style?
7 A I really don't recall.
8 Q Did you ever observe her to see about
9 her communication style with the SRNAs?
10 A Yes, a number of different times.
11 Q How many times?
12 A I couldn't say for sure how many
13 times.
14 Q Did you ever observe it yourself?
15 A I observed Miss Wimberly communicating
16 with students, yes.
17 Q And would you agree that at times her
18 communication style was abrupt?
19 A In what I observed infrequently, but I
20 observed it.
21 Q What did you see?
22 A An incident in our interventional
23 endoscopy area with a student. Had to do with a
24 preoperative evaluation.

Maricel Marcial v.

Deposition of Michael Kremer
March 14, 2018

Page 34

1 Q And were you present there in the
2 interventional endoscopy area?
3 A Yes.
4 Q And what did Miss Wimberly say that
5 you characterized -- that you would characterize
6 as abrupt?
7 A She felt the student hadn't done
8 everything that needed to be done to complete
9 preanesthesia evaluations on that day and was
10 just a bit forceful the way she conveyed that.
11 Q What do you mean by a bit forceful,
12 did she raise her voice?
13 A I think it was probably just more in
14 the words used.
15 Q They were sarcastic?
16 A Along the lines of, you know, you
17 really have to do this or get this right.
18 People, you know, will be on your case if you
19 don't have this right every time.
20 Q Do you recall who the student was?
21 A Hanna Kuna.
22 Q And did Hanna Kuna complain to you
23 about Miss Wimberly's communication style?
24 A I could tell that she was concerned

Page 35

1 about the communication. We talked briefly
2 privately. And then I talked to Mr. Narbone.
3 Q What did you tell Mr. Narbone?
4 A That I wanted him to minimize her
5 interaction with students.
6 Q Miss Wimberly's interaction with
7 students generally?
8 A Yes.
9 Q And do you recall when that occurred?
10 A The same day that I was also assigned
11 an interventional endoscopy.
12 Q Now, do you remember a timeframe, just
13 as well as you can recall?
14 A I'm just trying to remember which
15 cohort she was in 2013-2014.
16 Q And when did you speak with Mr.
17 Narbone?
18 A Right after I spoke with the student.
19 Q And after you told Mr. Narbone to
20 minimize Miss Wimberly's contact with students,
21 did you follow up to see how those assignments
22 were going?
23 A The short answer is yes. The caveat
24 being that we have up to 72 students in the

Page 36

1 clinical area at 10 different facilities at the
2 same time. So to the extent that, you know, it's
3 possible to at least intermittently verify that
4 that was happening, and it did appear to for a
5 while after that conversation that she had less
6 contact with students.
7 Q Did her contact with students
8 subsequently increase?
9 A Yes.
10 Q And when did you notice that her
11 contact with students had increased?
12 A I couldn't say for sure.
13 Q Was there an issue regarding Miss
14 Wimberly's contact with the plaintiff, Maricel
15 Marcial?
16 MR. LAND: Could you read that back, please.
17 (Record read by the reporter.)
18 MR. LAND: Just object as vague, but you can
19 answer.
20 THE WITNESS: I know Miss Wimberly worked
21 with Maricel on three different occasions while
22 she was clinically active.
23 BY MS. SIEGEL:
24 Q And did a communications issue come to

Page 37

1 your attention?
2 A Well, I know the first time they
3 worked together at least that is documented in
4 her student file she received a satisfactory
5 evaluation from Miss Wimberly. And the second
6 occasion there were documented concerns on the
7 evaluation that was submitted.
8 Q That was an evaluation of Miss Marcial
9 by Miss Wimberly; is that right?
10 A Yes, ma'am.
11 Q All right. And by the way, I
12 understand that Miss Wimberly's name has changed.
13 We've been using the name Wimberly for purposes
14 of consistency. Do you -- you know who I mean?
15 A Yes, I saw that in a database that we
16 use for the program. I think she is still using
17 Wimberly at work, but I think her married name is
18 O'Neil if I read that correctly.
19 Q All right. And, now, the evaluation
20 that you're talking about was Miss Wimberly's
21 evaluation of Miss Marcial.
22 When did -- Strike that.
23 When did Miss Wimberly's
24 communications come into issue with Miss Marcial?

Maricel Marcial v.

Page 38

1 A  I don't know that there was an issue
2 with her communication with Miss Marcial.
3 Q  Did there come a point where you asked
4 Mr. Narbone to minimize Miss Wimberly's contact
5 with Miss Marcial?
6 A  Yes, shortly after that June 20th,
7 2013, case.
8 Q  And how did you communicate that to
9 Mr. Narbone?
10 A  I simply asked him to minimize Jill's
11 interaction with Maricel and he did that.
12 Q  What did he say when you asked him to
13 do that?
14 A  I don't recall specifically.
15 Q  Now, did Mr. Narbone express any
16 opinions to you regarding Miss Wimberly's
17 performance as a CRNA?
18 A  What I recall is that he, you know,
19 expressed that she was very clinically
20 proficient.
21 Q  Did he comment at any point about Miss
22 Wimberly's teaching abilities?
23 A  Not that I recall.
24 Q  Now, would you agree with me that

Page 39

1 teaching proficiency is a significant aspect of
2 the CRNA's performance?
3 A  I would need a little clarification
4 around your question in terms of how we are
5 defining teaching proficiency and how we're
6 defining performance.
7 Q  Well, let me ask you from your
8 perspective what is -- what is teaching
9 proficiency on the part of a CRNA?
10    MR. LAND: I just object as vague.
11    BY MS. SIEGEL:
12 Q  You may answer.
13 A  I'm sorry, I didn't hear you.
14 Q  You may answer.  By the way, my voice
15 can get soft.  Don't hesitate to ask me to speak
16 up.
17 A  Mine too.  I sort of talk into my
18 chest sometimes.
19 Q  Do you need the question back?
20 A  No, ma'am.  Thanks.  Teaching
21 proficiency as I understand it, I mean, it goes
22 back to a person's nursing career because nurses
23 spend a lot of time educating patients and their
24 families.

Page 40

1    So I think most nursing schools have
2 content that teaches sort of basic concepts of
3 instruction, communication and then, you know,
4 things like peer education, being a clinical
5 preceptor, you know, of one's unit that those all
6 involve teaching.
7    And in the CRNA role patient education
8 is especially important because most surgical
9 patients today are same-day admissions or
10 out-patients and we are meeting them at the last
11 minute.  So trying to establish a rapport with
12 the patient and their family, discuss the
13 anesthetic options along with the risks and
14 benefits involves a lot of teaching that has to
15 be geared toward the patient, you know, their
16 cultural and other aspects of their background
17 that impact their comprehension.
18    So I think that there is a skill set
19 that nurses and nurse anesthetists have that
20 pertains to teaching.  The unique thing about
21 nurse anesthesia education is that the CRNA's
22 primary responsibility is to the patient and
23 maintaining patient safety.
24 Q  And is teaching proficiency a

Page 41

1 significant factor of CRNA performance with
2 respect to the SRNAs?
3 A  Can you repeat the question?
4    (Record read by the reporter as
5    follows:
6    "Q  And is teaching
7    proficiency a significant
8    factor of CRNA performance
9    with respect to the SRNAs?")
10    THE WITNESS: I'm not following.
11    BY MS. SIEGEL:
12 Q  Okay.  Does it matter how CRNAs teach
13 SRNAs?
14 A  I'm not trying to be difficult, but
15 does it matter to whom?
16 Q  To you as a program director?
17 A  Yes, it matters to me as a program
18 director how CRNAs or anesthesiologists teach
19 SRNAs.
20 Q  And how do you evaluate that teaching
21 proficiency?
22 A  Through clinical instructors'
23 evaluations, through student performance.  If a
24 student, for example, is struggling in a

Maricel Marcial v.

Deposition of Michael Kremer
March 14, 2018

---

Page 42

1 particular clinical setting, we will bring them
2 back to the main medical center to Rush and pair
3 them one to one with CRNAs who are experienced
4 clinical instructors.
5 The -- you know, and I've removed
6 students from clinical sites when I've had
7 concerns about the educational environment
8 including instruction by the anesthesia
9 providers.
10 MR. LAND: Can we take a quick break?
11 MS. SIEGEL: Sure.
12 (Whereupon a recess was taken
13 at 10:12 a.m. and the
14 deposition resumed at 10:32
15 a.m.)
16 BY MS. SIEGEL:
17 Q Dr. Kremer, before the break you were
18 referring to an incident that you witnessed
19 between Miss Wimberly and an SRNA in the
20 endoscopy area; do you recall that?
21 A Yes, ma'am.
22 Q And was that student a person named
23 Hakim Ellis?
24 A No, it was not. It was Sarah Curry.

---

Page 43

1 Q And did you have occasion to witness
2 an interaction between Mr. Ellis and Jill
3 Wimberly?
4 A Not that I recall.
5 Q Was there a dispute between Mr. Ellis
6 and Miss Wimberly regarding whether he had made a
7 telephone call to her?
8 A I have no idea.
9 Q You witnessed no such dispute?
10 A I did not.
11 Q And did Mr. Ellis express to you at
12 any time any objections regarding Miss Wimberly?
13 A Not that I recall.
14 Q Now, of course, you know that Miss
15 Wimberly is a defendant in this matter, right?
16 A Yes, ma'am.
17 Q Have you ever had a CRNA as a
18 defendant in a litigation matter during the time
19 you were director of the CRNA program?
20 MR. LAND: Just object as vague. You're
21 asking if he knows of any CRNA while he's
22 director has been a party to any lawsuit as a
23 defendant?
24 MS. SIEGEL: That's right.

---

Page 44

1 THE WITNESS: Which CRNAs are we talking
2 about?
3 BY MS. SIEGEL:
4 Q Any CRNAs at Rush?
5 A I wouldn't -- I wouldn't know that.
6 Q It never came to your attention?
7 A No, it wouldn't come to my attention.
8 Q Okay. And Miss Wimberly is the only
9 case that you're aware of regarding the CRNAs
10 that you supervised as program director?
11 A I was not Miss Wimberly's supervisor.
12 Mr. Narbone was.
13 Q What were his duties?
14 A Mr. Narbone?
15 Q Yes, as supervisor of the CRNAs?
16 A He was the Chief Nurse Anesthetist and
17 Director of Anesthesiology Operations. He had a
18 wide scope of authority.
19 Q Whom did he report to?
20 A The chair of the anesthesia
21 department.
22 Q Who is that?
23 A Dr. Kenneth Tuman.
24 Q Whom did you report to during the time

---

Page 45

1 that you were program director?
2 A The chair of my department, the Adult
3 Health and Gerontological Nursing Department as
4 well as the Assistant Dean for Specialty
5 Programs.
6 (Discussion outside the
7 record.)
8 BY MS. SIEGEL:
9 Q Dr. Kremer, I am handing you what's
10 previously been marked as Plaintiff's Exhibit 3,
11 and I'm asking you if you recognize this
12 document?
13 A I do.
14 Q And this is the defendants' answer to
15 plaintiff's first set of interrogatories; is that
16 right?
17 A That's right.
18 Q And is that a document that you
19 reviewed in anticipation of this litigation?
20 A I did.
21 Q Okay. And in anticipation of this
22 deposition?
23 A I thought I answered that.
24 Q I said litigation.

---

Maricel Marcial v.

Deposition of Michael Kremer
March 14, 2018

Page 46

1 A  I have reviewed the document.
2 Q  When did you review it?
3 A  Counsel provided it to me some time
4 ago for review and signature.
5 Q  And if you turn to page 13, is that
6 your signature?
7 A  It is.
8 Q  Okay.  Now, after -- Strike that.
9    Miss Marcial took a leave of absence
10 from the CRNA program; isn't that right?
11 A  That's right.
12 Q  And when was that initiated?
13 A  I believe it was --
14 Q  When did it begin, just ask that?
15 A  I believe it was for the fall 2013
16 academic term.
17 Q  And when did she return?
18 A  In January of 2014.
19 Q  And in January of 2014 Miss Marcial
20 was again assigned to Miss Wimberly; is that
21 right?
22 A  She was assigned with Miss Wimberly
23 once in January of 2014.
24 Q  Do you recall the date?

Page 47

1 A  I do not.
2 Q  And when did it come to your attention
3 that Miss Marcial would be working with Miss
4 Wimberly in January of 2014?
5 A  It was probably after the fact that
6 Maricel was assigned with Jill.
7 Q  But before she began the work?
8 A  Before she began what work?
9 Q  Strike that.  The assignment itself
10 occurred on a Friday; do you recall that?
11    MR. LAND: Objection, misstating facts not
12 in evidence.
13    THE WITNESS: As I mentioned earlier, we
14 have up to 72 students in clinical practicum or
15 residency at 10 different clinical sites at any
16 given time.  And I don't see the clinical
17 assignments for each site every day.
18    BY MS. SIEGEL:
19 Q  Did you -- Were you notified several
20 days before -- let's get out the evaluation for
21 that date.
22    (Discussion outside the
23    record.)
24

Page 48

1    (Whereupon said document was
2    marked as Plaintiff's Exhibit
3    Number 11, for
4    identification, dated
5    3/16/18.)
6    BY MS. SIEGEL:
7 Q  Okay.  I've handed you a rather
8 voluminous document here that we have marked as
9 Plaintiff's Exhibit 11.  And if you would take a
10 look at that for a moment and tell me if you
11 recognize that document?
12 A  Does Exhibit 11 refer to all of this
13 in aggregate?
14 Q  Yes.  For the record Plaintiff's
15 Exhibit 11 is compilation of evaluations.  It is
16 Bates numbered Rush 1 through Rush 452.
17    And if you take a look at that, I'm
18 not asking you whether that's all of Miss
19 Marcial's evaluations; but tell me if you
20 recognize what this compilation is?  This is how
21 we received it from the --
22    MR. LAND: I just want to note that this
23 exhibit contains pages marked Rush 1 through 40
24 and then there is a gap.  The next page is Rush

Page 49

1 391.  So there are many pages missing in the
2 sequence in which it was produced.  And it
3 includes documents like the learning contract at
4 page 392 and, I don't know, other materials from
5 2014.  Evaluations near the end.  And the first
6 page is Marcial summative evaluation from 2013.
7    So my point is that this exhibit is a
8 compilation of many documents and it does not
9 contain the sequential numbering as it was
10 produced.  So I don't know what you want the
11 witness to do with respect to clarifying what
12 this is or not, but I want that to be clear on
13 the record.
14    MS. SIEGEL: All right.  Thank you.
15    BY MS. SIEGEL:
16 Q  Why don't we come back to that one.
17 If you would turn, please, to page Rush 96 in
18 that compilation.  You are familiar with that
19 document?
20 A  I have seen it, yes.
21 Q  Can you tell me what that is, please?
22 A  It's an informative clinical
23 evaluation.
24 Q  All right.  And it's dated January

Maricel Marcial v.

Deposition of Michael Kremer
March 14, 2018

Page 50

1  20th of 2014; is that right?
2  A  That's right.
3  Q  And when did you first see this
4  evaluation?
5  A  I don't recall.
6  Q  This is a 2-page document; is that
7  right, numbered pages 96 and 97?
8  A  Yes.
9  Q  Rush numbers 96 and 97.  And that
10 evaluation was performed by Miss Wimberly; is
11 that right?
12 A  Yes.
13 Q  The morning of this procedure -- and
14 can you tell me what the procedure was, please?
15 A  I don't know that the procedure was
16 performed in the morning.
17 Q  All right.  The day of January 20th of
18 2014; can you tell me what that procedure was,
19 please?
20 A  I think there are -- well, there are
21 two procedures listed.  So I don't know if they
22 did do two cases together or if this represents
23 one case.
24      The cases listed are anterior -- looks

Page 51

1  like spine fusion abdominal approach.  And below
2  that is right ankle arthrodesis.  So those could
3  be two different cases or it could be the same
4  patient having two different orthopaedic
5  procedures.
6  Q  And that's not something you can tell
7  from this document from looking at it?
8  A  No, I cannot.
9  Q  Take a moment and look at the comments
10 and see if you can sort out which comments
11 pertain to which procedure?
12 A  Well, the Bates number Rush 97 is cut
13 off at the top.  So I don't have a full set of
14 comments to review.
15 Q  Based on the comments that you have
16 before you, can you sort out which comments
17 pertain to which procedure?
18 A  No.
19 Q  Did you learn that Miss Marcial, and I
20 believe I've asked you before, but perhaps this
21 document refreshes your recollection.  That Miss
22 Marcial would be working with Miss Wimberly on
23 January 20th of 2014 prior to the procedure or
24 procedures that are reflected here?

Page 52

1  A  No.
2  Q  In the course of your work during that
3  time period, you would from time to time go
4  around the hospital; isn't that right?
5  A  I don't understand the question.
6  Q  Was it your practice from time to time
7  to circulate around the operating area to observe
8  the work of the CRNAs and the SRNAs?
9  A  I made rounds on a regular basis and
10 the perioperative areas.
11 Q  I'm sorry, in the perioperative?
12 A  Perioperative areas.
13 Q  Okay.  Can you explain for the record
14 what the perioperative areas are, please?
15 A  Sure.  The preoperative holding area,
16 operating rooms and procedure rooms and
17 postanesthesia recovery areas.
18 Q  And why did you make rounds?
19 A  I made rounds to be visible as the
20 program director, to talk to staff about any
21 issues that might be impacting students, to
22 occasionally observe cases and to pick up student
23 evaluations which are deposited in a locked box
24 in the -- in an area on the five tower operating

Page 53

1  room.
2  Q  And when you make rounds do you
3  typically have someone with you?
4  A  When I make rounds it's really just me
5  making rounds.
6  Q  And so as I understand it, you don't
7  have any recollection of seeing Miss Marcial and
8  Miss Wimberly working together on the day of
9  January 20th of 2014?
10 A  I do not.
11 Q  Is this a kind of case where a --
12 where the CRNA or the SRNA would ordinarily order
13 blood to be available in the operating room?
14 A  If it was indicated, yes.
15 Q  What would cause it to be indicated?
16 A  The potential for significant blood
17 loss that is engendered by a transabdominal
18 approach to the spine where surgeons are going to
19 be working in close proximity to great vessels.
20 Q  And do you have an opinion regarding
21 the risk of the type of procedure that's
22 indicated here, the anterior --
23      MR. LAND: Just object as vague.
24      THE WITNESS: I'm not following.  Risk in

Maricel Marcial v.

Page 54

1  what regard?
2     MS. SIEGEL: Could you have a -- Could you
3  read the question back, please.
4     (Record read by the reporter as
5     follows:
6     "Q  And do you have an opinion
7     regarding the risk of the type
8     of procedure that's indicated
9     here, the anterior --")
10    BY MS. SIEGEL:
11 Q  Do you have an opinion regarding the
12 risk of excessive bleeding in the type of
13 procedure, the anterior abdominal approach, to
14 the spine?
15 A  There is a significant risk of major
16 blood loss with a procedure like this.
17 Q  And what is the basis of that opinion?
18 A  As stated earlier, the proximity of
19 the aorta, the vena cava, iliac arteries, to the
20 surgical field and the potential for surgeons to
21 inadvertently nick or even transect one of those
22 vessels. And even absent major vascular trauma,
23 the nature of the wound itself and
24 instrumentation of the spine can also produce

Page 55

1  significant bleeding.
2  Q  And would you anticipate that the
3  surgeons would also have an awareness of the risk
4  of excessive bleeding based on the factors that
5  you've indicated?
6  A  The surgeons would have an awareness
7  of the potential for bleeding, but surgeons
8  notoriously underestimate how much blood they may
9  lose, they have lost, as well as how long their
10 procedures take.
11 Q  And you state that surgeons are
12 notorious for this underestimation of these risk
13 factors?
14 A  I think it's fairly common based on 35
15 years of clinical practice, yes.
16 Q  Are you -- When you say it's
17 notorious, is that your opinion that you're
18 talking about?
19 A  I am expressing it as my opinion, yes.
20 Q  And when you're saying that it's
21 notorious, you're not referring to a general
22 reputation that surgeons have for being unable to
23 anticipate how much blood might be needed?
24    MR. LAND: Can you read that question back.

Page 56

1     (Record read by the reporter as
2     follows:
3     "Q  And when you're saying
4     that it's notorious, you're
5     not referring to a general
6     reputation that surgeons have
7     for being unable to anticipate
8     how much blood might be
9     needed?")
10    MR. LAND: Object, it's mischaracterizing
11 his testimony and the form of the question is
12 vague.
13    MS. SIEGEL: Let me rephrase it.
14    BY MS. SIEGEL:
15 Q  Dr. Kremer, when you say that surgeons
16 are notorious for underestimating how much blood
17 might be needed, how much bleeding might be
18 occurred and how much blood might be needed; are
19 you stating that that's a general reputation that
20 surgeons have?
21 A  To be more precise some surgeons are
22 more likely than others to underestimate how much
23 blood they may lose or they have lost which is
24 why it's incumbent on anesthesia providers to be

Page 57

1  prepared for any contingency.
2  Q  And, Dr. Kremer, would that
3  preparation involve blood typing for example?
4  A  Yes.
5  Q  And is there some kind of procedure
6  that one would expect to be performed in order to
7  prepare for this anterior abdominal approach
8  spinal procedure?
9  A  Probably a minimum of type and screen
10 and there are people who would probably even want
11 to have a couple of units of blood typed and
12 crossmatched.
13 Q  And where would that blood be, in the
14 blood bank?
15 A  I'm not following.
16 Q  Okay. Where would those units, the
17 units that were typed and crossmatched,
18 physically where would they be?
19 A  Well, there is a central blood bank
20 and then there are satellite blood banks in the
21 operating room.
22 Q  And for this type of procedure where
23 would you anticipate that they would be?
24 A  If blood is typed and crossmatched, it

Maricel Marcial v.

Deposition of Michael Kremer
March 14, 2018

---

Page 58

1 should be in the satellite blood bank.
2 Q   And when would such arrangements be
3 made?
4 A   It may be indicated on the surgical
5 schedule.  Surgeons may have placed orders for
6 type and screen or type and cross.  Failing
7 either of those there would be a discussion
8 perhaps between the anesthesia team and the
9 surgical team, but the anesthesia team would have
10 the prerogative of having blood available if they
11 felt it was indicated.
12 Q   Did you have a discussion with Miss
13 Marcial about the January 20th, 2014, evaluation?
14 A   Probably at some point after the
15 evaluation was submitted.
16 Q   Do you have a recollection of it?
17 A   I do not.
18 Q   Did you have a discussion with Miss
19 Wimberly about it?
20 A   I don't recall.
21     MS. SIEGEL: Now, mark this as the next
22 exhibit, please.
23
24

---

Page 59

1     (Whereupon said document was
2     marked as Plaintiff's Exhibit
3     Number 12, for identification,
4     dated 3/16/18.)
5     BY MS. SIEGEL:
6 Q   Dr. Kremer, we have marked a document
7 here.  Actually, it's already in evidence, but
8 I've marked it for your convenience as
9 Plaintiff's Exhibit 12.
10     And you've mentioned that you spoke
11 with Mr. Narbone from time to time concerning
12 Miss Wimberly's contact with Miss Marcial.  Is
13 that the only time -- Strike that.
14     Did you not also have a conversation
15 with Miss Marcial and Mr. Narbone regarding her
16 continuation in the program in October of 2013?
17 A   Yes.
18     MR. LAND: Just object to the form of the
19 question.  You struck something and then said did
20 you also have such a conversation, so I object to
21 the form.
22     BY MS. SIEGEL:
23 Q   You may answer.
24 A   I answered.

---

Page 60

1 Q   Okay.  And your answer is, yes, you
2 did have such a discussion?
3 A   Yes, ma'am.
4 Q   So first Miss Marcial came to speak
5 with you at your office; is that right?
6 A   I believe that's right.
7 Q   And that was approximately October
8 24th of 2013?
9 A   I don't have that in evidence in front
10 of me.  I couldn't say.
11 Q   All right.  But you do recall that in
12 October of 2013 you had a conversation with Miss
13 Marcial about her return?
14 A   Yes.
15 Q   From her leave of absence, right?
16 A   Yes.
17 Q   And she came was it to your office?
18 A   She may have.  I don't have an
19 explicit memory.
20 Q   Before you met with Mr. Narbone, was
21 anyone else present in your office when you began
22 speaking with Miss Marcial?
23     MR. LAND: Just object to the form of the
24 question.  He just said he doesn't recall whether

---

Page 61

1 he was in his office talking with Maricel.
2 Object to the form.
3     BY MS. SIEGEL:
4 Q   All right.  You may answer.
5 A   I think it's unlikely that there was
6 anyone else involved in the conversation that
7 you've mentioned except Mr. Narbone and me
8 because Dr. Wiley was on an Army deployment
9 overseas at the time.
10 Q   And as well as you can recall, what
11 transpired during that meeting that you had with
12 Miss Marcial in October of 2013 about her
13 returning from her leave of absence?
14 A   I think when she and I talked we
15 touched on what she had been doing during her
16 leave in terms of stress management as well as
17 observing some OR cases at Lutheran General and I
18 think somewhere in Wisconsin.
19     And then I wanted to involve Mr.
20 Narbone in the conversation since he controlled
21 all the clinical assignments to just kind of
22 review that Maricel would be coming back in
23 January and just hoping that we would all, you
24 know, get on the same page in terms of what the

---

Maricel Marcial v.

Deposition of Michael Kremer
March 14, 2018

Page 62

1 expectations would be.
2 Q  And before we get on to that meeting,
3 what were your expectations of Miss Marcial's
4 work when she returned from her LOA?
5 A  They were codified in the learning
6 contract that Miss Marcial and I signed.
7 Q  Did you have other expectations going
8 beyond that contract?
9 A  I think the contract is very detailed.
10 Q  And Miss Marcial had wanted to include
11 some provisions to insure a lack of
12 discrimination; isn't that right?
13 A  Yes.  As I understand that
14 conversation was recorded, and my best
15 recollection of the conversation was that there
16 was a request made for a guarantee of fair
17 treatment and that was in a meeting with Dr. Mary
18 Johnson, the Assistant Dean and myself.
19      And Dr. Johnson said that's not
20 something that can be measured and noted that
21 students who were in jeopardy often perceive
22 themselves as not being treated fairly.  So that
23 language wasn't added to the contract.
24 Q  Well, would you agree with Dr. Johnson

Page 63

1 that bias is in the eye of the beholder?
2      MR. LAND: Just object as
3 mischaracterizing --
4      THE WITNESS: Doesn't characterize --
5      MR. LAND: -- his testimony.
6      THE WITNESS: -- that conversation at all.
7      BY MS. SIEGEL:
8 Q  All right.  So you -- After you spoke
9 with Miss Marcial in your office, then you went
10 to Mr. Narbone's office; is that right?
11 A  Are we referencing October of 2013?
12 Q  I'm talking about October of 2013,
13 that's right.
14 A  Yes, we did.
15 Q  And Mr. Narbone was expecting you?
16 A  Yes, he was.
17 Q  And he was waiting for you.  And what
18 occurred?
19 A  We had a conversation about Maricel's
20 return to the operating room in January, the plan
21 to return to the operating room in January of
22 2014.
23 Q  Didn't Mr. Narbone ask Miss Marcial
24 why she wanted to be a nurse anesthetist?

Page 64

1 A  He may have.  I don't have an explicit
2 recall of that conversation as your client does.
3 Q  And do you have a recollection that
4 she indicated that she had a passion for critical
5 care nursing?
6 A  I don't recall.
7 Q  Do you recall Mr. Narbone talking
8 about whether or not that aspiration of Miss
9 Marcial was a fit with the Rush program?
10 A  He may have said something to that
11 effect.
12 Q  Do you recall him saying that she was
13 like a square peg in a round hole?
14 A  I don't recall that specific
15 statement.
16 Q  Do you recall him saying that she is
17 pushing the envelope?
18 A  I don't recall that specific
19 statement.
20 Q  How about that she couldn't force it,
21 that it had to be a natural fit?
22 A  I don't recall that specific
23 statement.
24 Q  Do you recall any general statements

Page 65

1 along those lines that Miss Marcial didn't fit
2 in?
3      MR. LAND: Object as mischaracterizing the
4 prior statements.  You can answer.
5      THE WITNESS: I wouldn't characterize the
6 statements as indicating that Miss Marcial
7 wouldn't fit.
8      BY MS. SIEGEL:
9 Q  Did Mr. Narbone say that he expected
10 that she was going to be coming back to inform
11 the two of you that she would be dropping out in
12 the program?
13 A  Can you repeat the question?
14 Q  Sure.  Do you recall Mr. Narbone
15 saying words to the effect that he assumed that
16 Miss Marcial was going to be dropping out of the
17 program?
18 A  I don't recall that, no.
19 Q  Or that he was surprised that she was
20 still around?
21 A  I don't recall that.
22 Q  Do you recall him saying that another
23 CRNA had heard that she was planning to return
24 and said that -- expressed disappointment?

Maricel Marcial v.

**Deposition of Michael Kremer**
**March 14, 2018**

---

Page 66

1  A  I don't recall that.
2  Q  Do you think that if Mr. Narbone had
3  said that, something to the effect that the CRNA
4  program wasn't a fit for her; do you think that
5  she would have -- do you think you would have
6  recalled it?
7    MR. LAND: Object as calling for
8  speculation.
9    BY MS. SIEGEL:
10  Q  You may answer.
11  A  I don't recall.
12  Q  Do you have any recollection of a
13  warning -- a warning to Miss Marcial that if she
14  tried to apply to another program, that --
15  another anesthesia program, that they would --
16  that you would have to talk about her poor
17  performance at Rush?
18  A  I don't understand who that statement
19  is attributed to.
20  Q  Well, was that statement made in that
21  October meeting?
22  A  Not by me.
23  Q  Do you recall Mr. Narbone making a
24  statement to that effect?

---

Page 67

1  A  No, I don't.
2  Q  Do you recall him speaking with her
3  about how she would react if she were in a
4  situation in the OR where a child had a cardiac
5  arrest?
6  A  I do not.
7  Q  Do you recall any discussion with her
8  about the stressful nature of anesthesia
9  practice?
10  A  A discussion initiated by whom?
11  Q  Any discussion in the course of that
12  October -- that October 2013 meeting with you and
13  Mr. Narbone and Miss Marcial?
14  A  It may have been discussed.
15  Q  Do you recall anything about it?
16  A  I do not.
17  Q  Do you recall any discussion about
18  whether Miss Marcial were emotionally fit to
19  serve as a CRNA?
20  A  I don't recall statements like that
21  being made.
22  Q  No, I was asking generally about
23  whether there were a discussion of her emotional
24  fitness to continue in the program?

---

Page 68

1    MR. LAND: Just object to the form of the
2  question as argumentative. Starting with no and
3  telling him that's not what you want him to say
4  is the implication because he answered your
5  question. That's why I am --
6    MS. SIEGEL: Mr. Land, I said no in terms of
7  the question to clarify what the question was.
8    MR. LAND: I am just stating it for the
9  record. You are challenging his answer instead
10  of asking him another question.
11    MS. SIEGEL: Let's have the question back.
12  That's not correct.
13    (Record read by the reporter as
14    follows:
15    "Q  No, I was asking generally
16    about whether there were a
17    discussion of her emotional
18    fitness to continue in the
19    program?")
20    BY MS. SIEGEL:
21  Q  Do you understand the question?
22  A  What is the question?
23  Q  Was there a discussion at the October
24  2013 meeting with Mr. Narbone and Ms. Marcial and

---

Page 69

1  yourself regarding her emotional fitness to
2  continue in the program?
3  A  I don't recall.
4  Q  Do you recall any discussion about her
5  emotional fitness to enter the profession of the
6  CRNA?
7  A  I don't recall.
8  Q  Do you recall any discussion about
9  whether she could handle herself in stressful
10  situations having come out of an ICU background
11  for many years?
12  A  I don't remember a question being
13  asked that was constructed in that manner.
14  Q  Do you recall making a statement to
15  the effect that Miss Marcial had been a nurse for
16  so long that this was a whole different challenge
17  to go into the CRNA field?
18  A  During the October 2013 meeting?
19  Q  During the October 2013 meeting,
20  that's right.
21  A  I may have made a statement to that
22  effect.
23  Q  As you sit here today do you think
24  that's true?

---

Maricel Marcial v.

Deposition of Michael Kremer
March 14, 2018

Page 70

1 A  Do I think what's true?
2      MS. SIEGEL: Can we have the question --
3  prior question back, please.
4      (Record read by the reporter as
5      follows:
6      "Q  Do you recall making a
7      statement to the effect that
8      Miss Marcial had been a nurse
9      for so long that this was a
10      whole different challenge to
11      go into the CRNA field?")
12      BY MS. SIEGEL:
13 Q  As you sit here today do you think
14 that's true?
15 A  It's challenging for any nurse to
16 become a CRNA.
17 Q  Did you think that it was a particular
18 challenge for Miss Marcial because she had been a
19 nurse for many years before applying to your
20 program?
21 A  I may have said something to that
22 effect, but I don't explicitly recall that
23 conversation.
24 Q  Did Mr. Narbone to your recollection

Page 71

1 make a statement to the effect that were Miss
2 Marcial to return, she could expect the CRNAs to
3 be rougher on her than they had been in the past?
4 A  I don't remember a statement to that
5 effect being made.
6 Q  Do you remember them -- Strike that.
7      Do you remember Mr. Narbone making a
8 statement to the effect that when she came back
9 that the CRNAs would look at her differently?
10 A  He may have said something to that
11 effect.
12 Q  Do you recall him saying something to
13 the effect that if he asked the CRNA's at Rush
14 about her return, that they would vote not to
15 have her return?
16 A  I don't remember him saying anything
17 like that.
18 Q  Did you make a statement that you had
19 met with the CRNAs that week and many of them
20 showed some skepticism about whether Miss Marcial
21 should return?
22 A  I don't recall.
23 Q  Did he say that it would be more than
24 an uphill battle for her?

Page 72

1 A  He may have said something to that
2 effect.
3 Q  Do you have a more specific
4 recollection as to what he may have said about an
5 uphill battle?
6 A  No, I didn't create a transcript of
7 his conversation so I don't have explicit recall
8 of it.
9 Q  Did someone make a transcript of it?
10 A  Your client seems to have very
11 explicit recall of what was discussed.
12 Q  Have you reviewed what her
13 recollection was?
14 A  I didn't hear the question.
15 Q  Have you reviewed what her
16 recollection was?
17 A  I don't think I had access to that
18 documentation.
19 Q  Did Mr. Narbone make a statement to
20 the effect that if she made a mistake, that the
21 CRNAs would look at it with more skepticism than
22 when she first began her work?
23 A  I don't recall.
24 Q  Do you recall a discussion about the

Page 73

1 gap between the SRNAs and her cohort how far
2 ahead of her they would be upon her return?
3 A  Does this question also pertain to the
4 meeting that Maricel and I had with Mr. Narbone
5 in October of '13?
6 Q  Yes.
7 A  I don't remember that.
8 Q  Do you remember a discussion like that
9 at any time?
10 A  No, I don't.
11 Q  Did he say anything about the kind of
12 example that she would be setting?  And by he I
13 mean Mr. Narbone.
14      Did he say anything about the kind of
15 example he would be setting if he allowed her to
16 come back?
17 A  It wasn't his decision to allow her to
18 come back, so I don't know what the context for
19 that question would have been.
20 Q  Whose decision would it be, your's?
21 A  The nurse anesthesia program.
22 Q  Okay.  Who would effectively make that
23 decision?
24 A  Well, following a grade of withdraw

Maricel Marcial v.

Deposition of Michael Kremer
March 14, 2018

Page 74

1 nonpassed, the College of Nursing Progressions
2 Committee would grant permission to repeat the
3 course and the program would implement that.
4 Q   Did Mr. Narbone express in that
5 October 2013 meeting a view that her return would
6 lower the high standards of the Rush program?
7 A   Not that I remember, no.
8 Q   Did Mr. Narbone in that October 2013
9 meeting say something to the effect that if she
10 -- Strike that.
11     Did he make a statement to the effect
12 that if she waited to flunk out, that you're just
13 looking at the inevitable?
14 A   I don't know what that means and I
15 don't recall a statement to that effect.
16 Q   Okay. Did he say, I'm going to tell
17 you I told you so if she flunked out?
18 A   He may have said something to that
19 effect.
20 Q   What's your best recollection of what
21 he said?
22 A   My best recollection is that Mr.
23 Narbone may have made a statement of -- to that
24 effect.

Page 75

1 Q   Did he say that he didn't suppose that
2 Miss Marcial was the youngest in her class?
3 A   I don't recall.
4 Q   Did he ask her why she would waste her
5 time doing something that would make her
6 miserable?
7 A   I don't remember a statement like
8 that.
9 Q   Did he suggest that she find out where
10 she could be truly successful and try to be
11 happy?
12 A   He may have said something to that
13 effect.
14 Q   Do you recall that he made a statement
15 to that effect?
16 A   He may have made a statement to that
17 effect.
18 Q   Did Mr. Narbone say that when Miss
19 Marcial -- Strike that.
20     Did he make a statement to the effect
21 that if Miss Marcial graduated, that he would
22 like to get an invitation?
23 A   I have no recall of a statement to
24 that effect.

Page 76

1 Q   Was Miss Marcial upset by that
2 meeting?
3 A   Yes, she was.
4 Q   How could you tell?
5 A   If I remember she was tearful.
6 Q   Did you say anything during that
7 meeting?
8 A   Yes.
9 Q   What did you say?
10 A   I don't recall.
11 Q   Did you say anything to Miss Marcial
12 that day after you left the meeting?
13 A   I think I apologized for the tone of
14 the meeting and wanted to encourage her to think
15 positively about the future and about coming
16 back.
17 Q   Why did you apologize about the tone
18 of the meeting?
19 A   Because Miss Marcial was upset.
20 Q   Did you see anything going on that
21 would make her upset?
22 A   No, I didn't see anything going on
23 that would have made her upset.
24 Q   Did you hear anything that would make

Page 77

1 her upset?
2 A   Mr. Narbone can be kind of blunt at
3 times and he may have said things that were
4 upsetting to Miss Marcial.
5 Q   Did you agree with what he was saying?
6 A   No.
7 Q   What didn't you agree with?
8 A   I don't have a transcript of that
9 meeting in front of me.
10 Q   Based on your recollection is there
11 anything that was said at the meeting that you
12 don't agree with?
13 A   I don't recall.
14 Q   Did you make any notes of that
15 meeting?
16 A   I don't recall.
17 Q   Had you made notes where would you
18 have kept them?
19 A   I didn't hear the question.
20 Q   Where would you have kept the notes
21 had you made any?
22 A   In the student's file.
23 Q   Did you have a file for Miss Marcial?
24 A   All students have a file.

Maricel Marcial v.

**Deposition of Michael Kremer**
**March 14, 2018**

Page 78

1 Q  Did you have a file that you
2 maintained for Miss Marcial?
3 A  Miss Marcial and all the other nurse
4 anesthesia students have files that are kept in
5 locked cabinets.
6 Q  Where are they?
7 A  The exact location is room 1060F at
8 the Armour Academic Facility of Rush University
9 Medical Center that's located at 600 South
10 Paulina Street in Chicago.
11 Q  Thank you.  And where is it with
12 reference to your office?
13 A  Down the hall and around the corner.
14 Q  Are you the person that maintains that
15 file?
16 A  I am not.
17 Q  Who does?
18 A  Our program assistant.
19 Q  And had you made a note on that
20 meeting, would it have become part of Miss
21 Marcial's permanent record?
22 A  It may have.
23 Q  Did you have any other files where you
24 kept notes on student issues?

Page 79

1 A  The student files, they're a
2 repository for any notes about student issues.
3 Q  After that October meeting did you
4 tell Miss Marcial that it would be more an
5 uphill battle were she to return?
6 A  I don't recall.
7 Q  Did you say anything to the effect of
8 we just want you to be happy?
9 A  I may have said something to that
10 effect.
11 Q  Did you tell her to just try to find
12 her happiness?
13 A  I may have said something to that
14 effect.
15 Q  And did you think that she would find
16 happiness practicing as a CRNA?
17 A  I couldn't say.
18 Q  Did you have an opinion at the time as
19 to whether that would be a source of happiness
20 for her were she to return?
21 A  I knew Miss Marcial very much wanted
22 to become a CRNA.
23 Q  Did you think she was a good fit?
24     MR. LAND: Object as vague.

Page 80

1     BY MS. SIEGEL:
2 Q  You may answer.
3     MR. LAND: Did she fit in the chair?  Did
4 she fit in the room?  That's a very vague
5 question.
6     BY MS. SIEGEL:
7 Q  You may answer.
8 A  She met the admissions criteria for
9 the program, and her academic performance and
10 initial clinical performance was satisfactory.
11     MS. SIEGEL: Why don't we take a short break
12 here.
13     (Whereupon a recess was taken
14     at 11:29 a.m. and the
15     deposition resumed at 11:43
16     a.m.)
17     (Whereupon said document was
18     marked as Plaintiff's Exhibit
19     Number 13, for identification,
20     dated 3/16/18.)
21     BY MS. SIEGEL:
22 Q  Dr. Kremer, you've been handed what's
23 been marked as Plaintiff's Exhibit 13, and take a
24 moment to familiarize yourself with that.  Tell

Page 81

1 me if you recognize that document?
2 A  This appears to be the response I
3 submitted to the complaint that you and your
4 client submitted to the Council on Accreditation,
5 Nurse Anesthesia Educational Programs.
6 Q  And did you draft any portions of
7 Plaintiff's Exhibit 13?
8 A  I drafted all of it with input from
9 our Office of Legal Affairs and reviewed by my
10 direct reports in the college of nursing.
11     MR. LAND: Just advise you not to talk about
12 communication with counsel.
13     BY MS. SIEGEL:
14 Q  Yes.  And none of my questions are
15 intended to elicit privileged communications that
16 you had with your legal counsel whether outside
17 counsel or inhouse counsel.  And so please do not
18 divulge those conversations.
19     And who were the direct reports you
20 consulted to prepare the documents?
21 A  I sent drafts of the document that I
22 prepared to Dr. Rose Suhaypa, the Director of
23 Accreditation for our college now the entire
24 university. Dr. Mary Johnson, the Assistant Dean

Maricel Marcial v.

Deposition of Michael Kremer
March 14, 2018

Page 82

1 I report to. And Dr. Mark Foreman, the Dean of
2 the College of Nursing.
3 Q And how did you go about preparing
4 this report, this response let's call it?
5 A I was given six weeks to prepare a
6 response to the complaint; and I wrote narratives
7 and found supporting exhibits, documentation and
8 data.
9 Q Who else was involved in the drafting
10 if anyone?
11 A I drafted the response.
12 Q What's the COA?
13 A The Council on Accreditation of Nurse
14 Anesthesia Educational Programs.
15 Q And what's its function?
16 A To insure quality improvement, quality
17 assessment of nurse anesthesia programs
18 consistent with their accreditation standards.
19 Q And in your role as program director,
20 was it your function to monitor compliance with
21 accreditation standards?
22 A Yes, it was.
23 Q Do you have a -- Strike that.
24     During the time period of 2012 through

Page 83

1 2015, did you have a position with the COA?
2 A I was an elected Director of the
3 Council on Accreditation between 2005 and 2012 or
4 2006 and 2012.
5 Q How did you get elected to the
6 directorship?
7 A In my case a sitting president of our
8 national organization submitted my name for
9 consideration and then the members of the council
10 vote.
11 Q Who were the members of the COA?
12 A Who were the members?
13 Q Who are the members generically, not
14 by name?
15 A Generically CRNA practitioner, CRNA
16 educator, hospital administrator, university
17 administrator, public member, student.
18 Q And do they also -- Strike that.
19     Are those members also chosen by an
20 election process?
21 A They are. I'm trying to remember if
22 -- I think the process may be a bit different for
23 how the student is selected, but the other
24 directors' names appear on the ballot and the

Page 84

1 current members of the council vote on the
2 ballot.
3 Q And is anyone else from Rush involved
4 directly with the COA?
5 A Not as a sitting council member.
6 Dr. Wiley and I have both been onsite reviewers
7 for the COA for over 20 years.
8 Q Do you still perform that function?
9 A I am still eligible to perform that
10 function, but I am not planning to continue doing
11 that. My eligibility runs out I think in
12 September.
13 Q Of 2018?
14 A Yes, ma'am. 2018.
15 Q What was the date that you submitted
16 Plaintiff's Exhibit 13 to the COA?
17 A I don't have that in evidence. It was
18 in advance of whatever the submission deadline
19 was.
20 Q Thank you. Now, once they've
21 completed the didactic component of the CRNA
22 program at Rush, how are the students graded?
23 A For clinical courses that would be a
24 pass, fail grade. And there in the master's

Page 85

1 curriculum there was a capstone during the final
2 term. There was a letter grade for the capstone.
3 Q Did Miss Marcial submit a capstone?
4 A She did.
5 Q What was the letter grade?
6 A I don't recall.
7 Q And how are the -- In the pass, fail
8 component of the clinical work, how are the CRNAs
9 evaluated?
10 A The CRNAs aren't evaluated.
11 Q I'm sorry, the SRNAs. I misspoke.
12 A They're evaluated using a formative
13 evaluation tool.
14 Q And then is there also a summative
15 evaluation that they reach, that they receive?
16 A Yes, there is a summative evaluation
17 that's generated at the end of each academic
18 term.
19 Q In the 2013 and 2014 time period, what
20 were the academic terms?
21 A The college of nursing was
22 transitioning from academic -- 10-week academic
23 quarters to 15-week basically semesters in that
24 timeframe. So for our last master's cohort we

Maricel Marcial v.

Page 86

1 had to completely reorganize the curriculum to
2 follow the new calendar and --
3 Q   The semester calendar?
4 A   Yes, and I believe the semester
5 calendar took effect in 2014.
6 Q   When in 2014?  I'm asking to get a
7 sense of how you move from the -- from quarters
8 to semesters?
9 A   There was a transition year and it's
10 kind of a blur because we admitted our final
11 master's cohort in June of 2012 and our first DNP
12 cohort in September of 2012.  And the change to
13 -- now I'm trying to remember when exactly the
14 change in academic terms occurred.  We may have
15 -- we may have been on semesters by the 2013-2014
16 timeframe.
17 Q   Thank you.  Who does the summatives?
18 A   Our core faculty members.  So they're
19 done by four or five of the CRNA faculty.
20 Q   And in the 2013-2014 period, who would
21 that include?
22 A   Myself, Dr. Wiley, Dr. Przygodzka.
23 Q   Can you spell that for the court
24 reporter?

Page 87

1 A   Yes, ma'am.  P-r-z-y-g-o-d-z-k-a.  Mr.
2 Keith Marino would have been another one who was
3 involved in writing summative evaluations.
4 Q   Anyone else?
5 A   We had two other part-time faculty
6 members who were with us around that time; Susan
7 McMullan, M-c-M-u-l-l-a-n, and Sherwin Samson,
8 S-a-m-s-o-n.  I can't say for sure if they wrote
9 summative evaluations in that timeframe, but they
10 were also part-time academic faculty.
11 Q   And are MDs and CRNAs both competent
12 to do evaluations of SRNAs?
13 A   Yes.
14 Q   In preparing a summative evaluation,
15 do you weigh one type of evaluation more than the
16 other as MDs versus CRNAs?
17 A   No, we're grateful for any of them
18 that we get.
19 Q   And how many are the students supposed
20 to submit?
21 A   At least 2 per week.  So now we have
22 14 weeks of instruction and 1 week for exams.  So
23 minimum of 28 per term.
24 Q   And is there any other means besides

Page 88

1 evaluations by which you grade or judge student
2 performance, SRNA performance?
3 A   Does the question relate to clinical
4 performance?
5 Q   Yes.
6 A   The evaluations are the main source of
7 data for evaluating student performance.  And the
8 meetings with clinical instructors that we have
9 periodically also can help with that.
10 Q   And in what role do the meetings with
11 clinical instructors play in evaluating student
12 work?
13 A   Those meetings help verify and clarify
14 what is submitted in the formative evaluations or
15 they may be feedback that isn't reflected in
16 formative evaluations that comes up at those
17 meetings.
18 Q   And so are the meetings with the
19 clinical instructors, are those -- are you
20 talking about individual meetings or organized
21 meetings of the instructors?
22 A   They're organized like bimonthly
23 meetings.
24 Q   And who attends them?

Page 89

1 A   Any of the clinical instructors who
2 are available and now the Chief CRNA attends them
3 as well.
4 Q   You say now the Chief CRNA attends.
5 When did the Chief CRNA start attending those
6 meetings?
7 A   Well, Mr. Narbone's successor, Jim
8 Miller, is the Chief CRNA, so he attends those
9 meetings as well.
10 Q   And how did Jim Miller become the
11 Chief?
12 A   I really don't know.  That was a
13 process that was internal to the Department of
14 Anesthesia.
15 Q   Were you involved in the choice?
16 A   No.
17 Q   And, now, students are expected to
18 have two evaluations a week.  May they submit
19 more?
20 A   They may submit more and we strongly
21 encourage them when they're starting out to try
22 to get an evaluation every day.  We -- as you've
23 seen we have mostly paper-based evaluations.
24 Some are electronic, but the turnaround process

Maricel Marcial v.

Page 90

1 can be a little long sometimes from, you know,
2 when a student hands out an evaluation to when
3 it's returned. So and some don't get returned.
4 So it's really helpful to have a robust number of
5 evaluations so that faculty have the best
6 representation of how performance has been
7 trending.
8 Q Did you do anything to control the
9 accuracy of evaluations speaking generally?
10 A I don't understand the question.
11 Q Strike that. Let's talk for another
12 couple minutes about these departmental meetings,
13 these bimonthly departmental meetings.
14     So they were attended by the people
15 that were in the hospital on that date, is that
16 typically the way that the attendance worked?
17 A Yes, that's right.
18 Q And it wasn't a requirement?
19 A No.
20 Q Were there any specific number -- was
21 there any specific number of meetings that they
22 were expected to attend?
23 A No.
24 Q And what was discussed at those

Page 91

1 meetings?
2 A The focus of those meetings was -- and
3 I mentioned earlier it's a longstanding practice
4 in the program to have regular, we call it,
5 clinical competence review. So we have a minimum
6 of 48 students who are clinically deployed at
7 given times. Sometimes more. So we have maybe
8 45 minutes to meet. So it's difficult to cover
9 -- cover each of them in detail.
10     But the idea is to get a sense of how
11 things are trending for individual students and
12 at certain times of the year to determine when
13 faculty feel they're able to work without
14 one-on-one continuous supervision.
15 Q And can you -- can you give an example
16 of the kind of discussion that you would have
17 about a student in this competency review?
18 A We have composite pictures of the
19 cohort on the table and we basically go down the
20 list in alphabetical order and say has anybody
21 worked with Mike Kremer. If they have, they'll
22 speak up or they'll say, no, I haven't seen him
23 for a while. If it's something that looks like
24 it may take a little more time to discuss, then

Page 92

1 we take that offline.
2     But the idea is just to get overall
3 trends with individual student performance and
4 get a sense of who is doing really well, who is
5 at about where they are expected to be, you know,
6 for their level of training and who may need more
7 support.
8 Q And you say that you took it offline,
9 were the meetings online somehow?
10 A Oh, I was using a figure of speech
11 there just meaning that if an attendee had
12 specific concerns that they might want to discuss
13 in more detail, I would talk to them privately
14 after the meeting or at some other mutually
15 convenient time.
16 Q So you had -- you had composite
17 pictures of the cohort on the table. Do you mean
18 that you had evaluations that were spread on the
19 table?
20 A No, I mean a composite picture,
21 photographs of each cohort. Because we have so
22 many students, people can't always remember names
23 and faces.
24 Q I see. And, I'm sorry, I'm just

Page 93

1 trying to visualize this.
2 A Right. Right.
3 Q So the pictures are on the table. So
4 you would point to a picture say of, oh, Miss
5 Marcial and say, has anybody worked with her; is
6 that how it would go?
7 A The pictures are there for reference.
8 I'm going down a list in alphabetical order.
9 Q I see. And so if somebody didn't
10 recognize a name --
11 A I'm sorry.
12 Q I'm sorry, I'm just trying to get the
13 picture. The pictures had the names on them?
14 A Uh-huh.
15 Q Okay. I understand. About how much
16 time would be devoted to each student?
17 A Well, given the time constraints, I
18 mean, a minute. And there were times we had
19 program business to discuss too as far as, you
20 know, if we were adding a new clinical site or
21 something like that that I would try to sandwich
22 in at the end.
23 Q Okay. And then were recordings made
24 of those meetings?

Maricel Marcial v.

Deposition of Michael Kremer
March 14, 2018

---

Page 94

1 A   Not to my knowledge.
2 Q   Were minutes kept?
3 A   Yes, minutes were kept.
4 Q   Who kept them?
5 A   Either Dr. Wiley or me.
6 Q   And were the minutes circulated to the
7 clinical faculty?
8 A   No, they were not.
9 Q   Were they circulated to anybody?
10 A   No.
11 Q   Were the CRNAs regarded as
12 gatekeepers?
13 A   Regarded by whom as gatekeepers?
14 Q   Did the program regard the CRNAs as
15 gatekeepers, the program administration?
16 A   No.
17 Q   Have you ever heard the term used?
18 A   I have.
19 Q   In connection with CRNA evaluations of
20 students?
21 A   Not in that context, no.
22 Q   Have you heard it in the context of
23 the functioning of the CRNA program at Rush?
24 A   I'm not following.  I'm sorry.

---

Page 95

1 Q   Well, you said that you -- I'm trying
2 to get a -- the context of the term gatekeeper.
3 You said, of course, you've heard the terms.
4 We've all heard the term, but what I'm asking is
5 whether that term is something that's come up in
6 the context of administering the CRNA program?
7 A   Not to my recollection, no.
8 Q   In the functioning of the CRNA
9 program, have you heard that term used,
10 gatekeeper?
11     MR. LAND: Object as asked and answered.
12 BY MS. SIEGEL:
13 Q   Now, I was talking -- speaking more
14 generally the functioning of the CRNA program?
15     MR. LAND: That's what you asked him before.
16     THE WITNESS: Not that I -- no.
17 BY MS. SIEGEL:
18 Q   All right.  Is there anything that you
19 do to calibrate, I guess you would say, the CRNA
20 evaluations of the SRNAs?
21     MR. LAND: Object as vague.
22     THE WITNESS: I don't understand the use of
23 calibrate.
24

---

Page 96

1     BY MS. SIEGEL:
2 Q   Is there anything that you do to
3 insure the objectivity of the CRNA evaluations?
4 A   I can't insure that they're objective.
5 I can monitor trends and evaluations that are
6 produced by different evaluators.  Some of our
7 anesthesiologists will check on the tool.  It has
8 the Likert scale from zero to five.  They will
9 give everybody five's all the time.  So that kind
10 of feedback can be less helpful.
11 Q   Have you had any discussions with any
12 of the anesthesiologists about the -- their use
13 of the evaluation instrument with the Likert
14 scale?
15 A   If I've had discussions of that
16 nature, it would have been with the department
17 chair.
18 Q   Do you recall in the 2013 and 2014
19 academic years, do you recall having discussions
20 like that with the anesthesiologists?
21 A   Which anesthesiologists?
22 Q   Well, you said that you would have --
23 that you would have discussions from time to time
24 with anesthesiologists about their use of the

---

Page 97

1 evaluation tool?
2 A   I don't believe I said that.
3 Q   All right.  Did you have any sort of
4 discussion about the -- about misuse of the
5 Likert scale?
6 A   I didn't characterize it as a misuse.
7     MR. LAND: Objection, vague.
8     BY MS. SIEGEL:
9 Q   All right.  So there was -- Strike
10 that.
11     Is that an appropriate use of the
12 Likert scale to circle all of the ratings for all
13 the criteria -- that doesn't make sense.  To take
14 -- to circle as a group the ratings for the
15 various criteria?
16     MR. LAND: Object to form of the question.
17 It's vague, compound.
18     BY MS. SIEGEL:
19 Q   I'm referring -- just to clarify the
20 question a little bit, I'm referring to your
21 testimony about how some people would, for
22 example, make a circle around all of the
23 outstanding ratings for a given student?
24 A   If that's what they truly believe,

---

Maricel Marcial v.

Deposition of Michael Kremer
March 14, 2018

Page 98

1 they're, you know, that's their prerogative to
2 make those ratings; but when it comes to
3 interrater reliability, you know, it doesn't
4 always dive -- there may not be a correlation
5 between one of these evaluations that just choses
6 all five's and no comments versus, you know, a
7 bit of variation in numeric ratings with some
8 more specific comments about the student's
9 performance.
10 Q   And what I'm asking is if you take
11 steps to try to assure that kind of interrater
12 reliability?
13 A   I don't know what steps I could take
14 to insure that, you know, 30 plus
15 anesthesiologists and 30 nurse anesthetists have
16 -- are viewing student -- are evaluating student
17 performance similarly.
18 Q   Is there anything that you do to
19 control for bias on the ratings?
20 A   That's assuming that there is bias in
21 ratings.
22 Q   No, I'm asking if you do anything to
23 control for it?  It doesn't necessarily assume
24 there is any.

Page 99

1     MR. LAND: I would object to the form
2 because you're arguing, so it's argumentative.
3     MS. SIEGEL: He asked for clarification, I
4 provided it.
5     MR. LAND: What's the question?
6     (Record read by the reporter as
7 follows:
8     "Q  Is there anything that you
9     do to control for bias on the
10     ratings?")
11 BY MS. SIEGEL:
12 Q   Can you answer?
13 A   Is it the same question?
14 Q   I'm asking whether you do anything to
15 control with reference to bias in connection with
16 the evaluation ratings?
17     MR. LAND: Just object as asked and answered
18 and vague.
19     THE WITNESS: I'm not aware of intentional
20 bias in ratings.
21     BY MS. SIEGEL:
22 Q   Do you do anything with evaluations to
23 see if there are patterns that would reflect
24 intentional bias in ratings?

Page 100

1 A   You look at the evaluations
2 individually and in the aggregate.  If there was
3 a concerning trend of some kind, there would be
4 follow up with the involved provider as well as
5 clinical leadership and we've done that.
6 Q   Did you do that in the 2013-2014
7 academic years?
8 A   I don't recall.
9 Q   What do you do when you receive a
10 complaint about a given evaluation as to its
11 accuracy?
12 A   A complaint from whom?
13 Q   Anybody?
14 A   I'm not following.
15 Q   Do you ever get complaints about
16 evaluations as to their accuracy?  By evaluations
17 I'm referring to the CRNA evaluations of the
18 performance of SRNAs in a given procedure?
19 A   Rarely.
20 Q   What do you do when you receive one?
21 A   When I receive complaints?
22 Q   When you receive complaints, that's
23 right?
24 A   I would discuss it with the involved

Page 101

1 -- with the complainant.  I would look at the
2 trends, the performance trends, to see if the
3 evaluation in question is an outlier or
4 reflective of performance trends.
5 Q   Do you do anything else?
6 A   It would depend on the situation, but
7 I would follow up if I thought it was warranted
8 with the evaluator just to get some additional
9 clarity on the basis for the contested
10 evaluation.
11 Q   What does it -- Strike that.
12     What ratings must a student receive,
13 an SRNA, in order to have a satisfactory
14 evaluation?
15 A   They're most likely to -- Well, let me
16 back up.  Can you restate the question?
17     (Record read by the reporter.)
18     THE WITNESS: Are we talking about a
19 formative clinical evaluation?
20     BY MS. SIEGEL:
21 Q   A formative clinical evaluation,
22 that's right.
23 A   So they would need to meet or exceed
24 the elements under each domain on the evaluation

Maricel Marcial v.

Page 102

1 tool. If they're unsatisfactory ratings in areas
2 that impact patient safety, then that would be
3 considered an unsatisfactory evaluation.
4 Q Let's take a look again at Rush
5 Exhibit -- I'm sorry. Plaintiff's Exhibit 12.
6 Do you have that there?
7 MR. LAND: The only thing that's marked
8 Exhibit 12 the one that you didn't ask him about.
9 THE WITNESS: Oh, not Bates number, but
10 Exhibit 12?
11 BY MS. SIEGEL:
12 Q I am handing you what's previously
13 been marked as Plaintiff's Exhibit 8. And this
14 is an example of a formative SRNA evaluation,
15 isn't it?
16 A Yes, it is.
17 Q Of clinical performance?
18 A Yes, it is.
19 Q And can you tell me which are the
20 domains that involve ratings of patient safety?
21 A Well, there is domain 1A through C,
22 impact patient safety. And we've changed tools
23 so that's why it's taking me a minute to --
24 Q When did you change tools?

Page 103

1 MR. LAND: Can he please answer the first
2 question.
3 THE WITNESS: It's primarily the elements
4 under patient safety and clinical judgment.
5 BY MS. SIEGEL:
6 Q Anything else?
7 A There may have been. This is an older
8 tool. So we changed the tool a couple of years
9 ago.
10 Q You changed it in 2016?
11 A Approximately, yes.
12 Q And the form that we're looking at
13 here in Plaintiff's Exhibit 8 is the form that
14 was used in 2013 and 2014; is that right?
15 A Yes.
16 Q Okay. So all right. And if somebody
17 had an unsatisfactory rating in one of those two
18 domains, domain one and domain three; then that
19 would be an unsatisfactory overall evaluation?
20 A Uh-huh.
21 Q Yes?
22 A Yes.
23 Q Now, when a student got an
24 unsatisfactory evaluation, what would happen?

Page 104

1 A I would talk to them and talk to the
2 clinical instructor as well to hear the
3 instructor's basis for rating the student as they
4 did and to hear what the student had to say about
5 the case.
6 Q And if the student made the case that
7 there were some inaccuracy in their evaluation,
8 would that affect the formative evaluation for
9 the student for that day?
10 MR. LAND: Object as vague.
11 THE WITNESS: I don't understand the
12 question.
13 BY MS. SIEGEL:
14 Q All right. Let's take a hypothetical.
15 If a student came in and said that there were
16 something inaccurate about the -- about an
17 unsatisfactory rating that they had been given
18 and you spoke with the clinical instructor and
19 spoke with the student and determined that the
20 student were right, would that be reflected in
21 any way in the -- in the formative evaluation?
22 MR. LAND: Just object as calling for
23 speculation, but you can answer if you can.
24 THE WITNESS: It may be, but it's rare that

Page 105

1 a student disputes the feedback on a formative
2 evaluation.
3 BY MS. SIEGEL:
4 Q All right. In the event that a
5 student disputed the evaluation and you
6 determined that the student were correct, that
7 there was an inaccuracy; would you do anything
8 about the formative evaluation?
9 MR. LAND: Just object as vague, asked and
10 answered.
11 THE WITNESS: The formative evaluation is
12 part of the student's file. It would remain part
13 of the student's file.
14 BY MS. SIEGEL:
15 Q Would it be reflected in any way with
16 the summative evaluation that the student
17 ultimately received?
18 A It would.
19 Q And how would the inaccurate
20 evaluation be treated in the context of the
21 summative evaluation?
22 MR. LAND: Just object as mischaracterizing
23 his testimony.
24 THE WITNESS: I don't understand how an

Maricel Marcial v.

**Deposition of Michael Kremer**
**March 14, 2018**

---

Page 106

1 evaluation would be determined to be inaccurate.
2 BY MS. SIEGEL:
3 Q All right. Have you ever determined
4 that there was an -- that there was a formative
5 evaluation that was inaccurate?
6 MR. LAND: Just object as vague.
7 BY MS. SIEGEL:
8 Q You can answer.
9 A I would say there are situations where
10 perceptions vary, but I wouldn't call a -- the
11 fact that a student disagrees with how they have
12 been evaluated as automatically characterizing
13 that evaluation as inaccurate.
14 Q Well, if a student disagreed with an
15 evaluation and you investigated, you described
16 how you investigated it. And you made a
17 determination that there was an inaccuracy, would
18 that be reflected in some way in the summative
19 evaluation for that student for that -- for that
20 term?
21 A When I write summative evaluations I
22 have excerpts of the feedback from clinical
23 instructors. There is a space for student
24 comments. So students can write rebuttals if

---

Page 107

1 they choose to and that's how it's handled.
2 Q But the original formative evaluation
3 stands as written?
4 A Yes, it does.
5 MS. SIEGEL: Time to break for lunch?
6 MR. LAND: Yes.
7 (Whereupon a recess was taken
8 at 12:31 p.m. and the
9 deposition resumed at 1:25
10 p.m.)
11 BY MS. SIEGEL:
12 Q Dr. Kremer, who is Eva Fisher?
13 A She's a nurse anesthetist.
14 Q And do you know where she is employed
15 at this time?
16 A I believe she's employed in the
17 NorthShore HealthSystem.
18 Q And during the time that Miss Marcial
19 was enrolled in the CRNA program at Rush was Miss
20 Fisher a CRNA on the Rush staff?
21 A Yes, she was.
22 Q And going to -- Did you ever speak
23 with Miss Fisher?
24 A Yes I've spoken with Miss Fisher.

---

Page 108

1 Q About Miss Marcial?
2 A I don't recall.
3 Q Okay. I am going to hand you --
4 MS. SIEGEL: Off the record.
5 (Discussion outside the
6 record.)
7 BY MS. SIEGEL:
8 Q Dr. Kremer, the -- we've been talking
9 about Miss Wimberly's evaluation of Miss Marcial
10 on June 20th of 2013. And I am going to hand you
11 what's previously been marked as Plaintiff's
12 Exhibit 2. I'm going to ask if you recognize
13 that document?
14 MR. LAND: I just want to clarify before you
15 answer. I don't think we've talked about this
16 day or this evaluation yet.
17 MS. SIEGEL: All right. That's fine.
18 MR. LAND: Go ahead. Do you recognize that?
19 THE WITNESS: I recognize it.
20 BY MS. SIEGEL:
21 Q Can you tell me what it is, please?
22 A It's a formative evaluation.
23 Q And when did this evaluation come to
24 your attention?

---

Page 109

1 A I don't recall.
2 Q It's dated June 20th of 2013; is that
3 right?
4 A It is.
5 Q And you recognize Miss Wimberly's
6 signature?
7 A I see her name written there. I've
8 seen her use other signatures, but I believe it's
9 her's.
10 Q Okay. And did you see this document
11 on or about June 20th, 2013?
12 A Very likely, yes.
13 Q Now, there was a dispute over this
14 evaluation, wasn't there?
15 Q Who was disputing the evaluation?
16 Q Are you aware of a dispute over this
17 evaluation?
18 A Not without further clarification.
19 Q Did anyone dispute this evaluation to
20 you?
21 A How do you mean dispute?
22 Q Did anyone suggest the aspects, some
23 or all, of this evaluation were inaccurate?
24 A That may have been Miss Marcial's

---

**Victoria Legal + Corporate Services**
**800.827.7708 www.victorialcs.com**

Maricel Marcial v.

Deposition of Michael Kremer
March 14, 2018

Page 110

1 perception.
2 Q And when did -- when did that --
3 Strike that.
4    Is it your testimony that it was not
5 Miss Marcial's perception that this evaluation
6 was inaccurate in respects?
7 Q Can you repeat the question?
8    (Record read by the reporter.)
9    THE WITNESS: There are two negatives in
10 there. I'm --
11    BY MS. SIEGEL:
12 Q Is it your testimony that Miss Marcial
13 did not perceive Plaintiff's Exhibit 2 to have
14 inaccuracies?
15    MR. LAND: Object as asked and answered.
16    BY MS. SIEGEL:
17 Q You may answer.
18 A I believe I stated that Miss Marcial
19 perceived that there were aspects of the
20 evaluation that weren't accurate.
21 Q And did she come to your office some
22 time on or around June 20th of 2013 to discuss
23 this -- to discuss her session with Miss
24 Wimberly?

Page 111

1 A What is the session you are referring
2 to?
3 Q Her June 20th, 2013, session with Miss
4 Wimberly?
5 A I don't understand the meaning of
6 session.
7 Q I'll rephrase the question. Did Miss
8 Marcial come to your office to discuss her
9 procedure with Miss Wimberly on June 20th of
10 2013?
11 A Miss Marcial came to my office and
12 said that she had been dismissed from the
13 operating room. And it took a while to formulate
14 a timeline of the events that she was relating,
15 but she said that Miss Wimberly had concerns
16 about her level of preparation for her assigned
17 cases.
18 Q And you prepared a timeline?
19 A I constructed a timeline as we spoke.
20 Not a written timeline, but Miss Marcial was
21 upset and I was just trying to understand what
22 had transpired in the operating room that morning
23 before she left.
24 Q What time did Miss Marcial come to

Page 112

1 your office?
2 A I believe it was late morning.
3 Q As you tried to construct the
4 timeline, did you note the time of day that she
5 appeared?
6    MR. LAND: Just object as mischaracterizing
7 his testimony about constructing a timeline.
8    BY MS. SIEGEL:
9 Q You may answer.
10 A I believe she came to see me late that
11 morning.
12 Q You didn't note a specific time that
13 she came?
14 A No.
15 Q All right. And when she came what did
16 she say to you?
17 A Well, it was kind of a jumble because
18 she was upset and she -- all I can remember this
19 far from the incident is that her instructor was
20 concerned that -- her instructor believed that
21 she wasn't adequately prepared for her assigned
22 cases. And there were some other things that
23 happened during the case specific to patient
24 management that led to Miss Marcial being

Page 113

1 dismissed from the OR.
2 Q If you look down at professionalism,
3 it's section 4A, Roman numeral 4A of the
4 evaluation form. It says, that she is rated
5 unsatisfactory for promptness and attendance and
6 it states that she, quote, "Left OR without
7 telling CRNA or attending". Do you see that?
8 A I do.
9 Q Now, Miss Marcial had told you that
10 she was dismissed from the OR. Did that jive
11 with the allegation that she left the OR without
12 telling the CRNA or the attending?
13 A I wasn't in the OR. I don't know what
14 transpired. But while she was relieved of her
15 clinical responsibilities, it was her decision to
16 leave the operating room and not to inform the
17 clinical coordinator that she was leaving the
18 operating room.
19 Q And what's the basis for you -- for
20 your testimony that it was Miss Marcial's
21 decision to leave the OR without informing the
22 CRNA?
23 A Because what's documented is that she
24 left the operating room without telling a CRNA or

Maricel Marcial v.

**Deposition of Michael Kremer**
**March 14, 2018**

Page 114

1 the attending anesthesiologist. And when I spoke
2 to Mr. Narbone, he wasn't aware that she had left
3 the operating room.
4 Q When did you speak to Mr. Narbone?
5 A Sometime after I spoke with Miss
6 Marcial.
7 Q Had he spoken with Miss Marcial at
8 that time?
9 A Not that I know of.
10 Q Now, what Miss Marcial said was that
11 she had been dismissed from the OR; does that not
12 indicate that she should leave the OR?
13 A She was dismissed from the case. It's
14 different than physically leaving the operating
15 room suite.
16 Q Did Miss Marcial tell you that she had
17 been directed to see you?
18 A I don't recall.
19 Q And what else did Miss Marcial tell
20 you when she came into your office?
21 A She said she was very well prepared
22 for her assigned case or cases. And on her
23 clipboard she had a hard copy of a template that
24 I believe was available online that could be

Page 115

1 populated with drug doses, fluid management,
2 ventilator management settings, airway equipment
3 sizes. And there was that sheet and then there
4 were several Post-it notes attached to the sheet
5 that she referred to as her preps. And said
6 she had done her preps on the patients.
7 Q How many pages were there?
8 A I don't know. I just saw the page
9 that was the template from the online source.
10 Q Did you review the material she showed
11 you?
12 A I saw it. I didn't closely
13 investigate it.
14 Q Did you make a determination that her
15 preparations were inadequate?
16 A There was documentation that her
17 preparation was inadequate from her clinical
18 instructor.
19 Q And you're referring to the
20 unsatisfactory rating that Miss Wimberly gave her
21 on the room preparation?
22 A Among other things, yes.
23 Q Well, and what else?
24 A Entering adult doses for postoperative

Page 116

1 narcotic administration.
2 Q And where did you see that?
3 A It was described in the narrative.
4 Q All right. That's the second page of
5 the exhibit?
6 A That's the second page of the exhibit.
7 Q And can you tell us what you are
8 referring to on that second page?
9 A The final paragraph.
10 Q And what specifically are you
11 referring to, Doctor?
12 A "She needed to chart and look up
13 dosing, etcetera. When I asked her to tell me
14 how to properly dose opioids, emergency drugs,
15 etcetera, she could not do so".
16 Q What are you referring to and where is
17 it, please, on the page?
18 A It's Rush 21, the third paragraph.
19 Q What line?
20 A There aren't identified lines.
21 Q Well, is it the first line in the
22 paragraph?
23 A The third line. Oh, and the paragraph
24 above the second paragraph goes into detail about

Page 117

1 the ordering of opioids for the pediatric
2 patient.
3 Q Can you tell us, please, what the
4 correct answer would be to that question about
5 the dosing for Tylenol of a child with this type
6 of procedure?
7 A The dosing of Tylenol?
8 Q Yes.
9 A People -- depends on the route.
10 Depends on the overall health status of the
11 child.
12 Q So the amount of Tylenol dosage could
13 vary?
14 A It could.
15 Q And then there's also a discussion
16 here of the dosing of fentanyl?
17 A Yes.
18 Q And what is the correct dosage --
19 Strike that.
20 Can you tell us what the answer would
21 be to the question as to what the correct dosage
22 of fentanyl would be?
23 A It would be whatever was in the
24 pediatric order set and weight based.

Maricel Marcial v.

**Deposition of Michael Kremer**
**March 14, 2018**

---

Page 118

1  Q  I'm sorry, your voice dropped.
2  Whatever was in the pediatrics order?
3  A  Order set.
4  Q  And where would the pediatrics order
5  set be found?
6  A  In the electronic medical record.
7  Q  Who would have entered the pediatric
8  order into the medical record?
9  MR. LAND: Objection, calls for speculation.
10  THE WITNESS: I don't know.
11  BY MS. SIEGEL:
12  Q  Well, would that have been the surgeon
13  that was performing the procedure?
14  A  There is standard order sets in EPIC
15  and other electronic medical systems.  And those
16  order sets are formulated by usually committees
17  of clinical experts from the relevant
18  disciplines.
19  Q  So is there a specific number that
20  sitting here today you would be able to give?
21  A  I am not a pediatric anesthesia
22  expert.
23  Q  All right.  And was there any other
24  issue that was discussed that day with Miss

---

Page 119

1  Marcial regarding Plaintiff's Exhibit 2?
2  A  I am not sure at what time Plaintiff's
3  Exhibit 2 came into my possession.
4  Q  Was there anything else that you
5  recall in your meeting on June 20th of 2013 with
6  Miss Marcial, what issues she may have raised?
7  A  I just remember that she was upset and
8  that I believe she returned eventually to the OR
9  and that Mr. Narbone sent her home for the day.
10  Q  Now, you say that Miss Marcial was
11  upset, did she describe Miss Wimberly's behavior
12  in the OR on June 20th?
13  A  I don't recall.
14  Q  Do you recall hearing anything about
15  how she was -- how Miss Wimberly was upset and
16  was slamming syringes and drawers in the OR?
17  A  I don't recall hearing that.
18  Q  Did Miss Marcial communicate to you
19  that Miss Wimberly had lost her composure?
20  A  I don't remember hearing that phrase
21  used.
22  Q  Do you recall hearing anything that
23  would communicate to you that Miss Wimberly had
24  lost her composure on June 20th in the OR?

---

Page 120

1  A  It sounded like Miss Wimberly was
2  upset about how things were going.
3  Q  Do you recall anything else about your
4  meeting with Miss Marcial on June 20th?
5  A  No.
6  Q  Did you subsequently have a discussion
7  with Miss Wimberly?
8  A  I very likely did, yes.
9  Q  And I'm talking about this June 20th
10  procedure with -- that Miss Marcial assisted
11  with?
12  A  Uh-huh.
13  Q  Okay.  Do you recall anything about
14  your discussion with Miss Wimberly regarding the
15  June 20th, 2013, procedure?
16  A  I have a general recollection that she
17  confirmed the -- she confirmed the substance of
18  what was in the evaluation when we spoke.
19  Q  And is it -- is it your recollection
20  that that meeting with Miss Wimberly occurred
21  after Miss Wimberly had drafted Plaintiff's
22  Exhibit 2?
23  A  I have no idea.
24  Q  Now, is it correct that CRNA clinical

---

Page 121

1  instructor evaluations are forwarded to Mr.
2  Narbone?
3  A  That's been my practice.  When he was
4  in that position and I was in the program
5  director position.
6  Q  And did you send them to him after you
7  initially reviewed them?
8  A  Yes.
9  Q  And was it the case that he received
10  copies of all evaluations?
11  A  All evaluations of whom?
12  Q  SRNAs?
13  A  Of SRNAs?
14  Q  SRNAs by the CRNAs?
15  A  Did Mr. Narbone receive evaluations of
16  the SRNAs by the CRNAs?
17  Q  I'll rephrase that.  Did you forward
18  to Mr. Narbone copies of the evaluations prepared
19  by CRNAs of the SRNAs that they were supervising?
20  A  No, I didn't.
21  Q  Did he receive them by another means?
22  A  He didn't receive those evaluations
23  because he was in the operating room every day
24  and talking to the involved providers.  So he

---

Maricel Marcial v.

**Deposition of Michael Kremer**
**March 14, 2018**

Page 122

1 usually had a very good idea of what was going on
2 with the different trainees.
3 Q Did Miss Marcial communicate to you
4 around about June 20th of 2013 that she had been
5 told by another Filipino student that Miss
6 Wimberly had treated her in an abusive matter and
7 was on the warpath?
8 A I don't remember a conversation of
9 that nature.
10 Q Now, there was another Filipino
11 student in Miss Marcial's cohort, right?
12 A Yes.
13 Q And that was a student named Karen
14 Kam?
15 A Yes.
16 Q Did you have an opportunity to speak
17 with Miss Kam about Jill Wimberly?
18 A I don't recall.
19 Q Now, did you have a concern that Miss
20 Marcial had never purchased a copy of the text
21 that was used in the pediatrics anesthesia
22 course?
23 A I did when she revealed that to me
24 shortly before she came back into the clinical

Page 123

1 setting in January of 2014.
2 Q When did -- and what was the -- What
3 were the circumstances when she told you about
4 that?
5 A Completing a simulation exercise
6 involving a pediatric patient.
7 Q Do you recall what kind of procedure
8 it was?
9 A No, I just recall it was a pediatric
10 scenario and she struggled with pharmacology and
11 dosing of drugs.
12 Q And how did the issue of the textbook
13 come up?
14 A She volunteered that she hadn't
15 purchased it.
16 Q Did she tell you that she rented a
17 copy of the book?
18 A She may have said something to that
19 effect.
20 Q And did she tell you that she had --
21 that she worked with an e-copy of the text, an
22 e-book?
23 A Perhaps.
24 Q Have you examined the electronic

Page 124

1 version of the text that was used in the course?
2 A The electronic version of most texts
3 is -- has the same content that the print version
4 has.
5 Q And what was the text that was at
6 issue?
7 A Coté Anesthesia for Pediatrics or
8 something to that effect.
9 Q Was it required for the students to
10 purchase the hard copy?
11 A If I may, I would like to make it
12 clear that while there may not have been an
13 explicit requirement to purchase such books, it
14 would seem intuitive given that they will be
15 taking a comprehensive exam or a series of
16 comprehensive exams and that we're tasked with
17 educating nurse anesthetists who will be full
18 service licensed independent providers.
19      89 percent of the counties in the
20 state have nurse anesthetists practicing. In 29
21 percent of the counties they are the only
22 providers. So I think if it was your child or
23 your grandchild, you would want the anesthesia
24 provider to be fully versed in what was necessary

Page 125

1 to provide safe care.
2 Q And as for the electronic version of
3 the book, was there a requirement that the
4 student somehow use a hard copy, not an
5 electronic copy?
6 A There was no such requirement, but I
7 think it would be intuitive if one had struggled
8 with a content area, they would want to have a
9 reference readily at their fingertips that they
10 could easily refer to.
11 Q Dr. Kremer, I'm handing you what's
12 previously been marked as Plaintiff's Exhibit 4.
13 Have you ever seen a compilation such as
14 Plaintiff's Exhibit 4?
15 A I may have.
16 Q Could you describe for us, please,
17 what it is?
18 A Well, by the title it's an
19 anesthesiology pocket card set. So it's a
20 cognitive aid of some type.
21 Q Is this an aid that would make
22 anesthesiology information available at one's
23 fingertips for easy reference?
24 A If it was appropriately peer reviewed

Maricel Marcial v.

**Deposition of Michael Kremer**
**March 14, 2018**

---

Page 126

1 and referenced.  And there are situations that
2 really don't permit time for looking up and
3 calculating doses if someone's life is at stake.
4 Q   And as a form of reference, is this
5 something that would appear to you to be useful?
6 A   It appears that it could be useful.
7 Q   And I am handing you now what's
8 previously been marked as Plaintiff's Exhibit 5.
9 A   Okay.
10 Q   Sorry, I didn't mean to leave that in
11 the middle of the table.  Can you tell me what
12 that is, please?
13 A   It's titled the pediatric anesthesia
14 worksheet.
15 Q   Have you seen a document like that
16 before?
17 A   I may have.
18 Q   Okay.  And are Plaintiff's Exhibit 4
19 and Plaintiff's Exhibit 5 appropriate materials
20 for assisting SRNAs in mastering dosages and
21 double checking their recollection of dosages?
22     MR. LAND: Object to the form of the
23 question as vague.
24

---

Page 127

1     BY MS. SIEGEL:
2 Q   You may answer.
3 A   These aren't sources that are used in
4 our program.  I can't comment on their validity
5 or reliability.
6 Q   Now, would it be your understanding
7 that an electronic book -- portions of an
8 electronic book could be printed out for ready
9 reference?
10 A   Of course.
11 Q   And would that have certain
12 portability advantages over hard copy, a hard
13 copy text?
14 A   Well, I mean, a digital text could be
15 on a tablet or say a smart phone.  So, I mean,
16 I'm not sure how portability -- the context we're
17 discussing the portability.
18 Q   Well, if the -- if there were an
19 electronic version of the Coté text that you've
20 discussed.  And is there anything about that,
21 that version of the book, that is inferior to
22 having the hard copy?
23 A   I don't think it is the same advantage
24 as having a hard copy that can be readily

---

Page 128

1 referenced and highlighted and is there in its
2 entirety as opposed to selectively printing out
3 pages as you've described.
4 Q   Can one highlight an electronic copy
5 of the book?
6 A   I suppose.  It depends on the format.
7 Q   Did you ever look at the electronic
8 version of the Coté text?
9 A   I have had no occasion to.
10 Q   There was an issue on June 20th about
11 whether Miss Wimberly had paged Miss -- I'm
12 sorry, whether -- that's right.  Whether Miss --
13 Let me start again.
14     There was an issue on June 20th of
15 2013 as to whether Miss Wimberly had paged Miss
16 Marcial that morning; do you recall?
17 A   I recall a discussion about that
18 topic, yes.
19 Q   And Miss Wimberly represented that she
20 had paged Miss Marcial; isn't that right?
21 A   I believe so.
22 Q   And Miss Marcial disputed whether or
23 not she had received the page; is that right?
24 A   That's correct.

---

Page 129

1 Q   And Miss Marcial showed you her pager,
2 didn't she, on June 20th?
3 A   She showed me a pager, yes.
4 Q   Did you think it wasn't perhaps Miss
5 Marcial's pager?
6 A   I have no way of knowing.
7 Q   When she showed it to you, did you
8 think she was showing you somebody else's pager?
9 A   I have no way of knowing if it was
10 Miss Marcial's pager when it had been turned on.
11 Q   Did you check out Miss Wimberly's
12 pager to see if in fact she transmitted a page?
13 A   She wouldn't transmit a page from her
14 pager.
15 Q   All right.  How would she do that?
16 A   From a computer workstation.
17 Q   Did you check out the computer
18 workstation to see if Miss Wimberly had in fact
19 paged Miss Marcial?
20 A   No, I did not.
21 Q   Did you believe that Miss Marcial had
22 failed to respond to a page?
23 A   All I knew was that there was -- I
24 believe there was a delay in a case being

---

Maricel Marcial v.

**Deposition of Michael Kremer**
**March 14, 2018**

Page 130

1 started, in a case being moved to another room.
2 And for whatever reason Miss Marcial wasn't aware
3 of that.
4 Q Did you discuss that with Miss
5 Wimberly?
6 A I probably did.
7 Q And was that around June 20th of 2013?
8 A It likely was.
9 Q Was that part of the conversation that
10 you had -- was it in your office?
11 A I don't recall.
12 Q Do you remember what you said to her
13 and what she said to you?
14 A I do not.
15 Q Now, didn't -- looking back at
16 Plaintiff's Exhibit 2, didn't Miss Wimberly base
17 her unsatisfactory rating on professionalism in
18 part on Miss Marcial's alleged failure to answer
19 her page? I'm looking at the bottom of the first
20 page of Plaintiff's Exhibit 2.
21 A Yes.
22 Q Did you think that Miss Marcial was
23 not telling the truth about the alleged failure
24 to answer her page?

Page 131

1 A It was very clear that there was a
2 communication problem. The genesis of that
3 problem was not readily apparent.
4 Q Well, was that -- was that apparent
5 communication problem, could that have been
6 attributable to Miss -- strike that, Miss
7 Wimberly's failure to page Miss Marcial?
8 A It could have been.
9 Q And could Miss Wimberly have falsely
10 attributed her own failure to Miss Marcial?
11 A I don't know.
12 Q Would it concern you if a CRNA falsely
13 reported making a page that in fact hadn't been
14 made?
15 A I'm a lot more concerned about things
16 like inappropriate drug doses and lack of
17 preparation compared to communication issues with
18 pagers.
19 Q Did it concern you that there was
20 possibly a misrepresentation of the specific
21 issue of paging? Did it concern you that other
22 representations in the document may not have been
23 truthful?
24 MR. LAND: Object as mischaracterizing his

Page 132

1 testimony and to the form of the question as
2 vague and compound.
3 BY MS. SIEGEL:
4 Q Did you understand my question?
5 A Can you repeat it, please.
6 (Record read by the reporter as
7 follows:
8 "Q Did it concern you that
9 there was possibly a
10 misrepresentation of the
11 specific issue of paging? Did
12 it concern you that other
13 representations in the
14 document may not have been
15 truthful?")
16 THE WITNESS: I spoke with Dr. Brian Myers
17 the attending anesthesiologist the day after this
18 incident, and he largely corroborated what Miss
19 Wimberly reported in terms of clinical issues.
20 And those were of higher priority to me than the
21 paging issues.
22 BY MS. SIEGEL:
23 Q And where did you speak with Mr.
24 Myers?

Page 133

1 A Dr. Myers.
2 Q Where did you speak with Dr. Myers?
3 A In the operating room.
4 Q Was anyone else present?
5 A I don't think so.
6 Q What did he say to you and what did
7 you say to him?
8 A I don't remember the exact
9 conversation.
10 Q Do you remember what he corroborated?
11 A He corroborated that there were
12 concerns about the student's level of preparation
13 and putting in appropriate post-op analgesic
14 orders.
15 Q Did he tell you anything more specific
16 about the postoperative drug orders?
17 A I don't recall.
18 Q Was Dr. Myers present for the entire
19 case?
20 A The nature of that anesthesia practice
21 is that the attending anesthesiologists are in
22 and out of the room. To maintain compliance with
23 building requirements, they have to be present at
24 the beginning and the end of the case as well as

Maricel Marcial v.

**Deposition of Michael Kremer**
**March 14, 2018**

---

Page 134

1 at critical intervals during the case.
2 Q   Would that -- Would his moving in and
3 out of the room affected his ability to observe
4 the circumstances of the postoperative drug
5 orders?
6    MR. LAND: Objection, calls for speculation.
7    THE WITNESS: It may have.
8    BY MS. SIEGEL:
9 Q   Is that something that you looked into
10 to determine whether or not that affected his
11 perception of what had occurred?
12 A   I didn't ask the doctor in detail what
13 impacted his perception of the events.
14 Q   Okay.  Now, is it not correct that
15 Miss Marcial contacted an attending
16 anesthesiologist at Rush regarding the pediatric
17 dosing guidelines?
18    MR. LAND: Can you read that back?
19    (Record read by the reporter.)
20    MR. LAND: Objection is foundation.
21    THE WITNESS: I am not aware of an attending
22 anesthesiologist at Rush who she contacted.
23    BY MS. SIEGEL:
24 Q   Was there an anesthesiologist who had

---

Page 135

1 at one time been affiliated with Rush that she
2 contacted to your knowledge?
3 A   That may have been the case.  I don't
4 know what information that individual was given.
5 Q   Now, when you say that you don't know
6 the information that the individual was given,
7 can you be more specific as to what you were
8 referring to?
9 A   What I'm referring to is that dosing
10 of opioids for open heart surgery versus
11 postoperative analgesia is significantly
12 different.  There is a wide range of what
13 acceptable doses may constitute.  And as I said
14 earlier also based on weight and patient acuity,
15 those factors also determine appropriate dosing
16 for pediatric patients.
17 Q   And did the -- Strike that.
18    Did Dr. Myers express a specific dose
19 that he had -- that he had indicated?
20 A   Not that I recall.
21 Q   Did Miss Wimberly indicate to you a
22 specific dose that she felt that the patient
23 should have?
24 A   I think her concern was use of the

---

Page 136

1 adult postoperative analgesia order set versus
2 the pediatric postoperative analgesia post order
3 set.
4 Q   Is it your understanding -- Strike
5 that.
6    Is it your recollection that it was 20
7 minutes into your discussion with Miss Marcial on
8 June 20th that she told you that she had left the
9 OR without telling somebody?
10 A   I don't recall.
11 Q   Did you take notes of your discussion
12 with Miss Marcial that day?
13 A   I don't recall.  If I did they would
14 be in her file.
15 Q   Subsequently did it come to your
16 attention that Miss Marcial had been told of an
17 incident where Miss Wimberly was speaking on the
18 phone in some kind of break room within hearing
19 of patients and nurses and other medical staff
20 and loudly said, my student just tried to
21 overdose a patient.
22 A   Can you repeat the question.
23    (Record read by the reporter.)
24    THE WITNESS: I don't recall.

---

Page 137

1    BY MS. SIEGEL:
2 Q   Would it concern you if a CRNA made a
3 loud statement that was within hearing of
4 patients and nurses and other medical staff that
5 a student had tried to overdose a patient?
6    MR. LAND: Objection, calls for speculation.
7    MS. SIEGEL: He can answer as to his -- as
8 to whether that would concern him.
9    MR. LAND: In any circumstance regardless of
10 what happened?  That's why I'm objecting.
11    BY MS. SIEGEL:
12 Q   You may answer.
13 A   I'm thinking.  It's a very unlikely
14 scenario.
15 Q   Why is that unlikely?
16 A   It's not consistent with the behavior
17 of the people I know and work with.
18 Q   Would that kind of inconsistent
19 behavior be cause for concern?
20    MR. LAND: Objection, calls for speculation
21 and vague.
22    THE WITNESS: I don't understand the
23 question.
24    MS. SIEGEL: Can we have it back, please?

---

Maricel Marcial v.

Deposition of Michael Kremer
March 14, 2018

Page 138

1  (Record read by the reporter as
2  follows:
3  "Q  Would that kind of
4  inconsistent behavior be cause
5  for concern?")
6  THE WITNESS: What's the inconsistent
7  behavior?
8  BY MS. SIEGEL:
9  Q  Well, you've described we're talking
10  about a loud telephone conversation within
11  earshot of patients and other medical personnel
12  where there was a claim that an SRNA had tried to
13  overdose a patient.
14  And if I understand your testimony
15  it's that such a statement -- such a statement is
16  an unlikely scenario and not consistent with your
17  behavior norms at Rush?
18  A  I didn't say that.
19  MR. LAND: I object to the characterization
20  of what you're talking about.  You're talking
21  about a hypothetical question which calls for
22  speculation.  You just defined it in a different
23  way than what he was talking about.
24

Page 139

1  BY MS. SIEGEL:
2  Q  Can you answer that?
3  A  No.
4  Q  Are there behavioral expectations that
5  you have of CRNAs in the Rush -- in the Rush
6  anesthesia department?
7  A  There are 10,000 employees at Rush.
8  We're held to the same standards in terms of
9  overall performance, expectations that we're
10  evaluated on in our annual review.
11  Q  And professionalism is one of them,
12  right?
13  A  Depends on the staff category.
14  Q  Are CRNAs rated based on
15  professionalism?
16  A  I don't complete evaluations on CRNAs.
17  Q  I'm sorry?
18  A  I don't complete evaluations on CRNAs.
19  Q  Have you ever seen any?
20  A  I have when I was a staff CRNA, but
21  the format has changed considerably since then.
22  Q  In your opinion is it appropriate to
23  hold CRNAs to standards of professionalism?
24  A  Yes, it is.

Page 140

1  Q  And do you have an opinion as to
2  whether it's professional for a CRNA to speak
3  loudly on a telephone in the presence of other
4  people and say that an SRNA attempted to overdose
5  a patient?
6  A  I know of no such scenario.
7  Q  And if I've asked this before, I
8  apologize; but it did not come to your attention
9  that such an accusation was leveled against Miss
10  Wimberly, is that right?
11  MR. LAND: You did ask and he answered that
12  question before, so I object.
13  THE WITNESS: I don't understand the
14  question.  What accusation?
15  BY MS. SIEGEL:
16  Q  All right.  Let's try this, did anyone
17  tell you that that happened?
18  A  That what happened?
19  Q  That Miss Wimberly was on the phone
20  and loudly said that an SRNA tried to overdose a
21  patient?
22  A  I didn't hear any statement like that
23  from anyone who was a witness to such an event.
24  Q  Did you hear indirectly that someone

Page 141

1  had overheard that statement?
2  A  I don't recall.
3  MS. SIEGEL: Why don't we take five minutes
4  here.
5  (Whereupon a recess was taken
6  at 2:23 p.m. and the
7  deposition resumed at 2:38
8  p.m.)
9  BY MS. SIEGEL:
10  Q  How many unsatisfactory evaluations in
11  the area of patient safety may a CRNA get before
12  she's in or he is in danger of failure?
13  A  We don't evaluate CRNAs.
14  Q  You are exactly right.  How many
15  unsatisfactory evaluations may an SRNA receive
16  before they're in danger of failing?
17  A  Our program handbook says three.
18  Q  Dr. Kremer, I'm handing you what's
19  previously been marked as Plaintiff's Exhibit 5.
20  And can you tell me what Plaintiff's Exhibit 5
21  is, please?
22  A  It's a formative evaluation completed
23  by Eva Fisher on Maricel on June 11th of 2013.
24  Q  That's for a procedure that occurred

Maricel Marcial v.

Deposition of Michael Kremer
March 14, 2018

---

Page 142

1 on June 11th of 2013?
2 A  Appears to be, yes.
3 Q  And the -- is there a different date
4 at the bottom of the page?
5 A  There is.
6 Q  And that would be June 18th of 2013;
7 is that right?
8 A  Yes.
9 Q  And when did this evaluation come to
10 your attention?
11 A  I don't know.
12 Q  Did you see it in the summer of 2013?
13 A  I would have seen it in the summer of
14 2013, yes.
15 Q  Do you recall the circumstances?
16 A  I do not.
17 Q  And did Miss Marcial object to the --
18 some of the evaluations she received in
19 Plaintiff's Exhibit 5?
20 A  Yes.
21 Q  Did you have a meeting with Miss
22 Marcial about it?
23 A  I believe we did, yes.
24 Q  Do you recall when that occurred?

---

Page 143

1 A  Some time after the evaluation was
2 submitted.  I couldn't say exactly when.
3 Q  Do you have a recollection as to when
4 the evaluation was submitted?
5 A  I have no idea when the evaluation was
6 submitted.
7 Q  There is a place for the student
8 signature and date; do you see that?
9 A  I do.
10 Q  And it's blank.  Do you have an
11 understanding as to why it would be blank?
12 A  I don't know for sure why it wasn't
13 signed.  Sometimes we have students come sign
14 evaluations at the end of the term when we
15 prepare their summative evaluation.  It isn't
16 always signed contemporaneously with receipt and
17 review of the evaluation.
18 Q  And so you reviewed this evaluation
19 with Miss Maricel?
20 A  Yes.
21 Q  And where did that occur?
22 A  Probably in my office.
23 Q  Did anyone else join you for that
24 meeting?

---

Page 144

1 A  I don't recall.
2 Q  And as well as you can recall today,
3 what was said?
4 A  If I remember correctly Miss Marcial
5 objected to the areas that were marked as
6 unsatisfactory and said that they were -- I don't
7 remember what her words were.  I just had the
8 impression that she felt that it was subjective
9 and inaccurate feedback.
10 Q  You testified earlier that Miss Fisher
11 is no longer at Rush?
12 A  That's right.
13 Q  And do you have any -- Do you have an
14 understanding as to why she left Rush?
15 A  I think the clinical locations in the
16 NorthShore system are closer to her home.
17 Q  Did she tell you that?
18 A  She may have.
19 Q  Was she asked to leave?
20 A  I don't believe so.
21 Q  You didn't ask her to leave?
22 A  Miss Fisher didn't report to me.
23 Q  Okay.  You didn't have any discussion
24 with her with -- regarding anyone asking her to

---

Page 145

1 leave?
2 A  No.
3 Q  Did Miss Marcial dispute that she
4 prepared a wrong sized endotracheal tube for one
5 of her patients during this procedure, these
6 procedures?
7 A  As I recall her objection was that it
8 was a subjective statement.  And I asked is a
9 wrong sized ETT for a child an objective
10 statement.
11 Q  You asked her that?
12 A  I did.
13 Q  Did she answer you?
14 A  I believe she did.
15 Q  Do you recall what she said?
16 A  Not really, no.
17 Q  In a layout of instrumentation, would
18 there only be one ETT tube laid out for a
19 surgical procedure?
20 A  What we teach our trainees is to have
21 the calculated endotracheal tube size prepared
22 and styletted and have half a size smaller and
23 half a size larger also available.
24 Q  So do I understand there would be at

---

Maricel Marcial v.

**Deposition of Michael Kremer**
**March 14, 2018**

---

Page 146

1 least three sizes that would be available?
2 A  Depending on who prepared the airway
3 equipment there could be.
4 Q  Could there be more than three?
5 A  There could be.
6 Q  Where does one get the airway
7 equipment?
8 A  There is a pediatric anesthesia cart
9 that has airway equipment and other pediatric
10 specific equipment like blood pressure cuffs that
11 are specific to pediatric patients.
12 Q  And where is the pediatrics cart
13 located?
14 A  At Rush it's called the local room
15 which is just their way of describing the
16 anesthesia workroom.  So I think -- well, I would
17 be speculating.  I don't know how many of them
18 there are, but there are three different
19 workrooms right now.
20 Q  So there's more than one workroom?
21 A  Yes, ma'am, that's right.
22 Q  It might not be the same three as now,
23 but at the time there was more than one workroom?
24 A  I am just thinking back.  Yes, at the

---

Page 147

1 time there was more than one workroom.
2 Q  And each one of those workrooms had a
3 pediatric cart in it?
4 A  Very likely did, yes.
5 Q  Did you understand this criticism, the
6 first one on room preparation and equipment
7 check, that Miss Marcial had not put out a
8 child-sized ETT tube?
9 A  That statement is wrong-sized ETT for
10 child.
11 Q  Did you understand that to mean that
12 she had put an adult tube out?
13 A  I understood that the instructor's
14 statement is that it was the wrong-sized
15 endotracheal tube.  There is a wide range of
16 endotracheal tube sizes that are used in
17 pediatrics.  So it could have been a pediatric
18 tube or tubes that weren't the appropriate size
19 for the patient or patients in question.
20 Q  Did you discuss that with Miss
21 Marcial?
22 A  I may have.
23 Q  Do you have any recollection of it?
24 A  No.

---

Page 148

1 Q  And did you have a discussion with
2 Miss Marcial about an extubation after -- strike
3 that, an extubation while the child was having
4 apneic signs?
5 A  The concern was as written by Miss
6 Fisher, "Took circuit off after extubation with
7 baby having apneic spells".
8 Q  And did you discuss that with Miss
9 Marcial?
10 A  Very likely.
11 Q  Do you recall what she said?
12 A  I probably asked what happened.
13 Q  Do you remember what she responded?
14 A  No, I don't.
15 Q  Do you recall what the problem was
16 under clinical judgment with the fluids and
17 hemotherapy calculation, initiation and
18 management?
19 A  No, I don't.
20 Q  Did you follow up to find out what it
21 was?
22 A  I very likely spoke to Miss Fisher.
23 Q  Do you recall what she told you?
24 A  I believe she corroborated what is

---

Page 149

1 documented in the evaluation.
2 Q  And did Miss Marcial agree with her
3 unsatisfactory evaluation on that criterion?
4 A  Which criterion?
5 Q  The calculation, initiation and
6 management of fluid and hemotherapy?
7 A  Well, she disputed the whole
8 evaluation and said it was inaccurate.
9 Q  Do you recall specifically what she
10 thought was inaccurate about it, Dr. Kremer?
11 A  The best recollection I have is that
12 it was rejected and blocked as being inaccurate
13 and unfair.
14 Q  Well, did you do anything to
15 investigate that contention?
16 A  As I said I met with Miss Fisher.
17 Q  But you don't recall specifics as to
18 what she said in support of her ratings?
19 A  As I said, she corroborated her
20 ratings on the instrument.
21 Q  Well, do you recall what it was she
22 said that was corroborative?
23 A  Not almost five years later, no, I
24 don't.

---

Maricel Marcial v.

Deposition of Michael Kremer
March 14, 2018

---

Page 150

1 Q In June or July of 2013 did you have a
2 meeting with Miss Marcial and Dr. Wiley in which
3 you looked up fentanyl dosing in a text?
4 A I don't recall.
5 Q Is Amy Gawura still a CRNA at Rush?
6 A She's not.
7 Q Do you know where she is?
8 A She works in the NorthShore system.
9 Q Do you know why she went to
10 NorthShore?
11 A Her choice.
12 Q Do you know if she was asked to leave?
13 A I seriously doubt that. I don't know
14 for a fact since I don't manage the CRNAs.
15 Q That didn't come to your attention in
16 any event that she was asked to leave?
17 A I have no reason to believe that Amy
18 Gawura was asked to leave Rush.
19 Q And Katie Colino has also left?
20 A Some time ago.
21 Q Do you recall when she left?
22 A No, I don't.
23 Q Do you know where she went?
24 A When she left I believe she had taken

---

Page 151

1 a job at Condell Hospital in Libertyville. I
2 don't know if she is still working there.
3 Q Do you know why she left Rush?
4 A I think it -- Condell was closer to
5 home and she liked the schedule better.
6 Q Did you talk with her about it, did
7 she tell you that?
8 A We may have talked about it at the
9 time.
10 Q And who is Crystal Anderson?
11 A Crystal Anderson is a nurse
12 anesthetist who worked at Rush some years ago.
13 Q And is she there now?
14 A No, she's not.
15 Q And do you know what became of Crystal
16 Anderson?
17 A No, I don't.
18 Q Do you know where she is?
19 A Can you repeat the question?
20 Q Do you know where she is?
21 A No, I do not.
22 Q Did she stay in the field of
23 anesthesiology?
24 A I have no way of knowing that.

---

Page 152

1 Q Are you normally in the perioperative
2 area before cases begin?
3 A I make rounds on a regular basis.
4 Q And does that include the
5 perioperative area at the beginning of the day?
6 A It can.
7 Q Did you ever see Mr. Narbone there at
8 the beginning of the day?
9 A When he was employed there, yes.
10 Q Did you see him there frequently?
11 A Mr. Narbone basically lived at Rush.
12 He was probably there 80 hours a week.
13 Q And does that mean you would see him
14 in the perioperative area in the mornings before
15 things got going?
16 A Yes.
17 Q Okay. Did you have a joint meeting
18 with Miss Marcial and Dr. Wiley shortly after
19 Miss Fisher gave this evaluation for the June
20 11th procedure?
21 A Dr. Wiley and I met with Miss Marcial
22 on a number of occasions. We may have met
23 together some time after the June 11th evaluation
24 was completed.

---

Page 153

1 Q Would you have had occasion to discuss
2 both Miss Fisher's evaluation and Miss Wimberly's
3 evaluation with Miss Marcial in -- later in June
4 of 2013?
5 A That's likely, yes.
6 Q Meeting in your office?
7 A It could have been.
8 Q And what did you tell Miss Marcial?
9 A I don't recall.
10 Q Did you have a discussion with her
11 about her progress in the program?
12 A We probably discussed that, yes.
13 Q And as well as you can recall, what
14 did you advise her regarding her progress in the
15 program?
16 A I don't recall the substance of that
17 specific meeting.
18 Q Did you tell her she was in academic
19 jeopardy?
20 MR. LAND: Just object to the -- vague. I'm
21 not sure you've established what meeting you're
22 talking about. So I don't know if you're asking
23 about a specific meeting and a specific comment.
24 So object to the form.

---

Victoria Legal + Corporate Services
800.827.7708 www.victorialcs.com

Maricel Marcial v.

Deposition of Michael Kremer
March 14, 2018

---

Page 154

1  BY MS. SIEGEL:
2  Q  Well, after Miss Marcial received the
3  June 20th, 2013, evaluation from Miss Wimberly
4  and the June 18th evaluation from Miss Fisher;
5  did you get together with Miss Marcial and
6  Dr. Wiley to talk about Miss Marcial's
7  progression in light of those -- in light of
8  those two evaluations?
9  A  Dr. Wiley and I had a number of
10  meetings with Miss Marcial over the summer of
11  2013.
12  Q  Can you recall one in late June after
13  she had received the Fisher and the Wimberly
14  evaluations pretty much back to back?
15  A  Not specifically, no.
16  Q  Well, generally over the course of the
17  summer of 2013 how did you advise Miss Marcial
18  concerning her progression in the program?
19  A  If I remember she accrued other
20  unsatisfactory evaluations. So we probably
21  talked about other options in terms of other
22  degree options that were available, but that
23  wasn't something she wanted to pursue.
24  Q  What did you tell her about her

---

Page 155

1  prospects in the CRNA program?
2  A  I don't specifically recall.
3  Q  With reference to the Fisher and
4  Wimberly evaluations, those back-to-back
5  evaluations; did you tell Miss Marcial that there
6  were two strikes against her?
7  A  I may have said something to that
8  effect.
9  Q  As you sit here today do you believe
10  that Miss Marcial had two strikes against her at
11  that point?
12  A  The reference was to two
13  unsatisfactory evaluations knowing that the third
14  would result in clinical failure.
15  Q  Did you tell her that it would be a
16  herculean task to succeed in the program?
17  A  I don't recall.
18  Q  Did you tell her that her best
19  wouldn't be good enough?
20  A  I really doubt I would have made a
21  statement like that.
22  Q  Why not?
23  A  It's not the way I typically talk to
24  students.

---

Page 156

1  Q  Did you make a statement to that
2  effect?
3  A  What's the question?
4  Q  Did you make a statement to Miss
5  Marcial at the time of a meeting with Dr. Wiley
6  and yourself in approximately late June of 2013,
7  something to the effect that her best wouldn't be
8  good enough?
9  A  I don't remember saying something to
10  the effect of her best wouldn't be good enough.
11  Q  Did you perceive that she was doing
12  her best at that point?
13  A  I couldn't say.
14  Q  Did you make the statement when she
15  brought up issues of what she perceived to be
16  bias; did you make the statement who should I
17  believe, you or faculty?
18    MR. LAND: Object as to the form of the
19  question. Assuming facts not in evidence and
20  lack of foundation with the reference to bias.
21  You haven't asked him about a conversation about
22  bias.
23
24    BY MS. SIEGEL:

---

Page 157

1  Q  Let me rephrase it. Miss Marcial had
2  stated that she felt that the evaluations by Miss
3  Fisher and Miss Wimberly were not accurate, isn't
4  that right?
5  A  Yes.
6  Q  And did she state with respect to Miss
7  Wimberly that she felt that certain statements
8  were false?
9  A  I don't recall.
10  Q  Did you ask her who should I believe,
11  you or faculty?
12  A  I don't recall.
13  Q  Why do you say that it's not the way
14  you talk to students with respect to your best
15  wouldn't be good enough?
16  A  Because it's not the way I would
17  typically talk to a student.
18  Q  What would you say?
19    MR. LAND: Object as hopelessly vague. What
20  would you say to students?
21    MS. SIEGEL: Right.
22    MR. LAND: That's too vague a question.
23    THE WITNESS: I have no context for that.
24    BY MS. SIEGEL:

---

Maricel Marcial v.

Deposition of Michael Kremer
March 14, 2018

Page 158

1 Q  If a student were experiencing
2 difficulty in the clinical context and you felt
3 that there was an issue with that student's
4 ability to perform, what would you say?
5     MR. LAND: Can you read that back, please.
6     (Record read by the reporter.)
7     MR. LAND: You're calling for speculation
8 and vague.
9     THE WITNESS: It would depend completely on
10 the student, their history up to that point,
11 anything else they might have disclosed about
12 stress or life events that they're experiencing.
13     BY MS. SIEGEL:
14 Q  Do you recall Miss Marcial disclosing
15 anything in late June of 2013 with respect to
16 factors such as stress or life events that might
17 affect her ability to perform?
18 A  Not at that time, no.
19 Q  Do you recall anything that Dr. Wiley
20 said during that meeting?
21 A  I do not.
22 Q  How about Miss Marcial?
23 A  Which meeting are you referencing?
24 Q  Again, this meeting where you may have

Page 159

1 said something along the lines of you have two
2 strikes against you?
3     MR. LAND: You know, I object as
4 mischaracterizing his testimony. You asked about
5 meetings. He said he wasn't sure. Then you
6 asked questions about meetings over the entire
7 summer. Then you asked about specific comments.
8 Now you're asking about a meeting where something
9 was said. Lacks foundation and mischaracterizes
10 his testimony.
11     BY MS. SIEGEL:
12 Q  Do you recall the question?
13 A  Which date are we talking about?
14     MS. SIEGEL: Can you read the question back,
15 please.
16     (Record read by the reporter.)
17     THE WITNESS: I'm sorry, what's the
18 question?
19     (Record read by the reporter.)
20     BY MS. SIEGEL:
21 Q  Let me direct your attention to a
22 meeting that you had with Dr. Wiley and Miss
23 Marcial after she had received -- after Miss
24 Marcial had received the evaluations from Eva

Page 160

1 Fisher and Jill Wimberly on approximately June
2 18th and June 20th of 2013.
3 A  Is there a question?
4 Q  Yes, did Miss Marcial indicate any
5 factors that might have affected her performance?
6 A  Not at that time as I recall.
7 Q  And as well as you can recall, did you
8 make any statement to Miss Marcial regarding her
9 prognosis for a successful completion of her CRNA
10 studies?
11 A  I don't recall.
12 Q  Do you remember anything else about
13 that meeting?
14     MR. LAND: Just object as lacking foundation
15 as to what meeting. Go ahead.
16     MS. SIEGEL: Well, I think we've established
17 that there was a meeting with the three persons,
18 Dr. Wiley, Dr. Kremer, Miss Marcial, shortly
19 after the back-to-back evaluations of Miss Fisher
20 and Miss Wimberly.
21     And I'm asking if he has any
22 recollection about her possible -- the possible
23 prognosis of Miss Marcial for success in the CRNA
24 program during that meeting.

Page 161

1     MR. LAND: And I'm objecting because you're
2 mischaracterizing what he said about timing of
3 the meeting. You just said shortly after. And I
4 don't think you've demonstrated or created
5 foundation that he knows when the meeting that
6 he's talking about happened. That's my
7 objection.
8     BY MS. SIEGEL:
9 Q  Was there a meeting shortly after
10 those back-to-back evaluations?
11 A  I believe there was.
12 Q  Okay. And, in fact, you wrote a
13 summative shortly after that, didn't you?
14 A  A summative what?
15 Q  A summative evaluation for Miss
16 Marcial?
17 A  I would have written one at the end of
18 the term.
19 Q  Did you write one on the 1st of July,
20 2013?
21 A  I don't recall.
22 Q  Okay. Now, so some time between June
23 20th and the beginning of the next term it's
24 likely that you had this meeting with Miss

Maricel Marcial v.

Deposition of Michael Kremer
March 14, 2018

---

Page 162

1 Marcial and Dr. Wimberly -- Dr. Wiley; is that
2 right?
3 A As I said, Dr. Wiley and I had a
4 series of meetings with Miss Marcial over the
5 summer term of 2013.
6 Q Okay. And when do you think the first
7 one was?
8 A I don't know.
9 Q In the course of any of those
10 meetings, did you give a prognosis as to what her
11 likelihood of success was?
12 A Likelihood of success of what?
13 Q In the CRNA program at Rush College of
14 Nursing?
15 A I don't recall.
16 Q I am handing you what has been
17 previously marked as Plaintiff's Exhibit 6.
18 Dr. Kremer, do you recognize Plaintiff's Exhibit
19 6?
20 A It appears to be a set of formative
21 evaluations, summative evaluation.
22 Q Is that your signature in the lower
23 right-hand corner?
24 A Yes, it is.

---

Page 163

1 Q Would you take a look and tell me if
2 this is a true and correct copy of the summative
3 evaluation that you prepared for the summer
4 semester of 2013 for a student named Karen Kam?
5 MR. LAND: Just note that the Bates numbers
6 on this exhibit are not sequential. It's missing
7 gaps.
8 THE WITNESS: Spring is crossed out, summer
9 is written in and it's dated in December. So I'm
10 not exactly sure when this was generated.
11 BY MS. SIEGEL:
12 Q That's fair. Would you look those
13 over and tell me if these appear to be true and
14 correct copies of evaluations that Karen Kam
15 received in the CRNA program at Rush?
16 A They appear to be. I don't know if
17 they're all the evaluations that were submitted
18 for that term. And looks like there is a --
19 there is a 2012 evaluation mixed in and her
20 evaluations from both the spring and summer term
21 of 2013.
22 Q All right. And if you look at the
23 second page of this exhibit, this appears to be
24 an evaluation by Eva Fisher of Karen Kam dated

---

Page 164

1 August 20th of 2013?
2 A Yes.
3 Q And Miss Fisher has rated Miss Kam as
4 unsatisfactory on four different categories; is
5 that right?
6 A On four different items, yes.
7 Q And she makes an additional comment
8 that Miss Kam is an unsafe practitioner, right?
9 A Yes.
10 Q She makes the statement that Miss Kam
11 still does not comprehend basic principles of
12 anesthesia; do you see that?
13 A Yes.
14 Q And then there is some additional
15 comments in areas that she claims that she is
16 improving, right?
17 A Right.
18 Q And there are no outstanding ratings,
19 are there?
20 A No.
21 Q Then there's a second evaluation from
22 Miss Fisher dated August 15th of 2013; is that
23 right?
24 A That's right.

---

Page 165

1 Q And here, again, there are four
2 different unsatisfactory ratings that she
3 receives?
4 A Yes.
5 Q And there are various satisfactory
6 ratings and five outstanding ratings, right?
7 A Right.
8 Q And on the third line on the
9 additional comments she makes the statement that
10 it's extremely unsafe for you to be in the OR
11 without knowledge of volatile agents; do you see
12 that?
13 A Yes.
14 Q If you look at the next page there is
15 a May 16th of 2013 evaluation of Miss Kam by Jill
16 Wimberly?
17 A Uh-huh.
18 Q Yes?
19 A Yes.
20 Q And she has given Miss Kam ten
21 unsatisfactory evaluations, right?
22 A Right.
23 Q And she makes the statement that -- if
24 you look on the second page of that evaluation

---

Maricel Marcial v.

Deposition of Michael Kremer
March 14, 2018

Page 166

1 there is some handwritten notes. And in the
2 second full paragraph she makes the statement --
3 Miss Wimberly makes the statement, I'll read it
4 into the record, "The other instance that was
5 overly concerning" overly underlined twice,
6 "Concerning this day was that during Karen Kam's
7 second case (TKA/AS44 BMI 55) Karen was",
8 underlined, "Completely oblivious", underlined,
9 "To frequent", underlined, "Oversaturations",
10 underlined. Do you see that?
11 A  The word is desaturations.
12 Q  Okay. Thank you. And she continues,
13 quote, "I have experienced this utter unawareness
14 to things going on with or going on to her
15 patient on other instances I've worked with her",
16 end quote. Do you see that?
17 A  Yes.
18 Q  And did you talk with Miss Wimberly
19 about that?
20 A  Probably.
21 Q  Did you talk with Miss Kam about that?
22 A  Very likely.
23 Q  And did Miss Kam agree with the
24 evaluation?

Page 167

1 A  I don't recall.
2 Q  Did she complain about her work with
3 Miss Wimberly?
4 A  I don't recall.
5 Q  And how did Miss Kam do in the program
6 ultimately?
7 A  She graduated and she passed the
8 certification exam.
9 Q  And as she progressed through the
10 program, how was her work typically evaluated by
11 other CRNAs apart from Miss Fisher and Miss
12 Wimberly?
13 A  I would have to see the entire file to
14 be able to answer that question.
15    MS. SIEGEL: Could you mark this as the next
16 exhibit, please.
17    (Whereupon said document was
18    marked as Plaintiff's Exhibit
19    Number 14, for identification,
20    dated 3/16/18.)
21    BY MS. SIEGEL:
22 Q  Have you had a chance to review that
23 exhibit?
24 A  Briefly. I have no way of knowing if

Page 168

1 this is all the formative and summative
2 evaluations that were completed on Miss Kam
3 during her time in the program.
4    (Discussion outside the
5    record.)
6    BY MS. SIEGEL:
7 Q  Looking over the Plaintiff's Exhibit
8 14 and looking at the ratings from Miss Fisher
9 and Miss Wimberly by comparison with other
10 evaluators over the term for work in clinicals,
11 would you say that the evaluations of Miss Fisher
12 and Miss Wimberly are consistent with the
13 evaluators -- with the ratings of other
14 evaluators of Miss Kam's performance?
15 A  I haven't had the opportunity to
16 review every document in this file. And as I
17 said, I don't know if this comprises her entire
18 file of evaluations.
19 Q  Well, of course, Miss Marcial did not
20 generate the evaluations and we're working with
21 what was produced to us. Do you see looking over
22 -- and I realize this is a voluminous document;
23 but are there things in here that appear to be
24 missing?

Page 169

1 A  I have no way of knowing that.
2 Q  All right. And as she proceeded
3 through the program, is it not correct that Miss
4 Kam was increasingly recognized as having
5 outstanding clinical performance?
6 A  I don't think that's an accurate
7 statement.
8 Q  All right. And how would you
9 interpret her overall progress?
10 A  I remember she had difficulty during
11 her pediatric rotation. One of the attending
12 anesthesiologist, Dr. Edmund Mangahas, has a
13 negative evaluation on one of the days he worked
14 with her.
15 Q  Now, you've testified earlier that
16 Miss Wimberly was a pediatric cardiology CRNA?
17 A  I don't think I testified anything to
18 that effect.
19 Q  Okay. What was Miss Wimberly's forte?
20 A  In what regard?
21 Q  As a CRNA, as a clinician and as an
22 instructor?
23 A  According to her clinical instructor
24 evaluations she's very bright and capable

Maricel Marcial v.

Deposition of Michael Kremer
March 14, 2018

Page 170

1 clinically. She had an extensive pediatric
2 critical care background before she came into
3 anesthesia.
4 Q And what is Miss Fisher's background?
5 A I don't know.
6 Q Do you know what Miss Kam's
7 performance was in her didactics?
8 A I don't have that information in front
9 of me.
10 Q Does a 4.0 sound, right?
11 A She successfully completed the
12 didactic curriculum.
13 Q Now, if you look at the period of May
14 through August in 2013 where Miss Fisher gave her
15 2 unsatisfactory evaluations and Miss Wimberly
16 gave her an unsatisfactory evaluation both with
17 scathing criticisms that she was unsafe; would it
18 have been fair to her to tell her that at that
19 point she had three strikes against her?
20 MR. LAND: Can you read that question back,
21 please.
22 (Record read by the reporter.)
23 THE WITNESS: The May evaluation would have
24 reflected the spring term. So these grades

Page 171

1 didn't all occur in the same academic term.
2 BY MS. SIEGEL:
3 Q And she had -- in the second term she
4 had two unsatisfactories; is that right?
5 A Right.
6 Q And would it have been fair to her to
7 state that she had two strikes against her?
8 A We likely discussed that she had two
9 unsatisfactory evaluations and that was a source
10 of concern that if she progressed through the
11 term, she couldn't get any other unsatisfactory
12 evaluations so it became a moot point.
13 Q In the summer of 2013 did you counsel
14 Miss Kam to consider other alternatives to the
15 CRNA program?
16 A I don't recall.
17 Q Did you question how she fit into the
18 practice of anesthesiology?
19 A No, I didn't.
20 Q Would you pull out again Plaintiff's
21 Exhibit 10. It should be among your documents.
22 It's Miss Wimberly's January 20th, 2014,
23 evaluation of Miss Marcial.
24 MR. LAND: What one are you looking for?

Page 172

1 MS. SIEGEL: January 20th of 2014.
2 THE WITNESS: Oh, January 20th of 2014.
3 MS. SIEGEL: Right.
4 MR. LAND: I don't know. Elaine, we don't
5 have that.
6 MS. SIEGEL: No?
7 MR. LAND: Neither one of us do.
8 MS. SIEGEL: Off the record.
9 (Whereupon a recess was taken
10 at 3:36 p.m. and the
11 deposition continued at 3:45
12 p.m.)
13 BY MS. SIEGEL:
14 Q Okay. Here is Plaintiff's Exhibit 10
15 previously marked. Dr. Kremer, are you familiar
16 with Plaintiff's Exhibit 10?
17 A I've seen it, yes.
18 Q And, again, Miss Wimberly was assigned
19 to work with Miss Marcial. How long had she been
20 back in the program -- Miss Marcial been back in
21 the program before she was assigned to be working
22 with Miss Wimberly again?
23 A I think this would have been roughly
24 the third week.

Page 173

1 Q And is it your testimony that you were
2 unaware that Miss Marcial had been assigned to
3 work with Miss Wimberly again?
4 A I was.
5 Q When did you first become aware of the
6 assignment?
7 MR. LAND: Object as asked and answered this
8 morning.
9 BY MS. SIEGEL:
10 Q Do you recall?
11 A Only when I saw the evaluation.
12 Q Did you have occasion to talk with Mr.
13 Narbone about Miss Marcial's assignment to Miss
14 Wimberly?
15 A I don't know for sure. The only other
16 conversation I remember with him about that was
17 in the summer of 2013 and asked him to minimize
18 the interaction, but that was at that time. It
19 wasn't something that feasibly could have been
20 implemented for the duration of her time in the
21 program.
22 Q Why not?
23 A Because there were over 40
24 anesthetizing locations at Rush. Around 150

Maricel Marcial v.

Deposition of Michael Kremer
March 14, 2018

---

Page 174

1 procedures were completed there every day.
2 Providers are moved around with some frequency.
3 So it is difficult to insure exactly who will be
4 assigned with whom at a given time.
5 Q Now, what was the point that you
6 requested that Miss Wimberly's contact with SRNAs
7 be minimized altogether?
8    MR. LAND: I'm sorry, could your read that
9 back?
10   (Record read by the reporter.)
11   BY MS. SIEGEL:
12 Q When?
13 A I don't recall.
14 Q Do you recall why?
15 A No.
16 Q Had you already put that request in by
17 January 20th of 2014?
18 A I don't know.
19 Q And did you have a meeting with Miss
20 Wimberly about this evaluation?
21 A We may have discussed it.
22 Q If you'll take a look at the second
23 page, look at the comments. Does that refresh
24 your recollection as to whether you may have

---

Page 175

1 discussed this with Miss Wimberly?
2 A It's likely that we would have
3 discussed it. I don't know exactly where or when
4 that would have taken place.
5 Q And, again, do you have any
6 recollection of the content of the discussion?
7 A No, I don't.
8 Q If you'll direct your attention to
9 February 3rd of 2014. Did you meet with Miss
10 Marcial at that time to review her formative
11 evaluations?
12 A I may have.
13 Q And did you remind her at that point
14 that the instructors completing the formative
15 evaluations were credentialed faculty?
16 A I may have.
17 Q Did Miss Marcial request to work at an
18 offsite location?
19 A She did.
20 Q When did that occur?
21 A I don't recall exactly.
22 Q Why did she say she wanted to go
23 offsite?
24 A I don't recall.

---

Page 176

1 Q Did she say it was because she wanted
2 -- Strike that.
3    Do you have any recollection of her
4 discussing working offsite so that she would be
5 in a supportive environment?
6 A I don't specifically recall such a
7 conversation.
8 Q Did she make a reference at any time
9 to wanting to go offsite so that her evaluations
10 would be free from bias?
11 A I recall that she was requesting to
12 have the opportunity to go to another clinical
13 site.
14 Q Did she give a reason?
15 A She may have.
16 Q But you don't recall?
17 A I don't recall.
18 Q As you sit here today is there a
19 reason that she couldn't have gone?
20 A I didn't hear the question.
21 Q As you sit here today is there a
22 reason why she couldn't do some training offsite
23 to be certain that she wasn't being evaluated in
24 a -- in a way that was free from bias?

---

Page 177

1 A That assumes that she was evaluated
2 with bias.
3 Q I'm not assuming that. I'm saying
4 that that may be the case, but what I'm asking
5 you is whether there were discussion of sending
6 her offsite to assure that she was in a situation
7 free from bias?
8    MR. LAND: Object to that question as vague.
9    THE WITNESS: I don't have a context for
10 bias or the assumption that any -- that there --
11 I don't have a context for bias.
12   BY MS. SIEGEL:
13 Q Well, what was Miss Marcial saying as
14 she objected to her evaluations?
15 A Regardless of the source as she
16 accrued more unsatisfactory evaluations from a
17 cross-section of clinical instructors, she always
18 refuted the accuracy and unfairness of those
19 evaluations.
20 Q And didn't it seem to be the case that
21 were she in an altogether different site, that
22 those objections would be answered?
23 A I'm not following the question.
24 Q All right. Didn't it seem that if

---

Maricel Marcial v.

Deposition of Michael Kremer
March 14, 2018

---

Page 178

1 Miss Marcial were to do some of her training
2 offsite, that the kind of inaccuracies that she
3 claimed were infecting her evaluations at Rush
4 would not be an issue?
5    MR. LAND: Object as lacking foundation and
6 calling for speculation.
7    THE WITNESS: There would be no way of
8 knowing if her performance would be the same or
9 different at another clinical site.
10 BY MS. SIEGEL:
11 Q  No, not unless she went there; isn't
12 that right?
13 A  Yes.
14 Q  Would you agree with me that sending
15 her to another site would be a means of testing
16 the validity of the Rush evaluations?
17 A  No.
18 Q  Why not?
19 A  Because we had credentialed experts
20 evaluating Miss Marcial at Rush. And because I
21 contacted the only other site that we had
22 available that wasn't a specialty rotation site,
23 Skokie Hospital. I had two conversations with
24 Dr. Sam Parnass, the Chair of the Anesthesia

---

Page 179

1 Department, and Laurie Goldman who was our CRNA
2 clinical coordinator. And without going into
3 detail I asked if there was a chance they would
4 consider taking a student who was still on
5 one-to-one supervision. And they said they
6 didn't have the staff to support that.
7 Q  When did you have that discussion?
8 A  I don't recall. It was some time
9 after she made the request.
10 Q  Did it come to your attention that on
11 April 8th of 2014 Miss Marcial submitted a
12 complaint to Shannon Shumpert alleging abuse and
13 mistreatment?
14 A  On April 8th of 2014?
15 Q  Yes.
16 A  I know there was an anonymous
17 complaint submitted through the compliance
18 hotline, but I don't know -- I can't say for sure
19 that I know about a complaint that went to the
20 Title 9 Officer on that date.
21 Q  What is the procedure for Title 9
22 complaints at Rush?
23 A  Miss Shumpert is the Title 9 Officer.
24 And in conjunction with the Office of Legal

---

Page 180

1 Affairs and the Human Resources Department an
2 investigation is conducted surrounding Title 9
3 complaints.
4 Q  What does that investigation -- What
5 would such an investigation consist of?
6    MR. LAND: Can I just ask why we are asking
7 about Title 9 investigation when this is not a
8 gender discrimination case?
9    MS. SIEGEL: Because the witness was talking
10 about Title 9 complaints.
11    MR. LAND: No, he mentioned what Shannon
12 Shumpert's role is which includes Title 9 work,
13 but that doesn't mean that he's talking about
14 Title 9 complaints.
15 BY MS. SIEGEL:
16 Q  Did it come to your attention that
17 Miss Shumpert on or about April 8th of 2014
18 received a complaint of abuse and mistreatment
19 from Miss Marcial?
20    MR. LAND: I object as asked and answered.
21 You asked him that exact same question before and
22 we talked about it like two or three times.
23
24 BY MS. SIEGEL:

---

Page 181

1 Q  You may answer.
2 A  I don't recall a complaint at that
3 point in time.
4 Q  Do you recall any other complaint from
5 Miss Marcial alleging abuse and mistreatment?
6 A  Well, I was made aware of an anonymous
7 complaint to the compliance hotline alleging
8 differential treatment of current and former
9 students in the nurse anesthesia program, but I
10 think that was the summer of '14.
11 Q  And did no one make you aware that
12 Miss Marcial had filed a complaint with the
13 compliance office at Rush?
14 A  At what time?
15 Q  In April of 2014.
16 A  Not that I recall.
17 Q  Were you aware in April of 2014 of a
18 legal claim brought by Miss Marcial?
19 A  I think that was around the time she
20 retained her first attorney.
21 Q  All right. And what was your
22 understanding of the legal issues that were
23 pending in April of 2014?
24    MR. LAND: Object to the question as vague.

---

Victoria Legal + Corporate Services
800.827.7708 www.victorialcs.com

Maricel Marcial v.

Deposition of Michael Kremer
March 14, 2018

Page 182

1  MS. SIEGEL: You may answer.
2  MR. LAND: Legal issues is really broad.
3  THE WITNESS: Generally I recall that the
4  concerns related to differential -- perceived
5  differential treatment on the base of age,
6  ethnicity and national origin.
7  BY MS. SIEGEL:
8  Q  And how did you -- how did you become
9  aware of those claims?
10  MR. LAND: Objection to the extent it calls
11  for communication with counsel. If you can
12  answer that without talking about communications
13  with counsel, go ahead.
14  THE WITNESS: I can't.
15  BY MS. SIEGEL:
16  Q  Did you receive any correspondence
17  regarding Miss Marcial's claims?
18  MR. LAND: Same objection. Instruct you not
19  to answer.
20  BY MS. SIEGEL:
21  Q  With the exception of correspondence
22  from your counsel, did you get any correspondence
23  regarding those claims?
24  A  It was through the Office of Legal

Page 183

1  Affairs.
2  Q  Did they transmit to you anything from
3  Miss Marcial's counsel?
4  MR. LAND: You know, he's not going to talk
5  about what legal counsel shared with him. That's
6  what you just asked, what did they transfer
7  anything to him. We're not talking about what
8  they decided to give him.
9  MS. SIEGEL: But if it's not a communication
10  from university counsel, it's not covered by the
11  privilege nor is it work product.
12  MR. LAND: But that's what you just asked.
13  Did they, meaning the Office of Legal Counsel,
14  share with him certain documents and I am not
15  going to let him answer questions about what
16  legal counsel decided to share with him or not.
17  MS. SIEGEL: The documents I asked about
18  were specifically documents from Miss Marcial,
19  and his notice of those claims is relevant and
20  it's not sheltered from the attorney/client -- by
21  the attorney/client privilege or the work product
22  doctrine.
23  MR. LAND: If you want to ask him about did
24  he see a document, you can. But if you want to

Page 184

1  ask him about did you see a document that legal
2  counsel for Rush shared with him, I'm not going
3  to let you ask him that.
4  BY MS. SIEGEL:
5  Q  Did you see a document from Miss
6  Marcial or her counsel regarding her claims?
7  A  Yes.
8  Q  And what was that?
9  A  It was correspondence from Sherry Bell
10  Rothenberg to David Rice.
11  Q  What did it say?
12  A  I don't recall other than what I've
13  already said.
14  Q  Did you tell Miss Marcial that she
15  couldn't resume her work in the program because
16  of her legal claim of discrimination?
17  A  I did not.
18  Q  Did you write to her, "Thank you for
19  your voicemail regarding the medical clearance
20  you received. Since discussions are ongoing
21  between our attorney and your lawyers, do not
22  return to the OR until there is resolution on the
23  legal front"?
24  A  That is correct. And the return of

Page 185

1  Miss Marcial to the clinical area was negotiated
2  by counsel for Rush and her counsel.
3  Q  And approximately when did she return?
4  A  I couldn't say for sure.
5  Q  On the 22nd of April did -- was Miss
6  Marcial offered a 5-week training period to begin
7  on May 5th?
8  A  That sounds correct.
9  Q  And what was -- Did you take any
10  measures -- Strike that.
11  Did you take any measures to assure
12  that when she returned that Miss Marcial would be
13  evaluated fairly and accurately?
14  A  As we discussed earlier, fair can't be
15  quantified.
16  Q  So did you take any steps to assure
17  fairness?
18  A  Miss Marcial was assigned with a
19  cross-section of clinical instructors at the
20  medical center. And with the resources we had
21  available, that was -- that was the best
22  available option.
23  Q  And how were those -- how was that
24  cross-section chosen?

Maricel Marcial v.

Deposition of Michael Kremer
March 14, 2018

Page 186

1 A  Mr. Narbone made the daily clinical
2 assignments.
3 Q  Did you take any role to review her
4 evaluations to ascertain whether or not they were
5 fair?
6     MR. LAND: At what time?
7     THE WITNESS: There is no way to quantify
8 fairness of evaluations.
9     MS. SIEGEL: I'm sorry, could I have the
10 answer back, please.
11    (Record read by the reporter.)
12    MR. LAND: I was trying to ask if you were
13 talking about that time period in May because
14 you've already gone over other evaluations and
15 asked him questions about that. I wasn't sure if
16 you were talking about prior questions or this
17 time period.
18    BY MS. SIEGEL:
19 Q  Does that answer apply to the
20 evaluations that were performed In May after
21 Ms. Marcial began the five-week training program?
22 A  What's the question?
23    MS. SIEGEL: Can we have the question again,
24 please.

Page 187

1    (Record read by the reporter as
2 follows:
3    "Q  Does that answer apply to
4    the evaluations that were
5    performed In May after
6    Ms. Marcial began the
7    five-week training program?")
8    THE WITNESS: My answer is it is not
9 possible to quantify fairness of a formative
10 clinical evaluation.
11    BY MS. SIEGEL:
12 Q  And you were speaking with reference
13 to the 5-week period in May in which Miss Marcial
14 had been given an opportunity to continue her
15 training; is that right, May of 2014?
16 A  I am not following.
17 Q  You stated that it's not possible to
18 quantify fairness in formative evaluations; is
19 that correct?
20 A  Yes.
21 Q  That's your testimony?
22 A  It is.
23 Q  Okay.  And does that testimony apply
24 to the 5-week period in May and June of 2014 when

Page 188

1 Miss Marcial was continuing her training?
2 A  It is a general observation related to
3 testing and measurement.
4 Q  Are there ways of -- in testing and
5 measurement of investigating for validity?
6 A  Sure.
7 Q  And how do you do that?
8 A  Psychometric tests can be performed to
9 determine if a measure -- measures what it is
10 intended to measure.
11 Q  And reliability is another factor;
12 isn't that right?
13 A  Those pertaining -- those terms
14 pertain to quantitative items like test questions
15 and reliability refers to the replicability of an
16 item to consistently capture the same kinds of
17 information.
18 Q  Now, can you judge qualitatively the
19 fairness and validity of formative evaluations
20 with respect to bias?
21 A  No.
22 Q  And is it fair to say that you took no
23 steps to investigate whether the evaluations of
24 Miss Marcial during that five-week training

Page 189

1 period were flawed by rater bias?
2 A  I had no reason to believe that the
3 evaluations were flawed by rater bias.
4 Q  And you didn't investigate to
5 determine whether or not there were rate bias?
6 A  There was no reason to believe that
7 there was rater bias.
8 Q  Did you investigate in any way to
9 determine whether or not there were rater bias?
10 A  There was no reason to believe that
11 there was rater bias.
12    MR. LAND: Can we take a short break?
13    MS. SIEGEL: Sure.
14    (Whereupon a recess was taken
15    at 4:12 p.m. and the
16    deposition resumed at 4:22
17    p.m.)
18    MS. SIEGEL: In an off-the-record discussion
19 we agreed to adjourn for the day.  We will have a
20 subsequent session to review certain documents
21 that are in the process of assembly and not yet
22 been produced by the defendants.  And we will
23 have approximately an additional hour of
24 questioning of the witness at the same time.

Maricel Marcial v.

Deposition of Michael Kremer
March 14, 2018

---

Page 190

1    MR. LAND: And the only thing I would add is
2  that you kindly agreed to give us some list of
3  topics that you would be asking about for that
4  extra hour of time that you could have done today
5  so that we can narrow our preparation efforts
6  accordingly.  We are mutually agreeing to that,
7  right?
8    MS. SIEGEL: Yes, that's correct.
9    MR. LAND: All right.  We'll reserve
10 signature.
11   (Whereupon the deposition
12   concluded at 4:21 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24

---

Page 191

1    IN THE UNITED STATES DISTRICT COURT
2    NORTHERN DISTRICT OF ILLINOIS
3    EASTERN DIVISION
4  MARICEL MARCIAL,            )
5    Plaintiff,      )
6  vs.                  ) No. 16 CV 06109
7  RUSH UNIVERSITY MEDICAL CENTER;  )
8  DR. MICHAEL KREMER, in his       )
9  individual capacity; RAY          )
10 NARBONE, in his individual        )
11 capacity; and JILL WIMBERLY, in  )
12 her individual capacity;          )
13   Defendants.      )
14
15
16   I, MICHAEL J. KREMER, Ph.D., CRNA,
17 CHSE, FNAP, FAAN, state that I have read the
18 foregoing transcript of the testimony given by me
19 at my deposition on March 16, 2018, and that said
20 transcript constitutes a true and correct record of
21 the testimony given by me at said deposition except
22
23   (CONTINUED ONTO NEXT PAGE FOR JURAT.)
24

---

Page 192

1  As I have so indicated on the errata sheets
2  provided herein.
3  _____
4
5  _____
6  MICHAEL J. KREMER, Ph.D., CRNA, CHSE, FNAP, FAAN
7
8
9
10 No corrections (Please initial)_____
11 Number of errata sheets submitted_____(pgs)
12
13
14
15 SUBSCRIBED AND SWORN TO
16 before me this   day of
17   , A.D., 2018.
18
19
20 Notary Public
21
22
23
24

---

Page 193

1  STATE OF ILLINOIS )
2    ) SS.
3  COUNTY OF L A K E )
4    I, JULIE WALSH, CSR, and notary public
5  in and for the County of Lake and State of
6  Illinois, do hereby certify that previous to the
7  commencement of the examination, said witness was
8  duly sworn by me to testify the truth; that the
9  said deposition was taken at the time and place
10 aforesaid; that the testimony give by said witness
11 was reduced to writing by means of shorthand and
12 thereafter transcribed into typewritten form; and
13 that the foregoing is a true, correct, and complete
14 transcript of my shorthand notes so taken as
15 aforesaid.
16   I further certify that there were
17 present at the taking of the said deposition the
18 persons and parties as indicated on the appearance
19 page made a part of this deposition.
20   I further certify that I am not counsel
21 for nor in any way related to any of the parties to
22 this suit, nor am I in any way interested in the
23 outcome thereof.
24

---

Maricel Marcial v.

<div align="right">

**Deposition of Michael Kremer**
**March 14, 2018**

</div>

<div align="center">Page 194</div>

```
 1            I further certify that this certificate

 2    applies to the original signed and certified

 3    transcripts only.  I assume no responsibility for

 4    the accuracy of any reproduced copies not made

 5    under my control or direction.

 6            IN TESTIMONY WHEREOF I have hereunto set

 7    my hand and affixed my notarial seal this 29th day

 8    of March, 2018.

 9

10

11

12

13

14                 Julie Walsh, CSR
                    Illinois CSR No. 084-004032
15

16    My Commission Expires

17    August 5, 2020

18

19

20

21

22

23

24
```

# EXHIBIT A20

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARICEL MARCIAL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. |
| vs. | ) 16-CV-06109 |
| | ) |
| RUSH UNIVERSITY MEDICAL | ) |
| CENTER, et al., | ) |
| | ) |
| Defendants. | ) |

The deposition of KAREN B. KREINER,

M.D., taken in the above-entitled cause before

Teresa Volpentesta, a notary public within and

for the County of Cook and State of Illinois,

taken pursuant to the Federal Rules of Civil

Procedure for the United States District Courts,

at Suite 2200, 120 South Riverside Plaza,

Chicago, Illinois, on the 12th day of March,

A.D. 2018, at 4:15 o'clock p.m.

Page 2

1  APPEARANCES:
2
3      ELAINE K.B. SIEGEL & ASSOC., P.C.
       (53 West Jackson Boulevard, Suite 405
4      Chicago, Illinois 60604
       312.583.9970), by:
5      Siegeledlaw@aol.com
       MR. MARK GOLDRICH and
6      MS. ELAINE K.B. SIEGEL,
7          On behalf of the Plaintiff;
8
       HUSCH BLACKWELL, LLP
9      (120 South Riverside Plaza, Suite 2200
       Chicago, Illinois 60606
10     312.655.1500), by:
       Karen.Courtheoux@huschblackwell.com
11     MS. KAREN L. COURTHEOUX,
12         On behalf of the Defendants.
13
14 ALSO PRESENT:
15     Ms. Maricel Marcial
16
17
18
19
20
21
22
23
24

Page 3

1              I N D E X
2  WITNESS                      PAGE
3  KAREN B. KREINER, M.D.
4  BY MS. COURTHEOUX                   4
5  BY MS. SIEGEL            52
6  BY MS. COURTHEOUX                  60
7  BY MS. SIEGEL            62
8
9
10
11           E X H I B I T S
12 NUMBER                       PAGE
13
14 No. 1  Handwritten Notes           13
15
16
17
18
19
20
21
22
23
24

Page 4

1          (Witness duly sworn.)
2          KAREN B. KREINER, M.D.,
3  called as a witness herein, having been first
4  duly sworn, was examined and testified as
5  follows:
6          EXAMINATION
7  BY MS. COURTHEOUX:
8      Q.  Hello again, Dr. Kreiner.
9      A.  Hello.
10     Q.  Thanks again for being here today.
11 Have you had your deposition taken before?
12     A.  Yes.  Not on this case, but on other
13 cases, yes.
14     Q.  How many times?
15     A.  I would say at least five.
16     Q.  Okay.  We will review that in a few
17 minutes.  I just wanted to know, because we will
18 go over some ground rules today, and I want to
19 make sure you are familiar with them.
20         The first ground rule for the
21 deposition is to ask you to please wait for me
22 to finish my question before you begin
23 answering.  Is that okay?
24     A.  That's fine.

Page 5

1      Q.  Please also answer audibly.  No
2  gestures, no sort of non-verbal responses, only
3  verbal responses; is that okay?
4      A.  That's okay.
5      Q.  And that's because Teresa our court
6  reporter will be taking down the things that you
7  say, and she can't take down just a gesture, of
8  course.
9          We will ask you to give full and
10 complete answers to our questions, and also, if
11 you don't understand a question, please say so.
12         After I ask it, if you answer it, I
13 will assume that you understand what I meant.
14 Is that okay?
15     A.  That is okay.
16     Q.  All right.  Please let me know if you
17 would like to take a break at any point.  We can
18 do that.
19     A.  I might need -- an emergency might
20 come through around 5:00 or just after 5:00,
21 which I will need to step out for.
22     Q.  Understood.  The only thing that we
23 will ask is for you to finish answering whatever
24 question has just been asked before we take any

2  (Pages 2 to 5)

Page 6

1  break.
2      A.  Okay.
3      Q.  But if you get a phone call, you
4  know, as soon as you answer the question, please
5  go ahead and take it.  Understood?
6      A.  Okay.
7      Q.  Lastly, are you taking any
8  medications, or do you have any other
9  circumstances that will make it difficult for
10  you to understand or respond to questions today?
11      A.  No.
12      Q.  Thank you very much.
13          Well, to start with, would you please
14  walk us through your education, starting with
15  undergraduate?
16      A.  Okay.  As on my CV, I trained as a
17  medical doctor in Cape Town, South Africa.  It
18  is a seven-year program, six-year degree
19  program, and then a year of compulsory
20  internship.
21          I then went to Cleveland where I did
22  a year of internal medicine residency as -- I
23  had to redo my internship.
24          I then did two years as a pathology

Page 7

1  resident, and then I switched to psychiatry
2  where I came to Rush and did -- they only
3  required me to do three years because of my one
4  year of internal medicine, and I did three years
5  of general psychiatry residency, and then I
6  stayed on an extra year to do a fellowship in
7  consultation liaison psychiatry.
8          So that's where my formal medical
9  education ended.  I have also -- I am a
10  qualified psychoanalyst and I trained for five
11  years at the Chicago Institute for
12  Psychoanalysis.
13      Q.  Thank you.  Just a couple of
14  follow-ups to that.
15          What is consultation liaison
16  psychology?
17      A.  Psychiatry.
18      Q.  I am sorry.  Psychiatry.  Thank you.
19      A.  It is when psychiatrists get called
20  in the general hospital to see all kinds of
21  medical and surgical patients, whether they have
22  psychiatric issues arising from their hospital
23  stay, or whether it is to treat psychiatric
24  patients who are on a medical or surgical floor

Page 8

1  to address their psychiatric needs, so it is
2  basically looking at the interface between
3  medicine -- general medicine and surgery and
4  psychiatry.
5      Q.  And can you also explain what it
6  means to be a qualified psychoanalyst?
7      A.  What it means is I did five years of
8  courses in psychoanalysis in various fields.
9          I had to undergo my own analysis and
10  then also pass various tests and exams and write
11  various papers and have a number of supervised
12  patients in order to fulfill the requirements
13  for that diploma.
14      Q.  Okay.  Are you licensed to practice
15  medicine in the State of Illinois?
16      A.  I am.
17      Q.  Any other states?
18      A.  No.
19      Q.  Are you board certified?
20      A.  Yes, I am, and I have been
21  re-certified once.
22      Q.  Do you have any history of
23  professional discipline; any reprimands,
24  suspensions of your license, anything like that?

Page 9

1      A.  No.
2      Q.  Could you describe your medical
3  practice?  How many providers are in your
4  practice?
5      A.  I am a solo practitioner.
6      Q.  Do you have any staff working with
7  you?
8      A.  No.
9      Q.  Had you met or did you know
10  Ms. Marcial in any capacity before she came in
11  as a patient?
12      A.  No.
13      Q.  Okay.  Let's circle back to the other
14  depositions you mentioned.  You said there were
15  at least five.
16          Is that about right?  Was it about
17  five or more than that, do you think?
18      A.  I don't think it was -- I don't think
19  it is more than five.
20      Q.  And how many of those depositions
21  were in your capacity as an expert?
22      A.  You mean as a psychiatrist giving
23  psychiatric -- I am not sure I understand your
24  question.

3  (Pages 6 to 9)

**Lake Shore Reporting Service**
A Magna Legal Services Company

Page 10

1    Q.   Understood.  So how many of those
2  depositions were you called as an expert
3  witness?
4         In other words, you weren't called in
5  your capacity as having been the treating
6  physician for a party, but rather to weigh in
7  generally with an expert opinion on the facts of
8  a particular case?
9    A.   I believe one time I was called in as
10  an expert, and I don't know if it is five
11  exactly, but the other times were because I was
12  the treating physician and my patient was
13  involved in legal action, and as a result,
14  similar to this, there was a lawsuit and my
15  testimony was required.
16    Q.   Okay.  Understood.  How recently was
17  your most recent testimony in a deposition?
18    A.   It was within the last -- we are now
19  in March, so I believe it was in November.  That
20  could be wrong.  It was in the -- definitely
21  within the last six months.
22    Q.   Okay.  Dr. Kreiner, you are here for
23  your deposition pursuant to a subpoena; is that
24  right?

Page 11

1    A.   That's correct.
2    Q.   And you also provided documents to us
3  pursuant to a subpoena?
4    A.   That's correct.
5    Q.   Can you just explain how you
6  identified the documents to produce to us?
7    A.   Well, you requested medical records
8  on Maricel, and I went to my file, and these
9  were the records that were there and those were
10  the ones that I provided.
11    Q.   So you had a certain file where you
12  kept --
13    A.   This is the file that I brought with
14  me.
15    Q.   Okay.  Thank you.  In the course of
16  your practice, you have had occasion to treat
17  Ms. Marcial?
18    A.   Yes.
19    Q.   When was her first visit?
20    A.   I am going to refer to my notes as
21  this case has been a long time ago, and so I
22  want to make sure that I report everything
23  accurately, and so I am going to very much stick
24  to what is in my notes and not wander off and

Page 12

1  speculate.
2         So August 15, 2013 was my first
3  encounter with her.
4    Q.   And if you would like to refer to
5  your notes, I think it will easier for all of us
6  if we use the version that we have page numbers
7  on actually.  So I will --
8    A.   I just -- I am not sure.  I have them
9  organized in the way that I know is the right
10  order.  I am not sure if you have them in the
11  right order.
12    Q.   I am not sure, either.  They are just
13  exactly as you gave them to us, but you should
14  continue to refer to the ones you have.
15         In some of my questions, I will ask
16  you to turn to a particular page, so for that
17  reason, I would like to hand you this packet of
18  documents.  Do you recognize what this is?
19    A.   Yes, they are my notes.
20    MS. SIEGEL:  Could we have a set of those,
21  please?
22    MS. COURTHEOUX:  Yes.  Here you go.  This
23  is Exhibit 1, please.
24

Page 13

1         (Whereupon Kreiner Deposition
2          Exhibit No. 1 was marked for
3          identification.)
4  BY MS. COURTHEOUX:
5    Q.   So Maricel's first visit was on
6  August 15, 2013.
7         Do you know how it came to pass that
8  Maricel sought out your practice?
9    A.   At that time, I was the psychiatrist
10  for the Rush University Counseling Center, and
11  so she had seen Dr. Terebessy, and so
12  Dr. Terebessy then would refer students/patients
13  to me who needed evaluations for medication.
14    Q.   Had Dr. Terebessy told you anything
15  about Maricel prior to her first visit?
16    A.   As I said before, this has been a
17  long time ago.  I don't remember.
18         It was customary, however, that she
19  would call and leave a message about the
20  students, but I cannot say specifically in this
21  case that it happened, because I don't have
22  anything documented.
23    Q.   When Dr. Terebessy called and left
24  messages about students generally, not referring

4  (Pages 10 to 13)

Page 14

to Maricel now, what types of information did she usually provide?
A. You know, I haven't worked with the students for awhile now since I believe 2016, and so I don't remember.
Q. Why did you stop working with the students?
A. I worked with the students for a long time, at least ten years, and sometimes enough is enough.
Q. Was that your decision?
A. What's that?
Q. Was it your decision to stop?
A. Yes.
Q. Do you recall when Maricel first came in whether you felt you knew anything about her in advance?
A. As I said, I am going to stick to what I have got written, because I would just be speculating.
Q. I am just asking if you remember.
A. No. I mean, this is back in 2013.
Q. What usually happens at a patient's first visit?

Page 15

A. So what usually happens is I take -- as you can see on the cover sheet, I would take their name, their address, date of birth, an emergency contact.
I would -- for the students, I would always -- if there were more than one counselor, I would see what counselor they were seeing, and then I would also write what program they were in, and she was in the Nursing Anesthesia Program.
So that's how every visit would start, and then it would become a general psychiatric interview, and that's what follows next.
Q. Okay. Let's look at the first page of the packet that I have here, which seems to match up with your first page. This is marked Kreiner 1.
It looks like you have got Maricel with her address, phone number, date of birth, emergency contact, the name of Dr. Terebessy; is that correct?
A. Yes.
Q. And then what's that last line, if

Page 16

you could read that to me?
A. Nursing Anesthesia.
Q. That's her program?
A. Yes.
Q. Okay. Thank you. What did Maricel tell you at her first visit?
A. Well, I am going to refer -- if we could just walk through the notes, because -- so if we go to Page 2. They are the same.
So firstly I go through the medical history, and she reported that had a breast lump and was having yearly mammograms.
I asked her what medication she was on, and she wasn't taking -- she wasn't on the pill. She wasn't taking any medications.
I asked her if she had any drug allergies. She denied that. I asked her if she smoked cigarettes. She said no. She drank occasionally, and there was no use of any drugs.
And then I always ask about family history. She said there was no depression, no bipolar disorder, no schizophrenia, and then she told me she had -- if I read my notes correctly, an aunt with worries and was a question mark of

Page 17

whether this was real clinical anxiety, and then lastly, she said in her family history she had a brother on drugs, and I have there in quotes "jumped," and I am not sure -- I can't read the next word if that's suicide or not. I am not sure. I don't want to say it is, because I can't read my writing.
Q. Okay.
A. Then I ask her about past psychiatric history, and she said she had seen an acute care doctor and had took one dose of Zoloft, and it made her really anxious and it felt like her skin was crawling out of her, and it was just 25-milligrams, and she had taken one dose.
Q. Is that a relatively low dose, or how would you characterize the dose?
A. Yeah, that's a low dose, but certainly people can have a very anxious response to just a very low dose of Zoloft. That can be seen.
Q. Next to the word Zoloft in your notes, can you read what's to the right of that?
A. Very anxious.
Q. Okay. Can we proceed to the next

Page 18

page? That's Page 3.
A. Okay. So now moving to what was presently going on. She was about to be on a leave of absence. She reported had a man in with Crohn's and had got written up, also had two bad evals, and I can't read the word after that.
The next line says tied to work performance, anxiety -- the next line says anxiety increased and -- there is something about a lapse of memory. If it is simple things, lapse of memory, I can't read it.
She would wake up at night -- she would wake up terrified; are they are going to expel me.
Her anxiety was high, high. Those are what the arrows mean, but then her anxiety had been high, high, and then it had gone down.
She was sleeping four to five hours a night, and that had improved since. She was up to seven hours a night.
She used to have to force herself to eat. It was very -- I put a plus meaning that was really hard -- she really had to force

Page 19

herself to eat, but now her appetite had been about back to normal. She couldn't keep anything down before.
I think the next line reads with her loss of appetite, she was anxious about stuff coming back. She also felt embarrassed about it, worried about if and when going to graduate, and in brackets also have loans. I presume that's student loans.
Her focus was okay, could retain some. Once in awhile felt sad and crying. She had been running and doing yoga to decrease the tension.
Her energy level was fair. Some days had to push self; other days, can get into it. Something holding me from being myself. Because of what's going on, embarrassed, humiliated, what is going on.
No suicidal ideation, more irritable than usual. In the past, no episodes of depression, but had anxiety in school before when didn't feel -- I can't read those two words. I am sorry.
Q. That's okay.

Page 20

A. Then I did a screening. There was no history of anorexia, bulimia, no history of mania or hypermania, no history of seizures or headaches.
Her thyroid had been checked, no history of obsessive/compulsive disorder, and I assessed her as having an adjustment disorder with anxiety that was getting better.
The patient wanted to be on medication. I wasn't sure if medication was indicated, but I said we could try Celexa 10-milligrams, and I explained the risks and benefits of taking the medicine.
Q. Thank you for walking us through that.
If you could turn back to Page 3, I just have some questions about what you shared with us.
A. Sure.
Q. So there were a couple of points when it seemed like there were comparisons between two points in time.
For example, anxiety increased and then anxiety was very high?

Page 21

A. Right.
Q. Do you have a sense of when those points in time were?
A. I can't say exactly when and exactly the days or months when they were. All I can tell you is that before she came to see me, it appears from my notes that she was very, very anxious and was not sleeping well. Her appetite had been very, very poor, and but it had improved some by the time she had got to see me.
Q. Why had it improved before she got to you? Specifically, I am referring to the sleeping and eating.
A. I don't know. Sometimes -- I don't know. I didn't write -- I didn't ask. I don't know. Sometimes it can just improve. I don't know.
Q. And you are not sure how far -- how recently it had improved before she came to see you?
A. No.
Q. Under the discussion of appetite, you said that Maricel was anxious about something coming back?

Lake Shore Reporting Service
A Magna Legal Services Company

Page 22

1    A.   She was anxious about -- all I is
2  have is with loss of appetite, she was anxious
3  about coming back.  I am not sure.  This is
4  2013.  I am not sure.
5    Q.   Could it have meant coming back after
6  a leave of absence in the program?
7    MS. SIEGEL:  Calls for speculation.
8    THE WITNESS:  I would be speculating if I
9  said yes.
10 BY MS. COURTHEOUX:
11   Q.   That's one of the things it could
12 mean, I take it?
13   A.   It could, or it could also mean she
14 was anxious about her anxiety coming back and
15 getting bad again.
16   Q.   A couple lines down from there you
17 mention that Maricel expressed feeling
18 embarrassed about it.  What did you understand
19 "it" to mean?
20   A.   Again, this is 2013.  I don't
21 remember.
22   Q.   Further down, she mentions again
23 embarrassment, humiliation with what is going
24 on.

Page 23

1    A.   Again, I would say there it is either
2  what was going on at school or embarrassed
3  that -- about her anxiety.
4       A lot of patients get embarrassed and
5  humiliated, they need to come and see a
6  psychiatrist.  So it could be either, and I
7  would be speculating to say which one it was.
8    Q.   At this first visit, did you talk
9  much about school with Maricel?
10   A.   Well, I could only comment on what I
11 have documented.
12   Q.   I understand.  I am trying to
13 understand, though, you know your habit of
14 note-taking, so would you say that if school is
15 reflected only at certain points in the
16 conversation, those were the only times it was
17 raised?
18   A.   I mean, this is an hour appointment,
19 so if I wrote down everything that the person
20 said, you would have, you know, reams and reams
21 of paper so I try and write down the main points
22 as well as the main clinical symptoms, because I
23 am doing a medicine evaluation.  I am not her
24 treating therapist.

Page 24

1    Q.   As a psychiatrist, when you hear a
2  patient say there is something holding me back
3  from being myself, how do you interpret that?
4    A.   I mean, it can be -- well, here the
5  answer is in the next line.  I wrote the answer.
6    Q.   Okay.
7    A.   Something holding me back from being
8  myself, in brackets, because of what's going on;
9  embarrassed, humiliated with what's going on.
10   Q.   Okay.  I missed "because of."  I
11 didn't understand that.
12      Now, toward the bottom you mention
13 that Maricel told you she had had anxiety in
14 school before?
15   A.   Yes.
16   Q.   Do you know if she meant previously
17 within her program or previously like in another
18 stage of schooling?
19   A.   I don't know the answer to that.
20   Q.   And you don't know in terms of time
21 how long ago that would have been?
22   A.   No.
23   Q.   What is an adjustment disorder with
24 anxiety?

Page 25

1    A.   So it is when there is a situation
2  that is causing anxiety, and that's why -- and
3  you have some kind of stressor giving you
4  anxiety, and so we label that an adjustment
5  disorder with anxiety, and -- yeah.
6    Q.   How would you characterize what you
7  believed Maricel's stressor to be at the time?
8    A.   At the time, she was about to be
9  going on a leave of absence, and I -- from
10 school, and I have seen many Rush students, and
11 that's always a very stressful thing for them.
12   Q.   The leave itself?
13   A.   Well, just the whole process of being
14 put on leave and taking leave is very stressful,
15 what has led up to taking the leave.
16   Q.   And in Maricel's case, what led up to
17 taking the leave?
18   A.   Well, again, I want to stick to what
19 I have written, because I don't want anything to
20 be inaccurate so...
21   Q.   Well, in that case, I think I am
22 asking you to interpret your notes for us.
23   A.   It would be total speculation the
24 exact reason why she took leave.  I don't know.

Lake Shore Reporting Service
A Magna Legal Services Company

Page 26

1     Q.   Based on your notes, would you say
2 that issues in her work performance could be the
3 stressor or one of the stressors?
4        I see that here on the fourth line of
5 Page 3.
6     A.   Oh, yeah, she reported that she had
7 two bad evals and had got written up. I am not
8 going to speculate whether that was the reason
9 why she took a leave. I don't know. I don't
10 remember.
11     Q.   Is it your impression that some of
12 the conditions that are described here at the
13 top of Page 3 were contributing to her stress at
14 the time?
15     A.   Absolutely.
16     Q.   And specifically, that would include
17 the bad evaluations, getting written up, work
18 performance, lapse of memory; is that fair?
19     A.   Well, up until you said lapse of
20 memory, that would be fair, because the lapse of
21 memory, whether that was a stressor or whether
22 that was secondary to her anxiety is not clear.
23     Q.   I see. So just what comes above that
24 in the notes?

Page 27

1     A.   Yes.
2     Q.   I see. Turning back to Page 4, could
3 you say again the name of the drug that you
4 prescribed at the end of that first meeting?
5     A.   Celexa.
6     Q.   And what did you explain were the
7 benefits and risks of Celexa?
8     A.   Well, Celexa is a very typical
9 selective serotonin reuptake inhibitor. It is
10 commonly used to treat anxiety or depression.
11        It is a very low risk, high benefit
12 drug. It is very good for treating young women,
13 because it doesn't give you any weight gain.
14        The negatives are it can sometimes
15 increase anxiety, occasionally increase
16 depression, occasionally cause suicidal
17 thoughts, can give you stomach upset, give you
18 sleep problems, and sexual dysfunction.
19     Q.   Anything else?
20     A.   And if you have a bipolar
21 predisposition can make you manic.
22     Q.   Can we turn to the next appointment
23 and walk through your notes there?
24     A.   Yes. So the next time I saw her was

Page 28

1 on 9/6 of '13, and she had been on 10-milligrams
2 of Celexa for about 18, 19 days.
3        She said her side effects, she had a
4 twitch in her right eye. It was not visible
5 to -- but she could feel it.
6        She also had a queasiness in the
7 morning, in the a.m., but she was able to eat
8 and her appetite was okay.
9        She said also the queasiness was not
10 bothersome, but she felt it most of the time,
11 and after she ate food, she felt okay.
12        To the left, the current stress was
13 of being held back and not being able to be in
14 school, and then moving on, held back for
15 school, which is I think the word I wrote is
16 depressing.
17        A lot of pretty -- a lot of pretty
18 good days, more optimistic. Unfortunately, I
19 can't read but, but there were question mark
20 whether there was any changes from the
21 medication yet.
22        She was not -- she was not --
23 something in tears, so it doesn't seem like she
24 was crying anymore. She was sleeping eight

Page 29

1 hours, better. Her appetite had been good. Her
2 focus was okay. Her energy level had been good.
3 No suicidal thoughts, because there was a
4 question mark of whether the medicine was
5 working or not, and also we increased the dose
6 to 20-milligrams and to be taken with food.
7     Q.   Based on what Maricel told you at
8 that September meeting, September 2013, did you
9 believe that the medicine was working?
10     A.   I said there was a question mark if
11 you look at the bottom of the page whether there
12 were any changes from the medication yet.
13     Q.   So if it wasn't the medication, what
14 would you attribute what she reported in terms
15 of her sleeping, not crying, and appetite? How
16 would you attribute that, if not to the
17 medication?
18     A.   Well, anxiety -- again, this is pure
19 speculation, as it happened a long time ago.
20 Anxiety can wax and wane, people can feel better
21 for short periods. They cycle up and down.
22     Q.   Does that also mean that people with
23 anxiety can also feel increased anxiety or dips
24 in mood without a particular trigger?

8 (Pages 26 to 29)

Page 30

1    A.   That's a very -- I am going to answer
2 you this way:  Once somebody has a known anxiety
3 disorder, anxiety can come and go without --
4 once you have established anxiety, there are
5 triggers which obviously make it worse and
6 things which can make it better, but anxiety and
7 depression, for that matter, can come and go
8 once you have an established pattern of anxiety
9 without there being triggers.
10   Q.   Did Maricel have an established
11 pattern of anxiety?
12   A.   I wouldn't want to say that.  I had
13 only known her a month at that point.  She
14 definitely had -- she had anxiety symptoms, yes,
15 but was she a patient like I have just described
16 who for years has suffered from anxiety, no, but
17 again, we are speculating here.  I want to stick
18 to what Maricel.
19   Q.   I understand, and I am not trying to
20 ask you things -- I am not asking you to state
21 anything you don't recall about Maricel.
22        I am trying to educate myself a bit
23 on what these conditions mean.
24   A.   Sure.

Page 31

1    Q.   So adjustment disorder, that is a
2 distinct disorder from an anxiety disorder?
3    A.   Correct.  Well, it is an adjustment
4 reaction with anxiety, which is separate from
5 like a panic disorder or a generalized anxiety
6 disorder, which isn't brought on by a stressor.
7    Q.   I have another question about the
8 September meeting.
9        Was that the expected lag time
10 between her first and second visits to you?  The
11 first one was August 15, 2013, and the second
12 one was September 6th.
13   A.   Yes, usually I will when starting a
14 patient on medication, I will usually see them
15 within two to three weeks of starting that
16 medicine, and she certainly came back within two
17 to three weeks.  I even have 18 to 19 days.
18   Q.   By the end of the September meeting
19 with Maricel, had you developed an impression of
20 what Maricel's experience was like in the
21 program at Rush?
22   A.   These follow-up visits were 20 to 30
23 minutes long.  They weren't extensive meetings
24 like the first meeting.

Page 32

1        Again, I am going to stick to what is
2 on my notes, because I would be speculating.
3    Q.   So I asked you whether you developed
4 any impression of what her experience was like
5 in the Rush program.
6    A.   I thought we have covered that.  You
7 know, she had a bad -- you know, she had two bad
8 evals, she had got written up.  I don't, you
9 know, those are the facts.
10   Q.   Well, those are what she explained to
11 you?
12   A.   Hmm-hmm.
13   Q.   You didn't have any independent
14 understanding of outside of what she told you
15 about what her experience was in the program;
16 correct?
17   A.   Well, again, I want to stick with
18 what is written here, because this was 2013.  I
19 can't remember.  I mean --
20   Q.   I am just asking whether you knew
21 anything about Maricel's experience in the
22 program aside from what she told you?
23   A.   That would be -- you know, I treated
24 a lot of Rush students in all different -- and

Page 33

1 so I would be totally -- you are asking me to
2 remember something from being 2018 from
3 four-and-a-half, you know, years ago, and I
4 can't do that.
5    Q.   Did you ever review records from
6 Maricel's academic file from Rush?
7    A.   No.
8    Q.   Did you ever speak with any of her
9 clinical instructors at Rush?
10   A.   No.
11   Q.   Did you ever hear thirdhand or
12 secondhand about Maricel's reputation in the
13 program from people other than Maricel?
14   A.   Not that I can recall.
15   Q.   Were you in touch with anyone from
16 the Nurse Anesthesia Program at the time you
17 were treating Maricel?
18   A.   No.
19   Q.   When you were treating patients who
20 were students that had been referred by
21 Dr. Terebessy, did you usually give any kind of
22 update to Dr. Terebessy?
23   A.   Sometimes, yes.
24   Q.   Do you recall doing that with

Lake Shore Reporting Service
A Magna Legal Services Company

Page 34

1    Maricel?
2        A.    I don't recall.
3        Q.    Did Dr. Terebessy give you updates
4    when you were treating the same patient as well?
5    I mean, generally speaking?
6        A.    I would say it is probable, but I
7    don't recall.
8        Q.    Well, I understand that Dr. Terebessy
9    referred many patients to you when you were
10   serving as the psychiatrist for Rush students
11   through the Counseling Center.
12           Was it -- was it typical that you and
13   Dr. Terebessy would have no contact after that
14   referral about a student as if you were both
15   treating the student, or was it more typical
16   that you would periodically touch base?
17       A.    We would certainly touch base if
18   there were issues and problems with that
19   student.
20           Certainly, if a student came to me
21   and they were suicidal or I had to do something
22   urgently, I would touch base with her.
23           She would touch base with me if there
24   were specific concerns she had about students,

Page 35

1    but for students who would seem to be doing
2    okay, we wouldn't have regular contact on them,
3    no. Except maybe once a year, we would get
4    together once or twice a year, we would get
5    together and go over just in general the --
6    where students were.
7        Q.    Do you have notes from those once or
8    twice a year meetings with Dr. Terebessy?
9        A.    No.
10       Q.    Do you recall speaking with
11   Dr. Terebessy about Maricel after the initial
12   referral?
13       A.    I don't recall.
14       Q.    Based on your notes of what you
15   discussed with Maricel, do you believe Maricel
16   would fall into the category of students who you
17   would have touched base with Dr. Terebessy after
18   the initial referral or the category of students
19   who you more likely would not have?
20       MS. SIEGEL: I am going to object to the
21   lack of foundation.
22       THE WITNESS: Again, the fact that she was
23   going to go on a leave of absence, that's a
24   serious thing, but there was no suicidality.

Page 36

1    There was no imminent urgent thing.
2           I can't recall whether I spoke with
3    Dr. Terebessy or not.
4           Again, I would be speculating if I
5    said her leave of absence would make me call her
6    afterwards.
7    BY MS. COURTHEOUX:
8        Q.    Did you and Dr. Terebessy when you
9    compared sort of notes on students that you were
10   both treating, did you generally agree on things
11   like diagnoses and treatment plans?
12       A.    I would say the majority of the times
13   we agreed. I wouldn't say we agreed with every
14   patient.
15       Q.    Let's move on to the next
16   appointment, which was October 12th, 2013,
17   according to your notes on Page 6.
18           If you could tell us what happened on
19   October 12th, please.
20       A.    Sure. So she was -- Maricel was
21   taking Celexa 20-milligrams a day. Side
22   effects, the twitching had gone away, but still
23   got queasy in the morning.
24           She was not feeling depressed.

Page 37

1    Anxiety was decreased, doesn't feel as rattled,
2    but not in the situation.
3           Improvement with other -- I think
4    that says improvement with other stomach GI
5    symptoms, I think.
6           Sleeping okay, appetite okay, energy
7    okay, focus okay. Having some fun, went on a
8    trip, went driving, actually enjoyed it, not
9    anxious by -- I have to take this. Sorry.
10          (Short break in proceedings.)
11   BY MS. COURTHEOUX:
12       Q.    Are you able to continue?
13       A.    Yes.
14       Q.    I believe we left off --
15       A.    Actually enjoyed it, not anxious
16   by -- I can't read the next two words.
17          Irritable negative, no suicidal
18   ideation, can tolerate the queasiness.
19          Her mental status exam, her affect
20   was full range, and continue present management.
21       Q.    Can you explain that MSE something
22   exam that you mentioned?
23       A.    Well, that's a typical -- any
24   psychiatric exam, you do a mental status exam,

10  (Pages 34 to 37)

Page 38

1  and her affect is how she looked, and she had a
2  full range of affect, meaning, there was no
3  obvious sadness or anxiety or -- just was
4  normal.
5      Q.  So it looks like it had been between
6  maybe about five weeks since her last
7  appointment when she came in in October 2013?
8      A.  Right.
9      Q.  Would that have been an expected
10 length of time since the last appointment?
11     A.  Yes.
12     Q.  Up above you wrote, anxiety has
13 decreased, don't feel as rattled, but not in the
14 situation.
15         Can you explain what you meant by
16 that?
17     A.  Again, I am guessing, but not in the
18 -- I think Maricel was now on leave, so she
19 wasn't in the nursing program.
20     Q.  So in your view, by October 2013,
21 treatment was going well for Maricel?  Would you
22 say that?
23     A.  I would say she was doing better,
24 yes.

Page 39

1      Q.  You would say she was making
2  appropriate progress?
3      A.  Yes.
4      Q.  Could you tell at this point if the
5  medication was working?
6      A.  I mean, it did appear -- I mean, she
7  appeared to be better, so the medication could
8  be working, yes.
9      Q.  Okay.  Let's go to the next one,
10 please.  When was Maricel's next visit?
11     A.  On February 12 of 2014.
12     Q.  And we are on Page 7; correct?
13     A.  Yes.
14     Q.  Okay.  Could you walk us through what
15 happened on February 12th, please?
16     A.  It says she was still taking Celexa,
17 20-milligrams a day.
18         I have an arrow that I made, so I
19 would like to do that first just so it makes
20 more sense.
21     Q.  Okay.
22     A.  Don't feel that it is because of my
23 anxiety.  It is because of what I am up against.
24 I am going against the buddy system.  They want

Page 40

1  you to quit.
2         Able to sleep, appetite okay, but a
3  -- something secondary to stress.  I can't read
4  that.
5         Energy okay, focus at times down
6  because sleep is inadequate, no insomnia.  She
7  had no insomnia, which means she could fall
8  asleep but doesn't get enough sleep, not
9  irritable, no anhedonia, felt better with family
10 and husband, no suicidal thoughts, occasionally
11 wakes up in the middle of the night, anxious
12 secondary to -- I can't read that, and then
13 going back to the first paragraph, plus going
14 back to school, question, when will get kicked
15 out of school.  That's leading to increased
16 stress.  Waiting to hear from the dean and vice
17 provost.  Hopes are lower of passing or
18 something.  Feels that not being treated fairly,
19 feels like -- feels like there is no system,
20 feels that being bullied.
21     Q.  Did you expect there to be four
22 months between Maricel's October visit and her
23 next visit after that?
24     A.  It is customary at Rush when students

Page 41

1  go on leave that I no longer am the treating
2  doctor, because Rush, when they go on leave,
3  Rush doesn't cover it, and so when they go on
4  leave, they have to make other arrangements for
5  their care.  So it would not be unusual that I
6  didn't see her while she was on leave.
7      Q.  Are you aware whether Maricel made
8  other arrangements to meet with a psychiatrist
9  while she was on leave?
10     A.  I am not aware.  I don't know.
11     Q.  Do you recall offering her any
12 suggestions of who to see if she couldn't see
13 you because she wasn't -- because she was on a
14 leave of absence?
15     A.  I don't recall that.
16     Q.  What is anhedonia?
17     A.  She had no anhedonia, which means she
18 could still enjoy things.
19     Q.  Is it fair to say that Maricel talked
20 to you substantially about her experience in the
21 program at this February visit?
22     A.  Well, she did talk about the program,
23 yes.
24     Q.  Did she tell you why she felt she was

11  (Pages 38 to 41)

Page 42

1　at risk of getting kicked out of school?
2　　A.　Well, as I said, she didn't feel that
3　it was because of her anxiety.  She said that it
4　was what she was up against.  She was up against
5　a buddy system.  She said they just wanted you
6　to quit.  The exact reason why, no, I don't have
7　that documented.
8　　Q.　Looking back now, do you have any
9　impression of why she was concerned about her
10　ability to complete the program, concerned that
11　she might get kicked out of the program?
12　　A.　Could you repeat the question,
13　please.
14　　MS. COURTHEOUX:  Could you read it back,
15　please.
16　　　　(Record read.)
17　　THE WITNESS:  She certainly expressed her
18　concerns about getting kicked out of the
19　program, whether she would pass or graduate from
20　the program.  She said anxiety wasn't the
21　problem.  It was what the system she was up
22　against.
23　BY MS. COURTHEOUX:
24　　Q.　Is it consistent with what you recall

Page 43

1　about Maricel that she was getting kicked out of
2　school or at risk of getting kicked out of
3　school because of misconduct like theft or
4　acting out?
5　　A.　Can you repeat that?
6　　MS. COURTHEOUX:  Can you repeat that,
7　please.
8　　　　(Record read.)
9　　MS. SIEGEL:  I am going to object to the
10　form of the question, assumes facts not in
11　evidence.
12　　THE WITNESS:  If you are referring to theft
13　or misconduct, there is nothing that I am aware
14　of from these notes.  Misconduct is a very broad
15　word.
16　BY MS. COURTHEOUX:
17　　Q.　As you sit here today, is it a great
18　mystery to you why Maricel was in jeopardy of
19　being kicked out of the program when you were
20　treating her?
21　　A.　As I said earlier -- as we said
22　earlier, I did not have access to her academic
23　records.  I did not speak to her professors or
24　advisors.  I have snippets of information here

Page 44

1　and there.
2　　Q.　So you formed no impression about
3　what Maricel's issues in the program were that
4　were leading her to be in jeopardy of being
5　dismissed?
6　　A.　Could you repeat that, please?
7　　MS. COURTHEOUX:  Would you please read it
8　back?
9　　　　(Record read.)
10　　THE WITNESS:  Again, as I said, I told you
11　that I knew she had been written up, she had two
12　bad evaluations, but the exact reasons why, no,
13　but I have also said that she said that she was
14　up against a system, that they wanted her to
15　quit.
16　　　　So the -- it is -- I have a little
17　bit of information about what she did, certainly
18　not the whole picture, and I have some
19　information of -- that she reported of the
20　system that she was up against, the buddy
21　system, and wanting her to quit.  That's about
22　all I know.
23　BY MS. COURTHEOUX:
24　　Q.　What was the buddy system?

Page 45

1　　A.　Again, this is speculation, total
2　speculation.  I am kind of having a problem
3　here, because I have seen other students from
4　this program, and so I cannot reveal other
5　information without their consent.
6　　Q.　I haven't asked you about any other
7　patients specifically.  I am just asking you
8　what you meant when you wrote the "buddy
9　system."
10　　A.　What I think can happen is there can
11　be a couple of instructors who decide, you know,
12　you don't fit into our country club, and then
13　they kind of gun for you after that and they can
14　make your life very difficult.
15　　Q.　Is it your belief that that's -- that
16　that actually happened to Maricel in the
17　program?
18　　A.　Again, I said I was talking in
19　general.  I cannot say that that happened to
20　Maricel specifically.
21　　　　You asked me to extrapolate on that,
22　and I did, and whether I can say that exactly
23　happened to Maricel, of course I can't, but that
24　is what I know can happen.

12  (Pages 42 to 45)

Page 46

1    Q.    So here is it fair to say that you
2  were just reporting what she subjectively felt
3  was going on; that she felt subjectively like
4  she was being bullied?
5    A.    I am not sure where you get the word
6  "bullied." Oh, yes, fear of being bullied, yes.
7  Feels like there is no system, fear that she is
8  being bullied, yes.
9    Q.    Is that true also when you say,
10 "going against the buddy system," is it that
11 Maricel felt she was going against this buddy
12 system, or were you reporting that you believed
13 she was going against the buddy system?
14   A.    No, this is what she reports to me.
15 I don't feel that it is because of my anxiety.
16 It is because of what I am up against. I am
17 going against the buddy system. They want you
18 to quit.
19   Q.    Thank you. What -- who did you --
20 excuse me. Strike that.
21        Who is "they" when you have written,
22 "they want you to quit"? Who did she feel
23 wanted her to quit?
24   A.    Her instructors, her nursing

Page 47

1  instructors, professors.
2    Q.    Did Maricel mention worrying about
3  how she would be perceived by her peers if she
4  was dismissed from the program?
5    A.    By her peers? If I didn't comment on
6  it before in my notes, then no. We went through
7  my notes. If I didn't comment on it before,
8  then the answer is no.
9    Q.    Did Maricel complain to you of any
10 physical injury?
11   A.    Not that I have documented, no.
12   Q.    Is that something you would have
13 documented if she reported it to you?
14   A.    What sort of a physical injury are we
15 talking about?
16   Q.    Really any physical injury. I
17 haven't heard -- based on your notes, I haven't
18 seen anything in here about any physical injury,
19 only physical conditions, emotional conditions.
20   A.    I would certainly say that it is my
21 practice if somebody reports a physical injury
22 that if it is of any significance, I would make
23 documentation of that.
24   Q.    Did Maricel complain to you of any

Page 48

1  pain?
2    A.    Again, if it is not documented, then
3  I cannot comment.
4    Q.    If she was in physical pain, is it
5  your practice normally to include that in your
6  notes?
7    A.    Yes, if she complained of it, yes.
8    Q.    I just have one more question about
9  your notes, Dr. Kreiner.
10   A.    Sure.
11   Q.    We are going back to the initial
12 visit.
13   A.    Yes.
14   Q.    This should be around Page 3, I
15 think -- I am sorry, Page 4.
16        You indicated patient wants to be on
17 medication. I am not sure if medication is
18 indicated. Is that accurate?
19   A.    Yes.
20   Q.    Can you explain that?
21   A.    Sometimes with adjustment disorders,
22 they can get better with therapy alone, and --
23 or they can get better with therapy and
24 medication, and in this case, I clearly was on

Page 49

1  the fence, but because Maricel wanted to take
2  medicine, I agreed, and I wouldn't have agreed
3  if I wasn't on the fence.
4        So I could have gone either way, and
5  because she requested it, I agreed. If I had
6  thought it was not indicated at all, then it
7  would be malpractice to give somebody medicine.
8    Q.    Why did Maricel want to take
9  medication?
10   A.    I would be -- you know, I don't have
11 it written down why.
12        Again, I would be speculating that --
13 it is pure speculation that she felt that taking
14 medicine would help her anxiety symptoms.
15   Q.    Just one more set of questions, and
16 then I am all through.
17   A.    Sure.
18   Q.    You received a subpoena from us
19 around November 1st, 2017 for documents; is that
20 right?
21   A.    That's correct.
22   Q.    And I called you a few weeks after
23 that to see when we could expect to receive
24 documents from you; is that right?

13  (Pages 46 to 49)

Page 50

1    A.   That's correct.
2    Q.   Was that on November 20th, 2017?
3    A.   If you say so.
4    Q.   And at that time, I mentioned which
5  patient was the plaintiff in the case; is that
6  right, which you also knew from the subpoena?
7    A.   Yes.
8    Q.   And I said that I represented the
9  defendants, including Rush University Medical
10  Center; is that right?
11    A.   Yes.
12    Q.   What did you say then when we spoke
13  on the phone?
14    A.   I don't recall, but maybe you can
15  remind me.
16    Q.   Didn't you say, "I feel sorry for
17  you"?
18    A.   In connection with what?
19    Q.   When I asked what you meant, did you
20  say, "Some people just can't accept it when they
21  fail"?
22    A.   I am not sure what you are referring
23  to.
24    Q.   I am referring to our phone

Page 51

1  conversation on November --
2    A.   Yeah, I know, but I am not sure what
3  that means, what you have just said.
4    Q.   Well, I am just reminding you what I
5  recall you saying, and asking you whether that
6  is accurate?
7    A.   I mean, if you say I said it, I said
8  it. I don't recall in what context I said it.
9    Q.   As you sit here today, can you think
10  of any reason you would have said, "Some people
11  just can't accept it when they fail" with
12  respect to Maricel's case?
13    A.   I think you drew the wrong conclusion
14  from what I said. I certainly -- that's not --
15  that does not sound -- that is certainly not --
16  I wasn't referring to -- I certainly would not
17  stand here today and say that, not the way you
18  are saying it.
19    Q.   Could you clarify what you meant
20  then?
21    A.   I mean, these are just -- I really
22  don't recall.
23    Q.   So you don't recall saying that?
24    A.   No.

Page 52

1    MS. COURTHEOUX: Okay. That's it for me.
2    MS. SIEGEL: I just have a few follow-up
3  questions. Thank you for coming and thank you
4  for walking us through your notes. I had
5  difficulty trying to interpret them and you have
6  been very helpful.
7       EXAMINATION
8  BY MS. SIEGEL:
9    Q.   Now, we have gone over a period of
10  time stretching from August of 2013 through
11  February of 2014 when you were in contact with
12  Ms. Marcial; is that right?
13    A.   That's correct.
14    Q.   And during that time period, did you
15  have an opportunity to form an opinion as to
16  whether Ms. Marcial were in touch with reality?
17    A.   Do you mean whether I believed she
18  was psychotic? Because psychotic, you know, in
19  psychiatry we have are you psychotic, which
20  means -- "out of reality" is a very broad term.
21       She was not psychotic, meaning there
22  was no evidence of any delusions or
23  hallucinations, so she was not psychotic at any
24  time when I saw her.

Page 53

1    Q.   Did you have a perception of the
2  caliber of her perceptions from the facts she
3  was discussing with you?
4    A.   Sorry?
5    Q.   You can hear me now?
6    A.   Yes, I can hear you.
7    Q.   Okay. Did you have a perception as
8  to the accuracy with which Ms. Marcial was able
9  to relate to you facts and circumstances
10  pertinent to your work together?
11    A.   I believed that what she reported is
12  accurate, yes.
13    Q.   Now, in your work with students, did
14  you encounter from time to time students who
15  failed in their programs?
16    A.   Yes, I did.
17    Q.   How often did that happen?
18    A.   I saw students across all the Rush
19  programs, so medical school, nursing school,
20  postgraduate nursing school, OT.
21       You have got to remember that I see a
22  section of the Rush student population, the ones
23  who are having psychological/psychiatric issues,
24  so they are already a subset of the student

14  (Pages 50 to 53)

Page 54

1   population, and then of that subset, I certainly
2   encountered a fair amount of students who were
3   having problems, but I would say not a lot of
4   students -- I am going to rephrase.
5        Certainly, I did see students fail or
6   go on leaves of absences or some -- I can't
7   recall how many were asked to leave, and I did
8   this job for ten years or so, so it is a long --
9   it has been awhile since -- so certainly there
10  was some of the students, yes, didn't make it.
11       Q.   Now, did you see Ms. Marcial after
12  this February 12, 2014 meeting we have been
13  discussing?
14       A.   That's my last recorded note in my
15  chart so I would think not, unless there is some
16  notes that I am missing.
17       Q.   Do you have any reason to believe
18  that your notes are incomplete for Ms. Marcial?
19       A.   I mean, I would hope not.
20       Q.   Okay.  Do you try to keep complete
21  and accurate records of your sessions with your
22  patients?
23       A.   I try the best I can, yes.
24       Q.   Okay.  So do you have any knowledge

Page 55

1   from any source of what Ms. Marcial experienced
2   after February 12 of 2014?
3        A.   No, because I don't have any further
4   documentation.
5        Q.   Do you have any recollection of any
6   discussion with anybody at the university as to
7   what happened to her after that February date?
8        A.   Again, this is speculation
9   completely, but I would touch base with
10  Dr. Terebessy, and she would tell me which
11  students were or weren't in the program anymore,
12  and she probably said Maricel is not in the
13  program anymore and she is no longer in the Rush
14  system.  That probably would have happened at
15  some point.
16       Q.   All right.  And do you have any
17  recollection of any facts about the
18  circumstances of Maricel's termination?
19       A.   No.
20       Q.   All right.  Do you have an opinion as
21  to whether it is rational for a student to take
22  issue with facts and circumstances that they
23  perceive to be unjust?
24       A.   Can you just repeat that?  I want to

Page 56

1   make sure I answered correctly.
2        Q.   Sure.  Let me have the court reporter
3   repeat it, and I am glad to clarify if you need
4   further information.
5            (Record read.)
6        THE WITNESS:  Yes, I do.
7   BY MS. SIEGEL:
8        Q.   And what's that opinion?
9        A.   That if they feel that circumstances
10  are unjust or unfair, they should be allowed to
11  speak up and speak out, yes.
12       Q.   And if students perceive that they
13  have been wrongfully terminated from a program,
14  do you have an opinion as to whether it is
15  appropriate for them to take measures to get
16  redress?
17       A.   Yes, of course.  If they feel they
18  have been wrongfully terminated, they should
19  feel they have the right to take measures.
20       Q.   And the university has some
21  procedures so they can do that; is that right?
22       A.   I don't know.
23       Q.   All right.  And do you know whether
24  accrediting agencies take a look at issues as to

Page 57

1   whether students are treated fairly?
2        A.   I know in residency, medical
3   residency programs, they do regular
4   accreditations every number of years to see if
5   residents are being treated fairly.  I don't
6   know about nursing programs specifically.
7        Q.   And you are aware that there are
8   federal laws that institutions have to comply
9   with; isn't that right?
10       A.   If --
11       Q.   And by "institutions," I mean
12  academic institutions generally.
13       A.   I would assume so, yes.
14       Q.   All right.  And if a student feels
15  that the law has been violated, wouldn't you
16  agree that it is rational for the student to
17  take some kind of action to come to terms with
18  that?
19       A.   Of course.
20       Q.   And that could include bringing a
21  lawsuit?
22       A.   Of course.
23       Q.   And you never had an opportunity to
24  speak with Maricel about why it was that she was

15  (Pages 54 to 57)

Page 58

1  taking issue with her termination from the Rush
2  program?
3      A.   Well, not after she got terminated,
4  no, I have no documentation of that.
5      Q.   Now, you testified that you had other
6  students from the student anesthesia program,
7  the student Registered Nurse Anesthesia Program
8  at Rush among your caseload; right?
9      A.   Correct.
10     Q.   Is there a procedure to go through
11 where you could -- you could disclose
12 information about the circumstances of those
13 students?
14          And I want you to understand, I am
15 not asking you in answer to this question to
16 reveal any confidential information.
17     A.   Is there a procedure I could do?
18     Q.   Is there a procedure that could --
19 that the parties could do in order for you to be
20 able to testify about those circumstances?
21     A.   Well, no information can be released
22 on other students without their individual
23 consent.
24     Q.   Surely.

Page 59

1      A.   And they cannot be identified as --
2  that was the whole thing about Rush; that this
3  was a confidential setting that others -- that
4  students could come and get -- and that's where
5  Rush was very, very good; that this was a
6  totally confidential place that these -- medical
7  psychiatric treatment would stay completely
8  confidential and never -- they never had to put
9  it on their insurance.
10          Rush provided this service to enable
11 them to get the help they needed, so other
12 students that I have seen, their anonymity
13 absolutely has to be preserved.
14     Q.   Sure.  You testified about knowledge
15 of physical injury.
16     A.   I said I had no knowledge of any
17 physical injury.
18     Q.   Right.  And my question to you is
19 whether your work as a psychiatrist with
20 Ms. Marcial involved any other -- any other
21 systems apart from -- apart from the
22 psychological symptoms that she reported to you
23 and sought relief for?
24     A.   It is not a psychiatrist's job to

Page 60

1  physically examine a patient.
2      Q.   That's what I was asking.  Thank you.
3  MS. SIEGEL:  I have nothing further.
4  MS. COURTHEOUX:  I just have one follow-up
5  if you don't mind.
6      THE WITNESS:  Sure.
7          FURTHER EXAMINATION
8  BY MS. COURTHEOUX:
9      Q.   In response to one of Ms. Siegel's
10 questions, you testified, I believed that what
11 Maricel reported was accurate.  Do you recall
12 that?
13     A.   Yes.
14     Q.   I just want to make sure I
15 understand.  Does that mean you believed that
16 there is no system as reported on Page 7?
17     A.   No.  What -- to clarify, I believed
18 everything Maricel, what she was saying was
19 accurate, meaning, she was -- that was her
20 report, and as a psychiatrist, I have to go by
21 her report.
22          That is what she reported, and I
23 believed that report to be accurate as reported
24 by her.

Page 61

1      Q.   So in other words, would it be fair
2  to say that you believe that Maricel was
3  accurately reporting her subjective feelings?
4      A.   Correct.
5      Q.   Not that what she reported was
6  objectively true necessarily?
7      A.   She reported what she observed or
8  what she felt, and I believed those observations
9  that she -- the only thing a psychiatrist can do
10 is to go by what the patient says unless you go
11 get further collateral history from other
12 places.
13          So in this case, I am going off what
14 she told me, and she told me and reported things
15 about, for example, the system.  That was her
16 perception or her belief of what the situation
17 was at Rush.
18 MS. COURTHEOUX:  Thank you.
19 MS. SIEGEL:  Just another question or two.
20 THE WITNESS:  Yes.

16  (Pages 58 to 61)

Page 62

```
 1        FURTHER EXAMINATION
 2  BY MS. SIEGEL:
 3     Q.   You testified that -- I am trying to
 4  read my notes.
 5     A.   Sure.
 6     Q.   That what can happen, there can be a
 7  couple of instructors, and they decide you don't
 8  fit into our country club?
 9     A.   Hmm-hmm.
10     Q.   They gun for you after that?
11     A.   Hmm-hmm.
12     Q.   That can make your life very
13  difficult?
14     A.   Hmm-hmm -- yes.
15     Q.   Was that a perception that Maricel
16  reported to you?
17     A.   The question was for me to explain
18  the buddy system, and when I explained it, I
19  said because I have treated many students from
20  Rush and also being a student in medical school
21  myself, that medical schools are a -- let me
22  just stick -- let me not go away.
23         You have to conform, medical school
24  requires, nursing school, they all require a
```

Page 63

```
 1  certain way you dress, a certain way you behave,
 2  a certain way you comport yourself, and if you
 3  don't follow those norms, it is frowned upon and
 4  it is, as I said, there can be cases of where
 5  students are -- don't fit into that mold that
 6  they are looking for, and then instructors can
 7  say, you know, we don't -- that student,
 8  whatever, we don't care for that student and
 9  then they will gun for that student and can make
10  their life difficult.
11         Again, I am talking in generalities
12  across all the students that I have seen.
13     Q.   Now, isn't one of the things that you
14  assess as a psychiatrist when you are working
15  with -- when you are working with a client, is
16  one of the things that you look at the client's
17  physical presentation?
18     A.   Yes.
19     Q.   And you observe whether, for example,
20  their dress and deportment and self-presentation
21  show any signs of a compromised psychiatric
22  state?
23     A.   Yes.
24     Q.   Did you observe anything with
```

Page 64

```
 1  Ms. Marcial that suggested that she was less
 2  than fully intact in terms of her presentation
 3  of self?
 4     A.   No.
 5     MS. SIEGEL:  Nothing further.
 6     MS. COURTHEOUX:  That's all.
 7         Would you like to read over the
 8  transcript before you -- and then sign it?
 9     THE WITNESS:  That's okay.
10     MS. COURTHEOUX:  You just want to waive
11  signature?
12     THE WITNESS:  Yes.
13
14         DEPONENT FURTHER SAITH NOT
15
16
17
18
19
20
21
22
23
24
```

Page 65

```
 1  C E R T I F I C A T E   O F   R E P O R T E R
 2
 3         I, TERESA VOLPENTESTA, a Certified
 4  Shorthand Reporter within and for the County of
 5  Cook, State of Illinois, do hereby certify:
 6         That previous to the commencement of
 7  the examination of the witness, the witness was
 8  duly sworn to testify the whole truth concerning
 9  the matters herein;
10         That the foregoing deposition
11  transcript was reported stenographically by me,
12  was thereafter reduced to typewriting under my
13  personal direction and constitutes a true record
14  of the testimony given and the proceedings had;
15         That the said deposition was taken
16  before me at the time and place specified;
17         That I am not a relative or employee
18  or attorney or counsel, nor a relative or
19  employee of such attorney or counsel for any of
20  the parties hereto, nor interested directly or
21  indirectly in the outcome of this action.
22
23
24
```

17 (Pages 62 to 65)

Page 66

1       IN WITNESS WHEREOF, I do hereunto set
2  my hand and affix my seal of office at Chicago,
3  Illinois this 15th day of March, 2018.
4
5
6
7         _____
8      TERESA VOLPENTESTA.
9      C.S.R. Certificate No. 84-2781.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

18  (Page 66)

**A**

ability 42:10
able 28:7,13 37:12
  40:2 53:8 58:20
above-entitled 1:12
absence 18:4 22:6
  25:9 35:23 36:5
  41:14
absences 54:6
absolutely 26:15
  59:13
academic 33:6
  43:22 57:12
accept 50:20 51:11
access 43:22
accreditations 57:4
accrediting 56:24
accuracy 53:8
accurate 48:18
  51:6 53:12 54:21
  60:11,19,23
accurately 11:23
  61:3
acting 43:4
action 1:5 10:13
  57:17 65:21
acute 17:10
address 8:1 15:3,20
adjustment 20:7
  24:23 25:4 31:1,3
  48:21
advance 14:17
advisors 43:24
affect 37:19 38:1,2
affix 66:2
Africa 6:17
agencies 56:24
ago 11:21 13:17
  24:21 29:19 33:3
agree 36:10 57:16
agreed 36:13,13
  49:2,2,5
ahead 6:5
al 1:7
allergies 16:17
allowed 56:10
amount 54:2

analysis 8:9
anesthesia 15:9
  16:2 33:16 58:6,7
anhedonia 40:9
  41:16,17
anonymity 59:12
anorexia 20:2
answer 5:1,12 6:4
  24:5,5,19 30:1
  47:8 58:15
answered 56:1
answering 4:23
  5:23
answers 5:10
anxiety 17:1 18:9
  18:10,16,17 19:21
  20:8,23,24 22:14
  23:3 24:13,24
  25:2,4,5 26:22
  27:10,15 29:18,20
  29:23,23 30:2,3,4
  30:6,8,11,14,16
  31:2,4,5 37:1 38:3
  38:12 39:23 42:3
  42:20 46:15 49:14
anxious 17:12,18
  17:23 19:5 21:8
  21:23 22:1,2,14
  37:9,15 40:11
anybody 55:6
anymore 28:24
  55:11,13
apart 59:21,21
appear 39:6
APPEARANCES
  2:1
appeared 39:7
appears 21:7
appetite 19:1,5
  21:8,22 22:2 28:8
  29:1,15 37:6 40:2
appointment 23:18
  27:22 36:16 38:7
  38:10
appropriate 39:2
  56:15
arising 7:22
arrangements 41:4

41:8
arrow 39:18
arrows 18:17
aside 32:22
asked 5:24 16:13
  16:16,17 32:3
  45:6,21 50:19
  54:7
asking 14:21 25:22
  30:20 32:20 33:1
  45:7 51:5 58:15
  60:2
asleep 40:8
assess 63:14
assessed 20:7
ASSOC 2:3
assume 5:13 57:13
assumes 43:10
ate 28:11
attorney 65:18,19
attribute 29:14,16
audibly 5:1
August 12:2 13:6
  31:11 52:10
aunt 16:24
aware 41:7,10
  43:13 57:7
awhile 14:4 19:11
  54:9
A.D 1:19
a.m 28:7

**B**

B 1:11 3:3,11 4:2
back 9:13 14:22
  19:2,6 20:16
  21:24 22:3,5,14
  24:2,7 27:2 28:13
  28:14 31:16 40:13
  40:14 42:8,14
  44:8 48:11
bad 18:6 22:15 26:7
  26:17 32:7,7
  44:12
base 34:16,17,22,23
  35:17 55:9
based 26:1 29:7
  35:14 47:17

basically 8:2
behalf 2:7,12
behave 63:1
belief 45:15 61:16
believe 10:9,19
  14:4 29:9 35:15
  37:14 54:17 61:2
believed 25:7 46:12
  52:17 53:11 60:10
  60:15,17,23 61:8
benefit 27:11
benefits 20:13 27:7
best 54:23
better 20:8 29:1,20
  30:6 38:23 39:7
  40:9 48:22,23
bipolar 16:22 27:20
birth 15:3,20
bit 30:22 44:17
BLACKWELL 2:8
board 8:19
bothersome 28:10
bottom 24:12 29:11
Boulevard 2:3
brackets 19:8 24:8
break 5:17 6:1
  37:10
breast 16:11
bringing 57:20
broad 43:14 52:20
brother 17:3
brought 11:13 31:6
buddy 39:24 42:5
  44:20,24 45:8
  46:10,11,13,17
  62:18
bulimia 20:2
bullied 40:20 46:4
  46:6,6,8

**C**

C 65:1,1
caliber 53:2
call 6:3 13:19 36:5
called 4:3 7:19 10:2
  10:4,9 13:23
  49:22
Calls 22:7

capacity 9:10,21
  10:5
Cape 6:17
care 17:10 41:5
  63:8
case 4:12 10:8
  11:21 13:21 25:16
  25:21 48:24 50:5
  51:12 61:13
caseload 58:8
cases 4:13 63:4
category 35:16,18
cause 1:12 27:16
causing 25:2
Celexa 20:11 27:5,7
  27:8 28:2 36:21
  39:16
Center 1:7 13:10
  34:11 50:10
certain 11:11 23:15
  63:1,1,2
certainly 17:18
  31:16 34:17,20
  42:17 44:17 47:20
  51:14,15,16 54:1
  54:5,9
Certificate 66:9
certified 8:19 65:3
certify 65:5
changes 28:20
  29:12
characterize 17:16
  25:6
chart 54:15
checked 20:5
Chicago 1:18 2:4,9
  7:11 66:2
cigarettes 16:18
circle 9:13
circumstances 6:9
  53:9 55:18,22
  56:9 58:12,20
Civil 1:5,15
clarify 51:19 56:3
  60:17
clear 26:22
clearly 48:24
Cleveland 6:21

client 63:15
client's 63:16
clinical 17:1 23:22 33:9
club 45:12 62:8
collateral 61:11
come 5:20 23:5 30:3,7 57:17 59:4
comes 26:23
coming 19:6 21:24 22:3,5,14 52:3
commencement 65:6
comment 23:10 47:5,7 48:3
commonly 27:10
compared 36:9
comparisons 20:21
complain 47:9,24
complained 48:7
complete 5:10 42:10 54:20
completely 55:9 59:7
comply 57:8
comport 63:2
compromised 63:21
compulsory 6:19
concerned 42:9,10
concerning 65:8
concerns 34:24 42:18
conclusion 51:13
conditions 26:12 30:23 47:19,19
confidential 58:16 59:3,6,8
conform 62:23
connection 50:18
consent 45:5 58:23
consistent 42:24
constitutes 65:13
consultation 7:7,15
contact 15:4,21 34:13 35:2 52:11
context 51:8
continue 12:14

37:12,20
contributing 26:13
conversation 23:16 51:1
Cook 1:14 65:5
correct 11:1,4 15:22 31:3 32:16 39:12 49:21 50:1 52:13 58:9 61:4
correctly 16:23 56:1
counsel 65:18,19
Counseling 13:10 34:11
counselor 15:6,7
country 45:12 62:8
County 1:14 65:4
couple 7:13 20:20 22:16 45:11 62:7
course 5:8 11:15 45:23 56:17 57:19 57:22
courses 8:8
court 1:1 5:5 56:2
COURTHEOUX 2:11 3:4,6 4:7 12:22 13:4 22:10 36:7 37:11 42:14 42:23 43:6,16 44:7,23 52:1 60:4 60:8 61:18 64:6 64:10
Courts 1:16
cover 15:2 41:3
covered 32:6
crawling 17:13
Crohn's 18:5
crying 19:11 28:24 29:15
current 28:12
customary 13:18 40:24
CV 6:16
cycle 29:21
C.S.R 66:9

D
D 3:1

date 15:3,20 55:7
day 1:18 36:21 39:17 66:3
days 19:14,15 21:5 28:2,18 31:17
dean 40:16
decide 45:11 62:7
decision 14:11,13
decrease 19:12
decreased 37:1 38:13
defendants 1:8 2:12 50:9
definitely 10:20 30:14
degree 6:18
delusions 52:22
denied 16:17
DEPONENT 64:14
deportment 63:20
deposition 1:11 4:11,21 10:17,23 13:1 65:10,15
depositions 9:14,20 10:2
depressed 36:24
depressing 28:16
depression 16:21 19:21 27:10,16 30:7
describe 9:2
described 26:12 30:15
developed 31:19 32:3
diagnoses 36:11
different 32:24
difficult 6:9 45:14 62:13 63:10
difficulty 52:5
diploma 8:13
dips 29:23
direction 65:13
directly 65:20
discipline 8:23
disclose 58:11
discussed 35:15
discussing 53:3

54:13
discussion 21:22 55:6
dismissed 44:5 47:4
disorder 16:22 20:6 20:7 24:23 25:5 30:3 31:1,2,2,5,6
disorders 48:21
distinct 31:2
District 1:1,1,16
DIVISION 1:2
doctor 6:17 17:11 41:2
documentation 47:23 55:4 58:4
documented 13:22 23:11 42:7 47:11 47:13 48:2
documents 11:2,6 12:18 49:19,24
doing 19:12 23:23 33:24 35:1 38:23
dose 17:11,14,15,16 17:17,19 29:5
Dr 4:8 10:22 13:11 13:12,14,23 15:21 33:21,22 34:3,8 34:13 35:8,11,17 36:3,8 48:9 55:10
drank 16:18
dress 63:1,20
drew 51:13
driving 37:8
drug 16:16 27:3,12
drugs 16:19 17:3
duly 4:1,4 65:8
dysfunction 27:18

E
E 3:1,11 65:1,1,1,1
earlier 43:21,22
easier 12:5
EASTERN 1:2
eat 18:23 19:1 28:7
eating 21:13
educate 30:22
education 6:14 7:9
effects 28:3 36:22

54:13
eight 28:24
either 12:12 23:1,6 49:4
ELAINE 2:3,6
embarrassed 19:6 19:17 22:18 23:2 23:4 24:9
embarrassment 22:23
emergency 5:19 15:4,21
emotional 47:19
employee 65:17,19
enable 59:10
encounter 12:3 53:14
encountered 54:2
ended 7:9
energy 19:14 29:2 37:6 40:5
enjoy 41:18
enjoyed 37:8,15
episodes 19:20
established 30:4,8 30:10
et 1:7
evals 18:6 26:7 32:8
evaluation 23:23
evaluations 13:13 26:17 44:12
evidence 43:11 52:22
exact 25:24 42:6 44:12
exactly 10:11 12:13 21:4,4 45:22
exam 37:19,22,24 37:24
examination 4:6 52:7 60:7 62:1 65:7
examine 60:1
examined 4:4
example 20:23 61:15 63:19
exams 8:10
excuse 46:20
Exhibit 12:23 13:2

**expect** 40:21 49:23
**expected** 31:9 38:9
**expel** 18:15
**experience** 31:20
    32:4,15,21 41:20
**experienced** 55:1
**expert** 9:21 10:2,7
    10:10
**explain** 8:5 11:5
    27:6 37:21 38:15
    48:20 62:17
**explained** 20:12
    32:10 62:18
**expressed** 22:17
    42:17
**extensive** 31:23
**extra** 7:6
**extrapolate** 45:21
**eye** 28:4

---

**F**

**F** 65:1,1
**fact** 35:22
**facts** 10:7 32:9
    43:10 53:2,9
    55:17,22
**fail** 50:21 51:11
    54:5
**failed** 53:15
**fair** 19:14 26:18,20
    41:19 46:1 54:2
    61:1
**fairly** 40:18 57:1,5
**fall** 35:16 40:7
**familiar** 4:19
**family** 16:20 17:2
    40:9
**far** 21:18
**fear** 46:6,7
**February** 39:11,15
    41:21 52:11 54:12
    55:2,7
**federal** 1:15 57:8
**feel** 19:22 28:5
    29:20,23 37:1
    38:13 39:22 42:2
    46:15,22 50:16
    56:9,17,19

**feeling** 22:17 36:24
**feelings** 61:3
**feels** 40:18,19,19,20
    46:7 57:14
**fellowship** 7:6
**felt** 14:16 17:12
    19:6,11 28:10,11
    40:9 41:24 46:2,3
    46:11 49:13 61:8
**fence** 49:1,3
**fields** 8:8
**file** 11:8,11,13 33:6
**fine** 4:24
**finish** 4:22 5:23
**first** 4:3,20 11:19
    12:2 13:5,15
    14:15,24 15:15,17
    16:6 23:8 27:4
    31:10,11,24 39:19
    40:13
**firstly** 16:10
**fit** 45:12 62:8 63:5
**five** 4:15 7:10 8:7
    9:15,17,19 10:10
    18:19 38:6
**floor** 7:24
**focus** 19:10 29:2
    37:7 40:5
**follow** 63:3
**follows** 4:5 15:13
**follow-up** 31:22
    52:2 60:4
**follow-ups** 7:14
**food** 28:11 29:6
**force** 18:22,24
**foregoing** 65:10
**form** 43:10 52:15
**formal** 7:8
**formed** 44:2
**foundation** 35:21
**four** 18:19 40:21
**fourth** 26:4
**four-and-a-half**
    33:3
**frowned** 63:3
**fulfill** 8:12
**full** 5:9 37:20 38:2
**fully** 64:2

**fun** 37:7
**further** 22:22 55:3
    56:4 60:3,7 61:11
    62:1 64:5,14

---

**G**

**gain** 27:13
**general** 7:5,20 8:3
    15:12 35:5 45:19
**generalities** 63:11
**generalized** 31:5
**generally** 10:7
    13:24 34:5 36:10
    57:12
**gesture** 5:7
**gestures** 5:2
**getting** 20:8 22:15
    26:17 42:1,18
    43:1,2
**GI** 37:4
**give** 5:9 27:13,17
    27:17 33:21 34:3
    49:7
**given** 65:14
**giving** 9:22 25:3
**glad** 56:3
**go** 4:18 6:5 12:22
    16:9,10 30:3,7
    35:5,23 39:9 41:1
    41:2,3 54:6 58:10
    60:20 61:10,10
    62:22
**going** 11:20,23
    14:18 16:7 18:3
    18:14 19:7,17,18
    22:23 23:2 24:8,9
    25:9 26:8 30:1
    32:1 35:20,23
    38:21 39:24 40:13
    40:13 43:9 46:3
    46:10,11,13,17
    48:11 54:4 61:13
**GOLDRICH** 2:5
**good** 27:12 28:18
    29:1,2 59:5
**graduate** 19:7
    42:19
**great** 43:17

**ground** 4:18,20
**guessing** 38:17
**gun** 45:13 62:10
    63:9

---

**H**

**H** 3:11
**habit** 23:13
**hallucinations**
    52:23
**hand** 12:17 66:2
**Handwritten** 3:14
**happen** 45:10,24
    53:17 62:6
**happened** 13:21
    29:19 36:18 39:15
    45:16,19,23 55:7
    55:14
**happens** 14:23 15:1
**hard** 18:24
**headaches** 20:4
**hear** 24:1 33:11
    40:16 53:5,6
**heard** 47:17
**held** 28:13,14
**Hello** 4:8,9
**help** 49:14 59:11
**helpful** 52:6
**hereto** 65:20
**hereunto** 66:1
**high** 18:16,16,18,18
    20:24 27:11
**history** 8:22 16:11
    16:21 17:2,10
    20:2,2,3,6 61:11
**Hmm-hmm** 32:12
    62:9,11,14
**holding** 19:16 24:2
    24:7
**hope** 54:19
**Hopes** 40:17
**hospital** 7:20,22
**hour** 23:18
**hours** 18:19,21
    29:1
**humiliated** 19:17
    23:5 24:9
**humiliation** 22:23

**husband** 40:10
**HUSCH** 2:8
**hypermania** 20:3

---

**I**

**ideation** 19:19
    37:18
**identification** 13:3
**identified** 11:6 59:1
**Illinois** 1:1,14,18
    2:4,9 8:15 65:5
    66:3
**imminent** 36:1
**impression** 26:11
    31:19 32:4 42:9
    44:2
**improve** 21:16
**improved** 18:20
    21:10,11,19
**improvement** 37:3
    37:4
**inaccurate** 25:20
**inadequate** 40:6
**include** 26:16 48:5
    57:20
**including** 50:9
**incomplete** 54:18
**increase** 27:15,15
**increased** 18:10
    20:23 29:5,23
    40:15
**independent** 32:13
**indicated** 20:11
    48:16,18 49:6
**indirectly** 65:21
**individual** 58:22
**information** 14:1
    43:24 44:17,19
    45:5 56:4 58:12
    58:16,21
**inhibitor** 27:9
**initial** 35:11,18
    48:11
**injury** 47:10,14,16
    47:18,21 59:15,17
**insomnia** 40:6,7
**Institute** 7:11
**institutions** 57:8,11

Page 4

57:12
**instructors** 33:9
  45:11 46:24 47:1
  62:7 63:6
**insurance** 59:9
**intact** 64:2
**interested** 65:20
**interface** 8:2
**internal** 6:22 7:4
**internship** 6:20,23
**interpret** 24:3
  25:22 52:5
**interview** 15:13
**involved** 10:13
  59:20
**irritable** 19:19
  37:17 40:9
**issue** 55:22 58:1
**issues** 7:22 26:2
  34:18 44:3 53:23
  56:24

**J**
**Jackson** 2:3
**jeopardy** 43:18
  44:4
**job** 54:8 59:24
**jumped** 17:4

**K**
**KAREN** 1:11 2:11
  3:3 4:2
**Karen.Courtheo...**
  2:10
**keep** 19:2 54:20
**kept** 11:12
**kicked** 40:14 42:1
  42:11,18 43:1,2
  43:19
**kind** 25:3 33:21
  45:2,13 57:17
**kinds** 7:20
**knew** 14:16 32:20
  44:11 50:6
**know** 4:17 5:16 6:4
  9:9 10:10 12:9
  13:7 14:3 21:14
  21:15,16,17 23:13

23:20 24:16,19,20
  25:24 26:9 32:7,7
  32:9,23 33:3
  41:10 44:22 45:11
  45:24 49:10 51:2
  52:18 56:22,23
  57:2,6 63:7
**knowledge** 54:24
  59:14,16
**known** 30:2,13
**Kreiner** 1:11 3:3
  4:2,8 10:22 13:1
  15:18 48:9
**K.B** 2:3,6

**L**
**L** 2:11
**label** 25:4
**lack** 35:21
**lag** 31:9
**lapse** 18:11,12
  26:18,19,20
**lastly** 6:7 17:2
**law** 57:15
**laws** 57:8
**lawsuit** 10:14 57:21
**leading** 40:15 44:4
**leave** 13:19 18:4
  22:6 25:9,12,14
  25:14,15,17,24
  26:9 35:23 36:5
  38:18 41:1,2,4,6,9
  41:14 54:7
**leaves** 54:6
**led** 25:15,16
**left** 13:23 28:12
  37:14
**legal** 10:13
**length** 38:10
**Let's** 9:13 15:15
  36:15 39:9
**level** 19:14 29:2
**liaison** 7:7,15
**license** 8:24
**licensed** 8:14
**life** 45:14 62:12
  63:10
**line** 15:24 18:8,9

19:4 24:5 26:4
**lines** 22:16
**little** 44:16
**LLP** 2:8
**loans** 19:8,9
**long** 11:21 13:17
  14:8 24:21 29:19
  31:23 54:8
**longer** 41:1 55:13
**look** 15:15 29:11
  56:24 63:16
**looked** 38:1
**looking** 8:2 42:8
  63:6
**looks** 15:19 38:5
**loss** 19:5 22:2
**lot** 23:4 28:17,17
  32:24 54:3
**low** 17:15,17,19
  27:11
**lower** 40:17
**lump** 16:11

**M**
**main** 23:21,22
**majority** 36:12
**making** 39:1
**malpractice** 49:7
**mammograms**
  16:12
**man** 18:4
**management** 37:20
**mania** 20:3
**manic** 27:21
**March** 1:18 10:19
  66:3
**Marcial** 1:3 2:15
  9:10 11:17 52:12
  52:16 53:8 54:11
  54:18 55:1 59:20
  64:1
**Maricel** 1:3 2:15
  11:8 13:8,15 14:1
  14:15 15:19 16:5
  21:23 22:17 23:9
  24:13 29:7 30:10
  30:18,21 31:19
  33:13,17 34:1

35:11,15,15 36:20
  38:18,21 41:7,19
  43:1,18 45:16,20
  45:23 46:11 47:2
  47:9,24 49:1,8
  55:12 57:24 60:11
  60:18 61:2 62:15
**Maricel's** 13:5 25:7
  25:16 31:20 32:21
  33:6,12 39:10
  40:22 44:3 51:12
  55:18
**mark** 2:5 16:24
  28:19 29:4,10
**marked** 13:2 15:17
**match** 15:17
**matter** 30:7
**matters** 65:9
**mean** 9:22 14:22
  18:17 22:12,13,19
  23:18 24:4 29:22
  30:23 32:19 34:5
  39:6,6 51:7,21
  52:17 54:19 57:11
  60:15
**meaning** 18:23
  38:2 52:21 60:19
**means** 8:6,7 40:7
  41:17 51:3 52:20
**meant** 5:13 22:5
  24:16 38:15 45:8
  50:19 51:19
**measures** 56:15,19
**medical** 1:6 6:17
  7:8,21,24 9:2 11:7
  16:10 50:9 53:19
  57:2 59:6 62:20
  62:21,23
**medication** 13:13
  16:13 20:10,10
  28:21 29:12,13,17
  31:14 39:5,7
  48:17,17,24 49:9
**medications** 6:8
  16:15
**medicine** 6:22 7:4
  8:3,3,15 20:13
  23:23 29:4,9

31:16 49:2,7,14
**meet** 41:8
**meeting** 27:4 29:8
  31:8,18,24 54:12
**meetings** 31:23
  35:8
**memory** 18:11,12
  26:18,20,21
**mental** 37:19,24
**mention** 22:17
  24:12 47:2
**mentioned** 9:14
  37:22 50:4
**mentions** 22:22
**message** 13:19
**messages** 13:24
**met** 9:9
**middle** 40:11
**mind** 60:5
**minutes** 4:17 31:23
**misconduct** 43:3,13
  43:14
**missed** 24:10
**missing** 54:16
**mold** 63:5
**month** 30:13
**months** 10:21 21:5
  40:22
**mood** 29:24
**morning** 28:7
  36:23
**move** 36:15
**moving** 18:2 28:14
**MSE** 37:21
**mystery** 43:18
**M.D** 1:12 3:3 4:2

**N**
**N** 3:1
**name** 15:3,21 27:3
**necessarily** 61:6
**need** 5:19,21 23:5
  56:3
**needed** 13:13 59:11
**needs** 8:1
**negative** 37:17
**negatives** 27:14
**never** 57:23 59:8,8

**night** 18:13,20,21 40:11
**non-verbal** 5:2
**normal** 19:2 38:4
**normally** 48:5
**norms** 63:3
**NORTHERN** 1:1
**notary** 1:13
**note** 54:14
**notes** 3:14 11:20,24 12:5,19 16:8,23 17:22 21:7 25:22 26:1,24 27:23 32:2 35:7,14 36:9 36:17 43:14 47:6 47:7,17 48:6,9 52:4 54:16,18 62:4
**note-taking** 23:14
**November** 10:19 49:19 50:2 51:1
**number** 3:12 8:11 15:20 57:4
**numbers** 12:6
**Nurse** 33:16 58:7
**nursing** 15:9 16:2 38:19 46:24 53:19 53:20 57:6 62:24

---

**O**

**O** 65:1,1
**object** 35:20 43:9
**objectively** 61:6
**observations** 61:8
**observe** 63:19,24
**observed** 61:7
**obsessive/compul...** 20:6
**obvious** 38:3
**obviously** 30:5
**occasion** 11:16
**occasionally** 16:19 27:15,16 40:10
**October** 36:16,19 38:7,20 40:22
**offering** 41:11
**office** 66:2
**Oh** 26:6 46:6

**okay** 4:16,23 5:3,4 5:14,15 6:2,6,16 8:14 9:13 10:16 10:22 11:15 15:15 16:5 17:8,24 18:2 19:10,24 24:6,10 28:8,11 29:2 35:2 37:6,6,7,7 39:9,14 39:21 40:2,5 52:1 53:7 54:20,24 64:9
**once** 8:21 19:11 30:2,4,8 35:3,4,7
**ones** 11:10 12:14 53:22
**opinion** 10:7 52:15 55:20 56:8,14
**opportunity** 52:15 57:23
**optimistic** 28:18
**order** 8:12 12:10,11 58:19
**organized** 12:9
**OT** 53:20
**outcome** 65:21
**outside** 32:14
**o'clock** 1:19

---

**P**

**P** 65:1
**packet** 12:17 15:16
**page** 3:2,12 12:6,16 15:15,17 16:9 18:1,1 20:16 26:5 26:13 27:2 29:11 36:17 39:12 48:14 48:15 60:16
**pain** 48:1,4
**panic** 31:5
**paper** 23:21
**papers** 8:11
**paragraph** 40:13
**particular** 10:8 12:16 29:24
**parties** 58:19 65:20
**party** 10:6
**pass** 8:10 13:7 42:19

**passing** 40:17
**pathology** 6:24
**patient** 9:11 10:12 20:9 24:2 30:15 31:14 34:4 36:14 48:16 50:5 60:1 61:10
**patients** 7:21,24 8:12 23:4 33:19 34:9 45:7 54:22
**patient's** 14:23
**pattern** 30:8,11
**peers** 47:3,5
**people** 17:18 29:20 29:22 33:13 50:20 51:10
**perceive** 55:23 56:12
**perceived** 47:3
**perception** 53:1,7 61:16 62:15
**perceptions** 53:2
**performance** 18:9 26:2,18
**period** 52:9,14
**periodically** 34:16
**periods** 29:21
**person** 23:19
**personal** 65:13
**pertinent** 53:10
**phone** 6:3 15:20 50:13,24
**physical** 47:10,14 47:16,18,19,21 48:4 59:15,17 63:17
**physically** 60:1
**physician** 10:6,12
**picture** 44:18
**pill** 16:15
**place** 59:6 65:16
**places** 61:12
**plaintiff** 1:4 2:7 50:5
**plans** 36:11
**Plaza** 1:17 2:9
**please** 4:21 5:1,11 5:16 6:4,13 12:21

12:23 36:19 39:10 39:15 42:13,15 43:7 44:6,7
**plus** 18:23 40:13
**point** 5:17 30:13 39:4 55:15
**points** 20:20,22 21:3 23:15,21
**poor** 21:9
**population** 53:22 54:1
**postgraduate** 53:20
**practice** 8:14 9:3,4 11:16 13:8 47:21 48:5
**practitioner** 9:5
**predisposition** 27:21
**prescribed** 27:4
**present** 2:14 37:20
**presentation** 63:17 64:2
**presently** 18:3
**preserved** 59:13
**presume** 19:8
**pretty** 28:17,17
**previous** 65:6
**previously** 24:16 24:17
**prior** 13:15
**probable** 34:6
**probably** 55:12,14
**problem** 42:21 45:2
**problems** 27:18 34:18 54:3
**procedure** 1:16 58:10,17,18
**procedures** 56:21
**proceed** 17:24
**proceedings** 37:10 65:14
**process** 25:13
**produce** 11:6
**professional** 8:23
**professors** 43:23 47:1
**program** 6:18,19 15:8,10 16:3 22:6

24:17 31:21 32:5 32:15,22 33:13,16 38:19 41:21,22 42:10,11,19,20 43:19 44:3 45:4 45:17 47:4 55:11 55:13 56:13 58:2 58:6,7
**programs** 53:15,19 57:3,6
**progress** 39:2
**provide** 14:2
**provided** 11:2,10 59:10
**providers** 9:3
**provost** 40:17
**psychiatric** 7:22,23 8:1 9:23 15:13 17:9 37:24 59:7 63:21
**psychiatrist** 9:22 13:9 23:6 24:1 34:10 41:8 59:19 60:20 61:9 63:14
**psychiatrists** 7:19
**psychiatrist's** 59:24
**psychiatry** 7:1,5,7 7:17,18 8:4 52:19
**psychoanalysis** 7:12 8:8
**psychoanalyst** 7:10 8:6
**psychological** 59:22
**psychological/ps...** 53:23
**psychology** 7:16
**psychotic** 52:18,18 52:19,21,23
**public** 1:13
**pure** 29:18 49:13
**pursuant** 1:15 10:23 11:3
**push** 19:15
**put** 18:23 25:14 59:8
**P.C** 2:3
**p.m** 1:19

**Q**

qualified 7:10 8:6
queasiness 28:6,9
  37:18
queasy 36:23
question 4:22 5:11
  5:24 6:4 9:24
  16:24 28:19 29:4
  29:10 31:7 40:14
  42:12 43:10 48:8
  58:15 59:18 61:19
  62:17
questions 5:10 6:10
  12:15 20:17 49:15
  52:3 60:10
quit 40:1 42:6
  44:15,21 46:18,22
  46:23
quotes 17:3

**R**

R 65:1,1,1,1
raised 23:17
range 37:20 38:2
rational 55:21
  57:16
rattled 37:1 38:13
reaction 31:4
read 16:1,23 17:4,7
  17:22 18:6,12
  19:22 28:19 37:16
  40:3,12 42:14,16
  43:8 44:7,9 56:5
  62:4 64:7
reads 19:4
real 17:1
reality 52:16,20
really 17:12 18:24
  18:24 47:16 51:21
reams 23:20,20
reason 12:17 25:24
  26:8 42:6 51:10
  54:17
reasons 44:12
recall 14:15 30:21
  33:14,24 34:2,7
  35:10,13 36:2
  41:11,15 42:24

50:14 51:5,8,22
  51:23 54:7 60:11
receive 49:23
received 49:18
recognize 12:18
recollection 55:5
  55:17
record 42:16 43:8
  44:9 56:5 65:13
recorded 54:14
records 11:7,9 33:5
  43:23 54:21
redo 6:23
redress 56:16
reduced 65:12
refer 11:20 12:4,14
  13:12 16:7
referral 34:14
  35:12,18
referred 33:20 34:9
referring 13:24
  21:12 43:12 50:22
  50:24 51:16
reflected 23:15
Registered 58:7
regular 35:2 57:3
relate 53:9
relative 65:17,18
relatively 17:15
released 58:21
relief 59:23
remember 13:17
  14:5,21 22:21
  26:10 32:19 33:2
  53:21
remind 50:15
reminding 51:4
repeat 42:12 43:5,6
  44:6 55:24 56:3
rephrase 54:4
report 11:22 60:20
  60:21,23
reported 16:11
  18:4 26:6 29:14
  44:19 47:13 53:11
  59:22 60:11,16,22
  60:23 61:5,7,14
  62:16 65:11

reporter 5:6 56:2
  65:4
reporting 46:2,12
  61:3
reports 46:14 47:21
represented 50:8
reprimands 8:23
reputation 33:12
requested 11:7
  49:5
require 62:24
required 7:3 10:15
requirements 8:12
requires 62:24
residency 6:22 7:5
  57:2,3
resident 7:1
residents 57:5
respect 51:12
respond 6:10
response 17:19
  60:9
responses 5:2,3
result 10:13
retain 19:10
reuptake 27:9
reveal 45:4 58:16
review 4:16 33:5
re-certified 8:21
right 5:16 9:16
  10:24 12:9,11
  17:22 21:1 28:4
  38:8 49:20,24
  50:6,10 52:12
  55:16,20 56:19,21
  56:23 57:9,14
  58:8 59:18
risk 27:11 42:1
  43:2
risks 20:12 27:7
Riverside 1:17 2:9
rule 4:20
rules 1:15 4:18
running 19:12
Rush 1:6 7:2 13:10
  25:10 31:21 32:5
  32:24 33:6,9
  34:10 40:24 41:2

41:3 50:9 53:18
  53:22 55:13 58:1
  58:8 59:2,5,10
  61:17 62:20

**S**

S 3:11
sad 19:11
sadness 38:3
SAITH 64:14
saw 27:24 52:24
  53:18
saying 51:5,18,23
  60:18
says 18:8,9 37:4
  39:16 61:10
schizophrenia
  16:22
school 19:21 23:2,9
  23:14 24:14 25:10
  28:14,15 40:14,15
  42:1 43:2,3 53:19
  53:19,20 62:20,23
  62:24
schooling 24:18
schools 62:21
screening 20:1
seal 66:2
second 31:10,11
secondary 26:22
  40:3,12
secondhand 33:12
section 53:22
see 7:20 15:2,7 21:6
  21:10,19 23:5
  26:4,23 27:2
  31:14 41:6,12,12
  49:23 53:21 54:5
  54:11 57:4
seeing 15:7
seen 13:11 17:10,20
  25:10 45:3 47:18
  59:12 63:12
seizures 20:3
selective 27:9
self 19:15 64:3
self-presentation
  63:20

sense 21:2 39:20
separate 31:4
September 29:8,8
  31:8,12,18
serious 35:24
serotonin 27:9
service 59:10
serving 34:10
sessions 54:21
set 12:20 49:15
  66:1
setting 59:3
seven 18:21
seven-year 6:18
sexual 27:18
shared 20:17
sheet 15:2
short 29:21 37:10
Shorthand 65:4
show 63:21
side 28:3 36:21
SIEGEL 2:3,6 3:5
  3:7 12:20 22:7
  35:20 43:9 52:2,8
  56:7 60:3 61:19
  62:2 64:5
Siegeledlaw@aol...
  2:5
Siegel's 60:9
sign 64:8
signature 64:11
significance 47:22
signs 63:21
similar 10:14
simple 18:11
sit 43:17 51:9
situation 25:1 37:2
  38:14 61:16
six 10:21
six-year 6:18
skin 17:13
sleep 27:18 40:2,6,8
sleeping 18:19 21:8
  21:13 28:24 29:15
  37:6
smoked 16:18
snippets 43:24
solo 9:5

somebody 30:2
47:21 49:7
soon 6:4
sorry 7:18 19:23
37:9 48:15 50:16
53:4
sort 5:2 36:9 47:14
sought 13:8 59:23
sound 51:15
source 55:1
South 1:17 2:9 6:17
speak 33:8 43:23
56:11,11 57:24
speaking 34:5
35:10
specific 34:24
specifically 13:20
21:12 26:16 45:7
45:20 57:6
specified 65:16
speculate 12:1 26:8
speculating 14:20
22:8 23:7 30:17
32:2 36:4 49:12
speculation 22:7
25:23 29:19 45:1
45:2 49:13 55:8
spoke 36:2 50:12
staff 9:6
stage 24:18
stand 51:17
start 6:13 15:12
starting 6:14 31:13
31:15
state 1:14 8:15
30:20 63:22 65:5
states 1:1,16 8:17
status 37:19,24
stay 7:23 59:7
stayed 7:6
stenographically
65:11
step 5:21
stick 11:23 14:18
25:18 30:17 32:1
32:17 62:22
stomach 27:17 37:4
stop 14:6,13

stress 26:13 28:12
40:3,16
stressful 25:11,14
stressor 25:3,7 26:3
26:21 31:6
stressors 26:3
stretching 52:10
Strike 46:20
student 19:9 34:14
34:15,19,20 53:22
53:24 55:21 57:14
57:16 58:6,7
62:20 63:7,8,9
students 13:20,24
14:4,7,8 15:5
25:10 32:24 33:20
34:10,24 35:1,6
35:16,18 36:9
40:24 45:3 53:13
53:14,18 54:2,4,5
54:10 55:11 56:12
57:1 58:6,13,22
59:4,12 62:19
63:5,12
students/patients
13:12
stuff 19:5
subjective 61:3
subjectively 46:2,3
subpoena 10:23
11:3 49:18 50:6
subset 53:24 54:1
substantially 41:20
suffered 30:16
suggested 64:1
suggestions 41:12
suicidal 19:19
27:16 29:3 34:21
37:17 40:10
suicidality 35:24
suicide 17:5
Suite 1:17 2:3,9
supervised 8:11
sure 4:19 9:23
11:22 12:8,10,12
17:4,6 20:10,19
21:18 22:3,4
30:24 36:20 46:5

48:10,17 49:17
50:22 51:2 56:1,2
59:14 60:6,14
62:5
Surely 58:24
surgery 8:3
surgical 7:21,24
suspensions 8:24
switched 7:1
sworn 4:1,4 65:8
symptoms 23:22
30:14 37:5 49:14
59:22
system 39:24 40:19
42:5,21 44:14,20
44:21,24 45:9
46:7,10,12,13,17
55:14 60:16 61:15
62:18
systems 59:21

**T**

T 3:11 65:1,1,1
take 5:7,17,24 6:5
15:1,2 22:12 37:9
49:1,8 55:21
56:15,19,24 57:17
taken 1:12,15 4:11
17:14 29:6 65:15
talk 23:8 41:22
talked 41:19
talking 45:18 47:15
63:11
tears 28:23
tell 16:6 21:6 36:18
39:4 41:24 55:10
ten 14:9 54:8
tension 19:13
Terebessy 13:11,12
13:14,23 15:21
33:21,22 34:3,8
34:13 35:8,11,17
36:3,8 55:10
Teresa 1:13 5:5
65:3 66:8
term 52:20
terminated 56:13
56:18 58:3

termination 55:18
58:1
terms 24:20 29:14
57:17 64:2
terrified 18:14
testified 4:4 58:5
59:14 60:10 62:3
testify 58:20 65:8
testimony 10:15,17
65:14
tests 8:10
thank 6:12 7:13,18
11:15 16:5 20:14
46:19 52:3,3 60:2
61:18
Thanks 4:10
theft 43:3,12
therapist 23:24
therapy 48:22,23
thing 5:22 25:11
35:24 36:1 59:2
61:9
things 5:6 18:12
22:11 30:6,20
36:10 41:18 61:14
63:13,16
think 9:17,18,18
12:5 19:4 25:21
28:15 37:3,5
38:18 45:10 48:15
51:9,13 54:15
thirdhand 33:11
thought 32:6 49:6
thoughts 27:17
29:3 40:10
three 7:3,4 31:15
31:17
thyroid 20:5
tied 18:8
time 10:9 11:21
13:9,17 14:9
20:22 21:3,10
24:20 25:7,8
26:14 27:24 28:10
29:19 31:9 33:16
38:10 50:4 52:10
52:14,24 53:14,14
65:16

times 4:14 10:11
23:16 36:12 40:5
today 4:10,18 6:10
43:17 51:9,17
told 13:14 16:23
24:13 29:7 32:14
32:22 44:10 61:14
61:14
tolerate 37:18
top 26:13
total 25:23 45:1
totally 33:1 59:6
touch 33:15 34:16
34:17,22,23 52:16
55:9
touched 35:17
Town 6:17
trained 6:16 7:10
transcript 64:8
65:11
treat 7:23 11:16
27:10
treated 32:23 40:18
57:1,5 62:19
treating 10:5,12
23:24 27:12 33:17
33:19 34:4,15
36:10 41:1 43:20
treatment 36:11
38:21 59:7
trigger 29:24
triggers 30:5,9
trip 37:8
true 46:9 61:6
65:13
truth 65:8
try 20:11 23:21
54:20,23
trying 23:12 30:19
30:22 52:5 62:3
turn 12:16 20:16
27:22
Turning 27:2
twice 35:4,8
twitch 28:4
twitching 36:22
two 6:24 18:6 19:22
20:22 26:7 31:15

31:16 32:7 37:16
44:11 61:19
**types** 14:1
**typewriting** 65:12
**typical** 27:8 34:12
34:15 37:23

**U**

**undergo** 8:9
**undergraduate**
6:15
**understand** 5:11,13
6:10 9:23 22:18
23:12,13 24:11
30:19 34:8 58:14
60:15
**understanding**
32:14
**Understood** 5:22
6:5 10:1,16
**unfair** 56:10
**Unfortunately**
28:18
**United** 1:1,16
**university** 1:6
13:10 50:9 55:6
56:20
**unjust** 55:23 56:10
**unusual** 41:5
**update** 33:22
**updates** 34:3
**upset** 27:17
**urgent** 36:1
**urgently** 34:22
**use** 12:6 16:19
**usual** 19:20
**usually** 14:2,23
15:1 31:13,14
33:21

**V**

**various** 8:8,10,11
**verbal** 5:3
**version** 12:6
**vice** 40:16
**view** 38:20
**violated** 57:15
**visible** 28:4

**visit** 11:19 13:5,15
14:24 15:11 16:6
23:8 39:10 40:22
40:23 41:21 48:12
**visits** 31:10,22
**Volpentesta** 1:13
65:3 66:8
**vs** 1:5

**W**

**wait** 4:21
**Waiting** 40:16
**waive** 64:10
**wake** 18:13,14
**wakes** 40:11
**walk** 6:14 16:8
27:23 39:14
**walking** 20:14 52:4
**wander** 11:24
**wane** 29:20
**want** 4:18 11:22
17:6 25:18,19
30:12,17 32:17
39:24 46:17,22
49:8 55:24 58:14
60:14 64:10
**wanted** 4:17 20:9
42:5 44:14 46:23
49:1
**wanting** 44:21
**wants** 48:16
**wasn't** 16:14,14,15
20:10 29:13 38:19
41:13 42:20 49:3
51:16
**wax** 29:20
**way** 12:9 30:2 49:4
51:17 63:1,1,2
**weeks** 31:15,17
38:6 49:22
**weigh** 10:6
**weight** 27:13
**went** 6:21 11:8 37:7
37:8 47:6
**weren't** 10:4 31:23
55:11
**West** 2:3
**WHEREOF** 66:1

**witness** 3:2 4:1,3
10:3 22:8 35:22
42:17 43:12 44:10
56:6 60:6 61:20
64:9,12 65:7,7
66:1
**women** 27:12
**word** 17:5,21 18:6
28:15 43:15 46:5
**words** 10:4 19:23
37:16 61:1
**work** 18:8 26:2,17
53:10,13 59:19
**worked** 14:3,8
**working** 9:6 14:6
29:5,9 39:5,8
63:14,15
**worried** 19:7
**worries** 16:24
**worrying** 47:2
**worse** 30:5
**wouldn't** 30:12
35:2 36:13 49:2
57:15
**write** 8:10 15:8
21:15 23:21
**writing** 17:7
**written** 14:19 18:5
25:19 26:7,17
32:8,18 44:11
46:21 49:11
**wrong** 10:20 51:13
**wrongfully** 56:13
56:18
**wrote** 23:19 24:5
28:15 38:12 45:8

**X**

**X** 3:1,11

**Y**

**yeah** 17:17 25:5
26:6 51:2
**year** 6:19,22 7:4,6
35:3,4,8
**yearly** 16:12
**years** 6:24 7:3,4,11
8:7 14:9 30:16

33:3 54:8 57:4
**yoga** 19:12
**young** 27:12

**Z**

**Zoloft** 17:11,19,21

**1**

**1** 3:14 12:23 13:2
15:18
**1st** 49:19
**10-milligrams**
20:12 28:1
**12** 39:11 54:12 55:2
**12th** 1:18 36:16,19
39:15
**120** 1:17 2:9
**13** 3:14 28:1
**15** 12:2 13:6 31:11
**15th** 66:3
**16-CV-06109** 1:5
**18** 28:2 31:17
**19** 28:2 31:17

**2**

**2** 16:9
**20** 31:22
**20th** 50:2
**20-milligrams** 29:6
36:21 39:17
**2013** 12:2 13:6
14:22 22:4,20
29:8 31:11 32:18
36:16 38:7,20
52:10
**2014** 39:11 52:11
54:12 55:2
**2016** 14:4
**2017** 49:19 50:2
**2018** 1:19 33:2 66:3
**2200** 1:17 2:9
**25-milligrams**
17:14

**3**

**3** 18:1 20:16 26:5
26:13 48:14
**30** 31:22

**312.583.9970** 2:4
**312.655.1500** 2:10

**4**

**4** 3:4 27:2 48:15
**4:15** 1:19
**405** 2:3

**5**

**5:00** 5:20,20
**52** 3:5
**53** 2:3

**6**

**6** 36:17
**6th** 31:12
**60** 3:6
**60604** 2:4
**60606** 2:9
**62** 3:7

**7**

**7** 39:12 60:16

**8**

**84-2781** 66:9

**9**

**9/6** 28:1

# EXHIBIT

# A21

8/15/13

Maricel Marcial
2616 N. Spalding #3
Chicago, IL, 60647.
(847) 809 5669.

D.O.B. 1/21/1973.

Emrg Contact: Jorge [illegible] (773) 531 1909
(boyfriend)

Dr Terebelo.

Nancy Arnold

Confidential - Subject to Protective Order

Maricel Marcial

8/15/13   Medical Hx:

Breast lump — gets mammos

Medication
⊕ OC.
⊖ Medication

All: NKDA

Soc: Smoke ⊖
ETOH — occ.
⊖ Drugs.

FHx:   ⊕ depress  Anxiety/panic   ? medical anxiety
⊕ BPD  ⊖ Schizo.
Bro — "on drugs" — "jailed" — recovered

Pat Hx:   Saw on entire room do —
took 1 day of Zoloft — very anxious —
skin crawling out game. (25mg 1X dose)

KREINER000002

8/15/13

About to be on a leave of absence

Had anxiety c̄ [illegible] about going to writing up.

↳ 2 bad events. → ? [illegible]

Tried to watch [illegible]

Anxiety 4 & [illegible] [illegible] of [illegible]

Wake up terrified & [illegible]

Anxiety 4+ → anxiety is [illegible]

Sleep 4-5h/d → [illegible] (7h/night)

Had to force self to eat ⊕ → appetite has [illegible] (N)

Couldn't keep anything down.

But c̄ LOA → anxious about coming back.

Also feel excited about it.

Would doubt if & [illegible] to [illegible] (also have [illegible]).

Focus - OK. - can retain [illegible].

One is a [illegible]

Been using [illegible] Yoga - to ↓ tension.

Energy level - fair (can do [illegible] [illegible]

days can put into it)

Sorry [illegible] for [illegible] (∴ if what's going on - [illegible], [illegible] what is going on)

⊖ SI.

More within the month.

In the past no episodes of depression

But has anxiety in school before - when don't feel prepared [illegible]

Confidential - Subject to Protective Order

KREINER000003

- hx of [illegible] / [illegible]
- hx of [illegible] / [illegible]
- [illegible] 1° HA.
- [illegible] ✓
- hx of OCD.

A/p  [illegible] in c [illegible]

↳ [illegible] later.

Pt was to be on [illegible]
I'm not sure if [illegible] is indicated.
Try [illegible] 10 g  ([illegible])

9/6/13  [illegible] 10 g  ( x 28-15 d)

[illegible] in Rt eye [illegible] not [illegible] feel it
→ [illegible] in the HMO  ([illegible])
↳ not [illegible] — [illegible]

(E) [illegible]
held [illegible] & at
[illegible] at to his    Held back for school → [illegible]
school.   A lot of [illegible] — [illegible] but do [illegible]
        Try D f the [illegible] [illegible]

Confidential - Subject to Protective
Order

KREINER000004

Not way up [illegible]
Sleep [illegible] [illegible] – (8h)
Appetite – [illegible].
Focus – ok
Energy level – [illegible] good (+)
(–) ST
A/
[illegible] Try [illegible] 4 [illegible] to [illegible] [illegible] [illegible]

[illegible]

Confidential - Subject to Protective Order

KREINER000005

Mental Status

10/12/13

Celexa 20mg pogd

B.C. "trying your any
but still gas queasiness in the AM.

Not feeling depressed
↓ anxiety — don't feel as rattled but not in the
situation. Improvement c̄ others may stay SSRI.
Sleep — OK ; Appetite — OK
Energy — OK, Focus, OK
Having some fun — went on a trip — went diving
Acting energetic — not cursed ebact by dam three
Irritable ⊖
⊖ SI
Can tolerate the queasiness
MSE: Alright. feel range.

A/P CMbs.

Confidential - Subject to Protective
Order

KREINER000006

Marcial Marcano [illegible]

2/12/14 Celexa 20 mg po qd

(+) going back to school ; ? when was
get kicked out of school → 4 or 5 teens .
Way to hear [illegible] the Dean + Vice President .
hopes are [illegible] of [illegible] [illegible] the [illegible]
feels that [illegible] [illegible] [illegible] Fairly
Feels like there's a system ; feels not being bullied

→ Don't feel that it's helping my anxiety →
∴ it's what I'm up against —
going against the bully system —
they want you to quit .
Able to sleep , appetite - OK but a little
[illegible] 2° to stress
Energy - OK . Focus - at times decreased
∴ sleeps [illegible] : O [illegible] —
but [illegible] [illegible] [illegible] sleep
° Insight :
Anhedonia ⊖ ([illegible] [illegible] [illegible]
[illegible])
⊖ SI One [illegible] [illegible] [illegible] [illegible] [illegible] 20 [illegible]
[illegible] [illegible] ; Celexa 20 mg [illegible]
[illegible] 2.5, [illegible] [illegible] [illegible] [illegible]

Confidential - Subject to Protective Order KREINER000007

# EXHIBIT
# A22

Maricel Marcial                                    847/809-5669

6/5/21

**7/24/13 (initial appointment):** same day appointment for this Nursing Anesthesia student who had
scheduled an appointment for 7/17 and then cancelled it at the time she was supposed to come due to
her clinical schedule. This woman is in the residency portion of the program, and is in danger of
dismissal due to several poor evaluations that she has received from CRNAs ("Jill" and "Eva") who
appear to be close friends. She believes that J. has influenced E. to write a negative evaluation. This
woman has worked in telemetry and the ICU at Lutheran General since emigrating to the U.S. from the
Philippines, where she went to nursing school. She came with her parents and siblings. She started the
didactic portion of the program in 2011, and chose to attend Rush precisely because it has a reputation
for rigor. She wants to be challenged, and wants to be able to say that she is a Rush-trained nurse. She
has a 3.6 GPA, and has received a number of solid, positive evaluations, along with the two negative
ones; a third eval has one negative rating (among 5). She has met with the program director and the
assistant director and has been told that she has three weeks to collect 13 positive evaluations, or else
she will be dismissed from the program. She said several times that she is "fighting for [her] life", and
wonders every day if this will be the last day in the program. She became tearful when she talked about
how her parents would react if she were dismissed – she knows that they are very proud of her and are
counting on her to succeed in this program.

" Yosef "
This woman lives with her boyfriend who graduated from medical school but who teaches, rather than
practices clinical medicine. He has been very supportive, and has said that if she is dismissed, they
should hire a lawyer and sue Rush. I said that I did not expect that they would prevail by taking this
approach. She has received a lot of support from a senior student who has survived being on probation
twice, and who encouraged her to come to the Counseling Center. Several other classmates have also
voiced their support of her, and have said that in their estimation, she is performing at an acceptable
level. A number of them said that they, too, have had very negative experiences with one of the CRNAs
who has given M. a rough time (J.).

In the absence of a university ombudsperson, I suggested that she speak with either Dr. Lois Halstead or
Dr. Melanie Dreher about her situation, and her desire to succeed in the program. She needs to feel
supported, and to have her faculty help her to be successful, rather than threaten her with dismissal. I
encouraged her to focus on success in the OR, not on the shame of dismissal. I further suggested that
she do a better job of clarifying expectations and instructions since it appears that many of her
difficulties stem from a failure to do this. She is aware of my continuing availability.

8/2/13 (#2): met with program heads yesterday following
another negative evaluation. One suggested LOA
which I supported. Reviewed sleep hygiene principles
and discussed importance of exercise for stress
management. Encouraged her to pursue yoga
on a week-end day along with her usual run-
ning. Referred her to Kroeber or med eval, although

CONFIDENTIAL                                    TEREBESSY 000001

Maraial
p. 2

Said I think psychiatrist is out of the office for
vacation until 8/12. Said combination of addressing
sleep debt, exercise, med. and regular psychotherapy,
to help her regain confidence and sense of self-worth,
plus shadowing CRNA and a lot of studying to shore
up knowledge base, will likely make a difference for
her. She had scheduled an appt with L Halsted, but
decided to cancel it when it became evident that
her program is willing to work with her. Will call
for next appt once details of LOA are spelled out.

8/8/13 (#3): took LOA which will last ~3½ mo. This is in-
stead of failing current rotation and being dismissed. She
feels ashamed that she wasn't successful, embarrassed
to tell people what happened, but has plans to study
and learn as much as she can while she is away
from OR. Talked re: her tendency to explain too much,
to defend her decisions or actions when she has
been corrected, rather than accept the correction and

Marcial
p 3

agree to doing it in the specified manner the
next time. She acknowledges that she does this,
sees how it can be a problem. Encouraged her
to try to get in to see K Kriener next week before
I'm officially notified of her LOA, then see her as a
self-paying patient until she re-enrolls in 12/13 (?).
Encouraged her to continue to exercise for its mood
regulation benefits. F.u. on 8/13/13.

8/13/13 (#4). has appt with K Kriener on 8/16. Discussed fact
that she is still mentally fighting fact that she
failed rotation so has to take LOA. fighting fact that
program seems to pick on one victim in each cohort, etc.
Urged her to accept this outcome and work on fixing prob-
lem that led up to it. Specifically, talked with her re:
tendency to challenge authority of people over her but
appearing to question them, or explaining her reasons for

TEREBESSY 000003

Marcial
P. 4

handling things the way she did. This defensiveness
is seen as a challenge to their authority, so she has
to get much better at simply accepting their corrections
and making behavior changes accordingly. Said she
already feels more relaxed than she did while working
in the OR. Has been running more often and plans to
sign up for a half-marathon, which she has done in
the past. Also contacted choir director at her church
and wants to pursue this creative outlet as means of
managing her stress. She and ? plan to take a couple
of vacations, including to Germany to visit his brother.
Talked re: viewing ticket as speeding ticket: others have also
"exceeded the speed limit" but she got singled out. She
can't argue with the rules- she just has to pay the
fine and be more attentive to posted signs moving
forward, etc. F/u scheduled on 8/20/13.

8/20/13 (#5): saw k Kreiner on 8/16 and was prescribed Celexa.

Marcial
P 5

So far is tolerating a low dose of the medication. Heard from her, as well as from more senior students in the program, that it is important to be seen as teachable, cooperative, willing to fix mistakes. Reiterated that she shouldn't appear to question or resist instructors, and she needs to be calmer, better able to adapt to what is going on in OR. I talked re: the need to shift her focus away from information mastered to the process of working fluidly in OR. Encouraged her to study ±2 hrs per day along with running, yoga, singing in church choir, and hanging out with friends. Focus should be on how to better manage stress, not on cramming her head with facts. Has f/u with psychiatrist on 8/30, and since Loft hasn't started yet, will come to see me on 8/27.

8/20/13: informed that she took Loft on this date. Will keep previously scheduled appt with me and with RR.

8/27/13 (46): final appt until she returns to program ± 1/14.

Marcia

p.6

Feeling some side effects of medication which I encouraged her to discuss with psychiatrist when they meet on 8/30. Said she is feeling better, but we can't say whether it is due to medication, fact that she isn't in OR, she is exercising more, or some interaction of all of these things. Discussed again the shift that has to take place in order for her to succeed in the OR: she can't question CRNAs or appear to resist what she is told to do/not do --she has to agree to what is being asked of her. Should correct the record if something patently false is said about her, but otherwise she should accept the correction and indicate that she'll do it differently next time. Talked re: "sucking it up," not being defensive. Knows she can contact me via e-mail during her LOA, and I indicated a willingness to refer her out to someone in private practice if she prefers.

9/13/13 (#7): Saw M. at request of K Krecher who increases

Marcia
p. 7

M.'s medication and wanted her to have additional contact during adjustment period. M. seems to be doing fine. More relaxed, better rested, is exercising more. Shadowed anesthesiologist at Littleton General and got good feedback on her case management and her OR skills. Knows that when she feels supported she does fine. Talked re: what she needs to do to be successful in 1/14 including: not resisting instruction or correction by CRNAs; not being defensive; and being more confident. Asked her to think re: model of innoculations, her now-increased ability to withstand "injection" in OR because of "vaccine" she received this summer, etc.

10/29/13 (#8): phone consultation. Had been doing very well, was more confident re: her return to program in 1/14.

CONFIDENTIAL

Marcial
p. 8

Met with program director (MKramer) who voiced support for her actions during her LOA and who seemed to be encouraging re: her return to program. Together they met with Ray Narbone who was nothing short of hostile toward M. He told her she was unfit and unwanted by CRNAs and he predicted that she would fail if she returned. He actually bullied her and suggested that she was too old to succeed! I told her to schedule an appt with L Halstead to discuss what happened. I further suggested that she prepare a bullet pointed sheet (2 pgs) summarizing the events leading up to this point. I offered to review it prior to her meeting.

4/1/13: told K Kramer by phone that M is on LOA and must be self-paying patient until 1/4.

11/4/13: phone consultation with M who wanted guidance re: what kinds of information to include in her document that she plans to bring to her 11/7 meeting with L Halstead.

CONFIDENTIAL

TEREBESSY 000008

Marcial
p.9

12/30/13 (#9): discussed her return to the program on 1/6, probationary status, possibility that this career path might not be an option. Talked re: inoculating her against negative evaluations and judgments, importance of not being defensive and learning to accept their efforts to teach her, etc. Reminded her that doing so will not strip her of her dignity or integrity, etc. Will contact me when she learns her new schedule.

1/27/14: returned m's phone call. She wanted to discuss negative experience she had with CRNA ("Jill") on Monday. Encouraged her to come in to discuss situation in person. Sent her e-mail with open time slots.

1/29/14: called at her request. Is in TN at g.'s grandmother's hospital bedside, where they are about to be married. Met with program director on 1/24 and is convinced that faculty has no intention of allowing her to graduate, they are railroading her out of the program. Plans to meet with L Halstead to discuss this

TEREBESSY 000009

Marcia

P: 10

1/30/14: last minute cancellation - in TN to attend husband's grandmother's funeral. Re-sched for 2/5.

2/4/14: brief phone consult to discuss her upcoming meeting with L. Halstead. Feels program is actively trying to ex-ude her, isn't fair in their evaluations of her or performance.

2/5/14: last minute cancellation due to OR schedule. Re-sched for 2/6/14.

2/6/14 (#9): × 20 min late. Met with M. and G. to whom she is now married to discuss strategy for meeting with Mark Foreman, Ph.D., Acting Dean of CON. This meeting was suggested by L. Halstead on 2/4.

3/14/14: last minute cancellation

3/18/14 (#10): she is convinced that in 5 wks she will be failed on her current rotation resulting in dismissal from the program. They both feel that L. Halstead and M. Foreman have washed their hands of this situation, and are not resources to help. They asked a lot of questions re: Suing Rush. I

Marcial

P.11

repeatedly said that I cannot advise them in this matter, but I believe that it would be "ugly", that he would be portrayed in a negative light, and it is unlikely that she would win. She asked how she can get through the next 5 weeks knowing that she will be dismissed. I talked be: her pride and integrity, ability to look back at her work and feel very positive be: her efforts on behalf of patients, etc. Encouraged her to work hard and perform to the best of her ability, etc.

4/23/14: no show

4/29/14 (9:11): phone session. Has retained lawyer (~ Rothenberg) who has been in communication with Rush / Dr Rice. Because of this, program director has asked her to not come to school until matter is resolved. She would like to be allowed to work in an OR anywhere but at Rush because she feels that CRNAs here have been "poisoned" and everyone holds negative bias. Doesn't feel that she'd

CONFIDENTIAL

TEREBESSY 000011

Marcia I
p. 12

Is given fair chance to succeed. Wants level playing
field which she feels she doesn't have here. Was
advised to meet with HR staff member who handles
discrimination (Sharon Shrumpert). Was made to feel
that attorney (SS) wants her to just leave and stop
fighting this battle -- did not feel supported or en-
couraged. Expects decision to be made in next few days,
and may/may not be at work on 5/5. Will keep me
posted.

6/5/14 (#12)  (phone session): Was allowed to return to work and led to believe
that she would be given 5 wks to demonstrate compe-
tency. Was sent home and told to either withdraw
from the program or she would be failed. She declined
to withdraw so was failed. When her atty brought
this development (and the conditions leading up to it) to
attention of David Rice, he expressed surprise since the
conditions agreed upon by Rush weren't honored. M.

Marcial
P 13

Continues to feel that she is being set up to fail, that there is a campaign to get rid of her. She intends to file charges with the EEC to effect that she is being treated in a discriminatory manner. At least 2 students have also filed a complaint, and 2 others say they plan to do so. She was on a break from work at LGH and had to return to duties. Said she would keep me posted.

9/11/14: informed hi has taken a toll.

# RUSH UNIVERSITY
## MEDICAL CENTER

**COUNSELING CENTER**

### INFORMATION SHEET

Name: _MARCEL Q. MARCIAL_

Address: _2616 N. SPAULDING AVE APT. #3_

City/Zip: _CHICAGO, 60647_

Home Phone: _847-809-5669_ Other Phone: _847-299-9862_

Date of Birth: _3/21/73_

Email Address: _MILESONME@ HOTMAIL.COM_

I hereby authorize Counseling Center staff members to contact me using the above
E-mail address: _[signature]_
Signature

**Emergency Contact Information:**

Name: _YOSEF MENDELSOHN_

Relation to you: _BOYFRIEND_

Phone Number: _773 531-1909_

YOUR SIGNATURE HERE INDICATES THAT YOU HAVE READ THE
PSYCHOTHERAPIST – CLIENT AGREEMENT AND AGREE TO ITS TERMS.

Signature: _[signature]_ Date: _7/24/13_

CONFIDENTIAL

**Hilarie C Terebessy**

| | |
|---|---|
| From: | maricel marcial [milesonne@hotmail.com] |
| Sent: | Monday, October 28, 2013 1:37 AM |
| To: | Hilarie C Terebessy |
| Subject: | My meeting with Dr Kremer and Ray Narbone |

Dear Dr. Terebessy,

How are you?

I wanted to write you to tell you about a pretty bad experience I had last week. I wanted to write you at the time, but after the meeting I really wasn't able to think clearly.  However, I wanted to let you know about what happened as you have so supportive throughout this whole ordeal at Rush and I am hoping you might be able to give me some advice in terms of how I can complete the program.

On Thursday I went in for a check-in visit with Dr. Kremer. I was feeling pretty good about things as I have been working extremely hard studying (and I'm not exaggerating) between 5-6 hours almost every single day when I am not working. I only work 2-3 days a week. I have also been shadowing an anesthesiologist at Lutheran and another one who has been extremely supportive in Rockford. I have also been making sure that I exercise most days.

All in all, I was happy that I was managing to push myself in spite of all the misery of my initial experience during that second month of clinicals at Rush. I felt that even though I knew that the return to school in January would be stressful, I would manage and would be successful.

Then on Thursday morning I went to meet with Dr. Kremer. The meeting seemed to be going fine until he said that we should meet with Ray Narbone who oversees the CRNAs to discuss the plans for my return. I was quite happy to hear this as I felt that at last there was a true sense of support coming from the administration.

At that point everything fell apart.

It was miserable. Ray berated me throughout the entire meeting. He told me that I was delusional (that's the term he used). He said that I was in denial if I thought I had any chance of getting through the program. He said things that reminded me of a mean clique in high school. For example, he repeated to me that when he mentioned to a CRNA I was coming back in January, she said "God, I hope not". I find it hard to believe that any CRNA who oversees students would say that unprompted. At the very least, I would want to know exactly what prompted that kind of comment.

Ray had a great deal more to say – some of which completely amazed and devastated me. I had been warned by two female students that there were issues with Ray where he could be a real bully especially if he felt that he was being challenged. I just never expected it to manifest so intensely.

He also told me that he would be unable to control the CRNAs as they would all be questioning my return and that they almost unanimously felt that I did not belong there. (I know for a fact that this is not true as several of them were very positive about my performance when I was with them). Ray further said that he could not control the attitude of the CRNA preceptors towards me upon my return as it is "human nature" and there is nothing he can do to mitigate their behavior towards me.

1

CONFIDENTIAL

I was speechless that the manager of the CRNAs tells me that he neither intends nor wishes to tell his own staff to support me or at least give me the benefit of the doubt upon my return. It just reinforced my belief that they are setting me up to fail.

To make things even worse, during all of this, Dr. Kremer, who would always act supportive in private and on a few occasions told me that he was going to support me "every step of the way" did nothing but nod in agreement with everything Ray said and even reinforced it. I just felt so ganged up on, I was dumbfounded.

Dr. Terebessy, this already too-long email is actually not the first version I wrote you. In fact, I initially wrote you a much longer one as I have been keeping track of things and that version summarized many of them. However as a result, it turned out to be quite long. I realized that to send something like that to you was probably an imposition and possibly even disrespectful of your time. You have been so supportive that I did not want to take advantage of you in that way. I would, of course, be happy to show it to you if you would like to see it.

But I felt like I had to tell you about this latest experience. I can't help but feel that I am being railroaded out of this program.

I have put so much work, time, and emotional energy into this. I feel like I am being bullied every which way. It is such an injustice and is causing me so much pain. I KNOW that I can do this. I am a very capable nurse with 12 years of ICU experience and a very good reputation at Lutheran. I am also a hard worker. Why is it that the very people who I would have hoped would have supported me are the ones who are so determined to make sure that I fail?

I am at a complete loss. I hope you can help.

Thank you so much as always.
Maricel

**October 2013:**

It turns out that Ray and others wanted me to take my leave with the idea that it was only there only for me to decide to quit. This is very different from the approach that was as it was suggested to me. It is also, I believe, very different from the approach that a leave is intended for to any student. Mary Johnson suggested that I should take that leave. Personally, I only wanted a one month leave per Dr Terebessy but Mary clarified that it would not be possible because of academic scheduling and that I need to be assigned a grade. She said that from her experience with nursing students she dealt with in the past were advised to take time off to re group and that would help them come back refreshed and calibrated. That was the reassurance they gave me in addition to the possibility of reversing the withdrawal/non pass grade that I had to accept in line with the unsatisfactory evals that I've received so far.

It seems clear that the decision to allow me to take the leave was made in bad-faith – at least from the people in whose hands my future now rests.

**OTHER NOTES from OCTOBER 24:**
*Met with MK and we discussed what I have been doing during LOA. He jotted down in his notepad the activities I've been involved with which included reviewing Prodigy review, Valley review course, some anesthesia books and exercising and and watching my diet.

* Mentioned to him that I've been shadowing anesthesiologist at Lutheran and that he's allowed me to run cases with minimal supervision from start to finish. I added that my CRNA friend will also help me out with shadowing in Rockford and that he's been helpful with providing practical tips in clinical residency.(MK approved of this plan before my LOA)

*He verbalized being pleased with how I've spent this time of leave and noted that I've undertaken some healthy stress management skills that will help me in my return back in January. He was somewhat apologetic about the incidents I've had with Jill and Eva and concedes that in the OR there are plenty of personalities which can be difficult or challenging but reassured me that he will inform Ray to limit my interaction with them in clinicals

* I had asked how the juniors were doing with their clinicals as they had just started and he said they seem to be doing fine but they were apparently forewarned by the seniors that there is some "hazing" that goes on during clinicals; MK seemed incredulous that the juniors were being scared by this impression, he feels that there are challenging personalities but such a thing as hazing seemed far-fetched and probably a rare if even an occurence at all during residency training.

*We again revisited the terms for the LOA and said that in the first month of my return I will be assigned to a CRNA (I was alittle surprised as I thought that since I was still on probation that I would still need a full 3 months of CRNA supervision).He then advised ,"just make sure you review you're "drugs to know by heart" real well and if there's a question you couldn't answer then respond by saying I don't know it right now but I will look it up later and get back to you on it". He said I'm sure Ray will try to ease you

TEREBESSY 000017

into it by starting you with simple, not so-challenging cases at the beginning and so I just need to know the basics(got the impression that he was reassuring me that I don't need to be at the level I was in before LOA when I come back)."Nonetheless,cases change easily and so be prepared and flexible to take whatever he assigns you to do. "

*As fas as evaluations he repeated that if unsatisfactory evals start coming again that I will get a verbal warning at first then 2nd time around a written warning and if things don't go well then we can talk about transitioning me to CNL (clinical nurse leader)program so I can get full credits for all the courses I've taken before. I agreed to all of the aformentioned conditions.He then said, " I give you my word, Maricel that when you return I will support you in being succesful with your overall clinical experience."

*He then mentioned trying to set-up a time to do lab skills days on Mondays a month prior to my return so I can be refreshed with the basic skills such as induction, intubations and emergence anesthesia. And this will be done with either Keith or MK. I gave him 3 days(he asked for 2 days initially) and scheduled it right there and then in the month of December. Afterwards he said that it would be better if we met with Ray today to discuss the plans for my return. He got on the phone and per their conversation, Ray wanted to meet us at his office in the Jelke building(MK planned to meet him in the OR initially).

**ALL THIS WAS GREAT - AND I WAS GETTING HAPPIER AND HAPPIER IN THE BELIEF THAT Dr. KREMER WAS INDEED WANTING TO BE SUPPORTIVE AND SEE ME SUCCED AFTER ALL.**

*We arrived at Ray's office whre he was awaiting us and upon seating he asked me how I've been doing. I said I've been feeling good with having recovered and rested well during my leave and that I've been studying and shadowing(same thing I told MK). He then asked me , "Why do you want to be in nurse anesthesia?" I told him my reasons specifically my passion for critical care and I found it very fulfilling and gratifying to be doing this work and this is where I see my career going. He then looked irritated and started berating me saying," You see I don't think that you are a 'fit' at all for the program, you are really 'pushing the envelope' . It's like you're a square peg in a round hole, it just does not work and you can't force it."

**I got the sense that Ray had suddenly gotten extremely irritated when he realized that I wasn't planning on just 'going away'.**
* Ray says: "I thought that when you left, you would be coming back in a few weeks to tell us that you going to drop out of the program and so I am surprised to hear that you were still around."

**Ray says that shadowing - at least the type that *I* am trying to do is pointless.**
"I don't think this plan of yours to be shadowing anesthesiologists and CRNAs outside Rush is gonna work because the critical care decisions is theirs not yours so it won't help you and I don't know who's idea this was because it isn't going to help you. Plus the acuity of cases and standards in those hospitals is not the same as the standards here at Rush.

**This last comment was revealing as Ray had no idea of which hospitals I was talking about. He never had asked and I had never mentioned it. I think it is just another thing that shows that he was determined to simply bully me and**

TEREBESSY 000018

ensure that whatever I did, his intent is ONLY to make sure that this doesn't work out for me.

**Ray continues the theme of how I am an absolutley awful fit - and that I have no real business even trying.**
"You need to open your eyes and realize this is not a fit for you. Even if you try to apply in other places for nurse anesthesia it would be difficult or even impossible because  they would have to talk to us and we would have to tell them about your poor performance. It's not enough that you wish this, THINK. Don't let your mind, your heart or your emotions make this decision because you are just not a fit for this program. There are people who are not meant to do this so don't force the issue. As an example there was a child in the OR who was scheduled for a myringotomy and ended up having an arrest. Can you imagine taking care of that or being in that situation?. I replied it certainly sounds overwhelming - and he cuts me off and says "You can't be overwhelmed! You need to be able to act promptly during these stressful situations. Now can you imagine being in charge of this child's life?"

**Ray declares that I am also emotionally unfit. (How in the world did he decide that he could know and state that???)**
He then said, "You just don't have the emotional readiness to deal with this kind of things. You have the smarts but you don't have the emotional capability for this kind of profession.Your evaluations have been reflective of this. I argued that I had other evals from CRNAs and attendings that gave me positive evals( more than the negative ones even) I even said that being in the code team I've shown how I can handle myself in stressful situations and have been lookd at as a strong resource by the residents and nurses alike.

**MK then steps in in a role that is far from supportive.**
Then MK (who said "well there was consistency in the other evals that showed unsatisfactory marks.And it's difficult to transition to this new field especially that you've been in a nurse for so long ; it's just a whole different challenge "
Still, at this point, I thought maybe MK thought it was a fair and relevant contribution.

**Theme of turning my ICU experience into a liability**
This has been another point that they have tried to push on me - turning my experience and success as an ICU nurse into a liability. Every person OUTSIDE of MK and Ray (including pretty much every single anesthesiologist I have ever spoken to about my desire to become a CRNA) has said that there is no single thing that will be more valuable than my lengthy experience in the unit.

**Ray tells me that even when I do return, I can only expect even rougher treatment by the CRNAs.**
He also tells me an anecdote to point out just how little they want me there:
Ray said,"When you come back the CRNAs are going to look at you differently. And it's human nature so I don't have control of how they're going to behave towards you. As a matter of fact before this meeting I told one CRNA that I was about to meet with MK and you and she said, 'She's not coming back is she?'

**Ray continues on the theme of how little I am wanted.**

TEREBESSY 000019

"And I think if I took a poll from the CRNAs I have a feeling that they would unanimously vote to not have you return.

**MK steps in again to elaborate on this theme:**
MK then chimed in and said, " I actually had a meeting with them this week and many showed their skepticisim regarding Maricel's return. Ray said, "See realize what you're up against; it will be more than an uphill battle for you and if you made a mistake it would be looked into with more disdain than when you first commited them." How do you explain to them that your so far behind and your classmates are way ahead of you now?" Also what kind of example am I setting by allowing you to come back, it lowers down the high standards that we had set before and what Rush is known for." Right now the SRNAs who are working down there are measured in a very high level of expectation. The anesthesiologists are surprised when they actually meet them and even then they push the expectations even higher so imagine facing that. "

**Ray establishes that I shouldn't even consider trying to go elsewhere: (Why is he worried about this? I had never mentioned anything along those lines).**
"Anesthesia is a very small world , if you hiccup in the east coast we will hear about it here even before you say excuse me. Quitting the program does not mean that you were not successful, you can be successful but just NOT in anesthesia. Have you looked into other NP programs?. If you transition now it would be easier to get into other programs than if you waited until you fail out later and we're just looking at the inevitable, I'm just gonna tell  you later, "see I told you so".

**Trying to get me to just walk away**
He then asked MK, Mike how many people transfer from their initial program to another program within the various NP programs? MK then said, "Oh countless times!"

**Ray then refers to my age.**
"See, find out where you can be truly successful and be happy there. I don't suppose you are the youngest in your class so why waste your time on something that will make you miserable just try to be happy and find that place where you can be a good fit? I'm sorry I've upset you but you need to hear the truth, the people who are not telling you this  dont' care about you because they're not letting you see your shortcomings, they're not being honest to you.

**Accusation that I have been running around and around just so I can find someone who tells me what I wnt to hear. I have no idea where he gets this from either.**
You're like somebody who goes from doctor to doctor so you can get feedback that you want to hear and before too long it's too late and the cancer has spread. So, LISTEN to what MK has to say, listen to his advice and open your eyes don't use your heart and it's not enough that you wish or desire this you have to be qualified to do this!"

**Ray wants me to know that he really is on my side:**
He then ended with "You know, when you graduate send me an invitation and I would be there to congratulate you".

**Out of Ray's presence, MK reassures me that in fact, he too really is on my side.**
So we left as I kept fighting back the tears and MK pulled me aside a corner where he said he wants to talk to me privately. He started with"Well I'm told

TEREBESSY 000020

that I tend to soften things and make things sound less severe. I certainly was not expecting Ray's approach where he just slammed you and slammed you with all these things. It's definitely a lot to process right now so why don't you take some time to think things through because I'm certainly not expecting you tomake this major decision right now. Let's say that in two weeks get back to me on your decision.

**MK reiterates that I really don't have a shot:**
He then left me with "As Ray said it will be more than an uphill battle for you and we just want you to be happy."


And suddenly it was all warm and supportive. He hugged me and then said, you're a good person just try to find your happiness. Are you are going to be ok driving back home?"

I said yes I'll be fine, and thanked him for his time.

CONFIDENTIAL

# EXHIBIT A23

```
                                                    Page 1

              THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
                     EASTERN DIVISION

MARICEL MARCIAL,                    )
                                    )
              Plaintiff,            )
                                    )
              -vs-                  ) No. 16-CV-06109 5106
                                    )
RUSH UNIVERSITY MEDICAL CENTER,     )
et al,                              )
                                    )
              Defendants.           )


          The deposition of THOMAS G. HOLMES, M.D., taken
pursuant to the provisions of the Code of Civil Procedure
and the Supreme Court Rules of the State of Illinois
pertaining to the taking of depositions for the purpose
of discovery, taken before DEANNA L. TUFANO, Certified
Shorthand Reporter of the State of Illinois, at
1775 Ballard Road, Park Ridge, Illinois, on
March 12, 2018 at 1:00 p.m.



Reported for:

MAGNA LEGAL SERVICES

(866) 624-6221

www.magnals.com, by:

Deanna L. Tufano, C.S.R.
```



Page 2

APPEARANCES:

ELAINE K.B. SIEGEL & ASSOCIATES  (via videoconference)
MS. ELAINE K.B. SIEGEL
53 West Jackson Boulevard, Suite 405
Chicago, IL 60604
(312) 583-9970
ekbsiegel@aol.com
   on behalf of the Plaintiff;

HUSCH BLACKWELL, LLP        (via videoconference)
MS. KAREN L. COURTHEOUX
120 South Riverside Plaza, Suite 2200
Chicago, Illinois 60606
(312) 655-1500
   on behalf of the Defendants.

REPORTED BY: DEANNA L. TUFANO, CSR
            LICENSE NO. 084-003819

Page 3

INDEX

WITNESS                    PAGE

THOMAS G. HOLMES, M.D.

   Examination By Ms. Courtheoux.........  4

   Examination By Ms. Siegel.............  32

   Further Examination by Ms. Courtheoux.  36

      E X H I B I T S

                 MARKED
NUMBER            FOR ID
   Packet of documents were referred to but not
      marked during deposition

Page 4

   (Witness sworn.)
   THOMAS G. HOLMES, M.D.,
called as a witness herein on behalf of the Defendant,
having been first duly sworn, was examined and testified
as follows:
      EXAMINATION
BY MS. COURTHEOUX:
   Q  Good afternoon.  Thanks again for being here and
bearing with us through our technical challenges which
seem to have been resolved.
      Dr. Holmes, have you had your deposition taken
before?
   A  Yes, I have.
   Q  Great.  We will go over that in a few minutes.
      Before we do that, I just wanted to review a
few ground rules with you.  First, you should be familiar
since you've had your deposition taken before, please let
me finish the question before you begin your answer.
That way you'll know that you've heard the full question
and we'll know the question you're answering is the same
one that I asked; is that okay?
   A  Yes.
   Q  Also it should be obvious from the set up your
answers should be audible.  Please speak up so we can

Page 5

hear you and speak in words not gestures, okay?
   A  Okay.
   Q  We ask that you provide full and complete answers
to our questions.  Also, if you don't understand a
question, please say so.  If you answer a question, I
will assume that you understood what I meant, okay?
   A  Okay.
   Q  Please let us know if you feel you need a break
we can take one.  I would just ask that you finish
answering the question that's on the table before we take
any break, fair?
   A  Yes.  Absolutely.
   Q  Finally, are you taking any medications or are
there any other circumstances that might make it
difficult for you to understand and answer my questions
today?
   A  No, I am not.
   Q  Thank you.  I understand that there's a packet of
documents for us to use as exhibits with you.
   A  Yes.  I have it here.
   Q  Excellent.  I have given the same packet to
Plaintiff's Counsel and to Plaintiff, and they are in the
page numbered order that we received them.
      So to get started, would you mind please just



Page 6

1  walking us through your educational background?
2      A  I graduated medical school at Northwestern. I
3  did my residency also at Northwestern and have been
4  practicing primary care internal medicine since then.
5  That was in 1984.
6      Q  What was the specialization of your residency?
7      A  Internal medicine.
8      Q  THANK you. And would you mind reviewing your
9  employment history since you graduated from medical
10 school from residency?
11     A  Sure. I initially was an attending physician at
12 the VA Lakeside Hospital which was the VA associated with
13 Northwestern. I spent about four years there, and then I
14 joined the medical center, the teaching practice for
15 Lutheran General Residency Program, and I've been there
16 ever since.
17     Q  Thank you. And you're licensed to practice
18 medicine in the State of Illinois?
19     A  Yes.
20     Q  Are you board certified?
21     A  Yes.
22     Q  In what area?
23     A  Internal medicine.
24     Q  Thank you. And any history of professional

Page 7

1  discipline, any suspension of your license, reprimand,
2  anything like that?
3      A  No.
4      Q  How would you describe the nature of your medical
5  practice?
6      A  I practice general internal medicine diseases of
7  adults, so we basically diagnose and treat problems
8  associated with aging, chronic medical problems like
9  diabetes and hypertension and spend a fair amount of time
10 trying to accomplish preventative care to prevent people
11 from getting sick.
12     Q  How many providers are in your practice?
13     A  There are 8 attendings and 54 residents.
14     Q  And had you met or did you know Ms. Marcial in
15 any capacity before she came in as a patient?
16     A  She's a nurse on the intensive care unit over at
17 Lutheran, so I had met her in that context.
18     Q  How often would you say you interacted before she
19 became your patient?
20     A  Maybe once a month.
21     Q  Now, let's turn back to the other depositions
22 you've mentioned. How many depositions have you given?
23     A  I guess it must be near 20.
24     Q  And how many of those were you an expert witness?

Page 8

1      A  18.
2      Q  What about the other two?
3      A  The other two were suits against me or my
4  practice.
5      Q  Can you give me the approximate dates of those
6  two lawsuits?
7      A  The first one was in 2000. The second one was, I
8  want to say, 2006, 2005, somewhere around there.
9      Q  And for each of those, could you just briefly
10 describe what the claims were?
11     A  For the first one the claim was that patient who
12 came in under my care suffered adverse outcome with
13 permanent vegetative state after pneumococcal infection.
14     Q  And what was the resolution of that case?
15     A  It was settled.
16     Q  Thank you. How about the second one?
17     A  Second one was an older gentleman who came to the
18 office complaining of chest pain. We determined it was
19 non-cardiac and sent him home, and then he subsequently
20 had an acute MI and passed away.
21     Q  And how was that resolved?
22     A  It was dismissed.
23     Q  Okay. Dr. Holmes, thank you very much.
24         Just to clarify, you're here for your deposition

Page 9

1  pursuant to a subpoena issued by the Defendants, issued
2  by me as their attorney?
3      A  Okay.
4      Q  And did you also provide documents to us pursuant
5  to a separate subpoena?
6      A  This is the only one I know about.
7      Q  Well, the documents that I sent that I have in
8  front of you, are those documents that your office
9  produced to us?
10     A  Yes. I recognize them.
11     Q  Can you just explain how those documents were
12 identified and produced?
13     A  Well, not being involved in it myself, I will do
14 the best I can. These are basically the clinical
15 summaries of the visits for Ms. Marcial. They are not
16 the -- at least several of them are just the clinical
17 summaries which basically say why she was here and what
18 was done. And subsequently, several of these are
19 actually the notes themselves. The clinical summary is
20 kicked out of the actual note. And then later on, we
21 have actual notes that are printed up.
22     Q  Okay. Thanks. I'd like to start walking through
23 your treatment of Ms. Marcial. I understand that in the
24 course of your practice, you've had occasion to treat



Page 10

1  Maricel; is that correct?
2     A  Yes.
3     Q  Do you know how it came to pass that Maricel
4  sought out your practice?
5     A  I do not.
6     Q  When did you first see her?
7     A  I've only actually seen her personally on one
8  occasion.  Most of these notes are from a variety of
9  sources including the family practice residents as well
10  as some of the internal medicine residents.  So my name
11  is on a lot of these that we ordered to try and evaluate
12  what was going on.  You know, she also has notes from an
13  AMG practice down on the south side, 2545 South Martin
14  Luther King Drive which is a completely separate
15  facility.  So I believe that the one time I saw her and
16  wrote a note was a visit with one of the residents.  I am
17  not sure I can locate that right now.  Anyway, I should
18  have marked these up.  You said I didn't have to read
19  them, and then I should have read them.
20     Q  I am just asking for your recollection at this
21  point.  It sounds like you seen her as a patient just
22  once and you're not sure exactly when that was; is that
23  correct?
24     A  Correct.  It's in here somewhere, but I am having

Page 11

1  difficulty locating it at this moment.
2     Q  That's okay.  As we go through some of these
3  documents, we won't go through all of them, but as we
4  walk through some of them, if you could please point out
5  the one where you actually interacted with Maricel, that
6  would be great?
7     A  I would be happy to do so.
8     Q  Thank you.
9        Is it routine in your practice that Maricel,
10  although she is your patient, would see your colleagues
11  instead when she comes for office visits?
12     A  Yes.  That's routine.  We run a residency
13  training practice here, so our goal is to get as many
14  patients into the care of the residents as possible.
15     Q  What is your relationship to Maricel's treatment
16  for the times when you didn't actually interact with her
17  in the office, would you have find out that she had been
18  in or did you oversee her treatment at all personally?
19     A  I would either get a note from the resident who
20  saw her or supervise the visit myself.
21     Q  What would it mean to supervise the visit
22  yourself?
23     A  Well, the resident sees the patient and then
24  presents the case to me.  We discuss the treatment plan,

Page 12

1  and depending on the resident's level of skill, we
2  implement that.  With the second and third year
3  residents, I don't really need to do much most of the
4  time.  But for the first years, we interact very closely
5  with ordering tests and discussing results and that sort
6  of thing.
7     Q  Okay.  Thank you.
8        So you might notice that these documents all
9  have page numbers in the lower-right corner.
10     A  Yes.
11     Q  We'll be relying on those page numbers.
12  Unfortunately, that means we will not be proceeding
13  exactly in order in the sequence that they are stacked,
14  but the page number should help us to stay on the same
15  literal page.
16        If we can start actually at Page 97.
17     A  Okay.
18     Q  Do you recognize this record?
19     A  It's lab sheet, a CBC ordered by Sharon Decker
20  who was a resident here at the time.  It was a long time
21  ago.  That was in 2007.
22     Q  Yes.  What was the date of that lab work?
23     A  10/29/2007.
24     Q  And who created this record?

Page 13

1     A  I don't know what that means.  This is a page
2  from our EMR.  This is how the labs are presented in our
3  electronic medical record.
4     Q  So this is just a set of lab results?
5     A  Correct.
6     Q  Thank you.
7        So is it fair to say that this would not have
8  been an office visit, but rather just an independent lab
9  visit by Maricel?
10     A  I would guess that this was probably an office
11  visit with Dr. Decker, and then she went and had these
12  labs done.  It's difficult to say without seeing the rest
13  of the workup.  I mean, it's certainly possible it was an
14  independent lab test as well.
15     Q  Thank you.  Excuse me one moment.
16        Can you please turn to the document beginning
17  with Page 87.
18     A  Okay.
19     Q  Do you recognize this document?
20     A  This is a note from August 11, 2009.  It appears
21  to have been written by Dr. Mark Conley who is my
22  partner.
23     Q  Would you say that this record was kept in the
24  course of the regularly conducted business activity in



Page 14

1  your practice?
2  A  Yes.
3  Q  Would this document have been created at or near
4  the time of the event that it records?
5  A  It certainly appears to be.  She was in a car
6  accident on August 9th and came to see us on August 11th,
7  so that's two days.
8  Q  Would you answer the same way for any medical
9  records kept by your practice with regards --
10  A  I don't understand the question.
11  Q  I am just wondering whether records like this
12  one, you said that it was notes from her visit with Dr.
13  Conley.  Would any similar note of Maricel's visits to
14  providers in your practice --
15  MS. SIEGEL: I am going to object.  Lack of
16  foundation for records for all the documents.
17  MS. COURTHEOUX: Counsel, do you mean I should go
18  through it one by one and authenticate --
19  MS. SIEGEL: No.  I am saying that there are items in
20  here that don't constitute business records.  They
21  contain matters that are out of the scope of business
22  records.
23  BY MS. COURTHEOUX:
24  Q  Doctor, would you please turn to Page 88 which is

Page 15

1  the second page of this packet?
2  A  Yes.
3  Q  Can you tell what the reason for Maricel's visit
4  on August 11, 2009 was?
5  A  Yes.  She was complaining of neck and shoulder
6  soreness after a motor vehicle accident two days prior.
7  Q  And under active problems, what are the active
8  problems noted in this record?
9  A  Well, she had a breast mass that had been
10  identified, and she has a history of palpitations.
11  Q  Do you know anything else about Maricel's history
12  of palpitations?
13  A  Not based on this particular record, no.
14  Q  How about based on your recollection of treating
15  her?
16  A  I don't recall any issues with palpitations.
17  Q  Did Maricel attribute her palpitations to any
18  particular cause when she visited on August 11, 2009?
19  A  I don't believe her palpitations were discussed.
20  Q  Is it fair to say that her palpitations predated
21  her visit on August 11, 2009?
22  A  Yes.
23  Q  Are palpitations considered cardiovascular
24  symptoms?

Page 16

1  A  Yes, they are frequently.
2  Q  When patients come in for a reason other than
3  cardiovascular symptoms, do you ask about cardiovascular
4  symptoms as a matter of course?
5  A  It depends on the situation.  Sometimes you
6  would, sometimes you would not.
7  Q  Could you please turn the packet that begins with
8  Page 92, but we're actually going to look at Page 94.
9  A  Okay.
10  Q  What is this document?
11  A  This document is a note from a gynecologist who
12  was Dr. Daniel Pesch from August 6, 2008.
13  Q  Was Maricel in the office for a visit on August
14  6, 2008?
15  A  Yes.  In the gynecologist office, yes.
16  Q  Now on page 94, there's a section called ROS.
17  What does that stand for?
18  A  Review of systems.
19  Q  And under cardiovascular symptoms, does it say no
20  cardiovascular symptoms?
21  A  Yes, it does.
22  Q  Did that mean that Maricel did not complain of
23  palpitations when she was in that day?
24  A  It appears that's the case.

Page 17

1  Q  Did it tell you anything about her history of
2  palpitations?
3  A  It does not.
4  Q  Could you please turn to the packet that starts
5  with Page 49.
6  A  Absolutely.  Okay.
7  Q  Okay.  What is this document?
8  A  This is a document where the patient presented
9  complaining of palpitations and lightheadedness.  This
10  was on 4/2/2014.  She was seeing Dr. Kimberly Tran who
11  was one of our residents at the time, and I was the
12  supervising physician.
13  Q  So the reason for the visit was complaints of
14  lightheadedness and palpitations; is that correct?
15  A  Yes.
16  Q  On Page 51, what does it mean when it says acute
17  care note at the top?
18  A  Means that it was not a chronic care or follow-up
19  visit.  It was for an acute problem.
20  Q  If we look down, there's a heading that says HPI,
21  what is HPI?
22  A  History of present illness.
23  Q  And it says that Maricel had a past medical
24  history of PVC; is that correct?



Page 18

1    A  It does.
2    Q  What does that mean?
3    A  Means that she had a past medical history of
4  premature ventricular contractions, a common problem
5  that's often associated with the sensation of
6  palpitations.
7    Q  Does a past medical history of PVCs make it more
8  likely that a patient would experience palpitations
9  again?
10    A  Well, I don't know that you can make a blanket
11  statement about that.  A lot of the sensation of
12  palpitations are related to the state of arousal of the
13  patient, so somebody who is under a lot of stress, may be
14  more conscious of any premature beats that they're
15  having.  People who are not under stress will often not
16  notice them.  So the answer is, depends on the patient's
17  state of mind.
18    Q  Now also under HPI, there is a statement here,
19  patient states that she has been stressed out a lot with
20  school.  Patient states there's been a lot of bully in
21  her class.
22    A  Yes.
23    Q  What do those statements reflect?
24    A  I believe they reflect the state of mind that the

Page 19

1  patient was in.  She was very upset.  She felt that she
2  was not getting the support that she needed from the
3  class that she was taking.  If I recall, this is the
4  visit where I went in and talked to her and she, I
5  believe, was tearful and very upset about her school
6  situation.
7    Q  So those comments that I just referred to, those
8  are Maricel's subjective impressions that she was
9  relaying to you about how she was feeling?
10    A  Yes.
11    Q  Well, since you spoke with her, can you describe
12  what she told you?
13    A  Well, I think I wrote it down at the end of this
14  note.  On Page 54 at the bottom it says, seen and
15  discussed at time of visit, patient with complaints of
16  dizziness and palpitation.  She is under a lot of stress
17  at school, feels she is being misused.  Tearful and
18  depressed.  Has normal exam, some nystagmus with dicks
19  hallpike which means that some of the symptoms that she
20  was having are probably relating to a benign but
21  disturbing disorder of the inner ear.  Agree with plan,
22  trial of Bupropion and follow-up as noted.  So follow-up
23  with included some blood tests, a 2D echo and a note
24  given for school which is on the page, the following

Page 20

1  page, the following, following page.  Seen in office
2  today for workup for palpitations and lightheaded.
3  Please excuse patient from school for the next week until
4  she is medically cleared from us to return back to
5  school.
6    Q  Did Maricel say anything else about her
7  experience at school that day?
8    A  I don't honestly remember.  I think I wrote down
9  pretty much what I had taken out of it.  She was very
10  upset.
11    Q  I take it that Maricel said she was feeling
12  stressed?
13    A  Correct, yes.
14    Q  Did she say whether she was stressed because she
15  had been performing poorly at school?
16    A  I did not ask that question.  I don't know.
17    Q  Did she say whether she was stressed because she
18  was at risk of failing out of the program?
19    A  Again, I did not pursue those aspects of her
20  stress.
21    Q  Why was she stressed?
22    A  Well, anybody who's working in the ICU and going
23  to school I don't know how much class time she had, but
24  it's a stressful situation.  I have the opportunity to do

Page 21

1  clinical teaching with some of the nurse practitioner
2  student and most of them are under a tremendous amount of
3  stress, both financially and time-wise.  I did not pursue
4  the degree of stress that she was under at this time.  I
5  did recommend that she get started on something for
6  depression which would be the Bupropion, and we would
7  bring her back in a few weeks and see how she was doing.
8    Q  Is it fair to say that you don't know exactly why
9  she was stressed that day?
10    A  That is fair.
11    Q  Other than that, it had to do with school?
12    A  That is correct.  She did say she felt she was
13  being misused or being treated unfairly.  I did not
14  explore that issue anymore than that.
15    Q  Going back to Page 51, that statement that we
16  read before, patient states that there has been a lot of
17  bully in her class.
18    A  Yes.
19    Q  Dr. Holmes, who was bullying Maricel?
20    A  I don't know.  I don't know whether she's talking
21  about people in her class or the teachers or I don't
22  know.  I have no insight into that.
23    Q  Okay.  I think you have referred to Page 54
24  previously.  Let's turn back to that if you can.



Page 22

1    Could you please explain what's written under
2 the word vertigo at the top?
3    A  Vertigo most likely BPPV, which stands for benign
4 paroxysmal -- I'll think of it in a second.  That's the
5 benign vertigo that we often see in certain disorders of
6 the vestibular apparatus.  Benign paroxysmal positional
7 vertigo.
8    Q  And how about under where it says anxiety just
9 under vertigo?
10   A  Yes.
11   Q  Can you explain what's written there?
12   A  It says, will try Buproprion 150 milligrams daily
13 for a week and then increased to BID.
14   Q  What is BID?
15   A  BID means twice a day.
16   Q  And what is that medication?
17   A  Buproprion is an antidepressant and anti-anxiety
18 medication that we frequently use in young people because
19 it has fewer side effects than some of the other
20 medications.
21   Q  What are the side effects that it has, if any?
22   A  Of the Buproprion, probably the most serious side
23 effect is that it lowers the seizures threshold and can
24 make people who have a history of seizures have seizures.

Page 23

1 Other than that, it's really a very well-tolerated drug
2 in excess can cause some dizziness or lightheadedness.
3 But overall is a pretty well tolerated medication.
4    Q  And I see you also noted here and discussed that
5 Maricel was tearful and depressed; is that correct?
6    A  Yes, that's correct.
7    Q  What was the cause of Maricel's tearfulness and
8 depression?
9    A  Something going on at school I believe was the
10 main issue.
11   Q  Could it have made Maricel tearful and depressed
12 if she felt ashamed of mistakes she's made in caring for
13 patients in the clinical setting?
14   MS. SIEGEL:  I am going to object.  Calls for
15 speculation.
16 BY MS. COURTHEOUX:
17   Q  You can answer.
18   A  I could imagine that it would make anybody who is
19 clinically oriented tearful and depressed, yes.
20   Q  And if Maricel had felt ashamed that she hadn't
21 performed well enough to successfully complete her
22 residency, could that have made her feel and depressed?
23   A  Yes.
24   Q  Let's turn back to Page 50 which you eluded to

Page 24

1 earlier.  What is this document?
2    A  This is a letter for Maricel to take to her
3 school.
4    Q  And was this issued by Dr. Tran?
5    A  Yes.  It was under my guidance.
6    Q  Why did you request that Maricel be excused from
7 school?
8    A  Well, I think because she was so upset and
9 tearful and distraught that it was -- since that seemed
10 to be the source of her distress, that it would be good
11 to get away from that for a while.  It's sort of like an
12 excuse from work note.
13   Q  And why was it for the next week, why not a
14 shorter or longer period?
15   A  It's all hocus-pocus, I don't know.  We kind of
16 have to judge based on what's going on, how much time
17 they need, how do we tell anybody they need two weeks off
18 for their back injury.  It's kind of negotiation with the
19 patient.
20   Q  What treatment was prescribed for Maricel on
21 April 2, 2014?
22   A  Well, she was given Buproprion to take it once a
23 day for a week and it increased to twice a day.  A number
24 of tests were ordered to see if there was any metabolic

Page 25

1 cause for some of her symptoms, as well as an
2 echocardiogram to see if there was any issues with the
3 palpitations that may be related to something within her
4 heart.
5    Q  Now Dr. Holmes, if you wouldn't mind turning to
6 Page 16, please.  That's the front of the packet.  I am
7 sorry to jump around.  I am just trying to go
8 chronologically.
9    A  All right.  Page 16.  Here we go.
10   Q  Okay.  What is this document?
11   A  This document is a clinical summary that is
12 prepared from the note that we just reviewed.
13   Q  I see.  Can you just explain the relationship
14 between those two documents?
15   A  Yes.  The relationship here is that the clinical
16 summary is something that is given to the patient when
17 they leave which includes various reasons for being there
18 and what was talked about and what their vital signs were
19 and sort of a summary of the visit without all of the
20 language.
21   Q  Thank you.  And now can we please turn to Page
22 45.
23   A  Okay.
24   Q  What is this document?



7 (Pages 22 to 25)

Page 26

1    A  All right.  This is a report of an echocardiogram
2  that she had, I think.  Well, it's actually labs and
3  labs.  So there is no echocardiogram in here.  So these
4  are basic metabolic panels, a blood count and a thyroid
5  test that was ordered by Dr. Tran in the appointment that
6  we previously discussed.
7    Q  And would these tests have been run on April 3,
8  2014?
9    A  Probably so.  April 3rd looks like when she went
10  to get the blood drawn, yeah.
11    Q  What were the results of these test generally
12  speaking?
13    A  They were normal.  Her blood sugar was a little
14  bit high, but it was a non-fasting test and her blood
15  counts and thyroid tests were normal.
16    Q  Okay.  Next please turn to Page 40.
17    A  Okay.
18    Q  What is this document?
19    A  This is a result of labs done on April 2, 2014 --
20  ordered on April 2, 2014.  So these are the same labs as
21  the other one.
22    Q  I see.  So these reflect normal results of the
23  same lab tests that were done?
24    A  Correct.  This also included the echocardiogram

Page 27

1  that was obtained.  This was done apparently the
2  following day, and the echocardiogram was basically
3  normal.
4    Q  Was there anything abnormal about it?
5    A  There's a trivial pericardial effusion that has
6  no significant meaning and everything else was normal.
7    Q  When was Maricel's next visit after April 3,
8  2014?
9    A  I don't have her complete chart here, so I really
10  can't tell you.  There appears to be one here of April
11  2nd.  The August 10, 2012, that's going the wrong
12  direction, so I actually don't know.
13    Q  Maybe I can help.  Would you mind turning to Page
14  13?
15    A  Okay.
16    Q  What is this document?
17    A  This is a clinical summary, in other words the
18  shortened form from an appointment with Dr. Zang or Dr.
19  Zong, I am sorry.  That was 4/11/2014.
20    Q  What was the purpose of this visit by Maricel?
21    A  Well, I would have to actually look at the note I
22  believe that it looks like they discussed her anxiety.
23  There's not enough detail in here for me to say what the
24  purpose really was.  Do we have the note?

Page 28

1    Q  Actually, yes.  Why don't we supplement that one
2  and look at the same time at Page 35, maybe that will
3  help.
4    A  All right.  Here we go.
5      So she was following up from the visit the
6  previous week.  She states that her lightheadedness has
7  gotten worse.  Having nausea, dizziness which seems to be
8  related to probably her benign paroxysmal positional
9  vertigo.  So she was here with worsening dizziness.
10    Q  Were there any tests ordered or run in connection
11  with this visit by Maricel?
12    A  It appears that we did not do any tests.
13    Q  Sorry.  It looks like you said something but we
14  didn't hear anything come through.
15    A  Okay.  What was the question again?
16      (Question read.)
17  BY THE WITNESS:
18    A  No, there were not.
19  BY MS. COURTHEOUX:
20    Q  On Page 36, there's a page that says letter at
21  the top.  What is this letter?
22    A  This is another letter to her school stating that
23  she could return to her normal educational and clinical
24  duties.  So she was seen a week before, told to take a

Page 29

1  week off, we saw her back in a week, and her symptoms
2  were better and she was able to return back to work.
3    Q  So her lightheadedness or dizziness was not
4  concerning enough that you recommended she remain out of
5  school or clinical work; is that correct?
6    A  That's correct.
7    Q  Has Maricel come back in for treatment of her
8  vertigo or for anxiety or dizziness since April 2014?
9    A  Of my knowledge, no.
10    Q  And Dr. Holmes, in the period from 2012 to 2015,
11  did Maricel complain of pain?
12    A  Not that I know of, no.
13    Q  And during the same period from 2012 to 2015, did
14  Maricel complain of physical injury?
15    A  I don't know of any incident, although she was in
16  a car accident.  I don't remember when that was.  I don't
17  think that was -- I don't think that's what you're
18  referring to.
19    Q  And Dr. Holmes the documents that your office
20  produced in response to our subpoena which as we've
21  looked at today consists of clinical summaries and notes
22  and related documents.  Do you find these to be reliable
23  reflections of what happened when Maricel interacted with
24  providers in your office?



Page 30

1    A  Yes, I do.
2    Q  Just going to take one minute to look over my
3  notes if that's okay.  I'd like to clarify one more
4  thing, then I will wrap up my questioning.  If we go back
5  to that very first set of notes beginning with Page 97.
6  Could you let me know when you get there?
7    A  I have it.
8    Q  Thank you.
9       So actually turning into that document at Page
10  99 in the middle of the page.
11    A  Yes.
12    Q  There's a heading that says diagnoses?
13    A  Yes.
14    Q  Can you tell me what the diagnosis was on this
15  day which is October 29, 2007?
16    A  The diagnosis is palpitations.
17    Q  Does Maricel attribute her palpitations in 2007
18  to any particular cause?
19    A  I don't have an answer to that question because I
20  don't actually have the note that would be associated
21  with this, so I can't answer that question whether it was
22  attributed to anything.
23    Q  How likely is it that anxiety or stress caused
24  her palpitations in 2007?

Page 31

1    A  I am not aware of anxiety or stress she was
2  experiencing then, so I can't really answer that
3  question.  I don't know what her life was like at that
4  time.
5    Q  But there were labs conducted that day; is that
6  correct?
7    A  Yes.
8    Q  And what were the results of those lab tests?
9    A  They were normal.
10    Q  Do you know if there was a physical exam that day
11  as well?
12    A  I am sure there was, but I don't see it in these
13  records.  All these are are the labs and they were
14  normal.
15    Q  Okay.  And when the lab tests are normal, what
16  does that mean about the cause of palpitations?  Does
17  that give you any insight into what might be causing
18  them?
19    A  Only if they're abnormal.  A bunch of normal labs
20  is what I would expect to get from a young lady in good
21  health.  That's kind of what usually we find.  So the
22  cause of the palpitations is often or usually
23  multifactorial.  It might be related to stress.  It might
24  be related to lack of sleep or any number of physical and

Page 32

1  psychological factors.
2    MS. COURTHEOUX:  Okay.  That's all I have.  Thank
3  you, Dr. Holmes.
4    A  You're welcome.
5    MS. SIEGEL:  If I can take a minute.  I have a couple
6  follow-up questions.
7    MS. COURTHEOUX:  No problem.
8    MS. SIEGEL:  Let's take a short break.
9       (Short recess.)
10       EXAMINATION
11  BY MS. SIEGEL:
12    Q  Good afternoon, Doctor, ready to go back on the
13  record?
14    A  Yes.
15    Q  My name is Elaine Siegel and I am the attorney
16  for the Plaintiff in this matter, Maricel Marcial.  I
17  have a small handful of follow-up questions.  Thank you
18  very much for sitting with us this afternoon.
19       Now, you have testified that you saw Ms. Marcial
20  periodically over a multi-year period; is that right?
21    A  Yes.
22    Q  And during that time, she did not consistently
23  present with vertigo; isn't that correct?
24    A  That is correct.

Page 33

1    Q  And she did not consistently present with
2  palpitations; isn't that right?
3    A  That is also correct.
4    Q  Is it fair to say that in Ms. Marcial's case, the
5  palpitations were intermittent?
6    A  Yes.
7    Q  And is it fair to say that her bouts of vertigo
8  also were intermittent?
9    A  Yes.  As far as I know, it was fairly consistent
10  in that time frame that we spoke about.  I don't know
11  whether she's been having other bouts of vertigo or not.
12    Q  They didn't come to your attention; is that
13  right?
14    A  Correct.
15    Q  Your notes reflect that tests were performed on
16  Ms. Marcial for the vertigo, right?
17    A  Yes.
18    Q  And is it correct that one of those tests was
19  something -- I am not going to pronounce it correctly.
20  I'll try.  The dicks hallpike maneuver?
21    A  Yes.
22    Q  Can you explain for the record what the dicks
23  hallpike maneuver consist of?
24    A  The dicks hallpike maneuver is a series of



Page 34

1  movements that we use to diagnose benign paroxysmal
2  positional vertigo consists of lying a patient down very
3  quickly on the table and turning their head one direction
4  or the other in order to try and generate vertigo. And
5  more importantly nystagmus which is an indication that
6  the vestibular system is not working right.
7      Q   Can you explain for us please what nystagmus is?
8      A   Nystagmus is a rapid eye movement. Usually it's
9  a classically thought of saccade, S-A-C-C-A-D-E which is
10 where the eye moves rapidly in one direction and then
11 slowly back and rapid back, back and forth.
12     Q   And when the dicks hallpike maneuver induces
13 nystagmus, is that an objective indication of vertigo?
14     A   It's an objective identification of a peripheral
15 vertigo which we usually associate as being this BPPV
16 that we have spoken about.
17     Q   Did you have any reason to believe that Ms.
18 Marcial was malingering when she complained of vertigo?
19     A   No.
20     Q   And now when it comes to the palpitations, do you
21 have any reason to believe that Ms. Marcial was
22 malingering when she spoke of suffering from
23 palpitations?
24     A   No.

Page 35

1      Q   We have talked about two periods today in which
2  Ms. Marcial came to you with complaints of vertigo and a
3  palpitations; isn't that right?
4      A   Yes.
5      Q   And one was associated with the car accident;
6  isn't that right?
7      A   Yes.
8      Q   And the other Ms. Marcial reported to you that
9  she was experiencing high levels of stress in the course
10 of her studies; isn't that right?
11     A   That is true.
12     Q   And is it fair to say that stress can precipitate
13 palpitations?
14     A   Yes. I think that's something that we have all
15 seen, many of us have experienced.
16     Q   And when you say that's something that we have
17 all seen, do you mean that internal medicine
18 practitioners have seen that?
19     A   Yes.
20     Q   And you testified that that was multifactorial
21 often times; is that right?
22     A   It's usually multifactorial, yes.
23     Q   So the palpitations are frequently a
24 multifactorial condition; is that correct?

Page 36

1      A   Yes.
2      Q   Did you explore with Ms. Marcial other
3  contributing factors in addition to the stress that she
4  was experiencing in connection with her studies?
5      A   Yes. We sent labs off to make sure she wasn't
6  suffering from thyroid disease or any kind of electrolyte
7  abnormalities, anemia, that sort of thing as part of the
8  workup.
9      Q   And those were negative; is that right?
10     A   Those were all normal.
11     Q   And was there a practitioner associated with your
12 practice named Dr. Dennis Moore?
13     A   Dr. Dennis Moore was an ear, nose, and throat
14 physician that did a lot of work with dizziness and
15 vertigo.
16     Q   Do you recall whether you referred Ms. Marcial to
17 Dr. Dennis Moore?
18     A   I did not.
19     MS. SIEGEL: Thank you. I have nothing further.
20     MS. COURTHEOUX: If I can clarify one more thing for
21 the record, please.
22            FURTHER EXAMINATION
23 BY MS. COURTHEOUX:
24     Q   Doctor, Ms. Siegel asked to you confirm that

Page 37

1  there were two periods in which Maricel complained of
2  palpitations, vertigo and palpitation. But let's concern
3  ourselves just with palpitations for now. One period
4  associated with a car accident and another I think
5  referring to school stress experienced in April 2014; is
6  that correct?
7      A   Yes.
8      Q   When you listen to Ms. Siegel's question about
9  the car accident and you agreed that that was one of the
10 periods in which Maricel experienced palpitations, were
11 you referring to the car accident that's referred to in
12 the notes about Maricel's visit on August 11, 2009,
13 that's reflected in the packet starting with 87?
14     A   87, that's what I needed. I believe that is what
15 I was referring to. I guess I should look and see here.
16 I don't see anything in this content here about vertigo
17 or palpitations actually. This was really more of a
18 musculoskeletal --
19     Q   This was the car accident that you had in mind
20 when you answered Ms. Siegel's questions?
21     A   Yes.
22     Q   On Page 88 under active problems, I think we
23 noted that the word palpitations appeared there in the
24 middle of the page; is that correct?



Page 38

1  A  That is correct.
2  Q  Now for active problems, does that suggest a
3  problem that arose with the car accident that led Maricel
4  to come in or does that suggest a previous condition that
5  was ongoing at the time when she came in?
6  A  A previous condition that was ongoing --
7  MS. SIEGEL: Objection. Calls for speculation.
8  BY MS. COURTHEOUX:
9  Q  And just one more thing, Dr. Holmes. So this car
10 accident that you were referring to in answering Ms.
11 Siegel's question that's August 11, 2009, or therabout.
12 But when we looked at page the packet beginning with 97,
13 specifically Page 99, we noted that there was a diagnosis
14 of palpitations then, too; is that correct?
15 A  Yes.
16 Q  And that was in 2007 a couple years before the
17 car accident you were thinking of?
18 A  Yes.
19 Q  Does that change your assessment with whether Ms.
20 Siegel has the timing right that there were two periods
21 in which Maricel complained of palpitations?
22 A  Yeah, I think it probably does. I don't see
23 anything in this 2009 note about complaining of
24 palpitations or vertigo at that time. She was

Page 39

1  complaining of neck and shoulder pain, but nothing there
2  about palpitations.
3  Q  So the two periods of palpitations if there were
4  just two periods, would have been closer to October 2007
5  and then again April 2014?
6  A  Yes. I think that's probably correct.
7  MS. COURTHEOUX: Thank you. That's all I have.
8  THE COURT REPORTER: Signature?
9  MS. COURTHEOUX: Would you mind explaining the
10 question to him?
11 THE COURT REPORTER: Would you like to reserve or
12 waive signature?
13 THE WITNESS: I usually reserve signature.
14         * * * * * * * *
15
16
17
18
19
20
21
22
23
24

Page 40

1         REPORTER'S CERTIFICATE
2     The within and foregoing statement of the
3  witness, THOMAS G. HOLMES, M.D., was taken before DEANNA
4  L. TUFANO, CSR, and Notary Public, at 1775 Ballard Road,
5  in the City of Park Ridge, Cook County, Illinois, at 1:00
6  o'clock p.m. on the 12th of March, A.D., 2018.
7     The said witness was first duly sworn and was
8  then examined upon oral interrogatories; and the
9  questions and answers were taken down in shorthand by the
10 undersigned, acting as stenographer and Notary Public;
11 and the within and foregoing is a true, correct, and
12 accurate record of all of the questions asked of and
13 answers made by the said witness, THOMAS G. HOLMES, M.D.,
14 at the time and place hereinabove referred to.
15     The undersigned is not interested in the within
16 case, nor of kin or counsel to any of the parties.
17     Witness my official signature and seal as Notary
18 Public in and for Cook County, Illinois on this
19 15th Day of March, A.D., 2018.
20
21     DEANNA L. TUFANO, CSR
       CSR No. 084-003819
22     MAGNA LEGAL SERVICES
       SEVEN PENN CENTER
       1635 MARKET STREET, 8TH FLOOR
23     PHILADELPHIA, PA 19103
       (866) 624-6221
24



**A**

able 29:2
abnormal 27:4
  31:19
abnormalities 36:7
Absolutely 5:12
  17:6
accident 14:6 15:6
  29:16 35:5 37:4,9
  37:11,19 38:3,10
  38:17
accomplish 7:10
accurate 40:12
acting 40:10
active 15:7,7 37:22
  38:2
activity 13:24
actual 9:20,21
acute 8:20 17:16,19
addition 36:3
adults 7:7
adverse 8:12
afternoon 4:8
  32:12,18
aging 7:8
ago 12:21
Agree 19:21
agreed 37:9
al 1:7
AMG 10:13
amount 7:9 21:2
anemia 36:7
answer 4:18 5:5,15
  14:8 18:16 23:17
  30:19,21 31:2
answered 37:20
answering 4:20
  5:10 38:10
answers 4:24 5:3
  40:9,13
antidepressant
  22:17
anti-anxiety 22:17
anxiety 22:8 27:22
  29:8 30:23 31:1

anybody 20:22
  23:18 24:17
anymore 21:14
Anyway 10:17
apparatus 22:6
apparently 27:1
appeared 37:23
appears 13:20 14:5
  16:24 27:10 28:12
appointment 26:5
  27:18
approximate 8:5
April 24:21 26:7,9
  26:19,20 27:7,10
  29:8 37:5 39:5
area 6:22
arose 38:3
arousal 18:12
ashamed 23:12,20
asked 4:21 36:24
  40:12
asking 10:20
aspects 20:19
assessment 38:19
associate 34:15
associated 6:12 7:8
  18:5 30:20 35:5
  36:11 37:4
ASSOCIATES 2:2
assume 5:6
attending 6:11
attendings 7:13
attention 33:12
attorney 9:2 32:15
attribute 15:17
  30:17
attributed 30:22
audible 4:24
August 13:20 14:6
  14:6 15:4,18,21
  16:12,13 27:11
  37:12 38:11
authenticate 14:18
aware 31:1
A.D 40:6,19

**B**

B 3:7
back 7:21 20:4 21:7
  21:15,24 23:24
  24:18 29:1,2,7
  30:4 32:12 34:11
  34:11,11
background 6:1
Ballard 1:16 40:4
based 15:13,14
  24:16
basic 26:4
basically 7:7 9:14
  9:17 27:2
bearing 4:9
beats 18:14
beginning 13:16
  30:5 38:12
begins 16:7
behalf 2:6,11 4:3
believe 10:15 15:19
  18:24 19:5 23:9
  27:22 34:17,21
  37:14
benign 19:20 22:3,5
  22:6 28:8 34:1
best 9:14
better 29:2
BID 22:13,14,15
bit 26:14
BLACKWELL 2:8
blanket 18:10
blood 19:23 26:4,10
  26:13,14
board 6:20
bottom 19:14
Boulevard 2:3
bouts 33:7,11
BPPV 22:3 34:15
break 5:8,11 32:8
breast 15:9
briefly 8:9
bring 21:7
bully 18:20 21:17
bullying 21:19

bunch 31:19
Bupropion 19:22
  21:6
Buproprion 22:12
  22:17,22 24:22
business 13:24
  14:20,21

**C**

C 2:1
called 4:3 16:16
Calls 23:14 38:7
capacity 7:15
car 14:5 29:16 35:5
  37:4,9,11,19 38:3
  38:9,17
cardiovascular
  15:23 16:3,3,19
  16:20
care 6:4 7:10,16
  8:12 11:14 17:17
  17:18
caring 23:12
case 8:14 11:24
  16:24 33:4 40:16
cause 15:18 23:2,7
  25:1 30:18 31:16
  31:22
caused 30:23
causing 31:17
CBC 12:19
center 1:6 6:14
  40:22
certain 22:5
certainly 13:13
  14:5
CERTIFICATE
  40:1
certified 1:14 6:20
challenges 4:9
change 38:19
chart 27:9
chest 8:18
Chicago 2:4,9
chronic 7:8 17:18
chronologically

25:8
circumstances 5:14
City 40:5
Civil 1:11
claim 8:11
claims 8:10
clarify 8:24 30:3
  36:20
class 18:21 19:3
  20:23 21:17,21
classically 34:9
cleared 20:4
clinical 9:14,16,19
  21:1 23:13 25:11
  25:15 27:17 28:23
  29:5,21
clinically 23:19
closely 12:4
closer 39:4
Code 1:11
colleagues 11:10
come 16:2 28:14
  29:7 33:12 38:4
comes 11:11 34:20
comments 19:7
common 18:4
complain 16:22
  29:11,14
complained 34:18
  37:1 38:21
complaining 8:18
  15:5 17:9 38:23
  39:1
complaints 17:13
  19:15 35:2
complete 5:3 23:21
  27:9
completely 10:14
concern 37:2
concerning 29:4
condition 35:24
  38:4,6
conducted 13:24
  31:5
confirm 36:24
Conley 13:21 14:13



connection 28:10 36:4
conscious 18:14
considered 15:23
consist 33:23
consistent 33:9
consistently 32:22 33:1
consists 29:21 34:2
constitute 14:20
contain 14:21
content 37:16
context 7:17
contractions 18:4
contributing 36:3
Cook 40:5,18
corner 12:9
correct 10:1,23,24 13:5 17:14,24 20:13 21:12 23:5 23:6 26:24 29:5,6 31:6 32:23,24 33:3,14,18 35:24 37:6,24 38:1,14 39:6 40:11
correctly 33:19
counsel 5:22 14:17 40:16
count 26:4
counts 26:15
County 40:5,18
couple 32:5 38:16
course 9:24 13:24 16:4 35:9
Court 1:1,12 39:8 39:11
Courtheoux 2:8 3:4 3:6 4:7 14:17,23 23:16 28:19 32:2 32:7 36:20,23 38:8 39:7,9
created 12:24 14:3
CSR 2:13 40:4,20 40:21
C.S.R 1:24

**D**

D 3:1
daily 22:12
Daniel 16:12
date 12:22
dates 8:5
day 16:23 20:7 21:9 22:15 24:23,23 27:2 30:15 31:5 31:10 40:19
days 14:7 15:6
Deanna 1:14,24 2:13 40:3,20
Decker 12:19 13:11
Defendant 4:3
Defendants 1:8 2:11 9:1
degree 21:4
Dennis 36:12,13,17
depending 12:1
depends 16:5 18:16
deposition 1:10 3:10 4:11,17 8:24
depositions 1:13 7:21,22
depressed 19:18 23:5,11,19,22
depression 21:6 23:8
describe 7:4 8:10 19:11
detail 27:23
determined 8:18
diabetes 7:9
diagnose 7:7 34:1
diagnoses 30:12
diagnosis 30:14,16 38:13
dicks 19:18 33:20 33:22,24 34:12
difficult 5:15 13:12
difficulty 11:1
direction 27:12 34:3,10
discipline 7:1

discovery 1:14
discuss 11:24
discussed 15:19 19:15 23:4 26:6 27:22
discussing 12:5
disease 36:6
diseases 7:6
dismissed 8:22
disorder 19:21
disorders 22:5
distraught 24:9
distress 24:10
DISTRICT 1:1,1
disturbing 19:21
DIVISION 1:2
dizziness 19:16 23:2 28:7,9 29:3,8 36:14
Doctor 14:24 32:12 36:24
document 13:16,19 14:3 16:10,11 17:7,8 24:1 25:10 25:11,24 26:18 27:16 30:9
documents 3:10 5:19 9:4,7,8,11 11:3 12:8 14:16 25:14 29:19,22
doing 21:7
Dr 4:11 8:23 13:11 13:21 14:12 16:12 17:10 21:19 24:4 25:5 26:5 27:18 27:18 29:10,19 32:3 36:12,13,17 38:9
drawn 26:10
Drive 10:14
drug 23:1
duly 4:4 40:7
duties 28:24

**E**

E 2:1,1 3:1,7

ear 19:21 36:13
earlier 24:1
EASTERN 1:2
echo 19:23
echocardiogram 25:2 26:1,3,24 27:2
educational 6:1 28:23
effect 22:23
effects 22:19,21
effusion 27:5
either 11:19
ekbsiegel@aol.com 2:5
Elaine 2:2,3 32:15
electrolyte 36:6
electronic 13:3
eluded 23:24
employment 6:9
EMR 13:2
et 1:7
evaluate 10:11
event 14:4
exactly 10:22 12:13 21:8
exam 19:18 31:10
Examination 3:4,5 3:6 4:6 32:10 36:22
examined 4:4 40:8
Excellent 5:21
excess 23:2
excuse 13:15 20:3 24:12
excused 24:6
exhibits 5:19
expect 31:20
experience 18:8 20:7
experienced 35:15 37:5,10
experiencing 31:2 35:9 36:4
expert 7:24
explain 9:11 22:1

22:11 25:13 33:22 34:7
explaining 39:9
explore 21:14 36:2
eye 34:8,10

**F**

facility 10:15
factors 32:1 36:3
failing 20:18
fair 5:11 7:9 13:7 15:20 21:8,10 33:4,7 35:12
fairly 33:9
familiar 4:16
family 10:9
far 33:9
feel 5:8 23:22
feeling 19:9 20:11
feels 19:17
felt 19:1 21:12 23:12,20
fewer 22:19
Finally 5:13
financially 21:3
find 11:17 29:22 31:21
finish 4:18 5:9
first 4:4,16 8:7,11 10:6 12:4 30:5 40:7
FLOOR 40:22
following 19:24 20:1,1 27:2 28:5
follows 4:5
follow-up 17:18 19:22,22 32:6,17
foregoing 40:2,11
form 27:18
forth 34:11
foundation 14:16
four 6:13
frame 33:10
frequently 16:1 22:18 35:23
front 9:8 25:6



**full** 4:19 5:3
**further** 3:6 36:19
  36:22

---

**G**

**G** 1:10 3:3 4:2 40:3
  40:13
**general** 6:15 7:6
**generally** 26:11
**generate** 34:4
**gentleman** 8:17
**gestures** 5:1
**getting** 7:11 19:2
**give** 8:5 31:17
**given** 5:21 7:22
  19:24 24:22 25:16
**go** 4:14 11:2,3
  14:17 25:7,9 28:4
  30:4 32:12
**goal** 11:13
**going** 10:12 14:15
  16:8 20:22 21:15
  23:9,14 24:16
  27:11 30:2 33:19
**good** 4:8 24:10
  31:20 32:12
**gotten** 28:7
**graduated** 6:2,9
**great** 4:14 11:6
**ground** 4:16
**guess** 7:23 13:10
  37:15
**guidance** 24:5
**gynecologist** 16:11
  16:15

---

**H**

**H** 3:7
**hallpike** 19:19
  33:20,23,24 34:12
**handful** 32:17
**happened** 29:23
**happy** 11:7
**head** 34:3
**heading** 17:20
  30:12

**health** 31:21
**hear** 5:1 28:14
**heard** 4:19
**heart** 25:4
**help** 12:14 27:13
  28:3
**hereinabove** 40:14
**high** 26:14 35:9
**history** 6:9,24
  15:10,11 17:1,22
  17:24 18:3,7
  22:24
**hocus-pocus** 24:15
**Holmes** 1:10 3:3
  4:2,11 8:23 21:19
  25:5 29:10,19
  32:3 38:9 40:3,13
**home** 8:19
**honestly** 20:8
**Hospital** 6:12
**HPI** 17:20,21 18:18
**HUSCH** 2:8
**hypertension** 7:9

---

**I**

**ICU** 20:22
**ID** 3:9
**identification** 34:14
**identified** 9:12
  15:10
**IL** 2:4
**Illinois** 1:1,12,15
  1:16 2:9 6:18 40:5
  40:18
**illness** 17:22
**imagine** 23:18
**implement** 12:2
**importantly** 34:5
**impressions** 19:8
**incident** 29:15
**included** 19:23
  26:24
**includes** 25:17
**including** 10:9
**increased** 22:13
  24:23

**independent** 13:8
  13:14
**indication** 34:5,13
**induces** 34:12
**infection** 8:13
**initially** 6:11
**injury** 24:18 29:14
**inner** 19:21
**insight** 21:22 31:17
**intensive** 7:16
**interact** 11:16 12:4
**interacted** 7:18
  11:5 29:23
**interested** 40:15
**intermittent** 33:5,8
**internal** 6:4,7,23
  7:6 10:10 35:17
**interrogatories**
  40:8
**involved** 9:13
**issue** 21:14 23:10
**issued** 9:1,1 24:4
**issues** 15:16 25:2
**items** 14:19

---

**J**

**Jackson** 2:3
**joined** 6:14
**judge** 24:16
**jump** 25:7

---

**K**

**KAREN** 2:8
**kept** 13:23 14:9
**kicked** 9:20
**Kimberly** 17:10
**kin** 40:16
**kind** 24:15,18
  31:21 36:6
**King** 10:14
**know** 4:19,20 5:8
  7:14 9:6 10:3,12
  13:1 15:11 18:10
  20:16,23 21:8,20
  21:20,22 24:15
  27:12 29:12,15

  30:6 31:3,10 33:9
  33:10
**knowledge** 29:9
**K.B** 2:2,3

---

**L**

**L** 1:14,24 2:8,13
  40:4,20
**lab** 12:19,22 13:4,8
  13:14 26:23 31:8
  31:15
**labs** 13:2,12 26:2,3
  26:19,20 31:5,13
  31:19 36:5
**lack** 14:15 31:24
**lady** 31:20
**Lakeside** 6:12
**language** 25:20
**lawsuits** 8:6
**leave** 25:17
**led** 38:3
**LEGAL** 1:21 40:21
**letter** 24:2 28:20,21
  28:22
**let's** 7:21 21:24
  23:24 32:8 37:2
**level** 12:1
**levels** 35:9
**license** 2:13 7:1
**licensed** 6:17
**life** 31:3
**lightheaded** 20:2
**lightheadedness**
  17:9,14 23:2 28:6
  29:3
**listen** 37:8
**literal** 12:15
**little** 26:13
**LLP** 2:8
**locate** 10:17
**locating** 11:1
**long** 12:20
**longer** 24:14
**look** 16:8 17:20
  27:21 28:2 30:2
  37:15

**looked** 29:21 38:12
**looks** 26:9 27:22
  28:13
**lot** 10:11 18:11,13
  18:19,20 19:16
  21:16 36:14
**lowers** 22:23
**lower-right** 12:9
**Luther** 10:14
**Lutheran** 6:15 7:17
**lying** 34:2

---

**M**

**MAGNA** 1:21
  40:21
**main** 23:10
**malingering** 34:18
  34:22
**maneuver** 33:20,23
  33:24 34:12
**March** 1:17 40:6,19
**Marcial** 1:3 7:14
  9:15,23 32:16,19
  33:16 34:18,21
  35:2,8 36:2,16
**Marcial's** 33:4
**Maricel** 1:3 10:1,3
  11:5,9 13:9 15:17
  16:13,22 17:23
  20:6,11 21:19
  23:5,11,20 24:2,6
  24:20 27:20 28:11
  29:7,11,14,23
  30:17 32:16 37:1
  37:10 38:3,21
**Maricel's** 11:15
  14:13 15:3,11
  19:8 23:7 27:7
  37:12
**Mark** 13:21
**marked** 3:8,10
  10:18
**MARKET** 40:22
**Martin** 10:13
**mass** 15:9
**matter** 16:4 32:16



matters 14:21
mean 11:21 13:13
  14:17 16:22 17:16
  18:2 31:16 35:17
meaning 27:6
means 12:12 13:1
  17:18 18:3 19:19
  22:15
meant 5:6
medical 1:6 6:2,9
  6:14 7:4,8 13:3
  14:8 17:23 18:3,7
medically 20:4
medication 22:16
  22:18 23:3
medications 5:13
  22:20
medicine 6:4,7,18
  6:23 7:6 10:10
  35:17
mentioned 7:22
met 7:14,17
metabolic 24:24
  26:4
MI 8:20
middle 30:10 37:24
milligrams 22:12
mind 5:24 6:8
  18:17,24 25:5
  27:13 37:19 39:9
minute 30:2 32:5
minutes 4:14
mistakes 23:12
misused 19:17
  21:13
moment 11:1 13:15
month 7:20
Moore 36:12,13,17
motor 15:6
movement 34:8
movements 34:1
moves 34:10
multifactorial
  31:23 35:20,22,24
multi-year 32:20
musculoskeletal

37:18
M.D 1:10 3:3 4:2
  40:3,13

—————— N ——————
N 2:1 3:1
name 10:10 32:15
named 36:12
nature 7:4
nausea 28:7
near 7:23 14:3
neck 15:5 39:1
need 5:8 12:3 24:17
  24:17
needed 19:2 37:14
negative 36:9
negotiation 24:18
non-cardiac 8:19
non-fasting 26:14
normal 19:18 26:13
  26:15,22 27:3,6
  28:23 31:9,14,15
  31:19 36:10
NORTHERN 1:1
Northwestern 6:2,3
  6:13
nose 36:13
Notary 40:4,10,17
note 9:20 10:16
  11:19 13:20 14:13
  16:11 17:17 19:14
  19:23 24:12 25:12
  27:21,24 30:20
  38:23
noted 15:8 19:22
  23:4 37:23 38:13
notes 9:19,21 10:8
  10:12 14:12 29:21
  30:3,5 33:15
  37:12
notice 12:8 18:16
number 3:9 12:14
  24:23 31:24
numbered 5:23
numbers 12:9,11
nurse 7:16 21:1

nystagmus 19:18
  34:5,7,8,13

—————— O ——————
object 14:15 23:14
Objection 38:7
objective 34:13,14
obtained 27:1
obvious 4:23
occasion 9:24 10:8
October 30:15 39:4
office 8:18 9:8
  11:11,17 13:8,10
  16:13,15 20:1
  29:19,24
official 40:17
okay 4:21 5:1,2,6,7
  8:23 9:3,22 11:2
  12:7,17 13:18
  16:9 17:6,7 21:23
  25:10,23 26:16,17
  27:15 28:15 30:3
  31:15 32:2
older 8:17
once 7:20 10:22
  24:22
ongoing 38:5,6
opportunity 20:24
oral 40:8
order 5:23 12:13
  34:4
ordered 10:11
  12:19 24:24 26:5
  26:20 28:10
ordering 12:5
oriented 23:19
outcome 8:12
overall 23:3
oversee 11:18
o'clock 40:6

—————— P ——————
P 2:1,1
PA 40:23
packet 3:10 5:18,21
  15:1 16:7 17:4

25:6 37:13 38:12
page 3:2 5:23 12:9
  12:11,14,15,16
  13:1,17 14:24
  15:1 16:8,8,16
  17:5,16 19:14,24
  20:1,1 21:15,23
  23:24 25:6,9,21
  26:16 27:13 28:2
  28:20,20 30:5,9
  30:10 37:22,24
  38:12,13
pain 8:18 29:11
  39:1
palpitation 19:16
  37:2
palpitations 15:10
  15:12,16,17,19,20
  15:23 16:23 17:2
  17:9,14 18:6,8,12
  20:2 25:3 30:16
  30:17,24 31:16,22
  33:2,5 34:20,23
  35:3,13,23 37:2,3
  37:10,17,23 38:14
  38:21,24 39:2,3
panels 26:4
Park 1:16 40:5
paroxysmal 22:4,6
  28:8 34:1
part 36:7
particular 15:13,18
  30:18
parties 40:16
partner 13:22
pass 10:3
passed 8:20
patient 7:15,19
  8:11 10:21 11:10
  11:23 17:8 18:8
  18:13,19,20 19:1
  19:15 20:3 21:16
  24:19 25:16 34:2
patients 11:14 16:2
  23:13
patient's 18:16

PENN 40:22
people 7:10 18:15
  21:21 22:18,24
performed 23:21
  33:15
performing 20:15
pericardial 27:5
period 24:14 29:10
  29:13 32:20 37:3
periodically 32:20
periods 35:1 37:1
  37:10 38:20 39:3
  39:4
peripheral 34:14
permanent 8:13
personally 10:7
  11:18
pertaining 1:13
Pesch 16:12
PHILADELPHIA
  40:23
physical 29:14
  31:10,24
physician 6:11
  17:12 36:14
place 40:14
Plaintiff 1:4 2:6
  5:22 32:16
Plaintiff's 5:22
plan 11:24 19:21
Plaza 2:9
please 4:17,24 5:5,8
  5:24 11:4 13:16
  14:24 16:7 17:4
  20:3 22:1 25:6,21
  26:16 34:7 36:21
pneumococcal 8:13
point 10:21 11:4
poorly 20:15
positional 22:6
  28:8 34:2
possible 11:14
  13:13
practice 6:14,17
  7:5,6,12 8:4 9:24
  10:4,9,13 11:9,13



14:1,9,14 36:12
**practicing** 6:4
**practitioner** 21:1
  36:11
**practitioners** 35:18
**precipitate** 35:12
**predated** 15:20
**premature** 18:4,14
**prepared** 25:12
**prescribed** 24:20
**present** 17:22
  32:23 33:1
**presented** 13:2
  17:8
**presents** 11:24
**pretty** 20:9 23:3
**prevent** 7:10
**preventative** 7:10
**previous** 28:6 38:4
  38:6
**previously** 21:24
  26:6
**primary** 6:4
**printed** 9:21
**prior** 15:6
**probably** 13:10
  19:20 22:22 26:9
  28:8 38:22 39:6
**problem** 17:19 18:4
  32:7 38:3
**problems** 7:7,8
  15:7,8 37:22 38:2
**Procedure** 1:11
**proceeding** 12:12
**produced** 9:9,12
  29:20
**professional** 6:24
**program** 6:15
  20:18
**pronounce** 33:19
**provide** 5:3 9:4
**providers** 7:12
  14:14 29:24
**provisions** 1:11
**psychological** 32:1
**Public** 40:4,10,18

**purpose** 1:13 27:20
  27:24
**pursuant** 1:11 9:1,4
**pursue** 20:19 21:3
**PVC** 17:24
**PVCs** 18:7
**p.m** 1:17 40:6

---
**Q**
**question** 4:18,19,20
  5:5,5,10 14:10
  20:16 28:15,16
  30:19,21 31:3
  37:8 38:11 39:10
**questioning** 30:4
**questions** 5:4,15
  32:6,17 37:20
  40:9,12
**quickly** 34:3

---
**R**
**R** 2:1
**rapid** 34:8,11
**rapidly** 34:10
**read** 10:18,19
  21:16 28:16
**ready** 32:12
**really** 12:3 23:1
  27:9,24 31:2
  37:17
**reason** 15:3 16:2
  17:13 34:17,21
**reasons** 25:17
**recall** 15:16 19:3
  36:16
**received** 5:23
**recess** 32:9
**recognize** 9:10
  12:18 13:19
**recollection** 10:20
  15:14
**recommend** 21:5
**recommended** 29:4
**record** 12:18,24
  13:3,23 15:8,13
  32:13 33:22 36:21

40:12
**records** 14:4,9,11
  14:16,20,22 31:13
**referred** 3:10 19:7
  21:23 36:16 37:11
  40:14
**referring** 29:18
  37:5,11,15 38:10
**reflect** 18:23,24
  26:22 33:15
**reflected** 37:13
**reflections** 29:23
**regards** 14:9
**regularly** 13:24
**related** 18:12 25:3
  28:8 29:22 31:23
  31:24
**relating** 19:20
**relationship** 11:15
  25:13,15
**relaying** 19:9
**reliable** 29:22
**relying** 12:11
**remain** 29:4
**remember** 20:8
  29:16
**report** 26:1
**reported** 1:20 2:13
  35:8
**Reporter** 1:15 39:8
  39:11
**REPORTER'S**
  40:1
**reprimand** 7:1
**request** 24:6
**reserve** 39:11,13
**residency** 6:3,6,10
  6:15 11:12 23:22
**resident** 11:19,23
  12:20
**residents** 7:13 10:9
  10:10,16 11:14
  12:3 17:11
**resident's** 12:1
**resolution** 8:14
**resolved** 4:10 8:21

**response** 29:20
**rest** 13:12
**result** 26:19
**results** 12:5 13:4
  26:11,22 31:8
**return** 20:4 28:23
  29:2
**review** 4:15 16:18
**reviewed** 25:12
**reviewing** 6:8
**Ridge** 1:16 40:5
**right** 10:17 25:9
  26:1 28:4 32:20
  33:2,13,16 34:6
  35:3,6,10,21 36:9
  38:20
**risk** 20:18
**Riverside** 2:9
**Road** 1:16 40:4
**ROS** 16:16
**routine** 11:9,12
**rules** 1:12 4:16
**run** 11:12 26:7
  28:10
**RUSH** 1:6

---
**S**
**S** 2:1 3:7
**saccade** 34:9
**saw** 10:15 11:20
  29:1 32:19
**saying** 14:19
**says** 17:16,20,23
  19:14 22:8,12
  28:20 30:12
**school** 6:2,10 18:20
  19:5,17,24 20:3,5
  20:7,15,23 21:11
  23:9 24:3,7 28:22
  29:5 37:5
**scope** 14:21
**seal** 40:17
**second** 8:7,16,17
  12:2 15:1 22:4
**section** 16:16
**see** 10:6 11:10 14:6

21:7 22:5 23:4
  24:24 25:2,13
  26:22 31:12 37:15
  37:16 38:22
**seeing** 13:12 17:10
**seen** 10:7,21 19:14
  20:1 28:24 35:15
  35:17,18
**sees** 11:23
**seizures** 22:23,24
  22:24
**sensation** 18:5,11
**sent** 8:19 9:7 36:5
**separate** 9:5 10:14
**sequence** 12:13
**series** 33:24
**serious** 22:22
**SERVICES** 1:21
  40:21
**set** 4:23 13:4 30:5
**setting** 23:13
**settled** 8:15
**SEVEN** 40:22
**Sharon** 12:19
**sheet** 12:19
**short** 32:8,9
**shortened** 27:18
**shorter** 24:14
**shorthand** 1:15
  40:9
**shoulder** 15:5 39:1
**sick** 7:11
**side** 10:13 22:19,21
  22:22
**Siegel** 2:2,3 3:5
  14:15,19 23:14
  32:5,8,11,15
  36:19,24 38:7,20
**Siegel's** 37:8,20
  38:11
**signature** 39:8,12
  39:13 40:17
**significant** 27:6
**signs** 25:18
**similar** 14:13
**sitting** 32:18



situation 16:5 19:6 20:24
skill 12:1
sleep 31:24
slowly 34:11
small 32:17
somebody 18:13
soreness 15:6
sorry 25:7 27:19 28:13
sort 12:5 24:11 25:19 36:7
sought 10:4
sounds 10:21
source 24:10
sources 10:9
south 2:9 10:13,13
speak 4:24 5:1
speaking 26:12
specialization 6:6
specifically 38:13
speculation 23:15 38:7
spend 7:9
spent 6:13
spoke 19:11 33:10 34:22
spoken 34:16
stacked 12:13
stand 16:17
stands 22:3
start 9:22 12:16
started 5:24 21:5
starting 37:13
starts 17:4
state 1:12,15 6:18 8:13 18:12,17,24
statement 18:11,18 21:15 40:2
statements 18:23
states 1:1 18:19,20 21:16 28:6
stating 38:22
stay 12:14
stenographer 40:10
STREET 40:22

stress 18:13,15 19:16 20:20 21:3 21:4 30:23 31:1 31:23 35:9,12 36:3 37:5
stressed 18:19 20:12,14,17,21 21:9
stressful 20:24
student 21:2
studies 35:10 36:4
subjective 19:8
subpoena 9:1,5 29:20
subsequently 8:19 9:18
successfully 23:21
suffered 8:12
suffering 34:22 36:6
sugar 26:13
suggest 38:2,4
Suite 2:3,9
suits 8:3
summaries 9:15,17 29:21
summary 9:19 25:11,16,19 27:17
supervise 11:20,21
supervising 17:12
supplement 28:1
support 19:2
Supreme 1:12
sure 6:11 10:17,22 31:12 36:5
suspension 7:1
sworn 4:1,4 40:7
symptoms 15:24 16:3,4,19,20 19:19 25:1 29:1
system 34:6
systems 16:18
S-A-C-C-A-D-E 34:9

T

T 3:7
table 5:10 34:3
take 5:9,10 20:11 24:2,22 28:24 30:2 32:5,8
taken 1:10,14 4:11 4:17 20:9 40:3,9
talked 19:4 25:18 35:1
talking 21:20
teachers 21:21
teaching 6:14 21:1
tearful 19:5,17 23:5 23:11,19 24:9
tearfulness 23:7
technical 4:9
tell 15:3 17:1 24:17 27:10 30:14
test 13:14 26:5,11 26:14
testified 4:4 32:19 35:20
tests 12:5 19:23 24:24 26:7,15,23 28:10,12 31:8,15 33:15,18
thank 5:18 6:8,17 6:24 8:16,23 11:8 12:7 13:6,15 25:21 30:8 32:2 32:17 36:19 39:7
Thanks 4:8 9:22
therabout 38:11
thing 12:6 30:4 36:7,20 38:9
think 19:13 20:8 21:23 22:4 24:8 26:2 29:17,17 35:14 37:4,22 38:22 39:6
thinking 38:17
third 12:2
THOMAS 1:10 3:3 4:2 40:3,13
thought 34:9
threshold 22:23

throat 36:13
thyroid 26:4,15 36:6
time 7:9 10:15 12:4 12:20,20 14:4 17:11 19:15 20:23 21:4 24:16 28:2 31:4 32:22 33:10 38:5,24 40:14
times 11:16 35:21
time-wise 21:3
timing 38:20
today 5:16 20:2 29:21 35:1
told 19:12 28:24
tolerated 23:3
top 17:17 22:2 28:21
training 11:13
Tran 17:10 24:4 26:5
treat 7:7 9:24
treated 21:13
treating 15:14
treatment 9:23 11:15,18,24 24:20 29:7
tremendous 21:2
trial 19:22
trivial 27:5
true 35:11 40:11
try 10:11 22:12 33:20 34:4
trying 7:10 25:7
Tufano 1:14,24 2:13 40:4,20
turn 7:21 13:16 14:24 16:7 17:4 21:24 23:24 25:21 26:16
turning 25:5 27:13 30:9 34:3
twice 22:15 24:23
two 8:2,3,6 14:7 15:6 24:17 25:14 35:1 37:1 38:20

39:3,4

U

undersigned 40:10 40:15
understand 5:4,15 5:18 9:23 14:10
understood 5:6
unfairly 21:13
Unfortunately 12:12
unit 7:16
UNITED 1:1
UNIVERSITY 1:6
upset 19:1,5 20:10 24:8
use 5:19 22:18 34:1
usually 31:21,22 34:8,15 35:22 39:13

V

VA 6:12,12
variety 10:8
various 25:17
vegetative 8:13
vehicle 15:6
ventricular 18:4
vertigo 22:2,3,5,7,9 28:9 29:8 32:23 33:7,11,16 34:2,4 34:13,15,18 35:2 36:15 37:2,16 38:24
vestibular 22:6 34:6
videoconference 2:2,8
visit 10:16 11:20,21 13:8,9,11 14:12 15:3,21 16:13 17:13,19 19:4,15 25:19 27:7,20 28:5,11 37:12
visited 15:18
visits 9:15 11:11



14:13
**vital** 25:18
**vs** 1:5

---

**W**

**waive** 39:12
**walk** 11:4
**walking** 6:1 9:22
**want** 8:8
**wanted** 4:15
**wasn't** 36:5
**way** 4:19 14:8
**week** 20:3 22:13
  24:13,23 28:6,24
  29:1,1
**weeks** 21:7 24:17
**welcome** 32:4
**well-tolerated** 23:1
**went** 13:11 19:4
  26:9
**West** 2:3
**we'll** 4:20 12:11
**we're** 16:8
**we've** 29:20
**witness** 3:2 4:1,3
  7:24 28:17 39:13
  40:3,7,13,17
**wondering** 14:11
**word** 22:2 37:23
**words** 5:1 27:17
**work** 12:22 24:12
  29:2,5 36:14
**working** 20:22 34:6
**workup** 13:13 20:2
  36:8
**worse** 28:7
**worsening** 28:9
**wouldn't** 25:5
**wrap** 30:4
**written** 13:21 22:1
  22:11
**wrong** 27:11
**wrote** 10:16 19:13
  20:8
**www.magnals.com**
  1:23

---

**X**

**X** 3:1,7

---

**Y**

**yeah** 26:10 38:22
**year** 12:2
**years** 6:13 12:4
  38:16
**young** 22:18 31:20

---

**Z**

**Zang** 27:18
**Zong** 27:19

---

**0**

**084-003819** 2:13
  40:21

---

**1**

**1:00** 1:17 40:5
**10** 27:11
**10/29/2007** 12:23
**11** 13:20 15:4,18,21
  37:12 38:11
**11th** 14:6
**12** 1:17
**12th** 40:6
**120** 2:9
**13** 27:14
**15th** 40:19
**150** 22:12
**16** 25:6,9
**16-CV-06109** 1:5
**1635** 40:22
**1775** 1:16 40:4
**18** 8:1
**19103** 40:23
**1984** 6:5

---

**2**

**2** 24:21 26:19,20
**2D** 19:23
**2nd** 27:11
**20** 7:23
**2000** 8:7
**2005** 8:8

---

**2006** 8:8
**2007** 12:21 30:15
  30:17,24 38:16
  39:4
**2008** 16:12,14
**2009** 13:20 15:4,18
  15:21 37:12 38:11
  38:23
**2012** 27:11 29:10
  29:13
**2014** 24:21 26:8,19
  26:20 27:8 29:8
  37:5 39:5
**2015** 29:10,13
**2018** 1:17 40:6,19
**2200** 2:9
**2545** 10:13
**29** 30:15

---

**3**

**3** 26:7 27:7
**3rd** 26:9
**312** 2:4,10
**32** 3:5
**35** 28:2
**36** 3:6 28:20

---

**4**

**4** 3:4
**4/11/2014** 27:19
**4/2/2014** 17:10
**40** 26:16
**405** 2:3
**45** 25:22
**49** 17:5

---

**5**

**50** 23:24
**51** 17:16 21:15
**5106** 1:5
**53** 2:3
**54** 7:13 19:14 21:23
**583-9970** 2:4

---

**6**

**6** 16:12,14

---

**60604** 2:4
**60606** 2:9
**624-6221** 1:22
  40:23
**655-1500** 2:10

---

**8**

**8** 7:13
**8TH** 40:22
**866** 1:22 40:23
**87** 13:17 37:13,14
**88** 14:24 37:22

---

**9**

**9th** 14:6
**92** 16:8
**94** 16:8,16
**97** 12:16 30:5 38:12
**99** 30:10 38:13



# EXHIBIT A24

0034|329

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Northern District of Illinois

| | | |
|---|---|---|
| MARICEL MARCIAL | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.  16-CV-06109 |
| RUSH UNIVERSITY MEDICAL CENTER, ET. AL., | ) | |
| *Defendant* | ) | (If the action is pending in another district, state where:) |
| | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  Thomas Holmes, 1775 Ballard Road
     Park Ridge, IL 60068

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material: See Attachment A

| Place:  Franczek Radelet, P.C. | Date and Time: |
|---|---|
| 300 S. Wacker Dr., Ste. 3400 | |
| Chicago, IL 60606 | 11/16/2017 11:00 am |

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

     The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:    11/01/2017

                    *CLERK OF COURT*
                                          OR
_____        s/Karen L. Courtheoux
*Signature of Clerk or Deputy Clerk*          *Attorney's signature*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*   Rush University Medical Center, Dr. Michael Kremer, Ray Narbone and Jill Wimberly_____ , who issues or requests this subpoena, are:
Karen Courtheoux, Franczek Radelet P.C., 300 S. Wacker Dr., Ste. 3400, Chicago, IL 60606
Phone: 312-786-6537  Fax: 312-986-9192

CONFIDENTIAL                                          AMG 000001

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 16-CV-06109

## PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)*

was received by me on *(date)*

☑ I served the subpoena by delivering a copy to the named person as follows:   Thomas Holmes

1775 Ballard Road, Park Ridge, IL 60068

on *(date)*    11/01/2017    ; or

☐ I returned the subpoena unexecuted because:

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00

I declare under penalty of perjury that this information is true.

Date:    11/01/2017

s/Karen L. Courtheoux
*Server's signature*

Karen L. Courtheoux
*Printed name and title*

Franczek Radelet P.C.
300 S. Wacker Drive, Suite 3400
Chicago, IL 60606

*Server's address*

Additional information regarding attempted service, etc:

CONFIDENTIAL

AMG 000002

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*

(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*

(A) *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information;

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*

(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).



CONFIDENTIAL

ATTACHMENT A

Copies of all medical, health, hospital, mental health and insurance records pertaining to **Maricel Marcial** (DOB: January 21, 1973; SSN: 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), including, but not limited to, all admission or intake forms; records of office visits; records of appointments, whether they were kept, cancelled, or postponed; consents; summaries; charts; physicians', psychologists', psychiatrists', nurses' or others' notes, including "personal notes"; order sheets; all x-ray films and reports; all lab requisitions and reports; electrocardiogram or related reports; protocols; prescription records; reports of all referrals and non-surgical procedures, any specimens generated as a result thereof; reports of therapy and treatments; any records regarding telephone communications, examinations, evaluations, treatments or hospitalization; and any and all records received by you from any other physician or medical or mental health professional.

CONFIDENTIAL

## AUTHORIZATION TO RELEASE MEDICAL RECORDS

I, Marisol Marcial, hereby authorize the following health care provider:

Name:    Thomas Holmes
Address:   1775 Ballard Road
          Park Ridge, IL 60068

to use and/or disclose to the law firm of Franczek Radelet P.C. certain medical information for use in a lawsuit entitled Marisol Marcial v. Rush University Medical Center, et al., Case No. 16-cv-6109, filed in the United States District Court for the Northern District of Illinois, Eastern Division.

The medical information for which I am authorizing disclosure is: all medical, health, hospital, mental health and insurance records pertaining to me, Marisol Marcial. This authorization includes, but is not limited to, all admission or intake forms; records of office visits; consents; summaries; charts; physicians', psychologists', psychiatrists', nurses' or others' notes, including "personal notes"; order sheets; all x-ray films and reports; all lab requisitions and reports; protocols; prescription records; reports of all referrals and non-surgical procedures; any specimens generated as a result thereof; reports of therapy and treatments; and any records regarding telephone communications, examinations, evaluations, treatments of hospitalization. This authorization includes any and all records received by you from any other physician or medical or mental health professional. The authority shall extend to the right to inspect any original document in the event deemed necessary by the reviewer.

I authorize the above-described information to be disclosed to the law firm Franczek Radelet P.C., its employees, and its representatives, as well as other persons, organizations and/or entities directly connected with the above lawsuit, including but not limited to the court, court reporter(s), copy services and others. I understand that disclosure shall be limited to the minimum necessary amount of such information to accomplish the intended purpose(s) described in the preceding paragraphs.

I understand that I have the right to inspect and copy the information to be used or disclosed. I further understand that medical treatment, payment, enrollment or eligibility for benefits may not be withheld from me based on failure to sign this Authorization. I understand that the medical information used or disclosed pursuant to this authorization may be subject to limited re-disclosure by the recipient for purposes of the above captioned lawsuit only and will no longer be protected by the Privacy Policy of the physician or health care facility to whom this authorization is directed.

I understand that I retain the right to revoke this Authorization in writing at any time by delivery of a written notice to the health care provider identified above and that such revocation shall be effective for future uses and disclosures of my protected health information, but such revocation shall not be effective for information already used or disclosed. I understand that written revocation of this Authorization must be sent to the health care provider identified above.

This Authorization shall expire one year from the date signed below.

_Marisol A. Marcial_
Marisol Marcial

Social Security #:  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
Address:      2616 N. SPAULDING AVE APT # 3
             CHICAGO, IL 60647

Executed this 30 day of October, 2017

2361649.1

CONFIDENTIAL

**Advocate Medical Group**
**AMG-Sykes**
2545 S. Martin Luther King Drive
Chicago, IL 60616
(312) 842-7117

**Clinical Summary-RTF**
12/15/2016 3:30PM

Patient:
MARICEL MARCIAL
2616 N SPAULDING APT 3
CHICAGO, IL 60647

MRN:   00341329
DOB:   01/21/1973
Phone: (847) 809-5669

# Clinical Summary

## Patient Details for MARCIAL, MARICEL Q.

| MARICEL | Female | 00341329 |
|---|---|---|
| *Preferred Name* | *Sex* | *MRN* |
| 2616 N SPAULDING, APT 3, CHICAGO, IL, 60647 | ENGLISH | January 21, 1973 |
| *Address* | *Language* | *Born* |
| Asian | Non-Hispanic or Latino | |
| *Race* | *Ethnicity* | |

## Today's Appointment

| YOST, KYLE DO | 15 Dec 2016 03:30 PM |
|---|---|
| *Provider* | *Appointment* |

## Reason for Visit

Health Issues Reviewed :
Heel pain
Peroneal tendonitis

## Current Health Issues

Anxiety
Encounter for routine gynecological examination
Encounter for screening for respiratory tuberculosis
Fasting hyperglycemia
Fibrocystic breast disease
Heel pain
Nonspecific reaction to tuberculin skin test without active tuberculosis

CONFIDENTIAL

AMG 000006

## Clinical Summary-RTF

| | | | |
|---|---|---|---|
| Patient: | MARICEL Q. MARCIAL | SSN: | XXX-XX-7272 |
| Encounter: | Dec 15 2016 3:30PM | EMRN: | 00341329 |

Palpitations
Peroneal tendonitis
Routine History And Physical
Vertigo
Visit for screening mammogram

## Smoking Status

Never smoker

## Medications

Current Medications:

| Medication | Instructions |
|---|---|
| Flonase Allergy Relief 50 MCG/ACT Nasal Suspension (Fluticasone Propionate) | |
| ZyrTEC Allergy 10 MG Oral Capsule | |

## Allergies and Adverse Reactions

- No Known Drug Allergies

## Vital Signs

| Date/Time | 12/15/2016 3:45:00 PM |
|---|---|
| Blood Pressure | 105 / 64 |
| Temperature | 97.6 F |
| Heart Rate | 73 bpm |
| Respiration | 14 |
| Height | 5 ft 4.25 in |
| Weight | 153 lb 6.00 oz |
| BMI Calculated | 26.12 kg/m2 |
| BSA Calculated | 1.75 m2 |

## Results

Results not documented.

## Interventions

Follow-ups/Referrals:
- DME/Orthotics/Prosthetics; To Be Done: 15 Dec 2016

CONFIDENTIAL

**Clinical Summary-RTF**

Patient:     MARICEL Q. MARCIAL         SSN:     XXX-XX-7272
Encounter:   Dec 15 2016 3:30PM            EMRN:   00341329

**Plan:**
XR FOOT RT MIN 3V; Status:Complete; Done: 15Dec2016
Perform:Other; Due:14Jan2017; Last Updated By:Brunner, Kristyn; 12/15/2016 4:43:27 PM;Ordered;
For:Heel pain; Ordered By:YOST, KYLE;
   Annotations
      Right sides pain near calcaneus and 5th met. Possible fracture

Plan: <FNT>
<FNT>Xray reviewed by Dr. Skiba and I which showed a possible avulsion off the 5th met from a
peroneal brevis injury. It is possible it is an accessory bone but with the irregularity of the base of the
5th met most likely an avulsion injury

Non Pneumatic CAM Walker ordered
Pt to WBAT in CAM Boot
Pt may work but may take off if pain too severe in boot
Tylenol for pain

F/U in 2 weeks or sooner if needed.
   <FNT>Medical compliance with plan discussed and risks of non-compliance reviewed.\par
   <FNT>Patient education completed on disease process, etiology & prognosis.\par
   <FNT>Patient expresses understanding of the plan.\par
   <FNT>Proper usage and side effects of medications reviewed & discussed.\par
   <FNT>Refer to orders.\par
   <FNT>Return to clinic as clinically indicated as discussed with patient who verbalized understanding
of & agreement with the plan.

**Document Details**

| | | |
|---|---|---|
| AMG-Nesset | (847) 318-2500 | 15 Dec 2016 07:18 PM |
| *Site Name* | *Phone* | *Created Date/Time* |
| | | |
| 1775 Ballard Rd,Park | (847) 318-2940 | Elizabeth Malke |
| Ridge,IL,60068 | *Fax* | *Printed By* |
| *Site Address* | | |

Printed By: Anita Powell      3 of 3       11/7/17 8:24:39 PM

**Advocate Medical Group**
**AMG-Sykes**
2545 S. Martin Luther King Drive
Chicago, IL 60616
(312) 842-7117

---

**Clinical Summary-RTF**
10/10/2016 2:15PM

Patient:
MARICEL MARCIAL
2616 N SPAULDING APT 3
CHICAGO, IL 60647

MRN:   00341329
DOB:   01/21/1973
Phone:  (847) 809-5669

# Clinical Summary

## Patient Details for MARCIAL, MARICEL Q.

| | | |
|---|---|---|
| MARICEL<br>*Preferred Name* | Female<br>*Sex* | 00341329<br>*MRN* |
| 2616 N SPAULDING, APT 3,<br>CHICAGO, IL, 60647<br>*Address* | ENGLISH<br>*Language* | January 21, 1973<br>*Born* |
| Asian<br>*Race* | Non-Hispanic or Latino<br>*Ethnicity* | |

## Today's Appointment

| | |
|---|---|
| BURNOSKI, MELINDA MD<br>*Provider* | 10 Oct 2016 02:15 PM<br>*Appointment* |

## Reason for Visit

Health Issues Reviewed :
Encounter for preventive health examination
Fasting hyperglycemia
Visit for screening mammogram

## Current Health Issues

Anxiety
Encounter for routine gynecological examination
Encounter for screening for respiratory tuberculosis
Fasting hyperglycemia
Fibrocystic breast disease
Nonspecific reaction to tuberculin skin test without active tuberculosis

CONFIDENTIAL

AMG 000009

**Clinical Summary-RTF**

| Patient: | MARICEL Q. MARCIAL | SSN: | XXX-XX-7272 |
|---|---|---|---|
| Encounter: | Oct 10 2016 2:15PM | EMRN: | 00341329 |

Normal Routine History And Physical
Palpitations
Vertigo
Visit for screening mammogram

## Smoking Status

Never smoker

## Medications

**Current Medications:**

| Medication | Instructions |
|---|---|
| Flonase Allergy Relief 50 MCG/ACT Nasal Suspension | |
| Zyrtec Allergy 10 MG Oral Capsule | |

## Allergies and Adverse Reactions

- No Known Drug Allergies

## Vital Signs

| Date/Time | 10/10/2016 2:33:00 PM |
|---|---|
| Blood Pressure | 107 / 73 |
| Temperature | 97.5 F |
| Heart Rate | 75 bpm |
| Height | 5 ft 4.25 in |
| Weight | 154 lb |
| BMI Calculated | 26.23 kg/m2 |
| BSA Calculated | 1.76 m2 |

## Results

Results not documented.

## Interventions

**Labs/Procedure/Imaging:**
- BASIC METABOLIC PNL; To Be Done: 10 Oct 2016
- CBC WITH AUTOMATED DIFFERENTIAL; To Be Done. 10 Oct 2016
- HEMOGLOBIN A1C GLYCOSYLATED; To Be Done: 10 Oct 2016
- LIPID PNL; To Be Done: 10 Oct 2016

CONFIDENTIAL                                        AMG 000010

**Clinical Summary-RTF**

| | | | |
|---|---|---|---|
| Patient: | MARICEL Q. MARCIAL | SSN: | XXX-XX-7272 |
| Encounter: | Oct 10 2016 2:15PM | EMRN: | 00341329 |

- MA FFDM SCREEN BIL W TOMO W CAD; To Be Done: 10 Oct 2016
- VITAMIN D,25 HYDROXY; To Be Done: 10 Oct 2016

**Follow-ups/Referrals:**
- OB-GYN Referral/Consult; To Be Done: 10 Oct 2016

**Document Details**

AMG-Nesset
*Site Name*

(847) 318-2500
*Phone*

10 Oct 2016 04:33 PM
*Created Date/Time*

1775 Ballard Rd,Park
Ridge,IL,60068
*Site Address*

(847) 318-2940
*Fax*

Lavon Beaudoin
*Created By*

Printed By: Anita Powell          3 of 3          11/7/17 8:24:43 PM

CONFIDENTIAL

AMG 000011

**Advocate Medical Group**
**AMG-Sykes**
2545 S. Martin Luther King Drive
Chicago, IL 60616
(312) 842-7117

---

**Clinical Summary-RTF**
04/11/2014 1:30PM

Patient:
MARICEL MARCIAL
2616 N SPAULDING APT 3
CHICAGO, IL 60647

MRN: 00341329
DOB: 01/21/1973
Phone: (847) 809-5669

# Clinical Summary

## Patient Details for: MARCIAL, MARICEL Q

| | | |
|---|---|---|
| MARICEL<br>*Preferred Name* | Female<br>*Sex* | 00341329<br>*MRN* |
| 2616 N SPAULDING APT 3,<br>CHICAGO, 60647<br>*Address* | ENGLISH<br>*Language* | January 21, 1973<br>*Born* |
| Asian<br>*Race* | Non-Hispanic or Latino<br>*Ethnicity* | |

## Today's Appointment

| | |
|---|---|
| ZONG, KANGNI MD<br>*Provider* | 11 Apr 2014 01:30 PM<br>*Appointment* |

## Reason for Visit

<u>Health Issues Reviewed :</u>
- Vertigo

## Current Health Issues

- Anxiety
- Encounter for routine gynecological examination
- Encounter for screening for respiratory tuberculosis
- Fibrocystic breast disease
- Nonspecific reaction to tuberculin skin test without active tuberculosis
- Normal Routine History And Physical
- Palpitations
- Vertigo

Printed By: Anita Powell          1 of 3          11/7/17 8.24.45 PM

**Clinical Summary-RTF**

Patient: MARICEL Q. MARCIAL  SSN: XXX-XX-7272
Encounter: Apr 11 2014 1:30PM  EMRN: 00341329

## Smoking Status

Never smoker

## Medications

Current Medications:

| Medication | Instructions |
|---|---|
| Meclizine HCl - 25 MG Oral Tablet | TAKE 1 TABLET AT BEDTIME. |

## Allergies and Adverse Reactions

- No Known Drug Allergies

## Vital Signs

| Date/Time | 04/11/2014 1:38:00 PM |
|---|---|
| Blood Pressure | 80 / 50 |
| Temperature | 97.3 F |
| Heart Rate | 68 bpm |
| Pulse Quality | Regular |
| Height | 5 ft 4 in |
| Weight | 148 lb |
| BMI Calculated | 25.4 kg/m2 |
| BSA Calculated | 1.72 m2 |

## Results

Results not documented.

CONFIDENTIAL    AMG 000013

**Clinical Summary-RTF**

Patient:    MARICEL Q. MARCIAL        SSN:    XXX-XX-7272
Encounter:  Apr 11 2014 1:30PM           EMRN:  00341329

## Document Details

AMG-Nesset
*Site Name*

(847) 318-2500
*Phone*

11 Apr 2014 05:07 PM
*Created Date/Time*

1775 Ballard Rd, , Park Ridge, IL 60068
*Site Address*

(847) 318-2940
*Fax*

Lavon Beaudoin
*Created By*

CONFIDENTIAL

AMG 000014

**Advocate Medical Group**
**AMG-Sykes**
2545 S. Martin Luther King Drive
Chicago, IL 60616
(312) 842-7117

---

**Clinical Summary-RTF**
04/02/2014 3:15PM

Patient:
MARICEL MARCIAL
2616 N SPAULDING APT 3
CHICAGO, IL 60647

MRN: 00341329
DOB: 01/21/1973
Phone: (847) 809-5669

# Clinical Summary

## Patient Details for MARCIAL, MARICEL Q

| | | |
|---|---|---|
| MARICEL<br>*Preferred Name* | Female<br>*Sex* | 00341329<br>*MRN* |
| 2616 N SPAULDING, APT 3,<br>CHICAGO, 60647<br>*Address* | ENGLISH<br>*Language* | January 21, 1973<br>*Born* |
| Asian<br>*Race* | Non-Hispanic or Latino<br>*Ethnicity* | |

## Today's Appointment

| | |
|---|---|
| TRAN, KIMBERLY DO<br>*Provider* | 02 Apr 2014 03:15 PM<br>*Appointment* |

## Reason for Visit

Health Issues Reviewed :
- Anxiety
- Vertigo

## Current Health Issues

- Anxiety
- Breast Fibrocystic Disease
- Normal Routine History And Physical
- Tuberculin PPD Induration Positive Interpretation
- Vertigo
- Visit For: Screening Exam Pulmonary Tuberculosis
- Visit For: Single System Exam Gynecological With Pap Smear

CONFIDENTIAL

AMG 000015

**Clinical Summary-RTF**

Patient:　　MARICEL Q. MARCIAL　　　　SSN:　　XXX-XX-7272
Encounter:　Apr  2 2014  3:15PM　　　　　EMRN:　00341329

## Smoking Status

Never A Smoker

## Medications

Current Medications:

| Medication | Instructions |
|---|---|
| BuPROPion HCl ER (SR) 150 MG Oral Tablet Extended Release 12 Hour | TAKE 1 TABLET DAILY FOR 1 WEEK, THEN TAKE 1 TABLET TWICE DAILY. |

## Allergies and Adverse Reactions

• No Known Drug Allergies

## Vital Signs

| Date/Time | 04/02/2014 3:30:00 PM |
|---|---|
| Blood Pressure | 100 / 70 |
| Temperature | 97 F |
| Heart Rate | 72 bpm |
| Pulse Quality | Regular |
| Height | 5 ft 4 in |
| Weight | 145 lb 3.00 oz |
| BMI Calculated | 24.92 kg/m2 |
| BSA Calculated | 1.71 m2 |

## Results

Results not documented.

CONFIDENTIAL　　　　　AMG 000016

## Clinical Summary-RTF

| | | | |
|---|---|---|---|
| Patient: | MARICEL Q. MARCIAL | SSN: | XXX-XX-7272 |
| Encounter: | Apr 2 2014 3:15PM | EMRN: | 00341329 |

### Treatment Plans

**Future Appointment:**

| Provider | Date/Time | Location |
|---|---|---|
| NESSET, CARDIOVASCULARTEST | 03 Apr 2014 11:20 AM | NES |
| ECHO/ABI, NESSET | 03 Apr 2014 11:20 AM | NES |

### Interventions

**Medication Changes:**

| Medications | Update | Old Instructions | New Instructions |
|---|---|---|---|
| BuPROPion HCl ER (SR) 150 MG Oral Tablet Extended Release 12 Hour | Start | TAKE 1 TABLET DAILY FOR 1 WEEK, THEN TAKE 1 TABLET TWICE DAILY. | TAKE 1 TABLET DAILY FOR 1 WEEK, THEN TAKE 1 TABLET TWICE DAILY |

**Labs/Procedure/Imaging:**
- CBC WITH AUTOMATED DIFFERENTIAL; To Be Done: 02 Apr 2014
- BASIC METABOLIC PNL; To Be Done: 02 Apr 2014
- TSH; To Be Done: 02 Apr 2014
- CD ECHO 2D COMPLETE W DOP AND COLOR-ADLT; To Be Done: 02 Apr 2014

**Plan:**
CBC WITH AUTOMATED DIFFERENTIAL; Requested for: 02 Apr 2014
BASIC METABOLIC PNL; Requested for: 02 Apr 2014
TSH; Requested for: 02 Apr 2014
CD ECHO 2D COMPLETE W DOP AND COLOR-ADLT; Requested for: 02 Apr 2014
BuPROPion HCl ER (SR) 150 MG Oral Tablet Extended Release 12 Hour;TAKE 1 TABLET
DAILY FOR 1 WEEK, THEN TAKE 1 TABLET TWICE DAILY; Qty60; R0; Rx

### Document Details

| | | |
|---|---|---|
| AMG-Nesset | (847) 318-2500 | 02 Apr 2014 06:31 PM |
| *Site Name* | *Phone* | *Created Date/Time* |

Printed By: Anita Powell    3 of 4    11/7/17 8:24:50 PM

**Clinical Summary-RTF**

Patient:      MARICEL Q. MARCIAL              SSN:      XXX-XX-7272
Encounter:   Apr 2 2014 3:15PM               EMRN:    00341329

1775 Ballard Rd, , Park Ridge, IL   (847) 318-2940          Rebecca Whitford
60068                               *Fax*                   *Created By*
*Site Address*

CONFIDENTIAL                                              AMG 000018

**AMG-Sykes**

2545 S. Martin Luther King Drive
Chicago,IL 60616
(312) 842-7117

| Patient: | MARCIAL, MARICEL Q |
| EMRN: | 00341329 |
| OMRN: | 00341329 |
| DOB: | 21Jan1973 |

## Encounter Form

| Encounter Date | 05Oct2017  1:30PM |
| Provider: | DECHAMBRE,MARGAUX (12237   ) |
| Dept: | Family Practice Nesset |
| Appt Loc: | 1775 Ballard,family Prac Nesset |
| For: | |
| Appt No.: | 36195413 |
| Pt Ins: | HMO HUMANA/ADVOCATE |
| Special Billing: | |
| CRF#: | |

| Billing Provider: | KOO, KEVIN |
| Compliance Code: | |
| Performing Provider: | DECHAMBRE, MARGAUX |
| Referring Provider: | |
| Division: | FAMILY PRACTICE |
| Location: | FAMILY PRACTICE,NESSET 1775 BALLA |
| Billing Area: | FAM PRAC NESSET 110 |
| Special Billing Date: | |

## Diagnoses

| Primary | # | Code | Description |
|---------|---|------|-------------|
| Yes | 1 | (M77.12) | Lateral epicondylitis of left elbow |

## Charges

| Status | Units | Code | Mod | Description | Linked DX | Submitted by |
|--------|-------|------|-----|-------------|-----------|--------------|
| Submitted | 1 | 99213 | | Est Patient: Low Complexity | 1 | Whitman, Kathryn |

CONFIDENTIAL                                                                 AMG 000019

**Advocate Medical Group**
AMG-Sykes
2545 S. Martin Luther King Drive
Chicago, IL 60616
(312) 842-7117

---

*PCP Acute Care Note*
10/05/2017 1:30PM

**Patient:** MARICEL Q. MARCIAL
**MRN:** 00341329
**DOB:** 01/21/1973

### Reason For Visit
MARICEL MARCIAL is an established patient here today for a chief complaint of left elbow pain
Translator: interpreter services not used.
A chaperone is not applicable. She is unaccompanied.

### Quality

**Adult Wellness CI** height documented, discussion of regular exercise, exercising regularly, printed information given for activities, discussion of nutritional quality of diet, patient education given about proper diet, not using alcohol, no tobacco use, does not have feelings of hopelessness (PHQ-2) and no Anhedonia (PHQ-2)

### History of Present Illness
Ms. Marcial is a 44yo F who presents to clinic today for left elbow pain that has been going on for two weeks.

#Left elbow pain for 2 weeks
-week 1, started to get better but then 3 days ago, she twisted left arm with fast internal rotation to grab phone and aggravated it suddenly again
-worse when she wakes up because she doesn't wear her left elbow brace at night
-pain has been steady and somewhat improving since 3 days ago
-works as an ICU nurse at LGH
-9/21 - she had a strong patient; made patient go back into bed and left arm suffered a lot of backward force/resistance during the action; no initial pain then, just felt like lifted a lot of weights
-9/22 kept having to pull patient up in bed and aggravated left elbow more
-using brace on left elbow to help with pain because gravity makes pain worse; has helped but not completely
-worse with grasping (pain down lateral elbow), twisting something open and pushing; lifting is okay; sharp, shooting pain, 8/10 with aggravating factors
-without aggravation, pain is 0/10 unless it's not in brace, then it's an achy pain when it feels the force of gravity
-tried ibuprofen q6h, but then had upset stomach; stopped yesterday afternoon; ibuprofen didn't help much
-has done ice compresses; a little help because it soothed and numbed
-applying more compression to area helps
-no tingling, no swelling, no bruising, no numbness; no fevers, chills or redness in area
-called off work to rest one day
-never had this pain before
-only exercise is running; has not used weights in several months
-thinks it might be tennis elbow

#Health maintenance - patient follows with internal medicine but came to us today because of the family medicine presence in sports medicine; would like to continue health maintenance with internal medicine.

### Allergies
No Known Drug Allergies

### Current Meds

---

CONFIDENTIAL

AMG 000020

*PCP Acute Care Note*
10/05/2017 1:30PM

**Patient:** MARICEL Q. MARCIAL
**MRN:** 00341329
**DOB:** 01/21/1973

1. Flonase Allergy Relief 50 MCG/ACT Nasal Suspension;
   Therapy: 10Oct2016 to Recorded
2. ZyrTEC Allergy 10 MG Oral Capsule;
   Therapy: 10Oct2016 to Recorded

**Active Problems**
Anxiety (F41.9)
Encounter for routine gynecological examination (Z01.419)
Encounter for screening for respiratory tuberculosis (Z11.1)
Fasting hyperglycemia (R73.01)
Fibrocystic breast disease (N60.19)
Heel pain (M79.673)
Neck Strain
  • post MVA
Nonspecific reaction to tuberculin skin test without active tuberculosis (R76.11)
Palpitations (R00.2)
Peroneal tendonitis (M76.70)
Routine History And Physical
Vertigo (R42)
Visit for screening mammogram (Z12.31)

**Past Medical History**
History of breast lump (Z87.898)

**Surgical History**
Denied: History Of Prior Surgery

**Family History**
**Mother**
Family history of Duct, Solid Type, Carcinoma In Situ Of The Breast
  • diagnosed at age 54
**Paternal Aunt**
Family history of Breast Cancer
**Family History**
Family history of Breast Cancer
Family history of Diabetes Mellitus

**Social History**
Denied: Alcohol
Denied: Considered Quitting Drinking Alcohol
Denied: Drinking Alcohol Regularly; Feeling Guilty About It
Denied: Drug Use
Exercising Regularly
Denied: Getting Angry When Talked To About Drinking
Denied: Having A Drink Or Two In The Morning To Get Going
Never smoker
Denied: Tobacco Use

**Vitals**
**Vital Signs**
**Recorded: 05Oct2017 01:27PM**
  Height: 5 ft 4.25 in
  Weight: 149 lb

CONFIDENTIAL

AMG 000021

*PCP Acute Care Note*
10/05/2017 1:30PM

**Patient:** MARICEL Q. MARCIAL
**MRN:** 00341329
**DOB:** 01/21/1973

BMI Calculated: 25.38
BSA Calculated: 1.73
Systolic: 110, RUE, Sitting
Diastolic: 60, RUE, Sitting
Temperature: 97.2 F, Temporal
Heart Rate: 67
O2 Saturation: 99

**Physical Exam**
**Constitutional:** alert, in no acute distress and current vital signs reviewed.
**Head and Face:** atraumatic, no deformities, normocephalic, normal facies
**Eyes:** no discharge, normal conjunctiva, no eyelid swelling and the sclerae were normal, extraocular movements were intact.
**ENT:** no nasal discharge, normal lips, oral mucosa pink and moist.
**Neck:** normal appearing neck.
**Pulmonary:** no respiratory distress, normal respiratory rate and effort and no accessory muscle use. breath sounds clear to auscultation bilaterally
**Cardiovascular:** normal rate, no murmurs were heard, regular rhythm, normal S1 and normal S2. edema was not present in the lower extremities.
**Musculoskeletal:** normal gait, all finger joints have full range of motion, no erythema of the fingers and no swelling of the fingers. no musculoskeletal erythema was seen and no joint swelling seen. 5/5 grip strength BL some pain elicited along left lateral elbow with attempted supination against resistance; no pain on right side normal strength without pain with elbow flexion and extension
normal sensation to light touch BL upper extremities
pinching using left digits causes some soreness around posterior forearm
**Neurologic:** cranial nerves grossly intact.
**Psychiatric:** oriented to person, oriented to place and oriented to time. alert and
awake, interactive and mood/affect were appropriate. judgement not impaired and insight not impaired. normal attention span, logical and concrete. short term memory intact and long term memory intact
**Skin, Hair, Nails:** normal skin color and pigmentation and no rash.

**Assessment**
Lateral epicondylitis of left elbow (M77.12)
  • Assessed By: DECHAMBRE, MARGAUX (Primary Care); Last Assessed: 05 Oct 2017

**Discussion/Summary**
Ms. Marcial is a 44yo F who presents to clinic today for left elbow pain that has been going on for two weeks with some improvement over the last three days.

#Lateral epicondylitis of the left elbow - symptoms are improving somewhat on their own
-naproxen 500mg PO BID PRN OTC for pain; advised patient to take this with meals and to stop if she continues to have stomach upset
-continue to wear left elbow brace and ice PRN for symptoms relief; rest left elbow as much as possible
-provided lateral epicondylitis exercises for patient to try at home
-f/u in two weeks if no improvement in symptoms; f/u sooner if symptoms worsen, do not continue to improve, any numbness, increase in pain, etc

#Health maintenance
-discussed that patient will need a pap smear, mammogram, most likely lab work this year
-patient stated that she will f/u with internal medicine for this
-patient will try to get flu vaccine at work without a charge

Patient seen by and discussed with Dr. Koo.

Margaux DeChambre, MD

CONFIDENTIAL

AMG 000022

*PCP Acute Care Note*
10/05/2017 1:30PM

**Patient:** MARICEL Q. MARCIAL
**MRN:**   00341329
**DOB:** 01/21/1973

Family Medicine PGY-1

**Attending Note**
I saw and evaluated the patient. I discussed the patient's case with the Resident. I agree with the Resident's findings and plan, as documented in today's note. koo

**Signatures**
Electronically signed by : Samantha Kaspar, CMA; Oct 5 2017 1:28PM CST
Electronically signed by : MARGAUX DECHAMBRE, M.D.; Oct 8 2017 8:36AM CST
Electronically signed by : MARGAUX DECHAMBRE, M.D.; Oct 8 2017 8:37AM CST
Electronically signed by : MARGAUX DECHAMBRE, M.D.; Oct 8 2017 8:38AM CST
Electronically signed by : KEVIN KOO, M.D.; Oct 12 2017 6:04PM CST

CONFIDENTIAL                                                      AMG 000023

# AMG-Sykes

**2545 S. Martin Luther King Drive**
**Chicago, IL 60616**
**(312) 842-7117**

Patient: MARCIAL, MARICEL Q
      2616 N SPAULDING APT 3
      CHICAGO, IL 60647

Age/Sex/DOB: 44 yrs F 21-Jan-1973
EMRN: 00341329
OMRN: 00341329
Home: (847) 809-5669
Work: (847) 723-0122

---

## Results

Lab Accession #    XR-16-0740848AMG
Ordering Provider:    YOST, KYLE
Performing Location: AMG NESSET

Collected:    12/15/2016 4:37:00PM
Resulted:    12/15/2016 4:37:00PM
Verified By: YOST, KYLE
Auto Verify: N

---

**XR FOOT RT MIN 3V**                        Stage:    Final

Result      12/19/2016 9:14:00AM      YOST, KYLE
Annotations:    Questionable 5th met avulsion fx vs os vesalianum. Pt in short cam walker.

| Test | Result | Units | Flag Reference Range |
|------|--------|-------|----------------------|
| XR FOOT RT MIN 3V | | | |

Accession #

XR-16-0740848

Clinical indication:

Healed pain.

AP and lateral views as well as oblique view of right foot were performed.  There is moderate
 plantar calcaneal spur formation and small dorsal calcaneal spur formation.

Likely skin contamination overlying soft tissues of distal phalanx of 1st digit.

IMPRESSION:

Moderate plantar and small dorsal calcaneal spur formation, otherwise normal
examination.

**** F I N A L ****

Transcribed By: TP
12/15/16 6:36 pm

Dictated By:        DEVRIES-MD, MARIA

Electronically Reviewed and Approved By:        DEVRIES-MD, MARIA 12/15/16 6:40 pm

---

Printed by: Powell, Anita | 11/07/2017 8:21:00PM               Page 1 of 1

CONFIDENTIAL                    AMG 000024

**AMG-Sykes**

2545 S. Martin Luther King Drive
Chicago,IL 60616
(312) 842-7117

| | |
|---|---|
| Patient: | MARCIAL, MARICEL Q |
| EMRN: | 00341329 |
| OMRN: | 00341329 |
| DOB: | 21Jan1973 |

## Encounter Form

| | |
|---|---|
| Encounter Date | 15Dec2016  3:30PM |
| Provider: | YOST,KYLE (90140      } |
| Dept: | Family Practice Nesset |
| Appt Loc: | 1775 Ballard,family Prac Nesset |
| For: | |
| Appt No.: | 32730957 |
| Pt Ins: | HMO HUMANA/ADVOCATE |
| Special Billing: | |
| CRF #: | |

| | |
|---|---|
| Billing Provider: | SKIBA, PHILIP |
| Compliance Code: | |
| Performing Provider: | YOST, KYLE |
| Referring Provider: | |
| Division: | FAMILY PRACTICE |
| Location: | FAMILY PRACTICE,NESSET 1775 BALLA |
| Billing Area: | FAM PRAC NESSET 110 |
| Special Billing Date: | |

## Diagnoses

| Primary | # | Code | Description |
|---|---|---|---|
| Yes | 1 | (M79.673) | Heel pain |
| | 2 | (M76.70) | Peroneal tendonitis |

## Charges

| Status | Units | Code | Mod | Description | Linked DX | Submitted by |
|---|---|---|---|---|---|---|
| Submitted | 1 | 99214 | | Est Patient. Mod Complexity | 1,2 | Poindexter, Clemons |

CONFIDENTIAL                    AMG 000025

**Advocate Medical Group**
AMG-Sykes
2545 S. Martin Luther King Drive
Chicago, IL 60616
(312) 842-7117

*PCP Acute Care Note*
12/15/2016 3:30PM

**Patient:** MARICEL Q. MARCIAL
**MRN:** 00341329
**DOB:** 01/21/1973

### Reason For Visit
MARICEL MARCIAL is an established patient here today for a chief complaint of right foot pain.
Translator: interpreter services not used.
A chaperone is not applicable. She is unaccompanied.

### Quality
**Adult Wellness CI** height documented, discussion of regular exercise, exercising regularly, printed information given for activities, discussion of nutritional quality of diet, patient education given about proper diet, not using alcohol, no tobacco use, does not have feelings of hopelessness and no Anhedonia.

### History of Present Illness
Pt here for right foot pain for the past five days
-Pt was getting ready for a run and felt a pain over the lateral foot near the calcaneus
-Pain then resolved after running
-Pt then woke up the next day and pain was worse and pt had trouble bearing weight
-Pain was worse with walking
Now having trouble weight bearing and walking on her toes
-Denies any injury
-Denies N/T

### Review of Systems
All other systems reviewed and negative.

### Allergies
No Known Drug Allergies

### Current Meds
1. Flonase Allergy Relief 50 MCG/ACT Nasal Suspension;
   Therapy: 10Oct2016 to Recorded
2. ZyrTEC Allergy 10 MG Oral Capsule;
   Therapy: 10Oct2016 to Recorded

### Active Problems
Anxiety (300.00) (F41.9)
Encounter for routine gynecological examination (V72.31) (Z01.419)
Encounter for screening for respiratory tuberculosis (V74.1) (Z11.1)
Fasting hyperglycemia (790.21) (R73.01)
Fibrocystic breast disease (610.1) (N60.19)
Neck Strain (847.0)
 • post MVA
Nonspecific reaction to tuberculin skin test without active tuberculosis (795.51) (R76.11)

CONFIDENTIAL                                                    AMG 000026

*PCP Acute Care Note*
*12/15/2016 3:30PM*

**Patient:** MARICEL Q. MARCIAL
**MRN:** 00341329
**DOB:** 01/21/1973

Palpitations (785.1) (R00.2)
Routine History And Physical (V70.0)
Vertigo (780.4) (R42)
Visit for screening mammogram (V76.12) (Z12.31)

**Past Medical History**
History of breast lump (V13.89) (Z87.898)

**Surgical History**
Denied: History Of Prior Surgery

**Family History**
**Mother**
Family history of Duct, Solid Type, Carcinoma In Situ Of The Breast
- diagnosed at age 54

**Paternal Aunt**
Family history of Breast Cancer (V16.3)
**Family History**
Family history of Breast Cancer (V16.3)
Family history of Diabetes Mellitus (V18.0)

**Social History**
Denied: Alcohol
Denied: Considered Quitting Drinking Alcohol
Denied: Drinking Alcohol Regularly, Feeling Guilty About It
Denied: Drug Use
Exercising Regularly
Denied: Getting Angry When Talked To About Drinking
Denied: Having A Drink Or Two In The Morning To Get Going
Never smoker
Denied: Tobacco Use

**Vitals**
**Vital Signs**
**Recorded: 15Dec2016 03:45PM**
Height: 5 ft 4.25 in
Weight: 153 lb 6 oz
BMI Calculated: 26.12
BSA Calculated: 1.75
Systolic: 105, LUE, Sitting
Diastolic: 64, LUE, Sitting
Temperature: 97.6 F, Temporal
Heart Rate: 73
Respiration: 14

**Physical Exam**
**Constitutional:** alert, in no acute distress and current vital signs reviewed.
**Head and Face:** atraumatic, normocephalic.
**Eyes:** no discharge, extraocular movements were intact.
**Pulmonary:** no respiratory distress, normal respiratory rate and effort and no accessory muscle use.
**Cardiovascular:** edema was not present in the lower extremities.
**Musculoskeletal:** toe walking on the right side. TTP over the lateral foot between the calcaneus and 5th met
No pain with IV/EV/PF/DF

CONFIDENTIAL

AMG 000027

*PCP Acute Care Note*
12/15/2016 3:30PM

**Patient:** MARICEL Q. MARCIAL
**MRN:** 00341329
**DOB:** 01/21/1973

No TTP over ATFL, CFL, Achilles
SILT L3-S2
**Skin, Hair, Nails:** normal skin color and pigmentation and no rash

**Assessment**
Heel pain (729.5) (M79.673)
- Assessed By: YOST, KYLE (Primary Care); Last Assessed: 15 Dec 2016
Peroneal tendonitis (726.79) (M76.70)

**Plan**
DME/Orthotics/Prosthetics Treatment and Evaluation For: Peroneal tendonitis
Questionable peroneal brevis avulsion off 5th met Status: Active Requested
for: 15Dec2016
    (MU) Care Summary provided. : Yes
Plans:

Plan:
Xray reviewed by Dr. Skiba and I which showed a possible avulsion off the 5th met from a peroneal brevis injury. It
is possible it is an accessory bone but with the irregularity of the base of the 5th met most likely an avulsion injury

Non Pneumatic CAM Walker ordered
Pt to WBAT in CAM Boot
Pt may work but may take off if pain too severe in boot
Tylenol for pain

F/U in 2 weeks or sooner if needed.
Medical compliance with plan discussed and risks of non-compliance reviewed.
Patient education completed on disease process, etiology & prognosis.
Patient expresses understanding of the plan.
Proper usage and side effects of medications reviewed & discussed.
Refer to orders.
Return to clinic as clinically indicated as discussed with patient who verbalized understanding of & agreement with
the plan.
XR FOOT RT MIN 3V; Status:Complete; Done: 15Dec2016
Perform:Other; Due:14Jan2017, Last Updated By:Brunner, Kristyn; 12/15/2016 4:43:27 PM,Ordered;
For:Heel pain; Ordered By:YOST, KYLE;
    Annotations
        Right sides pain near calcaneus and 5th met. Possible fracture

**Attending Note**
    I saw and evaluated the patient. I discussed the patient's case with the Resident. I agree with the Resident's
    findings and plan, as documented in today's note. PFS

**Signatures**
Electronically signed by : Delia Gallegos, L.P.N.; Dec 15 2016 3:47PM CST
Electronically signed by : SHELLY VERMA, DO; Dec 15 2016 5:23PM CST
Electronically signed by : KYLE YOST, DO; Dec 15 2016 5:25PM CST
Electronically signed by : PHILIP SKIBA, DO; Dec 16 2016 4:04PM CST

---

Page 3 of 3 printed 11/07/2017 8:21PM

CONFIDENTIAL

AMG 000028

# AMG-Sykes

2545 S. Martin Luther King Drive
Chicago,IL 60616
(312) 842-7117

| Patient: | MARCIAL, MARICEL Q |
|---|---|
| EMRN: | 00341329 |
| OMRN: | 00341329 |
| DOB: | 21 Jan 1973 |

## Encounter Form

| | | | | |
|---|---|---|---|---|
| Encounter Date | 10Oct2016  2:15PM | | Billing Provider: | DECEMBER, MARIBETH |
| Provider: | MEROLA,MELINDA  (800901 ) | | Compliance Code: | |
| Dept: | Int Med,1775 Ballard-Nesset | | Performing Provider: | MEROLA, MELINDA |
| Appt Loc: | 1775 Ballard, Internal Med Nesset | | Referring Provider: | |
| For: | | | Division: | GENERAL INTERNAL MEDICINE |
| Appt No.: | 31823131 | | Location: | NESSET INTERNAL MEDICINE |
| Pt Ins: | PPO BLUE CROSS | | Billing Area: | INT MED NESSET 140 |
| Special Billing: | | | Special Billing Date: | |
| CRF #: | | | | |

## Diagnoses

| Primary | # | Code | Description |
|---|---|---|---|
| Yes | 1 | (Z00.00) | Encounter for preventive health examination |
| | 2 | (R73.01) | Fasting hyperglycemia |

## Charges

| Status | Units | Code | Mod | Description | Linked DX | Submitted by |
|---|---|---|---|---|---|---|
| Submitted | 1 | 99396 | | Est.Prev Med: Age 40-64 | 1,2 | Wright, Kelly |

Printed by:  Powell, Anita                    1                    Date:   11/7/17  8:21PM

CONFIDENTIAL                                                              AMG 000029

**Advocate Medical Group**
AMG-Sykes
2545 S. Martin Luther King Drive
Chicago, IL 60616
(312) 842-7117

---

*PCP Primary Care Note*
10/10/2016 2:15PM

**Patient:** MARICEL Q. MARCIAL
**MRN:** 00341329
**DOB:** 01/21/1973

**Reason For Visit**
MARICEL MARCIAL is an established patient here today for an annual physical. Wants ob referral.
A chaperone is not applicable. She is unaccompanied.

**Quality**

Adult Wellness CI height documented, discussion of regular exercise, exercising regularly, printed information given for activities, discussion of nutritional quality of diet, patient education given about proper diet, alcohol use, not having considered quitting drinking, not getting angry when talked to about drinking, not having a drink or two in the morning to get going, not drinking alcohol regularly, and feeling guilty about it, no tobacco use, did not provide intervention and counseling in regards to tobacco use, pap smear performed 06/19/2012, does not have feelings of hopelessness, no Anhedonia and preventive medicine therapy for influenza.

**History of Present Illness**
Maricel came in today for annual physical as it has been a couple of years. She is feeling well and past issues with vertigo and palpitations have dissipated. She works as an ICU nurse at LGH.

Has not had labs in 2 years, had elevated fasting blood sugars.
Last pap with reflex in 2012, due next year.
Due for mamm.

UTD on TDap, will get record from employee health.
Will get flu shot at employee health.

**Review of Systems**

Const: Normal.
Allergy & Immunology: Normal.
Eyes: Normal.
ENT: Normal.
CV: Normal.
Resp: Normal.
Breast: Normal.
GI: Normal.
GU: Normal.
Endo: Normal.
Heme/Lymph: Normal.
Musc: Normal.
Neuro: Normal.
Psych: Normal.
Skin: Normal.

**Allergies**

CONFIDENTIAL

AMG 000030

*PCP Primary Care Note*
10/10/2016 2:15PM

**Patient:** MARICEL Q. MARCIAL
**MRN:** 00341329
**DOB:** 01/21/1973

No Known Drug Allergies

**Current Meds**
1. Flonase Allergy Relief 50 MCG/ACT Nasal Suspension;
   Therapy: 10Oct2016 to Recorded
2. ZyrTEC Allergy 10 MG Oral Capsule;
   Therapy: 10Oct2016 to Recorded

**Active Problems**
Anxiety (300.00) (F41.9)
Encounter for routine gynecological examination (V72.31) (Z01.419)
Encounter for screening for respiratory tuberculosis (V74.1) (Z11.1)
Fibrocystic breast disease (610.1) (N60.19)
Neck Strain (847.0)
  • post MVA
Nonspecific reaction to tuberculin skin test without active tuberculosis (795.51) (R76.11)
Normal Routine History And Physical (V70.0)
Palpitations (785.1) (R00.2)
Vertigo (780.4) (R42)

**Past Medical History**
History of breast lump (V13.89) (Z87.898)

**Surgical History**
Denied: History Of Prior Surgery

**Family History**
**Mother**
Family history of Duct, Solid Type, Carcinoma In Situ Of The Breast
  • diagnosed at age 54
**Paternal Aunt**
Family history of Breast Cancer (V16.3)
**Family History**
Family history of Breast Cancer (V16.3)
Family history of Diabetes Mellitus (V18.0)

**Social History**
Denied: Alcohol
Denied: Considered Quitting Drinking Alcohol
Denied: Drinking Alcohol Regularly, Feeling Guilty About It
Denied: Drug Use
Exercising Regularly
Denied: Getting Angry When Talked To About Drinking
Denied: Having A Drink Or Two In The Morning To Get Going
Never smoker
Denied: Tobacco Use

**Vitals**
**Vital Signs [Data Includes: Current Encounter]**
**Recorded: 10Oct2016 02:33PM**
  Height: 5 ft 4.25 in
  Weight: 154 lb
  BMI Calculated: 26.23

CONFIDENTIAL

*PCP Primary Care Note*
10/10/2016 2:15PM

**Patient:** MARICEL Q. MARCIAL
**MRN:** 00341329
**DOB:** 01/21/1973

BSA Calculated: 1.76
Systolic: 107, RUE, Sitting
Diastolic: 73, RUE, Sitting
Temperature: 97.5 F, Tympanic
Heart Rate: 75, R Radial

## Physical Exam
**Constitutional:** alert, in no acute distress and current vital signs reviewed.
**Head and Face:** atraumatic, no deformities, normocephalic, normal facies, no tenderness of facial sinuses.
**Eyes:** no discharge, normal conjunctiva, no eyelid swelling, no ptosis and the sclerae were normal, pupils equal, round and reactive to light and accommodation and extraocular movements were intact.
**ENT:** normal appearing outer ear, normal appearing nose, examination of the tympanic membrane showed normal landmarks, normal appearing external canal , some white scarring on BL tympanic membranes, no current ear sx, nasal mucosa moist and pink, no nasal discharge, nasal septum midline, normal nasal turbinates , normal lips, oral mucosa pink and moist, no oral lesions, tonsils not enlarged, normal appearing pharynx, normal appearing tongue.
**Neck:** normal appearing neck and supple neck, thyroid not enlarged.
**Lymphatic:** no lymphadenopathy.
**Pulmonary:** no respiratory distress, normal respiratory rate and effort and no accessory muscle use, breath sounds clear to auscultation bilaterally.
**Cardiovascular:** normal rate, no murmurs were heard and regular rhythm, edema was not present in the lower extremities.
**Abdomen:** soft, nontender, nondistended, normal bowel sounds and no abdominal mass.
**Musculoskeletal:** normal gait, normal range of motion, muscle strength and tone were normal.
**Neurologic:** cranial nerves grossly intact, no sensory deficits noted, no coordination deficits, normal gait, muscle strength and tone were normal.
**Psychiatric:** oriented to person, oriented to place and oriented to time, alert and awake, interactive and mood/affect were appropriate.
**Skin, Hair, Nails:** normal skin color and pigmentation and no rash, no skin lesions.

## Assessment
Encounter for preventive health examination (V70.0) (Z00.00)
Fasting hyperglycemia (790.21) (R73.01)
Visit for screening mammogram (V76.12) (Z12.31)

## Plan
BASIC METABOLIC PNL; Status:Active; Requested for:10Oct2016;
CBC WITH AUTOMATED DIFFERENTIAL; Status:Active; Requested for:10Oct2016;
HEMOGLOBIN A1C GLYCOSYLATED; Status:Active; Requested for:10Oct2016;
LIPID PNL; Status:Active; Requested for:10Oct2016;
MA FFDM SCREEN BIL W TOMO W CAD; Status:Active; Requested for:10Oct2016;
VITAMIN D,25 HYDROXY; Status:Active; Requested for:10Oct2016;
Administer: Fluzone Quadrivalent 0.5 ML Intramuscular Suspension; INJECT 0.5  ML Intramuscular; To Be Done; 10Oct2016
OB-GYN Referral/Consult Treatment and Evaluation; Women's Wellness, due for pap with reflex in 2017  Status: Active  Requested for: 10Oct2016
      (MU) Care Summary provided. : Yes

## Discussion/Summary
Ms Marcial is here for her annual complete physical exam.

1. Health Maintenance
   annual labs ordered, added A1c given FHx and h/o fasting hyperglycemia
- ordered mamm
- UTD on paps, due next year, would like referral to OBGYN, provided

CONFIDENTIAL                                                    AMG 000032

*PCP Primary Care Note*
10/10/2016 2:15PM

**Patient:** MARICEL Q. MARCIAL
**MRN:** 00341329
**DOB:** 01/21/1973

- will get flu shot at employee health and record of last TDap

RTC in 2 years.
- M Burnoski, DO

**Attending Note**
I discussed the patient's case with the Resident. I agree with the Resident's findings and plan, as documented in today's note.

**Signatures**
Electronically signed by : Shada Posey, RMA; Oct 10 2016 2:34PM CST
Electronically signed by : MELINDA BURNOSKI, MD; Oct 10 2016 3:30PM CST
Electronically signed by : MARIBETH DECEMBER, M.D.; Oct 10 2016 3:45PM CST (Author)

CONFIDENTIAL                                                                 AMG 000033

**AMG-Sykes**

2545 S. Martin Luther King Drive
Chicago, IL 60616
(312) 842-7117

| Patient: | MARCIAL, MARICEL O |
|---|---|
| EMRN: | 00341329 |
| OMRN: | 00341329 |
| DOB: | 21Jan1973 |

## Encounter Form

| | |
|---|---|
| Encounter Date | 11Apr2014  1:30PM |
| Provider: | ZONG,KANGNI (5190          ) |
| Dept: | Int Med,1775 Ballard-Nesset |
| Appt Loc: | 1775 Ballard, Internal Med Nesset |
| For: | |
| Appt No.: | 22425772 |
| Pt Ins: | PPO BLUE CROSS |
| Special Billing: | |
| CRF#: | |

| | |
|---|---|
| Billing Provider: | HOLMES, THOMAS |
| Compliance Code: | |
| Performing Provider: | ZONG, KANGNI |
| Referring Provider: | |
| Division: | GENERAL INTERNAL MEDICINE |
| Location: | NESSET INTERNAL MEDICINE |
| Billing Area: | INT MED NESSET 140 |
| Special Billing Date: | |

## Diagnoses

| Primary | # | Code | Description |
|---|---|---|---|
| Yes | 1 | (R42) | Vertigo |

## Charges

| Status | Units | Code | Mod | Description | Linked DX | Submitted by |
|---|---|---|---|---|---|---|
| Submitted | 1 | 99213 | | Est Patient: Low Complexity | 1 | Weichman, Debra |

CONFIDENTIAL                                                                                      AMG 000034

**Advocate Medical Group**
**AMG-Sykes**
2545 S. Martin Luther King Drive
Chicago, IL 60616
(312) 842-7117

---

**Letter**
04/11/2014 1:30PM

Patient:
MARICEL MARCIAL
2616 N SPAULDING APT 3
CHICAGO, IL 60647

MRN:  00341329
DOB:  01/21/1973
Phone: (847) 809-5669

April 11, 2014

To Whom It May Concern:

I have evaluated Ms. Maricel Marcial at Nesset Clinic today. Based on my exam, she is physically stable to return to normal educational and clinical duties.

Please call should you have any questions.

Sincerely,

Kangni Zong, MD MPH

Electronically signed by:KANGNI ZONG MD  Apr 11 2014  2.08PM CST

Printed By: Anita Powell        1 of 1        11/7/17 8:21:51 PM

AMG 000035

**Advocate Medical Group**
**AMG-Sykes**
2545 S. Martin Luther King Drive
Chicago, IL 60616
(312) 842-7117

---

**PCP Acute Care Note**
04/11/2014 1:30PM

Patient:
MARICEL MARCIAL
2616 N SPAULDING APT 3
CHICAGO, IL 60647

MRN: 00341329
DOB: 01/21/1973
Phone: (847) 809-5669

**Chief Complaint**
• here for follow up visit from last week- lightheadedness states was gotten worse
**Chaperone**
    Patient not accompanied by a family member.
**HPI**
Ms. Marcial is well known to me
She is here for f/u of dizziness
Also having nausea as well
She feels the dizziness can be elicited with just lateral gaze
Dr Stone who works with her at LGH recommended seeing Dr Dennis Moore for BPPV. Dr Moore was unable to elicit nystagmus with Dix-Hallpike and tested warm calorics. He also ordered a video nystagography, which she had done this morning. He is also recommending an MRI to r/o Schwannoma.
She has no hearing symptoms. Her dizziness improves with rest, and symptoms do not interfere with her daily activities.
**Active Problems**
Anxiety (300.00)
Encounter for routine gynecological examination (V72.31)
Encounter for screening for respiratory tuberculosis (V74.1)
Fibrocystic breast disease (610.1)
Neck Strain (847.0),
* post MVA, 12 Aug 2009
Nonspecific reaction to tuberculin skin test without active tuberculosis (795.51)
Normal Routine History And Physical (V70.0)
Palpitations (785.1)
Vertigo (780.4).
**PMH**
History of breast lump (V13.89).
**PSH**
Denied History Of Prior Surgery.
**Family Hx**
Breast Cancer (V16.3); Maternal second cousin diagnosed in her 40's
Breast Cancer: Paternal Aunt (V16.3), diagnosed in her 60's
Diabetes Mellitus (V18.0)
Duct, Solid Type, Carcinoma In Situ Of The Breast. Mother, diagnosed at age 54.
**Personal Hx**
Denied Alcohol
Denied Considered Quitting Drinking Alcohol
Denied Drinking Alcohol Regularly, Feeling Guilty About It

CONFIDENTIAL                                                    AMG 000036

**PCP Acute Care Note**

Patient: MARICEL Q. MARCIAL        SSN:   XXX-XX-7272
Encounter: Apr 11 2014 1:30PM       EMRN:  00341329

Denied Drug Use
Exercising Regularly
Denied Getting Angry When Talked To About Drinking
Denied Having A Drink Or Two In The Morning To Get Going
Never smoker
Denied Tobacco Use.
**Allergies**
Rec: 11Apr2014. List Reconciled and Reviewed.
No Known Drug Allergy.
**Current Meds**
Rec: 11Apr2014. List Reconciled and Reviewed.
Meclizine HCl - 25 MG Oral Tablet;TAKE 1 TABLET AT BEDTIME., Rx.
**Vital Signs**
Vital Signs Recorded by Gonzalez, Martha on April 11,2014 01:38 PM
Height: 64 in, Weight: 148 lb, BMI: 25.40, BSA: 1.72
BP: 80/50 mm Hg RUE Sitting
Temp: 97.3 F Tympanic
HR: 68 b/min R Radial , Regular

**Physical Exam**
**Vital Signs:**
    ° Current vital signs reviewed.
**General Appearance:**
    ° Normal
**Head:**
    ° Normal.
**Eyes:**
    General/bilateral.
        ° Eyes: normal.
**Lungs:**
    ° Clear to auscultation.
**Cardiovascular:**
    Heart Rate And Rhythm: ° Normal.
    Heart Sounds: ° Normal.
    Murmurs: ° No murmurs were heard.
    Arterial Pulses: ° Equal bilaterally and normal.
    Edema: ° No pitting edema.
**Neurological:**
    • System: +dix-hallpike to left.
**Assessment**
Vertigo (780.4).
**Plan**
41yo female here for f/u of vertigo
- continue to suspect BPPV
- reviewed epley maneuver with patient, encourage to do at home
- encourage rest and hydration
- ok to return to clinical activities for CNA (nurse anesthesist) school, letter written
- if symptoms persist for next few days, consider prednisone for possible neuritis as she had URI 4 weeks ago
- pt awaiting result of nystagography

CONFIDENTIAL                                    AMG 000037

## PCP Acute Care Note

Patient:     MARICEL Q. MARCIAL         SSN:    XXX-XX-7272
Encounter:   Apr 11 2014  1:30PM            EMRN:   00341329

RTC prn

d/w Dr Holmes

K Zong

Discussed at time of visit. Pt returns for f/u vertigo. Has gotten little relief with meclizine. Agree with trial of modified epley at home and whatever steps can be taken to minimize stress at school. TH.

**Signature**
Electronically signed by : Martha Gonzalez CMA; 04/11/2014 1:40 PM CST.
Electronically signed by : KANGNI ZONG MD; 04/11/2014 4:11 PM CST.
Electronically signed by : THOMAS HOLMES M.D., 04/11/2014 4:23 PM CST.

CONFIDENTIAL            AMG 000038

**Advocate Medical Group**
AMG-Sykes
2545 S. Martin Luther King Drive
Chicago, IL 60616
(312) 842-7117

---

*Result Note*
04/03/2014 2:13PM

**Patient:** MARICEL Q. MARCIAL
**MRN:** 00341329
**DOB:** 01/21/1973

**Discussion/Summary**
All lab results look normal.

**Verified Results**
CBC WITH AUTOMATED            02Apr2014 04:45PM          TRAN, KIMBERLY
DIFFERENTIAL

| Test Name | Result | Flag | Reference |
|-----------|--------|------|-----------|
| WBC | 9.6 K/mcL | | 4.2-11.0 |
| RBC | 4.36 mil/mcL | | 4.00-5.20 |
| HEMOGLOBIN | 13.5 g/dl | | 12.0-15.5 |
| HEMATOCRIT | 41.4 % | | 36.0-46.5 |
| MCV | 95.0 fL | | 78.0-100.0 |
| MCH | 31.0 pg | | 26.0-34.0 |
| MCHC | 32.6 g/dl | | 32.0-36.5 |
| RDWCV | 12.8 % | | 11.0-15.0 |
| PLATELET | 277 K/mcL | | 140-450 |
| NEU% | 66 % | | |
| LYM% | 24 % | | |
| MON% | 8 % | | |
| EOS% | 2 % | | |
| BASO% | 0 % | | |
| NEU ABS | 6.3 K/mcL | | 1.8-7.7 |
| LYM ABS | 2.3 K/mcL | | 1.0-4.8 |
| MON ABS | 0.8 K/mcL | | 0.3-0.9 |
| EOS ABS | 0.2 K/mcL | | 0.1-0.5 |
| BASO ABS | 0.0 K/mcL | | 0.0-0.3 |
| DIFF TYPE | | | |
| AUTOMATED DIFFERENTIAL | | | |

BASIC METABOLIC PNL          02Apr2014 04:45PM          TRAN, KIMBERLY

---

CONFIDENTIAL

AMG 000039

*Result Note*
04/03/2014 2:13PM

**Patient:** MARICEL Q. MARCIAL
**MRN:** 00341329
**DOB:** 01/21/1973

| Test Name | Result | Flag | Reference |
|---|---|---|---|
| SODIUM | 139 mmol/L | | 135-145 |
| POTASSIUM | 4.0 mmol/L | | 3.4-5.1 |
| CHLORIDE | 104 mmol/L | | 98-107 |
| CARBON DIOXIDE | 26 mmol/L | | 21-32 |
| ANION GAP | 13 mmol/L | | 10-20 |
| GLUCOSE | 116 mg/dl | H | 65-99 |
| BUN | 17 mg/dl | | 10-20 |
| CREATININE | 0.80 mg/dl | | 0.50-1.10 |
| GFR EST.AFRICAN AMER Units = mL/min/1.73m2 | >60 | | >59 |
| GFR EST.NONAFRI AMER Units = mL/min/1.73m2 | >60 | | >59 |
| BUN/CREATININE RATIO | 21 | | 7-25 |
| CALCIUM | 9.4 mg/dl | | 8.4-10.2 |
| FASTING STATUS | 8 hrs | | |

TSH                02Apr2014 04:45PM        TRAN, KIMBERLY

| Test Name | Result | Flag | Reference |
|---|---|---|---|
| TSH | 1.610 mcUnits/mL | | 0.350-5.000 |

**Signatures**
Electronically signed by : KIMBERLY TRAN, DO; Apr 3 2014 2:13PM CST (Author)

CONFIDENTIAL                                    AMG 000040

**Advocate Medical Group**
**AMG-Sykes**
2545 S. Martin Luther King Drive
Chicago, IL 60616
(312) 842-7117

---

**Cardiology TTE**
04/03/2014 11:20AM

Patient:
MARICEL MARCIAL
2616 N SPAULDING APT 3
CHICAGO, IL 60647

MRN:   00341329
DOB:   01/21/1973
Phone: (847) 809-5669

# Adult Echo

Patient: **MARCIAL, MARICEL**                                              Account #: 00341
DOB: **01/21/1973**                                                           Study Quality: **G**
H: **64** in, W: **145** lbs, BSA: **1.71** m$^2$
Study Date: **4/3/2014 11:16:42 AM**
Referring Physician: **Holmes, Thomas, MD**                          Referring Cardiolo
Physical:
cc:

Symptoms:
Indications: Palpitations

## Procedure
A complete 2D, M-Mode, Spectral Doppler and Color Doppler echocardiogram was performed in the apical, parasternal and subcostal views.

## Conclusions
1. The patient was in normal sinus rhythm.
2. The left ventricular cavity size appears normal. The left ventricular wall thickness appears normal. Left ventricular ejection fraction was normal, estimated in the range of 60 to 65%. Left ventricular wall motion analysis appears normal.
3. There is pericardial effusion of trivial size.
4. Overall normal study.

## Findings
**General:** The patient was in normal sinus rhythm.  BP 100/70
**Left Ventricle:** The left ventricular cavity size appears normal. The left ventricular wall thickness appears normal. The shape of the left ventricle appears normal. Diastolic

Printed By: Anita Powell              1 of 3              11/7/17 8:21:59 PM

## Cardiology TTE

| | | | |
|---|---|---|---|
| Patient: | MARICEL Q. MARCIAL | SSN: | XXX-XX-7272 |
| Encounter: | Apr 3 2014 11:20AM | EMRN: | 00341329 |

filling appears normal for the patient's age. Left ventricular ejection fraction was normal, estimated in the range of 60 to 65%. Left ventricular wall motion analysis appears normal.

**Right Ventricle:** The right ventricular cavity size appears normal. The right ventricular wall thickness appears normal. The right ventricular systolic function appears normal.

**Left Atrium:** The left atrial size appears normal.

**Right Atrium:** The right atrial size appears normal.

**Aortic Valve:** The structure of the aortic valve is tricuspid. There is no evidence of aortic stenosis. There is no evidence of aortic regurgitation.

**Mitral Valve:** There is no evidence of mitral stenosis. There is no evidence of mitral regurgitation. The mitral valve appears normal in structure.

**Pulmonic Valve:** The pulmonic valve was not well visualized.

**Tricuspid Valve:** There is no evidence of tricuspid regurgitation. There is no evidence of tricuspid stenosis. The tricuspid valve appears normal in structure.

**Pericardium:** The pericardium appears normal. There is pericardial effusion of trivial size.

**Aorta:** The visualized portions of the aorta appear normal.

**Pulmonic Artery:** The pulmonary artery was not well visualized.

**Venous:** The pulmonary veins were not well visualized.

## Measurements

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| MVA (P1/2t) | 2.74 cm² | SV (LVOT) | 56.3 ml | ESV (A2C) | 18.3 ml | LA/Ao | 1.18 |
| MV P1/2t Vmax | 95.8 cm/s | LVOT VTI | 19.7 cm | EDV (A4C) | 67.7 ml | LA Dimen | 3.57 cm |
| MV Peak A Vel | 67.8 cm/s | TR Vmax | 188 cm/s | ESV (A4C) | 17 ml | AV Vmax | 113 cm/s |
| MV E/A | 1.33 | AoR Diam | 3.02 cm | Vis Est EF | 65 % | AV Max PG | 5 mmHg |
| MV Peak E Vel | 90 cm/s | TR Max PG | 14 mmHg | EF (Teich) | 41.2 % | AV Vmean | 78.9 cm/s |
| MV P1/2t | 80.4 msec | LVOT Mean PG | 2 mmHg | EDV (A2C) | 73.2 ml | LVPWs | 1.19 cm |
| AV VTI | 24.3 cm | LVOT Diam | 1.91 cm | SV (BP) | 56.7 ml | LVIDd | 4.84 cm |
| AV Mean PG | 3 mmHg | MV Decel Time | 0.13 msec | SV (A4C) | 50.7 ml | IVSd | 0.89 cm |
| AVA (Vmax) | 2.39 cm² | LVOT Vmax | 94.8 cm/s | EF (Teich) | 72 % | LVPWd | 0.81 cm |
| AV Cusp Sep | 1.91 cm | LVOT Max PG | 4 mmHg | EF (BP) | 76 % | IVSs | 1.36 cm |

CONFIDENTIAL

AMG 000042

**Cardiology TTE**

Patient:     MARICEL Q. MARCIAL                    SSN:     XXX-XX-7272
Encounter:   Apr 3 2014 11:20AM                     EMRN:    00341329


| AVA (VTI) | 2.32 cm² | LVOT Vmean | 63.7 cm/s | EF (A4C) | 74.9 % | LVIDs | 2.85 cm |

Sonographer: **Negru, Felicia, R.C.S.**


Electronically signed by:NAYLA CHAPTINI M.D. Apr 3 2014 6:48PM CST Author

CONFIDENTIAL                                                    AMG 000043

**AMG-Sykes**

2545 S. Martin Luther King Drive
Chicago, IL 60616
(312) 842-7117

| Patient: | MARCIAL, MARICEL Q |
|---|---|
| EMRN: | 00341329 |
| OMRN: | 00341329 |
| DOB: | 21 Jan 1973 |

## Encounter Form

| | | | |
|---|---|---|---|
| Encounter Date | 03Apr2014 11:20AM | Billing Provider: | |
| Provider: | ECHO/ABI,NESSET (51477 ) | Compliance Code: | |
| Dept: | RESOURCES,CARD NESSET | Performing Provider: | ECHO/ABI, NESSET |
| Appt Loc: | NES | Referring Provider: | HOLMES,THOMAS MD |
| For: | | Division: | |
| Appt No.: | 22375342 | Location: | |
| Pt Ins: | PPO BLUE CROSS | Billing Area: | |
| Special Billing: | | Special Billing Date: | |
| CRF #: | | | |

### Diagnoses

| Primary | # | Code | Description |
|---|---|---|---|
| Yes | 1 | (R00.2) | Palpitations |
| | 2 | (R42) | Vertigo |

### Charges

| Status | Units | Code | Mod | Description | Linked DX | Submitted by |
|---|---|---|---|---|---|---|
| Submitted | 1 | 93306 | | ECHO TTHRC R-T 2D -+M-MODE COMPL SPECCOLOR DOP | 1,2 | Caruso, Linda |

CONFIDENTIAL

AMG 000044

# AMG-Sykes

2545 S. Martin Luther King Drive
Chicago, IL 60616
(312) 842-7117

| | | | |
|---|---|---|---|
| Patient: | MARCIAL, MARICEL Q | Age/Sex/DOB: | 44 yrs  F  21-Jan-1973 |
| | 2616 N SPAULDING APT 3 | EMRN: | 00341329 |
| | CHICAGO, IL 60647 | OMRN: | 00341329 |
| | | Home: | (847) 809-5669 |
| | | Work: | (847) 723-0122 |

## Results

| | | | |
|---|---|---|---|
| Lab Accession # | 16790639LU912BPNL | Collected: | 04/02/2014  4:45:00PM |
| Ordering Provider: | TRAN,KIMBERLY | Resulted: | 04/03/2014  12:35:00AM |
| Performing Location: | ACL CENTRAL LAB IL | Verified By: | TRAN, KIMBERLY |
| | 5400 PEARL ST | Auto Verify: | N |
| | ROSEMONT, IL 60018-5320 | | |

BASIC METABOLIC PNL                                         Stage:      Final

| Test | Result | Units | Flag | Reference Range |
|---|---|---|---|---|
| SODIUM | 139 | mmol/L | | 135-145 |
| POTASSIUM | 4.0 | mmol/L | | 3.4-5.1 |
| CHLORIDE | 104 | mmol/L | | 98-107 |
| CARBON DIOXIDE | 26 | mmol/L | | 21-32 |
| ANION GAP | 13 | mmol/L | | 10-20 |
| GLUCOSE | 116 | mg/dl | H | 65-99 |
| BUN | 17 | mg/dl | | 10-20 |
| CREATININE | 0.80 | mg/dl | | 0.50-1.10 |
| GFR EST.AFRICAN AMER | >60 | | | >59 |
|   Units = mL/min/1.73m2 | | | | |
| GFR EST.NONAFRI AMER | >60 | | | >59 |
|   Units = mL/min/1.73m2 | | | | |
| BUN/CREATININE RATIO | 21 | | | 7-25 |
| CALCIUM | 9.4 | mg/dl | | 8.4-10.2 |
| FASTING STATUS | 8 | hrs | | |

CONFIDENTIAL                                                                                      AMG 000045

# AMG-Sykes

### 2545 S. Martin Luther King Drive
### Chicago,IL 60616
### (312) 842-7117

| | |
|---|---|
| **Patient:** MARCIAL, MARICEL Q | **Age/Sex/DOB:** 44 yrs F 21-Jun-1973 |
| 2616 N SPAULDING APT 3 | **EMRN:** 00341329 |
| CHICAGO, IL 60647 | **OMRN:** 00341329 |
| | **Home:** (847) 809-5669 |
| | **Work:** (847) 723-0122 |

## Results

| | | | |
|---|---|---|---|
| **Lab Accession #** 16790639LU912CBCA | | **Collected:** | 04/02/2014 4:45:00PM |
| **Ordering Provider:** TRAN,KIMBERLY | | **Resulted:** | 04/03/2014 12:08:00AM |
| **Performing Location:** ACL CENTRAL LAB IL | | **Verified By:** | TRAN, KIMBERLY |
| 5400 PEARL ST | | **Auto Verify:** | N |
| ROSEMONT, IL 60018-5320 | | | |

### CBC WITH AUTOMATED DIFFERENTIAL

**Stage:** **Final**

| Test | Result | Units | Flag | Reference Range |
|---|---|---|---|---|
| WHITE BLOOD COUNT | 9.6 | K/mcL | | 4.2-11.0 |
| RED CELL COUNT | 4.36 | mil/mcL | | 4.00-5.20 |
| HEMOGLOBIN | 13.5 | g/dl | | 12.0-15.5 |
| HEMATOCRIT | 41.4 | % | | 36.0-46.5 |
| MEAN CORPUSCULAR VOLUME | 95.0 | fL | | 78.0-100.0 |
| MEAN CORPUSCULAR HEMOGLOBIN | 31.0 | pg | | 26.0-34.0 |
| MEAN CORPUSCULAR HGB CONC | 32.6 | g/dl | | 32.0-36.5 |
| RDW-CV | 12.8 | % | | 11.0-15.0 |
| PLATELET COUNT | 277 | K/mcL | | 140-450 |
| NEU% | 66 | % | | |
| LYM% | 24 | % | | |
| MON% | 8 | % | | |
| EOS% | 2 | % | | |
| BASO% | 0 | % | | |
| NEU ABS | 6.3 | K/mcL | | 1.8-7.7 |
| LYM ABS | 2.3 | K/mcL | | 1.0-4.8 |
| MON ABS | 0.8 | K/mcL | | 0.3-0.9 |
| EOS ABS | 0.2 | K/mcL | | 0.1-0.5 |
| BASO ABS | 0.0 | K/mcL | | 0.0-0.3 |
| DIFF TYPE | AUTOMATED DIFFERENTIAL | | | |

CONFIDENTIAL      AMG 000046

**AMG-Sykes**

2545 S. Martin Luther King Drive
Chicago, IL 60616
(312) 842-7117

Patient: MARCIAL, MARICEL Q
2616 N SPAULDING APT 3
CHICAGO, IL 60647

Age/Sex/DOB: 44 yrs F 21-Jan-1973
EMRN: 00341329
OMRN: 00341329
Home: (847) 809-5669
Work: (847) 723-0122

## Results

Lab Accession #: 16790639LU912TSH
Ordering Provider: TRAN, KIMBERLY
Performing Location: ACL CENTRAL LAB IL
5400 PEARL ST
ROSEMONT, IL 60018-5320

Collected: 04/02/2014 4:45:00PM
Resulted: 04/03/2014 12:35:00AM
Verified By: TRAN, KIMBERLY
Auto Verify: N

TSH

Stage: Final

| Test | Result | Units | Flag | Reference Range |
|------|--------|-------|------|-----------------|
| TSH | 1.610 | mcUnits/mL | | 0.350-5.000 |

CONFIDENTIAL

AMG 000047

## AMG-Sykes

**2545 S. Martin Luther King Drive**
Chicago,IL 60616
(312) 842-7117

| | |
|---|---|
| **Patient:** | MARCIAL, MARICEL Q |
| **EMRN:** | 00341329 |
| **OMRN:** | 00341329 |
| **DOB:** | 21Jan1973 |

### Encounter Form

| | |
|---|---|
| Encounter Date | 02Apr2014  3:15PM |
| Provider: | TRAN,KIMBERLY (956625          ) |
| Dept: | Int Med,1775 Ballard-Nesset |
| Appt Loc: | 1775 Ballard, Internal Med Nesset |
| For: | |
| Appt No.: | 22367738 |
| Pt Ins: | PPO BLUE CROSS |
| Special Billing: | |
| CRF#: | |

| | |
|---|---|
| **Billing Provider:** | HOLMES, THOMAS |
| **Compliance Code:** | |
| **Performing Provider:** | TRAN, KIMBERLY |
| **Referring Provider:** | |
| **Division:** | GENERAL INTERNAL MEDICINE |
| **Location:** | NESSET INTERNAL MEDICINE |
| **Billing Area:** | INT MED NESSET 140 |
| **Special Billing Date:** | |

### Diagnoses

| Primary | # | Code | Description |
|---|---|---|---|
| Yes | 1 | (R42) | Vertigo |
| | 2 | (F41.9) | Anxiety |

### Charges

| Status | Units | Code | Mod | Description | Linked DX | Submitted by |
|---|---|---|---|---|---|---|
| Submitted | 1 | 99213 | | Est Patient Low Complexity | 1,2 | Weichman, Debra |

CONFIDENTIAL                                                                 AMG 000048

**Advocate Medical Group**
**AMG-Sykes**
2545 S. Martin Luther King Drive
Chicago, IL 60616
(312) 842-7117

---

**Letter**
04/02/2014 3:15PM

Patient:
MARICEL MARCIAL
2616 N SPAULDING APT 3
CHICAGO, IL 60647

MRN:  00341329
DOB:  01/21/1973
Phone: (847) 809-5669

Marcial, Maricel was seen in my office today 4/2/14 for workup for palpitations and lightheadeded.  Please excuse
patient from school for the next week until she is medically clear from us to return back to school.

Electronically signed by:KIMBERLY  TRAN DO  Apr  2 2014  4:28PM CST Author

Printed By: Anita Powell        1 of 1        11/7/17 8:22:16 PM

CONFIDENTIAL                                    AMG 000049

**Advocate Medical Group**
**AMG-Sykes**
2545 S. Martin Luther King Drive
Chicago, IL 60616
(312) 842-7117

---

**PCP Acute Care Note**
04/02/2014 3:15PM

Patient:
MARICEL MARCIAL
2616 N SPAULDING APT 3
CHICAGO, IL 60647

MRN:   00341329
DOB:   01/21/1973
Phone: (847) 809-5669

**Chief Complaint**
• "c/o palpitations and lightheadiness" not taking citalopran
**Quality**
    No feelings of hopelessness. No anhedonia. No Pap smear was performed 2 years ago. Discussion of
nutritional quality of diet. No tobacco use and not using alcohol. Education: exercising regularly. Printed
information given for activities. Able to walk. Height.
    Patient/caregiver queried about falls; Influenza immunization at lgh; Discussion of regular exercise; Printed
information given for patient education about a proper diet
**HPI**
41 year old female with past medical history of PVCs. Patient is a student for CRNA at Rush and works as an ICU
nurse at LGH. Patient states she has been stressed out a lot with school. Patient states that there has been a lot of
bully in her class.

Complains of intermittent pulpitations that has been ongoing since January 2014. Patient complains of symptoms of
lightheadedness that occurs only when she is standing for a prolonged time period. During these episodes, patient
experiences blurry vision. No fainting or LOC. Patient does complaining of bilateral ear fullness and tinnitus
mainly in the right ear that has been ongoing for the past month. No sensation of room spinning. Baseline SBP
90-100s. Patient states that she gets nauseous with turning. Patient was seen at urgent care yesterday. 12 Lead EKG
performed 4/1/14 revealed NSR.

**ROS**
**Systemic:** Systemic symptoms general overall feeling. Feeling fine. No fever and no chills.
**Head:** No head symptoms.
**Neck:** No neck symptoms.
**Eyes:** No eye symptoms.
**Otolaryngeal:** Ear symptoms ear fullness. No nasal symptoms and no throat symptoms.
**Cardiovascular:** Cardiovascular symptoms history of PVCs.
**Pulmonary:** No pulmonary symptoms, no dyspnea, no cough, and no wheezing.
**Gastrointestinal:** Gastrointestinal symptoms with head movements. Normal appetite. Nausea No vomiting.
**Endocrine:** No endocrine symptoms.
**Hematologic:** No hematologic symptoms.
**Musculoskeletal:** No musculoskeletal symptoms.
**Neurological:** Dizziness. No vertigo. Lightheadedness. No fainting, no decrease in consciousness, no decrease in
    concentrating ability, no confusion, no disorientation, no delirium, no convulsions, no speech difficulties, and
    no sensory disturbances.
**Psychological:** Psychological symptoms anxiety.
**Skin:** No skin symptoms.
**Allergic and Immunologic:** No allergic/immunologic symptoms.

CONFIDENTIAL
AMG 000050

## PCP Acute Care Note

Patient:      MARICEL Q. MARCIAL                SSN:      XXX-XX-7272
Encounter:    Apr 2 2014 3:15PM                 EMRN:     00341329

**Active Problems**
Breast Fibrocystic Disease  (610.1)
Neck Strain  (847.0);
* post MVA, 12 Aug 2009
Normal Routine History And Physical  (V70.0)
Palpitations  (785.1)
Tuberculin PPD Induration Positive Interpretation  (795.5)
Visit For: Screening Exam Pulmonary Tuberculosis  (V74.1)
Visit For: Single System Exam Gynecological With Pap Smear  (V72.31).
**PMH**
Breast Palpation Mass (611.72).
**PSH**
Denied History Of Prior Surgery.
**Family Hx**
Breast Cancer (V16.3); Maternal second cousin diagnosed in her 40's
Breast Cancer; Paternal Aunt (V16.3), diagnosed in her 60's
Diabetes Mellitus (V18.0)
Duct, Solid Type, Carcinoma In Situ Of The Breast; Mother; diagnosed at age 54.
**Personal Hx**
Denied Alcohol
Denied Considered Quitting Drinking Alcohol
Denied Drinking Alcohol Regularly, Feeling Guilty About It
Denied Drug Use
Exercising Regularly
Denied Getting Angry When Talked To About Drinking
Denied Having A Drink Or Two In The Morning To Get Going
Never A Smoker
Denied Tobacco Use.
**Allergies**
No Known Drug Allergy.
**Current Meds**
No Reported Medications;; RPT.
**Vital Signs**
Recorded by Kling,Geraldine on 02 Apr 2014 03:30 PM
BP 100/70,  LUE,  Sitting,
HR: 72 b/min,  L Radial, Regular,
Temp. 97 F,  Tympanic,
Height: 64 in, Weight: 145.1875 lb, BMI: 24.9 kg/m2,
BMI Calculated: 24.92 ,
BSA Calculated: 1.71.
**Physical Exam**
**Vital Signs:**
   ° Current vital signs reviewed.
**General Appearance:**
   • General appearance   ° Well-appearing.
**Head:**
   ° Normal.
**Neck:**
   Thyroid: ° Showed no abnormalities.
**Eyes:**

CONFIDENTIAL                                   AMG 000051

## PCP Acute Care Note

Patient: MARICEL Q. MARCIAL      SSN: XXX-XX-7272
Encounter: Apr 2 2014 3:15PM      EMRN: 00341329

General/bilateral:
   ° Eyes: normal.
**Ears, Nose, Throat:**
   ° ENT: normal.
**Ears:**
   General/bilateral:
     ° Ears: normal.
**Nose:**
   General/bilateral:
     ° Nose: normal.
**Oral Cavity:**
   ° Normal.
**Pharynx:**
   ° Normal.
**Lymph Nodes:**
   ° Normal.
**Lungs:**
   ° Normal breath sounds/voice sounds. ° No wheezing was heard. ° No rhonchi were heard.
**Cardiovascular:**
   Heart Rate And Rhythm: ° Normal. ° Heart rate was normal. ° Heart rhythm regular.
   Heart Sounds: ° Normal.
   Murmurs: ° No murmurs were heard.
   Arterial Pulses: ° Equal bilaterally and normal.
   Edema: ° No pitting edema.
**Abdomen:**
   ° Normal.
   Liver: ° Normal to palpation.
**Musculoskeletal System:**
   General/bilateral: ° Musculoskeletal system: normal.
**Neurological:**
   • System: positive dix hallpike maneuver with rotation to the right.
   Speech: ° Normal.
   Lateralizing Cortical Functions: ° Normal.
   Cranial Nerves: ° Normal.
   Sensation: ° No sensory exam abnormalities were noted.
   Coordination / Cerebellum: ° No coordination/cerebellum abnormalities were noted.
**Skin:**
   ° Normal.
**Assessment**
Vertigo (780.4).
Anxiety (300.00).
**Orders**
CBC WITH AUTOMATED DIFFERENTIAL, Requested for: 02 Apr 2014.
BASIC METABOLIC PNL; Requested for: 02 Apr 2014
TSH, Requested for: 02 Apr 2014.
CD ECHO 2D COMPLETE W DOP AND COLOR-ADLT, Requested for: 02 Apr 2014.
BuPROPion HCl ER (SR) 150 MG Oral Tablet Extended Release 12 Hour,TAKE 1 TABLET DAILY FOR 1
WEEK, THEN TAKE 1 TABLET TWICE DAILY, Qty60, R0; Rx.
**Plan**
41 year old female presents with lightheadedness

CONFIDENTIAL      AMG 000052

**PCP Acute Care Note**

Patient:    MARICEL Q. MARCIAL       SSN:    XXX-XX-7272
Encounter:   Apr 2 2014 3:15PM         EMRN:  00341329

Vertigo:
- most likely BPPV given positive dix hallpike maneuver
- orthostatics negative
- EKG 4/1/14 from urgent care reveals NSR
- will order CBC, BMP, TSH
- will order 2D echo
- note given for school

Anxiety:
- will try bupropion 150 mg daily x1 week, then increase to BID

F/U in 1 week

Seen and discussed at time of visit. Pt with c/o dizziness and palpitations. She is under a lot of stress at school, feels she is being misused. She is tearful and depressed. Has normal exam, some nystagmus with dix hallpike. Agree with plan, trial of bupropion and f/u as noted. TH.

**Past Meds**
~~Citalopram Hydrobromide 20 MG Oral Tablet,; Qty30; R0; RPT.~~
No Reported Medications;; Qty0; R0; RPT.

**Signature**
Electronically signed by : Geraldine Kling CMA; 04/02/2014 3:38 PM CST.
Electronically signed by : KIMBERLY TRAN DO; 04/02/2014 4:42 PM CST, Author.
Electronically signed by : THOMAS HOLMES M.D.; 04/02/2014 4:50 PM CST.

CONFIDENTIAL        AMG 000053

**AMG-Sykes**

2545 S. Martin Luther King Drive
Chicago,IL 60616
(312) 842-7117

| | |
|---|---|
| Patient: | MARCIAL, MARICEL Q |
| EMRN: | 00341329 |
| OMRN: | 00341329 |
| DOB: | 21Jan1973 |

## Encounter Form

| | | | |
|---|---|---|---|
| Encounter Date | 10Aug2012  9:00AM | Billing Provider: | MARCUS, SETH |
| Provider: | COUNSELOR,GENETICS (29001   ) | Compliance Code: | |
| Dept: | Genetics,1875 Dempster | Performing Provider: | MARCUS, SETH |
| Appt Loc: | 1875 Dempster,genetics Parkside | Referring Provider: | DOLAN,JAMES 04852 HTI |
| For: | | Division: | GENETICS |
| Appt No.: | 17361936 | Location: | PARKSIDE GENETICS |
| Pt Ins: | HMO HUMANA/ADVOCATE | Billing Area: | GENETICS PARKSIDE 166 |
| Special Billing: | | Special Billing Date: | |
| CRF#: 100004851 | | | |

### Diagnoses

| Primary | # | Code | Description |
|---|---|---|---|
| Yes | 1 | O | Family history breast cancer |

### Charges

| Status | Units | Code | Mod | Description | Linked DX | Submitted by |
|---|---|---|---|---|---|---|
| Submitted | 2 | 96040 | | GENETIC COUNSELING, EA 30 MIN | | Schulz, Marjorie |

LMRP:  J6 Medicare Adminitrative Contractor (MAC) National Government Services (NGS) (IL)

CONFIDENTIAL                                                                                    AMG 000054

**Advocate Medical Group**
**AMG-Sykes**
2545 S. Martin Luther King Drive
Chicago, IL 60616
(312) 842-7117

---

**Genetics Counseling Report**
08/10/2012 9:00AM

Patient:
MARICEL MARCIAL
2616 N SPAULDING APT 3
CHICAGO, IL 60647

MRN:  00341329
DOB:   01/21/1973
Phone: (847) 809-5669

**Chief Complaint**
• Family History of Cancer
**Referred By**
Consultation requested by: Dr. Dolan.
**Counseling/Coordination of Care**
Ms. Marcial came to Genetics to investigate a possible hereditary cause of the family history of breast cancer.

History.
Ms. Marcial is a 39 yo woman with no personal history of cancer. For more than 10 years she has had palpable thickening of the right breast. She has had mammograms. Ms. Marcial reports that her mother, now 64, had ductal carcinoma in situ at age 55, a maternal aunt who was a cigarette smoker died of lung cancer at ~50, a maternal first cousin once-removed died in the Philippines in the 1980's in her 40's of breast cancer. On the paternal side of the family, a paternal aunt who was a cigarette smoker died of lung cancer at ~58, another paternal aunt, who is now 65, was diagnosed with invasive ductal carcinoma at 65, and the paternal grandfather, who died at 84, had prostate cancer in his 70's.

I discussed in detail the implications of the history of cancer. Most cancer is not due to a hereditary gene mutation. Hereditary cancer is suspected under certain conditions, such as when breast cancer occurs prior to the age of 50 (or premenopausal), when there are multiple affected family members, when breast cancer occurs in combination with other cancers, especially ovarian cancer, when breast cancer occurs on both the right and left sides (bilateral), and when cancer appears to be passing from generation to generation.

Neither the maternal nor paternal family histories are highly suggestive of a hereditary origin. The one relative with early onset breast cancer is a fourth degree relative of Ms. Marcial, that is, not very closely related. Ms. Marcial's mother's family is unrelated to her father's family, neither breast cancer nor prostate cancer is rare nor is lung cancer in cigarette smokers, and the other individuals with breast cancer/DCIS did not have it at an early age. While a hereditary origin to some or all of the cancer in the family is possible, there is not a high statistical probability of a hereditary mutation cause. While genetic testing is not often performed with such a history, if the family wishes to pursue testing, they may wish to first have testing performed on Ms. Marcial's mother: when genetic testing is performed in a family it is usually most informative to begin testing an affected family member first. The pro and cons of cancer predisposing gene mutation testing were reviewed with Ms. Marcial. Mutations in the genes BRCA1 and BRCA2 account for most cases (but not all) of hereditary breast cancer. If a mutation were found it would significantly alter risk assessment and medical management - but finding a mutation is this family at this time is not highly likely.

Printed By: Anita Powell                    1 of 2                    11/7/17 8:22:23 PM

## Genetics Counseling Report

| | | | |
|---|---|---|---|
| Patient: | MARICEL Q. MARCIAL | SSN: | XXX-XX-7272 |
| Encounter: | Aug 10 2012 9:00AM | EMRN: | 00341329 |

Ms. Marcial and family members should utilize screening methods for cancer. It may also be helpful to reduce the risk of certain cancers by diet, exercise, and possible food/supplement intake.

Ms. Marcial decided not to proceed with genetic testing at this time.

If she has questions or wishes to have genetic testing she should call. In light of he fact that there continues to be many advances in cancer genetics, Ms. Marcial should maintain contact with a genetic professional to keep informed of any new developments.

**Signature**
Electronically signed by . Seth Marcus MS,LCGC, 08/10/2012 1:56 PM CST.

CONFIDENTIAL

AMG 000056

**Advocate Medical Group**
AMG-Sykes
2545 S. Martin Luther King Drive
Chicago, IL 60616
(312) 842-7117

---

*Result Note*
06/26/2012 4:30PM

**Patient:** MARICEL Q. MARCIAL
**MRN:** 00341329
**DOB:** 01/21/1973

**Discussion/Summary**
Maricel- Your pap smear from 6/19/12 was Normal

**Signatures**
Dr. James Dolan
Electronically signed by : Nicole Marcheschi, R.N.; Jun 26 2012 4:31PM (Co-author)

CONFIDENTIAL

AMG 000057

## AMG-Sykes

2545 S. Martin Luther King Drive
Chicago,IL 60616
(312) 842-7117

| Patient: | MARCIAL, MARICEL Q |
|---|---|
| EMRN: | 00341329 |
| OMRN: | 00341329 |
| DOB: | 21Jan1973 |

### Encounter Form

| | | | | |
|---|---|---|---|---|
| Encounter Date | 19Jun2012  2:30PM | | Billing Provider: | DOLAN, JAMES |
| Provider: | DOLAN,JAMES (3606        ) | | Compliance Code: | |
| Dept: | Gyn/onc,1700 Luther Lane | | Performing Provider: | DOLAN, JAMES |
| Appt Loc: | 1700 Luther Lane, Cancer Care Center | | Referring Provider: | |
| For: | | | Division: | GYNE/ONCOLOGY |
| Appt No.: | 16783980 | | Location: | WEST PAVILION |
| Pt Ins: | HMO HUMANA/ADVOCATE | | Billing Area: | GYNE ONCOLOGY W PAVILION 162 |
| Special Billing: | | | Special Billing Date: | |
| CRF #: | | | | |

### Diagnoses

| Primary | # | Code | Description |
|---|---|---|---|
| Yes | 1 | 0 | ROUTINE GYNE EXAM |
| | 2 | 0 | Fibrocystic breasts |

### Charges

| Status | Units | Code | Mod | Description | Linked DX | Submitted by |
|---|---|---|---|---|---|---|
| Submitted | 1 | 99214 | | Est Patient: Mod Complexity | | Branick, Mary |

CONFIDENTIAL                                                                                    AMG 000058

**Advocate Medical Group**
**AMG-Sykes**
2545 S. Martin Luther King Drive
Chicago, IL 60616
(312) 842-7117

---

**Gyne Onc Consult - New Patient Visit**
06/19/2012 2:30PM

Patient:
MARICEL MARCIAL
2616 N SPAULDING APT 3
CHICAGO, IL 60647

MRN: 00341329
DOB: 01/21/1973
Phone: (847) 809-5669

**Chaperone**
Jun 19, 2012

Chaperone : Nicole.
**Physicians**
Primary Care Physician: Dr. Mark Conley
Requested by:
**Chief Complaint**
• MARICEL MARCIAL, a 39 year existing Breast Center patient is here for an Annual Breast Exam. Patient has a history of a palpable thickening in right breast for the past 10+ years. Patient was due for a mammogram prior to this apt - scheduled for 4:20pm today

Patient would like a pap smear
**Quality**
    No tobacco use and not a former smoker.
**HPI**
    She reported: Breast symptoms. Thickened area of skin in right breast more prominent around menses, unchanged for many years. Denies nipple discharge.
    No pulmonary symptoms. Normal appetite, no nausea, no vomiting, and no change in stool. No urinary symptoms and no vaginal discharge or abnormal vaginal bleeding. Patient having a little residual spotting from menses 6/15/12.
**Last Screening**
Last PAP : 2004 Normal with Dr. Pesch. No h/o abnormal paps.

Last Mammogram:
Patient Name    MARCIAL,MARICEL
MRN    692103        Date of Birth    01/21/1973
Ordered By    CONLEY, MARK
Procedure Date   04/04/2011
Orig Approved By        FRIEDEWALD, SARAH
* Final Report *

#32448574 - MA FFDM DIAGNOSTIC W CAD BIL
# BILATERAL DIGITAL DIAGNOSTIC MAMMOGRAM WITH CAD: 4/4/2011
CLINICAL HISTORY:The patient is a 38 year old woman who presents with a palpable abnormality in her right breast.

FINDINGS:

Printed By: Anita Powell        1 of 6        11/7/17 8:22:32 PM

CONFIDENTIAL                                                                                    AMG 000059

## Gyne Onc Consult - New Patient Visit

Patient:    MARICEL Q. MARCIAL          SSN:    XXX-XX-7272
Encounter:  Jun 19 2012 2:30PM          EMRN:   00341329

The tissue of both breasts is extremely dense, which lowers the sensitivity of mammography.
No significant masses, calcifications, or other findings are seen in either breast.
Current study was also evaluated with a Computer Aided Detection (CAD) system.

IMPRESSION: ADDITIONAL IMAGING EVALUATION RECOMMENDED
BIRADS Category 0, additional imaging is recommended. Negative mammogram.
Recommendation: Ultrasound of the right breast is recommended.

---

#32448575 - MA US BREAST RT
ULTRASOUND OF THE RIGHT BREAST : 4/4/2011
FINDINGS
Real-time ultrasound was performed on the area of interest in the right breast.

No abnormality is identified in the region of the patient's palpable abnormality in the right breast at 10:00, 3 cm from the nipple.

IMPRESSION: NEGATIVE
BIRADS Category 1, negative. There is no mammographic or sonographic evidence of malignancy.

Recommendation: Management of the patient's palpable abnormality should be based on clinical grounds. A 1 year screening mammogram is recommended.

Findings and recommendations were discussed with the patient at the time of the examination both verbally and in writing.

Sarah Friedewald M.D.

**** FINAL ****
Signature Line
Electronically Signed
FRIEDEWALD, SARAH

---

Patient Name    MARCIAL,MARICEL
MRN    692103        Date of Birth    01/21/1973
Test Description: MA FFDM DIAGNOSTIC W CAD BIL
Ordered By    DOLAN, JAMES
Procedure Date    11/12/2009
Orig Approved By    KEZDI ROGUS, PAULA
* Final Report *
#30180708 - MA FFDM DIAGNOSTIC W CAD BIL
# BILATERAL DIGITAL DIAGNOSTIC MAMMOGRAM WITH CAD  11/12/2009

FINDINGS:
The tissue of both breasts is extremely dense, which lowers the sensitivity of mammography.
The grouped and scattered punctate calcifications in the superior and medial right breast are unchanged.
No significant masses, calcifications, or other findings are seen in either breast.
Current study was also evaluated with a Computer Aided Detection (CAD) system.

CONFIDENTIAL                                                      AMG 000060

## Gyne Onc Consult - New Patient Visit

| | | | |
|---|---|---|---|
| Patient: | MARICEL Q. MARCIAL | SSN: | XXX-XX-7272 |
| Encounter: | Jun 19 2012 2:30PM | EMRN: | 00341329 |

IMPRESSION: ADDITIONAL IMAGING EVALUATION RECOMMENDED
Ultrasound of the palpable area in the right breast is recommended.

Ultrasound of the 10-12 o'clock right breast and 1-5 o'clock right breast in the region of the dense tissue and calcifications is recommended.

The patient could not stay for the ultrasound exam and will reschedule.

The findings and recommendations were discussed with the patient at the time of the examination both verbally and in writing.

MAMMOGRAPHY BI-RADS: 0 - ADDITIONAL IMAGING EVALUATION RECOMMENDED

Paula Kezdi-Rogus MD
**** FINAL ****

---

Patient Name     MARCIAL,MARICEL
MRN    692103         Date of Birth     01/21/1973
Test Description: MR BREAST BIL WO/W CON
Ordered By     DOLAN, JAMES
Procedure Date  01/20/2009
Orig Approved By         FRIEDEWALD, SARAH
* Final Report *
FINDINGS.
The breasts demonstrates moderate background enhancement which limits the sensitivity of breast MRI.

There is bilateral symmetric nodular enhancement of both breasts which demonstrates rapid contrast uptake and persistant delayed enhancement. No suspicious enhancing nodules with washout of contrast are identified with particular attention to the region of the patient's palpable abnormality in the right breast.

Evaluation of the axillary regions demonstrate normal appearing lymph nodes. Evaluation of the internal mammary regions is unremarkable.

IMPRESSION: PROBABLY BENIGN
BIRADS Category 3, probably benign findings. Bilateral symmetric nodular enhancement of both breasts with no suspicious enhancing lesions.

Recommendation: A follow-up mammogram in 6 months is recommended to demonstrate stability of the microcalcifications in the upper outer quadrant and the lower inner quadrant of the right breast as previously recommended. A 1 year bilateral breast MRI is also recommended given the patient's strong family history to ensure stability of the nodular breast enhancement.

Sarah Friedewald M.D.

**** FINAL ****
Signature Line
Electronically Signed
FRIEDEWALD, SARAH

---

CONFIDENTIAL                                                                 AMG 000061

**Gyne Onc Consult - New Patient Visit**

| | | | |
|---|---|---|---|
| Patient: | MARICEL Q. MARCIAL | SSN: | XXX-XX-7272 |
| Encounter: | Jun 19 2012  2:30PM | EMRN: | 00341329 |

Last Colorectal Screening:
Last DEXA Scan:
Last Chest X-Ray: 12/14/11 Impression: No acute cardiopulmonary disease radiographically.

Last Labs:
CT Scan:
**Active Problems**
Breast Palpation Mass (611.72)
Neck Strain (847.0);
* post MVA, 12 Aug 2009
Normal Routine History And Physical (V70.0)
Palpitations (785.1)
Tuberculin PPD Induration Positive Interpretation (795.5)
Visit For Screening Exam Pulmonary Tuberculosis (V74.1)
**PGH**
G: 0 P: 0
LMP: 6/15/12, regular
METHOD OF BC: None
Menarche age 13.
**PMH**
Reviewed
**PSH**
Denied History Of Prior Surgery.
**Current Meds**
No Reported Medications;, RPT
**Allergies**
No Known Drug Allergy.
**Family Hx**
Family history of Breast Cancer, Maternal second cousin diagnosed in her 40's
Paternal aunt's history of Breast Cancer; diagnosed in her 60's
Family history of Diabetes Mellitus
Maternal history of Duct, Solid Type, Carcinoma In Situ Of The Breast; diagnosed at age 54
**Personal Hx**
Denied Alcohol
Denied Considered Quitting Drinking Alcohol
Denied Drinking Alcohol Regularly, Feeling Guilty About It
Denied Drug Use
Exercising Regularly
Denied Getting Angry When Talked To About Drinking
Denied Having A Drink Or Two In The Morning To Get Going
Never A Smoker
Denied Tobacco Use.
**ROS**
**Eyes:** No eye symptoms.
**Otolaryngeal:** No ear symptoms, no nasal symptoms, and no throat symptoms
**Cardiovascular:** No cardiovascular symptoms.
**Gastrointestinal:** No gastrointestinal symptoms.
**Genitourinary:** No genitourinary symptoms.
**Endocrine:** No endocrine symptoms.

CONFIDENTIAL

**Gyne Onc Consult – New Patient Visit**

| | | | |
|---|---|---|---|
| Patient: | MARICEL Q. MARCIAL | SSN: | XXX-XX-7272 |
| Encounter: | Jun 19 2012  2:30PM | EMRN: | 00341329 |

**Hematologic:** No hematologic symptoms.
**Neurological:** No neurological symptoms.
**Psychological:** No psychological symptoms.
**Skin:** No skin symptoms.
**Vital Signs**
 Recorded by Marcheschi,Nicole on 19 Jun 2012 02:49 PM
 BP 118/64, LUE,
 Height: 65.000000 in, Weight: 139.500000 lb, BMI: 23.2 kg/m2,
 BSA Calculated: 1.70 ,
 BMI Calculated: 23.24.
**Physical Exam**
**General Appearance:**
  ° Normal.
**Head:**
  ° Normal.
**Neck:**
  Thyroid: ° Showed no abnormalities.
**Ears, Nose, Throat:**
  ° ENT: normal.
**Lymph Nodes:**
  ° Normal.  ° Axillary lymph nodes were not enlarged.  ° Axillary lymph nodes were not enlarged bilaterally.
**Breasts:**
  General/bilateral.
    ° Breasts: normal.  ° Appearance of the breast was normal.  ° Palpation of the breast revealed no
      abnormalities.
  Right Breast:
    ° Normal.
  Left Breast:
    ° Normal.
**Lungs:**
  ° Normal.
**Cardiovascular:**
  ° System: normal.
**Abdomen:**
  ° Normal.
**Musculoskeletal System:**
  General/bilateral ° Musculoskeletal system: normal.
**Neurological:**
  ° System: normal.
**Gyne Exam**
  The inguinal lymph nodes were not enlarged. Genitalia, normal  and the vagina was normal. Cervix normal
  and showed no lesion  The uterus was normal  and the uterine adnexae were normal. Rectal Exam: normal. A
  stool sample was taken for occult blood analysis. A fecal occult blood test was negative.
**Assessment**
  • Visit for: gynecological exam with pap smear  (V72.31)
  • History of a breast mass was found  (611.72)
  • Breast fibrocystic disease  (610.1)
**Plan**
Pap Smear done
Mammogram    Bilateral will perform today

CONFIDENTIAL                                                                                    AMG 000063

## Gyne Onc Consult - New Patient Visit

| | | | |
|---|---|---|---|
| Patient: | MARICEL Q. MARCIAL | SSN: | XXX-XX-7272 |
| Encounter: | Jun 19 2012 2:30PM | EMRN: | 00341329 |

Pt to see Genetics re risk of BRCA mutation and need for poss testing
Return to office: here prn or 12 months for breast check
Follow up gen Gyne, Contact ionfo given for AMG Gen Gyne
Amended : JAMES DOLAN M.D.; 06/19/2012 3:15 PM CST
**Signature**
Electronically signed by : JAMES DOLAN M.D., 06/19/2012 3:13 PM CST; Author.
Electronically signed by : JAMES DOLAN M.D., 06/19/2012 3:14 PM CST; Author.
Electronically signed by : JAMES DOLAN M.D., 06/19/2012 3:42 PM CST; Author.

CONFIDENTIAL

AMG 000064

# AMG-Sykes

### 2545 S. Martin Luther King Drive
### Chicago, IL 60616
### (312) 842-7117

| | | | |
|---|---|---|---|
| Patient: | MARCIAL, MARICEL Q<br>2616 N SPAULDING APT 3<br>CHICAGO, IL 60647 | Age/Sex/DOB: | 44 yrs  F  21-Jun-1973 |
| | | EMRN: | 00341329 |
| | | OMRN: | 00341329 |
| | | Home: | (847) 809-5669 |
| | | Work: | (847) 723-0122 |

## Results

| | | |
|---|---|---|
| Lab Accession # | RG12-55154 | |
| Ordering Provider: | DOLAN,JAMES | |
| Performing Location: ACL | | |

| | |
|---|---|
| Collected: | 06/19/2012  12:00:00AM |
| Resulted: | 06/26/2012  3:02:00PM |
| Verified By: | DOLAN, JAMES |
| Auto Verify: | N |

### PAP SMEAR WITH HPV REFLEX (THIN PREP ONLY)

Stage:    Final

| | | |
|---|---|---|
| Result<br>Annotations: | 06/26/2012  4:30:00PM<br>letter sent | Marcheschi, Nicole |

| Test | Result | Units | Flag Reference Range |
|---|---|---|---|
| GYN PAP WITH HPV (THIN PREP ONLY) | | | O |

```
         Name: MARCIAL, MARICEL Q.              MRN:      00341329
         DOB:  01/21/1973                       Visit#:   16783980/ACL-LU916.2171

                          Gynecologic Cytology Consultation Report

         Client: LU916 AMG IL/GYNE-ONCOLOGY

         Date Specimen Collected: 06/19/12        Accession #:  RG12-55154
         Date Specimen Received:  06/19/12        Requisition
         #:7832300AM12171THINHPV
         Date Reported:           6/26/2012 15:02


         _____
         Cytologic Interpretation :

         Negative for intraepithelial lesion or malignancy.

         Satisfactory for evaluation.  Presence of endocervical/transformation zone
         component.


         Priya X Patel, CT (ASCP)
         ** Electronic Signature (PXP) 6/26/2012   15:02 **

         Educational note:  The Pap test is a screening test with a well-recognized
         false negative rate.  The best means available to lower the false negative
         rate and to detect early cervical lesions is a Pap test at regular intervals.
         All ThinPrep Paps will be reviewed with the aid of the ThinPrep Imaging
         System, unless otherwise specified.
```

CONFIDENTIAL                                                                                    AMG 000065

Patient: **MARCIAL, MARICEL Q**          EMRN: **00341329**

| Test | Result | Units | Flag Reference Range |
|------|--------|-------|----------------------|

Clinical Information:
LMP: 6/15/12
Other Clinical Conditions:Previous Pap: Negative

ABN-N/A
DX:V72.31,ROUTINE GYNECOLOGICAL EXAMINATION
LMP:6/15/12
ABNORMAL BLEEDING:N
POST MENOPAUSAL:N
POST-PARTUM:N
PRE-MENOPAUSAL:Y
HISTORY OF COLPOSCOP:N
SOURCE: ENDOCERVICAL:Y
SOURCE: VAGINAL:N
SOURCE: VULVAR:N
HISTORY OF CANCER:N
CONTRACEPTIVE HISTORY:N
DIAGNOSTIC:V72.31
HYSTERECTOMY:NO
PREVIOUS PAP:NEGATIVE
PREVIOUS PAP:LOW RISK (V76.2)

Specimen(s) Submitted:
Thin Prep HPV Reflex (E-Order)

ICD-9 Codes:
 V72.31 V76.2

Fee Codes:
 A: T-88175-IL

Performing Lab Location (Unless otherwise specified):
ACL Illinois Central Laboratory
5400 Pearl Street Rosemont, IL. 60018

CONFIDENTIAL          AMG 000066

**AMG-Sykes**

2545 S. Martin Luther King Drive
Chicago,IL 60616
(312) 842-7117

| | |
|---|---|
| Patient: | MARCIAL, MARICEL Q |
| EMRN: | 00341329 |
| OMRN: | 00341329 |
| DOB: | 21Jan1973 |

### Encounter Form

| | | | |
|---|---|---|---|
| Encounter Date | 25Jan2012 | Billing Provider: | CONLEY, MARK |
| Division: | GENERAL INTERNAL MEDICINE | Compliance Code: | |
| Location: | NESSET INTERNAL MEDICINE | Performing Provider: | STERL, KARIN |
| Billing Area: | INT MED NESSET 140 | Referring Provider: | |
| Pt Ins: | HMO HUMANA/ADVOCATE | | |
| Special Billing: | | Special Billing Date: | |
| CRF#: | | | |

### Diagnoses

| Primary | # | Code | Description |
|---|---|---|---|
| Yes | 1 | 0 | Gen Exam |

### Charges

| Status | Units | Code | Mod | Description | Linked DX | Submitted by |
|---|---|---|---|---|---|---|
| Submitted | 1 | 86762 | | RUBELLA ANTIBOD_86762 | | Zavala, Leslie |
| Submitted | 1 | 86765 | | RUBEOLA ANTIBODY_86765 | | Zavala, Leslie |
| Submitted | 1 | 86735 | | MUMPS ANTIBODY_86735 | | Zavala, Leslie |

CONFIDENTIAL

AMG 000067

# AMG-Sykes

**2545 S. Martin Luther King Drive**
**Chicago,IL 60616**
**(312) 842-7117**

| | |
|---|---|
| Patient: MARCIAL, MARICEL Q | Age/Sex/DOB: 44 yrs  F  21-Jan-1973 |
| 2616 N SPAULDING APT 3 | EMRN: 00341329 |
| CHICAGO, IL 60647 | OMRN: 00341329 |
| | Home: (847) 809-5669 |
| | Work: (847) 723-0122 |

## Results

| | | | |
|---|---|---|---|
| Lab Accession # R001226269MUMG2012 | | Collected: 01/25/2012  7:00:00PM | |
| Ordering Provider: STERL,KARIN | | Resulted: 01/27/2012  10:56:00AM | |
| Performing Location: ACL CENTRAL LAB IL | | Verified By: STERL, KARIN | |
| 5400 PEARL ST | | Auto Verify: N | |
| ROSEMONT, IL 60018-5320 | | | |

**MUMPS IGG (IMMUNE)**                                    Stage:        **Final**

| Test | Result | Units | Flag Reference Range |
|---|---|---|---|
| MUMPS IGG (IMMUNE) | 2.20 | OD RATIO | <0.91 |

    < OR = 0.90. Negative. No significant level
       of IgG antibody detected.
    0.91-1.09. Equivocal.  Suggest repeat testing.
    > or = 1.10.  Positive. Significant level
       of detectable IgG antibody.

CONFIDENTIAL                                                                        AMG 000068

2545 S. Martin Luther King Drive

# AMG-Sykes

2545 S. Martin Luther King Drive
Chicago,IL 60616
(312) 842-7117

| | | | |
|---|---|---|---|
| Patient: | MARCIAL, MARICEL Q | Age/Sex/DOB: | 44 yrs  F  21-Jan-1973 |
| | 2616 N SPAULDING APT 3 | EMRN: | 00341329 |
| | CHICAGO, IL 60647 | OMRN: | 00341329 |
| | | Home: | (847) 809-5669 |
| | | Work: | (847) 723-0122 |

## Results

| | | | |
|---|---|---|---|
| Lab Accession # | R001226269RUBEL2012 | Collected: | 01/25/2012  7:00:00PM |
| Ordering Provider: | STERL,KARIN | Resulted: | 01/26/2012  3:11:00AM |
| Performing Location: | ACL CENTRAL LAB IL | Verified By: | STERL, KARIN |
| | 5400 PEARL ST | Auto Verify: | N |
| | ROSEMONT, IL 60018-5320 | | |

__RUBELLA ANTIBODY IGG__                                        Stage:        Final


| Test | Result | Units | Flag | Reference Range |
|---|---|---|---|---|
| RUBELLA ANTIBODY, IGG | >500.0 | UNITS/ML | | >9.9 |

     <5.0 Units/mL = Negative for IgG antibodies (Non immune)
   5.0 to 9.9 Units/mL = Equivocal (Non Immune)
     >9.9 Units/mL = Immune

Result does not represent an antibody titer.

CONFIDENTIAL                                                                                AMG 000069

**AMG-Sykes**

2545 S. Martin Luther King Drive
Chicago, IL 60616
(312) 842-7117

| | | | |
|---|---|---|---|
| **Patient:** | MARCIAL, MARICEL Q | **Age/Sex/DOB:** | 44 yrs  F  21-Jan-1973 |
| | 2616 N SPAULDING APT 3 | **EMRN:** | 00341329 |
| | CHICAGO, IL 60647 | **OMRN:** | 00341329 |
| | | **Home:** | (847) 809-5669 |
| | | **Work:** | (847) 723-0122 |

## Results

| | | | |
|---|---|---|---|
| Lab Accession # | R001226269MEAI2012 | Collected: | 01/25/2012  7:00:00PM |
| Ordering Provider: | STERL, KARIN | Resulted: | 01/26/2012  10:17:00AM |
| Performing Location: | ACL-WI Central Lab | Verified By: | STERL, KARIN |
| | 8901 WEST LINCOLN AVENUE | Auto Verify: | N |
| | WEST ALLIS, WI 53227 | | |

**RUBEOLA IMMUNITY IGG**                                        Stage:     Final

| Test | Result | Units | Flag Reference Range |
|---|---|---|---|
| RUBEOLA IGG (IMMUNE) | 5.57 | OD RATIO | >1.09 |

    0.90 or less OD Ratio is Negative for IgG antibodies (Not Immune).
    0.91 to 1.09 OD Ratio is Equivocal (Not Immune).
    1.10 or greater OD Ratio is Positive for IgG antibodies (Immune).

CONFIDENTIAL                                                                          AMG 000070

**AMG-Sykes**

2545 S. Martin Luther King Drive
Chicago, IL 60616
(312) 842-7117

| | |
|---|---|
| Patient: | MARCIAL, MARICEL Q |
| EMRN: | 00341329 |
| OMRN: | 00341329 |
| DOB: | 21Jan1973 |

### Encounter Form

| | | | |
|---|---|---|---|
| Encounter Date | 30Dec2011 | Billing Provider: | HOLMES, THOMAS |
| Division: | GENERAL INTERNAL MEDICINE | Compliance Code: | |
| Location: | NESSET INTERNAL MEDICINE | Performing Provider: | STERL, KARIN |
| Billing Area: | INT MED NESSET 140 | Referring Provider: | |
| Pt Ins: | HMO HUMANA/ADVOCATE | | |
| Special Billing: | | Special Billing Date: | |
| CRF #: | | | |

### Diagnoses

| Primary | # | Code | Description |
|---|---|---|---|
| Yes | 1 | O | Gen Exam |

### Charges

| Status | Units | Code | Mod | Description | Linked DX | Submitted by |
|---|---|---|---|---|---|---|
| Submitted | 1 | 83036 | | HGB, GLYCATED_83036 | | Zavala, Leslie |

Printed by: Powell, Anita      1      Date 11/7/17 8:22PM

CONFIDENTIAL

AMG 000071

Case: 1:16-cv-06109 Document #: 108 Filed: 10/04/18 Page 396 of 475 PageID #:3173

# AMG-Sykes

2545 S. Martin Luther King Drive
Chicago,IL 60616
(312) 842-7117

| | | | |
|---|---|---|---|
| **Patient:** | MARCIAL, MARICEL Q | **Age/Sex/DOB:** | 44 yrs  F  21-Jan-1973 |
| | 2616 N SPAULDING APT 3 | **EMRN:** | 00341329 |
| | CHICAGO, IL 60647 | **OMRN:** | 00341329 |
| | | **Home:** | (847) 809-5669 |
| | | **Work:** | (847) 723-0122 |

## Results

| | | | |
|---|---|---|---|
| Lab Accession # | R001193475GLYH2011 | Collected: | 12/30/2011  11:12:00AM |
| Ordering Provider: | STERL,KARIN | Resulted: | 12/30/2011  7:49:00PM |
| Performing Location: | ACL CENTRAL LAB IL | Verified By: | STERL, KARIN |
| | 5400 PEARL ST | Auto Verify: | N |
| | ROSEMONT, IL 60018-5320 | | |

<u>HEMOGLOBIN A1C GLYCOSYLATED</u>                          Stage:        Final

| Test | Result | Units | Flag Reference Range |
|---|---|---|---|
| HEMOGLOBIN A1C GLYH | 5.6 | % | 4.5-5.9 |

| A1C% | eAG mg/dL |
|---|---|
| 6.0 | 126 |
| 6.5 | 140 |
| 7.0 | 154 |
| 7.5 | 169 |
| 8.0 | 183 |
| 8.5 | 197 |
| 9.0 | 212 |
| 9.5 | 226 |
| 10.0 | 240 |

NON DIABETIC                <6%
EXCELLENT CONTROL          6-7%
GOOD TO FAIR CONTROL       >7-8%
SUBOPTIMAL GLYCEMIC CONTROL >8%

Printed by: Powell, Anita  |  11/07/2017  8:22:00PM                                    Page 1 of 1

CONFIDENTIAL                                                                 AMG 000072

# AMG-Sykes

2545 S. Martin Luther King Drive
Chicago, IL 60616
(312) 842-7117

Patient: MARCIAL, MARICEL Q
2616 N SPAULDING APT 3
CHICAGO, IL 60647

Age/Sex/DOB: 44 yrs  F  21-Jan-1973
EMRN: 00341329
OMRN: 00341329
Home: (847) 809-5669
Work: (847) 723-0122

## Results

Lab Accession #   XR-11-0750106AMG
Ordering Provider: STERL, KARIN
Performing Location: AMG NESSET

Collected:  12/13/2011  5:56.00PM
Resulted:   12/13/2011  5:56.00PM
Verified By: STERL, KARIN
Auto Verify: N

XR CHEST PA, LATERAL 2V                                    Stage:      Final

Result          12/14/2011  11.06.00A      STERL, KARIN
Annotations:    called pt and left voicemessage. will recheck blood glucose as pt might not have been fasting for enough hours

| Test | Result | Units | Flag Reference Range |
|------|--------|-------|----------------------|
| XR CHEST PA, LATERAL 2V | | | |

PA and lateral views of the chest demonstrate the lung fields to be free of
infiltrates. There are no effusions. Heart is normal in size and contour.
Pulmonary vascularity is not congested.

Impression: No acute cardiopulmonary disease radiographically.

**** F I N A L ****

Transcribed By: TP
12/14/11 0:15 am

Dictated By:            ONEGY-MD, RICHARD

Electronically Reviewed and Approved By:        ONEGY-MD, RICHARD  12/14/11
0:16 am

CONFIDENTIAL                                                          AMG 000073

**AMG-Sykes**

2545 S. Martin Luther King Drive
Chicago, IL 60616
(312) 842-7117

| Patient: | MARCIAL, MARICEL Q |
|---|---|
| EMRN: | 00341329 |
| OMRN: | 00341329 |
| DOB: | 21 Jan 1973 |

### Encounter Form

| | | | | |
|---|---|---|---|---|
| Encounter Date | 13Dec2011 3:45PM | | Billing Provider: | CONLEY, MARK |
| Provider: | STERL, KARIN (3483 ) | | Compliance Code: | |
| Dept: | Int Med,1775 Ballard-Nesset | | Performing Provider: | STERL, KARIN |
| Appt Loc: | 1775 Ballard, Internal Med Nesset | | Referring Provider: | |
| For: | | | Division: | GENERAL INTERNAL MEDICINE |
| Appt No.: | 16018877 | | Location: | NESSET INTERNAL MEDICINE |
| Pt Ins: | HMO HUMANA/ADVOCATE | | Billing Area: | INT MED NESSET 140 |
| Special Billing: | | | Special Billing Date: | |
| CRF#: | | | | |

### Diagnoses

| Primary | # | Code | Description |
|---|---|---|---|
| Yes | 1 | 0 | Gen Exam |
| | 2 | 0 | Abnl PPD |

### Charges

| Status | Units | Code | Mod | Description | Linked DX | Submitted by |
|---|---|---|---|---|---|---|
| Submitted | 1 | 99395 | | Est Prev Med: Age 18-39 | | Zavala, Leslie |

CONFIDENTIAL

AMG 000074

**Advocate Medical Group**
**AMG-Sykes**
2545 S. Martin Luther King Drive
Chicago, IL 60616
(312) 842-7117

---

**PCP Primary Care Note**
12/13/2011 3:45PM

Patient:
MARICEL MARCIAL
2616 N SPAULDING APT 3
CHICAGO, IL 60647

MRN: 00341329
DOB: 01/21/1973
Phone: (847) 809-5669

**Chief Complaint**
• Visit for: comprehensive medical evaluation

**Chaperone**
N/a.

**Quality**
No tobacco use. Alcohol use. Education: exercising regularly. Printed information given for activities. Influenza immunization, Discussion of regular exercise, No intervention and counseling on cessation of tobacco use.

**HPI**
Pt is here for a physical exam. Has seasonal allergies, well controled with Zyrtec. Has pain in her R shoulder, started taking Ibuprofen and the pain improved. Denies numbness and weakness in that arm. Had a poz PPD in 1994, CXR was normal. Will start shcool at Rush and she needs a CXR. Has a lump in her l breast, it has been stable for years, she sees Dr Dolan for this. PAP smear will be done at her gyneoologists office. Last one was in 2003. Tetanus shot done in 2007. LMP Nov 24th, menstrual periods are regular.

**ROS**
**Systemic:** Enetgy level.
**Head:** No headache.
**Cardiovascular:** No chest pain or discomfort. Palpitations.
**Pulmonary:** No cough and no wheezing.
**Gastrointestinal:** No vomiting, no diarrhea, and no constipation.

**Active Problems**
Breast Palpation Mass (611.72)
Neck Strain (847.0),
" post MVA, 12 Aug 2009
Palpitations (785.1).

**Family Hx**
Family history of Reported Family History Of Cancer; M with br ca
 Diabetes mellitus.

**Personal Hx**
Alcohol: Not having considered quitting drinking, not getting angry when talked to about drinking, not drinking alcohol regularly, and feeling guilty about it, and not having a drink or two in the morning to get going.
Habits: Exercising regularly.
Denied Alcohol
Denied Drug Use
Never A Smoker
Denied Tobacco Use.

**Allergies**

CONFIDENTIAL                                                          AMG 000075

## PCP Primary Care Note

Patient:     MARICEL Q. MARCIAL          SSN:    XXX-XX-7272
Encounter:   Dec 13 2011 3:45PM          EMRN:   00341329

No Known Drug Allergy.
**Current Meds**
No Reported Medications;; RPT
**Vital Signs**
Recorded by Paul,Elizabeth on 13 Dec 2011 04:06 PM
BP:114/68, RUE, Sitting,
HR: 80 b/min, R Radial, Regular,
Height: 64.500000 in, Weight: 143.250000 lb, BMI: 24.2 kg/m2,
BSA Calculated: 1.71 ,
BMI Calculated: 24.16.
**Physical Exam**
**Vital Signs:**
    ° Current vital signs reviewed.
**General Appearance:**
    ° Normal.
**Neck:**
    ° Normal.
**Ears, Nose, Throat:**
    ° ENT: normal.
**Lymph Nodes:**
    ° Normal.
**Lungs:**
    ° Normal.
**Cardiovascular:**
    Auscultation: ° Normal.
    Arterial Pulses. ° Equal bilaterally and normal.
**Abdomen:**
    Auscultation: ° Abdominal auscultation revealed no abnormalities.
    Palpation: ° Abdominal palpation revealed no abnormalities.
**Skin:**
    ° Normal.
**Results**
CBC WITH AUTOMATED DIFFERENTIAL  13 Dec 2011 11:01 AM
-  WBC: 6.0 K/mcL  Reference Range: 4.2-11.0
-  RBC: 4.29 mil/mcL  Reference Range: 4.00-5.20
-  HEMOGLOBIN: 13.4 g/dl  Reference Range: 12.0-15.5
-  HEMATOCRIT: 39.2 %  Reference Range: 36.0-45.6
-  MCV: 91.4 fL  Reference Range: 78.0-100.0
-  MCH: 31.2 pg  Reference Range: 26.0-34.0
-  MCHC: 34.2 g/dl  Reference Range: 32.0-36.5
-  RDWCV: 12.4 %  Reference Range: 11.0-15.0
-  PLATELET: 248 K/mcL  Reference Range: 140-450
-  NEU%: 65 %  Reference Range: 33-69
-  LYM%: 23 %  Reference Range: 20-55
-  MON% 9 %  Reference Range: 0-10
-  EOS% 3 %  Reference Range: 0-6
-  BASO%: 1 %  Reference Range: 0-2
-  NEU ABS: 3.9 K/mcL  Reference Range: 1.8-7.7
-  LYM ABS: 1.4 K/mcL  Reference Range: 1.0-4.8
-  MON ABS: 0.5 K/mcL  Reference Range: 0.3-0.9

CONFIDENTIAL                                                          AMG 000076

**PCP Primary Care Note**

Patient: MARICEL Q. MARCIAL      SSN: XXX-XX-7272
Encounter: Dec 13 2011 3:45PM      EMRN: 00341329

- EOS ABS: 0.2 K/mcL  Reference Range: 0.1-0.5
- BASO ABS: 0.0 K/mcL  Reference Range: 0.0-0.3
- SMEAR REVIEW: DNR  Flag: N.
CBC WITH AUTOMATED DIFFERENTIAL  13 Dec 2011 11:01 AM
- WBC: 6.0 K/mcL  Reference Range: 4.2-11.0
- RBC: 4.29 mil/mcL  Reference Range: 4.00-5.20
- HEMOGLOBIN: 13.4 g/dl  Reference Range: 12.0-15.5
- HEMATOCRIT: 39.2 %  Reference Range: 36.0-45.6
- MCV: 91.4 fL  Reference Range: 78.0-100.0
- MCH: 31.2 pg  Reference Range: 26.0-34.0
- MCHC: 34.2 g/dl  Reference Range: 32.0-36.5
- RDWCV: 12.4 %  Reference Range: 11.0-15.0
- PLATELET: 248 K/mcL  Reference Range: 140-450
- NEU%: 65 %  Reference Range: 33-69
- LYM%: 23 %  Reference Range: 20-55
- MON%: 9 %  Reference Range: 0-10
- EOS%: 3 %  Reference Range: 0-6
- BASO%: 1 %  Reference Range: 0-2
- NEU ABS: 3.9 K/mcL  Reference Range: 1.8-7.7
- LYM ABS: 1.4 K/mcL  Reference Range: 1.0-4.8
- MON ABS: 0.5 K/mcL  Reference Range: 0.3-0.9
- EOS ABS: 0.2 K/mcL  Reference Range: 0.1-0.5
- BASO ABS: 0.0 K/mcL  Reference Range: 0.0-0.3
- SMEAR REVIEW: DNR  Flag: N.

**Assessment**
• Normal routine history and physical  (V70.0)

**Plan**
Anual physical exam
-CBC-WNL, CMP, TSH and lipid panel pending
-will have PAP smear done at gyne's office
-mammogram done in June-normal
-received flu shot at work

Hx poz PPD
-will get CXR as pt needs it for school

Shoulder pain
-cont Ibuprofen TIDX2weeks and exercise

RV in 1 year

I discussed patient's case with the resident. I agree with resident's findings and plan as documented in today's note.

**Signature**
Electronically signed by : Elizabeth  Paul  R.N , 12/13/2011 4:09 PM CST.
Electronically signed by : KARIN  STERL  M.D., 12/13/2011 5:09 PM CST.
Electronically signed by : MARK  CONLEY  D.O., 12/14/2011 8:49 AM CST

CONFIDENTIAL      AMG 000077

# AMG-Sykes

**2545 S. Martin Luther King Drive**
**Chicago,IL 60616**
**(312) 842-7117**

| | | | | |
|---|---|---|---|---|
| Patient: | MARCIAL, MARICEL Q | | Age/Sex/DOB: | 44 yrs  F  21-Jan-1973 |
| | 2616 N SPAULDING APT 3 | | EMRN: | 00341329 |
| | CHICAGO, IL 60647 | | OMRN: | 00341329 |
| | | | Home: | (847) 809-5669 |
| | | | Work: | (847) 723-0122 |

## Results

| | | | | |
|---|---|---|---|---|
| Lab Accession # | R001173611BPNL2011 | | Collected: | 12/13/2011  11:01:00AM |
| Ordering Provider: | STERL,KARIN | | Resulted: | 12/13/2011  5:20:00PM |
| Performing Location: | ACL CENTRAL LAB IL | | Verified By: | STERL, KARIN |
| | 5400 PEARL ST | | Auto Verify: | N |
| | ROSEMONT, IL 60018-5320 | | | |

BASIC METABOLIC PNL                            **Stage:**      Final

Result        12/14/2011  11:06:00A     STERL, KARIN
Annotations:      called pt and left voicemessage, will recheck blood glucose as pt might not have been fasting for enough hours

| Test | Result | Units | Flag | Reference Range |
|---|---|---|---|---|
| SODIUM | 139 | mmol/L | | 135-145 |
| POTASSIUM | 4.4 | mmol/L | | 3.4-5.1 |
| CHLORIDE | 103 | mmol/L | | 98-107 |
| CARBON DIOXIDE | 26 | mmol/L | | 21-32 |
| ANION GAP | 14 | mmol/L | | 10-20 |
| GLUCOSE | 109 | mg/dl | H | 65-99 |
| BUN | 9 | mg/dl | L | 10-20 |
| CREATININE | 0.80 | mg/dl | | 0.50-1.10 |
| GFR EST AFRICAN AMER | >60 | | | >59 |
|   Units = mL/min/1.73m2 | | | | |
| GFR EST NONAFRI AMER | >60 | | | >59 |
|   Units = mL/min/1.73m2 | | | | |
| BUN/CREATININE RATIO | 11 | | | 7-25 |
| CALCIUM | 9.0 | mg/dl | | 8.4-10.2 |

CONFIDENTIAL                                                                              AMG 000078

# AMG-Sykes

**2545 S. Martin Luther King Drive**
**Chicago,IL 60616**
**(312) 842-7117**

| | | |
|---|---|---|
| Patient: | MARCIAL, MARICEL Q | Age/Sex/DOB: 44 yrs F 21-Jan-1973 |
| | 2616 N SPAULDING APT 3 | EMRN: 00341329 |
| | CHICAGO, IL 60647 | OMRN: 00341329 |
| | | Home: (847) 809-5669 |
| | | Work: (847) 723-0122 |

## Results

| | | | |
|---|---|---|---|
| Lab Accession # | R001173611LIPDPL2011 | Collected: | 12/13/2011 11:01:00AM |
| Ordering Provider: | STERL,KARIN | Resulted: | 12/13/2011 5:20:00PM |
| Performing Location: | ACL CENTRAL LAB IL | Verified By: | STERL, KARIN |
| | 5400 PEARL ST | Auto Verify: | N |
| | ROSEMONT, IL 60018-5320 | | |

**LIPID PNL**                                                          **Stage:**    **Final**

Result       12/14/2011 11:06:00A    STERL, KARIN
Annotations:    called pt and left voicemessage. will recheck blood glucose as pt might not have been fasting for enough hours

| Test | Result | Units | Flag Reference Range |
|---|---|---|---|
| FASTING STATUS | (NOTE) | hrs | |
| FASTING | | | |
| CHOLESTEROL | 193 | mg/dl | 100-200 |
| DESIRABLE <200 | | | |
| BORDERLINE HIGH 200-239 | | | |
| HIGH >=240 | | | |
| HDL CHOLESTEROL | 58 | mg/dl | >39 |
| LOW <40 | | | |
| HIGH >=60 | | | |
| TRIGLYCERIDES | 65 | mg/dl | <150 |
| NORMAL <150 | | | |
| BORDERLINE HIGH 150-199 | | | |
| HIGH >200 | | | |
| LDL CHOLESTEROL (CALCULATED) | 122 | mg/dl | <130 |
| OPTIMAL <100 | | | |
| NEAR OPTIMAL 100-129 | | | |
| BORDERLINE HIGH 130-159 | | | |
| HIGH 160-189 | | | |
| VERY HIGH >=190 | | | |
| NON-HDL CHOLESTEROL | 135 | mg/dl | |
| THERAPEUTIC TARGET | | | |
| CHD AND RISK EQUIVALENTS <130 | | | |
| MULTIPLE RISK FACTORS <160 | | | |
| 0-1 RISK FACTORS <190 | | | |

Printed by: Powell, Anita | 11/07/2017 8:23:00PM                          Page 1 of 2

CONFIDENTIAL                                                    AMG 000079

Patient:  MARCIAL, MARICEL Q                          EMRN:  00341329

| Test | Result | Units | Flag | Reference Range |
|------|--------|-------|------|-----------------|
| CHOLESTEROL/HDL RATIO | 3.3 | | | <4.5 |

CONFIDENTIAL                                                                        AMG 000080

# AMG-Sykes

**2545 S. Martin Luther King Drive**
**Chicago, IL 60616**
**(312) 842-7117**

| | |
|---|---|
| Patient: MARCIAL, MARICEL Q | Age/Sex/DOB: 44 yrs F 21-Jan-1973 |
| 2616 N SPAULDING APT 3 | EMRN: 00341329 |
| CHICAGO, IL 60647 | OMRN: 00341329 |
| | Home: (847) 809-5669 |
| | Work: (847) 723-0122 |

## Results

| | |
|---|---|
| Lab Accession # R001173611TSHR2011 | Collected: 12/13/2011 11:01:00AM |
| Ordering Provider: STERL, KARIN | Resulted: 12/13/2011 5:20:00PM |
| Performing Location: ACL CENTRAL LAB IL | Verified By: STERL, KARIN |
| 5400 PEARL ST | Auto Verify: N |
| ROSEMONT, IL 60018-5320 | |

**TSH WITH REFLEX**                                    Stage:     **Final**

| | |
|---|---|
| Result | 12/14/2011 11:06:00A    STERL, KARIN |
| Annotations: | called pt and left voicemessage. will recheck blood glucose as pt might not have been fasting for enough hours |

| Test | Result | Units | Flag Reference Range |
|---|---|---|---|
| TSH | 1.796 | mcUnits/mL | 0.350-5.000 |

Findings most consistent with euthyroid state, no additional testing
suggested. TSH may be normal in patients with thyroid dysfunction and
pituitary disease. Clinical correlation recommended.
(Reflex TSH algorithm is not recommended in hospitalized patients. A
variety of drugs, as well as serious acute and chronic illnesses may
alter thyroid function tests. Commonly implicated drugs include
glucocorticoids, dopamine, carbamazepine, iodine, amiodarone, lithium
and heparin.)

CONFIDENTIAL                                                                   AMG 000081

# AMG-Sykes

**2545 S. Martin Luther King Drive**
**Chicago,IL 60616**
**(312) 842-7117**

| | | | |
|---|---|---|---|
| **Patient:** | MARCIAL, MARICEL Q | **Age/Sex/DOB:** | 44 yrs  F  21-Jan-1973 |
| | 2616 N SPAULDING APT 3 | **EMRN:** | 00341329 |
| | CHICAGO, IL 60647 | **OMRN:** | 00341329 |
| | | **Home:** | (847) 809-5669 |
| | | **Work:** | (847) 723-0122 |

## Results

| | | | |
|---|---|---|---|
| Lab Accession # | R001173611CBCA2011 | Collected: | 12/13/2011  11:01:00AM |
| Ordering Provider: | STERL,KARIN | Resulted: | 12/13/2011  1:49:00PM |
| Performing Location: | ACL CENTRAL LAB IL | Verified By: | STERL, KARIN |
| | 5400 PEARL ST | Auto Verify: | N |
| | ROSEMONT, IL 60018-5320 | | |

### CBC WITH AUTOMATED DIFFERENTIAL

**Stage:**       **Final**

| Test | Result | Units | Flag | Reference Range |
|---|---|---|---|---|
| WHITE BLOOD COUNT | 6.0 | K/mcL | | 4.2-11.0 |
| RED CELL COUNT | 4.29 | mil/mcL | | 4.00-5.20 |
| HEMOGLOBIN | 13.4 | g/dl | | 12.0-15.5 |
| HEMATOCRIT | 39.2 | % | | 36.0-45.6 |
| MEAN CORPUSCULAR VOLUME | 91.4 | fL | | 78.0-100.0 |
| MEAN CORPUSCULAR HEMOGLOBIN | 31.2 | pg | | 26.0-34.0 |
| MEAN CORPUSCULAR HGB CONC | 34.2 | g/dl | | 32.0-36.5 |
| RDW-CV | 12.4 | % | | 11.0-15.0 |
| PLATELET COUNT | 248 | K/mcL | | 140-450 |
| NEU% | 65 | % | | 33-69 |
| LYM% | 23 | % | | 20-55 |
| MON% | 9 | % | | 0-10 |
| EOS% | 3 | % | | 0-6 |
| BASO% | 1 | % | | 0-2 |
| NEU ABS | 3.9 | K/mcL | | 1.8-7.7 |
| LYM ABS | 1.4 | K/mcL | | 1.0-4.8 |
| MON ABS | 0.5 | K/mcL | | 0.3-0.9 |
| EOS ABS | 0.2 | K/mcL | | 0.1-0.5 |
| BASO ABS | 0.0 | K/mcL | | 0.0-0.3 |
| SMEAR REVIEW | DNR | | | |

CONFIDENTIAL                                      AMG 000082

**AMG-Sykes**

2545 S. Martin Luther King Drive
Chicago, IL 60616
(312) 842-7117

| | |
|---|---|
| Patient: | MARCIAL, MARICEL Q |
| EMRN: | 00341329 |
| OMRN: | 00341329 |
| DOB: | 21 Jan 1973 |

## Encounter Form

| | |
|---|---|
| Encounter Date | 13Dec2011 |
| Division: | GENERAL INTERNAL MEDICINE |
| Location: | NESSET INTERNAL MEDICINE |
| Billing Area: | INT MED NESSET 140 |
| Pt Ins: | HMO HUMANA/ADVOCATE |
| Special Billing: | |
| CRF #: | |

| | |
|---|---|
| Billing Provider: | CONLEY, MARK |
| Compliance Code: | |
| Performing Provider: | STERL, KARIN |
| Referring Provider: | |
| Special Billing Date: | |

### Diagnoses

| Primary | # | Code | Description |
|---|---|---|---|
| Yes | 1 | O | Gen Exam |

### Charges

| Status | Units | Code | Mod | Description | Linked DX | Submitted by |
|---|---|---|---|---|---|---|
| Submitted | 1 | 85025 | | BLOOD CT, HG AND PLATELET CT AUTO & AUTO COMPLT_85025 | | Kopec, Katarzyna |
| Submitted | 1 | 80048 | | BASIC METABOLIC PANELS_80048 | | Kopec, Katarzyna |
| Submitted | 1 | 80061 | | LIPID PANEL_80061 | | Kopec, Katarzyna |
| Submitted | 1 | 84443 | | THYROID STIMULATING HORMONE (TSH)_84443 | | Kopec, Katarzyna |

Printed by: Powell, Anita      1      Date 11/7/17 8:23PM

CONFIDENTIAL

AMG 000083

**Advocate Medical Group**
**AMG-Sykes**
2545 S. Martin Luther King Drive
Chicago, IL 60616
(312) 842-7117

---

**LGH_Breast Center Progress Note**
04/18/2011 5:32PM

Patient:
MARICEL MARCIAL
2616 N SPAULDING APT 3
CHICAGO, IL 60647

MRN: 00341329
DOB: 01/21/1973
Phone: (847) 809-5669

April 18, 2011

RE: MARICEL Q MARCIAL

The patient is a 38-year-old female gravida 0, para 0, LMP 04/04/2011 here for followup breast exam. The patient had bilateral mammogram performed on 04/04/2011 with a right breast ultrasound and both of these studies were unremarkable. There is no evidence of any suspicious lesions. The patient was reassured and informed of these findings. The patient continues to note an area of palpable thickening in the right breast which she has noted for at least 10 years and is unchanged. The patient does note that there is some cyclical change relative to her menstrual cycle. She does not take any hormones. No birth control pills. Her mother had DCIS diagnosed at age 54. She has a maternal second cousin who had breast cancer in her 40s and underwent apparently bilateral mastectomy. The patient has not had any breast biopsies or surgery here at Lutheran General. Remainder review of systems negative.

On exam she is afebrile, pulse of 68, respirations 18, blood pressure 119/67. HEENT is negative. Node survey is negative. Thyroid exam is normal. Lungs are clear. Cardiac exam is normal. Bilateral breast exam is performed sitting and supine. There are no dominant masses, skin changes, nipple discharge, or axillary adenopathy bilaterally. The area of concern in the upper outer aspect just lateral to the nipple areolar complex is fibrous tissue. There are no discrete masses by my exam and the patient also stated there has been no change in this area on self-exam for at least 10 years.

The patient did have a bilateral breast MRI in January 2009 which was also negative.

ASSESSMENT: This is a 38-year-old female with fibrocystic change. No worrisome or significant findings. The option of continued close followup versus the role of excisional biopsy was explained. The patient would like to avoid biopsy. The patient will continue close followup and if anything changes she will call us. Otherwise, we will

Printed By: Anita Powell      1 of 2      11/7/17 8:23:11 PM

CONFIDENTIAL                                    AMG 000084

## LGH_Breast Center Progress Note

Patient:      MARICEL Q. MARCIAL                    SSN:     XXX-XX-7272
Encounter:    Apr 18 2011 5:32PM                     EMRN:    00341329

plan on seeing her back in 6 months for serial interval exam. Questions
were answered. The patient expressed understanding. She will continue
her primary care under direction of Dr. Mark Conley. We also reviewed
with the patient the pros and cons of genetic consultation and the
contact information was given for Dr. Booth and
she will consider seeing them and reviewing her family history with
them.

James Dolan, M.D.

MEDQ/790992

cc: Mark Conley, D.O.          Breast Center Progress Note - 1

CONFIDENTIAL                                                    AMG 000085

# AMG-Sykes

2545 S. Martin Luther King Drive
Chicago, IL 60616
(312) 842-7117

| | |
|---|---|
| Patient: | MARCIAL, MARICEL Q |
| EMRN: | 00341329 |
| OMRN: | 00341329 |
| DOB: | 21Jan1973 |

## Encounter Form

| | | | | |
|---|---|---|---|---|
| Encounter Date | 11Aug2009 12.00PM | | Billing Provider: | CONLEY, MARK |
| Provider: | CONLEY, MARK (1084 ) | | Compliance Code: | |
| Dept: | Int Med, 1775 Ballard-Nesset | | Performing Provider: | CONLEY, MARK |
| Appt Loc: | 1775 Ballard, Internal Med Nesset | | Referring Provider: | |
| For: | | | Division: | GENERAL INTERNAL MEDICINE |
| Appt No.: | 12522410 | | Location: | NESSET INTERNAL MEDICINE |
| Pt Ins: | HMO HUMANA/ADVOCATE | | Billing Area: | INT MED NESSET 140 |
| Special Billing: | | | Special Billing Date: | |
| CRF #: | | | | |

## Diagnoses

| Primary | # | Code | Description |
|---|---|---|---|
| Yes | 1 | 0 | Sprain cervical |

## Charges

| Status | Units | Code | Mod | Description | Linked DX | Submitted by |
|---|---|---|---|---|---|---|
| Submitted | 1 | 99213 | | Est Patient: Low Complexity | | Zavala, Leslie |

LMRP: J6 Medicare Administrative Contractor (MAC) National Government Services (NGS) (IL)

CONFIDENTIAL

AMG 000086

**Advocate Medical Group**
**AMG-Sykes**
2545 S. Martin Luther King Drive
Chicago, IL 60616
(312) 842-7117

---

**PCP Chronic Care Note**
08/11/2009 12:00PM

Patient:
MARICEL MARCIAL
2616 N SPAULDING APT 3
CHICAGO, IL 60647

MRN:   00341329
DOB:   01/21/1973
Phone: (847) 809-5669

**Chief Complaint**
• follow up
**HPI**
In MVA on 8/9 on 190.
She was rear ended as she slowed for car in front of her.
Restrained driver
Neck and shoulder soreness two the three hours post MVA.
No head trauma.
No air bag deployment.
Felt as though she was hit twice
Tension in the neck, mostly right
No headache. No loss of arm strength or paresthesias.

**Active Problems**
Breast Palpation Mass (611.72)
Palpitations (785.1)
**Family Hx**
Family history of Reported Family History Of Cancer; M with brea
**Personal Hx**
No Alcohol
No Drug Use
No Tobacco Use.
**Allergies**
No Known Drug Allergy.
**Vital Signs**
Recorded by rodrigueza on 11 Aug 2009 03:29 PM
BP 100/60, RUE, Sitting,
HR. 80 b/min, R Radial, Normal,
Weight. 141 lb.
**Physical Exam**
**Vital signs:**
    ° Current vital signs reviewed.
**General appearance:**
    ° Normal.
**Head:**
    ° Normal.
**Neck:**
    ° Normal no spinous process tenderness

Printed By: Anita Powell          1 of 2          11/7/17 8:23:18 PM

CONFIDENTIAL                                                    AMG 000087

**PCP Chronic Care Note**

| | | | |
|---|---|---|---|
| Patient: | MARICEL Q. MARCIAL | SSN: | XXX-XX-7272 |
| Encounter: | Aug 11 2009 12:00PM | EMRN: | 00341329 |

**Ears, Nose, Throat:**
   ° ENT: normal.
**Chest:**
   ° Normal.
**Lungs:**
   ° Normal.
**Cardiovascular system:**
   Heart Rate And Rhythm: ° Normal.
   Heart Sounds: ° Normal.
   Murmurs: ° No murmurs were heard.
**Musculoskeletal system:**
   General/bilateral: • Musculoskeletal system: mild tenderness of the right trapezius.
**Neurological:**
   Sensation: ° No sensory exam abnormalities were noted.
   Motor: ° A motor exam demonstrated no dysfunction.
   Reflexes: ° Normal.
**Assessment**
   • Neck strain  (847.0),
   *post MVA; 12 Aug 2009
**Plan**
No neurologic findings.
No spinous process tenderness.
Apply heat.
OTC NSAID.
Cervical exercises explained.
Call if no better.
**Signature**
Signed By: Ana  Rodriguez CMA; 08/11/2009 3:29 PM CST.
Signed By: MARK  CONLEY  D.O.; 08/12/2009 8:54 AM CST.

CONFIDENTIAL

AMG 000088

**Advocate Medical Group**
**AMG-Sykes**
2545 S. Martin Luther King Drive
Chicago, IL 60616
(312) 842-7117

---

**LGH_Breast Center Progress Note**
12/15/2008 4:26PM

Patient:
MARICEL MARCIAL
2616 N SPAULDING APT 3
CHICAGO, IL 60647

MRN: 00341329
DOB: 01/21/1973
Phone: (847) 809-5669

December 15, 2008

RE: MARICEL Q MARCIAL

HISTORY OF PRESENT ILLNESS: Patient is a 35-year-old female, gravida 0, para 0 with a recent bilateral mammogram that was obtained on 12/11/2008. There were some calcifications noted in the right breast and ultrasound was also performed which was negative. Her left breast was without significant worrisome or suspicious change. Patient also had an area of focal asymmetry in the right breast, middle lateral depth. MRI was recommended after clinical breast exam. Patient also notes an area of nodularity which she had present since at least the year 2000 just lateral to her nipple areolar complex. She apparently did see Dr. Peckler in the past and excision was discussed, however, this was not performed. Patient has noted minimal to no change in this area since 2000. She has no other complaints. No nipple discharge, no tenderness. No redness, no thickening of the skin or dimpling. She is gravida 0, para 0. Her LMP was 12/03/2008. She does not use birth control pills.

PAST SURGICAL HISTORY: She had no prior surgery.

FAMILY HISTORY: Mother was diagnosed at age 54 with a right breast DCIS. She is status post mastectomy, no chemotherapy or radiation. She has one sister alive and well. She has a maternal second cousin who had a bilateral mastectomy when she was in her 40s. She has a maternal aunt who died of lung cancer who was a smoker. Paternal grandfather had prostate cancer and a paternal aunt had lung cancer and was also a smoker. The area in the right breast has been present again since 2000 with slight change during her menstrual cycle.

REVIEW OF SYSTEMS: Otherwise negative.

MEDICATIONS: She takes no current medications.

ALLERGIES: She has no known drug allergies.

Printed By: Anita Powell          1 of 2          11/7/17 8:23:20 PM

CONFIDENTIAL                    AMG 000089

## LGH_Breast Center Progress Note

| Patient: | MARICEL Q. MARCIAL | SSN: | XXX-XX-7272 |
|---|---|---|---|
| Encounter: | Dec 15 2008  4:26PM | EMRN: | 00341329 |

PHYSICAL EXAMINATION: She 65 inches tall. Weight 137. HEENT:
Negative. Node survey: Negative. Lungs: Clear. Cardiac: Sounds are
normal. Neck: Thyroid exam is normal. There is no suspicious
supraclavicular adenopathy or axonopathy bilaterally. Breasts:
Bilateral breast exam was performed sitting and supine. There are no
discrete masses bilaterally. The area of concern feels like prominent
glandular or fibrous tissue by my exam, is very subtle and no discrete
masses were seen. Patient does have dense breasts, however,
bilaterally. There are no obvious or suspicious masses.

PLAN: We did inform the patient of our findings. We recommended she
have a consult with Dr. Carol Booth for genetic counseling and
assessment for possible BRCA I and II testing. We did give her an order
for bilateral breast MRI. She will return to see us in two to three
weeks or sooner if any problems occur. We did discuss followup with
serial mammogram, ultrasound and MRI pending the MRI result. The role
of excisional biopsy based on the MRI findings was also reviewed.
Patient expressed understanding. She will also follow up Dr. Daniel
Pesch for her gynecologic continued care.

Breast Center Progress Note - 1

James R. Dolan, M.D.

MEDQ/273304

cc.  Daniel Pesch, M.D.          Breast Center Progress Note - 2

CONFIDENTIAL                                                           AMG 000090

**AMG-Sykes**

2545 S. Martin Luther King Drive
Chicago, IL 60616
(312) 842-7117

| | |
|---|---|
| Patient: | MARCIAL, MARICEL Q |
| EMRN: | 00341329 |
| OMRN: | 00341329 |
| DOB: | 21Jan1973 |

## Encounter Form

| | | | | |
|---|---|---|---|---|
| Encounter Date | 06Aug2008 10:45AM | | Billing Provider: | ZZZPESCH, DANIEL |
| Provider: | ZZZPESCH,DANIEL (5252 ) | | Compliance Code: | |
| Dept: | O/B Residency Program | | Performing Provider: | ZZZPESCH, DANIEL |
| Appt Loc: | OBR | | Referring Provider: | |
| For: | | | Division: | OBSTETRICS AND GYNECOLOGY |
| Appt No.: | 11242205 | | Location: | OB GYNE RESIDENTS YACKTMAN |
| Pt Ins: | PPO PRIVATE HEALTHCARE SYSTEMS | | Billing Area: | OB/GYN RESIDENCY CLINIC CC160 |
| Special Billing: | | | Special Billing Date: | |
| CRF #: | | | | |

### Diagnoses

| Primary | # | Code | Description |
|---|---|---|---|
| Yes | 1 | O | Breast lump |

### Charges

| Status | Units | Code | Mod | Description | Linked DX | Submitted by |
|---|---|---|---|---|---|---|
| Submitted | 1 | 99204 | | New Patient: Mod Complexity | | ZZZPESCH, DANIEL |

LMRP: J6 Medicare Administrative Contractor (MAC) National Government Services (NGS) (IL)

Printed by: Powell, Anita          1          Date: 11/7/17 8:23PM

CONFIDENTIAL

AMG 000091

**Advocate Medical Group**
**AMG-Sykes**
2545 S. Martin Luther King Drive
Chicago, IL 60616
(312) 842-7117

---

**Gynecologic Visit**
08/06/2008 10:45AM

Patient:
MARICEL MARCIAL
2616 N SPAULDING APT 3
CHICAGO, IL 60647

MRN: 00341329
DOB: 01/21/1973
Phone: (847) 809-5669

**Chaperone**
New pt here for annual exam and pap.
August 6, 2008

Chaperone : Declined.
**Vital Signs**
Recorded by martinezg on 06 Aug 2008 10:53 AM
BP.110/64,
Weight: 145.5 lb.
**Vitals 2**
G: 0    P: 0 0 0 0
LMP: 7/4/08
LAST PAP: 2 years ago
METHOD OF BC: none.
**Immunizations**
Reviewed.
**Personal Hx**
Behavioral history: No tobacco use.
Alcohol: No consumption of alcohol.
Drug use: Not using drugs
Reviewed.
**Current Meds**
Reviewed.
**Allergies**
No Known Drug Allergy.
**PGH**
Nl menses, No abnormal paps.
**PMH**
Reviewed.
**PSH**
Reviewed.
**Family Hx**
Reviewed
    Cancer  M with br ca.
**Chief Complaint**
  • Breast symptoms  Has known breast mass stable for many years and FH of br ca
  • No genitourinary symptoms

CONFIDENTIAL                                                   AMG 000092

## Gynecologic Visit

| | | | |
|---|---|---|---|
| Patient: | MARICEL Q. MARCIAL | SSN: | XXX-XX-7272 |
| Encounter: | Aug 6 2008 10:45AM | EMRN: | 00341329 |

### ROS
**Systemic symptoms:** Not feeling tired (fatigue). No recent weight change.
**Cardiovascular symptoms:** No cardiovascular symptoms.
**Pulmonary symptoms:** No pulmonary symptoms.
**Gastrointestinal symptoms:** No gastrointestinal symptoms.
### Physical Exam
**Head:**
° Normal.
**Neck:**
° Normal.
**Lymph Nodes:**
° Normal.
**Chest:**
° Normal.
**Breasts:**
General/bilateral.
• Breasts: RUQ quadrant mass 1cm smooth mobile.
**Lungs:**
° Normal.
**Cardiovascular system:**
° Normal.
**Abdomen:**
° Normal.
### Gyne Exam
The vagina was normal. Cervix normal and showed no lesion. The uterus was normal and the uterine adnexae were normal.
### Assessment
• A breast mass was found. (611.72)
### Orders
PAP SMEAR, THIN PREP.
Follow-up visit in 1 year.
MA MAMMOGRAM SCREEN BIL.
### Plan
The patient desires definitive information regarding testing for breast Ca. Recommended consult with Dr Dolan regarding ongoing screening. Diet, exercise and MVI/Ca use discussed. SBE reviewed.
### Signature
Signed By: Gesalle Martinez ; 08/06/2008 10:53 AM CST.
Signed By: DANIEL PESCH M.D.; 08/06/2008 1:27 PM CST.

CONFIDENTIAL

AMG 000093

# AMG-Sykes

**2545 S. Martin Luther King Drive**
**Chicago,IL 60616**
**(312) 842-7117**

**Patient:** MARCIAL, MARICEL Q
2616 N SPAULDING APT 3
CHICAGO, IL 60647

**Age/Sex/DOB:** 44 yrs F 21-Jan-1973
**EMRN:** 00341329
**OMRN:** 00341329
**Home:** (847) 809-5669
**Work:** (847) 723-0122

## Results

**Lab Accession #** IOG08-71754
**Ordering Provider:** PESCH,DANIEL
**Performing Location:** ACL

**Collected:** 08/06/2008 12:00:00AM
**Resulted:** 08/07/2008 4:18:00AM
**Verified By:** ZZZPESCH, DANIEL
**Auto Verify:** N

### CYTOLOGY NON-GYN

**Stage:** Final

Result          08/12/2008 10:27:00A    Zidek, Patricia
Annotations:    nes

| Test | Result | Units | Flag | Reference Range |
|------|--------|-------|------|-----------------|

CYTOLOGY NON-GYN
    ICL CYTOLOGY REPORT

    Client: LU905 AMG/OB GYNE-YACTMAN

    Date Specimen Collected: 08/06/08        Accession #: IOG08-71754
    Date Specimen Received:  08/07/08        Requisition #:
    273746AM08210THINPREP
    Date Reported:           8/10/2008 21:10

    Specimen(s) Submitted:  Thin Prep-Imager(E-Order), Site not specified.

    ─────────────────────────────────────────────────

    Cytologic Diagnosis :

    Thin Prep-Imager(E-Order), Site not specified.:

    Statement of Adequacy:
    Satisfactory for evaluation.  Presence of endocervical/transformation
    zone component.

    Descriptive Interpretation:
    Negative for intraepithelial lesion or malignancy.

    Comment: The Pap smear is not a diagnostic test. It is a screening test with
    an inherent false negative rate in the range of 5-10%. Annual Pap smears are
    the best means available to lower this false negative rate and to detect early
    cervial cancer. Please share this information with your patient.

    Lakshmi S Yarlagadda

Patient: MARCIAL, MARICEL Q        EMRN: 00341329

| Test | Result | Units | Flag Reference Range |
|------|--------|-------|----------------------|
| ** Electronic Signature (LSY) ** | | | |

LMP: 07/04/2008

Fee Codes:  A: 88175

CONFIDENTIAL        AMG 000095

# AMG-Sykes

**2545 S. Martin Luther King Drive**
**Chicago,IL 60616**
**(312) 842-7117**

Patient: MARCIAL, MARICEL Q
       2616 N SPAULDING APT 3
       CHICAGO, IL 60647

Age/Sex/DOB: 44 yrs F 21-Jan-1973
EMRN: 00341329
OMRN: 00341329
Home: (847) 809-5669
Work: (847) 723-0122

## Results

Lab Accession #: R000011476CBCA2007
Ordering Provider: DECKER,SHARON
Performing Location: ACL CENTRAL LAB IL
       5400 PEARL ST
       ROSEMONT, IL 60018-5320

Collected: 10/29/2007 8:25:00AM
Resulted: 10/29/2007 8:25:00AM
Verified By: DECKER, SHARON
Auto Verify: N

### CBC WITH AUTOMATED DIFFERENTIAL

Stage: Final

| Test | Result | Units | Flag Reference Range |
|------|--------|-------|----------------------|
| WHITE BLOOD COUNT | 8.4 | | 4.2-11.0 |
| RED CELL COUNT | 4.44 | | 4.00-5.20 |
| HEMOGLOBIN | 13.9 | | 12.0-15.5 |
| HEMATOCRIT | 41.7 | | 36.0-45.6 |
| MEAN CORPUSCULAR VOLUME | 93.9 | | 78.0-100.0 |
| MEAN CORPUSCULAR HEMOGLOBIN | 31.3 | | 26.0-34.0 |
| MEAN CORPUSCULAR HGB CONC | 33.3 | | 32.0-36.5 |
| RDW-CV | 12.5 | | 11.0-15.0 |
| PLATELET COUNT | 254 | | 140-450 |
| NEU% | 66 | | 33-69 |
| LYM% | 21 | | 20-55 |
| MON% | 9 | | 0-10 |
| EOS% | 3 | | 0-6 |
| BASO% | 0 | | 0-2 |
| NEU ABS | 5.6 | | 1.8-7.7 |
| LYM ABS | 1.8 | | 1.0-4.8 |
| MON ABS | 0.8 | | 0.3-0.9 |
| EOS ABS | 0.3 | | 0.1-0.5 |
| BASO ABS | 0.0 | | 0.0-0.3 |
| SMEAR REVIEW | DNR | | |

CONFIDENTIAL

AMG 000096

## AMG-Sykes

**2545 S. Martin Luther King Drive**
**Chicago,IL 60616**
**(312) 842-7117**

Patient: MARCIAL, MARICEL Q
2616 N SPAULDING APT 3
CHICAGO, IL 60647

Age/Sex/DOB: 44 yrs  F  21-Jan-1973
EMRN: 00341329
OMRN: 00341329
Home: (847) 809-5669
Work: (847) 723-0122

### Results

Lab Accession # R000011476CPNL2007
Ordering Provider: DECKER, SHARON
Performing Location: ACL CENTRAL LAB IL
5400 PEARL ST
ROSEMONT, IL 60018-5320

Collected: 10/29/2007  8:25:00AM
Resulted: 10/29/2007  8:25:00AM
Verified By: DECKER, SHARON
Auto Verify: N

### COMP METABOLIC PNL

Stage:    Final

| Test | Result | Units | Flag | Reference Range |
|------|--------|-------|------|-----------------|
| SODIUM | 140 | | | 135-145 |
| POTASSIUM | 4.4 | | | 3.5-5.0 |
| CHLORIDE | 102 | | | 98-107 |
| CARBON DIOXIDE | 28 | | | 22-30 |
| ANION GAP | 10 | | | 8-16 |
| GLUCOSE | 98 | | | 65-99 |
| BUN | 8 | | L | 10-20 |
| CREATININE | 0.8 | | | 0.6-1.1 |
| GFR EST AFRICAN AMER | >60 | | | >60 |
| GFR EST NONAFRI AMER | >60 | | | >60 |
| BUN/CREATININE RATIO | 10 | | | 7-25 |
| BILIRUBIN TOTAL | 0.4 | | | <1.4 |
| GOT/AST | 22 | | | 8-39 |
| ALKALINE PHOSPHATASE | 55 | | | 38-126 |
| ALBUMIN | 4.5 | | | 3.5-5.0 |
| TOTAL PROTEIN | 7.6 | | | 6.0-8.2 |
| GLOBULIN (CALCULATED) | 3.1 | | | 2.0-4.0 |
| A/G RATIO | 1.5 | | | 1.0-2.4 |
| CALCIUM | 9.4 | | | 8.4-10.2 |
| GPT/ALT | 17 | | | 9-52 |

CONFIDENTIAL

AMG 000097

**AMG-Sykes**

2545 S. Martin Luther King Drive
Chicago,IL 60616
(312) 842-7117

| Patient: | MARCIAL, MARICEL Q |
| EMRN: | 00341329 |
| OMRN: | 00341329 |
| DOB: | 21Jan1973 |

### Encounter Form

Encounter Date  29Oct2007
Division:        GENERAL INTERNAL MEDICINE
Location:        NESSET INTERNAL MEDICINE
Billing Area:    INT MED NESSET 140

Pt Ins:          PPO PRIVATE HEALTHCARE SYSTEMS
Special Billing:
CRF#:

Billing Provider:      CONLEY, MARK
Compliance Code:
Performing Provider:   DECKER, SHARON
Referring Provider:

Special Billing Date:

### Diagnoses

| Primary | # | Code | Description |
|---------|---|------|-------------|
| Yes | 1 | 0 | Palpitations |

### Charges

| Status | Units | Code | Mod | Description | Linked DX | Submitted by |
|--------|-------|------|-----|-------------|-----------|--------------|
| Submitted | 1 | 80061 | | LIPID PANEL_80061 | | George, Blessy |
| | | LMRP: | J6 Medicare Adminitrative Contractor (MAC) National Government Services (NGS) (IL) | | | |
| Submitted | 1 | 80053 | | COMPREHSIVE METABOLIC PANEL_80053 | | George, Blessy |
| | | LMRP: | J6 Medicare Adminitrative Contractor (MAC) National Government Services (NGS) (IL) | | | |
| Submitted | 1 | 85025 | | BLOOD CT, HG AND PLATELET CT AUTO & AUTO COMPLT_85025 | | George, Blessy |
| | | LMRP: | J6 Medicare Adminitrative Contractor (MAC) National Government Services (NGS) (IL) | | | |
| Submitted | 1 | 84443 | | THYROID STIMULATING HORMONE (TSH)_84443 | | George, Blessy |
| | | LMRP: | J6 Medicare Adminitrative Contractor (MAC) National Government Services (NGS) (IL) | | | |

CONFIDENTIAL

AMG 000098

# AMG-Sykes

**2545 S. Martin Luther King Drive**
**Chicago, IL 60616**
**(312) 842-7117**

| | | |
|---|---|---|
| Patient: MARCIAL, MARICEL Q | | Age/Sex/DOB: 44 yrs F 21-Jan-1973 |
| 2616 N SPAULDING APT 3 | | EMRN: 00341329 |
| CHICAGO, IL 60647 | | OMRN: 00341329 |
| | | Home: (847) 809-5669 |
| | | Work: (847) 723-0122 |

## Results

| | | |
|---|---|---|
| Lab Accession # R000011476LIPDPL2007 | | Collected: 10/29/2007 8:25.00AM |
| Ordering Provider: DECKER, SHARON | | Resulted: 10/29/2007 8:25.00AM |
| Performing Location: ACL CENTRAL LAB IL | | Verified By: DECKER, SHARON |
| 5400 PEARL ST | | Auto Verify: N |
| ROSEMONT, IL 60018-5320 | | |

**LIPID PNL**

Stage: Final

| Test | Result | Units | Flag Reference Range |
|---|---|---|---|
| FASTING STATUS | 12.0 | | |
| CHOLESTEROL | 193 | | 100-200 |
|   **Item Annotations** 10/29/2007 4:39:00PM | | | |
|   DESIRABLE   <200 | | | |
|   BORDERLINE HIGH   200-239 | | | |
|   HIGH   >=240 | | | |
| HDL CHOLESTEROL | 49 | | >39 |
|   **Item Annotations** 10/29/2007 4:39:00PM | | | |
|   LOW   <40 | | | |
|   HIGH   >=60 | | | |
| TRIGLYCERIDES | 98 | | <150 |
| LDL CHOLESTEROL (CALCULATED) | 124 | | <130 |
|   **Item Annotations** 10/29/2007 4:39:00PM | | | |
|   OPTIMAL   <100 | | | |
|   NEAR OPTIMAL   100-129 | | | |
|   BORDERLINE HIGH   130-159 | | | |
|   HIGH   160-189 | | | |
|   VERY HIGH   >=190 | | | |
| NON-HDL CHOLESTEROL | 144 | | |
|   **Item Annotations** 10/29/2007 4:39:00PM | | | |
|   THERAPEUTIC TARGET | | | |
|   CHD AND RISK EQUIVALENTS <130 | | | |
|   MULTIPLE RISK FACTORS   <160 | | | |
|   0-1 RISK FACTORS   <190 | | | |
| CHOLESTEROL/HDL RATIO | 3.9 | | <4.5 |

CONFIDENTIAL      AMG 000099

# AMG-Sykes

**2545 S. Martin Luther King Drive**
**Chicago, IL 60616**
**(312) 842-7117**

| | | | |
|---|---|---|---|
| **Patient:** | MARCIAL, MARICEL Q<br>2616 N SPAULDING APT 3<br>CHICAGO, IL 60647 | **Age/Sex/DOB:** | 44 yrs  F  21-Jan-1973 |
| | | **EMRN:** | 00341329 |
| | | **OMRN:** | 00341329 |
| | | **Home:** | (847) 809-5669 |
| | | **Work:** | (847) 723-0122 |

## Results

| | | |
|---|---|---|
| **Lab Accession #** R000011476TSHR2007 | **Collected:** | 10/29/2007  8:25:00AM |
| **Ordering Provider:** DECKER,SHARON | **Resulted:** | 10/29/2007  8:25:00AM |
| **Performing Location:** ACL CENTRAL LAB IL | **Verified By:** | DECKER, SHARON |
| 5400 PEARL ST | **Auto Verify:** | N |
| ROSEMONT, IL 60018-5320 | | |

**TSH WITH REFLEX**                                        **Stage:**    **Final**

| Test | Result | Units | Flag Reference Range |
|---|---|---|---|
| TSH | 2.84 | | 0.35-5.00 |

**Item Annotations**        10/29/2007  5:51:00PM

Findings most consistent with euthyroid state, no additional testing suggested. TSH may be normal in patients with thyroid dysfunction and pituitary disease.  Clinical correlation recommended.
(Reflex TSH algorithm is not recommended in hospitalized patients. A variety of drugs, as well as serious acute and chronic illnesses may alter thyroid function tests. Commonly implicated drugs include glucocorticoids, dopamine, carbamazepine, iodine, amiodarone, lithium and heparin. )

Printed by: Powell, Anita  |  11/07/2017  8:23:00PM                                        Page 1 of 1

                                        AMG 000100

# EXHIBIT

# A25

Case: 1:16-cv-06109 Document #: 108 Filed: 10/04/18 Page 426 of 475 PageID #:3203

*British Journal of Guidance & Counselling,*
*Vol. 32, No. 3, August 2004*



# Psychiatric distress and symptoms of PTSD among victims of bullying at work

STIG BERGE MATTHIESEN & STÅLE EINARSEN

*Division of Work and Organisational Psychology, Department of Psychosocial Science,*
*University of Bergen, Christiesgate 12, N-5015 Bergen, Norway*

ABSTRACT *Distress and symptoms of Post-Traumatic Stress Disorder (PTSD) were investigated among targets of experienced bullying at work, that is, the exposure to persistent or recurrent oppressive, offensive, abusive behaviour where the aggressor may be a superior or a colleague. The participants in the present study were all recruited from two associations of bullied victims (n = 102, response rate = 57%). A high level of distress and symptoms of PTSD was revealed in the sample, both according to recommended cut point scores for HSCL-25, PTSS-10 and IES-R, and when comparing the sample with traumatised samples. Three out of four victims reported an HSCL-25 level higher than the recommended threshold for psychiatric disease. Sixty and 63% of the sample reported a high level of IES intrusion and IES avoidance, correspondingly. The level of bullying, operationalised as the frequency of negative acts the individual had been exposed to at work, showed a stronger interconnection with distress and PTSD than a more unspecified, subjective measure of bullying, as well as the time since the bullying took place and the duration of the bullying episode. Those still being pestered reported a higher level of distress and PTSD than victims in which the bullying episodes were terminated more than 1 year ago, but the findings were somewhat mixed. Positive affectivity (PA) and especially negative affectivity (NA) contributed significantly to the explained variance of distress and PTSD in various regression analysis models, but did not interact with measures of bullying. Nor were mediator effects found between bullying, PA/NA and traumatic stress reactions. Implications of the findings are discussed.*

During the last decade there has been a growing awareness of the detrimental effects on employee health and well-being caused by exposure to bullying and non-sexual harassment in the workplace (Einarsen, 1999; Einarsen *et al.*, 2003; Hoel *et al.*, 1999). Although studied by the use of many different concepts, such as 'emotional abuse at work' (Keasly, 1998), 'harassment at work' (Brodsky, 1976; Einarsen & Raknes, 1997), 'bullying at work' (Vartia, 1996), 'mistreatment' (Spratlen, 1995), 'mobbing' (Leymann, 1996; Zapf *et al.*, 1996), 'workplace aggression' (Baron & Neuman, 1996) or as 'workplace incivility' (Andersson & Pearson, 1999), comparable conclusions seem to be reached. Exposure to systematic and long-lasting

ISSN 0306-9885/print/ISSN 1469-3534/online/04/030335-22 © 2004 Careers Research and Advisory Centre
DOI: 10.1080/03069880410001723558

verbal, non-physical, and non-sexual, abusive and aggressive behaviour at the workplace may cause a host of negative health effects in the target. Although single acts of aggression and harassment do occur fairly often in everyday interaction, they seem to be associated with severe health problems when occurring on a regular basis (Einarsen & Raknes, 1997; Leymann, 1987). Bullying at work is claimed to be an extreme form of social stress at work (Zapf *et al.*, 1996). It is referred to as a more crippling and devastating problem for employees than all other work-related stressors put together (Wilson, 1991).

Bullying can be described as a certain subset of conflicts (Zapf & Gross, 2001), and may be defined as the exposure to persistent or recurrent oppressive, offensive, abusive, intimidating, malicious, or insulting behaviour by a superior or a colleague. Feelings of being victimised from bullying at work seem to be associated with the experience of (a) bullying behaviours being intentional, (b) a lack of opportunities to evade it, and (c) these behaviours or sanctions as unfair or over-dimensioned (Matthiesen *et al.*, 2003). To be a victim of intentional and systematic psychological harm by another person, real or perceived, seems to produce severe emotional reactions such as fear, anxiety, helplessness, depression and shock (Mikkelsen & Einarsen, 2002a,b). These reactions seem to be especially pronounced if the perpetrator is in a position of power or the situation is an unavoidable or inescapable one (Einarsen, 1999; Niedl, 1996). The workplace seems to be a setting where people are especially vulnerable when facing aggression, abuse, or harassment (Einarsen & Raknes, 1997). Victimisation, such as exposure to intense bullying at work, may change the individual's perceptions of their work-environment and life in general to one of threat, danger, insecurity and self-questioning (cf. Janoff-Bulman, 1992), which may result in pervasive emotional, psychosomatic and psychiatric problems (Leymann, 1990a).

In an interview study among 30 Irish victims, O'Moore and associates found that all subjects reported anxiety, irritability, feelings of depression and paranoia as a consequence of experiences of bullying at work (O'Moore *et al.*, 1998). Also very common were symptoms like mood swings, feelings of helplessness, a lowered self-esteem, and a range of physical symptoms. Clinical observations of victims of harassment at work have also shown other grave effects such as social isolation, social maladjustment, psychosomatic illnesses, depressions, helplessness, anger, anxiety, and despair (Leymann, 1990a). A study among a representative sample of Norwegian assistant nurses showed a significant relationship between exposure to on-going workplace harassment and an elevated level of burn-out, as well as a lowered job satisfaction and a lowered psychological well-being (Einarsen *et al.*, 1998).

On the basis of clinical observations and interviews with American victims of work harassment, Brodsky (1976) identified three patterns of effects on the victims. Some expressed their reaction by developing vague physical symptoms such as weakness, loss of strength, chronic fatigue, pains and various aches. Others reacted with depression and related symptoms such as impotence, lack of self-esteem, and sleeplessness. A third group reacted with psychological symptoms such as hostility,

hypersensitivity, memory problems, feelings of victimisation, nervousness, and the avoidance of social contact.

In view of the particular symptom constellation presented above, it has been argued that many victims of long term bullying at work may in fact suffer from Post-Traumatic Stress Disorder (PTSD) (Björkqvist *et al.*, 1994; Einarsen & Hellesøy, 1998; Leymann, 1992). In a Finnish study of 350 university employees, 19 persons subjected to victimisation by harassment were interviewed as a follow-up study (Björkqvist *et al.*, 1994). The victims experienced high levels of insomnia, various nervous symptoms such as anxiety, depression and aggression, melancholy, apathy, lack of concentration and socio-phobia, leading the authors to conclude that these victims portrayed symptoms reminiscent of PTSD. In his 1992 report, the Swedish psychiatrist Heinz Leymann argued that PTSD probably was the correct diagnosis for approximately 95% of a representative sample of 350 victims of bullying at work (Leymann, 1992).

A host of studies (see e.g. Creamer, 2000) have suggested that victimisation caused by the aggressive and violent behaviour of other fellow human beings may produce high levels of distress and symptoms of post-traumatic stress even long after the event actually happened. Studies also suggest that psychological or physical abuse seems to be at least as traumatising as for example physical and criminal forms of violence. Experiencing sexual assault made a larger impact on PTSD symptomatology than combat exposure, according to a study of 160 army women after returning from the Persian Gulf (Wolfe *et al.*, 1998). In another investigation, 100 victims of harassment by stalking were interviewed to assess the impact of the experience on their psychological, social, and interpersonal functioning (Pathe & Mullen, 1997). The majority of the victims were subjected to multiple forms of harassment such as being followed, repeatedly approached, and bombarded with letters and telephone calls for periods varying from 1 month to 20 years. Threats were perceived by 58%, whereas 34% were physically or sexually assaulted. Increased levels of anxiety were reported by 83%. Intrusive recollections and flashbacks were reported by 55%, while nightmares, appetite disturbances, and depressed mood were commonly experienced. The criteria for a diagnosis of Post-Traumatic Stress Disorder (PTSD) were fulfilled in 37% of the cases.

Fontana and Rosenheck (1998) studied the relative impact of stress from military duty and exposure to sexual harassment on the development of PTSD among 327 female veterans. Sexual abuse and harassment were almost four times as influential in the development of PTSD compared to other kinds of duty-related stress. Using a liberal cutoff score, Vitanza *et al.* (1995) diagnosed 73% of a group of psychological abused women as having severe symptoms of PTSD. A Swedish study of PTSD in a group of 64 victims attending a rehabilitation programme for victims of bullying at work revealed that most of these victims were troubled with intrusive thoughts and avoidance reactions (Leymann & Gustavson, 1996). A Danish study of 118 bullied victims found that 76% portrayed symptoms indicating post-traumatic disorder (Mikkelsen & Einarsen, 2002a). Interpersonal conflicts in general may also be linked to PTSD symptoms. In a

Canadian study of 51 emergency personnel, a significant relationship was found between the level of interpersonal conflicts, and symptoms of PTSD (Laposa *et al.*, 2003).

Only a few studies (Leymann & Gustavson, 1996; Mikkelsen & Einarsen, 2002a) have been published on the relationship between exposure to bullying and symptoms of PTSD using a community sample. The aim of community studies is to assess specific disorders, in this case symptoms of post-traumatic stress, among a specified population, regardless of whether they have sought treatment or not (Schlenger *et al.*, 1997). The aim of the present study is therefore to examine the level of psychiatric symptoms and symptoms of PTSD among former and current victims of bullying at work, who has not necessarily sought medical or psychological treatment.

The literature on post-traumatic stress focus primarily on factors such as life-threatening menaces, object loss, physical harm and how hideous the critical incident turned out to be, as the main risk elements in development of PTSD (Davidson & Foa, 1993). This notion is however somewhat different from Dahl and his colleagues (Dahl *et al.*, 1994), who claim that Post-Traumatic Stress Disorder evolves if an event is perceived as threatening, scaring or awful, beyond a certain level. The risk of PTSD is claimed to increase if the incident(s) are prolonged, especially if adequate leadership is non-existent or social connections are lacking. Traumatic episodes connected to man-made aggressive acts (injustice, assaults, harassment) are argued to pose a greater risk than to incidents caused by accidents or disasters (Dahl *et al.*, 1994). A study of post-traumatic stress among women abused by their husbands concluded that psychological abuse even in rather subtle forms seems to produce clear cut symptoms of PTSD (Vitanza *et al.*, 1995). On the basis of case studies, Scott and Stradling (1994) argue that enduring psychosocial stress in the absence of one single acute and dramatic trauma may produce full symptomatology of PTSD.

In a theoretical framework of trauma at work, Williams (1993) argues that individual variables in personality and coping styles may have some overlap with PTSD as in regard to emotional distress. Although the causal relationship between individual differences and victimisation from bullying is a debatable one (Einarsen, 1999, 2000; Leymann, 1990a, 1996), victims of bullying at work do differ from non-bullied workers on a range of factors. For instance, Vartia (1996) found a high level of negative affectivity among a group of Finnish victims of bullying at work, while Zapf (1999) found German victims of bullying to be high on negative and low on positive affectivity compared to a control group. Experiences of negative social interactions in general seems to be associated with an increase in negative affectivity as well as low self-esteem and many dysfunctional attitudes (Lakey *et al.*, 1994). While Zapf (1999) argues that these characteristic may have caused bullying in the first place, other researchers (Mikkelsen & Einarsen, 2002b) claim that negative affectivity acts as a mediator and thus accounts for the relation between the victimisation and symptomatology by explaining how bullying takes on a psychological meaning. In a study of battered women the relationship between exposure to abuse and PTSD to a certain degree depended on vulnerability factors of

psychological dysfunctions such as cognitive failure and private self-consciousness (Saunders, 1994). The former is defined as the tendency to have perception and memory failures as well as engaging in misdirected action, while the latter refers to people who tend toward a self-analysis manner, focusing on their own perceptions, feelings and thoughts. Both concepts are considered to result from the excessive worry and anxiety caused by a highly threatening situation, hence they may be seen as partial mediators of the relationship between the experience of abuse and the evolving post-traumatic stress symptoms.

In the present study we will include the concepts of negative and positive affectivity as such possible mediating factors. Research has demonstrated those two independent dispositional variables to comprise the dominant factors of emotional experience (Watson, 1988). Negative affectivity (NA) is seen as a general factor of subjective distress and comprises a broad range of aversive mood states, including distress, nervousness, fear, anger and guilt. Individuals high in negative affectivity often focus on the negative sides of life and tend to have negative views of themselves, other people and the world in general. Positive affectivity (PA) reflects one's level of pleasurable engagement with the environment. High PA is composed of terms reflecting enthusiasm, energy, mental alertness and determination (e.g. excited, active, attentive, determined). Low PA is best defined by descriptors reflecting fatigue and depression (e.g. sluggish, sad). Positive and negative affectivity correspond roughly with the dominant factors extraversion and anxiety/neuroticism (Watson *et al.*, 1988).

The idea followed in many studies of work-related stress is that the tendency to experience positive and negative affect represents a stable, dispositional trait which may confound relationships between stressors and strain (Watson & Clark, 1984). However, exposure to bullying may also justify, enhance or even create a negative world-view and a negative emotional state, as proposed by the framework presented by Janoff-Bulman (1992). The core problem of bullying at work is that it undermines the target's sense of being a valuable and competent person living in a safe and caring environment (Keasly *et al.*, 1997; Leymann, 1990a). Distressed and dissatisfied with themselves, victims may focus on and magnify potential threats from their surroundings. Enhanced levels of state negative affectivity, as well as a lowered state of positive affect, may then initiate increased use of maladaptive coping strategies in turn causing higher levels of reported psychological symptoms and psychosomatic complaints (Costa & McCrae, 1980). Evidence that major stressful life events may increase symptomatology by increasing negative evaluations of others and self has been presented by Lakey and Edmundson (1993) and may easily be derived from the work of Janoff-Bulman (1992) as proposed by Mikkelsen and Einarsen (2002a). The aim of this study is to examine the level of psychiatric symptoms and symptoms of PTSD among current and former victims of bullying at work using a community sample. Second, we inquire how the PTSD symptoms relate to the kinds of bullying experienced by the victim and the duration of and time since the termination of the bullying. And third, we examine the role of state negative and positive affectivity as possible mediators or moderators in this stressor–strain relationship.

340   *Stig Berge Matthiesen & Ståle Einarsen*

## Method

*Procedure*

The 102 participants in the study were recruited among members of two Norwegian national associations against bullying at work. In total, 180 victims of on-going or prior exposure to bullying at work were members of these associations, by the onset of the survey. They all got a survey questionnaire, distributed by the two associations (by mail). Attached to the questionnaire was a letter of recommendation from the heads of the associations. The questionnaires were anonymously returned directly to the researchers.

*Subjects*

Mean age of the sample was 51.6 years (range 30–74 years). Seventy-four percent of the sample were women. The major part of the participants worked or had worked in administrative or clerical jobs (38%), health services (28%), or education (13%). Only a limited part of the sample were in fact still employed (33%), whereas 17% were on sick-leave, 12% were unemployed (the unemployment rate in Norway was only some 3% at that particular time) and 10% had retired. In addition, one out of four (26%) were disabled pensioners. The sample had a high educational level, where 60% had a university degrees or college degree, mostly on an undergraduate level. Sixty-three percent of the respondents had been exposed to bullying for a period of 2 years or more. Almost one in four (22%) were still exposed to bullying, or the bullying took place less than 6 years ago (6%) when the survey was carried out. Almost one in three (30%) were hit by bullying more than 5 years ago. The most frequent kinds of bullying reported were ostracism (social isolation), being devaluated, holding back information, calumniation, and frequent attacks or criticism against one's person.

*Instruments*

Bullying was measured in two ways. First, the following definition of workplace bullying was introduced to the respondents:

> 'Bullying takes place when one or more persons systematically and over time feel that they have been subjected to negative treatment on the part of one or more persons, in a situation in which the person(s) exposed to the treatment have difficulty in defending themselves against them. It is not bullying when two equal strong opponents are in conflict with each other' (Einarsen *et al.*, 1994).

Following this, the respondents were asked, 'Have you been exposed to bullying at work?' with three response alternatives (no, yes to some extent, and yes to a great extent). A quantitative measure of bullying, the Norwegian version of the 22-item

Negative Acts Questionnaire (NAQ; Einarsen & Raknes, 1997; Einarsen *et al.*, 1994), was also used. The NAQ consists of 22 items referring to specific kinds of bullying behaviours, such as exposure to excessive teasing, insulting remarks, social exclusion, verbal abuse, threats of being fired or redundant, and slanders or rumours about oneself. The respondents were asked if they had been exposed to any of these behaviours during the time they were targets of bullying, with the following response alternatives: never, occasionally, weekly, or daily.

Factor analysis has earlier revealed that the NAQ scale consists of two distinct subfactors, which were labelled 'personal derogation' and 'work-related harassment' (Einarsen & Raknes, 1997). In the present study, however, the NAQ score of each person was summed up to a single total measure of the intensity of the experienced bullying behaviours. Cronbach's alpha for NAQ was found to be 0.85.

Symptoms of post-traumatic stress were measured by the Impact of Event Scale, IES-R, the 22-item version (Weiss & Marmar, 1997), and the Post-Traumatic Stress Scale, PTSS-10 (Raphael *et al.*, 1989). The Impact of Event Scale Revised is a 22-item scale assessing three dimensions of symptoms often reported after trauma. The intrusion dimension consists of symptoms like intrusive memories, thoughts and emotions. The avoidance dimension measures symptoms related to avoiding memories and places, as well as denial. The newly added third dimension of the scale reflects hyperarousal, a strong kind of mental and bodily alertness. The four categories of IES was scored as 0, 1, 3, 5 according to standard scoring procedures (Horowitz, 1979; Weiss & Marmar, 1997). Cronbach alpha for the three subscales was found to be 0.81, 0.90 and 0.82, respectively. Horowitz (1979) divides the scores of IES (both intrusion and avoidance subscales) into three groups, with low, moderate and high level of post-traumatic stress (with respectively 0–9 points, 9–19 points, and 20 or more stress points). The cut point scoring procedures for the IES were applied, since IES-R does not have established separate cut point scores for the three subscales. In addition, the three subscales of IES were summed up to a single measure of post-traumatic stress. Here, a cut point threshold of 35 was applied, in line with Neal and associates (Neal *et al.*, 1994). Cronbach's alpha for the overall summed up scale was 0.94.

The PTSS-10 is a questionnaire assessing 10 common symptoms of PTSD (Raphael *et al.*, 1989). The measure range is from 1 (never/seldom) to 7 (very often). Cronbach's alpha was found to be 0.91 in the present study. Raphael *et al.* operationalise PTSD to be a PTSS-10 score of four or more on at least four items.

Psychiatric symptoms was measured by the Hopkins Symptom Checklist, HSCL (25-item version) originally developed by Derogatis and his co-workers (Derogatis *et al.*, 1974). The scale measures psychological symptoms of anxiety, depression and somatisation and was used as a measurement for psychiatric distress in the present study. The items in this scale are scored on a 4-point scale ranging from not at all, a little bit, quite a bit and very much. The scale had a very high internal stability in the present study with a Cronbach's alpha of 0.96. A convention is to use 1.75 as the cut point threshold of 'cases', indicating severe psychological distress (Winokur *et al.*, 1984).

Positive and negative affect was investigated by the use of the Positive and Negative Affectivity Scale (PANAS), which consist of respectively 10 + 10 items to measure the two affect concepts (Watson *et al.*, 1988). Both of the two affectivity scales had a Cronbach's alpha of 0.90. The respondents were asked about their reactions for the last couple of weeks. Hence, the inventory measured a state condition of positive and negative affectivity.

*Comparison groups*

The level of post-traumatic stress and psychiatric symptoms among victims of bullying was compared with several other contrast samples, by the means of IES and HSCL. The contrast samples were:

a. A contrast group of medical students, exposed to a high level of temporary stress (their first autopsy); 96 students (58% female) participated (Eid *et al.*, 1999). Eid and his associates conducted their study to establish a Norwegian control group which can be contrasted against other groups. They argue that their sample is stressed, but not traumatised.

b. Postal employees ($n = 144$, 88% female), all affected by a organisational downsising process (Myrvang & Stokke, 1997).

c. Recently divorced persons living in five different counties in Norway received a six pages questionnaire along with their official divorce decree during a period of 4 months. In total, 658 separated persons (58% female) participated (Thuen, 2000).

d. A population study, in which 2,015 individuals were personally interviewed (53% female) from a borough in Oslo and the islands of Lofoten in northern Norway (Sandanger *et al.*, 1998). Out of these, 797 (40%) were classified as 'possible psychiatric cases', after a HSCL-25 recommendation of 1.55 + (Richels *et al.*, 1976). Of these, 617 participated in a follow-up study. Thus, the follow-up study comprise the comparison group for the present study.

e. Thirty-six parents (50% female) of children in a major bus disaster, in which 12 school children and three accompanying parents died (Winje, 1996). The post-traumatic stress responses of these parents 1 year after the accident will be compared with the victims of bullying.

f. War zone personnel ($n = 213$, United Nation observers/medical helpers), all from Norway, interviewed about 1 year after their service in the Bosnia conflict (Andersen & Tysland, 1998).

The bullied victims were compared to group (a) on PTSS-10, groups (b)–(d) on HSCL-25, and to groups (e)–(f) by the use of IES-R.

Case: 1:16-cv-06109 Document #: 108 Filed: 10/04/18 Page 434 of 475 PageID #:3211

*Statistics*

The statistical analyses were conducted by the use of SPSS, version 8. The following statistical procedures were used: frequency, one way ANOVA, correlation and partial correlation analysis, and multiple linear regression.

## Results

Mean PTSS item stress scores of the bullied victims is compared with the comparison group of medical students (Fig. 1, part A). The bullied victims score markedly higher on all items ($p < 0.001$ for all $t$-test comparisons). It is also worthwhile to note that post-traumatic symptoms with the highest scores are depressive thoughts, isolation tendencies, fluctuating feelings, fear for reminding situations and general bodily tension.

Level of psychiatric distress in the bullied sample, as measured by the HSCL-25, was then compared with postal employees experiencing organisational transition, a sample of separated/divorced persons, and a group of possible psychiatric cases (Myrvang & Stokke, 1997; Raphael *et al.*, 1989; Sandanger *et al.*, 1998). Bullied victims reported higher levels of psychiatric distress than the three contrast groups (part B of Fig. 1). The bullied group reported a mean HSCL-25 level of 2.25, whereas the mean scores for the other three groups were 1.51, 1.43 and 1.30, correspondingly. Parts C and D of Fig. 1 comprises mean post-traumatic stress scores for Impact of Event Scale (intrusion and avoidance sub-indexes). The victims of bullying were compared with the parents of school children involved in a bus



FIG. 1. PTSD symptoms (PTSS-10, IES intrusion IES avoidance) and psychiatric symptoms (HSCL-25) among bullied victims, as compared with several other Norwegian samples.

accident, United Nation personnel 1 year after returning from war zone, and the group of medical students (Andersen & Tysland, 1998; Eid *et al.*, 1999; Winje, 1996). Bullied victims report a mean intrusion and avoidance level of 24.16 and 21.05, respectively. The post-traumatic stress scores among victims of bullying were higher than for all the other three groups.

Table 1 constitutes an estimate of how many of the bullied victims who are troubled with psychiatric distress and PTSD, according to critical cut point scores. The overall picture given by HSCL-25, PTSS-10 and IES-R is quite the same. A majority of the sample, between 60% and 77%, score above the cut point threshold, indicating severe psychiatric distress and PTSD (scores of distress indicating PTSD). Using IES as an overall measure (the three subscales added together) revealed that 72% of the respondents exceeded the recommended cut point threshold.

The second aim of this article was to investigate the association between characteristics of the bullying experience, and the level of reported psychiatric distress and PTSD (Table 2).

Weak interrelationships were found between the subjective feeling of being victimised, number of reported bullies, if one were bullied by a leader or not, the length of the bullying episode and the chosen post-traumatic stress indicators ($r$ = varies between 0.19 and 0.05, $p$ = ns for all of the correlations). However, the amount and kind of specific behaviours experienced in connection with bullying (summed up to an index) showed stronger interrelationship with psychiatric distress and PTSD. Victims reporting the highest exposure to specific negative acts during the bullying episode reported more post-traumatic stress and psychiatric distress than respondents exposed to fewer negative acts (all rs are significant, and varied between 0.28 and 0.41). Victims with the longest time interval since the bullying occurred were troubled the least ($r$ = −0.24, $p$ < 0.05).

Exposure to negative acts was more thoroughly investigated, correlating each of the 22 specific negative acts with psychiatric distress and PTSD (Table 3). Seven of the negative acts correlated significantly with the stress indices. Ridiculing, hostile or dismissive attitude, ignoring, downgrading or declaring the person incapable due to age or gender, exploitation and sanctions due to working style (working to much or

TABLE 1. Estimated PTSD and psychological distress among bullied victims; conventional cut point scores for IES-R, PTSS-10 and HSCL-25

| Scales | | $n$ | % |
|---|---|---|---|
| HSCL-25 | Low | 23 | 23.5 |
| | High | 75 | 76.5 |
| PTSS-10 | Not PTSD | 26 | 25.5 |
| | PTSD | 76 | 74.5 |
| IES intrusion | Low | 12 | 12.0 |
| | Moderate | 25 | 25.0 |
| | High | 63 | 63.0 |
| IES avoidance | Low | 14 | 14.0 |
| | Moderate | 26 | 26.0 |
| | High | 60 | 60.0 |

TABLE 2. The relationship between bulling, post-traumatic stress and mental distress (Pearson's *r* correlations)

| | PTSS-10 | IES intrusion | IES avoidance | IES hyperarousal | HSCL-25 |
|---|---|---|---|---|---|
| Feeling of being bullied[a] | 0.15 | 0.19 | 0.12 | 0.16 | 0.12 |
| Negative acts[b] | 0.39*** | 0.41*** | 0.36** | 0.35** | 0.28* |
| Number who bullied | 0.20 | 0.14 | 0.15 | 0.19 | 0.08 |
| Bullied by leader(s)[c] | 0.15 | 0.06 | 0.05 | 0.09 | 0.09 |
| Length of bullying | 0.08 | 0.09 | 0.16 | 0.09 | 0.05 |
| Time period since bullying | −0.21 | −0.24* | −0.14 | −0.29* | −0.21 |

*Note*: *$p$ <0.05, **$p$ <0.01, ***$p$ <0.001.
1) Feeling of being bullied is a dummy-variable, and comprises two levels: bullied to a certain extent, and strongly bullied.
2) Negative acts consists of 22 negative acts, summed to an index.
3) Dicotimised variable (bullied exclusively by leader(s) vs. bullied by others).

to little) were the only negative acts that were significantly linked to the psychiatric distress and PTSD (rs varied between 0.21 and 0.37). Downgrading or declaring the person incapable due to gender had the most consistent relation with the measures of psychiatric distress and PTSD ($p$ <0.01 for all of the correlations).

*Time passing by*

The possible effect of the passing of time is an interesting one in relation to PTSD. Only one in five (22%) of the sample reported to be bullied at present. This group was compared with victims exposed to bullying more than 1 year ago (66%). The group in between (bullied less than 1 year ago but not being bullied at present) was excluded from this analysis.

Those bullied at present reported a higher level of IES intrusion and IES hyperarousal than those bullied more than 1 year ago ($p$ <0.05 for the two *t*-tests). No significant differences were found in PTSS-10, HSCL-25 or IES avoidance (Table 4). An interesting point is that the mean levels of psychiatric distress and PTSD pass the critical cut point score for both the dichotomised groups of bullied victims (HSCL-25, IES intrusion, IES avoidance). Multivariate analyses were also conducted, to achieve an overall picture of the association between PTSD symptoms and the time variable (consisting of six categories, not dichotomised). The three IES measures were added as dependent variables. The overall association was not found to be significant ($p$ >0.05).

The final issue addressed in this study is whether positive and negative affectivity (state PA and state NA) may moderate or mediate the association between bullying and psychiatric distress/PTSD. The possible moderating effects of state PA and state NA were investigated by the use of multiple regression, whereas the mediator effects were examined by partial correlation analysis. Table 5 gives an overview of a series of regression models, in which psychiatric distress and PTSD were applied as

346 *Stig Berge Matthiesen & Ståle Einarsen*

dependent variables. Time since bullying and negative acts is stepwise entered into various regression models as predictors, followed by PA and NA.

Time since bullying occurred and the specific negative acts explain between 8% and 12% of the variance in the criteria variables. Positive and especially negative affectivity gives substantial contribution to the regression models (all beta values for NA were in the range 0.34 to 0.57, the amount of explained variance increased between 13 and 53%, when PA and NA was added to the models). Reversed multiple regression models were also conducted, that is, with positive and negative affectivity entered into the models as step 1 and the two bullying variables as step 2. Controlled for the positive and negative affect, the variable combination amount of bullying and time since bullying took place gave a significant increase in the regression models predicting post-traumatic stress symptoms: IES ($p < 0.05$, $R^2$ change, all three subscales) and PTSS. Bullying did not, however, predict psychiatric distress measured by HSCL-25. At most, the two bullying predictors added 9% increase to the models (IES avoidance). All five regression models were tested for an interaction between PA and NA and the two measures on bullying (all combinations). Only one interaction turned out to give a significant contribution to explain variance. The interaction effect between PA and time since bullying occurred gave a 2% increase in the explained variance of psychiatric distress.

Zero-order and second-order partial correlation analysis (*pr*), respectively, were conducted to examine possible mediator effects of PA or NA related to the link between bullying and traumatic stress reactions. The partial control thus consists of the PA and NA variables in the second-order partial analysis. A considerable difference between the two correlation coefficients may be interpreted as mediator effects of PA and NA. The difference between zero-order and second-order correlations were found to be modest, however: PTSS ($r = 0.27$, $pr = 0.23$), IES avoidance ($r = 0.31$, $pr = 0.28$), IES intrusion ($r = 0.24$, $pr = 0.19$), IES hyperarousal ($r = 0.26$, $pr = 0.22$) and HSCL-25 ($r = 0.20$, $pr = 0.14$). Thus, in sum our study does

TABLE 3. The relationship between various negative acts, psychological functioning and post-traumatic stress; zero-order correlations (Pearson's *r*)

| | PTSS-10 | IES intrusion | IES avoidance | IES hyperarousal | HSCL-25 |
|---|---|---|---|---|---|
| Ridiculing | 0.33** | 0.12 | 0.09 | 0.15 | 0.31** |
| Hostile/dismissive attitude | 0.21* | 0.23* | 0.20 | 0.28** | 0.07 |
| Ignoring | 0.15 | 0.20 | 0.11 | 0.24* | 0.10 |
| Downgrading due to age | 0.20 | 0.20 | 0.10 | 0.08 | 0.23* |
| Downgrading due to gender | 0.32** | 0.33*** | 0.37*** | 0.27** | 0.37** |
| Exploiting | 0.26** | 0.22* | 0.21* | 0.21* | 0.36** |
| Negative reactions because of working too much/too little | 0.28** | 0.21* | 0.05 | 0.18 | 0.22* |

*Note:* *$p < 0.05$, **$p < 0.01$, ***$p < 0.001$; *n* varies between 90 and 100.

TABLE 4. Post-traumatic stress and psychological distress; comparison of victims bullied at present vs. victims bullied one year ago or later (Student's *t* tests)

| | Bullied now | | Bullied before | | *t* | df | *p* |
|---|---|---|---|---|---|---|---|
| | M | SD | M | SD | | | |
| HSCL-25 | 2.45 | 0.49 | 2.15 | 0.69 | 1.79 | 1/83 | ns |
| PTSS-10 | 45.81 | 14.74 | 39.00 | 16.27 | 1.74 | 1/86 | ns |
| IES intrusion | 27.04 | 6.44 | 20.76 | 10.90 | 2.55 | 1/85 | <0.05 |
| IES avoidance | 22.61 | 9.24 | 19.52 | 10.12 | 1.24 | 1/85 | ns |
| IES hyperarousal | 25.07 | 7.72 | 18.97 | 11.01 | 2.35 | 1/85 | <0.05 |

TABLE 5. Multiple regression models with time since bullying occurred, negative acts, positive affectivity (PA) and negative affective (NA) as predictors, and with measures of psychological distress and post-traumatic stress as criteria variables; strongest (if significant) interactional term is included in each model

| | beta | $R^2$ | $R^2$ Change | $F$ Change |
|---|---|---|---|---|
| PTSS-10 | | | | |
| Time | −0.23 | 0.05 | 0.05 | 5.73* |
| Amount of bullying | 0.29 | 0.12 | 0.07 | 9.61** |
| PA | −0.43 | 0.30 | 0.18 | 26.06*** |
| NA | 0.50 | 0.49 | 0.19 | 37.66*** |
| | | | | |
| IES intrusion | | | | |
| Time | −0.17 | 0.02 | 0.02 | 2.96 |
| Amount of bullying | 0.33 | 0.12 | 0.10 | 12.31*** |
| PA | −0.20 | 0.16 | 0.04 | 4.58* |
| NA | 0.35 | 0.24 | 0.08 | 11.74*** |
| | | | | |
| IES avoidance | | | | |
| Time | −0.38 | 0.06 | 0.06 | 7.72** |
| Amount of bullying | 0.11 | 0.11 | 0.05 | 6.13* |
| PA | −0.11 | 0.21 | 0.10 | 13.96*** |
| NA | 0.34 | 0.43 | 0.22 | 37.66*** |
| | | | | |
| IES hyperarousal | | | | |
| Time | −0.25 | 0.05 | 0.05 | 6.87** |
| Amount of bullying | 0.28 | 0.12 | 0.07 | 8.92** |
| PA | −0.34 | 0.24 | 0.10 | 15.09*** |
| NA | 0.57 | 0.48 | 0.24 | 46.63*** |
| | | | | |
| HSCL-25 | | | | |
| Time | −0.24 | 0.05 | 0.05 | 6.09* |
| Amount of bullying | −0.20 | 0.09 | 0.04 | 4.37* |
| PA | −0.57 | 0.36 | 0.27 | 44.24*** |
| NA | 0.57 | 0.61 | 0.25 | 62.44*** |
| PA × time | −0.44 | 0.64 | 0.03 | 6.69* |

*$p$ <0.05, **$p$ <0.01, ***$p$ <0.001.

not confirm moderating or mediating effect of state PA and state NA regarding the bullying–traumatic stress connection.

## Discussion

Information about the prevalence of PTSD among victims of bullying may be useful in order to inform health care professionals as well as the legal system of the possible extreme consequences of such experiences. The description of specific symptoms may also benefit victims directly by informing them of symptoms experienced by others. In itself this may reduce any anxiety and fear of 'going crazy' (Saunders, 1994). Practitioners also need to be informed of the symptoms displayed by victims of bullying, thus preventing the misdiagnosis that often seems to occur when victims seek medical or psychological treatment (Einarsen, 2000; Leymann & Gustavson, 1996). Many victims may be incorrectly diagnosed by professionals receiving diagnoses such as paranoia, manic depression, or character disturbance (Leymann & Gustavson, 1996) which may give rise to further stigmatisation. The frequency and intensity of post-trauma symptoms diminish gradually over time, although the symptoms may never completely disappear (Foa & Riggs, 1995). This decline was demonstrated in two research studies examining changes in the prevalence of PTSD following assault (Foa & Riggs, 1995; Rothbaum *et al.*, 1992). In both studies female victims of rape and non-sexual assault were assessed repeatedly over a period of 3 months, with the onset of assessment starting about 14 days after the traumatic event. It was found that 94% of rape victims and 76% of non-sexual assault victims met symptom criteria for PTSD at the initial assessment, diminishing to, respectively, 47% and 22% after 11 weeks.

Several studies have demonstrated that bullying at work poses a serious threat to the health and well-being of those at the receiving end (Einarsen *et al.*, 1996; Zapf *et al.*, 1996). Delayed injuries of bullying, in which the victim perhaps has retired from active work, has been investigated to a very limited extent so far. The notion that victims of bullying are exposed to such health hazards causing Post-Traumatic Stress Disorder has, with a few exceptions (see e.g. Leymann & Gustavson, 1996; Mikkelsen & Einarsen, 2002a), not been investigated. The present study indicates that psychiatric distress and PTSD may be widespread among victims of bullying at work. Some three out of four respondents scored above the recommended IES and PTSS threshold for PTSD. Comparison with a host of other samples, like separated or divorced people, war zone personnel, postal employees after an organisational downsize, and a sample of possible psychiatric cases, indicates that our sample of bullied victims portrays an especially high level of stress. The findings should not be interpreted as indicating that exposure to bullying is worse than the aftermath of losing your kids in a bus accident, or being traumatised in a war zone.

According to Janoff-Bulman (1992), post-traumatic stress following victimisation is largely due to the shattering of basic assumptions victims hold about themselves and the world, in which the feeling of personal invulnerability constitutes an important part. The sense of invulnerability is tied to the three core beliefs: (a) the

world as benevolent, (b) the world as meaningful, and (c) the self as worthy. Also, the just world hypothesis (Lerner, 1980), that is, our need to believe that we live in a world where people get what they deserve and deserve what they get, seems to be shattered by the experience of being bullied. The belief in a just world and the three core beliefs enables the individual to confront the physical and social environment as if it were stable, orderly, coherent, safe and friendly. A traumatic event presents information that is incompatible with these existing mental models, or schemas (Horowitz, 1975, 1979).

This incongruity gives rise to stress responses requiring reappraisal and revision of the schemas. The person tends to use avoidance strategies in order to ward off distressing thoughts, images and feelings caused by the incident, thus giving the control system tolerable doses of information. Phases of intrusion and avoidance occur as the person attempts to process or 'work through' the experience (Horowitz, 1975). The bullied victim may repeatedly re-experience the most humiliating or frustrating aggressive events for his/her 'inner eye', or the person may systematically avoid certain work situations, be it lunch breaks, meetings or other people while at work. They may even experience it as difficult to approach or pass a former workplace, as described in one particular case study (Einarsen & Hellesøy, 1998). A traumatised and stigmatised person may, due to excessive bullying at work, have a strong shattered experience of the world as not being a just, meaningful and benevolent place, with a strong anticipation of future misfortune to come. These experiences can be induced later on, for instance, after the person has ended his/her job or even the job career. Following may be a state of extreme anxiety and hyperarousal, in the long run causing a breakdown of basic psycho-biological systems.

It is tempting to assume that the bullied victims are particularly hit by the shattering of the world as not being a benevolent place, and poor self-esteem after the devastating incidents. Another important assumption is the just world hypothesis (Lerner, 1980). People have a need to believe that they live in a world where people get what they deserve and deserve what they get. The belief in a just world enables the individual to confront the physical and social environment as if it were stable and orderly. A traumatised person experiencing bullying at work may have a strong shattered experience of the world as not being a just place, with a strong anticipation of future misfortune to come (Mikkelsen & Einarsen, 2002a). Traditionally, PTSD is regarded as a postponed negative health effect after the exposure to one shocking, stultifying stressor, e.g. an accident. The traumatic event can usually not be predicted, with natural disasters, mechanical failures or human errors typically being the triggering factors.

Bullying, at work or at school, is a somewhat different phenomenon, since it is a cumulative trauma (type 2 trauma). Jarring personal chemistry, escalating conflict episodes and dismissive interpersonal behaviour may gradually turn into mortifying bullying (Einarsen, 1999). The disaster is socially created, and at least on the psychologically level the victim feels that s/he cannot escape from this devastating traumatic situation. Other studies have demonstrated that being forced to stay in a life situation filled with traumatic episodes for a long time may result in PTSD, e.g.

study findings from concentration camp survivors (Eitinger & Strøm, 1973). Learned helplessness (Seligman, 1975), a sense of being unable to cope with destiny, may be a reaction bullied victims and concentration camp prisoners have in common, with PTSD as a negative health after effect.

Respondents who reported exposure to many different kinds of specific negative acts are troubled the most with post-traumatic stress. A somewhat surprising finding was the modest relationship between 'being bullied by leaders' and post-traumatic stress. Other studies have found that individuals to a great extent are struck by health complaints when bullied by their superiors (Björkqvist *et al.*, 1994). Leaders are influential and possess more power than colleagues, which means that they can exert sanctions against the victim as part of a conflict process. Bullying by superiors seems to be widespread among the participants of this study. It is possible that modest interrelationships between leadership harassment and post-traumatic stress was due to a relatively homogenous sample. Length of bullying was not associated with post-traumatic stress, which could be explained with a homogeneous sample, with low between subject variance.

Victimisation from bullying comprises a subjective experience. All types of situations can in principle be experienced as conflict episodes, according to Thomas' (1976) conflict definition. Most kinds of behaviours perceived as negative and directed at a person with a perceived aim to be hurtful may also lead to a perception of being bullied, at least if they are exhibited over a prolonged period of time (Einarsen *et al.*, 2003). Irrespective of this is it of crucial importance to gather information about negative acts that causes perceptions of being bullied, and PTSD in the next round. In his work Leymann (1990b) lists 47 negative acts potentially to perceived as precursors of bullying, whereas this survey maps 22 negative acts (the measure of NAQ), chosen from clinical and empirical experience. It is possible, however, that certain kinds of negative acts are experienced as more stressful than others. In the present study downgrading or incapasiting due to gender correlates quite strongly with post-traumatic stress. An adjacent finding is the revealed link between working style and traumatic stress. Downgrading due to gender and bullying because of working style could be seen as different expressions of tension between male and female employees at work.

Post-traumatic stress implies that the health weakening symptoms persist, or emerge with new intensity long after the actual trauma has ceased. Although this survey revealed that symptoms weakened somewhat as time goes by, the effect of time relationship was moderate. The small differences between victims exposed to present bullying and victims in which the bullying ceased more than a year ago support a notion that time only to a limited extent heals all wounds. The relationship between bullying and positive and negative affectivity has been demonstrated in previous research (Mikkelsen & Einarsen, 2002a). Negative affectivity has been seen as an important source of 'emotional dissonance' in organisations, and is linked to role conflict (Abraham, 1998). It has been found, furthermore, that negative affectivity also co-varies with interpersonal conflicts (Spector & O'Connell, 1994). Positive affectivity corresponds with, for example, organisational commitment (Cropanzano *et al.*, 1993) and prosocial behaviour (Lawton *et al.*, 1997). It has

been argued that negative affectivity should be applied as a control variable within stress research, because NA could reveal spurious relationship between strain and stress reactions, as stated by Watson and Clark (1984) in their seminal work. An example of such interrelationships could be the perception of exposure to negative acts at work, as seen in bullying. In this study it was unveiled that weak (non-significant) interaction effects between all combinations of PA, NA and the most important bullying predictors related to post-traumatic stress. The mediator effects of PA and NA were also modest. These findings stultify the notion that NA modifies most interconnections between strain and reaction measures, and is in line with Mikkelsen and Einarsen (2002b).

Still, NA seems to have a stronger direct effect on the PTSD-indicators than does PA. These findings support previous research, where NA co-varies the most with stress and health indicators, and PA with satisfaction and well-being indicators (Watson, 1988). Also found is a stronger interrelationship between post-traumatic avoidance and hyperarousal reactions, compared with post-traumatic intrusional thoughts and flashbacks. This could indicate that it is particularly bullied victims characterised by an evasive behaviour, and strong stress arousal, who are struck by PTSD problems.

## Conclusion

Using established tests of PTSD, a very high level of post-traumatic stress symptoms was revealed in the present study. This finding corresponds with previous research (Leymann & Gustavson, 1996; Mikkelsen & Einarsen, 2002a). A majority of the respondents exceed recommended threshold-values indicating PTSD. It is important to underline that our findings are only indicators of PTSD problems among the victims, since we did not undertake diagnostic interviews with the respondents. It remains a debatable question whether PTSD is an appropriate psychiatric diagnosis in the case of bullying at work, at least according to the criteria of DSM-IV. In our opinion, one should evaluate this aspect in an open-minded manner, since the PTSD diagnosis and DSM have undergone several revisions over the course of time.

Other methodological constraints must also be considered in the interpretation of the present findings. The participants comprise a selected group: they have all been recruited from two associations of bullied victims. The sample could consist of more injured people than what is typical for victims of bullying. It is reasonable, on the other hand, to assume that many individuals exposed to bullying at work do not have sufficient go-ahead spirit or strength to seek allies, e.g. by forming or contacting a bullying association. Many bullied victims express feelings of emotional constriction after being a victim of bullying. They refuse to confide in someone what they experience at work, male victims in particular (Einarsen *et al.*, 1994). The present sample consists on average of quite educated people, most women, working in white collar professions. However, an other study revealed that blue collar workers are more exposed to bullying than others (Einarsen & Skogstad, 1996). Hence, the participants of this study may not comprise a representative sample. Social

desirability (Crowne & Marlowe, 1964) represents another issue to be taken into consideration. Sceptics may claim that it is reasonable to assume that the participants in the present study, being members of bullied victims associations, consciously or unconsciously will express their feelings in a particularly negative light, in order to finally gain the attention their problems deserve.

As illuminated by this article, PTSD related to bullying at work constitutes a research field with scarce research attention so far. The field deserves follow-up studies. Longitudinal research should be conducted in particular, since the time factor is essential for our understanding of the progress of PTSD. A suggestion for follow-up studies, also, is that diagnostic interviews are implemented as part of the research design, as, for instance, performed by Dyregrov and associates in their studies among war children (Dyregrov *et al.*, 2000, 2002).

Irrespective of PTSD, the topic of bullying at work lacks longitudinal research designs, which should be applied during the forthcoming years. Particularly, personality issues should be investigated. Some victims of bullying may be more vulnerable than others, as indicated in a previous study (Matthiesen & Einarsen, 2001). Correspondingly, the strong direct link found between negative affectivity and PTSD symptoms in this study may indicate that there is a strong personality component in the phenomenology of bullying.

## Acknowledgements

The authors want to thank the respondents who participated in the study, and the members of two bullying associations in Norway. We also owe appreciation to Atle Dyregrov, Michael Sheehan, and two anonymous reviewers for helpful suggestions and comments, and Jarle Eid for providing some of the contrast group data.

## References

ABRAHAM, R. (1998). Emotional dissonance in organizations: antecedents, consequences, and moderators. *Genetic, Social and General Psychology Monographs*, 124 (2), 229–246.

ANDERSEN, A. & TYSLAND, I. (1998). Krigens skjulte ofre—hvem er de? (The hidden victims of the war—who are they?) Unpublished report, University of Bergen, Norway.

ANDERSSON, L.M. & PEARSON, C.M. (1999). Tit for tat? The spiraling effect of incivility in the workplace. *Academy of Management Review*, 24, 452–471.

BARON, R.A. & NEUMAN, J.H. (1996). Workplace violence and workplace aggression: evidence on their relative frequency and potential causes. *Aggressive Behavior*, 22, 161–173.

BJÖRKQVIST, K., ÖSTERMAN, K. & HJELT BÄCK, M. (1994). Aggression among university employees. *Aggressive Behavior*, 20 (3), 173–184.

BRODSKY, C.M. (1976). *The Harassed Worker*. Toronto: Lexington Books.

COSTA, P.T. & MCCRAE, R.R. (1980). Influences of extraversion and neuroticism on subjective well-being: happy and unhappy people. *Journal of Personality and Social Psychology*, 38, 668–678.

CREAMER, M. (2000). Posttraumatic stress disorder following violence and aggression. *Aggression and Violent Behavior*, 5 (5), 431–449.

CROPANZANO, R., JAMES, K. & KONOVSKY, M.A. (1993). Dispositional affectivity as a predictor of work attitudes and job performance. *Journal of Organizational Behavior*, 14 (6), 595–606.

CROWNE, D. & MARLOWE, D. (1964). *The Approval Motive: Studies in Evaluative Dependence*. New York: John Wiley.

DAHL, A.A., EITINGER, L., MALT, U.F. & RETTERSTØL, N. (1994). *Lærebok i psykiatri (Textbook in Psychiatry)*. Oslo: Universitetsforlaget.

DAVIDSON, J.T.J. & FOA, E.B. (1993). *Posttraumatic Stress Disorder*. Washington, DC: American Psychiatric Press.

DEROGATIS, L.R., LIPMAN, R.S., RICKELS, K., UHLENHUTH, E.H. & COVI, L. (1974). The Hopkins symptom checklist: a self report inventory. *Behavioral Science*, 19, 1–15.

DYREGROV, A., GUPTA, L., GJESTAD, R. & MUKANOHELI, E. (2000). Trauma exposure and pscychological reactions to genocide among Rwandan children. *Journal of Traumatic stress*, 13, 3–21.

DYREGROV, A., GJESTAD, R. & RAUNDALEN, M. (2002). Children exposed to warfare: a longitudinal study. *Journal of Traumatic stress*, 15, 59–68.

EID, J., THAYER, J.F. & JOHNSEN, B.H. (1999). Measuring post-traumatic stress: a psychometric evaluation of symptom and coping questionnaires based on a Norwegian sample. *Journal of Scandinavian Psychology*, 40, 101–108.

EINARSEN, S. (1999). The nature and causes of bullying at work. *International Journal of Manpower*, 20 (1/2), 16–27.

EINARSEN, S. (2000). Harassment and bullying at work: a review of the Scandinavian approach. *Aggression and Violent Behavior*, 4 (5), 379–401.

EINARSEN, S. & HELLESØY, O.H. (1998). *Når samhandling går på helsen løs: helsemessige konsekvenser av mobbing i arbeidslivet (When Social Interaction Weakens Your Health—Health Consequences of Workplace Bullying)*. Oslo: Norsk Lægeforening.

EINARSEN, S. & RAKNES, B.I. (1997). Harassment in the workplace and the victimization of men. *Violence and Victims*, 12, 247–263.

EINARSEN, S. & SKOGSTAD, S. (1996). Bullying at work: epidemiological findings in public and private organizations. *European Journal of Work and Organizational Psychology*, 5 (2), 185–201.

EINARSEN, S., RAKNES, B.I., MATTHIESEN, S.B. & HELLESØY, O.H. (1994). *Mobbing og harde personkonflikter. Helsefarlig samspill på arbeidsplassen (Bullying and Tough Interpersonal Conflicts. Health Injourious Interaction at the Work Place)*. Bergen: Sigma Forlag.

EINARSEN, S., RAKNES, B.I., MATTHIESEN, S.B. & HELLESØY, O.H. (1996). Bullying at work and its relationships with health complaints—moderating effects of social support and personality. *Nordisk Psykologi*, 48, 116–137.

EINARSEN, S., MATTHIESEN, S.B. & SKOGSTAD, A. (1998). Bullying, burnout and well-being among assistant nurses. *Journal of Occupational Health and Safety—Australia and New Zealand*, 14, 263–268.

EINARSEN, S., HOEL, H., ZAPF, D. & COOPER, C.L. (2003). The concept of bullying at work: the European tradition. In: EINARSEN, S., HOEL, H., ZAPF, D. & COOPER, C.L. (Eds), *Bullying and Emotional Abuse in the Workplace* (pp. 3–30). London: Taylor & Francis.

EITINGER, L. & STRØM, A. (1973). *Mortality and Mobidity after Excessive Stress: a Follow up Investigation of Norwegian Concentration Camp Survivors*. Oslo: Humanities Press/Universitetsforlaget.

FOA, E.B. & RIGGS, D.S. (1995). Posttraumatic stress disorder following assault: theoretical considerations and empirical findings. *Current directions in psychological science*, 4 (2), 61–65.

FONTANA, A. & ROSENHECK, R. (1998). Duty-related and sexual stress in the etiology of PTSD among women veterans who seek treatment. *Psychiatric Services*, 49 (5), 658–662.

HOEL, H., RAYNER, C. & COOPER, C.L. (1999). Workplace bullying. In: COOPER, C.L. & ROBERTSON, I.T. (Eds), *International Review of Industrial and Organizational Psychology*, Volume 14 (pp. 195–230). London: John Wiley.

HOROWITZ, M.J. (1975). Intrusive and repetitive thoughts after stress. *Archives of General Psychiatry*, 32, 1457–1463.

HOROWITZ, M.J. (1979). Psychological responses to serious life events. In: HAMILTON, V. & WARBURTON, D.M. (Eds), *Human Stress and Cognition: an Information Processing Approach*. New York: Wiley.

JANOFF-BULMAN, R. (1992). *Shattered Assumptions: towards a New Psychology of Trauma*. New York: The Free Press.

KEAHSLY, L. (1998). Emotional abuse in the workplace: conceptual and empirical issues. *Journal of Emotional Abuse*, *1* (1), 85–117.

KEAHSLY, L., HUNTER, S. & HARVEY, S. (1997). Abusive interaction and role state stressors: relative impact on student residence assistant stress and work attitudes. *Work and Stress*, *11*, 175–185.

LAKEY, B. & EDMUNDSON, D.D. (1993). Role evaluations and stressful life events: aggregate versus domain-specific predictors. *Cognitive Therapy and Research*, *17*, 249–267.

LAKEY, B., TARDIFF, T.A. & DREW, J.B. (1994). Negative social interactions: assessment and relations to social support, cognition and psychological distress. *Journal of Clinical and Social Psychology*, *13*, 42–62.

LAPOSA, J.M., ALDEN, L.E. & FULLERTON, L.M. (2003). *Journal of Emergency Nursing*, *20* (1), 23–28.

LAWTON, R., PARKER, D., MANSTEAD, A.S.R. & STRADLING, S.G. (1997). The role of affect in predicting social behaviors: the case of road traffic violations. *Journal of Applied Social Psychology*, *27* (14), 1258–1276.

LERNER, M.J. (1980). *The Belief in a Just World*. New York: Plenum Press.

LEYMANN, H. (1987). Sjalvmord til följd av forhallanden i arbetsmiljøn (Suicide due to work conditions). *Arbete, Menneska, Milj*, *3*, 155–160.

LEYMANN, H. (1990a). Mobbing and psychological terror at workplaces. *Violence and Victims*, *5* (2), 119–126.

LEYMANN, H. (1990b). *Presentation av LIPT-formularet. Konstuktion, validering, utfall (Presentation of the LIPT-Questionnaire. Construction, Validation, Measurement)*. Stockholm: Violen Praktikertjanst.

LEYMANN, H. (1992). *Psykiatriska halsoproblem i samband med vuxenmobbning. En rikstackende undersøkning med 2428 intervjuer (Psychiatric Problems after Mobbing—a Study of 2428 Individuals) (Report no. 3)*. Stockholm: Arbetarskyddsstyrelsen.

LEYMANN, H. (1996). The content and development of bullying at work. *European Journal of Work and Organizational Psychology*, *5*, 165–184.

LEYMANN, H. & GUSTAVSON, A. (1996). Mobbing at work and the development of Post-Traumatic Stress Disorders. *European Journal of Work and Organizational Psychology*, *5* (2), 251–275.

MATTHIESEN, S.B. & EINARSEN, S. (2001). MMPI-2 configurations after persistent bullying at work. *European Journal of Work and Organizational Psychology*, *10* (4), 467–484.

MATTHIESEN, S.B., AASEN, E., HOLST, G., WIE, K. & EINARSEN, S. (2003). The escalation of conflict: A case study of bullying at work. *International Journal of Management and Decision making*, *4* (1), 96–112.

MIKKELSEN, E.G. & EINARSEN, S. (2002a). Basic assumptions and post-traumatic stress among victims of workplace bullying. *European Journal of Work and Organizational Psychology*, *11* (1), 87–111.

MIKKELSEN, E.G. & EINARSEN, S. (2002b). Relationships between exposure to bullying at work and psychological and psychosomatic health complaints: the role of state negative affectivity and generalized self-efficacy. *Scandinavian Journal of Psychology*, *43* (5), 397–405.

MYRVANG, R. & STOKKE, T. (1997). Organisatorisk tilknytning i en omstillingstid. Kartlegging av omstillingsreaksjoner hos postansatte i forbindelse med nedleggelse av postkontorer (Organizational commitment in connection with organizational transition: a survey of individual reactions), unpublished report, University of Bergen.

NEAL, L.A., BUSUTTIL, W., ROLLINS, J., HEREPATH, R., STRIKE, P. & TURNBULL, G. (1994). Convergent validity of measures of Post-Traumatic Stress Disorder in a mixed military and civilian population. *Journal of Traumatic Stress*, *7*, 447–455.

NIEDL, K. (1996). Mobbing and well-being: economic and personnel development implications. *European Journal of Work and Organizational Psychology*, *5*, 203–214.

O'MOORE, M., SEIGNE, M., MCGUIRE, L. & SMITH, M. (1998). Victims of bullying at work in Ireland. *Journal of Occupational Health and Safety—Australia and New Zealand*, *14* (6), 569–574.

PATHE, M. & MULLEN, P.E. (1997). The impact of stalkers on their victims. *British Journal of Psychiatry*, *170*, 12–17.

RAPHAEL, B., LUNDIN, T. & WÆISETH, L. (1989). A research method for the study of psychological and psychiatric aspects of disaster. *Acta Psychiatrica Scandinavica Supplementum*, *353*, 1–75.

Richels, K., Garcia, C.R., Lipman, R.S., Derogatis, L.R. & Fisher, E.L. (1976). The Hopkins symptom checklist: assessing emotional distress in obstetric-gynecological practice. *Primary Care*, *3*, 751–764.

Rothbaum, B.O., Foa, E.B., Murdoch, T., Riggs, D. & Walsh, W. (1992). A prospective examination of Post-Traumatic Stress Disorder in rape victims. *Journal of Traumatic stress*, *5*, 455–475.

Sandanger, I., Moum, T., Ingebretsen, G., Dalgard, O.S., Sorensen, T. & Bruusgaard, D. (1998). Concordance between symptom screening and diagnostic procedure: the Hopkins Symptom Checklist-25 and the Composite International Interview 1. *Social Psychiatry and Psychiatric epidemiology*, *33*, 345–354.

Saunders, D.G. (1994). Posttraumatic stress symptom profiles of battered women: a comparison of survivors in two settings. *Violence and Victims*, *9* (1), 31–44.

Schlenger, W.E., Fairbank, J.A., Jordan, K.B. & Caddell, J.M. (1997). Epidemiological methods for assessing trauma and posttraumatic stress disorder. In: Wilson, J.P. & Keane, T.M. (Eds), *Assessing Psychological Trauma and PTSD* (pp. 139–159). New York: Guilford Press.

Scott, M.J. & Stradling, S.G. (1994). Post-Traumatic Stress Disorder without the trauma. *British Journal of Clinical Psychology*, *33* (1), 71–74.

Seligman, M.E.P. (1975). *Helplessness: on Depression, Development and Death*. San Francisco: Freeman Publishers.

Spector, P.E. & O'connell, B.J. (1994). The contribution of personality traits, negative affectivity, locus of control and Type A to the subsequent reports of job stressors and job strains. *Journal of Occupational and Organizational Psychology*, *67* (1), 1–12.

Spratlen, L.P. (1995). Interpersonnel conflict which includes mistreatment in a university workplace. *Violence and Victims*, *10*, 285–297.

Thomas, K.W. (1976). Conflict and conflict management. In: Dunnette, M. D. (Ed.), *Handbook of Industrial and Organizational Psychology* (pp. 889–935). Chicago: Rand McNally.

Thuen, F. (2000). Psychiatric symptoms and perceived need for psychiatric care after divorce. *Journal of Divorce and Remarriage*, *2000* (1), 61–76.

Vartia, M. (1996). The sources of bullying—psychological work environment and organizational climate. *European Journal of Work and Organizational Psychology*, *5*, 203–205.

Vitanza, S., Vogel, L.C.M. & Marshall, L.L. (1995). Distress and symptoms of posttraumatic stress disorder in abused women. *Violence and Victims*, *10* (1), 23–34.

Watson, D. (1988). Intraindividual and interindividual analyses of positive and negative affect: their relation to health complaints, perceived stress and daily activities. *Journal of Personality and Social Psychology*, *54* (6), 1020–1030.

Watson, D. & Clark, L.A. (1984). Negative affectivity: the disposition to experience aversive emotional states. *Psychological Bulletin*, *96* (3), 465–490.

Watson, D., Clark, L.A. & Tellegen, A. (1988). Development and validation of brief measures of positive and negative affect: the PANAS scales. *Journal of Personality and Social Psychology*, *54* (6), 1063–1070.

Weiss, D.S. & Marmar, C.R. (Eds) (1997). *The Impact of Event Scale—Revised*. New York: Guilford Press.

Williams, T. (1993). Trauma in the workplace. In: Wilson, J.P. & Raphael, B. (Eds), *International Handbook of Traumatic Stress Syndrome* (pp. 925–933). New York: Plenum Press.

Wilson, C.B. (1991). U.S. businesses suffers from workplace trauma. *Personnel Journal*, July, 47–50.

Winje, D. (1996). Long term outcome of trauma in adults: the psychological impact of a fatal bus accident. *Journal of Consulting and Clinical Psychology*, *64* (5), 1037–1043.

Winokur, A., Winokur, D.F., Rickels, K. & Cox, D.S. (1984). Symptoms of emotional distress in family planning service. *British Journal of Psychiatry*, *144*, 395–399.

Wolfe, J., Sharkansky, E.J., Read, J.P., Dawson, R., Martin, J.A. & Ouimette, P.C. (1998). Sexual harassment and assault as predictors of PTSD symptomatology among U.S. female Persian Gulf War military personnel. *Journal of Interpersonal Violence*, *13* (1), 40–57.

Zapf, D. (1999). Organisational, work group related and personal causes of mobbing/bullying at work. *International Journal of Manpower*, *20* (1/2), 70–85.

356  *Stig Berge Matthiesen & Ståle Einarsen*

ZAPF, D. & GROSS, C. (2001). Conflict escalation and coping with workplace bullying: a replication and extension. *European Journal of Work and Organizational Psychology*, *10* (4), 497–522.

ZAPF, D., KNORZ, C. & KULLA, M. (1996). On the relationship between mobbing factors, and job content, social work environment and health outcomes. *European Journal of Work and Organizational Psychology*, *5* (2), 215–237.

*(Accepted 9 April 2004)*

Copyright of British Journal of Guidance & Counselling is the property of Carfax Publishing Company and its content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.

Copyright of British Journal of Guidance & Counselling is the property of Brunner / Routledge and its content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.

# EXHIBIT

# A26

Case: 1:16-cv-06109 Document #: 108 Filed: 10/04/18 Page 451 of 475 PageID #:3228

*Anxiety, Stress, & Coping*
Vol. 24, No. 5, October 2011, 499–513



# Workplace bullying and its relation with work characteristics, personality, and post-traumatic stress symptoms: an integrated model

Cristian Balducci[a]*, Franco Fraccaroli[b] and Wilmar B. Schaufeli[c]

[a]*Department of Political Science, Alma Mater Studiorum, University of Bologna, Via dei Bersaglieri, 6/c, Bologna 40125, Italy;* [b]*Department of Cognitive and Education Sciences, University of Trento, Palazzo Fedrigotti, Corso Bettini 31, Rovereto 38068, Italy;* [c]*Department of Social and Organizational Psychology, University of Utrecht, P.O. Box 80.140, Utrecht 3508 TC, Netherlands*

(*Received 7 March 2010; final version received 13 January 2011*)

Workplace bullying refers to prolonged exposure to frequent hostile behaviors at work, which can lead to severe stress reactions. Research in this area has not revealed a clear picture on how bullying escalates in organizations. Drawing on recent developments in work stress theory, this study tested a comprehensive model of bullying in which work environmental and personality factors were hypothesized to act as antecedents of bullying and post-traumatic stress symptoms as an outcome. Structural equation modeling on data provided by 609 public sector employees in Italy showed that job demands (workload and role conflict) and job resources (decision authority, co-worker support and salary/promotion prospects) were related to bullying over and above neuroticism, and that bullying mediated the relationship between job demands and PTSD symptoms. Evidence also emerged for a buffering effect of job resources on the job demands–bullying relationship. Overall results are compatible with a view of bullying as a strain phenomenon, initiated by both work environmental and personality factors.

**Keywords:** workplace bullying; victimization; PTSD symptoms; job demands-resources model; bullying model; neuroticism

The phenomenon of workplace bullying, first described by Leymann (e.g., 1996), refers to prolonged exposure to frequent hostile behaviors at work, such as excessive criticism of one's work, withholding of information which affects performance, spreading of rumours, social isolation, etc. (Einarsen, Hoel, Zapf, & Cooper, 2010). In the long run these behaviors may lead to the stigmatisation and victimization of the exposed individual (Einarsen & Mikkelsen, 2003).

Despite important advancements in terms of refinement of the construct and understanding of the individual effects of the phenomenon, workplace bullying is still a topic in which there is a need for further research (Bowling & Beehr, 2006). This is because research on the antecedents of bullying and on the effect of possible preventive interventions is still in its infancy. Thus, in the present study we contribute to research in this area by developing and testing an overall model of bullying which presents the following three unique features: it integrates work environmental and

*Corresponding author. Email: cristian.balducci3@unibo.it

ISSN 1061-5806 print/1477-2205 online
© 2011 Taylor & Francis
DOI: 10.1080/10615806.2011.555533
http://www.informaworld.com

*C. Balducci* et al.

personality factors as potential preconditions of bullying; it includes not only traditional job stressors but also buffering resources; and it examines post-traumatic stress disorder (PTSD; American Psychiatric Association [APA], 2000) symptomatology as a possible consequence of the bullying-related victimization.

### Development of bullying: the role of work environmental and personality factors

Most research on the development of bullying has examined either the role of the work environment (see Salin & Hoel, 2010) or the role of the characteristics of the victim (see Zapf & Einarsen, 2010). According to the work environment hypothesis (e.g., Leymann, 1996), poor psychosocial conditions at work (e.g. role ambiguity and role conflict) may trigger interpersonal conflicts, which if not properly managed may escalate into bullying.

However, empirical data on the work environment hypothesis are not conclusive. While research has shown (e.g., Leymann, 1996; Vartia, 1996) that victims of bullying report poor psychosocial work environments (a more competitive social climate, higher workload, less social support, etc.), the systematic investigation of predicting factors and explaining processes of workplace bullying in the light of more robust models of work stress has only recently started up. Agervold and Mikkelsen (2004), in one of the first studies, found that employees who were frequently exposed to bullying reported less job control, work tasks which were more unclear or contradictory, a management style which was less employee-oriented, and fewer social contacts with co-workers. More recently, Skogstad, Einarsen, Torsheim, Aasland and Hetland (2007) found that a *laissez faire* leadership style as well as role conflict and role ambiguity were antecedents of bullying, with role stressors mediating the effect of abdicating leadership on bullying. These findings were corroborated by Hauge, Skogstad, and Einarsen (2007), who found that leadership variables were substantially related to bullying over and above other job stress-inducing factors such as role stressors, job demands and decision authority. In a meta-analysis, Bowling and Beehr (2006) reported that work constraints, role conflict and role ambiguity are the strongest potential antecedents of workplace harassment. In line with these results, on the basis of the analysis of 148 organizational ethnographies, Hodson, Roscigno, and Lopez (2006) concluded that coherent production procedures provide a context in which bullying is unnecessary and disallowed.

However, all of the studies reviewed above on the work environment hypothesis of bullying neglect the role of personality factors. This is an important shortcoming, since there is strong evidence for a relationship between bullying and certain personality traits (Zapf & Einarsen; 2010). Coyne, Smith-Lee Chong, Seigne, and Randll (2003), for example, found that victims of bullying displayed a tendency, in comparison to controls, to be easily upset and were more likely to experience difficulty in coping with personal criticism; they also tended to be more anxious, tense, and suspicious of others. Similar results were reported in a sample of victims who sought clinical advice (Brousse et al., 2008). In this study 88% of the victims reported high trait neuroticism at first consultation, with this percentage remaining statistically unchanged at the one-year follow-up. In a Finnish study of hospital employees, Kivimäki et al. (2003) showed not only that undergoing bullying predicted the incidence of depression, but also that the presence of a diagnosis of

Case: 1:16-cv-06109 Document #: 108 Filed: 10/04/18 Page 453 of 475 PageID #:3230

depression predicted the incidence of bullying, suggesting that personal psychological factors may be implicated in bullying. Finally, Bowling, Beehr, Bennett and Watson (2010) recently found a significant longitudinal relationship between negative affectivity – which includes a general proneness to experience anger, fear, sadness, and other negative feelings (Watson & Pennebaker, 1989) – and workplace victimization.

## A comprehensive model of bullying

Research on work environmental and personality factors as antecedents of bullying has mostly been parallel in nature. Thus, in the present study we test a model of the experience of bullying and its consequences in which we integrate both types of factors.

To operationalize the effect of the work environment on bullying, we use the framework of a recently introduced model of work stress: the job demands-resources (JD-R) model (e.g. Bakker & Demerouti, 2007). According to the JD-R model, the psychosocial characteristics of the work environment may be differentiated into two overarching factors: job demands and job resources. Job demands refer to aspects of the job (e.g. physical and psychological demands) that require physical or mental effort and that therefore may generate work-related stress, thus acting as a potential triggering factor for interpersonal conflicts and bullying. Job resources, on the other hand, are those aspects (e.g. decision latitude and social support) that are functional in reaching work goals and/or in reducing job demands and that may protect individual health and promote well-being. Therefore, job resources may be hypothesized as acting as a buffering factor in the escalation of bullying, which would be consistent with the widely known buffering hypothesis.

As far as personality is concerned, we focus on neuroticism, which has been found to be a potentially important factor in bullying (e.g. Coyne et al., 2003). However, of particular interest to unravel the process of bullying escalation is to look at whether neuroticism strengthens the job demands–bullying relationship. This would be in line with the idea of a differential reactivity to environmental stressors of people with high neuroticism (Warr, 2007), which could increase their risk of becoming victims of bullying. Different mechanisms may explain the strengthening effect of neuroticism on the job demands–bullying relationship (Bowling et al., 2010). For example, under distressing working conditions highly neurotic employees may engage more often in annoying behaviors, which could lead potential perpetrators to bully them.

A final aspect of novelty of the proposed model of bullying is that PTSD symptoms are examined as a possible consequence of the phenomenon. Although it is a matter of debate whether bullying has all the characteristics of an overwhelming traumatic event (Mikkelsen & Einarsen, 2002), which is a prerequisite condition for the diagnosis of PTSD, a number of studies indeed found a relationship between bullying and PTSD symptoms (e.g. Balducci, Alfano, & Fraccaroli, 2009; Mikkelsen & Einarsen, 2002). However, a potential limitation of these studies is that in none of the cases was an organizational sample of participants included. Rather, contacts were made either with victims from anti-bullying associations (Mikkelsen & Einarsen, 2002) or with victims who sought clinical consultation (Balducci et al., 2009). These victims may differ from bullying victims in general (Nielsen & Einarsen,

2008). For example, they may represent only the most extreme cases of bully-ing, ending with expulsion of the victim from the labour market (Leymann, 1996), which may be the real factor leading to PTSD symptoms. If bullying has indeed traumatic potential, then the relationship between bullying and PTSD symptoms should also emerge in organizational samples, which has never been investigated in previous research. Furthermore, since there is evidence for a relationship between work environmental factors and bullying (Hauge et al., 2007) and between bullying and PTSD symptoms (Balducci et al., 2009), then the hypothesis may also be investigated that bullying acts as a mediator in the relationship between work environmental factors and PTSD symptoms.

On the basis of the above considerations, we thus tested the following hypotheses:

*Hypothesis 1*: Work environmental factors and neuroticism would be related to the experience of bullying. Specifically, job demands and neuroticism would show a positive relationship with bullying, while job resources a negative relationship with bullying.

*Hypothesis 2*: Bullying would be positively related to PTSD symptoms.

*Hypothesis 3*: Job resources would moderate the job demands–bullying relationship.

*Hypothesis 4*: Neuroticism would strengthen the job demands–bullying relationship.

*Hypothesis 5*: Bullying would mediate the job demands–PTSD symptoms relationship.

## Method

### Participants

Data were collected as part of a psychosocial risk assessment conducted in 2007 in a large public administration agency in Italy. Employees in non-managerial positions, most of whom carrying out administrative work, were requested to fill in a structured, anonymous questionnaire investigating a number of psychosocial aspects of work and health outcomes. The questionnaire was administered during working hours; participation was on a voluntary basis. A total of 818 employees participated. The study sample consisted of the 609 participants who had complete data on all study variables. Response rate of the study sample was 43.78%. Gender was female in 49.4% of the cases, which represented fairly well the gender distribution of the organization (49.2% were females). Age of participants was distributed as follows: .5% were 20–29 years, 23.9% were 30–39, 43.0% were 40–49, 28.8% were 50–59 and 3.8% were 60 or more. As for the age distribution in the population, 65% of employees were aged 40 years or above, which indicates that the sample had a certain approximation to the population as far as age is concerned. Most participants (98.3%) had a permanent job contract. Given the sensitive nature of the questionnaire contents, no further demographic or occupational data were collected.

### Instruments

Workplace bullying was investigated by using a 9-item version (Notelaers & Einarsen, 2008) of the Negative Acts Questionnaire-Revised (NAQ-R; Einarsen, Hoel, & Notelaers, 2009). The NAQ-R explores how often the respondent has been subjected to a number of negative behaviors at work in the last six months, such as

"Someone withholding information which affects performance." Responses varies from 0 ("Never") to 4 ("Daily"). We obtained a Cronbach's alpha of .82 for the adopted version of the scale. The items of the short NAQ-R explores three 3-item components of bullying (i.e., work-related bullying, person-related bullying and social isolation), which were taken as the observed indicators of the underlying construct. Cronbach's alpha of observed variables used in the analyses is reported in Table 1.

Symptoms of PTSD were explored by using a validated brief version of the PTSD Checklist-civilian scale (PCL-C; Lang & Stein, 2005). This version includes six items forming three 2-item subscales (i.e., re-experiencing, avoidance, and hyper-arousal) which investigate the three types of symptoms of PTSD as defined by the DSM IV-TR (APA, 2000). An example item is "Experienced repeated, disturbing memories, thoughts or images of the traumatic event." Responses to items were in terms of symptoms intensity and varied from 1 ("Not at all") to 5 ("Extremely"). Where the original item was anchored to "the traumatic event," we modified the item by anchoring it to "the negative behaviors" defining bullying. The overall alpha for the scale was .89. In the analyses we used the three 2-item measures defined above as observed indicators of the investigated construct.

As for job demands, previous qualitative interviews conducted by the first author with employees suggested that two common sources of stress were role stressors and work overload. We therefore operationalized job demands in terms of role conflict and workload. Role conflict was measured by using six items (e.g., "I receive incompatible requests from two or more people") from the role conflict scale developed by Rizzo, House, and Lirtzman (1970). Responses ranged from 1 ("Completely true") to 5 ("Completely false"), with items being reverse coded before computing the scale total. Workload was measured by using the five-item Effort scale from the Effort-Reward Imbalance questionnaire (ERI; Siegrist et al., 2004). An example item is "I have constant time pressure due to a heavy workload." Responses on this scale vary from 1 ("Disagree") to 5 ("Agree, and I'm very disturbed by this").

We operationalized job resources in terms of autonomy, promotion prospects, and co-workers support – factors that emerged as important helping elements in the studied organization. These are job resources with potential importance in most work settings (e.g., Warr, 2007). Autonomy was measured by three items forming the decision authority scale of the Job Content Questionnaire (JCQ; Karasek et al., 1998). An example item is "In the organization of my work I have a lot to say." Responses vary on a 4-point scale ranging from 1 ("Strongly disagree") to 4 ("Strongly agree"). Promotion prospects were evaluated by using the Salary/promotion scale from the ERI questionnaire (Siegrist et al., 2004), which is composed of four items such as "Considering all my efforts and achievements, my job promotion prospects are adequate." Responses were given on a 5-point scale ranging from 1 ("Yes") to 5 ("No, and I'm very disturbed by this"). Items were recoded, when necessary, so that higher scores meant higher job promotion prospects. Co-workers support was measured by four items from the JCQ (Karasek et al., 1998). Responses were given on a 4-point scale ranging from 1 ("Strongly disagree") to 4 ("Strongly agree"); an example item is: "My co-workers are friendly with me."

504   *C. Balducci* et al.

Table 1. Properties and Pearson's product moment correlations of the study variables ($N=609$).

| Variable | M | SD | α | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. NAQ–Work-related bullying | 0.50 | 0.6 | .66 | – | | | | | | | | | | | | |
| 2. NAQ–Personal bullying | 0.47 | 0.6 | .71 | .57** | – | | | | | | | | | | | |
| 3. NAQ–Social isolation | 0.34 | 0.5 | .58 | .60** | .59** | – | | | | | | | | | | |
| 4. PTSD–Re-experiencing | 1.47 | 0.8 | .87 | .47** | .43** | .46** | – | | | | | | | | | |
| 5. PTSD–Avoidance | 1.67 | 0.9 | .76 | .38** | .39** | .44** | .71** | – | | | | | | | | |
| 6. PTSD–Hyperarousal | 1.50 | 0.8 | .79 | .42** | .41** | .42** | .64** | .62** | – | | | | | | | |
| 7. Role conflict | 2.40 | 0.8 | .76 | .37** | .24** | .27** | .23** | .25** | .28** | – | | | | | | |
| 8. Workload | 1.96 | 0.7 | .84 | .26** | .27** | .25** | .30** | .23** | .31** | .34** | – | | | | | |
| 9. Salary/promotion prospects | 3.31 | 1.1 | .81 | −.29** | −.19** | −.26** | −.29** | −.29** | −.26** | −.26** | −.20** | – | | | | |
| 10. Coworker support | 2.80 | 0.3 | .73 | −.26** | −.27** | −.31** | −.16** | −.20** | −.13** | −.15** | −.12** | .27** | – | | | |
| 11. Decision authority | 2.70 | 0.5 | .69 | −.21** | −.17** | −.13** | −.22** | −.17** | −.17** | −.15** | .08* | .24** | .13** | – | | |
| 12. Neuroticism | 2.08 | 0.8 | .90 | .30** | .22** | .28** | .39** | .31** | .41** | .21** | .25** | −.08 | −.08 | −.15** | – | |
| 13. Gender[a] | – | – | – | .15** | .12** | .02 | .04 | .11** | .03 | .10* | .21** | −.03 | −.09* | −.11** | .10* | – |

Note: [a]Coded as: 0 = male; 1 = females.

*$p < .05$. **$p < .01$.

Neuroticism was measured by using a 9-item scale (e.g., "I get upset easily") derived from a big-five personality inventory included in the International Personality Item Pool (IPIP; Goldberg, 1999). Responses varied from 1 ("Not at all") to 5 ("Completely").

### Analyses

Hypotheses were tested by using structural equation modeling (SEM) as implemented by LISREL 8.71. In order to test for the two hypothesized interactions (job demands × job resources and job demands × neuroticism) on bullying (see Hypothesis 3 and Hypothesis 4), we used moderated structural equation modeling (MSEM; Cortina, Chen, & Dunlap, 2001). More details on MSEM are given below. To test for the postulated mediation model of bullying (Hypothesis 5), we used the Sobel (1986) test.

The fit of the structural equation models was evaluated by using the $\chi^2$ statistic and a variety of other practical fit indices. Models showing values of up to .08 at the Root Mean Square Error of Approximation (RMSEA) and values of .90 or higher at the Normed Fit Index (NFI), Non-Normed Fit Index (NNFI), Comparative Fit Index (CFI), Goodness of Fit Index (GFI) and its adjusted form (AGFI) are usually considered as acceptable (see Tabachnick & Fidell, 2007). Models showing values of up to .06 at the RMSEA and values of .95 or higher at the NFI, NNFI and CFI are considered as good (Hu & Bentler, 1999).

### Results

#### Preliminary analyses

Since the study sample ($N = 609$) was obtained by using listwise deletion of cases from the initial sample ($N = 818$), we preliminarily checked whether the excluded cases differed from the included ones on the three bullying measures (i.e., the crucial study variables). Three *t*-tests did not reveal any difference between the two groups: $t(729) = 1.22$, *ns*, for work-related bullying; $t(727) = 1.13$, *ns*, for person-related bullying; and $t(738) = .44$, *ns*, for social isolation.

Properties of study variables and correlations are reported in Table 1. We also included gender in these analyses since gender has been found to be the strongest predictor of PTSD (Nemeroff et al., 2006). However, gender did not show strong correlations with PTSD symptoms in the present study (see Table 1); thus, we finally decided to leave it out from further analysis.

We then tested whether the joint distribution of observed variables was multivariate normal. Results of these tests revealed that this assumption did not hold – for example, the test for multivariate skewness was statistically significant ($Z = 25.88$; $p < .001$). Thus, to improve parameters' estimation, we run all SEM analyses by using the robust maximum likelihood method (Olsson, Foss, Troye, & Howell, 2000).

Finally, before testing our main hypotheses, we checked for whether the latent factors job demands and job resources could be differentiated empirically. To this end we used confirmatory factor analysis (CFA), comparing the fit of a second order two-factor (job demands and job resources) model to the fit of a second order one-factor (psychosocial risk) model. In the two-factor model the first order factors were

role conflict and workload for job demands, while promotion prospects, co-workers support and autonomy for job resources. In the one-factor model the same first order factors all loaded on a second-order psychosocial risk factor. Observed measures for these preliminary analyses were the following: role conflict, workload, promotion prospects and co-worker support were each indicated by two randomly derived parcels, while autonomy by the three component items. CFA results for the one-factor model were the following: $\chi^2$ (39) = 198.66; GFI = .94; AGFI = .91; RMSEA = .077; NFI = .91; NNFI = .90; CFI = .93. Results for the two-factor model were the following: $\chi^2$ (38) = 139.94; GFI = .96; AGFI = .93; RMSEA = .062; NFI = .94; NNFI = .93; CFI = .95. Satorra and Bentler (2001) scaled $\chi^2$ difference test (S-B $\triangle \chi^2$) indicated that the two-factor model fitted significantly better than the one-factor model, S-B $\triangle \chi^2$ (1) = 44.41, $p < .001$. The estimated correlation between the second-order job demands and job resources factors was $\varphi = -.41$. On the whole, the data supported the differentiation of a latent job demands factor from a latent job resources factor.

### Test of main hypotheses

MSEM was implemented by using the technique outlined by Mathieu, Tannenbaum, and Salas (1992) as reported in Cortina et al. (2001). In this analyses, job demands, job resources, neuroticism and each of the successive interactions tested (job demands × job resources and job demands × neuroticism) had only one observed indicator. The indicator for job demands, job resources and neuroticism was obtained by summing and standardizing (i.e., centering) the scores on the variables involved in the definition of the factor. The indicator of the interaction factor was the product of the two scores of the indicators defining the interacting factors. The path from each of the factors to its indicator was fixed by using the square root of the reliability of the indicator. The reliabilities of the job demands, job resources, and neuroticism indicators were estimated by means of their Cronbach's alpha. The reliability of the indicator for the interaction factor was computed by taking the product of the reliabilities of the interacting factors' indicators (e.g., job demands and job resources) plus the square of the latent correlation between the same factors, divided by one plus the square of the same latent correlation just mentioned (Cortina et al., 2001). The error variance of the observed indicator for each factor was set equal to the product of its variance and one minus its reliability. The correlation between each of the two interacting factors and the factor representing their interaction was fixed at zero (Cortina et al., 2001). A significant interaction effect is supported when the path coefficient from the latent interaction factor to the latent target factor is statistically significant and the model including this path fits significantly better, as evaluated by a difference in the $\chi^2$ statistic, than the model which does not include this same path.

Thus, each MSEM analysis included six factors: job demands, job resources, neuroticism, the focused interaction, bullying, and PTSD symptoms, with each of the latter two factors being defined by its three observed indicators (see Method section). The tested models were in line with the proposed hypotheses, such that job demands, job resources, neuroticism and each of the interaction factors tested were all related to bullying, while bullying was related to PTSD symptoms. We also included a direct relationship between neuroticism and PTSD symptoms in the model; this is because

Case: 1:16-cv-06109 Document #: 108 Filed: 10/04/18 Page 459 of 475 PageID #:3236

neuroticism has been found to be related to the experience and onset of anxiety symptoms and disorders (Clark, Watson, & Mineka, 1994). Table 2, Models 1–2, reports the results of MSEM testing for Hypotheses 1–3 that work environmental factors (i.e., job demands and job resources) and neuroticism would be related to bullying, that bullying would be related to PTSD symptoms, and that job resources would moderate the job demands–bullying relationship, respectively.

A comparison between Model 1 and Model 2, which differed for the inclusion in Model 2 of a direct path from the interaction factor to the bullying factor, indicated that the difference in their $\chi^2$ value was statistically significant (S-B $\Delta\chi^2_{M1-M2}$ (1) = 3.96; $p < .05$). Model 2 is graphically represented in Figure 1, from where it can be seen that job demands ($\gamma = .30$; $p < .05$), job resources ($\gamma = -.36$; $p < .05$), and neuroticism ($\gamma = .22$; $p < .05$) were all related to bullying in the expected direction and that bullying was strongly positively related to PTSD symptoms ($\gamma = .61$; $p < .05$). Thus, we found evidence in line with Hypothesis 1 and Hypothesis 2. Furthermore, the interaction (job demands × job resources) factor showed also a modest but significant negative relationship with bullying ($\gamma = -.13$; $p < .05$), with simple slope analysis (Figure 2) indicating that at higher levels of job resources the job demands–bullying relationship was weaker. Thus, we also found evidence in line with Hypothesis 3.

Table 2, Models 3–4, reports the results of MSEM testing for Hypotheses 4 that neuroticism would strengthen the job demands–bullying relationship. A comparison between Model 3 and Model 4, which differed for the inclusion in Model 4 of a path from the job demands × neuroticism interaction factor to the bullying factor, indicated that their fit was not significantly different. Thus we did not find evidence in line with Hypothesis 4.

To look at whether bullying would mediate the relationship between job demands and PTSD symptoms (Hypothesis 5), we focused on Model 2 (see Figure 1) and used

Table 2. Results of SEM analyses.

| Model | $\chi^2$ | df | GFI | AGFI | RMSEA | NFI | NNFI | CFI |
|---|---|---|---|---|---|---|---|---|
| Model 1 (JD × JR interaction on bullying: main effects only) | 58.769** | 30 | .970 | .944 | .039 (.023–.054) | .985 | .989 | .993 |
| Model 2 (JD × JR interaction on bullying: main and interaction effects) | 54.734** | 29 | .972 | .946 | .038 (.022–.053) | .987 | .990 | .994 |
| Model 3 (JD × neuroticism interaction on bullying: main effects only) | 55.837** | 30 | .971 | .946 | .038 (.022–.053) | .985 | .990 | .993 |
| Model 4 (JD × neuroticism interaction on bullying: main and interaction effects) | 55.925** | 29 | .971 | .945 | .039 (.023–.054) | .985 | .989 | .992 |

Note: JD, job demands; JR, job resources; GFI, goodness of fit index; AGFI, adjusted goodness of fit index; RMSEA, root mean square error of approximation; NFI, normed fit index; NNFI, non-normed fit index; CFI, comparative fit index.
**$p < .01$.

508     *C. Balducci* et al.



Figure 1. Moderation of job resources on the relationship between job demands and workplace bullying.
Note: Person-r. bullying, Person-related bullying; Work-r bullying, Work-related bullying. Reported paths are standardized parameter estimates.
[a]This parameter is fixed in the model, so no *p*-value is available.
*$p < .05$; **$p < .01$; ***$p < .001$.

the Sobel (1986) test on appropriate unstandardized coefficients. Results indicated that bullying indeed mediated the relationship between job demands and PTSD symptoms ($Z = 4.32$; $p < .05$), which was in line with Hypothesis 5. To increase our confidence on the latter result, we also ran bootstrap analysis, which – differently from the Sobel test – does not rely on the assumption of a normal sampling distribution (Preacher & Hayes, 2008). To this end we obtained appropriate factor scores from Model 2 in LISREL and sent them to the SPSS macro developed by Preacher and Hayes (2008). Results (reported as unstandardized coefficients) indicated that the total effect of job demands on PTSD symptoms (total effect = .60, $t = 10.31$; $p < .01$) became nonsignificant when bullying was included in the



Figure 2. Simple slope analysis for the moderation of job resources on the relationship between job demands and workplace bullying.

model (direct effect of job demands $= .07$, $t = 1.36$; *ns*). Furthermore, the analyses revealed that the indirect effect of job demands on PTSD symptoms (i.e., the difference between the total and direct effects) was significant, with a point estimate of .50 and a 95% BCa (bias-corrected and accelerated) bootstrap confidence interval of .41 to .60.

## Discussion

The current study was designed with the main purpose of testing a comprehensive model of bullying including three unique aspects, namely the consideration of work environmental and personality factors; examination of both traditional stressors and buffering resources; and the inclusion of PTSD symptoms as a possible consequence of bullying-related victimization.

We found that personality and work–environmental factors were independently related to bullying, suggesting two possible different paths to the workplace victimization. As far as personality is concerned, building on previous research (e.g., Bowling et al., 2010) we focused on neuroticism and found that the higher the level of this disposition, of which one of the main characteristics is emotional instability (Warr, 2007), the higher the frequency of the reported bullying. Thus, independently of the characteristics of the work environment, neuroticism may directly contribute to bullying. For example, neurotic individuals may behave in such a way to actively produce conflicts that may cause them to be aggressed by others (Zapf & Einarsen, 2010).

However, the results of the present study strongly suggest that personality is not a sufficient factor for an understanding of bullying. A reformulation and test of the work environment hypothesis (Hauge et al., 2007) according to the principles of the job demands–resources model of work stress (Bakker & Demerouti, 2007) supported the view that psychosocial characteristics of the job (i.e., job demands and job resources) are directly related to bullying over and above neuroticism. According to the job demands–resources model, job demands have the potential to activate negative arousing experiences at work and may, in the longer run, induce health impairment process (Schaufeli, Bakker, & Van Rhenen, 2009). Workplace bullying could be an interpersonal correlate of this process, in that negative arousing experiences at work and stress reactions may predispose individuals to involvement in interpersonal conflicts which may then escalate into bullying. In line with this interpretation, we also found that a job resources factor made up of promotion prospects, co-worker support and autonomy was negatively related to bullying and buffered the job demands–bullying relationship. This is to be expected, since the investigated resources provide protection from the arousing effect of job stressors and thus prevent individuals' experiencing the hypothesized preconditions of bullying. Overall these results further support the view of bullying as a strain phenomenon.

We also found that bullying was strongly related to PTSD symptoms and that bullying mediated the job demands–PTSD symptoms relationship. These findings are original for two reasons. First of all because previous studies on the relationship between bullying and PTSD symptoms (e.g., Balducci et al., 2009) only focused on non-organizational samples (usually clinical samples) of victims. Secondly, a model including a path from working conditions to bullying and from bullying to PTSD

symptoms, where bullying plays a mediating role, has not been previously explored. Our analyses provided evidence for this path, and thus for the plausibility of Leymann's (1996) idea that interpersonal conflicts at work that are related to poor working conditions may lead to bullying, and from bullying to traumatic stress reactions.

Of course we cannot resolve the complex issue of the appropriateness of PTSD diagnosis as a consequence of bullying, which is related to the conceptualization of bullying as an overwhelming traumatic event. However, bullying seems to have indeed the potential for being a traumatic event (Mikkelsen & Einarsen, 2002). To further investigate this issue in our data, in separate analyses (not reported here) we tried to control for participants' exposure to other traumatic events. Specifically, on the basis of an item included in the questionnaire, we split our sample into two sub-groups, differentiating workers who over the last year experienced ($n = 117$) versus did not experience ($n = 476$) a traumatic event (e.g., death of the spouse, severe personal illness, divorce) scoring higher than 50 on the Social Readjustment Rating Scale (Holmes & Rahe, 1967) – and refitted our final model of bullying (see Figure 1) on the latter subgroup. Bullying was still strongly related to PTSD symptoms and played a mediating role on the job demands–PTSD symptoms relationship. These results provide further evidence for the traumatic potential of bullying, which perhaps is related to its repetitive nature and prolonged duration.

### Study limitations and implications

The most important limitation of our study is that it was based on a cross-sectional design. Longitudinal studies in the work stress area (e.g., De Raeve, Jansen, van den Brandt, Vasse, & Kant, 2008; Schaufeli, Bakker, & Van Rhenen, 2009) do show that organizational factors such as role conflict and role ambiguity have an influence on interpersonal conflicts and health outcomes, so the path from job demands to PTSD symptoms through bullying is plausible. However, there is a strong need for more longitudinal research in this area.

A second limitation is that the data were self-reported, which raises the issue of common method variance. However, other methods, such as observer ratings of working conditions, may be equally affected by bias (Spector, 2006). For example, peer nominations of bullying as used by Coyne et al. (2003) may only capture bullying behaviors that are overt in nature, which may be the minority. Furthermore, by including neuroticism (i.e., negative affectivity) in our model, we considered a crucial source of common method bias (Watson & Pennebaker, 1989).

A third important limitation of the present study is its lack of generalizability. We have focused on employees of a public administration agency in Italy. So it is to be seen in future research whether the present findings generalize to other types of jobs and occupational sectors.

As far as implications are concerned, the results of the present study suggest that management interventions aiming at controlling critical job demands and reinforcing job resources seem to be useful means for avoiding interpersonal conflicts and bullying (see also De Raeve et al., 2008) and their extreme consequences. Furthermore, training employees on conflict management may also be useful, particularly for those with high potential to become targets of bullying.

Case: 1:16-cv-06109 Document #: 108 Filed: 10/04/18 Page 463 of 475 PageID #:3240

## References

Agervold, M., & Mikkelsen, E.G. (2004). Relationships between bullying, psychosocial work environment and individual stress reactions. *Work & Stress, 18*(4), 336–351. doi: 10.1080/0267837041233131 9794

American Psychiatric Association (APA). (2000). *Diagnostic and statistical manual of mental disorders* (4th ed., text revision). Washington, DC: Author.

Bakker, A.B., & Demerouti, E. (2007). The job demands-resources model: State of the art. *Journal of Managerial Psychology, 22*(3), 309–328. doi: 10.1108/02683940710733115

Balducci, C., Alfano, V., & Fraccaroli, F. (2009). Relationships between mobbing at work and MMPI-2 personality profile, post traumatic stress symptoms and suicidal ideation and behaviour. *Violence and Victims, 24*(1), 52–67. doi: 10.1891/0886-6708.24.1.52

Bowling, N.A., & Beehr, T.A. (2006). Workplace harassment from the victim's perspective: A theoretical model and meta-analysis. *Journal of Applied Psychology, 9*(5), 998–1112. doi: 10.1037/0021-9010.91.5.998

Bowling, N.A., Beehr, T.A., Bennett, M.M., & Watson, C.P. (2010). Target personality and workplace victimization: A prospective analysis. *Work & Stress, 24*(2), 140–158. doi: 10.1080/02678373.2010.489635

Brousse, G., Fontana, L., Ouchchane, L., Boisson, C., Gerbaud, L., Bourguet, D., ... Chamoux, A. (2008). Psychopathological features of a patient population of targets of workplace bullying. *Occupational Medicine, 58*, 122–128. doi: 10.1093/occmed/kqm148

Clark, L.A., Watson, D., & Mineka, S. (1994). Temperament, personality, and the mood and anxiety disorders. *Journal of Abnormal Psychology, 103*, 103–116. doi: 10.1037/0021-843X.103.1.103

Cortina, J.M., Chen, G., & Dunlap, W.P. (2001). Testing interactions effects in LISREL: Examination and illustration of available procedures. *Organizational Research Methods, 4*(4), 324–360. doi: 10.1177/109442810144002

Coyne, I., Smith-Lee Chong, P., Seigne, E., & Randall, P. (2003). Self and peer nominations of bullying: An analysis of incident rates, individual differences, and perceptions of the working environment. *European Journal of Work and Organizational Psychology, 12*(3), 209–228. doi: 10.1080/13594320344000101

De Raeve, L., Jansen, N.W.H., van den Brandt, P.A., Vasse, R.M., & Kant, I. (2008). Risk factors for interpersonal conflicts at work. *Scandinavian Journal of Work, Environment, and Health, 34*(2), 96–106.

Einarsen, S., Hoel, H., & Notelaers, G. (2009). Measuring exposure to bullying and harassment at work: Validity, factor structure and psychometric properties of the Negative Acts Questionnaire-Revised. *Work & Stress, 23*(1), 24–44. doi: 10.1080/02678370902815673

Einarsen, S., Hoel, H., Zapf, D., & Cooper, C.L. (2010). The concept of bullying and harassment at work: The European tradition. In S. Einarsen, H. Hoel, D. Zapf & C.L. Cooper (Eds.), *Bullying and harassment in the workplace. Developments in theory, research, and practice* (pp. 3–39). Boca Raton, FL: CRC Press.

Einarsen, S., & Mikkelsen, E.G. (2003). Individual effects of exposure to bullying at work. In S. Einarsen, H. Hoel, D. Zapf & C.L. Cooper (Eds.), *Bullying and emotional abuse in the workplace. International perspectives in research and practice* (pp. 127–144). London: Taylor and Francis.

Goldberg, L.R. (1999). A broad-bandwidth, public-domain, personality inventory measuring the lower-level facets of several five-factor models. In I. Mervielde, I. Deary, F. De Fruyt & F. Ostendorf (Eds.), *Personality psychology in Europe,* 7 (pp. 7–28). Tilburg, The Netherlands: Tilburg University Press.

Hauge, L.J., Skogstad, A., & Einarsen, S. (2007). Relationships between stressful work environments and bullying: Results of a large representative study. *Work & Stress, 21*(3), 220–242. doi: 10.1080/02678370701705810

Hodson, R., Roscigno, V.J., & Lopez, S.H. (2006). Chaos and the abuse of power: Workplace bullying in organizational and interactional context. *Work and Occupations, 33*(4), 382–416. doi: 10.1177/0730888406292885

Holmes, T.H., & Rahe, R.H. (1967). The social readjustment rating scale. *Journal of Psychosomatic Research, 11*, 213–218. doi: 10.1016/0022-3999(67)90010-4

Hu, L.T., & Bentler, P.M. (1999). Cutoff criteria for fit indexes in covariance structure analysis: Conventional criteria versus new alternatives. *Structural Equation Modeling*, 6(1), 1–55. doi: 10.1080/10705519909540118

Karasek, R., Brisson, C., Kawakami, N., Houtman, I., Bongers, P., & Amick, B. (1998). The Job Content Questionnaire (JCQ): An instrument for internationally comparative assessments of psychosocial job characteristics. *Journal of Occupational Health Psychology*, 3(4), 322–355. doi: 10.1037/1076-8998.3.4.322

Kivimäki, M., Virtanen, M., Vartia, M., Elovainio, M., Vahtera, J., & Keltikangas-Jarvinen, L. (2003). Workplace bullying and the risk for cardiovascular disease and depression. *Occupational and Environmental Medicine*, 60, 779–783. doi: 10.1136/oem.60.10.779

Lang, A.J., & Stein, M.B. (2005). An abbreviated PTSD checklist for use as a screening instrument in primary care. *Behaviour Research and Therapy*, 43, 585–594. doi: 10.1016/j.brat.2004.04.005

Leymann, H. (1996). The content and development of mobbing at work. *European Journal of Work and Organizational Psychology*, 5, 165–184. doi: 10.1080/13594329608414853

Mathieu, J.E., Tannenbaum, S.I., & Salas, E. (1992). Influences of individual and situational characteristics on measures of training effectiveness. *Academy of Management Journal*, 35(4), 828–847. doi: 10.2307/256317

Mikkelsen, E.G., & Einarsen, S. (2002). Basic assumptions and symptoms of post-traumatic stress among victims of bullying at work. *European Journal of Work and Organizational Psychology*, 11(1), 87–111. doi: 10.1080/13594320143000861

Nemeroff, C.B., Bremner, J.D., Foa, E.B., Mayberg, H.S., North, C.S., & Stein, M.B. (2006). Posttraumatic stress disorder: A state-of-the-science review. *Journal of Psychiatric Research*, 40(1), 1–21. doi: 10.1016/j.jpsychires.2005.07.005

Nielsen, M.B., & Einarsen, S. (2008). Sampling in research on interpersonal aggression. *Aggressive Behavior*, 34(3), 265–272. doi: 10.1002/ab.20229

Notelaers, G., & Einarsen, S. (2008). *The construction and validity of the Short – Negative Acts Questionnaire.* Paper presented at the 6th International Conference on Bullying and Harassment in the Workplace, Montreal, QC.

Olsson, U.H., Foss, T., Troye, S.V., & Howell, R.D. (2000). The performance of ML, GLS, and WLS estimation in structural equation modeling under conditions of misspecification and nonnormality. *Structural Equation Modeling*, 7, 557–595. doi: 10.1207/S15328007SEM0704_3

Preacher, K.J., & Hayes, A.F. (2008). Asymptotic and resampling strategies for assessing and comparing indirect effects in multiple mediator models. *Behavior Research Methods*, 40(3), 879–891. doi: 10.3758/BRM.40.3.879

Rizzo, J.R., House, R.J., & Lirtzman, S.I. (1970). Role conflict and ambiguity in complex organizations. *Administrative Science Quarterly*, 15(2), 150–163. doi: 10.2307/2391486

Salin, D., & Hoel, H. (2010). Organisational causes of workplace bullying. In S. Einarsen, H. Hoel, D. Zapf & C.L. Cooper (Eds.), *Bullying and harassment in the workplace. Developments in theory, research, and practice* (pp. 227–243). Boca Raton, FL: CRC Press.

Satorra, A., & Bentler, P.M. (2001). A scaled difference chi-square test statistic for moment structure analysis. *Psychometrica*, 66(4), 507–514. doi: 10.1007/BF02296192

Schaufeli, W.B., Bakker, A.B., & Van Rhenen, W. (2009). How changes in job demands and resources predict burnout, work engagement and sickness absenteeism. *Journal of Organizational Behavior*, 30(7), 893–917. doi: 10.1002/job.595

Siegrist, J., Starke, D., Chandola, T., Godin, I., Marmot, M., Niedhammer, I., & Peter, R. (2004). The measurement of effort-reward imbalance at work: European comparisons. *Social Science & Medicine*, 58(8), 1483–1499. doi: 10.1016/S0277-9536(03)00351-4

Skogstad, A., Einarsen, S., Torsheim, T., Aasland, M.S., & Hetland, H. (2007). The destructiveness of laissez-faire leadership behavior. *Journal of Occupational Health Psychology*, 12(1), 80–92. doi: 10.1037/1076-8998.12.1.80

Sobel, M.E. (1986). Some new results on indirect effects and their standard errors in covariance structure models. In N. Tuma (Ed.), *Sociological methodology 1986* (pp. 159–186). Washington, DC: American Sociological Association.

Spector, P.E. (2006). Method variance in organizational research. Truth or urban legend? *Organizational Research Methods*, 9(2), 221–232. doi: 10.1177/1094428105284955

Case: 1:16-cv-06109 Document #: 108 Filed: 10/04/18 Page 465 of 475 PageID #:3242

Tabachnick, B.G., & Fidell, L.S. (2007). *Using multivariate statistics.* Boston, MA: Pearson (Allyn and Bacon).

Vartia, M. (1996). The sources of bullying – psychological work environment and organizational climate. *European Journal of Work and Organizational Psychology, 5,* 203–214. doi: 10.1080/13594329608414855

Warr, P. (2007). *Work, happiness, and unhappiness.* Mahwah, NJ: Lawrence Erlbaum.

Watson, D., & Pennebaker, J.W. (1989). Health complaints, stress, and distress: Exploring the central role of negative affectivity. *Psychological Review, 96*(2), 234–254. doi: 10.1037/0033-295X.96.2.234

Zapf, D., & Einarsen, S. (2010). Individual antecedents of bullying: Victims and perpetrators. In S. Einarsen, H. Hoel, D. Zapf & C.L. Cooper (Eds.), *Bullying and harassment in the workplace. Developments in theory, research, and practice* (pp. 177–200). Boca Raton, FL: CRC Press.

Copyright of Anxiety, Stress & Coping is the property of Routledge and its content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.

# EXHIBIT A27

2016, 38: 897–903



# The effect of stress on learning in surgical skill acquisition

JEFF T. FLINN, AMIE MILLER, NATALIE PYATKA, JACOB BREWER, TAMERA SCHNEIDER & CAROLINE G. L. CAO

Wright State University, USA

## Abstract

**Background**: An excessive level of stress and anxiety in medical education can have a negative impact on learning. In particular, the interaction between attending surgeons and trainees in the operating room could induce stress on trainees that is counterproductive, especially if the teaching style or feedback is unduly harsh or critical.

**Aim**: To characterize the effects of stress resulting from attending–trainee interaction during surgical skill acquisition.

**Methods**: Forty medical students learned to perform the FLS pattern-cutting task for the first time in one of four scenarios. In the control condition, no mentor was present. In the three experimental conditions, participants were observed, encouraged, or criticized by an expert surgeon.

**Results**: Task performance, as well as physiological and subjective indicators of stress, were measured. Taking both speed and accuracy into account, participants who were criticized performed the worst on the task, and those who were encouraged performed best. Physiological and subjective measures indicated that the criticized participants experienced the highest level of stress and anxiety.

**Conclusion**: Even though providing constructive criticism to trainees is inevitable during the course of teaching, an exceedingly critical and negative mentoring style by attending physicians could be detrimental to trainees' acquisition of surgical skills.

## Introduction

The literature on stress and the effects of a stressor on learning and performance is rich and covers a wide range of situations (Tomaka et al. 1993, 1997; Kelsey 1999, 2000; Blascovich et al. 2001, 2004; Schneider 2004; Gildea et al. 2007; Schneider 2008; Seery et al. 2010; Schneider et al. 2012). Stress is a process that begins with an evaluation (appraisal) of an impending stressor (Lazarus & Folkman 1984; Lazarus 1999). Stress levels can range from *challenge* to *threat*, based on an evaluation of how relevant the situation is to personal goals, values and well-being, relative to how many resources there are to cope with the situation (Schneider 2004, 2008). At the level of challenge, the situational relevance is deemed to be proportionate to coping resources; while at the threat level, the coping resources available are far less than situational demands and relevance.

Studies have shown that evaluations of threat increase heart rate (HR) and blood pressure (BP) (Allen et al. 1991; Blascovich & Tomaka 1996; Blascovich et al. 2003). For example, one study examined the stress-buffering effects of pet dogs compared to friends. As expected, systolic BP and pulse rate were highest in the presence of friends and lowest in the presence of pet dogs. Compared to friends, pet dogs are non-evaluative social beings and reduced the threat of the stressor. Another study examined appraisals in response to mental math (Tomaka et al. 1993). Compared to threatened

### Practice points

- Interaction between attending and trainees is a stressor for the trainee regardless of how encouraging the attending's feedback may be.
- Overly negative criticism, to the point of being perceived as threat-like, is detrimental for learning.

participants, challenged participants had greater pulse transit time (the time for blood to travel from the heart to a peripheral site; inverse to BP) suggesting greater vasodilation. In other words, challenged people should have lower HR and BP stress responses than threatened people.

In the medical domain, a study examined residents' stress responses to trauma situations (Harvey et al. 2012). Low- or high-stress trauma scenarios were presented, and stress levels and performance were assessed. The high-stress scenario evoked greater reports of stress and lower performance on potentially life-saving procedures. Another study found that paramedics working in stressful clinical scenarios performed worse on drug dose calculation tests (LeBlanc et al. 2005).

In addition to detrimental effects on medical performance, stress may also affect the learning of medical skills. In particular, medical education and residency training, especially in the surgical specialty, has long been known to be a

*Correspondence*: Caroline Cao, PhD, Wright State University, 207 Russ Engineering Center, 3640 Colonel Glenn Highway, Dayton, OH 45435, USA. Tel: (937) 775-5044; Fax: (937) 775-7364; E-mail: caroline.cao@wright.edu

ISSN 0142-159X print/ISSN 1466-187X online/15/000897–7 © 2015 Taylor & Francis

DOI: 10.3109/0142159X.2015.1114597

J. T. Flinn et al.

stressful experience. Interaction with clinical faculty has been identified as a major source of stress for medical students and residents. Among residents and medical students, the perception of being "abused" is common (Mavis et al. 2014), with 50–85% of students claiming they have experienced abuse during training (Dyrbye et al. 2005). A study of third-year medical students' perception of mistreatment found that verbal abuse was most reported (85%) (Sheehan et al. 1990). Examples included being shouted at, treated rudely, humiliated, and sworn at. A study of Japanese medical residents showed similar rates of overall reported abuse, with surgical rotations being the most frequent site of occurrence (27.6%) (Nagata-Kobayashi et al. 2009). However, the effects of stressful attending–resident interactions on learning and performance is not clear.

The purpose of this research is to examine the effects of different types of interaction in the attending–student relationship on the acquisition and performance of laparoscopic surgery skills in the skills laboratory. We hypothesized that a challenge-like (encouraging) instruction set would lead to less subjective stress, a more salubrious physiological pattern, and better task performance compared to threat-like (evaluative/criticizing) instructions or the control (independent) or observed (neutral) conditions.

## Method

### Participants

Participants were first- through fourth-year medical students from the Wright State University (WSU) Boonshoft School of Medicine. A total of 43 participants were recruited, with no known visual, cognitive, or motor impairments that would prevent them from taking part in the experiment. Three participants were excluded; one was not able to perform the task and two received incomplete instructions. The 40 participants were 55% female, with a mean age of 26.1 years (SD = 2.6). None had any prior experience with surgical simulation, or with the task used in this experiment. The research protocol was approved by the WSU Internal Review Board, and all participants gave written informed consent.

### Task

A laparoscopic pattern-cutting task was used ("Revised-Manual-Skills-Guidelines-February-2014.pdf," n.d.). The pattern-cutting task is one of five basic laparoscopic surgery tasks in the Society of American Gastrointestinal and Endoscopic Surgeons (SAGES) Fundamentals of Laparoscopic Surgery (FLS) training system. The task consists of cutting out a circle that has been drawn on a piece of 10.16 cm × 10.16 cm square gauze, which has been suspended inside an FLS training box (Figure 1). Participants were required to cut along the outline of the circle using laparoscopic graspers and scissors that are inserted into the training box. Performance was scored based on time to task completion and accuracy of the cut.

898



**Figure 1.** FLS box displaying pattern-cutting task. A piece of mesh measuring 10.16 cm × 10.16 cm with a circle drawn on it was suspended inside the box. Subjects used laparoscopic graspers and scissors to cut along the outline of the drawn circle while watching the task space on a monitor positioned in front of them. The objective of the task was to cut out the circle as quickly and as accurately as possible.

### Procedure

Data were collected for each participant in a single session. Upon arriving, the participant was taken to a briefing room, shown a 2-min video demonstrating how the pattern-cutting task is performed, and instructed on the use of the laparoscopic tools. The participant was then given 5 min to practice performing the task itself.

The participant was then taken into a testing room to complete the block of trials, which lasted one hour or until 10 trials of the pattern-cutting task had been completed, whichever came first. Some participants (12 out of 40) were not able to complete all 10 trials within the hour. However, all participants were able to complete at least six trials. For each trial, time to completion was recorded. Timing for each trial began when the participant first grasped the gauze with the laparoscopic tool, and ended when the circle was completely cut out and free of the remaining gauze.

Before the trial block began, an inflatable cuff was attached to the participant's right upper arm for measuring mean arterial pressure (MAP) and HR. Two surface electrodes were attached to the inside of the participant's left forearm to measure skin conductance. Physiological measurements were taken at four instances during the experiment, each taking 2–3 min to complete. The first measurement was to establish baseline and occurred just before the block of pattern-cutting trials began. Measures included MAP, HR and skin conductance. A saliva sample was also taken for baseline cortisol. At the same time, a six-item abbreviated version of the State-Trait Anxiety Inventory (STAI) (Arora et al. 2010b) was administered to assess participant anxiety.

The second round of measurement was taken 20 min into the experiment, or after the fifth trial, whichever came first. This time point was chosen to capture any peak rise in cortisol concentration, which typically occurs 20–30 min after stressor

onset (Kirschbaum et al. 1992; Robins et al. 2009). The third round was taken 40 min into the experiment, or after the eighth trial, whichever came first. The fourth round was taken after the last trial, which was either the 10th trial or after an hour had elapsed, whichever came first.

## Experimental design

This study utilized a between-subject experimental design. The 40 subjects were assigned to one of four groups (Control ($n = 10$), Observed ($n = 10$), Encouraged ($n = 10$), Criticized ($n = 10$)) in order as they responded to the solicitation for participation. In the *Control* condition, participants simply completed the block of trials as described in the procedure above. In all other conditions, participants were led to believe an expert surgeon was evaluating them. The ostensible expert surgeon was portrayed by a professional actor. Although the actor was present in the testing room upon participants' arrival, he was not introduced to participants until after the baseline measurement was complete. The actor was introduced as an expert in laparoscopic surgery who would be doing the evaluation. Throughout the trials, the actor interacted with participants in a manner consistent with the experimental conditions – Observed quietly, Encouraged the participant, or Criticized the participant.

In the *Observed* condition, the "expert surgeon" maintained a silent and neutral demeanor as she observed the participant performing the task. In the *Encouraged* condition, the actor provided positive verbal feedback and projected an encouraging and nurturing demeanor. For example, he said "Nice job. Keep up the good work." In the *Criticized* condition, the actor critiqued the participant harshly and was critical and condescending. For example, he stated sarcastically, "Nice job. I think you just killed our patient." The observational, encouraging, or critical demeanor was maintained regardless of how participants performed. Since performance was to be compared across conditions, the feedback contained no instructive content that might improve task performance.

Participants were assigned to their group based on the order in which they were scheduled for participation in the study with 10 participants in each group. The control condition was completed first, followed by the Observed, then Encouraged, and lastly Criticized group. The main reason for assigning subjects in this manner, rather than a purely random assignment, was that the experiment involved the deception that they were being evaluated by an expert surgeon. The experimental design relied entirely on participants being naïve to the purpose of the study and not discussing the protocol amongst themselves. Therefore, conditions were completed according to their increasing level of expected psychological impact. At the end of the experimental session, the participant was debriefed. It was then disclosed that this study was examining the effects of stressful scenarios and that the expert was actually an actor.

## Physiological parameters selection

Measuring stress responses has been accomplished using both physiological and subjective markers. For the current experiment, physiological parameters were selected based on

previous research showing that they have predictive validity. HR, BP, skin conductance, and cortisol have all indicated increased stress responses (Arora et al. 2010a). Arora et al. developed the Imperial Stress Assessment Tool (ISAT) (Arora et al. 2010b) which combines three objective and subjective stress response measures: salivary cortisol, HR monitoring, and self-reported stress levels by means of an abbreviated STAI. This tool reliably and validly assessed intraoperative stress levels of experienced surgeons while performing surgery (Arora et al. 2010b). We used salivary cortisol, skin conductance, HR, BP, and the abbreviated STAI test as well. However, differences in skin conductance were not analyzed because a preliminary examination of the data showed that changes in skin conductance values were constantly changing and would not be meaningful as a discrete measure.

# Results and discussion

## Physiological Measurements

To verify that there were no systematic differences between the groups at baseline, a one-way (four conditions) ANOVA was performed on each physiological measure, with an alpha of 0.05 used for all significance tests. There were no significant differences among conditions for any baseline physiological measures. That is, participants were similar in physiological and subjective metrics at baseline across the four conditions. Therefore, subsequent differences between the four groups can be attributed to the experimental condition. To assess reactivity, difference scores were created for each participant by subtracting his or her baseline from his or her task responses.

Both Condition (Control, Observed, Encouraged and Criticized) and Time-Point (difference from baseline as measured at 20-min, 40-min, and post-experiment) were analyzed using a two-way mixed model ANOVA with repeated measures on Time-Point for each physiological measure. For those measures with a significant main effect, a *post-hoc* Tukey HSD was performed. Means and standard deviations for the four conditions at each time point are given for each measure in Table 1.

The difference scores for the STAI are shown in Figure 2a. Differences greater than zero indicate that participants' level of anxiety increased above baseline. There was a significant main effect of Time-Point ($p < 0.001$), but not Condition ($p = 0.39$). The post-hoc analysis showed that scores significantly decreased between 20-min and 40-min ($p = 0.02$), and between 20-min and post-experiment ($p = 0.004$). All of the groups experienced an increase in anxiety at the 20-min mark. This initial anxiety could be due to learning a new and difficult task, or to simply being part of an experiment. However, after the 20-min mark, STAI scores returned to baseline levels for all but the Criticized group, suggesting that participants were able to acclimate psychologically to performing the task so long as they were not being criticized.

The average differences in cortisol concentration from baseline obtained for each condition are shown in Figure 2b, with higher levels denoting greater stress responses. There was a significant main effect for Condition ($p = 0.03$), but not for Time-Point ($p = 0.12$). The post-hoc analysis revealed that

J. T. Flinn et al.

**Table 1.** Unit of measure, p-values, and descriptive statistics for the physiological measures.

| Measure | Unit | p-Values | | Condition | Difference from baseline | | |
|---|---|---|---|---|---|---|---|
| | | Cond | TP | | @ 20-min | @ 40-min | Post-exp. |
| STAI | Scale point | 0.07 | 0.006** | Control | 1.3 ± 1.8 | 0.6 ± 1.5 | 0.5 ± 2.2 |
| | | | | Observed | 1.0 ± 1.9 | 0.0 ± 2.8 | 0.1 ± 2.8 |
| | | | | Encouraged | 1.4 ± 3.4 | 0.0 ± 2.8 | −1.2 ± 3.9 |
| | | | | Criticized | 3.5 ± 3.1 | 2.6 ± 2.6 | 2.2 ± 2.4 |
| Cortisol | µg/dL | 0.03* | 0.12 | Control | −0.049 ± 0.062 | −0.100 ± 0.074 | −0.117 ± 0.082 |
| | | | | Observed | 0.006 ± 0.100 | −0.015 ± 0.095 | −0.008 ± 0.100 |
| | | | | Encouraged | 0.033 ± .102 | −0.021 ± 0.124 | −0.001 ± 0.120 |
| | | | | Criticized | 0.033 ± 0.084 | 0.045 ± 0.137 | 0.048 ± 0.136 |
| MAP | mmHg | 0.12 | 0.37 | Control | 0.5 ± 6.1 | 0.7 ± 10.4 | 0.3 ± 4.6 |
| | | | | Observed | 6.6 ± 7.0 | 6.8 ± 5.3 | 5.0 ± 8.7 |
| | | | | Encouraged | 1.6 ± 5.6 | 3.1 ± 5.7 | 0.1 ± 8.2 |
| | | | | Criticized | 3.2 ± 12.6 | 8.1 ± 9.5 | 8.4 ± 8.5 |
| HR | bpm | 0.39 | 0.80 | Control | −0.2 ± 7.2 | −1.2 ± 5.5 | −1.5 ± 7.6 |
| | | | | Observed | 3.0 ± 9.0 | 2.6 ± 13.9 | 4.1 ± 13.3 |
| | | | | Encouraged | 3.8 ± 13.7 | 4.0 ± 15.4 | 5.0 ± 13.8 |
| | | | | Criticized | 7.0 ± 10.9 | 7.3 ± 12.2 | 8.2 ± 13.0 |
| SC | µSiemen | N/A | N/A | Control | 3.61 ± 9.88 | 6.29 ± 10.97 | 7.78 ± 16.02 |
| | | | | Observed | 2.58 ± 9.47 | 7.36 ± 12.46 | 8.34 ± 10.61 |
| | | | | Encouraged | 8.54 ± 18.90 | 10.27 ± 18.81 | 10.78 ± 16.30 |
| | | | | Criticized | −0.01 ± 24.32 | 3.67 ± 26.84 | 3.87 ± 24.26 |

Descriptive statistics are the mean ± 1 standard deviation by the condition and time point.
*$p < 0.05$; **$p < 0.01$.



**Figure 2.** Differences from baseline scores as a function of time of measurement and condition. (a) State-Trait Anxiety Inventory (STAI) scores show an initial increase in anxiety level for all subjects, but only the Criticized group's anxiety remained elevated at 40 min into the experiment and after the conclusion of the experiment. (b) Significantly higher cortisol level above baseline, as an indicator of higher stress response, was found in the Criticized group. Error bars are ± 1 standard error of the mean.

the difference from baseline in cortisol concentration was significant for the Control and Criticized groups only ($p = 0.02$). Cortisol concentration increased following baseline for participants in the Criticized group whereas it decreased for those in the Control.

The average differences in MAP and HR are shown in Figure 3. Although increases in both HR and MAP were generally highest for the Criticized group, no significant group differences were found.

## Performance measures

### Score

In the FLS testing system, performance scoring is based on how quickly the circular pattern is cut from the gauze, with a

The effect of stress on learning



**Figure 3.** Differences from baseline score as a function of time of measurement and condition for (a) MAP, and (b) heart rate. Error bars are ± 1 standard error of the mean. No significant differences were found amongst the four groups.

penalty imposed based on the amount of error. Higher scores denote quicker cutting with less error. Score calculation is proprietary, used here with permission from SAGES.

The average FLS score was calculated for each trial. Then, for each participant, trial scores were grouped as the score on the first trial, the score on the last trial, and the mean score for all of the trials in between (Figure 4). These scores represent the early, late, and middle stages of the Learning Curve. Scores were analyzed using a two-way mixed ANOVA with a between-subjects factor of Condition and a within-subjects factor of Learning Curve (First-Trial, Between-Trials, or Last-Trial). A significant main effect was found for both Condition ($p = 0.03$) and Learning Curve ($p < 0.001$), with no significant interaction ($p = 0.07$). A post hoc analysis showed significant differences between all points on the Learning Curve, with scores increasing over the course of the experiment. For Condition, the post-hoc test showed a significant difference between the Criticized and Encouraged groups only, with the Criticized group having the lowest overall scores.

## General discussion

The STAI and physiological measures were used to ascertain stressor responses. Some degree of elevated reactivity was expected for all conditions, since all participants were being scrutinized while learning a new and difficult task. We expected that observation and criticism would evoke heightened stress responses relative to a control and encouraged group. It was hypothesized that the criticized group would appraise the negative feedback as a threat rather than a challenge, and would exhibit more indications of anxiety and physiological stress responding than the other groups, and perform worse on the experimental task. In fact, the criticized group did score lower than all the other groups throughout the trial block. Furthermore, the increases from the baseline STAI and physiological measures for the criticized group were generally larger



**Figure 4.** Mean raw FLS scores as a function of condition and learning curve. Error bars are ± 1 standard error of the mean. The overall performance scores for the Criticized group were significantly lower than those for the Encouraged group.

than those for the other groups, and were always larger than the control group for all measures and across time points. Although not always statistically significant, this consistent trend suggests that we may have suffered from low statistical power given this sample size. There were 40 participants altogether, but they were split equally into four experimental groups. In addition, the task was intentionally difficult in order to avoid ceiling effects in learning and performance, but perhaps at the cost of a wider range of individual differences.

Nevertheless, the overall trends in the data suggest that the criticized group was the most "stressed" and that the control

901

J. T. Flinn et al.

group was the least, with the observed and encouraged groups falling somewhere in between. The presence of a putative expert evaluator acted as an additional stressor among the observed, encouraged, and criticized participants, and the degree to which participants were affected depended on the way in which these stressors were likely appraised, given the manner of interactions between the evaluator and the trainee.

Performance-wise, the observed and criticized participants initially scored lower than those in the control and encouraged groups. After the first trial, however, the observed group's performance increased to a level similar to that of the control and encouraged groups. This may be because participants in the observed group did not know what to expect from the observer at first, other than that they were being evaluated. After the first trial, however, in the absence of any negative commentary, it appears participants had deemed the observer to be benign. This pattern of results suggests that it is not the case that encouragement improves performance, but that criticism impairs it. This would imply that productive teacher–student interaction does not depend on any particular instructional style so long as it is not negatively critical to the point of being appraised as threat-like in nature. Future research may investigate the threshold for threat in stress appraisals to allow for more effective teacher-student interactions.

## Notes on contributors

JEFF T. FLINN, MS, was a research associate in the Department of Biomedical, Industrial, and Human Factors Engineering, Wright State University, Dayton, Ohio. He is currently at Altamira Technologies Corporation.

AMIE MILLER, MD, is a surgical resident in the Boonshoft School of Medicine at Wright State University, Dayton, Ohio.

NATALIE PYATKA, MD, was a medical student in the Boonshoft School of Medicine at Wright State University. She is currently a neurology resident at the University Hospitals Case Medical Center, Cleveland, Ohio.

JACOB BREWER, BS, was a research assistant at Wright State University. He is currently a graduate research and teaching assistant in the Department of Psychology at Florida State University, Tallahassee, Florida.

TAMERA SCHNEIDER, PhD, is a professor of Psychology at Wright State University, Dayton, Ohio.

CAROLINE G. L. CAO, PhD, is the Ohio Research Scholar of the Ohio Imaging Research and Innovation Network (OIRAIN), and a professor of Biomedical, Industrial, and Human Factors Engineering at Wright State University, Dayton, Ohio.

## Acknowledgements

The authors wish to thank Mike Frazier, Professor Gale Kleven, and the students and staff at the Wright State University Boonshoft School of Medicine. We also acknowledge the permission from SAGES for the use of the FLS scoring algorithm.

***Declaration of interest***: This work was supported in part by a grant from the National Institutes of Health (NIBIB 2R01EB005807-05A1), and an award from the Ohio Third Frontier to the Ohio Imaging Research and Innovation Network (OIRAIN).

## References

Allen KM, Blascovich J, Tomaka J, Kelsey RM. 1991. Presence of human friends and pet dogs as moderators of autonomic responses to stress in women. J Pers Soc Psychol 61(4):582–589.

Arora S, Sevdalis N, Nestel D, Woloshynowych M, Darzi A, Kneebone R. 2010a. The impact of stress on surgical performance: A systematic review of the literature. Surgery 147(3):318–330.e6.

Arora S, Tierney T, Sevdalis N, Aggarwal R, Nestel D, Woloshynowych M, Kneebone R. 2010b. The Imperial Stress Assessment Tool (ISAT): A feasible, reliable and valid approach to measuring stress in the operating room. World J Surg 34(8):1756–1763.

Blascovich J, Mendes WB, Hunter SB, Lickel B, Kowai-Bell N. 2001. Perceiver threat in social interactions with stigmatized others. J Pers Soc Psychol 80(2):253–267.

Blascovich J, Mendes WB, Tomaka J, Salomon K, Seery M. 2003. The Robust nature of the biopsychosocial model challenge and threat: A reply to Wright and Kirby. Pers Soc Psychol Rev 7(3):234–243.

Blascovich J, Seery M, Mugridge C, Norris R, Weisbuch M. 2004. Predicting athletic performance from cardiovascular indexes of challenge and threat. J Exp Soc Psychol 40(5):683–688.

Blascovich J, Tomaka J. 1996. The biopsychosocial model of arousal regulation. In: Zanna MP editor. Advances in experimental social psychology. Vol. 28. New York: Academic Press. pp 1–51.

Dyrbye LN, Thomas MR, Shanafelt TD. 2005. Medical student distress: Causes, consequences, and proposed solutions. Mayo Clin Proc 80(12):1613–1622.

Fundamentals of Laparoscopic Surgery. (n.d.). [Accessed 12 January 2015] Available from http://www.flsprogram.org/wp-content/uploads/2014/03/Revised-Manual-Skills-Guidelines-February-2014.pdf.

Gildea KM, Schneider TR, Shebilske WL. 2007. Stress appraisals and training performance on a complex laboratory task. Hum Factors 49(4):745–758.

Harvey A, Bandiera G, Nathens AB, LeBlanc VR. 2012. Impact of stress on resident performance in simulated trauma scenarios. J Trauma Injury Infect Crit Care 72:497–503.

Kelsey RM. 1999. Cardiovascular reactivity and adaptation to recurrent psychological stress: Effects of prior task exposure. Psychophysiology 36(6):818–831.

Kelsey RM. 2000. Cardiovascular reactivity and adaptation to recurrent psychological stress: The moderating effects of evaluative observation. Psychophysiology 37(6):748–756.

Kirschbaum C, Wüst S, Hellhammer D. 1992. Consistent sex differences in cortisol responses to psychological stress. Psychosom Med 54(6):648–657.

Lazarus RS. 1999. Stress and emotion: A new synthesis. New York: Springer Publishing Co.

Lazarus RS, Folkman S. 1984. Stress, appraisal, and coping. New York: Springer Publishing Co.

LeBlanc VR, MacDonald RD, McArthur B, King K, Lepine T. 2005. Paramedic performance in calculating drug dosages following stressful scenarios in a human patient simulator. Prehosp Emerg Care 9(4):439–444.

Mavis B, Sousa A, Lipscomb W, Rappley MD. 2014. Learning about medical student mistreatment from responses to the medical school graduation questionnaire. Acad Med 89(5):705–711.

Nagata-Kobayashi S, Maeno T, Yoshizu M, Shimbo T. 2009. Universal problems during residency: Abuse and harassment. Med Educ 43(7):628–636.

Revised-Manual-Skills-Guidelines-February-2014.pdf. (n.d.). Available from http://www.flsprogram.org/wp-content/uploads/2014/03/Revised-Manual-Skills-Guidelines-February-2014.pdf.

Robins RW, Fraley RC, Krueger RF. 2009. Handbook of research methods in personality psychology. New York: Guilford Press.

Schneider TR. 2004. The role of neuroticism on psychological and physiological stress responses. J Exp Soc Psychol 40(6):795–804.

Schneider TR. 2008. Evaluations of stressful transactions: What's in an appraisal? Stress Health 24(2):151–158.


*The effect of stress on learning*

Schneider TR, Rench TA, Lyons JB, Riffle RR. 2012. The influence of neuroticism, extraversion and openness on stress responses. Stress Health 28(2):102–110.

Seery MD, Weisbuch M, Hetenyi MA, Blascovich J. 2010. Cardiovascular measures independently predict performance in a university course. Psychophysiology 47(3):535–539.

Sheehan K, Sheehan DV, White K, Leibowitz A, Baldwin Jr DC. 1990. A pilot study of medical student "abuse": Student perceptions of mistreatment and misconduct in medical school. JAMA 263(4):533–537.

Tomaka J, Blascovich J, Kelsey RM, Leitten CL. 1993. Subjective, physiological, and behavioral effects of threat and challenge appraisal. J Pers Soc Psychol 65(2):248–260.

Tomaka J, Blascovich J, Kibler J, Ernst JM. 1997. Cognitive and physiological antecedents of threat and challenge appraisal. J Pers Soc Psychol 73(1):63–72.

Copyright of Medical Teacher is the property of Taylor & Francis Ltd and its content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.