## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

<table>
<tr><td>

MARICEL MARCIAL,

  Plaintiff,

  v.

RUSH UNIVERSITY MEDICAL
CENTER; DR. MICHAEL KREMER, in
his individual capacity; RAY NARBONE,
in his individual capacity; and JILL
WIMBERLEY, in her individual capacity,

  Defendants.

</td><td>

)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)

</td><td>

Case No: 16-cv-6109<br>
Magistrate Judge Susan E. Cox

</td></tr>
</table>

## MEMORANDUM OPINION AND ORDER

For the reasons discussed below, Defendants' Motions for Summary Judgment [Dkt. 126, 130] are granted, and judgment is entered in favor of the Defendants.

## BACKGROUND

Plaintiff Maricel Marcial ("Plaintiff") is an Asian woman of Filipina descent, who was over 40 years old during the time period relevant to this matter. (Dkt. 143 at ¶ 3.) In 2012, Plaintiff, who had previously worked as a registered nurse in an Intensive Care Unit ("ICU"), enrolled in the Certified Registered Nurse Anesthetist ("CRNA") program at the Rush University Medical Center ("Rush") College of Nursing. (*Id.* at ¶2.) Plaintiff entered the CRNA program with 27 other Student Registered Nurse Anesthetists ("SRNA") in her cohort, including 23 women, six other minority students, and one other student over 40 years old. (*Id.* at ¶ 4.)

The first portion of the CRNA program was a didactic curriculum, which was primarily classroom learning, and was successfully completed by Plaintiff. (*Id.* at ¶ 33.) During this portion of the program, SRNAs also participated in a "clinical practicum," which gives students (including

Plaintiff) "incremental experience under the supervision of CRNAs." (*Id.* at ¶ 34.) The second portion of the program is a 15-month clinical residency, in which SRNAs assist CRNAs in providing anesthesia to patients. (*Id.* at ¶ 36.) CRNAs would supervise SRNAs during their residency, and would submit "formative evaluations," detailing the SRNAs' performance. (*Id.* at ¶ 38.)

SRNAs were given a student handbook, which provided Rush's policy on evaluations and clinical grades for SRNAs. (*Id.* at ¶ 17.) In relevant part, the handbook states:

> First year students need to obtain daily (formative) evaluations from physicians and CRNAs with whom they are assigned. A summative evaluation is prepared at the end of each trimester. During the clinical immersion residency, students will obtain at least two clinical evaluations each week, and will continue to have summative evaluations prepared. . . . Clinical practicum and clinical residency course grades are pass-fail. A passing grade is awarded if the student consistently meets or exceeds . . . applicable rotation objectives for clinical residency as demonstrated by a majority of satisfactory or higher ratings on formative evaluations.
> Multiple unsatisfactory ratings or repeated patient safety concerns may be grounds for course failure. . . . An Academic Improvement Form will be generated to document written warning of potential course failure.

(*Id.* at ¶ 17.)

According to CRNA program policy, a student who received more than three formative evaluations with unsatisfactory ratings in areas impacting patient safety may receive a failing clinical residency grade. (*Id.* at ¶ 44.)

Plaintiff began her clinical residency in May 2013. (*Id.* at ¶ 46.) On May 10, 2013, Plaintiff was assigned to work with Defendant Jill Wimberly for the first time; Defendant Wimberly rated Plaintiff's performance as satisfactory and wrote positive comments on Plaintiff's formative evaluation form. (*Id.* at ¶ 47.) On June 11, 2013, Plaintiff was assigned to work with Eva Fisher, another CRNA at Rush. (*Id.* at ¶ 48.) On an evaluation dated June 18, 2013, Ms. Fisher wrote

that Plaintiff had made mistakes while working on an infant patient, including having the wrong size endotracheal tube and drawing up the incorrect medication dosage for the infant's weight. (*Id.* at ¶ 49.) Plaintiff contends that Fisher did not say anything negative to her about her performance on June 11, and that she did not receive the evaluation dated June 18 until June 22. (*Id.* at ¶ 48.) Plaintiff also claims that she saw Ms. Fisher and Defendant Wimberly speaking in the nurse's lounge on June 21, and that their facial expressions and gestures suggested that they were speaking about Plaintiff in a disparaging way. (*Id.* at ¶ 48.) According to Plaintiff, "[t]he circumstances raise a fact issue that [Fisher's evaluation] was backdated in collusion with Wimberly."[1] (*Id.* at ¶ 48.)

On June 20, 2013, Plaintiff was once again assigned to Defendant Wimberly's supervision. (*Id.* at ¶ 50.) On this occasion, Wimberly claimed to observe several deficiencies, and her evaluation of Plaintiff reflected those issues, including incorrect dosing and having the incorrect breathing tube during the operating room setup. (*Id.* at ¶¶ 50-51.) Plaintiff maintains that this evaluation is incorrect and misleading, and that Wimberly was highly emotional and not impartial in her judgment of Plaintiff's performance. (*Id.*)

On July 1, 2013, Plaintiff was assigned to work with Alida Hooker, another CRNA at Rush. (Dkt. 129-12 at 24.) Ms. Hooker rated Plaintiff as unsatisfactory in the area of "recogniz[ing] intraoperative complications (utilizing ECG, invasive and/or noninvasive monitors and physical assessment." (*Id.*) The following day, Defendant Michael Kremer, Program Direct of the CRNA program, emailed Ms. Hooker for feedback on Plaintiff's performance because Plaintiff "had some

---

[1] Contrary to Plaintiff's *ipse dixit* assertion, the fact that Wimberly and Fisher – who are co-workers – were seen speaking to each other at work does not support Plaintiff's desired inference that Fisher's evaluation was backdated nor create a genuine issue of material fact that it was. As such, the Court will not be relying on this supposed fact in its discussion on the merits of Plaintiff's claims. The record shows that sometimes CRNAs and physicians in the program would take several days to complete their paperwork for the evaluations of SRNAs assigned to them. (*See* Dkt. 129-8 at 87:1-9.)

challenges," and Kremer wanted "to stay on top of how things are going." (*Id.* at 26.) Ms. Hooker responded that Plaintiff was prepared during "set up," but "appeared disorganized once we got to the intubation." (*Id.*) Ms. Hooker also noted that Plaintiff "kept an eye on the vitals, but seemed to take them as they came, not proactive in treating them and even realizing what [blood pressure] was too low." (*Id.*) Ms. Hooker concluded that Plaintiff "shows some difficulty with prioritizing and then following through and finishing tasks" and "becomes scattered and acts in a nervous rush." (*Id.*) It is Plaintiff's position that the patient in question had a 20% drop in blood pressure on only one reading, and that the standard of care only requires action on the basis of vital sign trends, not a single data point. (Dkt. 143 at ¶ 57.)

Plaintiff then met with Defendant Kremer to discuss her need to improve her clinical performance, and the possibility of dismissal if she continued to receive unsatisfactory clinical evaluations. (*Id.* at ¶ 60.) Defendant Kremer provided Plaintiff with a copy of her Academic Improvement Form; the Academic Improvement Plan stated that a student "requires a formal academic improvement plan when one or more course objectives are not being met," which "if not addressed, put the student at risk for receiving a non-passing final grade in this course." (Dkt. 129-14 at 1.) The Academic Improvement Form highlighted that Plaintiff had received "unsatisfactory ratings in the areas of patient safety, clinical judgment and professionalism," and reflected that Defendant Kremer discussed the need for Plaintiff to be more consistent in her clinical performance and the availability of counseling services. (Dkt. 143 at ¶¶ 61-62.)

On July 23, 2013, Plaintiff was evaluated by Dr. Judith Wiley. The evaluation rated Plaintiff as "below the level expected" in airway management and recognizing intraoperative complications. (Dkt. 129-12 at 34.) Dr. Wiley also noted that Plaintiff "[n]eed[ed] more direction that I would expect at this point of the program," and that she could not answer questions regarding

material covered during the didactic program.  (*Id.*)  She also stated that Plaintiff "seems to have difficulty remembering or following directions."  (*Id.*)  Plaintiff states that this review is misleading.  (Dkt. 143 at ¶ 63.)

On July 30, 2013, Plaintiff was working under the supervision of CRNA Amy Gawura.  (*Id.* at ¶ 66.)  Ms. Gawura rated Plaintiff as "unsatisfactory" in the following areas: "psychomotor skills," "clinical judgment," and "professionalism."  (*Id.*)  Gawura indicated that Plaintiff was unsure whether to ventilate a patient using a mask airway or an endotracheal tube, and that Plaintiff's mistake caused a breathing problem in the patient that Ms. Gawura had to correct.  (*Id.* at ¶ 66.)  Plaintiff again does not believe that the criticisms are correct or true.  (*Id.*)

In August 2013, Plaintiff met with Defendant Kremer and Dr. Wiley to discuss her failure to improve her clinical performance, and Plaintiff decided to withdraw nonpassing from her clinical residency.  (*Id.* at ¶¶ 68-69.)  Plaintiff requested a leave of absence, which was granted, and was scheduled to return at the start of the new academic term in January 2014.  (*Id.* at ¶ 70.)

During Plaintiff's leave of absence, she met with Defendants Kremer and Narbone, Chief Anesthetist and Director of Operating Room Services, to address the challenges Plaintiff would face upon her return to the program.  (*Id.* at ¶ 72.)  Defendant Kremer presented Plaintiff with other programs at Rush to which she could transfer, and Kremer requested Narbone to minimize Plaintiff's assignments with Defendant Wimberly.[2]  According to Plaintiff, Narbone told Plaintiff she was "delusional" to think she could succeed in the CRNA program, and said "I don't suppose

---

[2] In her response to Defendants' Statement of Material Facts, Plaintiff contends that "Narbone testified that Kremer directed him not to assign Marcial to Wimberly."  (Dkt. 143 at ¶ 74.)  The cited portion of Narbone's testimony demonstrates that this is incorrect.  To wit:

> Q: Did Dr. Kremer ever tell you not to assign [Plaintiff and Defendant Wimberly] together at all?
> A: Not to my recollection.

(Dkt. 129-9 at 60:24-61:2.)

you are the youngest in your class, so why waste your time on something that will make you miserable?" (Dkt. 151 at ¶ 10.)

On November 19, 2013, Plaintiff reviewed and signed a Student Learning Contract in anticipation of her return to the CRNA program; the Student Learning Contract provided certain benchmarks for Plaintiff's improvements in clinical performance and professionalism. (Dkt. 143 at ¶¶ 75-76.) Plaintiff claims that Kremer pressured her to withdraw from the CRNA program at this meeting, stating "you choose not to accept counsel from people who vehemently feel for many years that your chance of being successful are slim at best." (Dkt. 151 at ¶ 11.)

Plaintiff returned to the clinical residency course in January 2014, and met weekly with Defendant Kremer to review her progress. (Dkt. 143 at ¶¶ 78-79.) Upon her return to the program, Plaintiff's performance was rated as unsatisfactory by 13 different CRNAs. (*Id.* at ¶ 79.) Among the examples that Plaintiff does not dispute:[3]

- On January 9, 2014, CRNA Kathleen Oksvarek rated Plaintiff as unsatisfactory in the area of clinical judgment, noting that Plaintiff had failed to notice an abnormal EKG. (*Id.* at ¶ 80.)
- On January 15, 2014, CRNA Lea Forester rated Plaintiff as unsatisfactory in the areas of patient safety, clinical judgment, and professionalism. (*Id*. at ¶ 81.)
- On January 24, 2014, CRNA Rene Przygodzka noted that Plaintiff needed "continuous support." (*Id*. at ¶ 89.)
- On February 3, 2014, CRNA Jillian Klunk rated Plaintiff as unsatisfactory in the areas of psychomotor skills and professionalism.
- On February 13, 2014, Dr. Wiley rated Plaintiff's performance as below the level expected. (*Id.* at ¶ 94.)
- On February 18, 2014, Dr. Wiley rated Plaintiff's performance as below the level expected or unsatisfactory in the areas of patient safety, psychomotor skills, and clinical judgment. (*Id.* at ¶ 95.)
- On February 20, 2014, CRNA Heather Keldahl rated Plaintiff as unsatisfactory in the area of professionalism, noting that Plaintiff "had accidentally hit the sterile robot arm after dumping urine from a catheter, contaminating the sterile field for the procedure." (*Id.* at ¶ 97.) Plaintiff does not dispute that she did so, but disputes whether she attempted to hide this mistake from others.

---

[3] There are several other evaluations and interactions that Plaintiff disputes, but they are not material to this Court's decision, given the large number of undisputed negative evaluations in the summary judgment record, for the reasons discussed more fully below.

- On March 10, 2014, CRNA Sheila Warren rated Plaintiff as unsatisfactory in the areas of psychomotor skills and clinical judgment; Ms. Warren noted that Plaintiff continued to try and advance an IV catheter in a vein that had "blown." Plaintiff does not dispute that she did so, but believes that Warren's reaction to her doing so was "unwarranted." (*Id.* at ¶ 99.)
- On March 25, 2014, Dr. Wiley rated Plaintiff's performance as below the level expected or unsatisfactory in the areas of patient safety and clinical judgment. Wiley noted that Plaintiff had injected a patient with an unlabeled syringe. (*Id.* at ¶ 104.)
- On May 15, 2014, Dr. Wiley rated Plaintiff's performance as below the level expected or unsatisfactory in the areas of clinical judgment and professionalism. (*Id.* at ¶ 112.)

In the midst of these issues, on January 24, 2014, Plaintiff and Defendant Kremer met, and Kremer reminded Plaintiff that she had returned under a Student Learning Contract, and informed her that her performance upon returning had been inconsistent and resulted in four unsatisfactory formative evaluations, many of which highlighted deficiencies that had been documented prior to Plaintiff's leave of absence. (*Id.* at ¶ 91.)

In April 2014, Plaintiff submitted a complaint to the Rush director of the Compliance Office for discrimination and mistreatment. (*Id.* at ¶ 110.) At her deposition, Plaintiff testified that shortly prior to her leave of absence in 2013 she had verbally told Defendant Kremer that she felt she had been subjected to disparate treatment. (Dkt. 129-2 at 13:24-14:17.) Rush investigated Plaintiff's complaint and found no evidence of discrimination, bullying, hazing, or harassment in the CRNA program. (*Id.* at ¶ 134.)

Also in early April 2014, Plaintiff was absent from the clinical residency due to health reasons, and was scheduled to return to the clinical residency on May 5, 2014 for a five-week probationary period. (Dkt. at ¶¶ 108-109.) During her probationary period, Plaintiff received at least five additional negative evaluations with unsatisfactory ratings. (Dkt. 143 at ¶¶ 111-115.) Plaintiff does not dispute that she received these ratings, but argues that the clinical assessments in the evaluations are not valid and that what she did was appropriate. (Dkt. 143 at ¶¶ 111-115.) On May 30, 2014, Defendant Kremer informed Plaintiff that she would receive a grade of "no

pass" for her clinical residency. (Dkt. 143 at ¶ 117.) At the time of her dismissal, Plaintiff had accrued 26 clinical evaluations with unsatisfactory ratings, more than any other student during the relevant time period. (*Id*. at ¶ 119.) Plaintiff unsuccessfully appealed her "no-pass" grade through the internal administrative procedures available to her at Rush. (*Id.* at ¶¶ 130-131, 135-140.)

On October 8, 2014, Plaintiff filed charges with the United States Equal Employment Opportunity Commission, alleging discrimination on the basis of her race, national origin, and age. (*Id*. at ¶¶ 141-142.) Plaintiff then filed the instant suit on June 10, 2016. (*Id.* at ¶ 143.) The operative pleading in this case is Plaintiff's Second Amended Complaint, which was filed on July 12, 2017. (Dkt. 58.) Plaintiff alleges the following causes of action: Title VI and Title VII Race and National Origin Discrimination against Rush (Counts I, II, VI), ADEA violations against Rush (Count III), Retaliation pursuant to Title VI, Title VII, and the ADEA against Rush (Counts IV, V, and VII), Breach of Contract against Rush (Count VIII); Tortious Interference with Contract against Defendants Kremer, Narbone, and Wimberly (Count IX); and Tortious Interference with Prospective Economic Advantage against Kremer, Narbone, and Wimberly (Count X).

It is undisputed that Plaintiff never heard derogatory comments based on her race or national original during the time she was enrolled at Rush. (Dkt. 143 at ¶ 146.) In support of her case, Plaintiff filed several affidavits from other minority students in the CRNA program at Rush. However, as discussed in this Court's accompanying order, much of those affidavits contain inadmissible evidence that cannot be considered on summary judgment. Plaintiff has not submitted any evaluations of other similarly situated minority or over-40 SRNAs that would demonstrate a pattern of discriminatory negative evaluations at Rush, nor has she submitted any admissible evidence regarding more favorable treatment of white or young SRNAs at Rush.

The admissible portion of the affidavits that Plaintiff cites in her statement of additional facts is fairly limited. Hakeem Ellis, a black man from Ghana, was a 2014 graduate of the CRNA program at Rush. (Dkt. 151 at ¶ 20.) During his time at Rush, Defendant Kremer advised him that the CRNA program was "not for everyone," and Defendant Wimberly accused Mr. Ellis of lying and said he was "no good for anesthesia practice."[4] (Dkt. 151 at ¶ 21.) According to Ellis, he did not get good cases to work on early in the program, and once received a negative evaluation from CRNA Angela Keehn because he was wearing gloves so that he could be "ready to go in if something happened." (Dkt. 151 at ¶ 20.) After that experience, Mr. Ellis told Defendant Kremer that he "objected to working with CRNAs," and Mr. Ellis was no longer assigned to CRNAs for supervision after that meeting. (Dkt. 151 at ¶ 23.)

Ms. Ebele Okonkwor is a 2014 graduate of the CRNA program at Rush, and a black woman from Nigeria. (*Id*. at ¶ 25.) During her first period at Rush, she was not assigned to the operating room, and was assigned to the endoscopy suite or the surgicenter, and sometimes had no assignments at all. (*Id.* at ¶ 25.) On one occasion, Ms. Okonkwor asked Defendant Wimberly to confirm that a plus-sign was the direct chart designation for a carbon dioxide reading, and was screamed at by Defendant Wimberly, who told Ms. Okonkwor "[i]f you said that in another OR they would throw you out." (*Id.* at ¶ 26.)

Dr. Ben Gardner was an SRNA student from 2010-2012, and was over 40 years old during the relevant time period; he claims that he was told on multiple occasions that he was too old for the program. (*Id*. at ¶ 29.) In March 2012, Gardner confronted Defendant Kremer about

---

[4] Many of the citations in Plaintiff's Statement of Additional Facts contain incorrect references to affidavits. The Court has sought to use the substantive portions of Plaintiff's Statement of Additional Facts where they are supported by admissible evidence, even if the Plaintiff's citations to the record are incorrect. In other words, so long as the statement of fact is supported by the relevant affidavit with admissible evidence, the Court has not penalized the Plaintiff for incorrectly citing the affidavit in question.

unprofessional conduct he had witnessed from CRNAs at Rush and Defendant Narbone. (*Id.* at ¶ 31.) Gardner suggested that Rush would get sued if the aforementioned behavior continued and that it would behoove Rush to provide EEO training for SRNAs and CRNAs; Gardner states that Kremer admitted that Rush had a problem, but that he was uncertain what could be done to ameliorate the issue. (*Id.*)

Karen Kam is a 2014 graduate of the CRNA program at Rush, and is of Philippine national origin and Asian, like Plaintiff. (*Id.* at ¶ 32.) On May 16, 2013, Ms. Kam was assigned to Defendant Wimberly; Ms. Kam found Wimberly to be overbearing and abusive, and Defendant Wimberly issued a negative evaluation by Defendant Wimberly that Ms. Kam disputed. (*Id.* at ¶ 32.) Ms. Kam was also paired with Ms. Fisher on two occasions, which also resulted in negative evaluations which Ms. Kam disputed. (*Id.* at ¶ 33.)

Defendants filed the instant summary judgment motions on March 22, 2019. While reviewing the parties' summary judgment, the Court requested additional briefing on the admissibility of the affidavits that Plaintiff submitted. That briefing has been complete, and the motions for summary judgment are otherwise ripe for disposition.

## STANDARD OF REVIEW

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 (c). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette Indiana*, 359 F.3d 925, 928 (7th Cir. 2004). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *See Cellotex*

*Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L. Ed. 2d 265 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L. Ed. 2d 202 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Cellotex,* 477 U.S. at 322. "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. at 252.

## DISCUSSION

### A.    Employment Discrimination Claims (Counts I, II, III, VI)

Plaintiff brings employment discrimination claims based on Title VI, Title VII, and the ADEA.  Because these causes of action all share an analytical framework, the Court will consider them together.  *See, e.g., Sawyer v. Columbia College*, 864 F. Supp. 2d 709, 720 (N.D. Ill. 2012) (comparing Title VI and Title VII); *Perry v. Dept. of Humans Servs.*, 345 F. Supp. 3d 1019, 1026-27 (N.D. Ill. 2018) (analyzing ADEA and Title VII using the same framework).  Historically, courts have turned to the *McDonnell-Douglas* framework discussed later in this opinion.  However, the Seventh Circuit, while not eschewing the *McDonnell-Douglas* test, has noted that the legal standard for employment cases "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).[5]  Because the parties have spilled much ink on which standard should

---

[5] It is unclear how the Seventh Circuit's *Ortiz* decision affects Title VI, but other courts in this circuit appear to be treating Title VI claims under the framework articulated in *Ortiz*.  *See Martin v. Southern Illinois University School*

be used – even though, as noted above, *Ortiz* explicitly stated that it had no effect on the *McDonnell-Douglas* framework – and because Plaintiff's claims fail under either test, the Court will examine Plaintiff claims using both tests.

### 1. *McDonnell-Douglas* Framework

In order to establish a prima facie case for discrimination under a disparate treatment theory of liability, Plaintiff has the initial burden of establishing that: 1) she was a member of a protected class; 2) she performed reasonably on the job in accord with Rush's legitimate expectations; 3) she was subjected to an adverse employment action;[6] and 4) similarly situated employees outside of the protected class were treated more favorably by Rush. *David v. Bd. of Trustees of Community College Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017). After a plaintiff has demonstrated a *prima facie* case for race discrimination, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the challenged actions. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the employer does so, the burden shifts back to the plaintiff to present evidence that the proffered reason is "merely pretext for unlawful discrimination." *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004).

Here, Plaintiff has failed to create a genuine issue of material fact that would satisfy the second and fourth elements of the prima facie test. First, Plaintiff has not met her burden of creating a genuine issue of material fact that she performed reasonably on the job in accord with

---

*of Medicine*, 2017 WL 4780613, at *9 (C.D. Ill. Oct. 23, 2017). As such, the Court will treat Plaintiff's Title VI claims together with her Title VII and ADEA claims under both the *McDonnell-Douglas* and *Ortiz* analyses in this opinion.

[6] The parties have not argued which negative consequences constitute a legally cognizable adverse employment action. "While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action." *Dass v. Chicago Bd. of Ed.*, 675 F.3d 1060, 1069 (7th Cir. 2012) (quoting *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004)) (internal quotations omitted). Certainly, Plaintiff's failing grade and subsequent removal from the CRNA program would constitute an adverse employment action. However, the negative evaluations that Plaintiff received would not rise to the level of an adverse employment action. *See Krause v. City of La Crosse*, 246 F.3d 995, 1000 (7th Cir. 2001) (citing *Sweeney v. West*, 149 F.3d 550, 556 (7th Cir. 1998)) (noting that a written reprimand, without more, is not an adverse employment action). Therefore, for the purposes of this Court's analysis, only Plaintiff's failing grade is considered as an adverse employment action.

Rush's legitimate expectations. Plaintiff admits that the SRNA handbook said that multiple unsatisfactory ratings or repeated patient safety concerns may be grounds for failing the clinical residency course, and that Rush's policy was that a student who received more than three formative evaluations with unsatisfactory patient safety ratings may fail the clinical residency. (Dkt. 143 at ¶ 44.) Plaintiff admits that she received 26 evaluations with unsatisfactory ratings during her time in the CRNA program;[7] although Plaintiff contests the accuracy of many of these evaluation, there are still significantly more than three such evaluations that Plaintiff does not contest in her summary judgment filings, as discussed in the factual background section of this opinion. Standing alone, these undisputed negative evaluations conclusively show that Plaintiff was not meeting Rush's legitimate expectations for patient safety from SRNAs in their clinical residency program. The Court does not believe that Plaintiff has met her burden of showing that she meets the second element of the prima facie case requirement under *McDonnell-Douglas*.

Plaintiff has also failed to create a genuine issue of material fact demonstrating that similarly situated SRNAs outside of the relevant protected classes were treated more favorably than she was. In fact, there is almost no admissible evidence regarding the treatment of white or under-40 SRNAs in the CRNA program at Rush in the record to compare to Plaintiff's allegations.[8] Plaintiff did not provide the court with the discipline records of similarly situated SRNAs to compare whether such SRNAs were treated more or less harshly that Plaintiff. Plaintiff did not

---

[7] Plaintiff adds in her response to this undisputed fact that no other student accrued as many negative evaluations because SRNAs were "pressured out" of the CRNA program whereas Plaintiff was "determined to stick it out." (Dkt. 143 at ¶ 119.) This is irrelevant and has no bearing on whether Plaintiff was performing up to Rush's expectations. Just because other struggling students were quicker to realize that they were not meeting expectations than Plaintiff does not convert Plaintiff's longer period of substandard performance into adequate performance.

[8] Plaintiff provided several affidavits, but large swaths of those affidavits were stricken as containing accusations that were conclusory, hearsay, or lacking foundation to be admissible, and, therefore, could not be relied on to defeat Defendants' summary judgment motions. Those affidavits are discussed in a separate ruling issued simultaneously with this one.

cite any testimony demonstrating specific examples of white or under-40 SRNAs who were disciplined less harshly than Plaintiff or committed the mistakes discussed in Plaintiff's negative evaluations without any repercussions for non-protected SRNAs. Simply put, the Plaintiff has failed to provide the Court with any evidence that would allow the Court to meaningfully review how similarly situated SRNAs outside the protected class were treated. As such, she has failed to meet her burden to create a genuine issue of material fact on the fourth element.

Even if Plaintiff were able to make out a prima facie case, she has failed to show that the proffered reason for Plaintiff's failure was pretextual. Rush has articulated the obvious concern for patient safety as a reason for failing Plaintiff from the clinical residency course. Plaintiff has pointed to no evidence in the record that would tend to show that Rush's proffered reason for dismissing Plaintiff from the CRNA program – that Plaintiff had accrued too many unsatisfactory ratings in the area of patient safety – was pretextual. In fact, Plaintiff makes no argument regarding this issue anywhere in her brief in response. Therefore, Plaintiff's claim fails for this basis as well.

## 2. *Ortiz* Framework

The Court finds that Plaintiff's claims would also fail under the *Ortiz* analysis. As noted above, the legal standard articulated by the Seventh Circuit "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765.

Plaintiff's argument that she satisfies *Ortiz* essentially contains two elements, which combine to make out her claims: 1) the negative formative evaluations in Plaintiff's file were either misleading or fabricated; and 2) other minority students felt that they were treated to "arbitrary and capricious misconduct of which [Plaintiff] complains." (Dkt. 141 at 9-10.) Plaintiff contends

14

that this evidence would permit a reasonable factfinder to conclude that Plaintiff was subject to an adverse employment action because of her race, national origin, or age.

Regarding the second portion of the argument, Plaintiff has very little admissible evidence to show that other students in the protected class were discriminated against while in the CRNA program at Rush. The vast majority of the relevant testimony proffered by Plaintiff was stricken by this Court in the accompanying opinion, because it was conclusory, hearsay, not based on personal knowledge, or lacked foundation. The remainder does not much provide much probative evidence to support Plaintiff's claims. When the stricken material is removed from the affidavits, all that remains are a handful of stray examples of Defendant Wimberly or Ms. Eva Fisher being harsh with students and perhaps a bit unpredictable. There is no proof that these actions were motivated by racial animus towards any of those affiants or Plaintiff. There is no testimony from any of the witnesses personally observing preferential treatment of students outside the protected classes. There is no evidence that Defendant Wimberly was exclusively unkind to minority students, or that she made any comments demeaning minorities. The Court is left to guess whether Defendant Wimberly was also harsh to white American SRNAs. It is not enough that a supervisor be unpleasant or demeaning to a minority employee to make out a claim for discrimination; the Plaintiff must show that the supervisor was unpleasant or demeaning *because* the employee was a minority. There is no such evidence in the record. Moreover, many of the affiants are not part of the same protected class as Plaintiff, which necessarily limits the probative weight of their testimony; the only affiants who are in the same class as Plaintiff are Karen Kam (Asian, Filipina) and Ben Gardner (over-40). In short, Plaintiff has produced evidence that some minority students were unhappy with their treatment at Rush, but that is not sufficient, without more, to allow a reasonable factfinder to show that such treatment was *caused* by the witnesses' protected status.

Plaintiff's evidence regarding her own treatment at Rush suffers from the same deficiency. Plaintiff has disputed several of the evaluations used against her to justify her dismissal from the CRNA program, believing that her actions were medically justifiable or that the evaluations do not tell the whole story in many cases. However, what Plaintiff fails to provide is any evidence on which a reasonable factfinder could rely to conclude that these negative evaluations were not only misleading, but also written in a misleading fashion because of Plaintiff's protected status. Once again, there is no evidence of any animus by any of the evaluations' authors, or any evidence that students outside of the relevant protected classes were treated more favorably, had more accurate evaluations, or were not criticized for the same mistakes that Plaintiff was criticized for committing. Additionally, even if a factfinder did believe that Defendant Wimberly or Ms. Fisher wrote Plaintiff's negative evaluation because Plaintiff was an over-40 Asian Filipina woman, that would not explain away the approximately 20 additional negative evaluations that preceded Plaintiff's dismissal from the CRNA program. The best Plaintiff can point to is Narbone's comment that she was not the "youngest" in her class and Ben Gardner's affidavit. Gardner's affidavit identifies Angela Keehn and Renee Przygodzka as the CRNAs who told him he was "too old" for the CRNA program. Plaintiff does not dispute Ms. Przygodzka's negative review of her, so any ageism she showed towards Gardner is not relevant to Plaintiff's claim. (*See* Dkt. 143 at ¶ 89.) Keehn provided a negative review that Plaintiff "objected to Kremer" claiming it "had numerous false statements, but let it stand." (Dkt. 143 at ¶ 82.) Again, even if Plaintiff were to show that Keehn's negative evaluation were animated by ageism, that single evaluation and Narbone's stray comment would not be sufficient for a reasonable factfinder to find that Plaintiff's failure from the clinical residency was caused by her age in the face of so many additional negative evaluations whose authors' motives are not questioned by Plaintiff and for

whom there is no evidence of ageist animus in the record. Unless Plaintiff is claiming that every reviewer rated her performance as unsatisfactory because of her protected status,[9] the Court does not believe that a reasonable factfinder could find that Plaintiff received a failing grade in her clinical residency due to her race, age, or national origin.

## B.  Retaliation Claims (Counts IV, V, VII)

Because Plaintiff has failed to create a genuine issue of material fact that would allow a reasonable fact finder to conclude that her protected activity caused her to receive a failing grade in the clinical residency course, her retaliation claims also fail.[10]  In order to prevail on her retaliation claims, Plaintiff must prove that she: 1) engaged in an activity protected by the relevant statute, 2) suffered an adverse employment action; and 3) there is a causal link between the protected activity and the adverse action. *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018).[11]  In order to demonstrate a causal link, Plaintiff must show that Rush would not have failed her from her clinical residency but for her protected activity. *Greengrass v. International Monetary Sys., Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015).  There are many ways to prove a causal link – admission of discriminatory animus, suspicious timing, ambiguous statements of animus, evidence of pretext, or evidence that other employees were treated more favorably. *Id.*

In this case, Plaintiff has shown that she engaged in protected activity on two occasions; once at some point in 2013 when she mentioned discrimination to Kremer before her leave of

---

[9] Even if she were making that argument, it is not at all supported by the record.

[10] Retaliation claims under Title VI, Title VII and the ADEA are also treated under the same rubric. *Compare*, *Tanner v. Bd. of Trustees of University of Illinois*, 2018 WL 1161140, at *13 (C.D. Ill. Mar. 5, 2018)(Title VI retaliation elements), *with Lewis v. Wilkie*, 909 F.3d 866 (7th Cir. 2018) (Title VII retaliation elements); *see also*, *Spratt v. Bellwood Public Library*, 380 F. Supp. 3d 783, 787 (N.D. Ill. 2019) (ADEA retaliation elements).

[11] For many years, retaliation claims were analyzed under both direct and indirect evidence methods, but those distinctions were also done away with for retaliation claims by *Ortiz*. *See Lewis*, 909 F.3d at 866-67.  Even if this Court were to utilize the indirect method, Plaintiff's claims would fail because she has not created a genuine issue of material fact regarding her ability to perform to Rush's legitimate expectations or that similarly situated non-protected SRNAs were treated more favorably, as discussed above. *See id.* at 866.

absence, and then in April 2014 when she filed her formal complaint with Rush's internal Compliance Office. It is undisputed that Plaintiff suffered an adverse employment action in the form of her failure from the clinical residency course. The only disputed issue is whether Plaintiff's protected activity caused her failure; the Court does not believe that Plaintiff has created a genuine issue of material fact that it did.

Plaintiff has not come forth with any evidence that Rush or its employees admitted to discriminatory animus or made any ambiguous statements regarding animus. As discussed above, Plaintiff has failed to produce any evidence regarding pretext or more favorable treatment by non-protected SRNAs. As there was approximately one year between Plaintiff's 2013 complaints to Kremer regarding her perception that she was being discriminated against and her removal from the program, there is no suspicious timing for that protected activity. Regarding her formal EEO complaint with Rush's Compliance Department, the timing between that filing and her eventual dismissal from the program is close enough in time to be reasonably considered suspicious. However, suspicious timing, without more, is not sufficient to support a finding that protected activity caused an adverse employment action. *Mobley*, 531 F.3d 539, 549 (7th Cir. 2008) ("Evidence of temporal proximity, standing on its own, is insufficient to establish a causal connection for a claim of retaliation"). Plaintiff's brief does not illuminate the Court as to any other evidence that would allow a reasonable fact finder to conclude that Plaintiff's complaint with the Compliance Department caused her removal from the program. Her argument is limited to baseless speculation that "the evaluation has been corrupted by deceit, and CRNAs share and are influenced by the false opinions of other CRNAs," and portions of affidavits that contain nothing more than rank hearsay and were stricken in this Court's accompanying opinion. (*See* Dkt. 141 at

14.)  With nothing more than suspicious timing to back up the causation portion of her retaliation claims, Plaintiff's claims fail as a matter of law, and summary judgment is granted on these claims.

### C.       Breach of Contract (Count VIII)

The Court also grants Rush's motion for summary judgment on Plaintiff's breach of contract claim.  Under Illinois law, the elements of a breach of contract claim are: (1) the existence of a valid and enforceable contract, (2) substantial performance by the plaintiff, (3) a breach by the defendant, and (4) resultant damages.  *Royal Sleep Prods., Inc. v. Restonic Corp.*, 2010 WL 1172555, at *7 (N.D. Ill. Mar. 22, 2010) (citing *Reger Development, LLC v. National City Bank*, 592 F.3d 759, 764 (7th Cir. 2010)).  Students and universities may have a contractual relationship set forth in handbooks or catalogs.  *DiPerna v. Chicago School of Professional Psychology*, 893 F.3d 1001, 1006-1007 (7th Cir. 2018) (citing *Raethz v. Aurora Univ.*, 805 N.E.2d 696, 699 (Ill. App. 2004)).  However, courts are reluctant to interfere in private universities' regulation of student conduct, and "breach of contract claims brought by a student against a private college or university are subject to a distinct standard: 'a student may have a remedy for breach of contract when it is alleged that an adverse academic decision has been made concerning the student but *only* if that decision was made *arbitrarily, capriciously, or in bad faith*.'"  *Id.* at 1007 (quoting *Raethz*, 805 N.E.2d at 699) (emphasis in original).  This standard requires that the plaintiff demonstrate that the university's decision was "without any discernible rational basis," and was "such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment."  *Raethz*, 805 N.E.2d at 699.

The Plaintiff falls far short of meeting this standard.  The Court can find no evidence in the record that failing Plaintiff from her clinical residency course based on 26 negative formative

evaluations, including several that Plaintiff does not dispute at all, was arbitrary, capricious, or in bad faith. To the extent that Plaintiff is arguing that doing so in the face of Plaintiff's pending discrimination claims with Rush's Compliance Office meets the standard, the undisputed record shows that Rush investigated those claims, found that they were not substantiated, and that Plaintiff was allowed to appeal her no-pass grade through all of the internal mechanisms available to her under the student handbook. As such, a reasonable fact finder could not determine that Rush's decision was made without any discernible rational basis, and Plaintiff's breach of contract claim fails.

### D. Tortious Interference with Contract (Count IX)

Plaintiff's claim for Tortious Interference with Contract against Defendants Wimberly, Narbone, and Kremer ("the Individual Defendants") also fails. In order to state a claim for tortious interference with a contract, Plaintiff must allege: (1) the existence of a contract; (2) the Individual Defendants' awareness of the contract; (3) the intentional inducement of a contract breach; (4) an actual breach of the contract; and (5) damages. *Cody v. Harris*, 409 F.3d 853, 859 (7th Cir. 2005) (citing *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 676 (Ill. 1989)).

The fundamental problem for Plaintiff is that she has failed to respond in any meaningful way to the Individual Defendants' motion for summary judgment. Although she submitted a brief titled as a response to the Individual Defendants' motion, the body of the brief is simply a copy of Plaintiff's brief in opposition to Rush's motion on the claims brought against Rush. Plaintiff has made no attempt to correct this mistake, despite the Individual Defendants pointing it out in their reply brief. Even if she had, this claim would also fail because, as noted above, Plaintiff has failed to create a genuine issue of material fact regarding an actual breach of the relevant contract. Therefore, summary judgment is also granted on this claim.

**E.      Tortious Interference with Prospective Economic Advantage (Count X)**

The elements for a claim for tortious interference with a prospective economic advantage in Illinois are: (1) a reasonable expectancy of entering into a valid business relationship; (2) the defendant's knowledge of the expectancy; (3) an intentional and unjustified interference by the defendant that induced or cause a breach or termination of the expectancy; and (4) damage to the plaintiff resulting from the defendant's interference. *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 508 (7th Cir. 2007). "However, the tortious behavior must be directed toward a third party with whom the expected employment or business relationship was to occur." *Ricco v. Southwest Surgery Center, LLC*, 73 F. Supp. 3d 961, 973 (N.D. Ill. 2014). As such, a corporate entity cannot be held liable for interfering with its own business relationship with its own employees; this rule includes employees acting on behalf of an employer who are alleged to have interfered with a plaintiff's employment. *See Trujillo v. American Bar Assoc.*, 2015 WL 5139419, at *7 (N.D. Ill. Aug. 28. 2015) (citing *Vickers v. Abbott Labs.*, 719 N.E.2d 1101, 1116 (Ill. App. 1999)). That rule does not apply when the agent of the principal places his or her own interests ahead of the corporate entity's interests. *Ricco*, 73 F. Supp. 3d at 973 ("[a] corporate officer acting on behalf of a corporation can be held liable for interference with employment expectancy only where he places his own interests ahead of the corporation's interest").

In this case, the Individual Defendants are employees of Rush, and Plaintiff has alleged that she had an "enforceable expectation of continued coursework within and completion of the Rush CRNA program." (Dkt. 58 at ¶ 157.) Therefore, the Individual Defendants can only be held liable for interference with Plaintiff's prospective economic advantage with Rush to the extent they were putting their own interests ahead of Rush's.[12] Plaintiff has put forth no evidence and

---

[12] The Court also notes that Plaintiff has alleged she "could reasonably expect increased job opportunities and monetary compensation" if she had successfully completed the CRNA program. (Dkt. 58 at ¶ 157.) Plaintiff has not

mounted no argument that would allow a reasonable factfinder to conclude that any of the Individual Defendants were putting their own interests ahead of Rush's, or even what those interests might be. Therefore, Plaintiff's claims for tortious interference with a prospective economic advantage fails and summary judgment is granted on this claim in favor of the Individual Defendants.

## **CONCLUSION**

For the reasons discussed above, Defendants' Motions for Summary Judgment [Dkt. 126, 130] are granted, and judgment is entered in favor of the Defendants.


**ENTERED:**

Date: 8/21/2019

_____

U.S. Magistrate Judge, Susan E. Cox

---

provided any evidence regarding her reasonable expectation of entering into a business relationship with any third party, and put forth no arguments to support such a finding.